FRANK M. PITRE (SBN 100077)
fpitre@cpmlegal.com
NABILAH A. HOSSAIN (SBN 329689)
nhossain@cpmlegal.com
ANDREW F. KIRTLEY (SBN 328023)
akirtley@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax: (650) 697-0577

FRANCIS A. BOTTINI, JR. (SBN 175783)
fbottini@bottinilaw.com
NICHOLAUS H. WOLTERING (SBN 337193)
nwoltering@bottinilaw.com
**BOTTINI & BOTTINI, INC.**
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: (858) 914-2001
Fax: (858) 914-2002

DAVID S. CASEY, JR. (SBN 060768)
dcasey@cglaw.com
GAYLE M. BLATT (SBN 122048)
gmb@cglaw.com
JEREMY ROBINSON (SBN 188325)
jrobinson@cglaw.com
P. CAMILLE GUERRA (SBN 326546)
camille@cglaw.com
MICHAEL J. MORPHEW (SBN 304463)
mmorphew@cglaw.com
**CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

# NORTHEN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **In re Tesla Advanced Driver Assistance Systems Litigation**<br><br>This Case Relates To All Actions | Case No. 4:22-cv-05240-HSG<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................................ 1

II.    JURISDICTION AND VENUE ................................................................................. 7

III.   PARTIES ...................................................................................................................... 9

       A.    Plaintiffs ............................................................................................................ 9

       B.    Defendants ...................................................................................................... 11

IV.    AGENCY, JOINT VENTURE, AIDING AND ABETTING, AND CONSPIRACY ......... 12

V.     FACTUAL ALLEGATIONS ................................................................................... 12

       A.    The Technology of Autonomous Vehicles ..................................................... 12

       B.    Tesla's First-Generation "Autopilot" Technology ........................................ 17

       C.    Tesla's Release of "Enhanced Autopilot" and "Full-Self-Driving Capability" ............. 22

       D.    Year After Year, Tesla Fails to Deliver on Its Promise of a Fully Self-Driving Car,
             Instead Providing Experimental Software that Kills and Maims Drivers ...................... 24

       E.    Federal and State Authorities Launch Numerous Investigations and Actions
             Regarding Tesla's Autopilot and FSD Technology ........................................ 38

             1.    The NHTSA significantly expands its investigations into Autopilot and FSD ........ 38

             2.    The FTC says Tesla's Autopilot and FSD is "on its radar" ........................ 39

             3.    The California DMV charges Tesla with untrue and deceptive marketing
                   of its Autopilot and FSD technology .................................................. 39

             4.    The U.S. Department of Justice launches a criminal investigation ........................ 40

VI.    CLASS ACTION ALLEGATIONS ......................................................................... 40

VII.   TOLLING OF THE STATUTES OF LIMITATIONS ........................................ 44

VIII.  CLAIMS FOR RELIEF ............................................................................................ 44

       FIRST CLAIM FOR RELIEF ................................................................................ 44
       Violation of the Magnuson-Moss Warranty Act
       15 U.S.C. § 2301, *et seq.*

       SECOND CLAIM FOR RELIEF ............................................................................ 46
       Breach of Express Warranty
       Cal. Civ. Code §§ 1791.2(a), 1794

       THIRD CLAIM FOR RELIEF ................................................................................ 48
       Breach of Implied Warranties
       Cal. Civ. Code §§ 1791.1, 1792, 1794

FOURTH CLAIM FOR RELIEF ................................................................ 51
Violation of the California False Advertising Law
Cal. Bus. & Prof. Code § 17500, *et seq.*

FIFTH CLAIM FOR RELIEF ..................................................................... 52
Violation of the California Consumer Legal Remedies Act
Cal. Civ. Code § 1750, *et seq.*

SIXTH CLAIM FOR RELIEF ..................................................................... 54
Violation of the California Unfair Competition Law
Cal. Bus. & Prof. Code § 17200, *et seq.*

SEVENTH CLAIM FOR RELIEF ............................................................... 59
Fraud and Deceit

EIGHTH CLAIM FOR RELIEF .................................................................. 60
Negligent Misrepresentation

NINTH CLAIM FOR RELIEF ..................................................................... 61
Negligence

TENTH CLAIM FOR RELIEF .................................................................... 62
Unjust Enrichment

**IX.**     **PRAYER FOR RELIEF** ........................................................................ **62**

**X.**      **DEMAND FOR JURY TRIAL** ............................................................. **63**

1    Plaintiffs Thomas LoSavio, Brenda Broussard, Dominick Battiato, Christopher Mallow, and

2  Jazmin Imaguchi (collectively, "Plaintiffs"), on behalf of themselves and the plaintiff Class described

3  herein, bring this Consolidated Amended Complaint against Defendants Tesla, Inc., dba Tesla Motors,

4  Inc., Tesla Lease Trust, and Tesla Finance LLC (collectively, "Defendants" or "Tesla"), and allege as

5  follows:

6  **I.    INTRODUCTION**

7    1.    Plaintiffs bring this consumer class action lawsuit to hold Tesla and its representatives,

8  including CEO Elon Musk, accountable for years of making misleading and deceptive statements

9  regarding the company's advanced driver assistance systems ("ADAS") technology. For years, Tesla

10  has deceptively and misleadingly marketed its ADAS technology as autonomous driving technology

11  under various names, including "Autopilot," "Enhanced Autopilot," and "Full Self-Driving

12  Capability" ("FSD"), the latter two of which Tesla charges consumers thousands of additional dollars

13  to add to their new vehicle. Tesla has deceived and misled consumers regarding the current abilities of

14  its ADAS technology and by representing that it was perpetually on the cusp of perfecting that

15  technology and finally fulfilling its promise of producing a fully self-driving car. Although these

16  promises have proven false time and time again, Tesla and Musk have continued making them to

17  generate media attention, to deceive consumers into believing it has unrivaled cutting-edge

18  technology, and to establish itself as a leading player in the fast-growing electric vehicle market.

19    2.    Despite portraying itself as a leader in autonomous vehicle technology, Tesla's ADAS

20  features have been surpassed by numerous automaker competitors that have developed autonomous

21  driving technology far more advanced than Tesla's, and now available in some consumer markets. At

22  the same time, former Tesla employees and investigations have revealed damning information that

23  now makes clear that, contrary to Tesla's repeated promises that it would have a fully self-driving car

24  within months or a year, Tesla has never been remotely close to achieving that goal.

25    3.    For example, to accompany the 2016 launch of Tesla's "Enhanced Autopilot" and

26  "Full Self-Driving" versions of its ADAS technology, much of the Tesla Autopilot engineering team

27  dropped everything to produce a video that purports to show a Tesla car driving itself. The video

28  begins with the following message: "The person in the driver's seat is only there for legal reasons. He

1   is not driving anything. The car is driving itself." In reality, Tesla employees who made the video

2   would later reveal that the car in the video had significant assistance from commercial mapping

3   software not available to Tesla customers, and that the car still performed poorly and even ran into a

4   fence during filming. Despite this assistance, the car had to run the same route over and over again

5   before Tesla got acceptable video that appeared to show a car capable of driving itself. Even though

6   the video was debunked as deceptive and misleading years ago, Tesla continues to prominently

7   feature it on its website.





*Source: www.tesla.com/autopliot*

26      4.      Six years later in 2022, Tesla has yet to produce anything even remotely approaching a

27  fully self-driving car. Instead, Tesla pushes out "updates" to its experimental FSD Beta software to a

28  small minority of Tesla owners, who effectively act as untrained test engineers testing experimental

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

software on public roadways. Drivers have consistently found that Tesla's FSD Beta software has myriad problems, such as cars failing to make routine turns, running red lights, and steering directly into large objects and oncoming traffic.[1] There have also been numerous collisions involving Tesla's purportedly cutting-edge ADAS software, including Tesla vehicles plowing at high speeds into large stationary objects such as emergency vehicles and an overturned box truck. Dozens of people have suffered fatal and other serious injuries as a result of these ADAS-related collisions, triggering a host of investigations by state and federal regulators.



*Fatal 2018 crash involving Autopilot, in which Tesla's software suddenly steered the Tesla to the left, directly into a concrete barrier on a highway in Mountain View, California. Photograph by NTSB.*



*2018 crash in which Tesla's software crashed the vehicle into the back of a firetruck stopped at a red light in Utah. Photograph by South Jordan Police Department.*

---

[1] *See, e.g.*, The Dawn Project, "Unsafe at Any Speed," https://dawnproject.com/wp-content/uploads/2022/06/Tesla-ADAS-unsafe-at-any-speed-NA.mp4?_=1 (collecting video clips showing such problems).

1
2
3
4
5
6
7
8
9
10
11



*2020 crash involving Autopilot, in which the Tesla drove into an overturned box truck on a highway in Taiwan.[2]*

12   5. As information has trickled out of the secretive company via former employees and

13   investigations, it has become increasingly clear that Tesla knew for years its statements regarding its

14   ADAS technology were deceptive and misleading, but the company made them anyway. Tesla did so

15   to generate excitement about the company's vehicles and thereby improve its financial condition by,

16   among other things, attracting investment, increasing sales, avoiding bankruptcy, driving up Tesla's

17   stock price, and helping to establish Tesla as a dominant player in the electric vehicle market.

18   6. For example, in 2016, Musk tweeted a bold prediction—that a Tesla vehicle would

19   complete a fully self-driving trip *across the United States* by "next year." Later in 2016, Tesla

20   announced on its official blog that "All Tesla Cars Being Produced Now Have Full Self-Driving

21   Hardware." The blog post included the misleading October 2016 video of a Tesla car purportedly

22   driving itself without incident, and suggested that Tesla was on the cusp of bringing to market cars

23   that would be fully "self-driving" and have "full autonomy."[3] When Tesla and Musk made these

24   statements, they knew there was no reasonable chance of Tesla being able to meet these forecasts.

25

26   [2] *See* Brad Templeton, "Tesla In Taiwan Crashes Directly Into Overturned Truck, Ignores Pedestrian, With
Autopilot On," *Forbes* (June 2, 2020), *available at* https://www.forbes.com/sites/bradtempleton/2020/06/02
27   /tesla-in-taiwan-crashes-directly-into-overturned-truck-ignores-pedestrian-with-autopilot-on/ (includes
surveillance video showing the collision).
28   [3] *See* The Tesla Team, "All Tesla Cars Being Produced Now Have Full Self-Driving Hardware," https://
www.tesla.com/blog/all-tesla-cars-being-produced-now-have-full-selfdriving-hardware (Oct. 19, 2016).

1
2
3
4
5
6
7
8
9
10
11



*Musk making bold promises in 2016. Photograph by Justin Sullivan/Getty Images.*[4]

12    7.    From approximately 2017 to 2019, the page on Tesla's website explaining its "Full

13  Self-Driving Capability" technology similarly promised that consumers who purchased or leased cars

14  with the FSD version of its ADAS technology would receive cars capable of "full self-driving in

15  almost all circumstances," including being able to "conduct short and long distance trips with no

16  action required by the person in the driver's seat" and with a "probability of safety at least twice as

17  good as the average human driver." On the same webpage, Tesla went on to state:

18        **All you will need to do is get in and tell your car where to go.** If you
19        don't say anything, the car will look at your calendar and take you there
20        as the assumed destination or just home if nothing is on the calendar. **Your
         Tesla will figure out the optimal route, navigate urban streets (even
21        without lane markings), manage complex intersections with traffic
         lights, stop signs and roundabouts, and handle densely pack freeways
22        with cars moving at high speed.**

23    8.    Indeed, in every year since 2016, Tesla and Musk have repeatedly made deceptive and

24  misleading statements to consumers indicating that a fully self-driving, fully autonomous Tesla

25  vehicle was just around the corner, often expressly stating that would occur by the end of that

26
27
28

---

[4] *See* Maya Kosoff, "Elon Musk: Self-Driving Car Doubters Are Literally 'Killing People,'" *Vanity Fair* (Oct. 20, 2016), *available at* https://www.vanityfair.com/news/2016/10/elon-musk-self-driving-car-doubters-are-literally-killing-people.


LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**Plaintiffs' Consolidated Amended Complaint**
Case No. 4:22-cv-05240-HSG

5

calendar year or within the "next year."[5] For example, in May 2019, after years of failing to deliver on prior promises, Musk again promised consumers that a fully self-driving Tesla car would be available by the end of that year, tweeting that "everyone with Tesla Full Self-Driving will be able" to take a fully automated trip in their Tesla from Los Angeles to New York.[6] While tens of thousands of U.S. and California consumers have purchased or leased new Tesla vehicles with ADAS technology in 2019 and every year since, Tesla has yet to deliver on its repeated promises of a fully self-driving car at *any* distance—much less a fully automated three-thousand-mile journey across the country.

9.      The reality of Tesla's ADAS technology is far different from what Tesla and Musk have spent years telling consumers. Instead of providing its customers the "Full Self-Driving Capability" they paid for, Tesla uses them as untrained test engineers to test drive its experimental FSD Beta software on public roadways, which generates data that Tesla can use to improve its software. Along the way, scores of Tesla owners who believed Tesla's and Musk's deceptive and misleading statements about the capabilities of Tesla's ADAS technology have been killed and seriously injured when that technology failed, often in the face of routine roadway scenarios.

10.      Even Tesla itself has admitted that "Full Self-Driving" is an inaccurate name. In response to California regulators' concerns about Musk's public announcements in late 2020 indicating that a new FSD Beta update would make Tesla vehicles autonomous, Tesla attorneys sent private emails to those regulators (later disclosed in response to Public Records Act requests) walking those statements back and making clear they were false. Tesla attorneys told the regulators that Tesla vehicles equipped with so-called "Full Self-Driving Capability" were not fully self-driving at all, but still required the driver to steer, brake, and accelerate as needed. In the meantime, Tesla and Musk continued their deceptive marketing to consumers.

11.      Plaintiffs are California and Florida residents who purchased new Tesla vehicles in 2017, 2018, 2019, 2021, and 2022, and paid Tesla thousands of additional dollars above the vehicle base price for the Enhanced Autopilot or Full Self-Driving Capability versions of Tesla's ADAS

---

[5] *See, e.g.*, The Dawn Project, "Elon Musk's broken promises," https://dawnproject.com/wp-content/uploads /2022/06/The-Dawn-Project-Musk-promises-1min-NA.mp4?_=2 (collecting video clips of Musk making such promises from 2014 to 2021).
[6] Elon Musk, https://twitter.com/elonmusk/status/1126611407984779264 (May 9, 2019, 3:14 PM).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

technology. Tesla had represented its ADAS technology would make its vehicles fully self-driving in some situations and would soon make them fully self-driving in all situations. For four of the Plaintiffs, it is now years later, and Tesla has never provided them anything remotely approaching the fully self-driving car it promised.

12. Plaintiffs bring this class action lawsuit on behalf of themselves and fellow consumers who purchased or leased a new Tesla vehicle with Tesla's ADAS technology but never received the self-driving car that Tesla promised them. Plaintiffs bring claims against Tesla for violations of the federal Magnuson-Moss Warranty Act and California's False Advertising Law, Consumer Legal Remedies Act, and Unfair Competition Law, as well as common law claims for fraud and deceit, negligent misrepresentation, negligence, and unjust enrichment. Plaintiffs seek various relief on behalf of themselves and the proposed Class, including injunctive relief prohibiting Tesla from continuing its deceptive and misleading marketing of its ADAS technology, restitution of the money Plaintiffs and Class members paid for technology that Tesla promised but never delivered, and all available damages including punitive damages to punish Tesla for years of using deceptive and misleading marketing to eventually establish itself as a dominant player in the electric vehicle market.

## II.      JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), as Plaintiffs seek damages and other relief on a behalf of a class consisting of hundreds of thousands of individuals. This action meets CAFA's jurisdictional requirements because the sum or value of the relief sought exceeds $5,000,000 exclusive of interest and costs, and because at least one Class member is a citizen of a state different from Defendants under § 1332(d)(2)(A) and/or a citizen of a foreign state under § 1332(d)(2)(B). The Court also has federal question jurisdiction over Plaintiffs' Magnuson-Moss Warranty Act claim under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law claims under § 1367.

14. This Court has personal jurisdiction over Defendants because they have conducted and continue to conduct substantial business in California, and have sufficient minimum contacts with California in that (1) from the beginning of the Class Period (as defined herein) until December 2021, Defendant Tesla, Inc. was headquartered in Palo Alto, California, and thus designed, developed,

manufactured, tested, and marketed its vehicles and ADAS technology at issue in this action in California throughout that period; (2) throughout the Class Period, Tesla, Inc. tested and manufactured a substantial percentage of the Class Vehicles (as defined herein) at its factory in Fremont, California; (3) throughout the Class Period, Tesla, Inc. has been the direct or indirect owner and operator of dozens of retail Tesla stores in California (accounting for more than a quarter of Tesla stores nationwide) that market and sell or lease new Tesla vehicles, including a substantial percentage of Class Vehicles; (4) throughout the Class Period, California has been by far the largest U.S. market for sales and leases of new electric vehicles, including sales and leases of new Tesla vehicles and Class Vehicles; (5) throughout the Class Period, Defendants developed the marketing scheme at issue in this action in California and targeted California consumers with that marketing scheme, including deceptive and misleading statements about Tesla's vehicles and ADAS technology on Tesla's website and Musk's Twitter feed; (6) Tesla, Inc. is registered with the California Secretary of State to do business in the State of California, and is licensed by the California Department of Motor Vehicles as a vehicle dealer and a vehicle manufacturer; and (7) Defendants Tesla Finance LLC and Tesla Lease Trust have their principal places of business in California.



*Tesla's 5.3 million square foot factory in Fremont, California.*

15. Venue is proper in the United States District Court for the Northern District of California under 28 U.S.C. § 1391(b)(1) because Defendants are subject to the Court's personal jurisdiction with respect to this action and therefore reside in this District for purposes of venue, under § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District (including both Defendants' wrongful conduct and the resulting harm to Plaintiffs and Class members residing in this District), and under § 1391(b)(2) because a substantial part of the property that is the subject of this action is situated in this District.

### III.   PARTIES

#### A.   Plaintiffs

16. Plaintiff Thomas J. LoSavio is a resident of Hillsborough, California. In or about January 2017, LoSavio purchased a new 2017 Tesla Model S in the State of California from Defendant Tesla, Inc. He paid Tesla $8,000 above the vehicle's base price for the Full Self-Driving Capability ADAS package. LoSavio decided to purchase this vehicle and ADAS package after researching, reviewing, and relying on Tesla's online and other public statements, including those made by Musk, which were disseminated to LoSavio and other consumers throughout the State of California, the United States, and the world, and which represented that Tesla's ADAS technology made its vehicles capable of being fully self-driving at the time of LoSavio's purchase, or that it would do so within a reasonably short period thereafter.

17. Plaintiff Brenda T. Broussard is a resident of Los Angeles, California. In or about May 2022, Broussard purchased a new 2022 Tesla Model Y in the State of California from Defendant Tesla, Inc. She paid Tesla $12,000 above the vehicle's base price for the Full Self-Driving Capability ADAS package. Broussard decided to purchase this vehicle and ADAS package after researching, reviewing, and relying on Tesla's online and other public statements, including those made by Musk, which were disseminated to Broussard and other consumers throughout the State of California, the United States, and the world, and which represented that Tesla's ADAS technology made its vehicles capable of being fully self-driving at the time of Broussard's purchase, or that it would do so within a reasonably short period thereafter.

18.     Plaintiff Dominick Battiato is a resident of Valencia, California. In or about June 2021, Battiato purchased a new 2021 Tesla Model 3 Performance in the State of California. In or about March 2022, he purchased a new 2022 Tesla Model Y Performance, also in the State of California. Battiato made the decision to purchase these vehicles after researching, viewing, and relying on Tesla's online and other public statements, including those made by Musk, which were disseminated to consumers throughout the State of California, the United States, and the world, and which represented that Tesla's ADAS technology made its vehicles capable of being fully self-driving at the time of Battiato's purchases, or that it would do so within a reasonably short period thereafter.

19.     Plaintiff Christopher Mallow is a resident of Boca Raton, Florida. On or about November 4, 2019, Plaintiff purchased a new Tesla Model 3 Performance Edition from Tesla, Inc., at a Tesla location in Boca Raton, Florida. Mallow paid Tesla an additional $7,000 above the vehicle's base price for the Full Self-Driving Capability ADAS package, after researching, reviewing, and relying on Tesla's online and other public statements, including those made by Musk, which were disseminated to Mallow and other consumers throughout Florida, the United States, and the world, and which represented that Tesla's ADAS technology made its vehicles capable of being fully self-driving at the time of Mallow's purchase, or that it would do so within a reasonably short period thereafter.

20.     Plaintiff Jazmin Imaguchi is a resident of Tustin, California. In or about September 2018, Imaguchi purchased a new 2018 Tesla Model 3 in the State of California from Defendant Tesla, Inc., with the Enhanced Autopilot ADAS package. Imaguchi financed the purchase through Tesla. In or about late June 2020, she paid Tesla an additional $3,000 to upgrade her vehicle to the Full Self-Driving Capability ADAS package. Imaguchi decided to purchase this vehicle and the ADAS packages after researching, reviewing, and relying on Tesla's online and other public statements, including those made by Musk, which were disseminated to Imaguchi and other consumers throughout the State of California, the United States, and the world, and which represented that Tesla's ADAS technology made its vehicles capable of being fully self-driving at the time of Imaguchi's purchase, or that it would do so within a reasonably short period thereafter.

**B.     Defendants**

21.     Defendant Tesla, Inc., dba Tesla Motors, Inc., is a Delaware corporation that had its principal place of business in Palo Alto, California, from approximately 2003 until December 1, 2021, at which point it moved its principal place of business to Austin, Texas. Defendant designs, develops, manufactures, tests, markets, distributes, sells, and leases electric vehicles under the brand name "Tesla." Defendant also offers services related to those vehicles, including designing, developing, and periodically sending over-the-air updates for the ADAS software in Tesla vehicles.

22.     Tesla, Inc. has a vertically integrated business model. (a) Tesla designs, develops, manufacturers, and tests its electric vehicles and the ADAS software on those vehicles. This includes all versions of Tesla's ADAS technology (e.g., Autopilot, Enhanced Autopilot, FSD), which were and are designed, developed, manufactured, and tested by Tesla in the State of California at its Palo Alto offices, Fremont factory, and other California offices and facilities. On information and belief, all or a substantial majority of the Class Vehicles (as defined herein) were manufactured and tested in California. (b) Tesla markets its vehicles on its website, in marketing materials, in its brick-and-mortar galleries and showrooms, and through the tweets, media interviews, new conferences, earnings calls, conferences, forums, and other public events and statements by its representatives and agents, including Elon Musk, all of which are intended and designed to generate media coverage, and have been historically successful at doing so. (c) Tesla sells and leases its electric vehicles directly to consumers, including through its website and retail stores, which Tesla owns and operates.

23.     Defendant Tesla Lease Trust is a Delaware statutory trust, and its initial beneficiary is Tesla Finance LLC. Tesla Lease Trust is the title holder to the Tesla vehicles that are leased under a leasing program managed by Tesla Finance LLC. Tesla Lease Trust has its principal place of business in Palo Alto, California.

24.     Defendant Tesla Finance LLC is a wholly owned subsidiary of Tesla, Inc., and is the beneficial owner of the leasing assets held in Trust by Tesla Lease Trust and, as an agent of the Tesla Lease Trust, originates, services, administers, and collects leases for Tesla Lease Trust. Tesla Finance LLC is incorporated in Delaware and has its principal place of business in Palo Alto, California.

## IV.    AGENCY, JOINT VENTURE, AIDING AND ABETTING, AND CONSPIRACY

25.    On information and belief, Plaintiffs allege that at all relevant times herein, Defendants conspired with currently unidentified co-conspirators in carrying out the wrongful conduct alleged herein, and that all such unidentified co-conspirators were Defendants' agents, employees, and/or joint venturers, and were at all times acting within the course and scope of said agency, employment, and/or joint venture.

26.    Each Defendant and unidentified co-conspirators took actions that aided and abetted, encouraged, and rendered substantial assistance in accomplishing the wrongful conduct, wrongful goals, and other wrongdoing alleged herein. In taking these actions, each Defendant and unidentified co-conspirator acted with an awareness of his/her primary wrongdoing and realized his/her conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and other wrongdoing. In addition, each act and omission comprising the aforementioned wrongful conduct, wrongful goals, and other wrongdoing was made known to, and ratified by, each of the Defendants.

27.    Each Defendant and unidentified co-conspirator conspired with each other and with others to perpetrate the unlawful scheme on Plaintiffs and Class members, as alleged herein. In doing so, each Defendant and unidentified co-conspirator have committed acts and omissions, including but not limited to making materially false, misleading, and deceptive statements and omissions, while acting within the scope and in furtherance of the conspiracy alleged herein, and with full knowledge of the goals of that conspiracy.

28.    Plaintiffs reserve the right to amend this Complaint when they learn the identities of currently unidentified co-conspirators, and Plaintiffs intend to sue each Defendant and co-conspirator as participants, alter egos, agents, and conspirators with one another in the wrongful acts, omissions, plans, schemes, and transactions alleged herein.

## V.    FACTUAL ALLEGATIONS

### A.    The Technology of Autonomous Vehicles

29.    SAE International, formerly the Society of Automotive Engineers, is a U.S.-based professional association and standards development organization founded in the early 20th century. In 2014, SAE International took a leading role in the development of autonomous vehicle technology

1  standards by publishing the initial version of *SAE J3016 Recommended Practice: Taxonomy and*

2  *Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles*,

3  commonly referred to as the SAE Levels of Driving Automation ("SAE Levels"). Following this,

4  SAE International published revised versions of the SAE Levels in 2016, 2018, and 2021.[7]

5      30.    The SAE Levels provide a taxonomy of vehicle driving automation systems with

6  detailed definitions for six levels for driving automation, ranging from no driving automation (SAE

7  Level 0) to full driving automation (SAE Level 5). The SAE Levels can be summarized as follows:

8  **Level 0: No Driving Automation.** The human driver performs all driving tasks (steering,

9  acceleration, braking, etc.), although vehicles may have safety features like automatic emergency

10  braking and forward collision warning. **Level 1: Driver Assistance.** The vehicle has features that

11  provide a small degree of automation over the vehicle's acceleration, braking, or steering (e.g.,

12  adaptive cruise control, lane-keeping assistance). **Level 2: Partial Driving Automation.** The vehicle

13  can perform multiple driving tasks (e.g., acceleration, steering) but remains under the human driver's

14  constant supervision, responsibility, and control. **Level 3: Conditional Driving Automation.** The

15  vehicle can take full control of certain driving tasks such that the human driver need not remain

16  constantly alert but must be ready to intervene upon request from the vehicle. **Level 4: High Driving**

17  **Automation.** The vehicle can perform all driving tasks in specific locations or environments, but

18  human override is still an option. **Level 5: Full Driving Automation.** The vehicle can perform all

19  driving tasks under all conditions, with zero human attention or interaction required. The SAE Levels

20  are summarized in the following graphic from *The Wall Street Journal*.

21

22

23

24

25

26

27

28

---

[7] *See* SAE International, *Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles* (revised Apr. 30, 2021), https://www.sae.org/standards/content/j3016_202104.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP



31.     The SAE Levels are a widely accepted international standard and have been adopted by regulatory agencies such as the National Transportation Safety Board ("NTSB"), National Highway Traffic Safety Administration ("NHTSA"), and U.S. Department of Transportation.

32.     SAE International refers to SAE Level 1 and 2 technologies as systems or features that provide "driver support" (see below in blue), whereas it refers to SAE Level 3, 4, and 5 technologies as systems or features that provide "automated driving" (see below in green). When SAE International published the current version of the SAE Levels in 2021, it summarized the revised SAE Levels in the following graphic, which emphasizes that for SAE Level 2 driver-support features, "You <u>are</u> driving whenever these driver support features are engaged" and "You must constantly supervise these support features."[8]

---

[8] SAE International, "SAE Levels of Driving Automation Refined for Clarity and International Audience" (May 3, 2021), https://www.sae.org/blog/sae-j3016-update.

33.     In May 2022, the NHTSA published the following graphic summarizing the SAE

Levels, which drives home many of the same points as the 2021 SAE International graphic—i.e., that

at SAE Levels 0 to 2, the driver is fully responsible for the driving the car ("You drive, you monitor"),

whereas autonomous technology does not begin until SAE Level 3 ("System drives, you must be able

to take over upon request"), and fully self-driving technology does not occur until SAE Levels 4 and 5

("system drives, you ride").[9]

---

[9] NHTSA, "Levels of Automation" (May 2022), *available at* https://www.nhtsa.gov/sites/nhtsa.gov/files/2022-05/Level-of-Automation-052522-tag.pdf.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23



24    34.    While Tesla and Musk have routinely promised Tesla's SAE Level 2 ADAS

25 technology (including Autopilot and FSD) would rapidly advance to SAE Level 5 abilities within a

26 year or other short period of time, Tesla's technology has never advanced beyond SAE Level 2.

27    35.    While Tesla has spent year after year stuck at SAE Level 2, other vehicle

28 manufacturers have successfully designed and developed SAE Level 3 features, including Audi in

2017, Honda in 2021, and Mercedes-Benz in 2021. Honda and Mercedes-Benz both currently offer automobiles with Level 3 features for sale or lease to the public in their respective home markets of Japan and Europe. Meanwhile, Waymo has been operating limited SAE Level 4 taxi service on public roadways in some areas of Phoenix (since 2018) and San Francisco (since 2021), and Cruise has been operating a fully driverless robotaxi service in San Francisco (since 2022).

36.     Whereas Tesla's Level 2 technology relies heavily on cameras (with limited assistance from a single forward-facing radar unit), the successful design and development of safer and more advanced Level 3 and 4 systems to date has universally relied on a more robust and expensive combination of cameras, multiple radar units, and one or more lidar units. The general consensus among autonomous vehicle experts is that truly autonomous, self-driving cars cannot be achieved without some reliance on lidar technology, which Tesla has always refused to use because of considerations related to expense and aesthetics.

**B.     Tesla's First-Generation "Autopilot" Technology**

37.     In 2003, Tesla was founded by Martin Eberhard and Marc Tarpenning. The following year, PayPal co-founder Elon Musk made a substantial investment in Tesla and became chairman of the company's board. Tesla will later refer to Musk as a "co-founder" of the company.

38.     In 2008, Musk became Tesla's Chief Executive Officer ("CEO"), and Tesla released the Roadster, which was the first mainstream electric vehicle powered by lithium-ion batteries.

39.     In 2012, Tesla released its Model S sedan.

40.     In 2014, Tesla began equipping its Model S sedan with hardware that (although the necessary software was not yet active) was intended to allow vehicles to automate some steering, braking, and acceleration functions. Consistent with widely used industry terminology, Tesla originally called this feature "advanced driver assistance" before Tesla executives led by Musk decided to change the name to "Autopilot." Tesla engineers expressed concerns that the name was misleading and suggested less misleading options such as "Copilot," which Tesla rejected.[10]

---

[10] Cade Metz & Neal E. Boudette, "Inside Tesla as Elon Musk Pushed an Unflinching Vision for Self-Driving Cars," *The New York Times* (Dec. 6, 2021), *available at* https://www.nytimes.com/2021/12/06/technology/tesla-autopilot-elon-musk.html; Tesla, "Tesla Self-Driving Demonstration" (Nov. 18, 2016), https://www.tesla.com/videos/autopilot-self-driving-hardware-neighborhood-long.

41.     Tesla's "Autopilot" technology is based on two driver assistance technologies developed by other automakers in the 1990s. The first is adaptive cruise control ("ACC") technology, versions of which were debuted by Toyota and Mercedes-Benz in the 1990s. ACC uses radar to warn the driver if a vehicle ahead is slowing down and automatically brakes if the driver fails to take sufficient responsive action. Contemporary ACC technology also has the ability to follow a forward vehicle at a pre-selected time gap, up to a driver-selected speed. ACC is an SAE Level 1 feature.[11]

42.     The second driver-assistance technology on which Autopilot is based is lane keeping assistance ("LKA"). LKA evolved from lane departure warning ("LDW") technology, which was developed in the 1990s and first appeared on commercial vehicles in Europe in 2000. LDW warns the driver if the vehicle crosses a painted line on the roadway, whereas LKA controls steering inputs to keep a vehicle in its lane. LKA is an SAE Level 1 feature.

43.     On October 2, 2014, CNN Business published video of portions of an interview with Musk, in which Musk represented that "[a] Tesla car next year will probably be 90 percent capable of Autopilot. Like, so 90 percent of your miles can be on auto. For sure highway travel."[12]

44.     In October 2015, Tesla released its version 7.0 software, which enabled Autopilot on Model S vehicles. Robert Rose, the head of the Autopilot project, left Tesla shortly before the release. Evan Nakano, a Tesla Autopilot engineer who had worked on safety features, objected that Autopilot was not ready for release. When Tesla ignored his concerns, Nakano resigned in protest and wrote a resignation letter, circulated widely among Tesla employees, that called Autopilot's development based on "reckless decision making that has potentially put customer lives at risk."[13]

45.     By December 2015, Musk was publicly stating that Tesla vehicles would drive themselves within about two years. He told *Fortune* magazine, "I think we have all the pieces, and it's just about refining those pieces, putting them in place, and making sure they work across a huge

---

[11] *See* NHTSA, "Automated Vehicles for Safety: The Road to Full Automation," https://www.nhtsa.gov /technology-innovation/automated-vehicles-safety#the-topic-road-to-full-automation.

[12] CNN Business, https://twitter.com/CNNBusiness/status/517738916892270592 (Oct. 2, 2014, 11:12 AM).

[13] Ianthe Jeanne Dugan & Mike Spector, "Tesla's Push to Build a Self-Driving Car Sparked Dissent Among Its Engineers," *The Wall Street Journal* (Aug. 24, 2017), *available at* https://www.wsj.com/articles/teslas-push-to-build-a-self-driving-car-sparks-dissent-among-its-engineers-1503593742.

number of environments—and then we're done. It's a much easier problem than people think it is."[14]

46.    In January 2016, Musk announced on a conference call with reporters that Autopilot was "probably better" than a human driver. He stated that Tesla vehicles would be able to drive significantly better than humans within two to three years, and that within approximately two years drivers would be able to use Tesla's "Summon" feature, which allows drivers to remotely instruct their vehicle to drive to a specified location, to summon a vehicle from the other side of the country.[15]



47.    Ten days later, on January 20, 2016, 23-year-old Gao Yaning, who had a history of relying on Autopilot to drive, was killed in China on the way home from a family wedding when his Tesla Model S crashed at full speed on a highway into the back of a large street sweeper. The facts of the accident strongly indicate that Autopilot was engaged at the time of the crash.[16]

48.    In February 2016, Consumer Reports tested Tesla's new Summon feature, which Tesla claimed makes the car able to drive itself for short distances without anyone in the car, such as to enter or leave a parking space or garage. Although Consumer Reports had previously given Tesla vehicles rave reviews (scoring Tesla's Model S a 99 out of 100 and calling it "the best car we have ever tested" in 2013, and scoring a another version of the Model S even higher in 2015), this time Consumer Reports' testing revealed that the Summon feature failed to detect "several large objects that a homeowner might leave in a driveway or on the floor of a garage—such as a duffel bag and bicycle—and the car failed to stop before hitting them." Consumer Reports' testers also encountered

---

[14] Kristen Korosec, "Elon Musk Says Tesla Vehicles Will Drive Themselves in Two Years," *Fortune* (Dec. 21, 2015), *available at* https://fortune.com/2015/12/21/elon-musk-interview/.
[15] Elon Musk, https://twitter.com/elonmusk/status/686279251293777920 (Jan. 10, 2016, 12:11 PM).
[16] Neal Boudette, "Autopilot cited in Death of Chinese Tesla Driver," *The New York Times* (Sept. 14, 2016), *available at* https://www.nytimes.com/2016/09/15/business/fatal-tesla-crash-in-china-involved-autopilot-government-tv-says.html.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

1   other problems related to difficulties they had remotely stopping the car, which resulted in damage to

2   one of the car's wheels and raised significant safety concerns.[17]

3        49.    On May 7, 2016, Tesla driver Joshua Brown was killed in Florida when the Autopilot

4   on his Tesla Model S failed to recognize a tractor-trailer crossing in front his car, which resulted in

5   Brown's car striking and passing under the trailer at 74 mph.[18] The top third of Brown's car was

6   sheared off (pictured below). Brown was a Tesla enthusiast who had previously made videos of

7   himself using Autopilot, one of which was retweeted by Elon Musk just a few weeks earlier.[19] Tesla

8   later publicly stated that the Autopilot software on Brown's car failed to detect the white tractor-trailer

9   because it could not distinguish it from the bright sky. Several months later, in September 2016, Tesla

10  would announce it was confident it had fixed the issue in version 8 of its Autopilot software by

11  increasing the system's reliance on radar so that it "would see a large metal object across the road."[20]



*Joshua Brown's Tesla Model S following the fatal crash. Photograph by NTSB/Florida Highway Patrol.*

---

[17] Jake Fisher, "Tesla to Fix Self-Parking Feature After Consumer Reports Raises Safety Concern," *Consumer Reports* (Feb. 10, 2016), *available at* https://www.consumerreports.org/car-safety/tesla-fixes-self-parking-feature-after-consumer-reports-raises-safety-concern/.

[18] NTSB, Investigation No. HWY16FH018, Dkt. No. 2, "Crash Summary Report" (June 19, 2017), *available at* https://data.ntsb.gov/Docket/Document/docBLOB?ID=40453253&FileExtension=.PDF&FileName=Crash%20 Summary-Master.PDF.

[19] Rachel Abrams & Annalyn Kurtz, "Joshua Brown, Who Died in Self-Driving Accident, Tested Limits of His Tesla," *The New York Times* (July 1, 2016), *available at* https://www.nytimes.com/2016/07/02/business/joshua-brown-technology-enthusiast-tested-the-limits-of-his-tesla.html.

[20] Neal Boudette, "Elon Musk Says Pending Tesla Updates Could Have Prevented Fatal Crash," *The New York Times* (Sept. 11, 2016), *available at* https://www.nytimes.com/2016/09/12/business/elon-musk-says-pending-tesla-updates-could-have-prevented-fatal-crash.html.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

50.     Less than a month later, on June 2, 2016, Musk confidently announced that "autonomous driving" was "basically a solved problem," and that Tesla's Autopilot software was already safer than a human driver on highways. "I think we're basically less than two years away from complete autonomy—*complete*," Musk said.[21]

51.     On July 14, 2016, Consumer Reports took the unusual step of publicly calling on Tesla to take certain actions. It urged Tesla to "change the name of the Autopilot feature because it promotes a potentially dangerous assumption that the Model S is capable of driving on its own." Instead of using the "misleading" name Autopilot, Consumer Reports urged Tesla to "name automated features with descriptive, not exaggerated, titles."[22]

52.     On July 20, 2016, Tesla's official blog published a post by Musk, in which he misleadingly suggests that lack of regulatory approval was a major challenge Tesla was facing in bringing to market fully self-driving vehicles: "When true self-driving is approved by regulators, it will mean that you will be able to summon your Tesla from pretty much anywhere. Once it picks you up, you will be able to sleep, read or do anything else enroute to your destination. You will also be able to add your car to the Tesla shared fleet just by tapping a button on the Tesla phone app and have it generate income for you while you're at work or on vacation."[23]

53.     In August 2016, after a Tesla driver with Autopilot engaged crashed into a parked vehicle on a Beijing highway and later stated publicly that the Tesla had misrepresented Autopilot's capabilities and misled buyers, Tesla removed from its China website a term that translates as "self-driving" and replaced it with a term that translates as "self-assisted driving."[24] Tesla did not make any similar changes to its U.S. website.

54.     On or about October 16, 2016, German regulators sent Tesla a formal letter reading, "In order to prevent misunderstanding and incorrect customers' expectations, we demand that the

---

[21] Recode, "Elon Mush | Full Interview | Code Conference 2016," https://www.youtube.com/watch?v=wsixsRI-Sz4&t=4675s at 1:17:55–1:21:20 (June 2, 2016).
[22] Consumer Reports, "Consumer Reports Calls on Tesla to Disable and Update Auto Steering Function, Remove 'Autopilot' Name" (July 14, 2016), *available at* https://www.consumerreports.org/media-room/press-releases/2016/07/consumer-reports-calls-on-tesla-to-disable-and-update-auto-steering-function-remove-autopilot-name/.
[23] Elon Musk, "Master Plan, Part Deux," https://www.tesla.com/blog/master-plan-part-deux (July 20, 2016).
[24] Jake Spring & Alexandria Sage, "Tesla removes 'self-driving' from China website after Beijing crash," *Reuters* (Aug. 15, 2016), https://www.reuters.com/article/us-tesla-china-crash-idUSKCN10Q0L4.

1   misleading term Autopilot is no longer used in advertising the system." The German government also

2   reminded Tesla vehicle owners that Tesla's ADAS technology required, and could only be safely

3   operated with, constant driver attention and supervision.[25]

4         **C.**      **Tesla's Release of "Enhanced Autopilot" and "Full-Self-Driving Capability"**

5         55.      On October 19, 2016, Tesla released its Autopilot 2.0 software and announced that all

6   new Tesla cars would come with a new suite of hardware (called Autopilot Hardware 2.0) comprising

7   eight cameras, twelve ultrasonic sensors, and a forward-facing radar unit, which Tesla claimed would

8   allow the cars to soon become capable of SAE Level 5 autonomy.[26] To access the hardware, owners

9   would have to pay $5,000 for an "Enhanced Autopilot" feature and another $3,000 for the right to

10   activate Tesla's promised "Full Self-Driving Capability." The Enhanced Autopilot package provided

11   drivers most or all of the features in the FSD package, except for the right to unlimited access to

12   Tesla's soon-to-arrive full self-driving technology, and potential early access to FSD Beta updates

13   Tesla might release on its way perfecting that technology.

14         56.      As part of the announcement, Tesla published on its official blog a post titled "All

15   Tesla Cars Being Produced Now Have Full Self-Driving Hardware," stating "[w]e are excited to

16   announce that, as of today, all Tesla vehicles produced in our factory – including Model 3 – will have

17   the hardware needed for full self-driving capability at a safety level substantially greater than that of a

18   human driver." In the same post, Tesla stated that "[s]elf-driving vehicles will play a crucial role in

19   improving transportation safety and accelerating the world's transition to a sustainable future," and

20   that "[f]ull autonomy will enable a Tesla to be substantially safer than a human driver."[27]

21         57.      The blog post included a video made by Tesla's Autopilot team in the weeks before

22   the release, which purported to show a Tesla driving itself without any human intervention from the

23   person in the driver's seat, whose hands remain off the steering wheel throughout the video. The

24   video begins with a note saying, "The person in the driver's seat is only there for legal reasons. He is

---

25   [25] Reuters Staff, "Germany says Tesla should not use 'Autopilot' in advertising," *Reuters* (Oct 16, 2016),

26   *available at* https://www.reuters.com/article/idUSKBN12G0KS.
[26] *See* Alex Nishimoto, "All New Tesla Models Will Feature Level 5-Capable Autopilot Hardware," *Motor*

27   *Trend* (Oct. 20, 2016), *available at* https://www.motortrend.com/news/new-tesla-models-will-feature-level-5-
capable-autopilot-hardware/.

28   [27] The Tesla Team, "All Tesla Cars Being Produced Now Have Full Self-Driving Hardware," https://
www.tesla.com/blog/all-tesla-cars-being-produced-now-have-full-self-driving-hardware (Oct. 19, 2016).

not doing anything. The car is driving itself." However, multiple Tesla Autopilot employees who worked on the video would later report that the route taken by the car had been charted ahead of time by software that created a three-dimensional digital map of the route (a feature unavailable to Tesla owners), and that the video did not accurately show how the car operated during filming. For example, the car kept executing driving tasks poorly and engineers had to run the pre-programmed route over and over again to get video that would make it appear the car was capable of driving itself. At one point during filming, the car crashed into a fence while on Autopilot and had to be repaired.[28] None of these facts were referenced in the video or otherwise disclosed by Tesla. The deceptive and misleading video was later used to promote Autopilot's purported abilities, and indeed is still featured on the company's website despite having been debunked for years.[29]

58.     Also on October 19, 2016, the company held a conference call with reporters, during which Musk stated that all new Tesla cars would now include all the cameras, computing power, and other hardware necessary for "full self driving"—not a technical term but one that suggests truly autonomous operation. Musk further stated that Tesla would "be able to demonstrate a demonstration drive of our full autonomy all the way from LA to New York. So basically from home in LA to let's say dropping you off in Times Square, NY and then having the car parking itself by the end of next year without the need for a single touch."[30] Musk repeatedly represented that autonomous vehicles were safer than human-driven ones, and even warned journalists that they would be "killing people" if they wrote negative articles about self-driving technology that dissuaded people from using it.[31]

59.     According to reporting by multiple outlets, including *The Wall Street Journal* and *The New York Times*, Tesla's decision to promise the technology would be able to provide "Full Self-Driving" and Musk's statements at the news conference "took the Tesla engineering team by surprise, and some felt that Musk was promising something that was not possible." Sterling Anderson, who was the head of Tesla's Autopilot program at the time, "told Tesla's sales and marketing teams that

---

[28] *See* Metz & Boudette, *supra* note 10.
[29] *See id.*; Tesla, https://wwwa.tesla.com/autopilot; Tesla, "Tesla Self-Driving Demonstration," https://www.tesla.com/videos/autopilot-self-driving-hardware-neighborhood-long (Nov. 18, 2016).
[30] Xautoworld, "Transcript: Elon Musk's Autopilot 2.0 Conference Call," https://www.xautoworld.com/tesla/transcript-elon-musk-autopilot-2-conference-call/ (Oct. 19, 2016).
[31] Kosoff, *supra* note 4; Andrew Batiuk, "Tesla October 19th 2016 Autopilot 2.0 Conference Call With Visuals Added," https://www.youtube.com/watch?v=-vjGEEF_p5E (Oct. 20, 2016).

they should not refer to the company's technology as 'autonomous' or 'self-driving' because this would mislead the public."[32] In a meeting after the October announcement, someone asked Mr. Anderson how Tesla could defend branding the product "Full Self-Driving," to which he responded, "This was Elon's decision." Two months later, in December 2016, Mr. Anderson resigned.[33]

60.     On October 20, 2016, the day after the release of Enhanced Autopilot and FSD, Musk tweeted that Tesla's "Summon" feature was capable of autonomously driving itself to pick up its owner "even if you are on the other side of the country."[34]



### D.     Year After Year, Tesla Fails to Deliver on Its Promise of a Fully Self-Driving Car, Instead Providing Experimental Software that Kills and Maims Drivers

61.     In March 2018, Apple engineer Walter Huang was killed when the Autopilot on his Tesla Model X became confused at a fork in the highway and caused the car to veer sharply to the left and crash into a concrete barrier in Mountain View, California (pictured below).



---

[32] Metz & Boudette, *supra* note 10.
[33] Dugan & Spector, *supra* note 13.
[34] Elon Musk, https://twitter.com/elonmusk/status/789022017311735808 (Oct. 20, 2016, 1:34 AM).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

62.     In the aftermath of that fatal crash, Tesla publicly released crash data and sought to blame Huang for the accident, including that Huang's hands were not detected on the steering wheel during the six seconds before the collision. This release of information violated Tesla's agreement with NTSB not to comment on crashes during the course of an investigation, and caused NTSB to remove Tesla as a party to its investigation.

63.     In April 2018, in the wake of the Huang crash, Musk appeared on the national morning news show *CBS This Morning* to discuss Autopilot with co-host Gayle King and take her on a ride in a Tesla vehicle to demonstrate how it worked. During the demonstration, Musk was driving and King was in the passenger seat. Musk repeatedly took his hands off the steering wheel and kept his hands off the wheel while the car was moving with Tesla's ADAS technology engaged, reinforcing the notion that a Tesla vehicle is fully capable of driving itself.[35]

64.     Later than month, a Tesla vehicle with Autopilot engaged struck and killed a pedestrian in Japan.

65.     In September 2018, Musk sent a series of tweets regarding Tesla's stock price and his purported plans to take the company private that the Securities and Exchange Commission ("SEC") labeled "misleading." The SEC filed a lawsuit against Tesla and Musk, who settled two days later. Under the settlement, Tesla and Musk agreed to pay $40 million in penalties, Tesla agreed to oversee Musk's communications, and Musk was forced to step down as Tesla's chairman (though he would remain as CEO). Musk would later send at least two tweets that violated the terms of the settlement.

66.     In December 2018, Musk appeared on the CBS show *60 Minutes* in a segment with co-host Leslie Stahl. As part of the segment, Musk took Stahl on a ride in a Tesla vehicle to demonstrate the Tesla's ADAS technology, with Musk driving and Stahl in the passenger seat. Just as he had earlier in the year on *CBS This Morning*, Musk repeatedly took his hands off the steering wheel and kept them off the wheel while the car was moving with Tesla's ADAS technology engaged, reinforcing the notion that a Tesla vehicle is fully capable of driving itself.[36]

---

[35] Gayle King, "Elon Musk says Tesla's autopilot system will 'never be perfect,'" *CBS This Morning* (Apr. 13, 2018), https://www.youtube.com/watch?v=AO33rOofFpg.
[36] Leslie Stahl, "Tesla CEO Elon Musk: The 60 Minutes Interview," *60 Minutes* (Dec. 9, 2018), https://www.cbsnews.com/news/tesla-ceo-elon-musk-the-2018-60-minutes-interview/; *see also* Jack Stewart, "Even

67.     In March 2019, Jeremy Banner was killed when his 2018 Tesla Model 3 with Autopilot engaged drove under a tractor-trailer in Florida. The Banner accident were eerily similar to the 2016 accident that killed Joshua Brown when his car drove under a tractor-trailer, and that led Tesla to announce in September 2016 that the company was confident it had fixed the issue by increasing its ADAS software's reliance on radar. The Banner accident indicated that Tesla had not fixed this significant flaw in its ADAS technology in September 2016, and still had not done so two-and-a-half years later.

68.     In April 2019, at an event in Palo Alto, California, that Tesla dubbed "Autonomy Day," Musk took to the stage and announced that Tesla vehicles would be capable of full self-driving and autonomously navigating dense urban areas like San Francisco and New York by the end of 2019, and that in two years the company would be making cars without steering wheels or pedals.[37] Musk also stated, "If you fast forward a year, maybe a year and three months, but next year for sure, we will have over a million robo-taxis on the road," and "I feel very confident predicting autonomous robo-taxis for Tesla next year. … I'm confident we'll have at least regulatory approval somewhere, literally next year." Musk stated the robo-taxis would be a way for Tesla owners to make money when they aren't using their vehicles, with Tesla taking 25 or 30 percent of the revenue and allowing the company to compete with popular ride-hailing services like Uber and Lyft.[38] A few months later, Musk doubled-down on the robo-taxi prediction, tweeting that Tesla would "have a million robotaxis by end of 2020."[39] Tesla has never developed a robo-taxi and is nowhere near doing so.

69.     In May 2019, Tesla released an update to its ADAS "Navigate" feature, which is designed to automate some lane-change functions. When Consumer Reports tested the feature, it

---

Elon Musk Abuses Tesla's Autopilot," *Wired* (Dec. 10, 2018), *available at* https://www.wired.com/story/elon-musk-tesla-autopilot-60-minutes-interview/.

[37] R. Baldwin, "Tesla promises 'one million robo-taxis' in 2020," https://www.engadget.com/2019-04-22-tesla-elon-musk-self-driving-robo-taxi.html (Apr. 22, 2019).

[38] Tech Insider, "Watch Elon Musk Unveil Plans For A Tesla Ride-Hailing App," https://www.youtube.com/watch?v=YiWbdZ8ItRs (Apr. 22, 2019); Matt McFarland, "Elon Musk says Tesla will have robo-taxis operating next year," *CNN Business*, https://www.cnn.com/2019/04/22/tech/tesla-robotaxis (Apr. 22, 2019).

[39] Elon Musk, https://twitter.com/elonmusk/status/1148070210412265473 (July 7, 2019, 8:24 PM).

1  found that it cut off other cars without leaving enough space, failed to pass in the correct lane, and

2  sometimes struggled to merge into traffic.[40]

3       70.     In October 2019, Consumer Reports tested Tesla's "Smart Summon" feature, which

4  Tesla claimed would allow owners to use a smartphone app to "summon" their Tesla vehicle to drive

5  itself across a parking lot without any occupants inside the vehicle. Consumer Reports' testing

6  revealed that the feature had difficulty negotiating a parking lot, with the summoned car crossing lane

7  lines and wandering erratically "like a drunken or distracted driver."[41] This was nearly four years after

8  Musk's January 2016 tweet that Tesla was two years away from its customers being able to use

9  Summon to have their car come to them even if it was thousands of miles away.[42]

10       71.     In December 2019, Jenna Monet was killed when the Model 3 she was in crashed into

11  the back of a parked fire truck in Indiana while Autopilot was engaged.

12       72.     In February 2020, the NTSB called on NHTSA to set stricter standards on Autopilot,

13  citing the high number of Autopilot-related collisions and deaths.

14       73.     In August 2020, a couple was killed in Saratoga, California, after their Tesla veered off

15  a highway while Autopilot was active.

16       74.     In September 2020, Consumer Reports published the first in a series of evaluations of

17  Tesla's "Full Self-Driving Capability" technology, finding that the technology caused vehicles to

18  engage in unusual and unsafe behavior, such as stopping at green lights, driving through stop signs,

19  slamming on the brakes for yield signs when the merge was clear, and stopping at every exit while

20  going around a traffic circle.[43]

21

22

23  [40] *See* Keith Barry, "Tesla's Updated Navigate on Autopilot Requires Significant Driver Intervention,"
   *Consumer Reports* (May 22, 2019), *available at* https://www.consumerreports.org/autonomous-driving/tesla-

24  navigate-on-autopilot-automatic-lane-change-requires-significant-driver-intervention/.
   [41] Jeff Plungis, "Tesla's Smart Summon Performance Doesn't Match Marketing Hype," *Consumer Reports*

25  (Oct. 8, 2019), *available at* https://www.consumerreports.org/automotive-technology/teslas-smart-summon-
   performance-doesnt-match-marketing-hype/.

26  [42] Musk, *supra* notes 15, 34.
   [43] *See* Mike Monticello & Keith Barry, "Tesla's 'Full Self-Driving Capability' Falls Short of Its Name: The

27  pricey option doesn't make the car self-driving, and now Tesla's promises are under scrutiny by state regulators
   in California," *Consumer Reports* (Sept. 4, 2020) (last updated May 19, 2021), *available at* https://

28  www.consumerreports.org/autonomous-driving/tesla-full-self-driving-capability-review-falls-short-of-its-name-
   a1224795690/.

75.     In October 2020, Tesla increased the price of an FSD package from $8,000 to $10,000, and informed some owners who had previously purchased an FSD package that their vehicles would require a $1,000 hardware upgrade to be compatible with Tesla's FSD technology going forward.

76.     On November 20, 2020, Tesla attorneys sent the California Department of Motor Vehicles ("DMV") a letter (later released via Public Records Act request) in response to the DMV's questions about the FSD "City Streets" feature that was about to be released to some Tesla owners in a software update. Tesla's legal counsel wrote, "For context, as we've previously discussed, City Streets continues to firmly root the vehicle in SAE Level 2 capability." The letter goes on to explain in detail FSD's limitations and to admit that the system is nowhere near being fully autonomous or fully self-driving:

> City Streets' capabilities with respect to the object and event detection and response (OEDR) sub-task are limited, as there are circumstances and events to which the system is not capable of recognizing or responding. These include static objects and road debris, emergency vehicles, construction zones, large uncontrolled intersections with multiple incoming ways, occlusions, adverse weather, complicated or adversarial vehicles in the driving path, unmapped roads. As a result, the driver maintains responsibility for this part of the dynamic driving task (DDT). In addition, the driver must supervise the system, monitoring both the driving environment and the functioning of City Streets, and he is responsible for responding to inappropriate actions taken by the system. The feature is not designed such that a driver can rely on an alert to draw his attention to a situation requiring response. There are scenarios or situations where an intervention from the driver is required but the system will not alert the driver. In the case of City Streets (and all other existing FSD features), because the vehicle is not capable of performing the entire DDT, a human driver must participate ….[44]

77.     On December 14, 2020, in another letter to the California DMV (released via Public Records Act request), Tesla's legal counsel reiterated that any final release of the FSD City Streets feature to the Tesla customer fleet "will continue to be an SAE Level 2, advanced driver-assistance feature" that, like all other FSD features, "do[es] not make the vehicle autonomous" and is "intended for use only with a fully attentive drier who has his or her hands on the wheel and is prepared to take

---

[44] Letter from Eric Williams (Tesla) to Miguel Acosta (DMV) Re: City Streets – Pilot Release at 1 (Nov. 20, 2020), *available at* https://www.plainsite.org/documents/242a2g/california-dmv-tesla-robotaxi-ADAS-emails/.

over at any moment." Tesla's counsel continued, "Please note that Tesla's development of true autonomous features (SAE Levels 3+) … will not be released to the general public until we have fully validated them and received any required regulatory permits or approvals."[45]

78.     On December 28, 2020, in another letter to the California DMV (released via Public Records Act request), Tesla's legal counsel again reiterated the SAE Level 2 nature and limitations of Tesla's FSD technology:

> Full Self-Driving (FSD) Capability is an additional optional suite of features that builds from Autopilot and is also representative of SAE L2. Features that comprise FSD Capability are Navigate on Autopilot, Auto Lane Change, Autopark, Summon, Smart Summon, Traffic and Stop Sign Control, and, upcoming, Autosteer on City Streets (City Streets). While we designed these features to become more capable over time through over-the-air software updates, currently neither Autopilot nor FSD Capability is an autonomous system, and currently no comprising feature, whether singularly or collectively, is autonomous or makes our vehicles autonomous. This includes the limited pilot release of City Streets.[46]

79.     During the same month that Tesla's legal team was assuring California regulators that the most advanced version of its ADAS technology was still at SAE Level 2 and suggesting it was likely to remain at Level 2 for the foreseeable future, Elon Musk gave an interview to Business Insider in which he promised that Tesla would achieve Level 5 before the end of the following year, stating "I'm extremely confident that Tesla will have level five next year, extremely confident, 100%."[47]

80.     In January 2021, Tesla reported $721 million in profit in 2020, its first profitable year. This was a dramatic turnaround in the company's financial condition from prior recent years. As

---

[45] Letter from Eric Williams (Tesla) to Miguel Acosta (DMV) Re: City Streets – Pilot Release at 2-3 (Dec. 14, 2020), *available at* https://www.plainsite.org/documents/242a2g/california-dmv-tesla-robotaxi-ADAS-emails/.

[46] Letter from Eric Williams (Tesla) to Miguel Acosta (DMV) Re: Autonomous Mode Disengagements for Reporting Year 2020 at 1-2 (Dec. 14, 2020), *available at* https://www.plainsite.org/documents/242a2g /california-dmv-tesla-robotaxi-ADAS-emails/; *see also* David Silver, "Tesla Emails To The California DMV Emphasize Continued Reliance On Maps," *Forbes* (Mar. 9, 2021), *available at* https://www.forbes.com/sites /davidsilver/2021/03/09/tesla-emails-to-the-california-dmv-emphasize-continued-reliance-on-maps/?sh =2c0884c957e6.

[47] Mathias Döpfner, "Elon Musk reveals Tesla's plan to be at the forefront of a self-driving-car revolution," *Business Insider*, https://www.businessinsider.com/elon-musk-interview-axel-springer-tesla-accelerate-advent-of-sustainable-energy (Dec. 5, 2020).

1    recently as 2018, Tesla had been burning through cash, was in danger of running out of money, and at

2    one point was approximately only one month away from having to declare bankruptcy.[48]

3        81.    In a January 2021 earnings call, Musk stated that the company had made "massive

4    progress on Full Self-Driving," and that it "will become obvious later this year" that "Tesla Autopilot

5    is capable of full self-driving." Musk also stated, "I'm highly confident the car will drive itself for the

6    reliability in excess of a human this year. This is a very big deal." When a financial analyst asked

7    Musk why he was confident Tesla would achieve SAE Level 5 autonomy in 2021, Musk responded,

8    "I'm confident based on my understanding of the technical roadmap and the progress that we're

9    making between each beta iteration."[49]

10       82.    Six weeks later on a March 9, 2021 phone call with California DMV regulators,

11   Tesla's director of Autopilot software, CJ Moore, contradicted Musk. According to an internal DMV

12   memo memorializing the call (released via Public Records Act request), "DMV asked CJ to address,

13   from an engineering perspective, Elon's messaging about L5 [Level 5] capability by the end of the

14   year. Elon's tweet does not match engineering reality per CJ." (It appears that the DMV tried but

15   failed to redact that last sentence.) In response to a question from DMV regulators about "how Tesla

16   evaluates the potential advancement of levels of autonomy," Tesla representatives "indicated they are

17   still firmly in L2 [Level 2]." Tesla further told DMV that "[t]he ratio of driver interaction would need

18   to be in the magnitude of 1 or 2 million miles per driver interaction to move into higher levels of

19   automation [i.e., Level 3 and higher]."[50] In other words, drivers would need to intervene only once

20   per 1 to 2 million miles before Tesla would proceed to Level 3 software. Tesla's ADAS software,

21   which routinely makes mistakes, is not even remotely close to this level of reliability.

22       83.    Following up on the March 9, 2021 phone call, the California DMV wrote to Tesla:

23   "Notwithstanding other public messaging from Tesla about developing vehicles capable of full

24

---

25   [48] See Chris Isidore, "Tesla just proved all its haters wrong. Here's how," CNN Business, https://www.cnn.com
     /2020/01/31/investing/tesla-cash-crunch/index.html (Jan. 31, 2020); Chris Isidore, "Elon Musk: Tesla was

26   month away from bankruptcy," CNN Business, https://www.cnn.com/2020/11/04/tech/elon-musk-tesla-once-
     got-near-bankruptcy/index.html (Nov. 4, 2020).

27   [49] Tesla (TSLA) Q4 2020 Earnings Call Transcript (Jan. 27, 2021), available at https://www.fool.com/earnings
     /call-transcripts/2021/01/27/tesla-tsla-q4-2020-earnings-call-transcript/.

28   [50] Memorandum to File by Miguel Acosta (DMV) Re: Tesla AP City Streets Update (Mar. 9, 2021), available
     at https://www.plainsite.org/documents/28jcs0/california-dmv-tesla-robotaxi-ADAS-notes/.

1   driving automation, Tesla reiterated that the City Streets feature is currently a Society of Automotive

2   Engineers (SAE) level two (2) Advanced Driver-Assistance feature and that Tesla will continue to

3   monitor how participants interact with the feature and make improvements. As mentioned in your

4   [prior] correspondence and per California regulations, should Tesla develop technology features

5   characterized as SAE level 3 or higher, Tesla will seek the appropriate regulatory permitting from the

6   DMV before autonomous vehicles are operated on public roads."[51]

7        84.     In May 2021, Tesla began building new Tesla vehicles bound for the North America

8   market without radar, as part of the company's move toward achieving a fully self-driving car using

9   only cameras (and neural network machine learning). No longer including radar in new Tesla vehicles

10  has reduced Tesla's manufacturing costs, but it is contrary to the industry-standard view that a

11  combination of sensors—i.e., at minimum, cameras, radar, and lidar—is necessary to achieve

12  technology capable of SAE Level 3, 4, or 5 functionality. Tesla's decision to change the hardware

13  mix by excluding radar and relying heavily or solely on cameras also means that Tesla's ADAS

14  technology cannot now and likely will never be able to function safely in weather conditions with

15  reduced visibility, such as heavy rain and fog.[52]

16       85.     Also in May 2021, under pressure from the Transportation Committee of the

17  California Senate, the California Department of Motor Vehicles launched an investigation into

18  whether Tesla is deceptively marketing its ADAS technology as making its cars capable of

19  autonomous driving.[53]

20       86.     In June 2021, in what was widely seen as a response to motor vehicle collisions

21  involving Tesla's ADAS technology, NHTSA issued an unprecedented order requiring automobile

22

23

24  [51] Letter from Miguel Acosta (DMV) to Eric Williams (Tesla) (Apr. 21, 2021), *available at* https://
    www.plainsite.org/documents/28jcs0/california-dmv-tesla-robotaxi-ADAS-notes/.

25  [52] *See* Kirsten Korosec, "Tesla is no longer using radar sensors in Model 3 and Model Y vehicles built in North
    America," *TechCrunch* (Mar. 25, 2021), https://techcrunch.com/2021/05/25/tesla-is-no-longer-using-radar-

26  sensors-in-model-3-and-model-y-vehicles-built-in-north-america/; Hyunjoo Jin, "Explainer: Tesla drops radar;
    is Autopilot system safe?," *Reuters* (June 2, 2021), https://www.reuters.com/business/autos-transportation

27  /tesla-drops-radar-is-autopilot-system-safe-2021-06-02/.

28  [53] *See* Russ Mitchell, "DMV probing whether Tesla violates state regulations with self-driving claims," *Los
    Angeles Times* (May 17, 2021), *available at* https://www.latimes.com/business/story/2021-05-17/dmv-tesla-
    california-ADAS-autopilot-safety.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

1   manufacturers to report any crash involving an injury, fatality, or property damage that happens while
2   or immediately after a vehicle is automating some driving tasks.

3        87.    In early July 2021, Tesla released the FSD Beta 9 version of its FSD software to
4   certain Tesla vehicle owners. Following the release, Tesla owners took videos of the software in
5   action that show vehicles missing turns, scraping against bushes, and veering toward parked cars.

6        88.    On July 26, 2021, on a quarterly earnings call, Musk told investors and reporters that
7   he was confident FSD-equipped Tesla vehicles would soon "be able to drive themselves with the
8   safety levels substantially greater than that of the average person."

9        89.    On August 13, 2021, NHTSA's Office of Defects Investigation opened a "Preliminary
10   Evaluation" investigation to assess the performance of Tesla's Autopilot system, which was prompted
11   by at least 11 incidents in which Tesla vehicles using Autopilot crashed into parked emergency
12   vehicles that had their lights on and flashing, killing one person and injuring 17.[54] The investigation
13   was reported to be "the broadest look yet at Autopilot and at potential flaws that could make it and the
14   Teslas that operate on it dangerous."[55] As alleged below, NHTSA significantly expanded this
15   investigation in June 2022.

16        90.    Later in August 2021, two U.S. Senators called for the Federal Trade Commission to
17   investigate what they referred to as Tesla's potentially deceptive marketing practices surrounding its
18   FSD technology, including Tesla's use of the phrase "full self-driving" to describe and market a set of
19   features that does not make the vehicle fully self-driving.

20        91.    On August 31, 2021, NHTSA ordered Tesla to produce documents and information
21   regarding the design of its FSD technology, crashes involving that technology, and marketing
22   materials that make representations about that technology. On the date that was the deadline for
23   compliance, Tesla submitted only a partial response to NHTSA, claiming that the documents and
24   information it had requested was confidential business information.

---

[54] NHTSA, Investigation PE 21-020, ODI Resume (Aug. 13, 2021), *available at* https://static.nhtsa.gov/odi/inv/2021/INOA-PE21020-1893.PDF.
[55] Neal Boudette & Niraj Chokshi, "U.S. Will Investigate Tesla's Autopilot System Over Crashes With Emergency Vehicles," *The New York Times* (Aug. 16, 2021), *available at* https://www.nytimes.com/2021/08/16/business/tesla-autopilot-nhtsa.html.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

92.     In September 2021, Tesla announced it was aiming for a wider release of FSD Beta by the end of that month. In response, NTSB Chair Jennifer Homendy made public comments stating that Tesla should address "basic safety issues" before expanding the availability of FSD. Regarding Tesla's of the term "full self-driving," Homendy called it "misleading and irresponsible," and further stated that Tesla "has clearly misled numerous people to misuse and abuse the technology."

93.     On October 12, 2021, NHTSA asked Tesla about its practice of asking FSD Beta users to sign nondisclosure agreements prohibiting users from sharing negative information about their experiences using the FSD Beta software.

94.     On October 24, 2021, Tesla pulled back the release of version 10.3 of its ADAS software, which the company had already made available for drivers to use on public roads, because of problems the software was having making left turns at traffic lights.

95.     On October 25, 2021, NTSB Chair Homendy sent Musk a letter expressing concern that Tesla was rolling out FSD software updates without having implemented recommendations about improving the safety of Tesla's ADAS technology that NTSB had made years earlier following fatal crashes involving Tesla's ADAS technology. The following day, Homendy appeared on the CNBC show *Squawk Box* to share her concerns about Tesla's anticipated rollout of FSD beta to a larger group of Tesla vehicle owners.

> My biggest concern is that Tesla is rolling out Full Self-Driving technology in beta on city streets with untrained drivers, and they [Tesla] have not addressed our [NTSB's] recommendations that we've issued as a result of numerous investigations of Tesla crashes.
>
> … The NTSB, and I specifically, meet people on the worst day of their lives after a crash, after they've lost a loved one. That is part of our job at the NTSB. And our job is to determine what happened, why it happened, and prevent a crash from happening again. We conduct a thorough investigation, and at the end of that investigation, we issue findings of probable cause and safety recommendations, and then we work extensively with the recipients of those recommendations to ensure they're implemented because it's not until they're implemented that safety is truly improved. And in this case, we haven't received a response from Tesla in four years, yet we've reiterated those recommendations numerous times.

The show's host then asked Chair Homendy about Tesla's statements that Tesla drivers "need to be engaged when [they're] behind the wheel—that's not enough [to ensure safety]?" Chair Homendy unequivocally responded that it was not, in part because Tesla's marketing of its ADAS technology as "Full Self-Driving" is inherently misleading:

> No, that's not enough. It's clear that if you're marketing something as Full Self-Driving, and it is not full self-driving, and people are misusing the vehicles and the technology, that you have a design flaw, and you have to prevent that misuse. And part of that is how you talk about your technology. It is not full self-driving. … It isn't full self-driving technology. It's misleading.[56]

96.     In October 2021, after an update to the FSD Beta software, there was a major increase in "phantom braking" incidents, in which the software identifies a non-existent threat that triggers the vehicle's emergency braking system. The result is that Tesla vehicles, traveling at various speeds, were suddenly slamming on the brakes for no apparent reason. Tesla initially claimed it had identified the source of the problem and fixed it with a software update released on October 25, 2021, but subsequently issued a formal recall over the issue for the more than 11,0000 vehicles using the FSD Beta software in a reported effort to head off adverse action by U.S. regulators.[57] Tesla's claims of having fixed the problem, however, turned out to be false, as driver complaints about "phantom braking" issues soared to 107 NHTSA complaints in the three-month period of November 2021 through January 2022 (compared with only 34 such complaints in the preceding 22 months). Owner complaints to NHTSA included everything from phantom braking incidents that were "happening with NOTHING present in front of my vehicle, and sometimes with nothing around me at all," to an incident where Tesla software slammed on the brakes in response to a plastic bag.[58] Many industry experts have opined that the increase in "phantom braking" incidents is a predictable result of removing radar from new Tesla vehicles in favor of relying more heavily or entirely on cameras.[59]

---

[56] Michael Wayland, "NTSB head criticizes Tesla's self-driving features, calls them 'misleading,'" *CNBC* (Oct. 26, 2021), https://www.cnbc.com/2021/10/26/ntsb-head-criticizes-teslas-self-driving-features-calls-them-misleading.html.

[57] Tom Krisher, "Tesla software recall may head off fight with US regulators," *Associated Press* (Nov. 2, 2021), *available at* https://apnews.com/article/technology-business-software-d3e2107435f432fd9b36ba14898166a0.

[58] Faiz Siddiqui & Jeremy B. Merrill, "Tesla drivers report a surge in 'phantom braking,'" *The Washington Post* (Feb. 2, 2022), *available at* https://www.washingtonpost.com/technology/2022/02/02/tesla-phantom-braking/.

[59] *See, e.g.*, Jonathan M. Gitlin, "Tesla's radar-less cars investigated by NHTSA after complaints spike: Tesla's safety camera system has a real problem with false positives," *ArsTechnica* (Feb. 18, 2022), https://

97.     On November 18, 2021, CNN Business reported that it spent a morning testing Tesla's FSD technology on the streets of New York City and "watched the software nearly crash into a construction site, try to turn into a stopped truck and attempt to drive down the wrong side of the road." The FSD software reportedly "needed plenty of human interventions to protect us and everyone else on the road," including a driver intervention "every couple of blocks or so" and multiple instances in which the driver "quickly jerked the wheel to avoid a crash."[60]

98.     On December 6, 2021, *The New York Times* published an article about its investigation into the failures of Tesla's ADAS technology based on interviews with 19 Tesla employees who had worked on design, developing, and testing that technology at Tesla over the prior decade. The article reported that interviews with the employees indicated that Musk "repeatedly misled buyers" about the abilities of Tesla's ADAS technology.[61]

99.     Later in December 2021, Musk appeared on a popular podcast and predicted that Tesla's ADAS technology would reach SAE Level 4 in 2022. The podcast host asked Musk, "When you do you think Tesla will solve level four FSD?" Musk responded, "I mean, it's looking quite likely that it'll be next year."[62]

100.     In January 2022, Musk stated on an earnings call, "My personal guess is that we'll achieve Full Self-Driving this year. I would be shocked if we do not achieve Full Self-Driving safer than a human this year. I would be shocked."

101.     In February 2022, the company Cruise received regulatory approval to begin offering a fully driverless robotaxi service with no backup driver behind the wheel, and received regulatory approval to begin charging customers.[63]

---

arstechnica.com/cars/2022/02/teslas-radar-less-cars-investigated-by-nhtsa-after-complaints-spike/.
[60] Matt McFarland, "We tried Tesla's 'full self-driving.' Here's what happened," *CNN Business*, https://www.cnn.com/2021/11/18/cars/tesla-full-self-driving-brooklyn/index.html (Nov. 18, 2021); *CNN*, "CNN tests a 'full self-driving' Tesla," https://www.youtube.com/watch?v=2PMu7MD9GvI (Nov. 18, 2021).
[61] Metz & Boudette, *supra* note 10; Tesla, "Tesla Self-Driving Demonstration" (Nov. 18, 2016), https://www.tesla.com/videos/autopilot-self-driving-hardware-neighborhood-long.
[62] Lex Fridman, Podcast #252 at 1:26:56 (Dec. 28, 2021), https://youtu.be/DxREm3s1scA?t=5215.
[63] *See* Andres Picon, "Cruise gets state permit to offer paid driverless taxi rides in San Francisco," *San Francisco Chronicle* (June 2, 2022), *available at* https://www.sfchronicle.com/bayarea/article/Cruise-gets-state-permit-to-offer-paid-driverless-17216515.php.

102.    In May 2022, Musk told reporters in Brazil that Tesla will have self-driving cars without the need for people behind the wheel in about a year. The comments received media coverage in the United States.

103.    On July 13, 2022, the Dawn Project, an organization dedicated to increasing the software safety, published a white paper regarding its testing of a Tesla Model 3 equipped with FSD Beta 10.12.2 (released on June 1, 2022). The purpose of the testing was to determine the FSD software's safety in terms of its ability to detect and avoid hitting small children. The testing was performed on a closed racetrack with the Tesla driving itself between a long row of cones with a child-sized mannequin placed in plain view at the end of the row—i.e., conditions significantly less complex and more favorable to the FSD software than those that would be encountered in the real world. Nevertheless, the testing found that Tesla's FSD software consistently failed to detect the stationary child-size mannequins and "d[id] not avoid the child or even slow down," but instead "repeatedly struck the child mannequin in a manner that would be fatal to an actual child."[64]

104.    On July 14, 2022, the editor-in-chief of Electrek, a website that covers electric vehicles, published a review of Tesla's FSD Beta software based on his experience of using it over the course of two months. His ultimate conclusion was that, despite years of development and updates by Tesla, FSD Beta's "decision-making is still the equivalent of a 14-year-old who has been learning to drive for the last week and sometimes appears to consume hard drugs."[65]

105.    In August 2022, Tesla announced that the price of FSD on new Tesla cars would increase from $12,000 to $15,000, effective September 5, 2022.

106.    On October 19, 2022, in a quarterly earnings call, Musk said he expects Tesla to release upgraded FSD software that "will be able to take you from your home to your work, your friend's house, to the grocery store without you touching the wheel. So, it's looking very good."

---

[64] The Dawn Project, *In Scientific Test, Tesla "Full Self-Driving" Technology Consistently Strikes Child-Sized Mannequins* (July 13, 2022), *available at* https://dawnproject.com/wpcontent/uploads/2022/08/The_Dawn _Project___Tesla_ADAS_Test__8_.pdf.

[65] Fred Lambert, "Elon Musk does the impossible and manages expectations on Tesla's next Full Self-Driving update," *Electrek* (July 14, 2022), https://electrek.co/2022/07/14/elon-musk-manages-expectations-tesla-next-big-full-self-driving-update/.

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**Plaintiffs' Consolidated Amended Complaint**
Case No. 4:22-cv-05240-HSG

36

107.    On the same call, Musk made comments stating Tesla was unlikely to get regulatory approval for its full self-driving technology in 2022—a misleading rhetorical tactic that Musk has used throughout the Class Period (as defined below) to generate media coverage that is likely to leave many readers and viewers with the false impression that Tesla's Autopilot and FSD technology is, for all intents and purposes, already capable of making the car fully autonomous (i.e., SAE Level 4 or 5), and it is only that "regulators" are refusing to recognize this and/or preventing Tesla from making it's most advanced self-driving technology available to the public. This is misleading, in part, because it implies that Tesla's Autopilot and FSD technology is ready or almost ready for regulatory approval as an SAE Level 3, 4, or 5 technology, when that is not the case, when Musk and Tesla know that is not the case, and when no objectively reasonable view of the relevant facts known to Musk and Tesla could lead them to believe that that is the case. To the contrary, Musk and Tesla know, and any objectively reasonable view of the facts known to Musk and Tesla would lead a reasonable person to conclude, that Tesla's Autopilot and FSD technology is an SAE Level 2 ADAS technology and nowhere near an SAE Level 3, 4, or 5 technology, or ready to seek regulatory approval as an SAE Level 3, 4, or 5 technology.

108.    Just as such comments regularly have in the past, Musk's October 20, 2022 comments regarding the anticipated lack of "regulatory approval" in the two remaining months of 2022 generated misleading news coverage. A Reuters article about Musk's comments is typical of kind of misleading news coverage that such comments often generate, and that Musk and Tesla know such comments have often generated in the past and are likely to generate whenever such comments are made. Ignoring that Tesla's Autopilot and FSD technology is an SAE Level 2 ADAS technology, the Reuters article reports that Musk's comments "signal[] that the company is not yet able to satisfy authorities that its cars can be driven without someone behind the wheel" (i.e., SAE Level 4 or 5). The article goes on to report on Musk's comments as follows:

> On a call on Wednesday to discuss quarterly results, Musk said he expects to release an upgraded FSD software at the end of the year, adding that while its cars are not ready to have no one behind the wheel, drivers would rarely have to touch the controls. [¶] "The car will be able to take you from your home to your work, your friend's house, the grocery store without you touching the wheel," he said. [¶] "It's a

separate matter as to will it have regulatory approval. It won't have regulatory approval at that time," he added.[66]

**E.   Federal and State Authorities Launch Numerous Investigations and Actions Regarding Tesla's Autopilot and FSD Technology**

*1.   The NHTSA significantly expands its investigations into Autopilot and FSD*

109.    In April 2022, the NHTSA opened two defect investigations into Autopilot. In reporting on this development, *Bloomberg News* spoke on the record with several current and former top federal officials responsible for roadway safety under various administrations, all of whom singled out Tesla and its Autopilot and FSD software as cause for concern. According to the article, NTSB Chair Jennifer Homendy "describe[d] Tesla's deployment of features marketed as Autopilot and Full Self-Driving as artificial-intelligence experiments using untrained operators of 5,000-pound vehicles," and said "It is a disaster waiting to happen." David Friedman, a former deputy and acting administrator of NHTSA from 2013 to 2015, told reporters that Tesla's approach to automated-driving features "sticks out like a sore thumb" in the industry and "has for years." Heidi King, a deputy and acting administrator of NHTSA during the Trump administration, similarly stated for the article: "I really dislike a lot of what Tesla has done, and at the top of the list in bright, bold letters, is Elon Musk's habit of making false public claims, and using his podium in a way that creates safety risks." King continued: "We all admire his [Musk's] visionary attributes. But visionary exaggerations about a consumer product can be very, very dangerous."[67]

110.    In June 2022, the NHTSA announced it was upgrading its August 2021 "Preliminary Evaluation" into Tesla's Autopilot system into an "Engineering Analysis"—a significant expansion of the investigation.[68] The announcement was welcomed by many roadway safety organizations, including the Governors Highway Safety Association, whose executive director told the *The New*

---

[66] Hyunjoo Jin & Akrash Sriram, "Tesla cars will not be approved as fully self driving this year, Musk says," *Reuters* (Oct. 20, 2022), *available at* https://www.reuters.com/business/autos-transportation/tesla-flags-its-cars-not-ready-be-approved-fully-self-driving-this-year-2022-10-20/.
[67] Craig Trudell & Keith Laing, "Tesla Autopilot Stirs U.S. Alarm as 'Disaster Waiting to Happen,'" *Bloomberg News* (Apr. 18, 2022), https://www.bloomberg.com/news/articles/2022-04-18/tesla-autopilot-stirs-u-s-alarm-as-disaster-waiting-to-happen.
[68] NHTSA, Investigation EA 22-002, ODI Resume (June 8, 2022), *available at* https://static.nhtsa.gov/odi/inv/2022/INOA-EA22002-3184.PDF.

*York Times* that his organization had been "asking for closer scrutiny of Autopilot for some time," and that the product names Autopilot and Full Self-Driving "confuse people into thinking they can do more than they are actually capable," and that "[a]t a minimum they should be renamed."[69]

### 2. The FTC says Tesla's Autopilot and FSD is "on its radar"

111.    On June 7, 2022, Lina Khan, the Chair of the Federal Trade Commission ("FTC"), which is charged with protecting the consuming public from unfair and deceptive corporate practices, made public comments indicating that concerns about Tesla's Autopilot and FSD technology were on the FTC's radar. Though Chair Khan declined to say whether the FTC had opened an investigation into Tesla, she referred to concern about the marketing of Autopilot and FSD as an "issue on which many members of Congress have focused and written to us about, so it's certainly something that's on our radar."[70]

### 3. The California DMV charges Tesla with untrue and deceptive marketing of its Autopilot and FSD technology

112.    On July 28, 2022, following a year-long investigation, the California DMV, which licenses motor vehicle manufacturers and dealerships in California (including Tesla's Fremont factory and dozens of Tesla retail stores), brought two related administrative enforcement actions against Tesla for "untrue," "misleading," and "deceptive" marketing of its Autopilot and FSD technology. The DMV specifically alleged that Tesla's use of the product labels "Autopilot" and "Full Self-Driving Capability," as well as statements about those technologies that have appeared on Tesla's website in 2022, "represent that vehicles equipped with those ADAS features will operate as an autonomous vehicle, but vehicles equipped with those ADAS features could not at the time of those advertisements, and cannot now, operate as autonomous vehicles." For relief, the DMV seeks restitution and the revocation or suspension of Tesla's California vehicle manufacturer license and vehicle dealer license. *See In the Matter of the Accusation Against Tesla Inc. dba Tesla Motors, Inc., a*

---

[69] Neal E. Boudette, "Federal safety agency expands its investigation of Tesla's Autopilot system," *The New York Times* (June 9, 2022), *available at* https://www.nytimes.com/2022/06/09/business/tesla-autopilot-nhtsa-investigation.html.

[70] Diane Bartz & David Shepardson, "Tesla Autopilot concerns are on U.S. agency's 'radar,' chair says," *Reuters* (June 9, 2022), https://www.reuters.com/business/autos-transportation/tesla-autopilot-concerns-are-us-agencys-radar-chair-says-2022-06-09/.

1   *Vehicle Manufacturer*, Case No. 21-02188, Accusation (July 28, 2022) (attached here as **Exhibit A**);

2   *In the Matter of the Accusation Against Tesla Inc. dba Tesla Motors, Inc., a Vehicle Dealer*, Case No.

3   21-02189, Accusation (July 28, 2022) (attached here as **Exhibit B**).

4           ***4.   The U.S. Department of Justice launches a criminal investigation***

5           113.   On October 25, 2022, Reuters reported that the U.S. Department of Justice had

6   launched a criminal investigation against Tesla, Inc. regarding the company's claims that its vehicles

7   could drive themselves. As part of the investigation, "Justice Department prosecutors in Washington

8   and San Francisco are examining whether Tesla misled consumers, investors and regulators by

9   making unsupported claims about its driver assistance technology's capabilities." One of the article's

10  sources provided information indicating that the criminal probe "is competing with two other DOJ

11  investigations involving Tesla" but did not elaborate on the subject matter of those other ongoing

12  investigations.[71]

13  **VI.   CLASS ACTION ALLEGATION**S

14          114.   Plaintiffs bring this lawsuit individually and as a class action under Federal Rule of

15  Civil Procedure ("Rule") 23, seeking declaratory relief, injunctive relief, restitution, damages, and

16  other relief specified herein, on behalf of a proposed nationwide class and, in the alternative, a

17  proposed California class (collectively, the "Class"), defined as follows:

18
19          **Nationwide Class:** All persons who purchased or leased from Tesla, Inc.
            (or any entity it directly or indirectly owns or controls, including but not
20          limited to Tesla Lease Trust and Tesla Finance LLC) a new Tesla vehicle
            with "Autopilot," "Enhanced Autopilot," or "Full Self-Driving
21          Capability" (collectively, "Class Vehicles") at any time from January 1,
            2016, to the present ("Class Period").

22          **California Class:** All persons who purchased or leased from Tesla, Inc.
23          (or any entity it directly or indirectly owns or controls, including but not
            limited to Tesla Lease Trust and Tesla Finance LLC) a new Tesla vehicle
24          with "Autopilot," "Enhanced Autopilot," or "Full Self-Driving
            Capability" (collectively, "Class Vehicles") at any time from January 1,
25          2016, to the present ("Class Period"), and who either purchased or leased
            that vehicle in California or who currently reside in California.
26

27  ───────────────────────
28  [71] Mike Spector & Dan Levine, "Exclusive: Tesla faces U.S. criminal probe over self-driving claims," *Reuters*
    (Oct. 26, 2022), https://www.reuters.com/legal/exclusive-tesla-faces-us-criminal-probe-over-self-driving-
    claims-sources-2022-10-26/.

1    115.    The following persons are excluded from the proposed Class: Defendants; any entity

2 that Defendants directly or indirectly own or control; Defendants' officers, directors, employees,

3 agents, legal representatives, and attorneys; and the Court and its employees.

4    116.    Plaintiffs reserve the right under Rule 23 to amend or modify the proposed Class

5 definitions and to add one or more subclasses based on information obtained during this litigation.

6    117.    This action is brought and may be properly maintained as a class action against

7 Defendants under the following provisions of Rule 23:

8        a.    **Numerosity (Rule 23(a)(1)):** The members of the Class are so numerous that

9 their individual joinder is impracticable. Defendants sold or leased tens of thousands of Class

10 Vehicles during the Class Period. The identities of Class members may be identified through business

11 records regularly maintained by Defendants and their employees, agents, and subsidiaries, and

12 through the media. If necessary, Class members can be notified of this action by e-mail, mail, and

13 supplemental published notice.

14        b.    **Commonality and Predominance (Rules 23(a)(2) and 23(b)(3)):** Many

15 questions of law and fact are common to the Class. These common questions predominate over any

16 questions affecting only individual Class members. These common questions include, but are not

17 limited to:

18            i.    Whether Defendants and their agents (collectively, "Defendants") engaged in

19                the conduct alleged herein;

20            ii.    Whether Defendants' use of the terms "Autopilot," "Enhanced Autopilot,"

21                "Full Self-Driving," and "Full Self-Driving Capability" to describe their ADAS

22                technology was false, deceptive, or misleading;

23            iii.    Whether Defendants knew or should have known that their public statements

24                and omissions regarding the time period in which Tesla vehicles would be, or

25                would likely be, fully self-driving were false, deceptive, or misleading;

26            iv.    Whether Defendants knew or should have known that their prior public

27                statements regarding the time period in which Tesla vehicles would be, or

28

1           would likely be, fully self-driving were false, deceptive, or misleading, but

2           failed to take steps adequate to correct those prior statements;

3     v.   Whether Defendants knowingly concealed from consumers information that

4           would cause a reasonable consumer to develop material doubts or conclude that

5           Defendants' public statements and omissions regarding the time period in

6           which Tesla vehicles would be, or would likely be, fully self-driving were

7           false, deceptive, or misleading;

8     vi.   Whether Defendants' conduct alleged herein violates consumer protection laws;

9     vii.   Whether Defendants' conduct alleged herein violates warranty laws;

10    viii.   Whether Defendants' conduct alleged herein violates any other laws set forth

11           below in the Claims for Relief;

12     ix.   Whether Defendants' conduct alleged herein actually and proximately caused

13           Plaintiffs and Class members to suffer legally cognizable harm; and

14     x.   Whether Plaintiffs and Class members are entitled to declaratory relief,

15           injunctive relief, restitution, damages, or any other relief requested herein.

16     c.     **Typicality (Rule 23(a)(3)):** Plaintiffs' claims are typical of the other Class

17 members' claims because: Defendants' wrongful acts and omissions alleged herein were substantially

18 the same with respect to Plaintiffs and all other Class members, Defendants' wrongful acts and

19 omissions alleged herein caused Plaintiffs and all other Class members comparable injury, Plaintiffs

20 are advancing the same claims and legal theories on behalf of themselves and all other Class

21 members, and there are no defenses that are unique to any of the Plaintiffs.

22     d.     **Adequacy of Representation (Rule 23(a)(4)):** Plaintiffs can fairly and

23 adequately represent and protect the interests of all other Class members. There are no material

24 conflicts between the interests of Plaintiffs and the other Class members that would make certification

25 of the Class inappropriate. Plaintiffs have retained competent and qualified counsel who have

26 extensive experience in complex litigation and class action litigation, and who will vigorously

27 prosecute the claims of Plaintiffs and all other Class members.

28

1      118.    This action is properly maintained as a class action under Rule 23(b) for the following

2   reasons:

3               a.      **Class Action Status (Rule 23(b)(1)):** Class action status is appropriate under

4   Rule 23(b)(1)(A) because prosecution of separate actions by each of the tens of thousands of Class

5   members would create a risk of establishing incompatible standards of conduct for Defendants and

6   inconsistent results for Class members. Class action status is also appropriate under Rule 23(b)(1)(B)

7   because prosecution of separate actions by Class members would create a risk of adjudication with

8   respect to individual Class members that, as a practical matter, would be dispositive of other Class

9   members' interests or would substantially impair or impede their ability to protect their interests.

10              b.      **Declaratory and Injunctive Relief (Rule 23(b)(2)):** Certification under Rule

11   23(b)(2) is appropriate because Defendants have acted or refused to act on grounds that apply

12   generally to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate

13   equitable relief with respect to the Class as a whole.

14              c.      **Predominance and Superiority (Rule 23(b)(3)):** Certification under Rule

15   23(b)(3) is appropriate because questions of law and fact common to the Class predominate over the

16   questions affecting only individual Class members, and because a class action is superior to other

17   available methods for the fair and efficient adjudication of this controversy, including consideration

18   of the following: (i) the relatively limited interests of Class members in individually controlling the

19   prosecution of separate actions; (ii) the limited extent and nature of any litigation concerning this

20   controversy already begun by Class members; (iii) the desirability of concentrating the litigation of

21   the claims in this forum; and (iv) the relatively minor difficulties likely to arise in managing the

22   proposed class action. Class action treatment is superior here because the monetary harms suffered by

23   individual Class members are small compared to the burden and expense of bringing and prosecuting

24   individual actions against Defendants to address their complex misconduct against the consuming

25   public. A class action allows for the adjudication of a significant number of claims that would

26   otherwise go unaddressed because of the significant practical difficulties and relative expense of

27   bringing and maintaining an individual action, and also provides economies of scale and other

28   significant potential benefits that can be realized only by resolving this controversy in a single

1  adjudication with comprehensive supervision by a single court. By contrast, individualized litigation

2  also presents a potential for inconsistent or contradictory judgments, would increase the delay and

3  expense to all parties and the court system due to the complex legal and factual issues involved in this

4  controversy, and would make it virtually impossible for individual Class members to redress

5  effectively the harm done to them by Defendants.

6       119.   **Issue Certification (Rule 23(c)(4)):** Certification of particular issues in this action,

7  including issues of liability and relief sought, is appropriate under Rule 23(c)(4) because these issues

8  are common to all Class members, and because resolution of these common issues on a classwide

9  basis will materially advance the disposition of the litigation as a whole.

10       120.   The Class is ascertainable from Defendants' own records, and there is a well-defined

11  community of interest in the questions of law and fact alleged herein since the rights of each Class

12  member were infringed or violated by Defendants in the same or similar fashion.

13  **VII.    TOLLING OF THE STATUTES OF LIMITATIONS**

14       121.   To the extent that there are any statutes of limitations applicable to Plaintiffs' and

15  Class members' claims, the running of the limitations periods have been tolled by various doctrines

16  and rules, including but not limited to equitable tolling, the discovery rule, the fraudulent concealment

17  rule, equitable estoppel, the repair rule, and class action tolling.

18  **VIII.  CLAIMS FOR RELIEF**

19  **FIRST CLAIM FOR RELIEF**

20  **Violation of the Magnuson-Moss Warranty Act**

21  **15 U.S.C. § 2301, *et seq.***

22       122.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth

23  above, as though fully set forth in this Claim for Relief.

24       123.   The Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, provides a cause of

25  action for any consumer damaged by the failures of a warrantor to comply with a written or implied

26  warranty. *See id.* § 2310(d)(1).

27       124.   The Class Vehicles and the ADAS packages on those vehicles are "consumer

28  products" within the meaning of the Magnuson-Moss Warranty Act, *id.* § 2301(1).

125.    Plaintiffs and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, *id.* § 2301(3).

126.    Defendants are each a "supplier" and a "warrantor" within the meaning of the Magnuson-Moss Warranty Act, *id.* § 2301(4)-(5).

127.    Under 15 U.S.C. § 2310(e), Plaintiffs and the Class are not required to provide Defendants notice of this class action and an opportunity to cure until the time the Court determines the representative capacity of Plaintiffs under Rule 23.

128.    Defendants' representations (including those made by Defendants' representatives and agents) on Tesla's website, in Tesla marketing materials, on Twitter, and in various other media that the Class Vehicles already were or would soon become fully self-driving cars are each written warranties within the meaning of the Magnuson-Moss Warranty Act, *id.* § 2301(6).

129.    Through written and implied warranties, Defendants warranted that the Class Vehicles and the ADAS packages and technology on those vehicles (both as sold or leased, and as periodically updated thereafter) are free from defects, of merchantable quality, and fit for their ordinary and represented use.

130.    Defendants breached their written and implied warranties. Plaintiffs and Class members were lured into purchasing or leasing Class Vehicles with ADAS packages and technology by Tesla's misrepresentations that it already had developed, or would soon complete its development of, ADAS packages and technology capable of making the Class Vehicles fully self-driving. Instead, the Class Vehicles and ADAS packages and technology purchased or leased by Plaintiffs and Class members do not perform as promised, are not free of defects, are not of merchantability quality, and are unfit for their ordinary and represented use.

131.    Defendants knew or should have known that they were making express and implied warranties that they would not be able to keep regarding the current and future near-term abilities, limitations, flaws, and value of Tesla's ADAS packages and technology, and knew or should have known that Tesla's ADAS packages and technology would not perform as promised, were not free of defects, were not of merchantability quality, and were unfit for their ordinary and represented use. Nevertheless, Defendants repeatedly promised, in highly public and sensational ways intended to

1   attract media attention and consumer interest in Tesla's vehicles and ADAS packages and technology,

2   that its vehicles already were or would very shortly be fully self-driving.

3       132.    Plaintiffs and Class members were damaged as a result of Defendants' breaches of

4   their warranties because they received Class Vehicles and ADAS packages incapable of performing

5   as Defendants represented, rendering the Class Vehicles and ADAS packages significantly less

6   valuable than represented.

7       133.    For relief, Plaintiffs and the Class are entitled to and seek (a) damages caused by

8   Defendants' breaches of their warranties, including economic damages (based on the return of the

9   price that Plaintiffs and Class members paid Defendants for ADAS packages and/or the difference

10  between the price paid for the Class Vehicles as warranted and the actual value of the Class Vehicles

11  as delivered) and all other available damages; (b) reasonable attorneys' fees and costs, and (c) all

12  other available relief prayed for below.

13      WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

14                          <u>**SECOND CLAIM FOR RELIEF**</u>

15                          **Breach of Express Warranty**

16                          **Cal. Civ. Code §§ 1791.2(a), 1794**

17      134.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth

18  above, as though fully set forth in this Claim for Relief.

19      135.    Defendants expressly warranted to Plaintiffs and Class members through written

20  statements within the meaning of Cal. Civ. Code § 1791.2(a)(1) (including but not limited to

21  statements that Defendants made or caused to be made on Tesla's website, in Tesla marketing

22  materials, on Musk's Twitter account, in various print media, and other written forums) that the Class

23  Vehicles were fully self-driving, or that they would be fully self-driving within a reasonable time after

24  Plaintiffs and Class members purchased or leased their respective Class Vehicles and ADAS

25  packages.

26      136.    Defendants also expressly warranted to Plaintiffs and Class members through use the

27  of samples and models within the meaning of Cal. Civ. Code § 1791.2(a)(2) (including but not limited

28  to videos Defendants produced purporting to show Tesla vehicles driving themselves) that the Class

Vehicles were fully self-driving, or that they would be fully self-driving within a reasonable time after Plaintiffs and Class members purchased or leased their respective Class Vehicles and ADAS packages.

137.    The Class Vehicles and ADAS packages that Plaintiffs and Class members purchased or leased: were not as warranted when they left Tesla's factories, reached Plaintiffs and Class members without substantial change in the condition in which they were sold or leased, and did not perform as warranted.

138.    Defendants breached their warranties by knowingly selling or leasing Class Vehicles equipped with ADAS packages and technology that had abilities, limitations, flaws, and value that were different from what Defendants had represented and warranted. Defendants' breaches were "willful" within the meaning of Cal. Civ. Code § 1794(c).

139.    As a direct and proximate result of Defendants' breaches, Plaintiffs and Class members have suffered various injuries and economic losses, including but not limited to (1) purchasing or leasing Class Vehicles and ADAS packages they would not otherwise have purchased or leased; (2) purchasing or leasing an inferior product whose nature and characteristics render it of lesser value than represented; (3) incurring monetary harm from the diminution in the Class Vehicles' and ADAS packages' value and resale value; and (4) purchasing or leasing Class Vehicles and ADAS packages that pose a danger to the health and safety of Plaintiffs, Class members, and the public.

140.    The failure of the Class Vehicles and ADAS packages to be as warranted was a substantial factor in causing Plaintiffs' and Class members' harm, which includes the difference between the prices they paid for their respective Class Vehicles and ADAS packages as warranted and the actual value of their Class Vehicles and ADAS packages as delivered.

141.    Unless Defendants are enjoined from engaging in conduct alleged herein that violates their express warranties, members of the consuming public will be further harmed by that conduct.

142.    For relief, Plaintiffs and the Class are entitled to and seek (a) an injunction prohibiting Defendants from sending or transmitting false, deceptive, or misleading statements to the public regarding the abilities, limitations, flaws, and value of Tesla's ADAS packages and technology; (b) damages caused by Defendants' breaches of the warranties, including economic damages (based

1   on the return of the price that Plaintiffs and Class members paid for their respective Class Vehicles

2   and ADAS packages and/or the difference between the price paid for the Class Vehicles and ADAS

3   packages as warranted and their actual value as delivered); (c) consequential and incidental damages;

4   (d) a civil penalty of two times the amount of damages under Cal. Civ. Code § 1794; (d) reasonable

5   attorneys' fees and costs under Cal. Civ. Code § 1794 and any other applicable law; and (e) all other

6   available relief prayed for below.

7         WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

8                    **THIRD CLAIM FOR RELIEF**

9                   **Breach of Implied Warranties**

10              **Cal. Civ. Code §§ 1791.1, 1792, 1794**

11      143.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth

12   above, as though fully set forth in this Claim for Relief.

13      144.     Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, *et seq.*,

14   every sale or lease of consumer goods to a retail buyer is accompanied by an implied warranty of

15   merchantability from both the manufacturer and the retail seller or lessor, and some such sales and

16   leases may be also be accompanied by an implied warranty of fitness from both the manufacturer and

17   the retail seller or lessor. *Id.* § 1792-1792.2.

18      145.     The durations of these implied warranties are coextensive with the duration of the

19   Defendants' express warranty, provided the duration of the express warranty is reasonable, except

20   that the duration of the implied warranties cannot have a duration of less than 60 days or more than

21   one year. *Id.* § 1791.1(c).

22      146.     Defendants' sale or lease of Class Vehicles and ADAS packages to Plaintiffs and Class

23   members was accompanied by Defendants' implied warranty of merchantability, both in their

24   capacities as manufacturer and as retail seller or lessor of Class Vehicles and ADAS packages. *Id.*

25   § 1792.

26      147.     Defendants' implied warranties of merchantability include warranties that the Class

27   Vehicles and ADAS packages (1) will pass without objection in the trade under the contract

28   description, (2) are fit for the ordinary purposes for which such goods are used, (3) are adequately

1  contained, packaged, and labelled, and (4) will conform to the promises or affirmations of fact made

2  on the container or label. *Id.* § 1791.1(a).

3       148.   At the time of purchase or lease, or within one year thereafter, the Class Vehicles and

4  ADAS packages and technology failed to conform with Defendants' implied warranty of

5  merchantability because they (1) did not pass without objection in the trade under the contract

6  description, (2) were not fit for the ordinary purposes for which such goods are used, (3) were not

7  adequately contained, packaged, and labelled, and (4) did not conform to the promises or affirmations

8  of fact made on the container or label. Among other things, the Class Vehicles and ADAS packages

9  did not conform to the promises contained in the labels "Autopilot," "Enhanced Autopilot," and "Full

10  Self-Driving Capability."

11       149.   Defendants' sale or lease of Class Vehicles and ADAS packages to Plaintiffs and Class

12  members was also accompanied by Defendants' implied warranty of fitness, both in their capacities

13  as manufacturer and as retail seller or lessor of Class Vehicles and ADAS packages. *Id.* § 1792.

14       150.   At the time that Plaintiffs and Class members purchased or leased their Class Vehicles

15  and ADAS packages from Defendants, Defendants were in the business of designing, developing,

16  testing, manufacturing, selling, and leasing electric vehicles and ADAS technology in general, and the

17  Class Vehicles and Tesla's ADAS packages and technologies in particular.

18       151.   Defendants held themselves out as having special knowledge or skill regarding the

19  designing, developing, testing, and manufacturing of electric vehicles and ADAS technology in

20  general, and the Class Vehicles and Tesla's ADAS packages and technologies in particular. Further,

21  Defendants knew or had reason to know that Plaintiffs and Class members required the Class

22  Vehicles and ADAS packages for a particular purpose, and that Plaintiffs and Class members were

23  relying on Defendants' skill and judgment to furnish goods suitable for that purpose.

24       152.   Defendants breached the implied warranty of fitness because they failed to deliver

25  Class Vehicles and ADAS packages that were suited to Plaintiffs' and Class members' purpose of

26  purchasing or leasing a car that was fully self-driving car at the time of transaction, or that would be

27  fully self-driving within a reasonably short period thereafter.

28

153.     Defendants breached their warranties by knowingly selling or leasing Class Vehicles equipped with ADAS packages and technology that had abilities, limitations, flaws, and value that were different from what Defendants had represented and warranted. Defendants' breaches were "willful" within the meaning of Cal. Civ. Code § 1794(c).

154.     As a direct and proximate result of these breaches, Plaintiffs and Class members have suffered various injuries and economic losses, including but not limited to (1) purchasing or leasing Class Vehicles and ADAS packages they would not otherwise have purchased or leased; (2) purchasing or leasing inferior products whose nature and characteristics render them of lesser value than warranted; (3) incurring monetary harm from the diminution in the Class Vehicles' and ADAS packages' value and resale value; and (4) purchasing or leasing Class Vehicles and ADAS packages that pose a danger to the health and safety of Plaintiffs, Class members, and the public.

155.     The failure of the Class Vehicles and ADAS packages to be as warranted was a substantial factor in causing Plaintiffs' and Class members' harm, which includes the difference between the prices they paid for their respective Class Vehicles and ADAS packages as warranted and the actual value of their Class Vehicles and ADAS packages as delivered.

156.     Unless Defendants are enjoined from engaging in conduct alleged herein that violates their implied warranties, members of the consuming public will be further harmed by that conduct.

157.     For relief, Plaintiffs and the Class are entitled to and seek (a) an injunction prohibiting Defendants from sending or transmitting false, deceptive, or misleading statements to the public regarding the abilities, limitations, flaws, and value of Tesla's ADAS packages and technology; (b) damages caused by Defendants' breaches of their warranties, including economic damages (based on the return of the price that Plaintiffs and Class members paid for their respective Class Vehicles and ADAS packages and/or the difference between the price paid for the Class Vehicles and ADAS packages as warranted and their actual value as delivered); (c) consequential and incidental damages; (d) a civil penalty of two times the amount of damages under Cal. Civ. Code § 1794; (e) reasonable attorneys' fees and costs under Cal. Civ. Code § 1794 and any other applicable law; and (f) all other available relief prayed for below.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

## FOURTH CLAIM FOR RELIEF

### Violation of the California False Advertising Law

### Cal. Bus. & Prof. Code § 17500, *et seq.*

158.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

159.     Defendants' conduct alleged herein violates California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*, which makes it unlawful for a business to make, disseminate, or cause to be made or disseminated to the public "any statement, concerning … personal property … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.* § 17500.

160.     The Class Vehicles and ADAS packages (including all ADAS hardware, software, and rights to receive updates and use the same) are "personal property" within the meaning of the FAL.

161.     Any express or implied representation, material omission of information, or failure to correct a past material misrepresentation or omission regarding the abilities, limitations, flaws, or value of the Class Vehicles and ADAS packages and technology is a "statement[] concerning personal property" within the meaning of the FAL.

162.     Defendants violated the FAL by making, disseminating, and causing to be made or disseminated to the public statements about the abilities, limitations, flaws, and value of Tesla's ADAS packages and technology that were "untrue or misleading" within the meaning of the FAL, and by failing to correct what was untrue or misleading about those statements after they had been made.

163.     Defendants made, disseminated, caused to be made or disseminated, and failed to correct such public statements in numerous forums, including but not limited to Tesla's blog and website, Musk's Twitter account, earnings calls and other public statements to investors, conferences and other public events, television, radio, podcasts, and other publicly available media (whether print, video, audio, or some other format) that republished such representations and omissions.

164.     Defendants knew or, by the exercise of reasonable care, should have known about each of those statements at or near the time they were made or disseminated, and at all times thereafter.

1    165.    Defendants knew or, by the exercise of reasonable care, should have known that each

2  of those statements was untrue, misleading, and likely to deceive the public at or near the time it was

3  made or disseminated, and at all times thereafter.

4    166.    Unless Defendants are enjoined from engaging in the conduct alleged herein that

5  violates the FAL, members of the consuming public will be further harmed by that conduct.

6    167.    As a result of Defendants' FAL violations and the harm caused thereby, Plaintiffs and

7  Class members are entitled to and seek (a) injunctive relief to protect the consuming public by

8  prohibiting Tesla from engaging in its past and ongoing acts, omissions, and conduct that violate the

9  FAL; (b) restitution of the full value of all monies and other consideration that Plaintiffs and Class

10  members paid Defendants for the purchase or lease of Class Vehicles and ADAS packages, which

11  Defendant continues to wrongfully retain, including any diminished value of Plaintiffs' and Class

12  members' Class Vehicles and ADAS packages and disgorgement of the profits Defendants derived

13  from their wrongful conduct; (c) an award of reasonable attorneys' fees under Cal. Code Civ. Proc.

14  § 1021.5 and any other applicable law; and (d) all other available relief prayed for below.

15    WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

16  ### FIFTH CLAIM FOR RELIEF

17  **Violation of the California Consumer Legal Remedies Act**

18  **Cal. Civ. Code § 1750, *et seq.***

19    168.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth

20  above, as though fully set forth in this Claim for Relief.

21    169.    The California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et*

22  *seq.*, makes unlawful certain "unfair methods of competition and unfair or deceptive acts or practices

23  … undertaken by any person in a transaction intended to result or that results in the sale or lease of

24  goods or service to any consumer." *Id.* § 1770(a).

25    170.    Each Defendant is a "person" under the CLRA, *id.* § 1761(c).

26    171.    Plaintiffs and all Class members are "consumers" under the CLRA because they are all

27  individuals who acquired, by purchase or lease, Class Vehicles and ADAS packages for personal,

28  family, or household purposes. *See id.* § 1761(d).

172.    The purchase or lease of a Class Vehicle and/or ADAS package is a "transaction" under the CLRA, *id.* § 1761(e).

173.    Class Vehicles and ADAS packages are "goods" under the CLRA, *id.* § 1761(a).

174.    In selling or leasing Class Vehicles and ADAS packages to Plaintiffs and Class members, Defendants made an express or implied promise to provide future ADAS software development, future ADAS software updates, and other work or labor that constitutes "services" under the CLRA, *id.* § 1761(b).

175.    Defendants' wrongful acts, practices, and conduct alleged herein—including but not limited to their false, misleading, and deceptive marketing, representations, and omissions regarding the present and likely future abilities, limitations, flaws, and value of Class Vehicles and ADAS packages and technology, and the time periods in which Tesla's ADAS packages and technology would result in a fully self-driving vehicle—are "unfair or deceptive acts or practices" in violation of the CLRA, *id.* § 1770(a).

176.    "Unfair or deceptive acts or practices" in violation of the CLRA include but are not limited to: (a) representing that goods or services have characteristics, ingredients, uses, or benefits that they do not have, *id.* § 1770(a)(5); (b) representing that goods or services are of a particular standard or quality, or that goods are of a particular style or model, if they are of another, *id.* § 1770(a)(7); (c) advertising goods or services with intent not to sell or lease them as advertised, *id.* § 1770(a)(9); and (d) representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not, *id.* § 1770(a)(16).

177.    Defendants committed these unfair or deceptive acts or practices when they sold or leased Class Vehicles and ADAS packages to Plaintiffs and Class members that did not have represented characteristics, uses, and benefits; were not of the represented quality; were not sold or leased as advertised; did not perform as advertised; and were materially worse, less capable, less safe, and less valuable than Defendants had represented, and continued to represent them, to be.

178.    Defendants knowingly and intentionally committed these unfair or deceptive acts or practices.

179.    A reasonable consumer would consider knowing the reasons why Defendants' representations were unfair or deceptive to be material and important in deciding whether to purchase or lease a Class Vehicle, and whether to pay additional money above the vehicle's base price for an ADAS package.

180.    Defendants' unfair or deceptive acts or practices materially affected Plaintiffs' and Class members' purchasing and leasing decisions. Defendants' false, misleading, and deceptive marketing, representations, and omissions regarding Class Vehicles and ADAS packages and technology were a substantial factor in Plaintiffs' and Class members' decisions to purchase or lease Class Vehicles, and their decisions to pay thousands of dollars above the vehicle's base price for an ADAS package.

181.    Plaintiffs' CLRA venue affidavits are attached here as **Exhibit C** (LoSavio), **Exhibit D** (Broussard), **Exhibit E** (Battiato), **Exhibit F** (Mallow), and **Exhibit G** (Imaguchi), in accordance with Cal. Civ. Code § 1780(d).

182.    Unless Defendants are enjoined from engaging in conduct alleged herein that violates the CLRA, members of the consuming public will be further harmed by that conduct.

183.    As a result of Defendants' CLRA violations and the harm caused thereby, Plaintiffs and Class members are entitled to and seek (a) injunctive relief to protect the consuming public by prohibiting Defendants from engaging in its past and ongoing acts, omissions, and conduct that violate the CLRA; (b) an award of reasonable attorneys' fees under Cal. Civ. Code § 1780(e), Cal. Code Civ. Proc. § 1021.5, and any other applicable law; and (c) all other available relief prayed for below.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

## SIXTH CLAIM FOR RELIEF

### Violation of the California Unfair Competition Law

### Cal. Bus. & Prof. Code § 17200, *et seq.*

184.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

185.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, prohibits any unlawful, unfair, or fraudulent business act or practice, including but not limited

1  any act or practice that constitutes deception, fraud, misrepresentation, or the concealment,

2  suppression, or omission of a material fact in a consumer transaction, or that is likely to deceive the

3  consuming public.

4        186.    Defendants' wrongful acts and omissions alleged herein were and are unlawful, unfair,

5  and fraudulent business acts and practices in violation of the UCL. Defendants' wrongful acts and

6  omissions alleged herein were and are likely to deceive the consuming public in California and

7  throughout the United States regarding the abilities, limitations, flaws, and value of the Class

8  Vehicles and Tesla's ADAS packages and technology. Defendants' wrongful acts and omissions

9  alleged herein also constitute deception, fraud, and misrepresentation, and concealment, suppression,

10  and omission of material facts in the context of consumer transactions with Plaintiffs and Class

11  members.

12        187.    Defendants knew or should have known that their wrongful acts and omissions alleged

13  herein were are likely to deceive the consuming public in California and the rest of the United States,

14  and Defendants committed those acts and omissions anyway for their own financial gain, including

15  for the purpose of shoring up and otherwise improve their financial condition, avoiding bankruptcy,

16  increasing the likelihood of receiving new capital from investors, increasing their revenue and profits,

17  and increasing the value of Tesla (including by increasing its share price).

18        188.    Defendants' "unfair" business acts and practices under the UCL include, among other

19  things, Defendants' acts, omissions, and conduct in: (a) marketing and referring to Tesla's ADAS

20  packages and technology as "Autopilot," "Full Self-Driving," and "Full Self-Driving Capability";

21  (b) representing the capabilities, limitations, flaws, and value of Tesla's ADAS packages and

22  technology to the public in a way that is materially different from how Defendants

23  contemporaneously represented those same subjects to regulators, especially when those

24  representations were communicated to regulators in a non-public forum or in a way not

25  contemporaneously available to the public (e.g., when a FOIA or PRA request is required to obtain

26  the communication); (c) describing and marketing Tesla's ADAS packages and technology in a way

27  that largely or entirely focuses on its actual or purported positive attributes and abilities in forums

28  likely to generate significant public attention or reach large numbers of consumers (e.g., Musk's

Twitter feed, interviews with high-distribution or otherwise influential media outlets, news conferences and other public events likely to generate media coverage, pages on the Tesla website that potential Tesla customers are more likely to visit than other pages on the website), while relegating information about the ADAS packages' and technology's limitations and flaws to forums likely to generate little public attention or otherwise reach a relatively small number of relevant consumers (e.g., pages on the Tesla website that potential Tesla customers are less likely to visit than other pages on the website, vehicle user manuals, regulatory filings); (d) misrepresenting or otherwise providing information likely to deceive the public regarding the then-existing abilities, limitations, flaws, and value of Tesla's ADAS packages and technology, including versions of that technology then available to some or all eligible Tesla owners, and versions Defendants represented to be in their possession but not yet available to some or all eligible Tesla owners; (e) misrepresenting or otherwise providing information likely to deceive the public regarding the likely future abilities, limitations, flaws, and value of Tesla's ADAS packages and technology, and the time periods in which those future abilities would likely be achieved and the future limitations and flaws likely reduced or eliminated; and (f) otherwise disseminating or causing to be disseminated to the consuming public information likely to deceive the consuming public in California and the rest of the United States.

189.   Defendants' acts, omissions, and conduct alleged herein were and are "unfair" under the UCL because they are offensive to public policy and constitute immoral, unethical, oppressive, and unscrupulous activities that caused and continue to cause substantial injury to the consuming public, including Plaintiffs and Class members. The harm caused by Defendants' conduct greatly outweighs any countervailing benefits to consumers or competition.

190.   Defendants have engaged in "unlawful" business acts and practices by, as set forth in this Complaint, violating the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*; violating the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, *et seq.*, violating the California False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*; violating the California Consumer Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*; and violating their common law obligations.

191.   Defendants have further engaged in "unlawful" business acts and practices by (a) committing "unfair or deceptive acts or practices in or affecting commerce" in violation of 15

1   U.S.C. § 45; (b) "mak[ing] or disseminat[ing], or caus[ing] to be made or disseminated, before the

2   public in this state … a statement that is untrue or misleading and that is known, or that by the exercise

3   of reasonable care should be known, to be untrue or misleading," in violation of Cal. Vehicle Code

4   § 11713(a); (c) "mak[ing] or disseminat[ing], or caus[ing] to be so disseminated, a statement as part of

5   a plan or scheme with the intent not to sell a vehicle or service … as so advertised," in violation of

6   Cal. Vehicle Code § 11713(a); (d) making "advertised statements, representations, or offers [] in

7   connection with the sale or attempted sale of any vehicle(s)" that is not "clearly set forth," "based on

8   facts," or otherwise violates the Vehicle Code or Title 13, Division 1, Chapter 1 of the California Code

9   of Regulations, in violation of 13 Cal. Code Regs. § 260.00; (e) violating other "provision[s] of Article

10   1 (commencing with Section 11700) of, or Article 1.1 (commencing with Section 11750) of, Chapter 4

11   of Division 5 or any rule or regulation adopted pursuant thereto," as referenced in Cal. Vehicle Code

12   § 11705(a)(10); and (f) causing Plaintiffs and all other Class members to suffer "loss or damage by

13   reason of any fraud or deceit practiced on that person or fraudulent representations made to that

14   person" within the meaning of Cal. Vehicle Code § 11705(a)(14).

15        192.    Defendants have engaged in "fraudulent" business acts and practices by making

16   representations (including by failing to disclose and concealing information) about the abilities,

17   limitations, flaws, and value of the Class Vehicles and Tesla's ADAS packages and technology that

18   were likely to deceive the public. Among other representations likely to deceive the public,

19   Defendants represented the Class Vehicles and Tesla's ADAS packages and technology as being

20   capable of full self-driving at the time of purchase or lease, or within a reasonably short period

21   thereafter. Plaintiffs and Class members reasonably relied on Defendants' representations,

22   nondisclosure, and concealment, and suffered economic injury as a result, including by not receiving

23   the full benefit of the bargain from their purchase or lease of their new Tesla vehicle and ADAS

24   package.

25        193.    Defendants' wrongful conduct and the harm it has caused, and continues to cause, was

26   and is not reasonably avoidable by Plaintiffs, Class members, or the consuming public. At all relevant

27   times, Defendants knew or should have known that Plaintiffs and Class members would not have

28   reasonably known or discovered that so many of Defendants' representations regarding the present

1   and likely future abilities, limitations, flaws, and value of Tesla's ADAS packages and technology,

2   and time periods in which those future abilities would likely be achieved and the future limitations

3   and flaws likely reduced or eliminated, were false, deceptive, or misleading.

4   194.   Defendants' false, deceptive, or misleading representations regarding the capabilities,

5   limitations, flaws, and value of Tesla's ADAS packages and technology were material, and Plaintiffs'

6   and Class members' reasonable reliance on the truth and accuracy of those material

7   misrepresentations was a substantial factor in influencing Plaintiffs and Class members to purchase or

8   lease Class Vehicles and ADAS packages from Defendants.

9   195.   As a direct and proximate result of their wrongful conduct, Defendants (a) have

10   received wrongful obtained money from Plaintiffs and Class members that rightfully belongs to

11   Plaintiffs and Class members, but that Defendants continue to wrongfully retain; (b) will continue to

12   receive revenue, profits, and other benefits that they would not have received if they had not engaged

13   in conduct violating the UCL as alleged herein, and (c) have obtained, and will continue to obtain, an

14   unfair advantage over similar businesses that represent their goods and services in a manner that

15   either does not violate the UCL, or that violates the UCL to a lesser extent than Defendants.

16   196.   As a direct and proximate cause of Defendants' UCL violations, Plaintiffs and Class

17   members have each suffered monetary injury because they each paid Defendants money for a good or

18   service (e.g., a vehicle with full self-driving capability) that Defendants have never provided, and

19   because Defendants have wrongfully retained those monies.

20   197.   Unless Defendants are enjoined from engaging in conduct alleged herein that violates

21   the UCL, members of the consuming public will be further harmed by that conduct.

22   198.   As a result of Defendants' UCL violations and the harm caused thereby, Plaintiffs and

23   Class members seek and are entitled to (a) injunctive relief to protect the consuming public by

24   prohibiting Defendants from engaging in their past and ongoing acts, omissions, and conduct that

25   violate the UCL; (b) restitution of the full value of all monies and other consideration that Plaintiffs

26   and Class members paid Defendants for Class Vehicles and for ADAS packages, including any

27   diminished value of Plaintiffs' and Class members' Class Vehicles and ADAS packages and

28   disgorgement of the profits Defendants derived from their wrongful conduct; (c) an award of

reasonable attorneys' fees under Cal. Code Civ. Proc. § 1021.5 and any other applicable law; and
(d) all other available relief prayed for below.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

### SEVENTH CLAIM FOR RELIEF

#### Fraud and Deceit

#### Cal. Civ. Code §§ 1572, 1573, 1710

199.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

200.    Based on Defendants' conduct alleged in this Complaint, Defendants have engaged in fraud and deceit as set forth in Cal. Civ. Code §§ 1572, 1573, and 1710.

201.    Defendants misrepresented to Plaintiffs and Class members the abilities, limitations, flaws, and value of Class Vehicles and Tesla's ADAS packages by marketing them in a manner that Defendants knew was materially false and deceptive, including by knowingly engaging in misrepresentation, nondisclosure, and concealment of material facts. Among other wrongful conduct, Defendants knowingly misrepresented the Class Vehicles and Tesla's ADAS packages and technology as being capable of full self-driving at the time of purchase or lease, or within a reasonably short period thereafter.

202.    Plaintiffs and Class members reasonably relied on Defendants' misrepresentations, nondisclosure, and concealment, and were induced by Defendants' wrongful conduct to purchase or lease Class Vehicles and ADAS packages that they would not otherwise have purchased or leased in the absence of Defendants' fraud and deceit.

203.    As a direct and proximate result of Defendants' fraud and deceit, Plaintiffs and Class members have suffered damages and other harms. Plaintiffs' and Class members' reliance was a substantial factor in causing their harm because they purchased or leased Class Vehicles and ADAS packages that they would not otherwise have purchased or leased, and/or because they paid materially more for Class Vehicles and ADAS packages than they otherwise would have paid, in the absence of Defendants' fraud and deceit.

204.    Defendants' misrepresentations, deceit, and concealment were intentionally false or deceptive, and Defendants engaged in that conduct with the intent to mislead and deceive Plaintiffs and Class members in order to obtain their business and otherwise benefit financially. As a result, Plaintiffs are entitled punitive or exemplary damages under Cal. Civ. Code § 3294.

205.    As a result of Defendants' fraud and deceit and the harm caused thereby, Plaintiffs and Class members seek and are entitled to (a) damages in an amount to be determined at trial, (b) punitive or exemplary damages under Cal. Civ. Code § 3294 and any other applicable law, and (c) all other available relief prayed for below.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

## EIGHTH CLAIM FOR RELIEF

### Negligent Misrepresentation

206.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

207.    Defendants misrepresented the abilities, limitations, flaws, and value of Class Vehicles and ADAS packages by marketing the Class Vehicles and ADAS packages as being capable of full self-driving at the time of purchase or lease, or within a reasonable short period thereafter.

208.    Defendants' representations were not true because the Class Vehicles and ADAS packages were not capable of full self-driving at the time of purchase or lease, or within a reasonable short period thereafter. On information and belief, Defendants are still nowhere near being able to deliver fully self-driving vehicles to Plaintiffs, Class members, and the consuming public.

209.    Defendants had no reasonable grounds for believing their representations were true and not misleading or deceptive when they made them.

210.    Defendants' misrepresentations, nondisclosure, and/or concealment of material facts to Plaintiffs and Class members, as set forth above, were intended by Defendants to mislead and deceive Plaintiffs and Class members.

211.    Plaintiffs and Class members reasonably relied on Defendants' misrepresentations, nondisclosure, and/or concealment, and were actually misled and deceived thereby, and were induced

by Defendants' wrongful conduct to purchase or lease Class Vehicles and ADAS packages that they would not otherwise have purchased or leased in the absence of Defendants' wrongful conduct.

212.     Plaintiffs and Class members were damaged by Defendants' misrepresentations, and Plaintiffs' and Class members' reliance was a substantial factor in causing their harm.

213.     As a result of Defendants' negligent misrepresentation and the harm caused thereby, Plaintiffs and Class members seek and are entitled to (a) damages in an amount to be determined at trial and (b) all other available relief prayed for below.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

## NINTH CLAIM FOR RELIEF

### Negligence

214.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

215.     Defendants have a duty to their customers, potential customers, and consumers to exercise a degree of care that a reasonable person in a similar position would exercise, including a duty to follow industry custom and standards to accurately represent the abilities, limitations, flaws, and value of Class Vehicles and Tesla's ADAS packages and technology.

216.     Defendants breached their duties to Plaintiffs and Class members by negligently misrepresenting that the Class Vehicles and ADAS packages had greater abilities and value than they actually had, and fewer limitations and flaws than they actually had, and by further repeatedly representing that they were on the cusp of advancing their ADAS technology to the point of being able to deliver fully self-driving vehicles within a reasonable time in near future, when Defendants had no reasonable basis to believe that those representations were true, accurate, and non-misleading.

217.     As a direct and legal result of Defendants' wrongful acts and omissions, Plaintiffs and Class members have suffered damages and other harms.

218.     Defendants' negligence was a substantial factor in causing Plaintiffs' and Class members' damages and other harms.

219.     As a result of Defendants' negligent misrepresentation and the harm caused thereby, Plaintiffs and Class members seek and are entitled to (a) damages in an amount to be determined at trial and (b) all other available relief prayed for below.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

**TENTH CLAIM FOR RELIEF**

**Unjust Enrichment**

220.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

221.     Plaintiffs and Class members paid Defendants the value of Class Vehicles with ADAS packages that would make their vehicles fully self-driving at the time of purchase or lease, or within a reasonably short period thereafter.

222.     In exchange, Defendants provided Plaintiffs and Class members with Class Vehicles and ADAS packages that could not meet Plaintiffs' and Class members' reasonable expectations created by Defendants' marketing, labelling, and other representations, concealment, and nondisclosure.

223.     Defendants knew or should have known that the Class Vehicles and ADAS packages could not meet Plaintiffs' and Class members' reasonable expectations created by Defendants' marketing, labelling, and other representations, concealment, and nondisclosure.

224.     As such, Plaintiffs and Class members conferred value upon Defendants which would be unjust for Defendants to retain.

225.     As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and Class members have suffered and continue to suffer economic and other harms.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

**IX.     PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all other Class members, pray for judgment against Defendants and the following relief:

A.     An order certifying this matter as a class action, appointing Plaintiffs and their counsel of record to represent the Class, and requiring Defendants to pay the costs of all Class

1             notice and administration of Class relief;

2     B.    Declaratory and preliminary and permanent injunctive relief prohibiting Defendants

3          from continuing to engage in acts, omissions, and conduct alleged herein that violate

4          any law set forth in the Claims for Relief for which injunctive relief is available,

5          including but limited to the California FAL, CLRA, and UCL;

6     C.    An award of all recoverable actual, general, special, incidental, compensatory,

7          consequential, statutory, and punitive damages, as well as civil penalties, in an amount

8          to be determined at trial;

9     D.    An order awarding Plaintiffs and the Class restitution and disgorgement in an amount

10        to be determined at trial;

11     E.    An award of reasonable attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5,

12        Cal. Civ. Code § 1780(e), Cal. Civ. Code § 1794, and any other applicable law;

13     F.    Pre- and post-judgment interest at the maximum rate provided by law; and

14     G.    Such other and further relief as the Court may deem proper.

## X.   DEMAND FOR JURY TRIAL

16     Plaintiffs hereby demand trial by jury on all issues so triable.

18   Dated:  October 28, 2022         **COTCHETT, PITRE & McCARTHY, LLP**

19                    By:    */s/ Frank M. Pitre*

20                        FRANK M. PITRE
                          NABILAH A. HOSSAIN

21                        ANDREW F. KIRTLEY

22                        *Attorneys for Plaintiffs Thomas LoSavio,*
                       *Brenda Broussard, and the Proposed Class*

24   Dated:  October 28, 2022         **BOTTINI & BOTTINI, INC.**

25                    By:    */s/ Francis A. Bottini, Jr.*
                       FRANCIS A. BOTTINI, JR.

26                        NICHOLAUS H. WOLTERING

27                        *Attorneys for Plaintiff Dominick Battiato*
                       *and the Proposed Class*

28

1

Dated:  October 28, 2022

**CASEY GERRY SCHENK FRANCAVILLA BLATT & PENFIELD, LLP**

By:     */s/ David S. Casey, Jr.*

DAVID S. CASEY, JR.
GAYLE M. BLATT
JEREMY ROBINSON
P. CAMILLE GUERRA
MICHAEL J. MORPHEW

*Attorneys for Plaintiffs Christopher Mallow, Jazmin Imaguchi, and the Proposed Class*

1

## <u>ATTORNEY ATTESTATION</u>

2     I, Frank M. Pitre, am the ECF User whose ID and password are being used to file this

3 Consolidated Amended Complaint. In compliance with Civil Local Rule 5-l(h)(3), I hereby attest that

4 concurrence in the filing of this document has been obtained from each signatory.

5

6      Dated:  October 28, 2022

By:     */s/ Frank M. Pitre*
Frank M. Pitre

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit A

1  JENNIFER BERRY
   Assistant Chief Counsel
2  DANIAN HOPP, Attorney IV, SBN 204066
   DEPARTMENT OF MOTOR VEHICLES
3  Legal Affairs Division, Los Angeles Office
   Administrative Law Section
4  320 West Fourth Street, Suite 410
   Los Angeles, CA 90013-2318
5  Telephone: (213) 576-6237
   *Attorneys for Complainant*
6

*FILED*
DEPT. OF MOTOR VEHICLES
JUL 2 8 2022
By _Dimuleahy_

7

8                  DEPARTMENT OF MOTOR VEHICLES

9                      STATE OF CALIFORNIA

10

11  In the Matter of the Accusation Against:      CASE NO. 21-02188

12  TESLA INC. dba TESLA MOTORS INC.,             LICENSE NO. 63277
    a Vehicle Manufacturer,
13                                                AIMS NO. 21V1L12011

14                                                **ACCUSATION**

15              Respondent.

16

17  COMPLAINANT ALLEGES AS FOLLOWS:

18                          **PARTIES**

19      1.  AILENE SHORT (Complainant) brings this Accusation solely in her official

20  capacity as Branch Chief, Industry Services Branch, Occupational Licensing Operations,

21  Operations Division, Department of Motor Vehicles.

22      2.  During the times set forth in the Cause for Discipline, TESLA INC. was doing

23  business as TESLA MOTORS INC. (Respondent), a corporation, operating in the State of

24  California, under vehicle manufacturer license number 63277 issued by the Department of Motor

25  Vehicles (Department).  Said license is in full force and effect and is scheduled to expire on

26  October 31, 2022.

27  ///

28  ///

_____
                                    1
Accusation                          In re Tesla Inc. dba Tesla Motors Inc. (Manufacturer) Case No. 21-02188

1

**JURISDICTION**

2      3. This Accusation is brought before the Office of Administrative Hearings and is

3   conducted pursuant to Vehicle Code § 11705(c).

4      4. The Department has continuing jurisdiction to file this Accusation pursuant to

5   Vehicle Code § 11721(c).

6

**CAUSE FOR DISCIPLINE**

7      5. Respondent made or disseminated statements that are untrue or misleading, and not

8   based on facts, in advertising vehicles as equipped, or potentially equipped, with advanced

9   driver assistance system (ADAS) features.  On at least five dates between May 28, 2021, and

10   July 12, 2022, specifically May 28, 2021, June 3, 2022, June 14, 2022, June 28, 2022, and

11   July 12, 2022, Tesla advertised ADAS features in written marketing materials primarily on

12   Tesla's internet website using the product label and descriptions:

13      A. "Autopilot"

14      B. "Full Self-Driving Capability"

15      C. The phrase:  "The system is designed to be able to conduct short and long-distance

16          trips with no action required by the person in the driver's seat."

17      D. The claims:  "From Home - All you will need to do is get in and tell your car where

18          to go.  If you don't say anything, your car will look at your calendar and take you

19          there as the assumed destination. Your Tesla will figure out the optimal route,

20          navigating urban streets, complex intersections and freeways.  To your Destination

21          – When you arrive at your destination, simply step out at the entrance and your car

22          will enter park seek mode, automatically search for a spot and park itself.  A tap on

23          your phone summons it back to you."

24   Instead of simply identifying product or brand names, these "Autopilot" and "Full Self-Driving

25   Capability" labels and descriptions represent that vehicles equipped with the ADAS features

26   will operate as an autonomous vehicle, but vehicles equipped with those ADAS features could

27   not at the time of those advertisements, and cannot now, operate as autonomous vehicles.

28   These advertisements are a deceptive practice under Civil Code § 1770(a)(5).  Tesla has

2

1   published disclaimers including one observed June 28, 2022, stating in part: "The currently

2   enabled features require active driver supervision and do not make the vehicle autonomous."

3   However, the disclaimer contradicts the original untrue or misleading labels and claims, which

4   is misleading, and does not cure the violation.  Respondent advertised statements not based on

5   facts in violation of Cal. Code Regs. Title 13, § 260.00.  Respondent made untrue or

6   misleading statements in advertisements in violation of Vehicle Code § 11713(a).

7   Respondent's acts, omissions, or conduct constitutes cause to discipline a manufacturer license

8   pursuant to Vehicle Code § 11705(a)(10).

9                                          **PRAYER**

10           6. By reason of the facts alleged in paragraph 5 in this Accusation, Respondent's acts

11  or omissions are cause for suspension or revocation of Respondent's manufacturer license and

12  special plates under Vehicle Code § 11705.

13          WHEREFORE, the undersigned prays that the Department of Motor Vehicles take such

14  action against the license of the Respondent as is warranted by the facts of this case, to wit:

15          a.  To suspend or revoke Respondent's manufacturer license and special plates number

16              63277;

17          b.  For an order pursuant to Government Code § 11519.1(a), if applicable, that

18              Respondent pay restitution to the persons or institutions who have suffered financial

19              loss or damage, according to proof; and

20          c.  To order any other and further action as it may deem just and proper under the

21              circumstances.

22  DATED: 7/28/2022

23

24

25              AILENE SHORT
                Branch Chief, Industry Services Branch
26              Occupational Licensing Operations
                Operations Division
27              Department of Motor Vehicles

28

                                              3

Accusation                    In re Tesla Inc. dba Tesla Motors Inc. (Manufacturer) Case No. 21-02188

## DEPARTMENT OF MOTOR VEHICLES
## STATEMENT TO RESPONDENT



### ACCUSATION

An Accusation filed by the Chief, Occupational Licensing Branch ("Complainant"), Department of Motor Vehicles ("Department"), in which you are named as Respondent, is hereby served on you along with the enclosed Notice of Defense. ***THE CHARGES IN THE ACCUSATION, IF PROVED, COULD HAVE SERIOUS CONSEQUENCES ON ANY OCCUPATIONAL LICENSE ISSUED TO YOU BY THE DEPARTMENT. PLEASE READ THE FOLLOWING INFORMATION CAREFULLY:***

**Defending the Accusation:** If you want to defend the allegations in the Accusation, you must submit a written request for a hearing (Notice of Defense) to the Department, signed by you or by an individual acting on your behalf. The request for hearing may be made by delivering or mailing the Notice of Defense as provided by Section 11506 of the Government Code, to the address checked below.  If the Notice of Defense is not **delivered or mailed to the Department within 15 days** after the Accusation was personally served on you or mailed to you, the Department may proceed on the Accusation without a hearing.  **Failure to file the Notice of Defense shall constitute a waiver of your right to a hearing** and the Department may take action against your license or license rights as provided by law.

**Representation by Counsel and Discovery:** You may, but need not, be represented by counsel **at your own expense** at all stages of these proceedings.  If you desire the names and addresses of witnesses or an opportunity to inspect and copy the items mentioned in Section 11507.6 of the Government Code in the possession, custody or control of the Department, you may contact the Department at the address checked below.  Copies of Sections 11507.5, 11507.6 and 11507.7 of the Government Code are attached.

**Postponements:** The hearing may be postponed only for good cause.  If you desire a postponement and have good cause, you **must** notify the Department AND the Office of Administrative Hearings within 10 working days after you discover the good cause.  Failure to give notice within 10 working days will deprive you of a postponement.

**Interpreters:  The hearing shall be conducted in English.  If you or your witnesses do not speak or understand English, you may request an interpreter BEFORE the commencement of the hearing, and the Department will provide one.**

**Waiver of Certain Objections:** If you sign and timely file the Notice of Defense, all parts of the Accusation which you do not expressly admit will be deemed denied.  However, if you do not separately object to the Accusation on the ground that it is so indefinite or uncertain that you cannot identify the transaction or prepare a defense, all such objections to the form of the Accusation shall be deemed waived.

**Burden of Proof and Governing Procedures:** The Complainant has the burden of proving the charges in the Accusation before an Administrative Law Judge in an adjudicative proceeding held in accordance with the provisions of Chapters 4.5 and 5 of Title 2, Division 3, Part 1 of the Government Code (Section 11400 et seq.).  In reaching a decision, the Administrative Law Judge may rely on certain guidelines applicable to your case.  These guidelines are contained in 13 California Code of Regulations, section 440.04.  You may obtain a copy of these Occupational Licensing and Disciplinary Guidelines by contacting the ***Department of Motor Vehicles, Occupational Licensing Branch, Services and Support Unit, P. O. Box 932342, MS-L224, Sacramento, CA  94232-3420, telephone number (916) 229-3153.***

**If you desire further information, you may contact the Department's Legal Office:**

320 West Fourth Street, Suite 410, Los Angeles, California 90013-2318
Phone Number: (213) 576-6237



STATE OF CALIFORNIA
DEPARTMENT OF MOTOR VEHICLES
A Public Service Agency

## COPY OF GOVERNMENT CODE SECTION
## 11507.5, 11507.6 AND 11507.7
## PURSUANT TO GOVERNMENT CODE SECTIONS
## 11504 AND 11505.

### *11507.5.*

The provisions of Section 11507.6 provide the exclusive right to and method of discovery as to any proceeding governed by this chapter.

### *11507.6*

After initiation of a proceeding in which a respondent or other party is entitled to a hearing on the merits, a party, upon written request made to another party, prior to the hearing and within 30 days after service by the agency of the initial pleading or within 15 days after the service of an additional pleading, is entitled to (1) obtain the names and addresses of witnesses to the extent known to the other party, including, but not limited to, those intended to be called to testify at the hearing, and (2) inspect and make a copy of any of the following in the possession or custody or under the control of the other party:

(a) A statement of a person, other than the respondent, named in the initial administrative pleading, or in any additional pleading, when it is claimed that the act or omission of the respondent as to this person is the basis for the administrative proceeding;

(b) A statement pertaining to the subject matter of the proceeding made by any party to another party or person;

(c) Statements of witnesses then proposed to be called by the party and of other persons having personal knowledge of the acts, omissions or events which are the basis for the proceeding, not included in (a) or (b) above;

(d) All writings, including, but not limited to, reports of mental, physical and blood examinations and things which the party then proposes to offer in evidence;

(e) Any other writing or thing which is relevant and which would be admissible in evidence;

(f) Investigative reports made by or on behalf of the agency or other party pertaining to the subject matter of the proceeding, to the extent that these reports (1) contain the names and addresses of witnesses or of persons having personal knowledge of the acts, omissions or events which are the basis for the proceeding, or (2) reflect matters perceived by the investigator in the course of his or her investigation, or (3) contain or include by attachment any statement or writing described in (a) to (e), inclusive, or summary thereof.

For the purpose of this section, "statements" include written statements by the person signed or otherwise authenticated by him or her, stenographic, mechanical, electrical or other recordings, or transcripts thereof, of oral statements by the person, and written reports or summaries of these oral statements.

Nothing in this section shall authorize the inspection or copying of any writing or thing which is privileged from disclosure by law or otherwise made confidential or protected as the attorney's work product.

***11507.7.***

(a)  Any party claiming the party's request for discovery pursuant to Section 11507.6 has not been complied with may serve and file with the administrative law judge a motion to compel discovery, naming as respondent the party refusing or failing to comply with Section 11507.6. The motion shall state facts showing the respondent party failed or refused to comply with Section 11507.6, a description of the matters sought to be discovered, the reason or reasons why the matter is discoverable under that section, that a reasonable and good faith attempt to contact the respondent for an informal resolution of the issue has been made, and the ground or grounds of respondent's refusal so far as known to the moving party.

(b)  The motion shall be served upon respondent party and filed within 15 days after the respondent party first evidenced failure or refusal to comply with Section 11507.6 or within 30 days after request was made and the party has failed to reply to the request, or within another time provided by stipulation, whichever period is longer.

(c)  The hearing on the motion to compel discovery shall be held within 15 days after the motion is made, or  a later time that the administrative law judge may on the judge's own motion for good cause determine. The respondent party shall have the right to serve and file a written answer or other response to the motion before or at the time of the hearing.

(d)  Where the matter sought to be discovered is under the custody or control of the respondent party and the respondent party asserts that the matter is not a discoverable matter under the provisions of Section 11507.6, or is privileged against disclosure under those provisions, the administrative law judge may order lodged with it matters provided in subdivision (b) of Section 915 of the Evidence Code and examine the matters in accordance with its provisions.

(e)  The administrative law judge shall decide the case on the matters examined in camera, the papers filed by the parties, and such oral argument and additional evidence as the administrative law judge may allow.

(f)  Unless otherwise stipulated by the parties, the administrative law judge shall no later than 15 days after the hearing make its order denying or granting the motion. The order shall be in writing setting forth the matters the party is entitled to discover under Section 11507.6. A copy of the order shall forthwith be served by mail by the administrative law judge upon the parties. Where the order grants the motion in whole or in part, the order shall not become effective until 10 days after the date the order is served. Where the order denies relief to the moving party, the order shall be effective on the date it is served.

## DEPARTMENT OF MOTOR VEHICLES

## STATE OF CALIFORNIA

In the Matter of the Accusation Against: | CASE NO.  21-02188

TESLA INC., dba TESLA MOTORS INC.,
a Vehicle Manufacturer,

NOTICE OF DEFENSE

Respondent.

I, the Respondent, in the above-entitled proceeding, acknowledge receipt of a copy of the Accusation, Statement to Respondent, and a copy of the Notice of Defense.

I hereby request a hearing to permit me to present my defense to the charges contained in said Accusation.

All correspondence concerning this proceeding should be sent to the following address:

(If you are represented by an attorney, all correspondence concerning this matter will be sent to the attorney.)

_____

Address                                                          Telephone Number

_____

City                              State                          Zip Code

_____

Signature                         Date                           Email **(Required)**

**I will need an interpreter at my hearing: Yes _____  No _____**

**Language? _____**

**I consent to the proceedings at my hearing being recorded/reported electronically:     Yes _____     No _____**

ADM 1146 (REV 8/2008)
**DEPARTMENT OF MOTOR VEHICLES**
LEGAL OFFICE   C128
P.O. BOX 932382
SACRAMENTO, CA 94232-3820



NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

# BUSINESS REPLY MAIL
FIRST CLASS   PERMIT NO. 1415   SACRAMENTO, CA

POSTAGE WILL BE PAID BY ADDRESSEE

STATE OF CALIFORNIA
DEPARTMENT OF MOTOR VEHICLES
LEGAL OFFICE   C128
P.O. BOX 932382
SACRAMENTO, CA 94299-9992

1

2

3                     DEPARTMENT OF MOTOR VEHICLES

4                        STATE OF CALIFORNIA

5

6 | In the Matter of the Accusation Against: | CASE NO.  21-02188 |

7 | TESLA INC. dba TESLA MOTORS INC., | LICENSE NO.  63277 |
   a Vehicle Manufacturer,

8                                     AIMS NO.  21V1L12011

9                Respondent.      **REQUEST FOR DISCOVERY**

10

11 TO:  TESLA INC. dba TESLA MOTORS INC.

12      Pursuant to Government Code section 11507.6, Complainant requests the following:

13      1. The names and addresses of all witnesses to the extent known by you, including, but

14 not limited to, those intended to be called to testify at the hearing.

15      2. An opportunity to inspect and copy each and all the matters set forth in Government

16 Code section 11507.6, subdivisions (a) through (f) inclusive, which are under your possession,

17 custody, or control.

18      Please be advised that this request for discovery is continuing in nature.

19 Dated:  **JUL 2 8** 2022

20

21

22

23                       DANIAN HOPP
                      Attorney IV

24

25

26

27

28

## DECLARATION OF SERVICE

Case Name    :    TESLA, INC., dba TESLA MOTORS, INC.
Case No.    :    21-02188
Court    :    OFFICE OF ADMINISTRATIVE HEARINGS

I declare:

I am employed in the County of Sacramento. My business address is 2415 First Avenue, Sacramento, CA  95818.  I am over the age of 18 years and not a party to the within entitled case.

On **July 28, 2022**, I served the following:

### *ACCUSATION; STATEMENT TO RESPONDENT; COPY OF GOVERNMENT CODE SECTION 11507.5, 11507.6, AND 11507.7 PURSUANT TO GOVERNMENT CODE SECTIONS 11504 AND 11505; NOTICE OF DEFENSE; REQUEST FOR DISCOVERY*

Addressed as follows:

Tesla Inc., dba Tesla Motors Inc.
45500 Fremont Blvd.
Fremont, CA  94538

By the following method:

☒ **US MAIL:** By placing the true copies thereof enclosed in a sealed envelope marked certified mail with return receipt requested. I am familiar with the business practice at the Department of Motor Vehicles for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Department of Motor Vehicles is deposited with the United States Postal Service that same day in the ordinary course of business.

☐ **E-MAIL:** By causing a true copy of the above described document in pdf form to be e-mailed to the e-mail address/es listed above. **Opposing party has agreed to be served by email.**

☐ **OTHER SERVICE:** I caused such envelope(s) to be delivered to the office of the addressee(s) listed above by:
☐ Golden State Overnight

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed at Sacramento, California on **July 28, 2022**.

*MMulcahy*
MAUREEN MULCAHY
Legal Secretary

US Postal Service®

**Certified Mail® Receipt**

Domestic Mail Only
No Insurance
Coverage Provided

CERTIFIED MAIL® ARTICLE NUMBER

9414 7266 9904 2972 0384 51

| | |
|---|---|
| Postage | $ |
| Certified Mail Fee | $ |
| Return Receipt Fee (Endorsement Required) | $ |
| Restricted Delivery Fee (Endorsement Required) | $ |
| Total Postage & Fees | $ |

Postmark
Here

PS Form 3800, April 2015

SEE REVERSE FOR INSTRUCTIONS

Sent To:

21-02188   (ACC)   SMD

TESLA INC dba TESLA MOTORS INC
45500 FREMONT BOULEVARD
FREMONT, CA  94538

Exhibit B

1   JENNIFER BERRY
    Assistant Chief Counsel
2   DANIAN HOPP, Attorney IV, SBN 204066
    DEPARTMENT OF MOTOR VEHICLES
3   Legal Affairs Division, Los Angeles Office
    Administrative Law Section
4   320 West Fourth Street, Suite 410
    Los Angeles, CA 90013-2318
5   Telephone: (213) 576-6237
    *Attorneys for Complainant*
6

FILED
DEPT. OF MOTOR VEHICLES
JUL 2 8 2022
By MMulcahy

7

8                    DEPARTMENT OF MOTOR VEHICLES

9                        STATE OF CALIFORNIA

10

11   In the Matter of the Accusation Against:        CASE NO. 21-02189

12   TESLA INC. dba TESLA MOTORS INC.,               LICENSE NO. 68106
     a Vehicle Dealer,
13                                                   AIMS NO. 21V1L12011

14                                                   **ACCUSATION**

15                        Respondent.

16

17   COMPLAINANT ALLEGES AS FOLLOWS:

18                              **PARTIES**

19        1. AILENE SHORT (Complainant) brings this Accusation solely in her official

20   capacity as Branch Chief, Industry Services Branch, Occupational Licensing Operations,

21   Operations Division, Department of Motor Vehicles.

22        2. During the times set forth in the Cause for Discipline, TESLA INC. was doing

23   business as TESLA MOTORS INC. (Respondent), a corporation, operating in the State of

24   California, under vehicle dealer license number 68106 issued by the Department of Motor

25   Vehicles (Department). Said license is in full force and effect and is scheduled to expire on

26   October 31, 2022.

27   ///

28   ///

                                              1

Accusation                    In re Tesla Inc. dba Tesla Motors Inc. (Dealer) Case No. 21-02189

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURISDICTION

3. This Accusation is brought before the Office of Administrative Hearings and is conducted pursuant to Vehicle Code § 11705(c).

4. The Department has continuing jurisdiction to file this Accusation pursuant to Vehicle Code § 11721(c).

## CAUSE FOR DISCIPLINE

5. Respondent made or disseminated statements that are untrue or misleading, and not based on facts, in advertising vehicles as equipped, or potentially equipped, with advanced driver assistance system (ADAS) features. On at least five dates between May 28, 2021, and July 12, 2022, specifically May 28, 2021, June 3, 2022, June 14, 2022, June 28, 2022, and July 12, 2022, Tesla advertised ADAS features in written marketing materials primarily on Tesla's internet website using the product labels and descriptions:

A. "Autopilot"

B. "Full Self-Driving Capability"

C. The phrase: "The system is designed to be able to conduct short and long-distance trips with no action required by the person in the driver's seat."

D. The claims: "From Home - All you will need to do is get in and tell your car where to go. If you don't say anything, your car will look at your calendar and take you there as the assumed destination. Your Tesla will figure out the optimal route, navigating urban streets, complex intersections and freeways. To your Destination – When you arrive at your destination, simply step out at the entrance and your car will enter park seek mode, automatically search for a spot and park itself. A tap on your phone summons it back to you."

Instead of simply identifying product or brand names, these "Autopilot" and "Full Self-Driving Capability" labels and descriptions represent that vehicles equipped with the ADAS features will operate as an autonomous vehicle, but vehicles equipped with those ADAS features could not at the time of those advertisements, and cannot now, operate as autonomous vehicles. These advertisements are a deceptive practice under Civil Code § 1770(a)(5). Tesla has

2

1  published disclaimers including one observed June 28, 2022, stating in part: "The currently

2  enabled features require active driver supervision and do not make the vehicle autonomous."

3  However, the disclaimer contradicts the original untrue or misleading labels and claims, which

4  is misleading, and does not cure the violation. Respondent advertised statements not based on

5  facts in violation of Cal. Code Regs. Title 13, § 260.00. Respondent made untrue or

6  misleading statements in advertisements in violation of Vehicle Code § 11713(a).

7  Respondent's acts, omissions, or conduct constitutes cause to discipline a dealer license

8  pursuant to Vehicle Code § 11705(a)(10).

9  **PRAYER**

10      6. By reason of the facts alleged in paragraph 5 in this Accusation, Respondent's acts

11  or omissions are cause for suspension or revocation of Respondent's dealer license and special

12  plates under Vehicle Code § 11705.

13      WHEREFORE, the undersigned prays that the Department of Motor Vehicles take such

14  action against the license of the Respondent as is warranted by the facts of this case, to wit:

15      a.  To suspend or revoke Respondent's dealer license and special plates number 68106;

16      b.  For an order pursuant to Government Code § 11519.1(a), if applicable, that

17          Respondent pay restitution to the persons or institutions who have suffered financial

18          loss or damage, according to proof; and

19      c.  To order any other and further action as it may deem just and proper under the

20          circumstances.

21  DATED: 7/28/2022

22

23

24  AILENE SHORT
Branch Chief, Industry Services Branch

25  Occupational Licensing Operations
Operations Division

26  Department of Motor Vehicles

27

28

3

Accusation                    In re Tesla Inc. dba Tesla Motors Inc. (Dealer) Case No. 21-02189

FILED
DEPT. OF MOTOR VEHICLES

JUL 2 8 2022

By *[signature]*

## DEPARTMENT OF MOTOR VEHICLES
## STATEMENT TO RESPONDENT

### ACCUSATION

An Accusation filed by the Chief, Occupational Licensing Branch ("Complainant"), Department of Motor Vehicles ("Department"), in which you are named as Respondent, is hereby served on you along with the enclosed Notice of Defense. **THE CHARGES IN THE ACCUSATION, IF PROVED, COULD HAVE SERIOUS CONSEQUENCES ON ANY OCCUPATIONAL LICENSE ISSUED TO YOU BY THE DEPARTMENT. PLEASE READ THE FOLLOWING INFORMATION CAREFULLY:**

**Defending the Accusation:** If you want to defend the allegations in the Accusation, you must submit a written request for a hearing (Notice of Defense) to the Department, signed by you or by an individual acting on your behalf. The request for hearing may be made by delivering or mailing the Notice of Defense as provided by Section 11506 of the Government Code, to the address checked below. If the Notice of Defense is not **delivered or mailed to the Department within 15 days** after the Accusation was personally served on you or mailed to you, the Department may proceed on the Accusation without a hearing. **Failure to file the Notice of Defense shall constitute a waiver of your right to a hearing** and the Department may take action against your license or license rights as provided by law.

**Representation by Counsel and Discovery:** You may, but need not, be represented by counsel **at your own expense** at all stages of these proceedings. If you desire the names and addresses of witnesses or an opportunity to inspect and copy the items mentioned in Section 11507.6 of the Government Code in the possession, custody or control of the Department, you may contact the Department at the address checked below. Copies of Sections 11507.5, 11507.6 and 11507.7 of the Government Code are attached.

**Postponements:** The hearing may be postponed only for good cause. If you desire a postponement and have good cause, you **must** notify the Department AND the Office of Administrative Hearings within 10 working days after you discover the good cause. Failure to give notice within 10 working days will deprive you of a postponement.

**Interpreters: The hearing shall be conducted in English. If you or your witnesses do not speak or understand English, you may request an interpreter BEFORE the commencement of the hearing, and the Department will provide one.**

**Waiver of Certain Objections:** If you sign and timely file the Notice of Defense, all parts of the Accusation which you do not expressly admit will be deemed denied. However, if you do not separately object to the Accusation on the ground that it is so indefinite or uncertain that you cannot identify the transaction or prepare a defense, all such objections to the form of the Accusation shall be deemed waived.

**Burden of Proof and Governing Procedures:** The Complainant has the burden of proving the charges in the Accusation before an Administrative Law Judge in an adjudicative proceeding held in accordance with the provisions of Chapters 4.5 and 5 of Title 2, Division 3, Part 1 of the Government Code (Section 11400 et seq.). In reaching a decision, the Administrative Law Judge may rely on certain guidelines applicable to your case. These guidelines are contained in 13 California Code of Regulations, section 440.04. You may obtain a copy of these Occupational Licensing and Disciplinary Guidelines by contacting the **Department of Motor Vehicles, Occupational Licensing Branch, Services and Support Unit, P. O. Box 932342, MS-L224, Sacramento, CA 94232-3420, telephone number (916) 229-3153.**

**If you desire further information, you may contact the Department's Legal Office:**

320 West Fourth Street, Suite 410, Los Angeles, California 90013-2318
Phone Number: (213) 576-6237



A Public Service Agency

## COPY OF GOVERNMENT CODE SECTION
## 11507.5, 11507.6 AND 11507.7
## PURSUANT TO GOVERNMENT CODE SECTIONS
## 11504 AND 11505.

### *11507.5.*

The provisions of Section 11507.6 provide the exclusive right to and method of discovery as to any proceeding governed by this chapter.

### *11507.6*

After initiation of a proceeding in which a respondent or other party is entitled to a hearing on the merits, a party, upon written request made to another party, prior to the hearing and within 30 days after service by the agency of the initial pleading or within 15 days after the service of an additional pleading, is entitled to (1) obtain the names and addresses of witnesses to the extent known to the other party, including, but not limited to, those intended to be called to testify at the hearing, and (2) inspect and make a copy of any of the following in the possession or custody or under the control of the other party:

(a) A statement of a person, other than the respondent, named in the initial administrative pleading, or in any additional pleading, when it is claimed that the act or omission of the respondent as to this person is the basis for the administrative proceeding;

(b) A statement pertaining to the subject matter of the proceeding made by any party to another party or person;

(c) Statements of witnesses then proposed to be called by the party and of other persons having personal knowledge of the acts, omissions or events which are the basis for the proceeding, not included in (a) or (b) above;

(d) All writings, including, but not limited to, reports of mental, physical and blood examinations and things which the party then proposes to offer in evidence;

(e) Any other writing or thing which is relevant and which would be admissible in evidence;

(f) Investigative reports made by or on behalf of the agency or other party pertaining to the subject matter of the proceeding, to the extent that these reports (1) contain the names and addresses of witnesses or of persons having personal knowledge of the acts, omissions or events which are the basis for the proceeding, or (2) reflect matters perceived by the investigator in the course of his or her investigation, or (3) contain or include by attachment any statement or writing described in (a) to (e), inclusive, or summary thereof.

For the purpose of this section, "statements" include written statements by the person signed or otherwise authenticated by him or her, stenographic, mechanical, electrical or other recordings, or transcripts thereof, of oral statements by the person, and written reports or summaries of these oral statements.

Nothing in this section shall authorize the inspection or copying of any writing or thing which is privileged from disclosure by law or otherwise made confidential or protected as the attorney's work product.

*11507.7.*

(a)  Any party claiming the party's request for discovery pursuant to Section 11507.6 has not been complied with may serve and file with the administrative law judge a motion to compel discovery, naming as respondent the party refusing or failing to comply with Section 11507.6. The motion shall state facts showing the respondent party failed or refused to comply with Section 11507.6, a description of the matters sought to be discovered, the reason or reasons why the matter is discoverable under that section, that a reasonable and good faith attempt to contact the respondent for an informal resolution of the issue has been made, and the ground or grounds of respondent's refusal so far as known to the moving party.

(b)  The motion shall be served upon respondent party and filed within 15 days after the respondent party first evidenced failure or refusal to comply with Section 11507.6 or within 30 days after request was made and the party has failed to reply to the request, or within another time provided by stipulation, whichever period is longer.

(c)  The hearing on the motion to compel discovery shall be held within 15 days after the motion is made, or a later time that the administrative law judge may on the judge's own motion for good cause determine. The respondent party shall have the right to serve and file a written answer or other response to the motion before or at the time of the hearing.

(d)  Where the matter sought to be discovered is under the custody or control of the respondent party and the respondent party asserts that the matter is not a discoverable matter under the provisions of Section 11507.6, or is privileged against disclosure under those provisions, the administrative law judge may order lodged with it matters provided in subdivision (b) of Section 915 of the Evidence Code and examine the matters in accordance with its provisions.

(e)  The administrative law judge shall decide the case on the matters examined in camera, the papers filed by the parties, and such oral argument and additional evidence as the administrative law judge may allow.

(f)  Unless otherwise stipulated by the parties, the administrative law judge shall no later than 15 days after the hearing make its order denying or granting the motion. The order shall be in writing setting forth the matters the party is entitled to discover under Section 11507.6. A copy of the order shall forthwith be served by mail by the administrative law judge upon the parties. Where the order grants the motion in whole or in part, the order shall not become effective until 10 days after the date the order is served. Where the order denies relief to the moving party, the order shall be effective on the date it is served.

## DEPARTMENT OF MOTOR VEHICLES

## STATE OF CALIFORNIA

In the Matter of the Accusation Against:

TESLA INC. dba TESLA MOTORS INC.,
a Vehicle Dealer,

Respondent.

CASE NO.  21-02189

NOTICE OF DEFENSE

I, the Respondent, in the above-entitled proceeding, acknowledge receipt of a copy of the Accusation, Statement to Respondent, and a copy of the Notice of Defense.

I hereby request a hearing to permit me to present my defense to the charges contained in said Accusation.

All correspondence concerning this proceeding should be sent to the following address:

(If you are represented by an attorney, all correspondence concerning this matter will be sent to the attorney.)

_____

Address                                                    Telephone Number

_____

City                              State                         Zip Code

_____

Signature                       Date                        Email **(Required)**

**I will need an interpreter at my hearing: Yes _____ No _____**

**Language? _____**

**I consent to the proceedings at my hearing being recorded/reported electronically:     Yes _____     No _____**

ADM 1146 (REV. 8/2008)
**DEPARTMENT OF MOTOR VEHICLES**
LEGAL OFFICE   C128
P.O. BOX 932382
SACRAMENTO, CA 94232-3820

NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

# BUSINESS REPLY MAIL
FIRST CLASS          PERMIT NO. 1415          SACRAMENTO, CA

POSTAGE WILL BE PAID BY ADDRESSEE

STATE OF CALIFORNIA
DEPARTMENT OF MOTOR VEHICLES
LEGAL OFFICE   C128
P.O. BOX 932382
SACRAMENTO, CA 94299-9992

1
2
3                    DEPARTMENT OF MOTOR VEHICLES
4                         STATE OF CALIFORNIA
5

6   In the Matter of the Accusation Against:        CASE NO.  21-02189

7   TESLA INC. dba TESLA MOTORS INC.,               LICENSE NO.  68106
    a Vehicle Dealer,
8                                                   AIMS NO.  21V1L12011

9                        Respondent.                **REQUEST FOR DISCOVERY**

10

11  TO: TESLA INC. dba TESLA MOTORS INC.

12       Pursuant to Government Code section 11507.6, Complainant requests the following:

13       1. The names and addresses of all witnesses to the extent known by you, including, but

14  not limited to, those intended to be called to testify at the hearing.

15       2. An opportunity to inspect and copy each and all the matters set forth in Government

16  Code section 11507.6, subdivisions (a) through (f) inclusive, which are under your possession,

17  custody, or control.

18       Please be advised that this request for discovery is continuing in nature.

19  Dated:    **JUL 2 8 2022**

20

21

22

23                                              DANIAN HOPP
                                                Attorney IV
24

25

26

27

28
                                                1
    ─────────────────────────────────────────────────────────────────
    Discovery Request                      Tesla Inc. dba Tesla Motors Inc., Case No. 21-02189

## DECLARATION OF SERVICE

Case Name    :    TESLA INC., dba TESLA MOTORS INC.
Case No.     :    21-02189
Court        :    OFFICE OF ADMINISTRATIVE HEARINGS

I declare:

I am employed in the County of Sacramento. My business address is 2415 First Avenue, Sacramento, California 95818. I am over the age of 18 years and not a party to the within entitled case.

On July 28, 2022, I served the following:

*ACCUSATION; STATEMENT TO RESPONDENT; GOVERNMENT CODE SECTION 11507.5, 11507.6, AND 11507.7 PURSUANT TO GOVERNMENT CODE SECTIONS 11504 AND 11505; NOTICE OF DEFENSE; REQUEST FOR DISCOVERY*

Addressed as follows:

Tesla Inc., dba Tesla Motors Inc.
45500 Fremont Blvd.
Fremont, CA  94538

By the following method:

☒ **US MAIL:**   By placing the true copies thereof enclosed in a sealed envelope marked certified mail with return receipt requested. I am familiar with the business practice at the Department of Motor Vehicles for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Department of Motor Vehicles is deposited with the United States Postal Service that same day in the ordinary course of business.

☐ **OTHER SERVICE**   I caused such envelope(s) to be delivered to the office of the addressee(s) listed above by:
☐       Express Mail
☐       Golden State Overnight
☐       Messenger

☐ **FACSIMILE TRANSMISSION:**   On the date below from facsimile machine number (213) 576-6245, I personally transmitted to the above-named person(s) to the facsimile number(s) shown above, pursuant to California Rules of Court 2003-2008. True copies of the above-described document(s) were transmitted by facsimile transmission and the transmission was reported as complete and without error. A copy of the transmission report issued by the transmitting machine is attached to this proof of service.

☐ **PERSONAL SERVICE**   By causing a true copy of the above-described documents to be hand delivered to the office(s) of the addressee(s).

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on July 28, 2022, at Sacramento, California.

MAUREEN MULCAHY
Legal Secretary



CERTIFIED MAIL® ARTICLE NUMBER

9414 7266 9904 2472 0384 68

US Postal Service®

**Certified Mail® Receipt**

Domestic Mail Only
No Insurance Coverage Provided

| | | |
|---|---|---|
| Postage | $ | |
| Certified Mail Fee | $ | |
| Return Receipt Fee (Endorsement Required) | $ | |
| Restricted Delivery Fee (Endorsement Required) | $ | Postmark Here |
| Total Postage & Fees | $ | |

Sent To:

21-02189  (ACC)  SMD

TESLA INC dba TESLA MOTORS INC
45500 FREMONT BOULEVARD
FREMONT, CA  94538

PS Form 3800, April 2015                                    SEE REVERSE FOR INSTRUCTIONS

Exhibit C

JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
FRANK M. PITRE (SBN 100077)
fpitre@cpmlegal.com
NABILAH A. HOSSAIN (SBN 329689)
nhossain@cpmlegal.com
ANDREW F. KIRTLEY (SBN 328023)
akirtley@cpmlegal.com
**COTCHETT, PITRE & McCARTHY LLP**
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax: (650) 697-0577

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHEN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BRIGGS A. MATSKO**, **THOMAS J. LOSAVIO**, and **BRENDA T. BROUSSARD**, on behalf of themselves and all others similarly situated, | Case No. 3:22-cv-05240 |
| | **PLAINTIFF THOMAS J. LOSAVIO'S CLRA VENUE AFFIDAVIT** |
| Plaintiffs, | |
| | [Cal. Civ. Code § 1780(d)] |
| v. | |
| **TESLA, INC., dba TESLA MOTORS, INC.**; **TESLA LEASE TRUST**; and **TESLA FINANCE LLC**, | |
| Defendants. | |

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

1    I, THOMAS J. LOSAVIO, hereby declare:

2        1.      I have personal knowledge of the facts stated herein and, if called upon to do so, could

3    competently testify thereto.

4        2.      I am a Plaintiff in the above-captioned action.

5        3.      I am a resident of Hillsborough, California.

6        4.      I submit this declaration in support of the Amended Complaint ("Complaint"), which

7    is based in part on violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*,

8    in connection with my purchase of a new 2017 Tesla Model S with Full Self-Driving Capability

9    ("FSD") from Defendant Tesla, Inc.

10       5.      The Complaint has been filed in the proper venue under Cal. Civ. Code § 1780(d)

11   because a substantial portion of these transactions occurred in the Northern District of California.

12   Specifically, I purchased the above vehicle while residing in Hillsborough, California (San Mateo

13   County) from Tesla, Inc., which had its principal place of business in Palo Alto, California (Santa

14   Clara County), which manufactured the vehicle at its factory in Fremont, California (Alameda

15   County), and which designed, developed, tested, marketed the vast majority of its FSD technology in

16   Palo Alto, California (Santa Clara County) and elsewhere in this District. All of these locations and

17   counties are in the Northern District of California.

18       6.      The Complaint has also been filed in the proper venue under Cal. Civ. Code § 1780(d)

19   for the separate and independent reasons that Defendants do substantial business in most if not all of

20   the California counties comprising the Northern District of California; because all Defendants

21   principal places of business were in Palo Alto, California (Santa Clara County) at the time of the

22   transaction; and because Defendants Tesla Lease Trust's and Tesla Finance LLC's principal places of

23   business are still in Palo Alto, California (Santa Clara County), according to information available on

24   the California Secretary of State's website on the date indicated below.

25       I declare under penalty of perjury, pursuant to the laws of the State of California, that the

26   foregoing is true and correct. Executed this 23rd day of September 2022 at Hillsborough, California.

27

28
                                                    _____
                                                    THOMAS J. LOSAVIO

**Plaintiff Thomas J. LoSavio's CLRA Venue Affidavit**
Case No. 3:22-cv-05240

Exhibit D

JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
FRANK M. PITRE (SBN 100077)
fpitre@cpmlegal.com
NABILAH A. HOSSAIN (SBN 329689)
nhossain@cpmlegal.com
ANDREW F. KIRTLEY (SBN 328023)
akirtley@cpmlegal.com
**COTCHETT, PITRE & McCARTHY LLP**
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax: (650) 697-0577

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHEN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **BRIGGS A. MATSKO**, **THOMAS J. LOSAVIO**, and **BRENDA T. BROUSSARD**, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> **TESLA, INC., dba TESLA MOTORS, INC.**; **TESLA LEASE TRUST**; and **TESLA FINANCE LLC**, <br><br> Defendants. | Case No. 3:22-cv-05240 <br><br> **PLAINTIFF BRENDA T. BROUSSARD'S CLRA VENUE AFFIDAVIT** <br><br> [Cal. Civ. Code § 1780(d)] |

I, BRENDA T. BROUSSARD, hereby declare:

1.     I have personal knowledge of the facts stated herein and, if called upon to do so, could competently testify thereto.

2.     I am a Plaintiff in the above-captioned action.

3.     I am a resident of Los Angeles, California.

4.     I submit this declaration in support of the Amended Complaint ("Complaint"), which is based in part on violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, in connection with my purchase of a new 2022 Tesla Model Y with Full Self-Driving Capability ("FSD") from Defendant Tesla, Inc.

5.     The Complaint has been filed in the proper venue under Cal. Civ. Code § 1780(d) because a substantial portion of these transactions occurred in the Northern District of California. Specifically, I purchased the vehicle from Tesla, Inc., which manufactured the vehicle at its factory in Fremont, California (Alameda County), and which designed, developed, tested, marketed the vast majority of its FSD technology in Palo Alto, California (Santa Clara County) and elsewhere in this District. All of these locations and counties are in the Northern District of California.

6.     The Complaint has also been filed in the proper venue under Cal. Civ. Code § 1780(d) for the separate and independent reasons that Defendants do substantial business in most if not all of the California counties comprising the Northern District of California; because all Defendants principal places of business were in Palo Alto, California (Santa Clara County) at the time of the transaction; and because Defendants Tesla Lease Trust's and Tesla Finance LLC's principal places of business are still in Palo Alto, California (Santa Clara County), according to information available on the California Secretary of State's website on the date indicated below.

I declare under penalty of perjury, pursuant to the laws of the State of California, that the foregoing is true and correct. Executed this 23rd day of September 2022 at Los Angeless, California.

*Brenda  Broussard*

_____
BRENDA T. BROUSSARD

**Plaintiff Brenda T. Broussard's CLRA Venue Affidavit**
Case No. 3:22-cv-05240

Exhibit E

DocuSign Envelope ID: 9B8A0695-A820-4910-A933-0EF9CB41AFE4

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
  fbottini@bottinilaw.com
Nicholaus H. Woltering (SBN 337193)
  nwoltering@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone:   (858) 914-2001
Facsimile:    (858) 914-2002

*Attorneys for Plaintiff Dominick Battiato*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DOMINICK BATTIATO, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TESLA, INC., dba TESLA MOTORS, INC.; TESLA LEASE TRUST; and TESLA FINANCE LLC,<br><br>Defendants. | Case No. _____<br><br>**CONSUMER LEGAL REMEDIES ACT VENUE AFFIDAVIT OF PLAINTIFF** |

I, Dominick Battiato, declare and state as follows:

1.      I am over the age of 18 and the Plaintiff in the above-captioned action.  I have personal knowledge of the facts stated herein and, if called upon to do so, could competently testify thereto.

2.      I make this affidavit as required by California Civil Code § 1780(d).

3.      The complaint in this action is filed in the proper place for trial of this action because Defendants do business within the Northern District of California and because substantial portions of the events, acts and omissions that are subject to my claims in this matter occurred within the Northern District of California, in Alameda County.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed on September 7, 2022.                    _____
                                                                              Dominick Battiato

**CLRA Venue Affidavit of Plaintiff Dominick Battiato**

Exhibit F

1   DAVID S. CASEY, JR. (SBN 060768)
    dcasey@cglaw.com
2   GAYLE M. BLATT (SBN 122048)
    gmb@cglaw.com
3   **CASEY GERRY SCHENK FRANCAVILLA**
    **BLATT & PENFIELD, LLP**
4   110 Laurel Street
5   San Diego, CA 92101
    Telephone: (619) 238-1811
6

7   *Attorneys for Plaintiff and the Proposed Class*

8                 **UNITED STATES DISTRICT COURT**

9                **NORTHEN DISTRICT OF CALIFORNIA**

10

11                                  | Case No. 4:22-cv-05240-HSG

12  **In re Tesla Advanced Driver Assistance** | **CONSUMER LEGAL REMEDIES ACT**
    **Systems Litigation** | **VENUE AFFIDAVIT OF PLAINTIFF**
13                                  | **CHRISTOPHER MALLOW**

14

15  This Case Relates To All Actions

16

17

18

19

20

21

22

23

24

25

26

27

28

1    I, Christopher Mallow, declare and state as follows:

2    1.    I am over the age of 18 and a Plaintiff in the above-captioned action. I have personal

3    knowledge of the facts stated herein and, if called upon to do so, could competently testify thereto.

4    2.    I make this affidavit as required by California Civil Code § 1780(d).

5    3.    The complaint in this action is filed in the proper place for trial of this action because

6    Defendants do business within the Northern District of California and because substantial portions of

7    the events, acts and omissions that are subject to my claims in this matter occurred within the

8    Northern District of California.

9    I declare under penalty of perjury under the laws of the State of California and the United

10    States that the foregoing is true and correct.

11

12    Executed on October 27, 2022

_____

Christopher Mallow

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit G

DAVID S. CASEY, JR. (SBN 060768)
dcasey@cglaw.com
GAYLE M. BLATT (SBN 122048)
gmb@cglaw.com
**CASEY GERRY SCHENK FRANCAVILLA**
**BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811

*Attorneys for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## NORTHEN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **In re Tesla Advanced Driver Assistance Systems Litigation**<br><br><br>This Case Relates To All Actions | Case No. 4:22-cv-05240-HSG<br><br>**CONSUMER LEGAL REMEDIES ACT VENUE AFFIDAVIT OF PLAINTIFF JAZMIN IMAGUCHI** |

**Plaintiffs' Consolidated Amended Complaint** 3
Case No. 4:22-cv-05240-HSG

I, Jazmin Imaguchi, declare and state as follows:

1. I am over the age of 18 and a Plaintiff in the above-captioned action. I have personal knowledge of the facts stated herein and, if called upon to do so, could competently testify thereto.

2. I make this affidavit as required by California Civil Code § 1780(d).

3. The complaint in this action is filed in the proper place for trial of this action because Defendants do business within the Northern District of California and because substantial portions of the events, acts and omissions that are subject to my claims in this matter occurred within the Northern District of California.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed on October 27, 2022

_____
                                            Jazmin Imaguchi

**Plaintiffs' Consolidated Amended Complaint** 3
Case No. 4:22-cv-05240-HSG