FRANK M. PITRE (SBN 100077)
fpitre@cpmlegal.com
JULIE L. FIEBER (SBN 202857)
jfieber@cpmlegal.com
NABILAH A. HOSSAIN (SBN 329689)
nhossain@cpmlegal.com
ANDREW F. KIRTLEY (SBN 328023)
akirtley@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax: (650) 697-0577

FRANCIS A. BOTTINI, JR. (SBN 175783)
fbottini@bottinilaw.com
NICHOLAUS H. WOLTERING (SBN 337193)
nwoltering@bottinilaw.com
**BOTTINI & BOTTINI, INC.**
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: (858) 914-2001
Fax: (858) 914-2002

DAVID S. CASEY, JR. (SBN 060768)
dcasey@cglaw.com
GAYLE M. BLATT (SBN 122048)
gmb@cglaw.com
JEREMY ROBINSON (SBN 188325)
jrobinson@cglaw.com
P. CAMILLE GUERRA (SBN 326546)
camille@cglaw.com
MICHAEL J. MORPHEW (SBN 304463)
mmorphew@cglaw.com
**CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **In re Tesla Advanced Driver Assistance Systems Litigation**<br><br><br><br>*This Filing Relates To All Actions* | Case No. 4:22-cv-05240-HSG<br><br>**MOTION FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>Judge: Hon. Haywood S. Gilliam, Jr.<br>Date:   June 29, 2023<br>Time:   2:00 p.m.<br>Room: Courtroom 2, 4th Floor |

1

## NOTICE OF MOTION AND MOTION

2

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3

**PLEASE TAKE NOTICE** that on June 29, 2023, at 2:00 p.m., or as soon thereafter as this

4 matter may be heard before the Honorable Haywood S. Gilliam, Jr., in Courtroom 2 on the Fourth

5 Floor of the United States District Court for the Northern District of California, Oakland Courthouse,

6 1301 Clay Street, Oakland, California 94612, Plaintiffs Thomas J. LoSavio, Brenda T. Broussard,

7 Dominick Battiato, Christopher Mallow, and Jazmin Imaguchi (collectively, "Plaintiffs") will and

8 hereby do move the Court pursuant to Rule 65 of the Federal Rules of Civil Procedure for a

9 preliminary injunction ordering Defendants Tesla, Inc., Tesla Lease Trust, and Tesla Finance LLC

10 (collectively, "Tesla" or "Defendants"), and Tesla's officers, directors, agents, employees,

11 representatives, and all persons acting for, under, or in concert or participation with Tesla, to comply

12 with its statutory and common law obligations by doing the following:

13        1.      Immediately cease to market or otherwise represent that its SAE Level 2 ADAS

14 technology gives vehicles "Full Self Driving Capability" (or substantively equivalent language),

15 makes vehicles "self-driving" or "autonomous" (or substantively equivalent language), unless and

16 until Tesla develops technology that is approved by a U.S. state or federal regulator as an SAE Level

17 3, 4, or 5 technology that may be used on all public roadways by any person with a typical class of

18 driver's license.

19        2.      Immediately cease the sale and initial activation of FSD Beta software on all Tesla

20 vehicles until such time as defects publicly identified by the National Highway Traffic Safety

21 Administration ("NHTSA") have been remedied, as confirmed by the Court.

22        3.      Within 24 hours of the issuance of the preliminary injunction, provide conspicuous

23 written notice to all Tesla vehicle owners and lessees, delivered by an electronic message to each

24 owner's or lessee's Tesla account "inbox" and by a conspicuous one-time pop-up on their vehicle's

25 main touchscreen that appears upon starting the vehicle and that requires the driver to touch the

26 screen to click out of the pop-up, that a court has found that Tesla's use of the terms "Full Self

27 Driving Capability," "self-driving," and "autonomous" to describe its FSD technology is inaccurate

28

1  and likely to deceive members of the public, and that the Court has ordered Tesla to immediately stop

2  using those terms to describe its FSD technology.

3        4.    Within 24 hours of the issuance of the preliminary injunction, provide conspicuous

4  written notice to all Tesla vehicle owners and lessees, delivered by an electronic message to each

5  owner's or lessee's Tesla account "inbox" and by a conspicuous one-time pop-up on their vehicle's

6  main touchscreen that appears upon starting the vehicle and that requires the driver to touch the

7  screen to click out of the pop-up, that Tesla will be remotely deactivating FSD Beta on all vehicles

8  due to safety defects identified by NHTSA, and that Tesla will not reactivate FSD Beta until those

9  defects have been remedied, as confirmed by the Court. Within 48 hours of the issuance of the

10  preliminary injunction, cause FSD Beta to be remotely deactivated on all Tesla vehicles, and keep

11  FSD Beta deactivated on those vehicles in accordance with the terms of the afore-mentioned written

12  notice.

13        5.    *In the alternative to #4:* Within 24 hours of the issuance of the preliminary injunction,

14  provide conspicuous written notice to all Tesla vehicle owners and lessees, delivered by an electronic

15  message to each owner's or lessee's Tesla account "inbox" and by a conspicuous one-time pop-up on

16  their vehicle's main touchscreen that appears upon starting the vehicle and that requires the driver to

17  touch the screen to click out of the pop-up, that NHTSA has identified safety defects with FSD Beta,

18  and that Tesla vehicle owners and lessees with FSD Beta are advised not to use FSD Beta until Tesla

19  provides them further written notice that the defects have been remedied, as confirmed by the Court.

20        To effectuate the purposes of the foregoing categories of preliminary injunctive relief,

21  Plaintiffs seek the following further relief from this Court:

22        6.    Expedited discovery from Tesla on the following issues: (a) whether deactivating FSD

23  Beta fully removes the safety risks identified by NHTSA, (b) whether Tesla has an appropriate

24  process and standards to ascertain whether any proposed over-the-air software update developed by

25  Tesla would fully remedy the defects identified by NHTSA, and (c) such other issues deemed that the

26  Court deems appropriate for expedited discovery in connection with the preliminary injunctive relief.

27        7.    Order the appointment of a U.S. Magistrate Judge or special master to, on an expedited

28  basis, (a) oversee enforcement of the preliminary injunction, (b) adjudicate in the first instance any

disputes that may arise related to expedited discovery ordered by the Court, and (c) recommend to the Court whether it would be in the public interest to appoint an independent third party with appropriate expertise in ADAS technology to review Tesla's proposed remedies to the defects identified by NHTSA and confirm whether they are likely to remedy the defects, before Tesla transmits those remedies via over-the-air updates to the Tesla vehicles owned or leased by members of the provisionally certified class.

8.      Provisionally certify the following class of Tesla vehicle owners and lessees for purposes entering preliminary injunctive relief: All persons who purchased or leased a new Tesla vehicle from Tesla, Inc. (or any entity it directly or indirectly owns or controls, including but not limited to Tesla Lease Trust and Tesla Finance LLC) on or after January 1, 2016, who still own or lease that vehicle, and who have purchased "Full Self-Driving Capability" for their vehicle, or who could add "Full Self-Driving Capability" to their vehicle by purchase or subscription.

9.      Order such other and further relief that the Court deems just and appropriate.

*      *      *

Plaintiffs move for the above preliminary injunction on the basis that Tesla has and continues to violate the Consumer Legal Remedies Act, False Advertising Law, and Unfair Competition Law by continuing to engage in false and deceptive labeling and marketing with respect to its FSD system, with the foreseeable result of causing a significant number of fatal and non-fatal vehicle collisions on the nation's roads due to Tesla owners over-relying on FSD to drive their cars for them, and for the other reasons set forth in the accompanying Memorandum of Points and Authorities.

Plaintiffs move for provisional class certification on the grounds that the class is sufficiently numerous, there are ample common questions of law and fact, Plaintiffs' claims are typical of class members' claims, Plaintiffs are adequate representatives, and certification under Rule 23(b)(2) is appropriate because Plaintiffs at this stage seek only preliminary injunctive relief based on Tesla's practices that are applicable to all Class Members. *See* Fed. R. Civ. P. 23(a), 23(b)(2); *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041-43 (9th Cir. 2012); *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010).

1        Plaintiffs' motion is based on this Notice of Motion, the accompanying Memorandum of

2   Points and Authorities, Declaration of Julie Fieber (with 11 plaintiff and class member declarations

3   attached), Request for Judicial Notice, Proposed Order, the pleadings and records on file with the

4   Court, and any further briefing and arguments of counsel.

5

6                                           Respectfully submitted,

7   Dated:  March 22, 2023                **COTCHETT, PITRE & McCARTHY, LLP**

8                                          By:    /s/ Frank M. Pitre
9                                                 FRANK M. PITRE

10                                         *Attorneys for Plaintiffs Thomas LoSavio,*
                                           *Brenda Broussard, and the Proposed Class*
11

12  Dated:  March 22, 2023                **BOTTINI & BOTTINI, INC.**
13
                                           By:    /s/ Francis A. Bottini, Jr.
14                                                FRANCIS A. BOTTINI, JR.

15                                         *Attorneys for Plaintiff Dominick Battiato*
                                           *and the Proposed Class*
16

17  Dated:  March 22, 2023                **CASEY GERRY SCHENK FRANCAVILLA**
                                           **BLATT & PENFIELD, LLP**
18

19                                         By:    /s/ Gayle M. Blatt
                                                  GAYLE M. BLATT
20

21                                         *Attorneys for Plaintiffs Christopher Mallow,*
                                           *Jazmin Imaguchi, and the Proposed Class*
22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.   **INTRODUCTION** ....................................................................................1

II.  **STATEMENT OF FACTS** ...................................................................**3**

   A.   Autonomous Vehicle Technology ...............................................**3**

   B.   Tesla Has Deceptively Marketed its ADAS Technology Since its Inception. ......................**4**

      1.   Early Autopilot (October 2014 to September 2016) ............... 5

      2.   The Release of FSD (October 2016) .................................. 6

      3.   The Development of FSD (November 2016 to present) ....................... 7

   C.   Tesla's False and Deceptive Marketing Has Misled Consumers ...............................**9**

   D.   Tesla's False and Deceptive Marketing Has Caused Significant Death and Injury ............**10**

   E.   Federal and State Regulators Launch Investigations Amid Mounting Criticism ..............**12**

   F.   The February 2023 NHTSA Recall of FSD ...............................**12**

   G.   Tesla's Continuing Deceptive Claims Pose a Serious Danger to the Public .....................**12**

III. **LEGAL STANDARD** ...............................................................**13**

IV.  **ARGUMENT** ...............................................................................**13**

   A.   **THE COURT SHOULD GRANT PRELIMINARY INJUNCTIVE RELIEF TO STOP TESLA'S DECECPTIVE MARKETING OF FSD FROM CAUSING FURTHER DEATH AND INJURY.** ....................**13**

      1.   Plaintiffs Are Likely to Succeed on the Merits, or at Minimum Have Raised Serious Merits Questions. ........................ 13

         a.   Tesla's FSD claims are false and deceptive. ........................ 15

         b.   Tesla's FSD claims are likely to deceive the public. ........................ 17

         c.   Plaintiffs easily satisfy all additional requirements for imposing liability on Tesla under the CLRA, FAL, and UCL. ........................ 18

      2.   Irreparable Injury Is Likely Absent a Preliminary Injunction. ........................ 19

         d.   Death and serious bodily harm constitute "irreparable injury." ........................19

         e.   Tesla's deceptive FSD claims are virtually certain to cause more preventable death and injury absent the requested injunctive relief. ........................20

      3.   The Balance of the Equities Tips Sharply in Plaintiffs' Favor. ........................ 21

      4.   Immediate Injunctive Relief is in the Public Interest. ........................ 22

**B.    THE COURT SHOULD PROVISIONALLY CERTIFY THE CLASS.**......................**22**

    1.   The Requirements of Rule 23(a) Are Satisfied..................................................... 23

    2.   Under Rule 23(b)(2), Tesla's Challenged Practices Apply Generally to the Class. ......... 24

    3.   Plaintiffs' Counsel Should Be Appointed Provisional Class Counsel under
       Rule 23(g)................................................................................................................ 25

**V.    CONCLUSION** .........................................................................................................**25**

1

## <u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

**Cases**

4

*Abdullah v. U.S. Sec. Assocs., Inc.,*

5

   731 F.3d 952 (9th Cir. 2013) ................................................................................. 23

6

*Adkins v. Facebook, Inc.,*

   424 F.Supp.3d 686 (N.D. Cal. 2019) .................................................................... 25

7

*Ahlman v. Barnes,*

8

   445 F.Supp.3d 671 (C.D. Cal. 2020) ................................................................... 22

9

*Alger v. FCA US LLC,*

10

   334 F.R.D. 415 (E.D. Cal. 2020) ................................................................... 14, 25

11

*Amchem Prod., Inc. v. Windsor,*

   521 U.S. 591 (1997) .............................................................................................. 24

12

*Berger v. Home Depot USA, Inc.,*

13

   741 F.3d 1061 (9th Cir. 2014) .............................................................................. 18

14

*Brown v. Plata,*

15

   563 U.S. 493 (2011) .............................................................................................. 21

16

*Coe v. Gen. Mills, Inc.,*

   2016 WL 4208287 (N.D. Cal. Aug. 10, 2016) .................................................... 18

17

*Coleman v. Paccar, Inc.,*

18

   424 U.S. 1301 (1976) ............................................................................................ 22

19

*Colgan v. Leatherman Tool Grp., Inc.,*

20

   135 Cal.App.4th 663 (2006) ................................................................................. 15

21

*Delaware v. Prouse,*

   440 U.S. 648 (1979) .............................................................................................. 22

22

*Edge v. City of Everett,*

23

   929 F.3d 657 (9th Cir. 2019) ................................................................................ 13

24

*Ellis v. Costco Wholesale Corp.,*

   657 F.3d 970 (9th Cir. 2011) ................................................................................ 24

25

*Fernandez v. Atkins Nutritionals, Inc.,*

26

   2018 WL 280028 (S.D. Cal. Jan. 3, 2018) .......................................................... 18

27

*Ford v. Wainwright,*

28

   477 U.S. 399 (1986) .............................................................................................. 19

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

*Gayle v. Meade*,
    2020 WL 3041326 (S.D. Fla. June 6, 2020) ......................................................... 19

*Harris v. Bd. of Supervisors*,
    366 F.3d 754 (9th Cir. 2004) ............................................................................... 21

*Hauk v. JP Morgan Chase Bank USA*,
    552 F.3d 1114 (9th Cir. 2009) ............................................................................. 14

*Helling v. McKinney*,
    509 U.S. 25 (1993) ............................................................................................... 20

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    938 F.3d 985 (9th Cir. 2019) ............................................................................... 13

*Ho v. Toyota Motor Corp.*,
    931 F.Supp.2d 987 (N.D. Cal. 2013) ................................................................... 14

*Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*,
    725 F.3d 940 (9th Cir. 2013) ............................................................................... 19

*Kasky v. Nike, Inc.*,
    27 Cal.4th 939 (2002) .......................................................................................... 17

*Keegan v. Am. Honda Motor Co.*,
    284 F.R.D. 504 (C.D. Cal. 2012) ......................................................................... 19

*Kwikset Corp. v. Superior Court*,
    51 Cal.4th 310 (2011) .......................................................................................... 19

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) ............................................................................... 14

*Mackey v. Montrym*,
    443 U.S. 1 (1979) ................................................................................................. 22

*Maurer v. Hamilton*,
    309 U.S. 598 (1940) ............................................................................................. 22

*Meyer v. Portfolio Recovery Assocs., LLC*,
    707 F.3d 1036 (9th Cir. 2012) ............................................................................. 22

*Moore v. Mars Petcare US, Inc.*,
    966 F.3d 1007 (9th Cir. 2020) ............................................................................. 16

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ......................................................................... 24, 25

*Plata v. Schwarzenegger*,
    2008 WL 4847080 (N.D. Cal. Nov. 7, 2008) ...................................................... 21

*Playskool, Inc. v. Prod. Dev. Grp., Inc.*,
   699 F. Supp. 1056 (E.D.N.Y. 1988) .................................................................................... 20

*Rannis v. Recchia*,
   380 F. App'x 646 (9th Cir. 2010) ........................................................................................ 23

*Rodriguez v. Hayes*,
   591 F.3d 1105 (9th Cir. 2010) ............................................................................................. 25

*Roman v. Wolf*,
   977 F.3d 935 (9th Cir. 2020) ............................................................................................... 22

*Ruiz Torres v. Mercer Canyons Inc.*,
   835 F.3d 1125 (9th Cir. 2016) ............................................................................................. 24

*Sandoval v. PharmaCare US, Inc.*,
   730 F. App'x 417 (9th Cir. 2018) ........................................................................................ 14

*Senne v. Kansas City Royals Baseball Corp.*,
   2021 WL 3129460 (N.D. Cal. July 23, 2021) .................................................................... 23

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
   709 F.3d 1281 (9th Cir. 2013) ............................................................................................. 19

*Skinner v. Ken's Foods, Inc.*,
   53 Cal.App.5th 938 (2020) .................................................................................................. 18

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ............................................................................................... 24

*Suski v. Marden-Kane, Inc.*,
   2022 WL 103541 (N.D. Cal. Jan. 11, 2022) ...................................................................... 14

*In re Tobacco II Cases*,
   46 Cal.4th 298 (2009) .......................................................................................................... 19

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) ............................................................................................................. 23

*United States v. Gear Box Z Inc.*,
   526 F.Supp.3d 522 (D. Ariz. 2021) .................................................................................... 20

*United States v. Hinds Cnty.*,
   --- F.Supp.3d ----, 2022 WL 4071968 (S.D. Miss. Sept. 2, 2022) .................................... 21

*Walker v. Nestle USA, Inc.*,
   2020 WL 3317194 (S.D. Cal., June 17, 2020) ................................................................... 18

*Williams v. Gerber Prod. Co.*,
   552 F.3d 934 (9th Cir. 2008) ............................................................................................... 14

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008).......................................................................................... 13, 19, 21

**Statutes**

California Business & Professions Code:

   § 17200 ...................................................................................................................... 14
   § 17204 ...................................................................................................................... 19
   § 17500 ................................................................................................................. 14, 18

California Civil Code § 1770(a)(5)............................................................................. 14

**Rules**

Federal Rules of Civil Procedure:

   Rule 23(a) ............................................................................................................. 23, 24
   Rule 23(b)(2) ...................................................................................................... 23, 24, 25
   Rule 23(g) ........................................................................................................... 23, 25

**Other Authorities**

Merriam-Webster Online, *Autonomous*, https://www.merriam-
   webster.com/dictionary/autonomous ................................................................. 16

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

*This is what happens when you work to change things—first they think you're crazy, then they fight you, and then all of a sudden you change the world.* **– Elizabeth Holmes**

## I.     INTRODUCTION

For nearly a decade, Tesla CEO Elon Musk has been promising that Tesla is on the cusp of bringing to market a fully self-driving car that's going to change the world. Tesla forged its corporate brand and identity in the crucible of this promise: that it would be not only the first to revolutionize transportation as we know it, but that it would do so using a significantly more limited, sleeker, and cheaper suite of vehicle sensors than any of its competitors. It is a beautiful vision, one which has propelled Tesla to become the world's leading electric vehicle manufacturer.

The problem is that the vision is a mirage. Tesla has never been *remotely close* to developing the self-driving car that Musk keeps promising is just around the corner. In the words of one senior Tesla engineer, Musk's promises do "not match engineering reality." But having staked the company's reputation and value on developing a self-driving car, Musk and Tesla keep telling the world that they just need another six months or a year to make good on their promise. And to make that lie more plausible, they also keep exaggerating the *current* abilities of Tesla's technology to give the impression that it is currently more advanced and safer than it actually is. As a result, a significant number of Tesla owners, who have been understandably impressed by the bells and whistles of an exciting new technology, lack an accurate understanding of the technology's significant limitations, are over-relying on that technology, and are getting into one horrific accident after the next.

Plaintiffs bring this Motion for Preliminary Injunction ("Motion") to stop Tesla and Musk's reckless endangerment of the public by continuing their false and deceptive claims about Tesla's advanced driver assistance systems ("ADAS") technology—particularly its flagship system named Full Self Driving Capability ("FSD"). Many consumers pay thousands of dollars for FSD believing that it will do what its name says: make their Tesla car fully self-driving. In reality, FSD is merely a driver-assistance technology (SAE Level 2) that does not make cars self-driving under *any* circumstances (SAE Levels 3-4), much less *fully* self-driving (SAE Level 5). With the number of FSD vehicles on the road at 360,000 and growing, the wholly preventable deaths and injuries from

widespread misuse of FSD show no signs of slowing down.

In many ways, the deception at the heart of this case can be traced to October 2016, when Tesla coupled its announcement of FSD with the release of a deceptive "demonstration" video (still on Tesla's website) that begins with the following message: "The person in the driver's seat is only there for legal reasons. He is not doing anything. The car is driving itself." While the car in the video does indeed appear to be driving itself, we now know the video was a fraud thanks to investigative reporting by The New York Times, and the recent emergence of explosive internal Tesla emails and deposition testimony from Tesla's top Autopilot engineer. We also know the videos were a fraud because today—over six years later—FSD still fails to consistently and safely execute even the most routine driving maneuvers, such as stopping at red lights and stop signs, following reductions in posted speed limits, avoiding oncoming traffic, and not driving at high speed directly toward concrete barriers and emergency vehicles. Just last month, the National Highway Traffic Safety Administration ("NHTSA") issued an unprecedented **nationwide recall** of all 360,000 vehicles with FSD, but Tesla has declined to temporarily deactivate FSD until the defects are remedied, or even to provide FSD owners notice of the recall. Instead, it continues expanding the program. The result? Two days after the recall, yet another Tesla plowed into a parked fire truck on a California highway, killing the driver and injuring five.

Plaintiffs filed the first of these consumer class actions in September 2022, and filed their Consolidated Amended Complaint ("CAC") (ECF No. 23) the following month. The declarations accompanying this Motion detail how Plaintiffs and class members conducted significant research before purchasing their Tesla cars with FSD, based on their belief in Tesla's claims that FSD would make their cars safely self-driving at least in some circumstances, and that the technology would rapidly improve during their ownership of the car. Upon using FSD, however, they gradually realized the technology was unpredictable, unreliable, and unsafe. Their testimony recalls the words of the Chair of the National Transportation Safety Board ("NTSB"), the nation's top investigator of roadway accidents, charging that Tesla "has clearly misled numerous people to misuse and abuse the technology," calling the resulting situation "very, very dangerous" and "a disaster waiting to happen."

Plaintiffs bring this Motion now because the disaster is already happening and shows no signs

1    of abating. Even amid a nationwide FSD recall and numerous ongoing civil and reported *criminal*

2    investigations into Tesla's marketing of Autopilot and FSD, Tesla and Musk continue making the

3    same false and deceptive claims that have misled so many into believing that FSD makes cars self-

4    driving when it indisputably does not. People have already needlessly died and suffered, and more

5    people will die and be injured in the coming weeks and months if there is no change in the status quo.

6    Plaintiffs respectfully ask this Court to enter the requested preliminary injunction set forth in the

7    Notice of Motion, and to provisionally certify a Rule 23(b)(2) class as defined herein.

8    **II.      STATEMENT OF FACTS**

9    **A.      Autonomous Vehicle Technology**

10          The international standard of classifying autonomous vehicle technology was developed by

11   SAE International ("SAE") in 2014. Ex. 41 at 2.[1] It is universally recognized as the industry standard,

12   including by Tesla and key government agencies (e.g., USDOT, NHTSA, NTSB, California DMV). It

13   is a six-level classification: Level 0 (no driver automation), Level 1 (driver assistance), Level 2

14   (advanced driver assistance, or ADAS), Level 3 (autonomous operation subject to requests for human

15   intervention), Level 4 (autonomous in *specific* locations or conditions), and Level 5 (autonomous in

16   *all* locations and conditions). *Id.* The standard is summarized in the SAE graphic reproduced on the

17   following page. Note the emphasis that Level 0-2 technologies are merely "driver support features" in

18   which "**You <u>are</u> driving**." *Id.*; *see also* Ex. 10 (2022 NHTSA graphic similarly emphasizing that the

19   driver is fully responsible for driving at Levels 0-2, whereas self-driving or autonomous technology

20   does not begin until Level 3).

21          Driving automation technologies at all SAE Levels require the use of vehicle-mounted sensors

22   to gather data about the surrounding environment, such as cameras, radar, and lidar (light detecting

23   and ranging). To date, all Level 3 or higher technologies have been based on a combination of

24   cameras, radar, and lidar. Ex. 110. There has long been an expert consensus that achieving

25   autonomous vehicle technology requires use of lidar sensors, which are expensive and Tesla has

26   always refused to use. *Id.*

---

[1] Numbered exhibits (e.g., "Ex. 1") refer to those attached to the Declaration of Andrew F. Kirtley, and which are the subject of Plaintiffs' Request for Judicial Notice. Lettered exhibits (e.g., "Ex. A") refer to those attached to the Declaration of Julie L. Fieber, which consist of declarations from Plaintiffs and class members.

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

Motion for Preliminary Injunction and Provisional Class Certification
Case No. 4:22-cv-05240-HSG

3



**B.**     **Tesla Has Deceptively Marketed its ADAS Technology Since its Inception.**

Musk became Tesla's CEO in 2008 and took the company public in 2010. Tesla does not use conventional advertising. Ex. 15 at 682 (Musk testimony); Ex. 55 (Musk tweet). Instead of traditional dealerships, it has vertically integrated Tesla "Stores" and "Galleries" where customers can see vehicles before ordering them through the Tesla website.

The company's marketing strategy relies on Musk's high public profile and Twitter account to generate buzz for its products. *See also* Ex. 15 at 681 (Musk testifying his Twitter account has been an official source of corporate information since 2013); Ex. 61 (Musk has over 130 million Twitter followers). Tesla has three related ADAS packages: Autopilot, Enhanced Autopilot, and FSD, each of which builds on the next. *See* Ex. 31 at 1 (Tesla noting that FSD "is an additional optional suite of features that builds from Autopilot"). Tesla and others often use "Autopilot" as an umbrella term to refer to all or any one of the three systems. *See, e.g.*, Ex. 32 at 7 (Musk stating on 2021 earnings call

that "Autopilot" would soon be "capable of full self-driving"); Ex. 38 at 2 (Tesla calling an FSD feature an "Autopilot feature[]"); Ex. 39 (similar).

### 1.    Early Autopilot (October 2014 to September 2016)

Tesla first released Autopilot in October 2014, which consists of two common ADAS features invented in the 1990s. Ex. 90. Tesla calls its versions "Traffic-Aware Cruise Control" and "Autosteer." Ex. 38 at 1 (Tesla website); Ex. 40 at 4 (Tesla: "Autopilot enables your car to steer, accelerate and brake automatically within its lane"). Musk decided to use the "Autopilot" name despite Tesla engineers' concern that it was misleading. Ex. 93 at 2. That same concern has been echoed by many over the years. *See, e.g.*, Exs. 66-67 (Consumer Reports in July 2016); Exs. 72, 93 (Tesla Autopilot lead engineer in late 2016); Exs. 87-88, 95 (quoting NTSB Chair in 2021); Ex. 95 (quoting NTSB Chair and other federal safety officials in 2022); Exs. 13-14, 84 (California DMV in 2022).

Following Autopilot's release, Musk started to make false and deceptive claims about the technology. In October 2014, for example, Musk told CNN Business that "[a] Tesla car next year will probably be 90 percent capable of Autopilot. Like, so 90 percent of your miles can be on auto. For sure highway travel." Ex. 54. In October 2015, when Autopilot v7.0 was released, Musk stated "We're being especially cautious at this stage, so we're advising drivers to keep their hands on the wheel just in case." Ex. 65 at 1 (Reuters); *see also* Ex. 72 at 4 (WSJ reporting v7.0's release coincided with resignations of multiple Autopilot engineers, including one who stated the release was "reckless" and "potentially put customer lives at risk"). By December 2015, Musk was telling the public that Tesla vehicles would drive themselves within about two years, stating "It's a much easier problem than people think it is." *See, e.g.*, Ex. 63 at 3.

In January 2016, Musk tweeted that a Tesla would complete a fully autonomous trip across the entire United States by "next year," and that Tesla owners would be able to "summon" their car to pick them up from anywhere in the country in about two years ("eg you're in LA and the car is in NY"). Ex. 42. Also in January 2016, Musk said Autopilot was "probably better" than a human driver, Ex. 64, which he revised upward only months later to "almost twice as good as a person." Ex. 65 at 1.

But in the coming months, Autopilot would cause two fatalities when it failed to recognize and plowed into a large street sweeper on a highway, and failed to recognize a tractor-trailer blocking

a highway and collided with it at 74 mph). Exs. 3, 69. A month after the second fatality, Musk proclaimed that "autonomous driving" was "basically a solved problem," adding "I think we're basically less than two years away from complete autonomy." Ex. 43. In September 2016, Tesla's key vehicle sensor supplier Mobileye publicly broke with Tesla due to stated "reputation" concerns it had from "be[ing] associated with [Tesla] pushing the envelope in terms of safety." Ex. 70 at 2.

### 2.    The Release of FSD (October 2016)

On October 19, 2016, Tesla announced the release of its more advanced SAE Level 2 ADAS systems, "Enhanced Autopilot" ($5,000) and "Full Self Driving Capability" ($8,000), in a post titled "All Tesla Cars Being Produced Now Have Full Self-Driving Hardware." Ex. 20. The post includes numerous carefully worded statements that, even if technically true, could mislead reasonable consumers about the abilities of Tesla's technology, including:

- "Full autonomy will enable a Tesla to be substantially safer than a human driver …."
- "[A]s of today, all Tesla vehicles … will have the hardware needed for full self-driving capability at a safety level substantially greater than that of a human driver."
- "[T]his system provides a view of the world that a driver alone cannot access, seeing in every direction simultaneously and on wavelengths that go far beyond the human senses."

*Id.* At a press conference that same day, Musk stated that "all Tesla vehicles leaving the factory have all the hardware necessary for Level 5 autonomy." Ex. 44 at 0:00-0:15. The next day, Tesla released a video that appears to show a Tesla driving itself and begins by displaying the following message: **"The person in the driver's seat is only there for legal reasons. He is not doing anything. The car is driving itself."** Ex. 21. Musk shared the video on Twitter, stating: "Tesla drives itself (no human input at all) thru urban streets to highway to streets, then finds a parking spot." Ex. 45.

That video was debunked by a 2021 New York Times investigation based on interviews with 19 former Autopilot employees. Ex. 93 at. The investigation showed that Tesla had concealed key facts about the video, including that the car: was assisted by a pre-loaded 3D digital map of the route (a technology Tesla's ADAS systems do not use), had to repeatedly drive the pre-loaded route to get usable video, and crashed into a fence during filming. *Id.* In January 2023, these details were broadly confirmed by the deposition testimony of longtime Autopilot engineer Ashok Elluswamy (obtained by Reuters), as well as internal Tesla emails about the making of the video (transcript obtained by

Bloomberg News). *See* Ex. 12 at 71, 80, 82-84, 88-89 (Elluswamy admitting that the route was "3-D mapped beforehand," the car drove into a fence, and the video shows the car having abilities not then possessed by Tesla's ADAS technology). The internal emails show that Musk rejected a fourth draft of the video because there were still too many jump cuts, telling Tesla staff it "needs to feel like one continuous take," and that Musk personally dictated the text at the beginning of the videos. Ex. 106 at 3. Tesla made similar videos during that time, all of which begin with that same deceptive text bolded above. *See* Exs. 21-23. Even though **Tesla has never denied these facts**, the company continues to host the deceptive videos on its website, including on its main "Autopilot" webpage. Exs. 21-23, 40.

### 3.    The Development of FSD (November 2016 to present)

Since 2017, the "Autopilot" page on Tesla's website has stated that FSD is capable of "full self-driving in almost all circumstances," including being able to "conduct short and long distance trips with no action required by the person in the driver's seat" and with a "probability of safety at least twice as good as the average human driver." *See, e.g.*, Ex. 24 at 8 (2017 archived webpage); Ex. 25 at 7 (2018 archived); Ex. 40 at 7 (current webpage). According to Tesla, "All you will need to do is get in and tell your car where to go. … Your Tesla will figure out the optimal route, navigate urban streets (even without lane markings), manage complex intersections with traffic lights, stop signs and roundabouts, and handle densely packed freeways with cars moving at high speed." Ex. 24 at 8; Ex. 25 at 8; Ex. 26 at 8; Ex. 40 at 8. In 2018, Musk reinforced the false notion that Tesla cars are self-driving by going on two major national television shows and engaging in prolonged "no hands" driving demonstrations, thus suggesting to the country that Tesla cars were already self-driving. Ex. 49 (*CBS This Morning* video); Ex. 52 at 10 (*60 Minutes* transcript, photograph, and video); *see also* Ex. 74 at 2 (*Wired* article after *60 Minutes* titled "Even Elon Musk Abuses Tesla's Autopilot").

In every year since 2016, Tesla and Musk have also made false and deceptive statements indicating that a fully self-driving Tesla was just around the corner, often specifying Tesla would achieve that goal within a year.[2] Tesla made many of these claims in 2017-2018 when, in Musk's

---

[2] *See, e.g.*, Ex. 19 at 4 (Oct. 2016) ("by the end of next year"); Ex. 46 at 15:00-15:40, 16:42-17:02 (Apr. 2017 TED interview) ("fully autonomous" cross-country trip "by the end of 2017," and drivers able to sleep in "about two years"); Ex. 47 (May 2017 tweet) (similar); Ex. 48 at 36:05-36:30 (Mar. 2018 SXSW interview) ("by end of next year"); Ex. 51 (Nov. 2018 tweet) ("in about a year"); Ex. 27 at 4 (Jan. 2019 earnings call) ("towards the end of this year"); Ex. 53 at 15:15-15:35 (Apr. 2019

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

words, the company "was bleeding money like crazy" and on the brink of collapse. Ex. 73 at 1; *see also* Ex. 80 at 2 (Musk admitting Tesla was "about a month" from bankruptcy). In early 2019, Musk coupled a $2 billion capital campaign with new projections about Tesla's imminent advances in "self-driving" technology. *See* Ex. 75 at 2 (CNBC). This included the headline-grabbing claim that a million Tesla cars would be able to act as Level 5 "robotaxis" by 2020, which Musk announced without Tesla appearing to have any "answers to or [] even considered pretty basic questions on the pricing, insurance liability, or regulatory and legal requirements." *Id.* On an investor call a few days later, Musk talked up Tesla's self-driving strategy right off the bat, calling it "the fundamental driver of value for Tesla," and projecting it would soon make Tesla vehicles "worth $150,000 to $250,000." Ex. 76 at 4 (CNBC). Musk has continued making the claims up to the present day, while also repeatedly stating that Tesla's brand and value depends on FSD being successful, calling it "the difference between Tesla being worth a lot of money and being worth basically zero." Ex. 110 at 1.

None of these projections have come true, and the reality of FSD is far different from what Tesla and Musk have claimed. Those using FSD have found that it runs red lights, drives into oncoming traffic, drives toward large stationary objects, cannot consistently execute basic turns, and is riddled with myriad other problems. *See, e.g.*, Ex. 77 (2019 Consumer Reports review of "Navigate" feature); Ex. 85 (2020 Consumer Reports finding FSD stopped at green lights, drove through stop signs, and slammed on the brakes for yield signs, among other problems); Exs. 91-92 (2021 CNN test drive resulting in FSD driving on the wrong side of the road, the driver having to intervene "every

podcast) (Tesla so close to FSD that anyone who "buys a Tesla today … [is] buying an appreciating asset, not a depreciating asset"); Ex. 28 at 1:55:48-1:56:01 (Apr. 2019 Tesla "Autonomy Day") (hands-free driving by "second quarter of next year" and one million robotaxis on the road by 2020 operating at "Level 5 without a geofence"); Ex. 54 (May 2019 tweet) (fully autonomous cross-country trip "this year"); Ex. 56 (Apr. 2020 tweet) (robotaxi technology completed "this year" with "[r]egulatory approval [being] the big unknown"); Ex. 79 at 1:17:55–1:21:20  (Apr. 2020) (robotaxis on roads "next year"); Ex. 57 at 00:20-00:36 (July 2020 WAIC conference) ("we are very close" and "will have the basic functionality for Level 5 autonomy complete this year"); Ex. 81 at 9 (Dec. 2020) ("extremely confident, 100%" that "Tesla will have level five next year"); Ex. 32 at 7 (Jan. 2021 earnings call) ("confident" Tesla will achieve Level 5 "later this year [2021]"); Ex. 33 at 3 (July 2021 earnings call) (FSD would soon "be able to drive [cars]" safer than the average persons); Ex. 59 at 1:26:56  (Dec. 2021 podcast) ("likely that [Tesla will solve Level 4] next year"); Ex. 34 at 8 (Jan. 2022 earnings call) ("this year"); Ex. 35 at 9 (Oct. 2022 earnings call) (coming FSD update "FSD software that "will be able to take you from your home to your work, your friend's house, to the grocery store without you touching the wheel"); Ex. 99 (collecting video of Musk making such promises).

1    couple of blocks or so," and multiple instances of "quickly jerk[ing] the wheel to avoid a crash"); Ex.

2    98 at 3 (2022 two-month review of FSD by auto industry journalist concludes its "decision-making is

3    still the equivalent of a 14-year-old who has been learning to drive for the last week and sometimes

4    appears to consume hard drugs"); Ex. 96 (collecting video from FSD owners showing such problems).

5    The declarants here have had similar experiences. *See* Ex. B ¶¶ 7-12 (Broussard); Ex. C ¶¶ 7-10

6    (Imaguchi); Ex. E ¶¶ 6-9 (Mallow); Ex. F ¶¶ 8-9 (Cornetti); Ex. G ¶¶ 8-11 (Foreman); Ex. H ¶¶ 7-10

7    (Meyer); Ex. I ¶¶ 7-10 (Thomas); Ex. J ¶¶ 7-11 (Valdovinos); Ex. K ¶¶ 9-12 (Wiley).

8          Instead of providing its customers fully self-driving cars, Tesla has used them, and continues to

9    use them, to test drive its FSD system on public roadways and thereby generate the "trial and error"

10   data that Tesla needs to improve FSD Exs. 86, 110; *see also* Ex. 53 at 08:00-08:40, 11:00-12:30 (Musk

11   discussing Tesla's competitive advantage in having a "massive inflow of data" from the Tesla fleet,

12   and explaining how Tesla uses that data to design and improve its ADAS software).

13         Moreover, while Tesla and Musk are telling consumers one thing, Tesla's attorneys and

14   engineers are telling regulators another. In a November 2020 letter later disclosed via a Public Records

15   Act request, a Tesla attorney assured concerned California DMV regulators that FSD remains "firmly"

16   root[ed]… in SAE Level 2 capability," details FSD's limitations, and admits that the system is

17   nowhere near being fully self-driving. Ex. 29 at 1. Subsequent correspondence between Tesla's

18   counsel and the California DMV is similar, emphasizing that FSD features "do not make the vehicle

19   autonomous." Ex. 30 at 2-3; *see also* Ex. 31 at 1-2 (similar). In a subsequent call with the California

20   DMV triggered by Musk's prediction of reaching Level 5 autonomy in 2021, a senior Tesla engineer

21   assured regulators that the prediction by Musk "does not match engineering reality" and that Tesla's

22   technology was still "firmly in L2 [Level 2]." Ex. 6 (DMV memorandum regarding the call); Ex. 8

23   (DMV letter to Tesla memorializing the call).

24   **C.    Tesla's False and Deceptive Marketing Has Misled Consumers**

25         In 2018, 71% of surveyed motorists incorrectly believed that they can buy a self-driving car at

26   that time, and 11% said they would be tempted to have a brief nap while using ADAS technology. Ex.

27   112 (concluding consumers incorrectly believe ADAS makes cars "autonomous"). In late 2022, 72%

28   of 2,000 U.S. drivers answered "Yes, definitely" or "Yes, possibly" to the question: "Do you think it

1  is possible to purchase a car today than can drive itself. Ex. 113 at 8.

2  Given this backdrop, it should be no surprise that Plaintiffs here were deceived by Tesla's

3  claims about FSD, including its current abilities and Musk's headlines-grabbing projections about the

4  likelihood of the company rapidly advancing FSD to a Level 4 or 5 technology. Ex. A ¶¶ 5-8

5  (Battiato), Ex. B ¶¶ 4-6, 10, 13 (Broussard), Ex. C ¶¶ 4-6, 11-12 (Imaguchi), Ex. D ¶¶ 3-7, 10-12

6  (LoSavio), Ex. E ¶¶ 3-5, 10-13 (Mallow). The same is true of other class members. Ex. F ¶¶ 6-7, 10-

7  11 (Cornetti), Ex. G ¶¶ 6-7, 12-13 (Foreman), Ex. H ¶¶ 4-6, 11-12 (Meyer), Ex. I ¶¶ 3-6, 11-13

8  (Thomas), Ex. J ¶¶ 5-6, 12-14 (Valdovinos), Ex. K ¶¶ 5-8, 13-16 (Wiley). These declarants testify

9  how they paid Tesla thousands of dollars to add the FSD option to their car because they believed

10  Tesla's representations that it made the car self-driving at least in some circumstances, and that the

11  technology would rapidly advance per Musk's projections. Ex. B ¶¶ 3-6, 9 (Broussard); Ex. C ¶¶ 3-6

12  (Imaguchi); Ex. D ¶¶ 3, 7, 11 (LoSavio); Ex. E ¶¶ 2, 4-5 (Mallow); Ex. G ¶¶ 3-4, 6 (Foreman); Ex. H

13  ¶¶ 3-6 (Meyer); Ex. I ¶¶ 2-6 (Thomas); Ex. J ¶¶ 3-6 (Valdovinos); Ex. K ¶¶ 3-8 (Wiley).

14  Further, these declarants bought a Tesla with FSD *only after* conducting significant research.

15  Ex. B ¶¶ 5-6, 9 (Broussard), Ex. C ¶¶ 5-6 (Imaguchi), Ex. D ¶¶ 5-6 (LoSavio), Ex. E ¶¶ 3-5 (Mallow),

16  Ex. F ¶ 6 (Cornetti), Ex. G ¶¶ 6-7 (Foreman), Ex. H ¶ 6 (Meyer), Ex. I ¶¶ 3-5 (Thomas), Ex. J ¶¶ 5-6

17  (Valdovinos), Ex. K ¶¶ 5-7 (Wiley). Many declarants have advanced degrees and decades of

18  professional experience, including as attorneys, physicians, engineers, and technologists. Ex. A ¶ 2

19  (Battiato) (senior data project manager); Ex. B ¶ 2 (Broussard) (paralegal and homemaker); Ex. C ¶ 2

20  (Imaguchi) (business relations manager); Ex. D ¶ 2 (LoSavio) (attorney); Ex. E ¶ 3 (Mallow)

21  (physician); Ex. F ¶ 2 (Cornetti) (finance and accounting consultant); Ex. G ¶ 2 (Foreman) (senior

22  technology program manager); Ex. H ¶ 2 (Meyer) (computer technician); Ex. J ¶ 2 (Valdovinos) (civil

23  engineer); Ex. K ¶ 2 (Wiley) (attorney). Yet still they were deceived.

24  **D.    Tesla's False and Deceptive Marketing Has Caused Significant Death and Injury**

25  The industry has long known that many drivers over-rely on SAE Level 2 systems to drive

26  their cars and do not accurately understand the systems' limitations. In 2015, for example, a NHTSA-

27  sponsored study found that "participants greatly trusted the capabilities of the automated systems,"

28  causing them to "prioritize[e] non-driving activities" and even "disregard[] TORs [take-over

requests]" from the vehicle. Ex. 1 at 11. That same year, research by Google's self-driving car division concluded that people cannot "be trusted to dip in and out of the task of driving when the car is encouraging them to sit back and relax." Ex. 2 at 2. There is also the phenomenon of "automation complacency", which leads to distraction, inattentiveness, and drivers "becom[ing] disengaged from the driving task for an extended period." Ex. 18 at 1-2 (NHTSA).

As one might expect, the problem is exacerbated by deceptive product names suggesting that ADAS technology is more advanced or autonomous than it actually is. *See, e.g.*, Ex. 115 (AAA study finding drivers over-relied much more on the same ADAS technology when named "AutonoDrive" versus "DriveAssist"). The problem is also exacerbated by Musk's recurring deceptive claims that using Tesla's ADAS technology makes car travel *significantly* safer. *Compare, e.g.*, Ex. 50 (May 2018 tweet: "Tesla is safest car on road …. Approx 4X better than avg."), *and* Ex. 58 (Apr. 2021 tweet: "Tesla with Autopilot engaged now approaching 10 times lower chance of accident than average vehicle"), *with* Exs. 97, 114 (academic study indicating Tesla's self-reported Autopilot safety figures are opaque and make it impossible to tell if Autopilot provides *any* safety benefit).

Over the years, drivers' over-reliance on Tesla's ADAS technology has caused significant deaths and injuries on the nation's roads—often from the same or similar technology failures occurring over an extended period. For example, NHTSA has an ongoing investigation into the numerous fatalities that have occurred due to Tesla cars colliding at high speeds into the back of large vehicles. Ex. 9 (opening investigation in Aug. 2021); Ex. 11 (expanding investigation in June 2022). The most recent such accident, which killed one and injured five, occurred in California in February 2023 only days after NHTSA's nationwide FSD recall. Exs. 17, 108-109.

Tesla's ADAS systems have also caused cars to suddenly veering left or right on a highway and crash into concrete barriers. *See, e.g.*, Ex. 4 (2018 fatality). The same is true of Tesla's ADAS systems failing to detect tractor trailers stretched across highways and colliding with them at high speed. Ex. 3 (2016) (fatality); Ex. 5 (2019) (fatality); Ex. 83 (2019) (non-fatal injuries). Several months after the fatal tractor trailer collision in 2016, Tesla announced a software update that it said fixed the problem by having Autopilot rely more on radar so that it would now "see a large metal object across the road." Ex. 68. But the occurrence of almost identical crashes following that update

1   casts serious doubt on the credibility of Tesla's untested and unverified representations about its

2   software updates. Moreover, accidents following the recent broad rollout of FSD make clear that the

3   system in its current state is not ready for public use. Exs. 103-105 (highway surveillance footage

4   showing a January 2023 multi-car pile-up, resulting in numerous injuries, caused by FSD bringing the

5   car to a stop on a San Francisco highway).

6   **E.      Federal and State Regulators Launch Investigations Amid Mounting Criticism**

7            In March 2020, the NTSB called on NHTSA to evaluate Autopilot for "driver misuse" and

8   whether it poses "an unreasonable risk to safety." Ex. 7 at 1. After Tesla announced in May 2021 that

9   it was implementing Musk's vision of eliminating radar in favor of relying entirely on cameras, the

10  number of concerning Tesla ADAS incidents surged dramatically, leading to at least one FSD recall.

11  *See* Exs. 94, 110. Tesla's ADAS marketing practices also started to catch up with it in 2021 when

12  they first became the target of a growing number of ongoing investigations and actions. *See, e.g.*, Exs.

13  13-14, 84 (California DMV), Ex. 101 at 86 (USDOJ Criminal Division), Ex. 107 (SEC); *see also* Ex.

14  36 at 86 (Tesla's 10-K filed January 2023 stating "the company has received requests from the DOJ

15  for documents related to Tesla's Autopilot and FSD features").

16  **F.      The February 2023 NHTSA Recall of FSD**

17           In February 2023, after Plaintiffs filed their CAC, NHTSA took the unprecedented step of

18  issuing a nationwide recall of all 362,758 vehicles with FSD. Ex. 16. The recall identified four new

19  FSD safety defects not identified by NHTSA's other ongoing FSD investigations: (1) traveling or

20  turning through intersections during a stale yellow light, (2) not stopping at stop signs, (3) not

21  reducing vehicle speed in response changes in posted speed limits, and (4) changing lanes out of a

22  turn-only lane to continue traveling straight. *Id.* at 2. The remedy is for Tesla to provide an over-the-

23  air software update to fix the issue, with no deadline for when that must be done and no process to

24  confirm if the update is effective. *Id.* at 4. Meanwhile, Tesla is behaving as if there is no ongoing

25  recall, recently celebrating on Twitter that "FSD Beta has been released to nearly all customers in the

26  US & Canada who bought FSD (approximately 400k)." Ex. 37 (Tesla Mar. 1, 2023 tweet).

27  **G.      Tesla's Continuing Deceptive Claims Pose a Serious Danger to the Public**

28           Beyond simply confirming that FSD does not currently make vehicles self-driving, the

NHTSA recalls to date add to growing body of evidence that an unphased Musk is continuing to deceive the public about the current abilities of FSD by repeatedly and falsely stating that Tesla is on the cusp of perfecting FSD, including as recently as March 2023. Ex. 60 at 50:20 (Mar. 7, 2023) (Musk telling investors that Tesla's next vehicle will operate "almost entirely in autonomous mode"). The same is true of Tesla's deceptive tactic of implying that a significant factor preventing Tesla from bringing to market a fully self-driving vehicle is the lack of regulatory approval for its non-existent Level 3 or higher technology. *See, e.g.*, Ex. 71 at 5 (Tesla: "[I]t is not possible to know exactly when each element of [FSD] functionality … will be available, as this is highly dependent on local regulatory approval."); Ex. 100 (Reuters article covering Musk's comments about the lack of regulatory approval). On March 20, 2023, despite the ongoing FSD recall, Tesla initiated a "broad rollout" of "a significant [FSD] update that is … both an exciting and scary step as it is supposed to merge Tesla's FSD and Autopilot highway stacks." Ex. 111.

## III.   LEGAL STANDARD

A preliminary injunction should issue if the moving parties establish they are: (1) "likely to succeed on the merits"; (2) "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Under the Ninth Circuit's "'sliding scale' approach to these factors, … when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious questions going to the merits.'" *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1135 (9th Cir. 2011)).

## IV.   ARGUMENT

### A.   THE COURT SHOULD GRANT PRELIMINARY INJUNCTIVE RELIEF TO STOP TESLA'S DECECPTIVE MARKETING OF FSD FROM CAUSING FURTHER DEATH AND INJURY.

#### 1.   Plaintiffs Are Likely to Succeed on the Merits, or at Minimum Have Raised Serious Merits Questions.

"Likelihood of success on the merits is the most important factor" in deciding whether to issue a preliminary injunction. *Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019). To satisfy this

1  factor, a plaintiff need only demonstrate that she has "a substantial case for relief on the merits,"

2  which is something less than "showing that success is more likely than not." *Leiva-Perez v. Holder*,

3  640 F.3d 962, 967-68 (9th Cir. 2011).

4       This Motion seeking a preliminary injunctive to stop Tesla's continual misrepresentations

5  regarding FSD's abilities is based on the strong likelihood that Plaintiffs will succeed on the merits of

6  their claims under three consumer protection statutes: the Consumer Legal Remedies Act ("CLRA"),

7  False Advertising Law ("FAL"), and Unfair Competition Law ("UCL"). *See* CAC ¶¶ 158-198. The

8  CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices" in the sale

9  or lease of consumer goods or services, including "[r]epresenting that goods or services have …

10  characteristics, … uses, [or] benefits … which they do not have." Cal. Civ. Code § 1770(a)(5); *see Ho*

11  *v. Toyota Motor Corp.*, 931 F.Supp.2d 987, 996 (N.D. Cal. 2013) (finding that car maker's failure to

12  disclose potentially dangerous problem with headlamps could violate the CLRA). The FAL bars the

13  making or disseminating of any statement concerning goods or services "which is untrue or

14  misleading, and which is known, or which by the exercise of reasonable care should be known, to be

15  untrue or misleading." Cal. Bus. & Prof. Code § 17500. And the UCL has the greatest reach by

16  broadly prohibiting any "unfair, deceptive, untrue or misleading advertising," as well as any other

17  "business act or practice" that is "unlawful" or "unfair." *Id.* § 17200; *see also Hauk v. JP Morgan*

18  *Chase Bank USA*, 552 F.3d 1114, 1122 (9th Cir. 2009) (UCL makes "independently actionable"

19  "violations of other laws" and unfair "acts and practices not specifically proscribed by any other law").

20       In a false advertising case, "courts often analyze the[se] three statutes together" because

21  liability is governed by the same standard: whether the defendant made a false or deceptive

22  statements, and whether that statement is "likely to deceive a reasonable consumer." *Suski v. Marden-*

23  *Kane, Inc.*, 2022 WL 103541, at *8 (N.D. Cal. Jan. 11, 2022) (citing *Williams v. Gerber Prod. Co.*,

24  552 F.3d 934, 938 (9th Cir. 2008)); *see also Alger v. FCA US LLC*, 334 F.R.D. 415, 425-26 (E.D.

25  Cal. 2020) (similar). This standard "prohibit[s] not only advertising which is false, but also

26  advertising which although true, is either actually misleading or which has a capacity, likelihood or

27  tendency to deceive or confuse the public." *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1017

28  (9th Cir. 2020); *accord Sandoval v. PharmaCare US, Inc.*, 730 F. App'x 417, 419-20 (9th Cir. 2018).

1    Plaintiffs' evidence amply shows they are highly likely to succeed under this standard, and that

2    Plaintiffs satisfy all additional requirements of the CLRA, FAL, and UCL statutes.

                        **a.**      **Tesla's FSD claims are false and deceptive.**

4    "[T]he primary evidence in a false advertising case is the advertising itself." *Colgan v.*

5    *Leatherman Tool Grp., Inc.*, 135 Cal.App.4th 663, 679 (2006). The "misleading character" of a

6    statement "appears on applying its words to the facts." *Id.* Here, Tesla and Musk have long made, ***and***

7    ***consistently continue to make***, false and deceptive claims about FSD's abilities. The claims greatly

8    endanger the public every day that they are allowed to continue.

9    As argued below, Tesla's and Musk's false and deceptive statements include: (i) using the

10   labels "Full Self Driving" and "FSD"; (ii) claiming FSD makes vehicles "self-driving" or

11   "autonomous"; (iii)  promoting FSD with its repeatedly debunked 2016 video that purports to show a

12   Tesla "driving itself," and Musk doing "no hands" driving demonstrations on national television; and

13   (iv) Musk repeatedly stating that FSD is nearly a Level 4 or 5 technology, and implying that

14   "regulators" are in part responsible for any delays.

15   ***(i) "Full Self Driving" and "FSD."*** Tesla's names "Full Self-Driving Capability," "Full Self

16   Driving," and "FSD" falsely indicate that the FSD system makes cars fully self-driving. It does not.

17   Indeed, Tesla has already ***admitted*** to this Court that FSD does not make cars "self-driving" under

18   *any* circumstances, much less *fully* self-driving. *See* ECF No. 30 ("MTD") at 2:3-4, 2:11-14. Clearly,

19   the label is false if the only way to make it true is to tack a "not" on the beginning (e.g., "Not Full Self

20   Driving"). Even without Tesla's admission, any fair interpretation of the term "full self-driving" is

21   inconsistent with FSD routinely being unable to safely execute routine driving maneuvers, or driving

22   the car at high speed into emergency vehicles, tractor trailers blocking highways, overturned box

23   trucks, and other large and clearly visible stationary objects. These problems with FSD continue to

24   grow as Tesla expands access to the system to more customers, with the most recent example that

25   received significant press being a fatal February 2023 crash in California that occurred when a Tesla

26   slammed at high speed into one of multiple fire trucks. *See* Exs. 17, 108-109. Even Tesla itself, in its

27   communications with California DMV regulators, has admitted that "Full Self-Driving" is an

28   inaccurate name. *See* Exs. 6, 8, 29-31.

*(ii)* *"Autonomous."*  Tesla's and Musk's continued use of the term "autonomous" is similarly false and deceptive. Under the industry standard for autonomous vehicle technology, only SAE Level 3, 4, and 5 technologies make vehicles partially or completely autonomous. *See* Ex. 41. Tesla and Musk recognize this standard, yet they continue to falsely state and imply that FSD (a Level 2 technology) makes vehicles partially "autonomous." Even Tesla's counsel in this action has parroted the company's false and deceptive language by implying that FSD makes vehicles at least somewhat "autonomous." *See, e.g.*, MTD at 2:3-5, 2:11-14, 4:2-3 (asserting FSD makes cars partially "autonomous" and is "constantly updated to reach greater autonomous capabilities" based on Tesla's purported "timeline towards more complete autonomy"). This is objectively false under the industry-recognized standard. It is also false and deceptive under any fair dictionary definition of the term, which would require that FSD be able to safely operate the vehicle "without outside control." *See* Merriam-Webster Online, *Autonomous*, https://www.merriam-webster.com/dictionary/autonomous ("undertaken or carried on without outside control").

*(iii)* *The Deceptive 2016 Videos and Musk's "No Hands" Driving.*  Perhaps the best demonstration of Tesla's hubris and disregard for honestly communicating with consumers about FSD is the fact it continues to prominently feature on its website deceptive videos of a Tesla "driving itself." *See* Exs. 21-23, 40; *see generally supra* § II.B. These videos been repeatedly debunked, including by news that broke in January 2023 after Plaintiffs filed the operative CAC in this action. *See* Exs. 93, 105-106. Even in the face of numerous investigations and lawsuits concerning its marketing practices, Tesla continues to use the videos. *See supra* §§ II.B.2, II.E. This same false message that Tesla cars are capable of driving themselves is reinforced by Musk going on national television and elsewhere and engaging in no-hands driving. *See* Exs. 49, 52; *supra* § II.B.3.

*(iv)* *Projecting FSD Will Soon Be Perfected and Blaming "Regulators."*  Musk further deceives consumers by stating that Tesla is *perpetually on the cusp* of advancing its ADAS technology to the point that a Tesla car could fully drive itself from origin to destination, without the driver needing to pay any attention, in all or nearly all circumstances (i.e., SAE Level 4 or 5). Tesla has done this primarily through Musk repeatedly making objectively unrealistic projections about Tesla's likely future timeline for achieving Level 4 or 5 technology, such as repeatedly telling the

1  public that it would do so by the end of that year or within the "next year," at the same time that

2  Tesla's own attorneys and engineers were disavowing those statements in private communications

3  with regulators. *Compare supra* at 8 fn.3, *with* Exs. 6, 8, 29-31. It is now clear that Tesla has never

4  been remotely close to achieving Level 4 or 5 technology, in part because of Musk's decision to go it

5  alone (against emerging expert consensus) by relying heavily on cameras to exclusion of other

6  necessary sensors, such as lidar.

7          Even in this action, Tesla has doubled-down on the company's long-standing misleading tactic

8  of insinuating that its failure to develop a fully autonomous vehicle is somehow attributable to a lack

9  of "regulatory approval" for its nonexistent SAE Level 3, 4, or 5 technology. *See* MTD at 2:12-13,

10  3:6-11 (arguing Plaintiffs "knew that the timeline towards complete autonomy was contingent upon

11  … regulatory approval," and that Tesla has "repeatedly made clear would require regulatory

12  approval"); *id.* at 5:1-6, 5:24-6:2, 16:17-23 (similar). To be clear, Plaintiffs' claims are not based on

13  Tesla's failure to deliver on things that are outside its control (such as obtaining regulatory approval

14  to use Level 4 or 5 technology on public roads), but on Tesla's knowingly false and deceptive

15  labeling and statements about the then-existing capabilities of its ADAS technology, and when it

16  would likely achieve Level 4 or 5 technology.

17          **b.      Tesla's FSD claims are likely to deceive the public.**

18          The CLRA, FAL, and UCL prohibit "not only advertising which is false," but also advertising

19  that "although true, is either actually misleading or [] has a capacity, likelihood or tendency to deceive

20  or confuse the public." *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 951 (2002). Indeed, many Plaintiffs and

21  other declarants testify that were steered toward buying a Tesla because of FSD, and to pay thousands

22  of dollars for FSD, because they believed that it would make the vehicle "self-driving" in at least

23  some circumstances. Ex. A ¶ 5 (Battiato); Ex. B ¶¶ 4-5, 7 (Broussard); Ex. C ¶¶ 5-6 (Imaguchi); Ex.

24  D ¶¶ 3-7 (LoSavio); Ex. E ¶¶ 2-5 (Mallow); Ex. F ¶¶ 6-7, 9 (Cornetti); Ex. G ¶¶ 6-7 (Foreman); Ex. H

25  ¶¶ 4-6, 9 (Meyer); Ex. I ¶¶ 3-6, 9 (Thomas); Ex. J ¶¶ 2-6 (Valdovinos); Ex. K ¶¶ 3-8, 10, 12 (Wiley).

26          Tesla may argue that any reasonable consumer would know that the FSD name is merely

27  aspirational and does not make the car capable of full self-driving because of contrary information

28  online, in vehicle user manuals, and because of reminders for users to keep their hands on the wheel.

But Tesla cannot give its products misleading names, and Musk cannot say whatever he wants regarding FSD, so long as corrective statements are available elsewhere. Just as a consumer is not required to "look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box," a consumer is not required to research the veracity of product claims, such as by going to a company website or scouring user manuals in search of disclaimers. *Williams*, 552 F.3d at 939-40; *Coe v. Gen. Mills, Inc.*, 2016 WL 4208287, at *5 (N.D. Cal. Aug. 10, 2016) (less prominent, smaller font statements on front of box insufficient to dispel larger font deception); *Fernandez v. Atkins Nutritionals, Inc.*, 2018 WL 280028, at *8 n.6 (S.D. Cal. Jan. 3, 2018) ("A manufacturer cannot cure a misleading statement on a product label by simply providing a further explanation of the statement on [its] website"); *Walker v. Nestle USA, Inc.*, 2020 WL 3317194, at *3 (S.D. Cal., June 17, 2020) (similar). Plaintiffs and class members who believed Tesla's misrepresentations about FSD were not required to research the veracity of those claims.

   **c.**  **Plaintiffs easily satisfy all additional requirements for imposing liability on Tesla under the CLRA, FAL, and UCL.**

  The FAL has the additional requirement that Plaintiffs show Tesla *knew or should have known* that their claims about FSD were untrue or deceptive. Cal. Bus. & Prof. Code § 17500. Here, there is ample circumstantial evidence of such knowledge. *See supra* §§ II.B-II.G.

  The CLRA "requires a showing of actual injury as to each class member," *Steroid Hormone Prod. Cases*, 181 Cal. App. 4th at 155, but "that injury may be presumed if the misrepresentation is material." *Skinner v. Ken's Foods, Inc.*, 53 Cal.App.5th 938, 949 (2020). Here, there can be little question that Tesla's false and deceptive claims about FSD's abilities were material to Plaintiffs and other class members, who have testified that there were deceived by Tesla's representations about FSD, which led them to purchase a Tesla vehicle with FSD. *See supra* at 18.

  The UCL does not require any individual showing of deception, reliance, or injury. *See Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014). In a class action where vehicle safety is a key issue, "a violation of the UCL can be proved with common evidence regarding the nature of the design defect in question, the likely effect of the defect on class vehicles, its likely impact on vehicle safety, what [the defendant] knew or did not know, and what it disclosed or did not disclose to

1   consumers." *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 534 (C.D. Cal. 2012). Named

2   plaintiffs need not show individual reliance because a presumption of reliance arises as to the entire

3   class "wherever there is a showing that a misrepresentation was material." *In re Tobacco II Cases*, 46

4   Cal.4th 298, 327 (2009); *Steroid Hormone Prod. Cases*, 181 Cal.App.4th 145, 157 (2010). As argued

5   above, Plaintiffs have shown the materiality of Tesla's and Musk's misrepresentations about FSD.

6        Finally, Plaintiffs easily meet the UCL's statutory standing requirement of having "lost money

7   or property as a result of unfair competition." Cal. Bus. & Prof. Code § 17204. Tesla's

8   misrepresentations caused each of them to pay more for their Tesla and for FSD than they otherwise

9   would have. *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 329 (2011); *see* Ex. B ¶¶ 3-4

10  (Broussard); Ex. C ¶¶ 3-6 (Imaguchi); Ex. D ¶¶ 3-7 (LoSavio); Ex. E ¶¶ 2-5 (Mallow); *see also* Ex. A

11  ¶¶ 3-5, 8 (Battiato) (purchased a Tesla with the intent of adding FSD when he could afford it).

12        **2.      Irreparable Injury Is Likely Absent a Preliminary Injunction.**

13        Obtaining a preliminary injunction requires a showing that "irreparable injury is likely in the

14  absence of an injunction." *Winter,* 555 U.S. at 22. As the Ninth Circuit has observed: "A dangerous

15  act, if committed often enough, will inevitably lead to harm, which could easily be irreparable." *Inst.*

16  *of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 946 (9th Cir. 2013). That is

17  precisely the situation here. Plaintiffs' evidence shows that Tesla continues to make false and

18  deceptive claims about FSD's abilities and limitations (including failing to notify FSD owners about

19  the nationwide recall), and to allow the continued use of 360,000 FSD vehicles on the roads despite

20  known safety defects and the regular recurrence of fatal crashes due to drivers using and over-relying

21  on FSD. Given the situation, the probability of yet more deaths and serious injuries fairly attributable

22  to Tesla's wrongful conduct is not just "likely" (as required to obtain an injunction) but ***virtually***

23  ***certain*** to occur absent the requested injunctive relief.

24        **d.      Death and serious bodily harm constitute "irreparable injury."**

25        Death and serious bodily harm are the quintessential "irreparable" injuries. *See, e.g.*, *Ford v.*

26  *Wainwright*, 477 U.S. 399, 411 (1986) (death is "irremediable"); *Shell Offshore, Inc. v. Greenpeace,*

27  *Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (affirming injunction against protesters' dangerous activity

28  of forcibly boarding arctic oil rigs and vessels at sea); *Gayle v. Meade*, 2020 WL 3041326, at *20

1  (S.D. Fla. June 6, 2020) (finding "increased likelihood of severe illness and death" was irreparable).

2  Even when threats to human health are somewhat attenuated, such as when the sale of an after-market

3  auto part that defeats vehicle emission controls and thereby increases air pollution, courts still find the

4  likelihood of irreparable harm to human health is "obvious." *United States v. Gear Box Z Inc.*, 526

5  F.Supp.3d 522, 529 (D. Ariz. 2021) (enjoining sale of the auto part); *see also Helling v. McKinney*,

6  509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to [plaintiffs] who plainly proved an

7  unsafe, life-threatening condition … on the ground that nothing yet had happened to them.").

8      Thus, when a manufacturer's false or deceptive marketing creates a material risk of death or

9  serious injury by causing customers to believe a product is safer than it actually is, or by causing them

10  to use the product in a dangerous manner, this is precisely the kind of irreparable injury that warrants

11  entry of a preliminary injunction. *See, e.g.*, *Playskool, Inc. v. Prod. Dev. Grp., Inc.*, 699 F. Supp.

12  1056, 1063 (E.D.N.Y. 1988) (enjoining toy maker from using misleading language on packaging that

13  posed a safety hazard to children).

14          **e.    Tesla's deceptive FSD claims are virtually certain to cause more
               preventable death and injury absent the requested injunctive relief.**
15

16      Tesla's FSD branding and ongoing false and deceptive claims about FSD's abilities and

17  limitations are currently causing many FSD vehicle owners to falsely believe FSD is safer and more

18  capable than it actually is, and thus to over-rely on FSD to drive their cars for them. The result is a

19  tragic series of wholly preventable deaths and injuries. As discussed above, the public record is

20  replete with instances in which fatal and other serious accidents occurred due to overreliance on FSD.

21  *See supra* § II.D. This is no surprise given those systems' documented instances of behaving

22  erratically when attempting to execute a routine driving maneuver, failing to detect and crashing into

23  large stationary objects in the roadway, failing to stop at stop signs and stop lights, and instances of

24  sudden and severe "phantom braking." *See id*.; Ex. 94. Now, declarations from Plaintiffs and class

25  members and recent news coverage provide yet more evidence that these problems are not only still

26  occurring, but are a real and growing threat to road safety. *See supra* §§ II.C-II.D

27      Given these known safety issues and the fact that Tesla continues to allow 360,000 vehicles to

28  use the FSD system despite a nationwide recall, the probability that Tesla's ongoing FSD deception

will cause more death and injury is virtually certain. There is zero reason to believe that FSD's known defects and flaws will suddenly stop during the pendency of this action. *Cf. United States v. Hinds Cnty.*, --- F.Supp.3d ----, 2022 WL 4071968, at *6 (S.D. Miss. Sept. 2, 2022) (denying motion to stay injunction pending appeal, in part, because of defendant's "clear lack of urgency and competency" and because "there is no indication that if [defendant] is left to its own devices, the situation will change anytime soon"). To the contrary, there is every reason to believe the fatalities and injuries will only continue. Every day, Tesla sells more new vehicles with FSD, and neither the company nor Musk show any signs of slowing their false and deceptive claims.

### 3. The Balance of the Equities Tips Sharply in Plaintiffs' Favor.

In balancing the equities, courts look to "the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. When courts are "faced with a conflict between financial concerns and preventable human suffering," they have "little difficulty concluding that the balance of hardships tips decidedly in plaintiff's favor." *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)) (cleaned up). Even serious financial hardship to *the public* may not be sufficient to "outweigh the human suffering and preventable … deaths that will occur" absent injunctive relief. *Plata v. Schwarzenegger*, 2008 WL 4847080, at *5 (N.D. Cal. Nov. 7, 2008) (ordering state to provide $250 million to improve its prisons despite "financial hardship" to state budget); *accord Brown v. Plata*, 563 U.S. 493, 501, 505 n.4, 506 (2011) (affirming order requiring California to sharply reduce overcrowding in its prisons based on broad consideration of "preventable and possibly preventable deaths," "unnecessary pain," and "[n]eedless suffering" of prisoners).

That rule applies neatly here. On Plaintiffs' side of the scales is the inevitability of Tesla's false and deceptive FSD labeling and marketing claims causing yet more death and bodily injury to class members and the public, as well as the need to prevent Tesla from further deceiving consumers into purchasing and relying on an unsafe technology. On Tesla's side of the scales is the financial cost of rebranding FSD with a non-deceptive name, notifying FSD owners of the February 2023 recall, sending limited one-time corrective statements to FSD owners, and temporarily deactivating and halting sales of FSD until the safety defects that led to NHTSA's unprecedented nationwide recall of

1  all FSD vehicles are remedied by Tesla (as confirmed by an independent expert appointed by the

2  Court). The balance of equities is sharply in Plaintiffs' favor.

3  **4.    Immediate Injunctive Relief is in the Public Interest.**

4  Courts have long recognized a "paramount" public interest in "preserving the safety of []

5  public highways," *Mackey v. Montrym*, 443 U.S. 1, 17 (1979), including by "ensuring … vehicles are

6  fit for safe operation" and by "keep[ing] dangerous automobiles off the road." *Delaware v. Prouse*,

7  440 U.S. 648, 658 (1979); *see also Coleman v. Paccar, Inc.*, 424 U.S. 1301, 1307 (1976) (Rehnquist,

8  Cir. J.) (vacating order staying federal vehicle safety regulations based, in relevant part, on the strong

9  public interest in "reduc[ing] traffic accidents and [the resulting] deaths and injuries"). In automobile

10  cases, "safety is a dominant consideration" in assessing what is in the public interest because "[m]otor

11  vehicles are dangerous machines whose operation is attended by serious hazard to persons and

12  property." *Maurer v. Hamilton*, 309 U.S. 598, 605 (1940). Here, the public interest factor strongly

13  favors ordering Tesla to stop engaging in false and deceptive FSD branding and marketing claims, to

14  issue corrective statements to FSD owners, and to temporarily deactivate and halt sales of FSD until

15  Tesla remedies the safety defects identified by NHTSA.

16  **B.    THE COURT SHOULD PROVISIONALLY CERTIFY THE CLASS.**

17  "Courts in the Ninth Circuit routinely grant provisional class certification for purposes of

18  entering injunctive relief." *Ahlman v. Barnes*, 445 F.Supp.3d 671, 682 (C.D. Cal. 2020) (internal

19  quotation marks omitted); *accord Roman v. Wolf*, 977 F.3d 935, 944-45 (9th Cir. 2020) (affirming

20  provisional certification for preliminary injunction); *Meyer v. Portfolio Recovery Assocs., LLC*, 707

21  F.3d 1036, 1041-43 (9th Cir. 2012) (same). Here, for purposes of entering a preliminary injunction,

22  the Court should provisionally certify the following Rule 23(b)(2) class:

23  All persons who purchased or leased a new Tesla vehicle from Tesla, Inc. (or any entity
24  it directly or indirectly owns or controls, including but not limited to Tesla Lease Trust
   and Tesla Finance LLC) on or after January 1, 2016, who still own or lease that vehicle,
25  and who have purchased "Full Self-Driving Capability" for their vehicle or who could
   add "Full Self-Driving Capability" to their vehicle by purchase or subscription.
26

27  Plaintiffs LoSavio, Broussard, Battiato, Mallow, and Imaguchi should be provisionally certified as

28  class representatives, and their attorneys should be provisionally certified as class counsel. All

1  requirements of Rules 23(a), 23(b)(2), and 23(g) are satisfied.

2       **1.**     **The Requirements of Rule 23(a) Are Satisfied.**

3       The class is sufficiently numerous under Rule 23(a)(1) because, according to recent NHTSA

4  data, it includes the owners or lessees of 350,000 Tesla vehicles equipped with FSD Beta. *See* RJN,

5  Ex. 20 (2023 NHTSA Recall Notice); *see also Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir.

6  2010) (numerosity satisfied "when a class includes at least 40 members").

7       Commonality under Rule 23(a)(2) is also satisfied. "A common question is one where the

8  same evidence will suffice for each member to make a prima facie showing or the issue is susceptible

9  to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). "[T]he

10  threshold for meeting the commonality requirement is relatively low." *Senne v. Kansas City Royals*

11  *Baseball Corp.*, 2021 WL 3129460, at *18 (N.D. Cal. July 23, 2021). All that is "require[d] is a single

12  significant question of law or fact." *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir.

13  2013); *see also Meyer*, 707 F.3d at 1041 ("shared legal issues with divergent factual predicates is

14  sufficient, as is a common core of salient facts [] with disparate legal remedies within the class").

15       Here, there are numerous common issues of fact or law regarding Tesla's acts and omissions

16  in marketing and otherwise representing the present and near-term future abilities of FSD, and the

17  effects of those acts and omissions in causing significant harm to Plaintiffs and class members.

18  Examples of such common questions include: (1) whether Tesla engages in false or misleading

19  marketing by branding its flagship SAE Level 2 ADAS technology as "FSD" or "Full Self-Driving

20  Capability," or by using the adjectives "self-driving," "autonomous," and equivalent language to

21  describe FSD; (2) whether Tesla's historic and recent public projections about the time in which FSD

22  would make, or would likely make, its vehicles fully self-driving (i.e., become an SAE Level 4 or 5

23  technology) are likely to mislead reasonable consumers, including by causing current Tesla owner

24  and lessees to misunderstand and over-rely on FSD to the peril of themselves and others; (3) whether

25  Tesla's concealment of information, including by failing to make adequate corrective statements, is

26  similarly likely to mislead reasonable consumers; and (4) whether Tesla's conduct violates statutory

27  or common law. Any one of these suffices as a "common" issue under Rule 23(a)(2) because they

28

1   would all "generate common answers apt to drive the resolution of the litigation." *Ruiz Torres v.*

2   *Mercer Canyons Inc.*, 835 F.3d 1125, 1133 (9th Cir. 2016) (internal quotation marks omitted).

3        Rule 23(a)(3)'s typicality requirement is satisfied because Plaintiffs' claims arise from Tesla's

4   same challenged practices and rely on the same legal arguments as other class members' claims. *See*

5   *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) ("Under the rule's permissive standards,

6   representative claims are 'typical' if they are reasonably coextensive with those of absent class

7   members; they need not be substantially identical."). "[T]ypicality refers to the nature of the claim or

8   defense of the class representative, and not to the specific facts from which it arose or the relief

9   sought." *Id.* "The test of typicality is whether other members have the same or similar injury, whether

10  the action is based on conduct which is not unique to the named plaintiffs, and whether other class

11  members have been injured by the same course of conduct." *Id.* (quoting *Hanon v. Dataproducts*

12  *Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Plaintiffs here easily meet that test. Like all class members,

13  Plaintiffs purchased or leased new Tesla vehicles, suffered or are at imminent risk of suffering

14  monetary injury from being induced by Tesla's misrepresentations to purchase FSD, and are

15  continually threatened with physical injury from Tesla's continuing gross exaggerations and other

16  misrepresentations about FSD's abilities. *See* Ex. A ¶¶ 3-8 (Battiato); Ex. B ¶¶ 3-10 (Broussard);

17  Ex. C ¶¶ 3-9 (Imaguchi); Ex. D ¶¶ 3-11 (LoSavio); Ex. E ¶¶ 2-12 (Mallow).

18       Rule 23(a)(4)'s adequacy requirement is also satisfied. Plaintiffs and their counsel lack any

19  conflicts of interest with other class members and will vigorously prosecute the action. *See Ellis v.*

20  *Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011); *Staton v. Boeing Co.*, 327 F.3d 938, 957

21  (9th Cir. 2003). Plaintiffs are aware of their role as class representatives, willing to serve, and have no

22  conflicts. Ex. A ¶¶ 9-11 (Battiato); Ex. B ¶¶ 15-17 (Broussard); Ex. C ¶¶ 13-15 (Imaguchi); Ex. D

23  ¶¶ 13-15 (LoSavio); Ex. E ¶¶ 14-16 (Mallow).

24       **2.      Under Rule 23(b)(2), Tesla's Challenged Practices Apply Generally to the Class.**

25       Plaintiffs have also shown that Tesla "has acted or refused to act on grounds that apply

26  generally to the class," making preliminary injunctive relief appropriate under Rule 23(b)(2). Fed. R.

27  Civ. P. 23(b)(2); *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Rule 23(b)(2)

28  "[o]rdinarily will be satisfied when plaintiffs have described the general contours of an injunction that

1    would provide relief to the whole class, that is more specific than a bare injunction to follow the law,

2    and that can be given greater substance and specificity at an appropriate stage in the litigation through

3    fact-finding, negotiations, and expert testimony." *Parsons*, 754 F.3d at 689 n.35 (9th Cir. 2014).

4    "That inquiry does not require an examination of the viability or bases of the class members' claims

5    for relief." *Id.* at 688 (citing *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010)). Rather, the

6    relevant question is "whether class members seek uniform relief from a practice applicable to all of

7    them." *Rodriguez*, 591 F.3d at 1125. "The fact that some class members may have suffered no injury

8    or different injuries from the challenged practice does not prevent the class from meeting the

9    requirements of Rule 23(b)(2)." *Id.*

10       That requirement is readily satisfied here. As laid out above, the injunctive relief sought by

11   Plaintiffs will provide relief to all class members and is specific in the relief sought. That is sufficient.

12   *See Alger v. FCA US LLC*, 334 F.R.D. 415, 431 (E.D. Cal. 2020) (certifying injunctive relief class in

13   case alleging car manufacturer was selling cars with dangerously defective headrests); *Adkins v.*

14   *Facebook, Inc.*, 424 F.Supp.3d 686, 698 (N.D. Cal. 2019) (certifying injunctive relief class where

15   plaintiffs sought to compel Facebook to fix data security flaws identified by third-party auditors).

16       **3.     Plaintiffs' Counsel Should Be Appointed Provisional Class Counsel under Rule 23(g).**

17       The Court should appoint Plaintiffs' counsel Cotchett Pitre & McCarthy LLP ("CPM"),

18   Bottini & Bottini Inc. ("Bottini"), and Casey Gerry Schenk Francavilla Blatt & Penfield LLP ("Casey

19   Gerry") as provisional class counsel under Rule 23(g). Each of these firms has performed substantial

20   work identifying and investigating potential claims, has significant experience prosecuting class

21   actions and other complex cases with claims similar to those at issue here, is knowledgeable regarding

22   the applicable law, and has the resources and ability to litigate this case. *See* Fed. R. Civ. P. 23(g)(1);

23   Decl. of Frank M. Pitre ¶¶ 2-15 (CPM); Decl. of Frank A. Bottini, Jr. ¶¶ 2-6 (Bottini); Decl. of Gayle

24   M. Blatt ¶¶ 3-11 (Casey Gerry).

25   **V.     CONCLUSION**

26       For the foregoing reasons, plaintiffs respectfully request the Court provisionally certify the

27   proposed class under Rule 23(b)(2) and enter a preliminary injunction as set forth in the Notice of

28   Motion and accompanying proposed order.

1                               Respectfully submitted,

2   Dated:  March 22, 2023             **COTCHETT, PITRE & McCARTHY, LLP**

3                               By:     */s/ Frank M. Pitre*

4                                     FRANK M. PITRE

5                                     JULIE L. FIEBER
                                    NABILAH A. HOSSAIN

6                                     ANDREW F. KIRTLEY

7                               *Attorneys for Plaintiffs Thomas LoSavio,*
                              *Brenda Broussard, and the Proposed Class*

8

9   Dated:  March 22, 2023             **BOTTINI & BOTTINI, INC.**

10                              By:     */s/ Francis A. Bottini, Jr.*

11                                     FRANCIS A. BOTTINI, JR.
                                    NICHOLAUS H. WOLTERING

12

13                               *Attorneys for Plaintiff Dominick Battiato*
                              *and the Proposed Class*

14

15   Dated:  March 22, 2023             **CASEY GERRY SCHENK FRANCAVILLA BLATT & PENFIELD, LLP**

16                              By:     */s/ Gayle M. Blatt*

17                                     DAVID S. CASEY, JR.

18                                     GAYLE M. BLATT
                                    JEREMY ROBINSON

19                                     P. CAMILLE GUERRA
                                    MICHAEL J. MORPHEW

20

21                               *Attorneys for Plaintiffs Christopher Mallow,*
                              *Jazmin Imaguchi, and the Proposed Class*

22

23

24

25

26

27

28

**ATTORNEY ATTESTATION**

I, Frank M. Pitre, am the ECF User whose ID and password are being used to file this Motion for Preliminary Injunction and Provisional Class Certification. In compliance with Civil Local Rule 5-l(h)(3), I hereby attest that concurrence in the filing of this document has been obtained from each signatory.

Dated:  March 22, 2023

By:   */s/ Frank M. Pitre*
    Frank M. Pitre