# Exhibit 15

Volume 3

Pages 467 - 715

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

IN RE TESLA, INC. SECURITIES          )
LITIGATION.                           ) No. 18-cv-04865-EMC
_____       )
                                      San Francisco, California
                                      Friday, January 20, 2023

### TRANSCRIPT OF TRIAL PROCEEDINGS

**APPEARANCES**:

For Movants:
                    LEVI & KORSINSKY, LLP
                    1101 30th Street NW
                    Suite 115
                    Washington, D.C.  20007
           BY:  **NICHOLAS IAN PORRITT, ESQ.**
                **ELIZABETH K. TRIPODI, ESQ.**
                **ALEXANDER A. KROT, III, ESQ.**
                **JOSEPH LEVI, ESQ.**

                    LEVI & KORSINSKY LLP
                    75 Broadway
                    Suite 202
                    San Francisco, California  94111
           BY:  **ADAM M. APTON, ESQ.**
                **ADAM C. MCCALL, ESQ.**

                    LEVI & KORSINSKY LLP
                    55 Broadway
                    10th Floor
                    New York, New York  10016
           BY:  **MAX EDWARD WEISS, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              **DEBRA L. PAS, CSR 11916, CRR, RMR, RPR**
              Official Reporters, U.S. District Court


      (Appearances continued, next page)

**APPEARANCES, CONTINUED:**

For Defendants:

QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue
22nd Floor
New York, New York  10010
BY:  **ALEXANDER B. SPIRO, ESQ.**
**ANDREW JOHN ROSSMAN, ESQ.**
**PHILLIP B. JOBE, ESQ.**
**ELLYDE R. THOMPSON, ESQ.**
**JESSE A. BERNSTEIN, ESQ.**

QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 South Figueroa Street
10th Floor
Los Angeles, California  90017
BY:  **MICHAEL T. LIFRAK, ESQ.**
**ANTHONY P. ALDEN, ESQ.**
**MATTHEW ALEXANDER BERGJANS, ESQ.**
**WILLIAM C. PRICE, ESQ.**

For Third Party Egon Durban and Silver Lake:

CONRAD METLITZKY KANE
Four Embarcadero Center
Suite 1400
San Francisco, California  94111
BY:  **LIZ KIM, ESQ.**

DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue N.W.
Suite 500
Washington, D.C.  20004
BY:  **JULIE M. RIEWE, ESQ.**
(Appearing telephonically)

**PROCEEDINGS**

| | |
|---|---|
| 1 | **Friday, January 20, 2023**                    **8:01 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | (The following proceedings were held outside of the |
| 4 | presence of the Jury) |
| 5 | **THE COURTROOM DEPUTY:**  Court is now in session, the |
| 6 | Honorable Edward M. Chen presiding. |
| 7 | Court is calling the case In Re Tesla Inc. Securities |
| 8 | Litigation, Case No. 18-4865.  Counsel, please state your |
| 9 | appearances for the record, beginning with plaintiff. |
| 10 | **MR. PORRITT:**  Good morning, Your Honor.  Nicholas |
| 11 | Porritt of Levi & Korsinsky on behalf of the plaintiff and the |
| 12 | class.  And, with my team from Levi & Korsinsky. |
| 13 | **THE COURT:**  Thank you, good morning. |
| 14 | **MR. PORRITT:**  And we'll spare individual introductions |
| 15 | today. |
| 16 | **MR. SPIRO:**  Good morning, Your Honor.  Alex Spiro of |
| 17 | Quinn Emanuel on behalf of defendants. |
| 18 | **THE COURT:**  All right.  Thank you, Mr. Spiro. |
| 19 | Let's address the things that we need to address prior to |
| 20 | certain witnesses going on, coming on.  I do want to start with |
| 21 | the issue about whether I should issue a proposed instruction |
| 22 | that I sent, delivered to you, I think early this morning, in |
| 23 | response to the plaintiff's filing. |
| 24 | And I want to get your comments.  And I will tell you that |
| 25 | my view at this point is that without some instruction, I think |

1                          **ELON MUSK**,

2    called as a witness for the Plaintiff, having been duly sworn,

3    testified as follows:

4              **THE WITNESS:**  I do.

5              **THE CLERK:**  Thank you.  Please have a seat.

6         Please speak clearly into the microphone.  State and spell

7    your first and last name for the record please.

8              **THE WITNESS:**  Elon Musk.  E-L-O-N, M-U-S-K.

9              **THE COURT:**  Thank you, Mr. Musk.

10        You may proceed.

11            **MR. PORRITT:**  Thank you, Your Honor.  I have a witness

12   binder here, one for the witness and one for the Court.

13        (Whereupon exhibit binder was tendered to the Court and

14   the witness.)

15                      **DIRECT EXAMINATION**

16   **BY MR. PORRITT**

17   **Q.**   Good afternoon, Mr. Musk.

18   **A.**   Good afternoon.

19   **Q.**   You are currently the Chief Executive Officer of Tesla?

20   **A.**   Yes.

21   **Q.**   And you also held that position in August of 2018;

22   correct?

23   **A.**   Correct.

24   **Q.**   And at that point you were also chairman of Tesla;

25   correct?

**MUSK - DIRECT  /  PORRITT**

1  **A.**   Yes.

2  **Q.**   Now, you've had a Twitter account since 2010; is that

3  correct?

4  **A.**   Since 2009.

5  **Q.**   2009, okay.  And you understand that your Twitter account

6  has been identified by Tesla as the source of corporate

7  information; is that correct?

8  **A.**   Yes.

9  **Q.**   That's been the case since 2013; correct?

10  **A.**   I assume so.

11  **Q.**   And the Tesla board approved that decision?

12  **A.**   Yes.

13  **Q.**   And it's true that you got Twitter as part of your

14  interaction with retail investors?

15  **A.**   Yes.  I speak with retail investors quite frequently --

16  well, communicate with retail investors quite frequently on

17  Twitter.  Yeah.

18  **Q.**   And before you tweet something about Tesla, you think

19  about what effect it will have on retail investors; is that

20  correct?

21  **A.**   Yes.  I care a great deal about retail investors.  They

22  are our most loyal and steadfast, I think, investors.

23  **Q.**   And you want information that you tweet to reach your

24  millions of followers, including Tesla investors; isn't that

25  correct?

**MUSK - DIRECT / PORRITT**

1   **A.**   Yeah.   I think it's the best way to communicate with

2   people.   It's, I think, the most democratic way to communicate

3   with people and it gives all investors, no matter whether they

4   are big or small investors, equal access to information.

5   **Q.**   And you're aware that your institutional investors also

6   follow you on Twitter; is that correct?

7   **A.**   I assume so.   I don't know.

8   **Q.**   And so you frequently use your Twitter account to tweet

9   corporate information about Twitter -- about Tesla, sorry;

10   isn't that correct?

11   **A.**   That is one of the things that I tweet about.   Also me.

12   **Q.**   And -- and Tesla itself does no conventional advertising;

13   is that correct?

14   **A.**   Correct.

15   **Q.**   Is it fair to say that your Twitter account is a primary

16   means of communication in raising brand awareness for Tesla?

17   **A.**   I don't really think about brand awareness, but I -- I

18   think it is a good way to communicate about products and to

19   enter customer's support questions and to hear, you know, what

20   people think about the product and to get feedback for

21   improvement.

22   **Q.**   And you're aware that Tesla's stock price sometimes goes

23   up or down following one of your tweets?

24   **A.**   Well, it's difficult to say if that's -- the stock price

25   is linked to the tweet.   I mean, there have been many cases

 1  where I thought that if I were to tweet something, that the

 2  stock price would go down.

 3      I mean, for example, at one point I tweeted that I thought

 4  that in my opinion the stock price was too high, and then the

 5  stock price went down.  So just because I tweet something does

 6  not mean people believe it or will act accordingly.

 7      I found it ironic that me saying that I thought the stock

 8  price was too high, because I was concerned that people might

 9  buy the stock at too high a price, and then ironically it went

10  down.

11  **Q.**  But you're aware that --

12  **A.**  I'm sorry.  It didn't go down.  It went up.  I said I

13  thought the stock price was too high, and it went higher, which

14  is -- which is, you know, counterintuitive.

15  **Q.**  But you're aware that sometimes after your tweet, the

16  stock price moves either up or down.

17      I'm not asking you to make a causal relationship.  You

18  just -- you understand that happens?

19  **A.**  Yes.  What I'm trying to say is that the causal

20  relationship is clearly not there simply because of a tweet.

21  That's why I used the example of when I -- even though I said

22  that I tweeted that, in my opinion, the stock price was too

23  high, the stock price then went up from that.  And you

24  obviously think if I tweeted -- you'd think that if I tweeted

25  the stock price was too high, the stock price would go down,

 1  but it actually went up.

 2       So, you know, correlation is not causation, but the tweets

 3  don't -- you know, they aren't directly linked.

 4  **Q.**   And you're aware that your tweets about Tesla are governed

 5  by the federal securities laws; correct?

 6  **A.**   Yes.

 7  **Q.**   And that even though Twitter is an informal medium, your

 8  tweets about Tesla are the same as statements contained in a

 9  Securities and Exchange Commission filing or formal corporate

10  press release?

11       **MR. SPIRO:**  Objection.  Compound.  Calls for a legal

12  conclusion.

13       **THE COURT:**  Overruled.  You can answer the question.

14  **A.**   Well, there is a limit to what you can say in a tweet

15  obviously.  So you can put a lot more in a filing than you can

16  in a tweet.

17  **BY MR. PORRITT**

18  **Q.**   But you understand that tweets are the same under the law,

19  under the federal securities laws?

20       **MR. SPIRO:**  Same objection.

21       **THE COURT:**  A tweet is the same as what?

22       **MR. PORRITT:**  As an SEC filing or a press release.

23  **BY MR. PORRITT**

24  **Q.**   I will rephrase the question.

25       You understand that a statement by you on Twitter about

 1   Tesla is a public statement in connection with Tesla's -- in

 2   connection with Tesla stock in the same way or securities in

 3   the same way that an SEC filing or press release is?

 4   A.   The tweets are information that I think the public should

 5   hear.

 6          THE COURT:  Well, I don't think that answers the

 7   question.  Do you want to ask it one more time?

 8   BY MR. PORRITT

 9   Q.   You understand that you're under the same obligation to be

10   accurate in a tweet about Tesla as you are in an SEC filing or

11   press release?

12   A.   Yes.  But, obviously, there is a limit, if you've got 240

13   characters, to what you can say.  You can obviously be far more

14   verbose in a filing, and everyone on Twitter understands that.

15   Q.   Nonetheless, the character constraints in Twitter does

16   not -- there is no exception under the SEC rules based on the

17   character limitation in Twitter, is there?

18   A.   There isn't, but I think one cannot ignore the character

19   limitation, and everyone on Twitter is aware of the character

20   limitation.

21   Q.   You don't -- when you're composing a tweet about Tesla, do

22   you think about whether you can accurately and fully and

23   truthfully communicate information in the constraints of

24   Twitter?

25   A.   I think you can absolutely be truthful, but can you be

**MUSK - DIRECT  / PORRITT**

1  comprehensive?  Of course not.

2  **Q.**  Do you ever consider not tweeting something because you

3  can't contain its -- you can't completely explain it within the

4  context of a tweet, so it would be misleading for you to tweet

5  out some of the information?

6  **A.**  I'm not sure I understand your question.  It seems like

7  you're combining many questions in one.

8  **Q.**  Okay.  I will rephrase.

9      We're talking about the character constraints of Twitter;

10  correct?

11  **A.**  Yes.

12  **Q.**  And you -- as I understand the testimony, you've said

13  sometimes that prevents you from tweeting or disclosing all the

14  information; correct?

15  **A.**  Well, there is a 240 character limitation.

16  **Q.**  So if --

17  **A.**  You can do multiple tweets obviously.  Yeah.

18  **Q.**  Have you ever thought about not tweeting something because

19  you thought it would be -- you wouldn't be able to fully

20  express it within the context of a tweet?

21  **A.**  Yeah.  I mean, there's things, like, for example, Tesla

22  safety blogs and whatnot, which are quite lengthy.  And so, you

23  know, those are on our website.

24  **Q.**  And you wouldn't want to put out a misleading selection or

25  something from something about their safety blogs; right?

**MUSK - DIRECT  / PORRITT**

1  **A.**   Yes.  But, I mean, I have tweeted about Tesla safety in

2  tweets, but the tweets are truthful.  They are simply short.

3  I think you're trying to conflate misleading with short.

4  **Q.**   And --

5  **A.**   That's misleading.

6  **Q.**   Well, the SEC has enacted rules regulating statements

7  about public companies; right?

8  **A.**   The SEC makes rulings about public companies?

9  **Q.**   About statements made about public companies; correct?

10  **A.**   Yes, they do.

11  **Q.**   And those rules apply to your Twitter account for

12  statements about Tesla; right?

13        **MR. SPIRO:**  Objection.  These questions call for legal

14  conclusions.

15        **THE COURT:**  Overruled.  You can answer.

16  **A.**   Sorry.  Can you repeat that?

17  **BY MR. PORRITT**

18  **Q.**   The SEC rules about public statements regarding public

19  companies apply to your Twitter account in connection with

20  statements about Tesla; isn't that correct?

21  **A.**   Yes.

22  **Q.**   Okay.  And you knew that in 2018?

23  **A.**   Yes.

24  **Q.**   In August of 2018 there was no practice for anyone at

25  Tesla to review your tweets before you published them; correct?

**MUSK - DIRECT  / PORRITT**

1  **A.**   I'm sorry.  Can you talk closer to the microphone?  It's a

2  little hard to hear.

3  **Q.**   I apologize.  How about that?

4  **A.**   That's better, yeah.

5  **Q.**   Okay.  I'm often accused of speaking too loudly.

6      In August of 2018 there was no practice for anyone at

7  Tesla to review your tweets before you published them; correct?

8  **A.**   Correct.

9  **Q.**   And that was a policy approved by Tesla and its Board of

10  Directors?

11  **A.**   Yes.

12  **Q.**   So in 2018 none of your tweets were reviewed by anyone at

13  Tesla before you posted them; correct?

14  **A.**   Well, I worked at Tesla, but besides me.

15  **Q.**   You review your tweets before you post them?

16  **A.**   I mean, I read my tweet, yes.

17  **Q.**   Do you recall in July 2018 there was controversy involving

18  one of your tweets and an English diver and the cave rescue in

19  Thailand?  Do you recall that?

20  **A.**   He was not a diver.

21  **Q.**   Do you recall that controversy?

22  **A.**   I'm aware of that controversy.

23  **Q.**   And you're aware that controversy on Twitter caused a

24  decline in Tesla stock price?

25  **A.**   No.  I think you're linking things on Twitter to Tesla

MUSK - DIRECT  /  PORRITT

1    stock prices when they are not linked.  That's why I gave the

2    example, even if I say on Twitter that I think the stock price

3    is too high, the stock price still goes higher.

4    **Q.**   I will rephrase.  I'll reask the question.

5        And this controversy about the cave rescue in Thailand was

6    followed by a negative impact on Tesla stock price?

7    **A.**   No.  I think you're creating a link that doesn't exist.

8    **Q.**   Well, did Tesla stock price go down after you tweeted

9    about the Thai cave rescue?

10            **MR. SPIRO:**  Objection.  That day?  That week?  It's

11   vague.

12            **THE COURT:**  Give a time frame.

13   **BY MR. PORRITT**

14   **Q.**   Within the week after that controversy?

15   **A.**   Well, Tesla stock price goes up and down all the time.

16   And I don't think that, you know, some tweet about something

17   completely unrelated to Tesla is going to have an effect on the

18   stock price.  That's absurd.

19   **Q.**   Do you recall in July 2018 being approached by Antonio

20   Gracias suggesting you take a break from Twitter after your

21   tweets about the cave rescue in Thailand?

22   **A.**   I don't recall that.  It was five years ago.

23   **Q.**   Do you recall being advised in July 2018 by Ron Baron to

24   stop using Twitter?

25   **A.**   No.  Again, that was five years ago.

1          **MR. PORRITT:**  Your Honor, if I may show the witness

2    Exhibit 78 just to refresh his recollection?

3          **THE COURT:**  All right.  About a question you just

4    asked?  This is about the question that you just asked about?

5          **MR. PORRITT:**  Correct.  Correct, Your Honor.

6          **THE COURT:**  Okay.

7       (Whereupon document was tendered to the Court and the

8    witness.)

9    **BY MR. PORRITT**

10   **Q.**   Can you please read to yourself Exhibit 78, Mr. Musk?

11         **THE COURT:**  All of it or some portion of it?

12         **MR. PORRITT:**  It's two -- it's just on the first --

13   it's really just the first page, about halfway down the first

14   page.

15         **THE COURT:**  All right.  So, Mr. Musk --

16         **THE WITNESS:**  What are you referring to?

17         **THE COURT:**  So read it to himself.

18         **MR. PORRITT:**  Read to it himself, yes.

19         **THE COURT:**  And then not refer to it afterwards.

20         **MR. PORRITT:**  Not refer to it.  I'm just asking if it

21   refreshes his recollection about whether Mr. Baron asked him --

22   asked the witness to take a break from Twitter.

23       Actually, I'll correct that.  "Just don't use Twitter."

24   **A.**   Yes, I read it.

25

**MUSK - DIRECT  / PORRITT**

1  **BY MR. PORRITT**

2  **Q.**   Okay.  Does this refresh your recollection that Ron Baron

3  suggested to you in July 2018 to "Just don't use Twitter"?

4  **A.**   I mean, I can see that he -- he's not saying don't use

5  Twitter.  He's -- he's saying I should not respond to criticism

6  in the news on Twitter.

7  **Q.**   Did you follow --

8  **A.**   Yeah.

9  **Q.**   Did you follow Mr. Baron's suggestion to stop using

10  Twitter?

11          **MR. SPIRO:**  Objection.  Mischaracterizes the

12  testimony.

13          **THE COURT:**  Sustained.  That wasn't what the witness

14  said.

15  **BY MR. PORRITT**

16  **Q.**   Do you know, who is Ron Baron?

17  **A.**   Ron Baron is an investor.  He's one of the best investors

18  in the world.  A very wise, smart person.

19  **Q.**   Do you recall in July 2018 Sam Teller providing feedback

20  from Tesla and SpaceX executives to you asking you take a break

21  from Twitter?

22  **A.**   Again, that was five years ago.  I don't recall it.

23          **MR. PORRITT:**  Your Honor, if I may show the witness

24  Exhibit 104 to refresh his recollection?

25          **THE COURT:**  Okay.  It would be helpful if you direct

 1  the witness to a specific portion.

 2          **MR. PORRITT:**  I will.

 3      (Whereupon document was tendered to the Court and the

 4  witness.)

 5          **MR. PORRITT:**  Second paragraph in the document.

 6          **MR. SPIRO:**  Your Honor, we're not doing refreshing

 7  recollection exactly how it's supposed to be done in my view.

 8      But if the Court could just -- or if I could have a

 9  standing objection to the way it's being done.  Because the

10  witness is speaking from the document, which is obviously

11  not --

12          **THE COURT:**  Well, all right.  So what's supposed to

13  happen is if the witness doesn't remember something, he can be

14  presented with a document, read to himself, and then not read

15  from the document, just say whether it does refresh your

16  memory.  And if it doesn't, that's it.  If it does, then you

17  can say what you remember.

18          **MR. PORRITT:**  I believe that's what I'm doing, but if

19  I'm falling down, I apologize.

20          **THE COURT:**  All right.  I just want to make sure we

21  follow the procedure.

22      So, Mr. Musk, if -- you're going to direct the witness to,

23  what, the first paragraph?

24          **MR. PORRITT:**  It's the -- well, it's the second

25  paragraph in the document, which is an email chain.  So it's

 1   that first block, if you like, large paragraph in the middle

 2   there.

 3           THE COURT:  All right.  You're going to have him read

 4   that first indented block; right?

 5           MR. PORRITT:  Correct, Your Honor.

 6           THE COURT:  So, Mr. Musk, if you would just read that

 7   to yourself.  Then when you're done, you can look up.

 8           THE WITNESS:  Okay.

 9       (Witness complied.)

10   A.   Yes.  It's saying that --

11           THE COURT:  Now, that's where you -- you're not

12   supposed to recite that.

13           THE WITNESS:  Oh, my apologies.

14           THE COURT:  You're supposed to wait for the question

15   from Mr. Porritt.

16   BY MR. PORRITT

17   Q.   I'll now ask, have you had a chance to review this, that

18   exhibit?

19   A.   I have.

20   Q.   Okay.  Does this refresh your recollection that Sam Teller

21   in July 2018 asked you to take a break from Twitter?

22   A.   It does.

23   Q.   Okay.  And do you recall investors also in July 2018

24   asking you to take a break from Twitter?

25   A.   I mean, a lot -- I can say, like, 2018 was an eventful and

1   very difficult year.  So, you know, we're sitting here five

2   years later.  If you're asking me to recall one of several

3   thousand emails or texts, it's quite difficult.  My memory is

4   simply not that good.

5   **Q.**   I understand.  That's why I'm trying to refresh your

6   recollection.  I have to do this because -- I have to do this

7   this way for the reasons we just discussed.

8       One last thing on this, if I show the witness Exhibit 40

9   to refresh his recollection.

10      So please read this to yourself and let me know when

11  you've read it.

12      (Whereupon document was tendered to the Court and the

13  witness.)

14          **MR. SPIRO:**  I would also like a standing objection to

15  relevance on any of this.

16          **THE COURT:**  Overruled.  But at some point there is a

17  403 question here, so I'd like to move on.

18          **MR. PORRITT:**  This is the last one, Your Honor.

19          **THE COURT:**  All right.

20  **BY MR. PORRITT**

21  **Q.**   This is -- this is the month before the tweets in

22  question.

23  **A.**   Yes, I see it.  It does -- I actually -- I mean, like I

24  said, I get -- I truly have, like, a Niagara Falls of email,

25  you know.  So it's really difficult to remember every email.

**MUSK - DIRECT  /  PORRITT**

1    But, I mean, I -- does this refresh my recollection?  Sure.

2    **Q.**   Okay.  So it refreshes your recollection that investors

3    were asking you to take a break from Twitter in July 2018, or

4    at least an investor?

5    **A.**   I mean, the -- there's some -- I mean, we have many

6    thousands of investors.  These are a few emails.

7    **Q.**   Did you, in fact, take a break from Twitter in July 2018?

8    **A.**   I don't think so.

9    **Q.**   So you ignored the advice of Sam Teller and the Tesla

10   executives?

11   **A.**   I suppose I continued to tweet, yes.

12   **Q.**   You ignored the advice of your investor Joe Fath?

13   **A.**   Yeah.  I mean, like I said, we have many thousands of

14   investors.  These are two emails out of probably 20,000

15   investors.

16   **Q.**   During 2018 Tesla was dealing with the operational

17   challenge of the model -- scaling Model 3 production; is that

18   a fair summary?

19   **A.**   Yes.  2018 was an extremely painful and difficult year.

20   I was sleeping in the factory to help make the factory work.

21   **Q.**   So that was a big challenge, is that an understatement

22   perhaps?

23   **A.**   That would be an understatement.  The sheer level of pain

24   required to make Tesla successful in the '17 -- 2017 through

25   2019 period was excruciating for me and for many others.  I

1    wasn't sleeping in the factory because I wanted to, but because

2    I had to.

3    **Q.**    And, in fact, in the July 2018 Tesla shareholder meeting

4    you described the preceding month as "the most excruciating

5    hellish seven months I've maybe ever had."  Does that sound

6    familiar?

7    **A.**    That is an accurate statement.  Extremely -- extreme pain.

8    **Q.**    And you thought the -- your belief was that the stress of

9    this operational challenge was made worse by Tesla being a

10   public company with the stock; correct?

11   **A.**    Yes, in addition to the executional challenges.  I mean,

12   it is important to note that there has not been a successful

13   American car company to reach volume production in the United

14   States since Chrysler in the '20s.  So it's been about 100

15   years since a car company was successful in reaching volume

16   production.  The reason is because it is extremely difficult to

17   do so, and in Tesla's case we just barely succeeded in doing

18   so.

19   **Q.**    And one of the issues caused by being a public company is

20   that you face pressure from so-called short sellers; is that

21   correct?

22   **A.**    Yes.  I -- I think most people don't know what a "short

23   seller" means.  You know, it's sort of like -- sort of like a

24   -- is a sort of, you know, a seller of small stature, or is it

25   a -- like, medium and tall sellers, or what -- short sellers, I

1    think it's maybe important for -- if I'll just explain.

2        A short seller is someone who is betting that the company

3    will -- will fail.  A short seller is someone that wants the

4    company's stock to go down.  And the best case scenario for a

5    short seller is if the company goes bankrupt.

6        So they -- the short seller is basically a bunch of sharks

7    on Wall Street wanted Tesla to die, very badly.

8    Q.   And then short sellers, of course, lose money when the

9    stock price goes up; isn't that correct?

10   A.   If they exit their short position, they lose money.

11   Q.   And you had several public -- made several public

12   criticisms of short sellers during 2018; is that correct?

13   A.   Yes.  I believe short selling should be made illegal.  It

14   is a means of -- for, in my opinion, bad people on Wall Street

15   to steal money from small investors.

16   Q.   And --

17   A.   Not good.

18   Q.   And short sellers attack companies like Tesla by putting

19   negative stories in the press; isn't that correct?

20   A.   Yes.  Short sellers, meaning sellers, people who want

21   Tesla to die, will engage in what's called an FUD campaign, a

22   fear, uncertainty and doubt campaign, where they will plant

23   false stories in the media in order to get the stock to go down

24   and do anything in their power to make a company die.  It's

25   evil.

MUSK - DIRECT  /  PORRITT

1   Q.   And you had publicly stated prior to August 2018 that you

2   wish Tesla was a private company; isn't that correct?

3   A.   Yes.  If you're a private company, then private companies

4   cannot be -- cannot be sold short.  So short sellers are unable

5   to attack a private company because private companies can be --

6   cannot be short sold, and this -- this makes it much easier to

7   execute and get things done.

8        So like SpaceX, my rocket company, is private and is not

9   subject to short seller attacks.

10       MR. SPIRO:  Your Honor, we're having an issue with the

11   real time.  I don't know if there is a way to reboot.

12       THE COURT:  I have been having that problem.  The

13   problem is -- well, we're almost at 2:00 o'clock.  It would

14   take about ten minutes to fix it, so I have been living without

15   it.

16       MR. SPIRO:  I don't want to waste the jury's time.

17       MR. PORRITT:  I have got a natural stopping point in

18   about seven more questions.

19       THE COURT:  Why don't we do that?  We'll fix it by

20   Monday.

21       MR. SPIRO:  Thank you, Your Honor.

22   BY MR. PORRITT

23   Q.   In fact, do you recall telling *Rolling Stone* magazine in

24   November 2017 that Tesla would be more efficient as a private

25   company?

1   **A.**   I don't recall that exact thing, but I certainly feel that

2   way.

3   **Q.**   Okay.  And being -- but being public, being a public

4   company has brought some benefits for Tesla though; correct?

5   **A.**   There are pros and cons to being a public, so there are

6   some benefits to being a public company.

7   **Q.**   Okay.  One of those benefits is raising millions of

8   dollars from the capital markets and the public by selling

9   shares to the public?

10  **A**   No.  That is something that both private companies and

11  public companies can do.  SpaceX -- I mean I have two, two main

12  companies that I run.  And where I'm essentially the chief

13  technologist and product person.  And they're rough- -- they're

14  of comparable magnitude.  And you've got SpaceX on the one hand

15  which is private and is not subject to short-seller attacks,

16  and you have got Tesla which is public and is subject to

17  short-seller attacks.  But both SpaceX and Tesla have been able

18  to raise billions of dollars.  So being private does not

19  prevent you from raising money.

20  **Q**   No.  And I didn't suggest the opposite.  But as a public

21  company, you -- Tesla has successfully raised billions of

22  dollars, correct?

23  **A**   Correct.  But SpaceX also, as a private company, has

24  raised billions of dollars.

25  **Q**   And you're involved in all those financings done by Tesla

1   as a public company, correct, as CEO?

2   A    Yes.

3   Q    Okay.  And you worked with Tesla's bankers and lawyers in

4   connection with those financings?

5   A    Yes.

6   Q    Okay.  And with their help and advice, you filed lengthy

7   legal documents with the SEC before sending your shares to the

8   public?

9           MR. SPIRO:  Objection.  "You"?

10  BY MR. PORRITT

11  Q    Before Tesla sold its shares to the public?

12  A    Yes.  As a public company, you must do public filings when

13  selling shares.

14  Q    And you developed those filings with the advice of bankers

15  and lawyers?

16  A    Actually, most of the time we don't use bankers for our --

17  well, we -- bankers are not necessary for public financings.

18  Q    Yeah, but the banks, such as Goldman Sachs, didn't

19  underwrite many of your public offerings of shares?

20  A    It is optional to use bankers for raising money.  It is

21  not required.

22  Q    Okay.  But Tesla, in fact, used bankers to help it raise

23  money.

24  A    Yes.

25  Q    Okay.

PROCEEDINGS

1          **MR. PORRITT:**  Your Honor, I think I might -- it's

2    2:02, by my watch, so --

3          **THE COURT:**  All right.  This is a convenient stopping

4    point.  Then we will adjourn for the day, and we will resume

5    Monday morning at 8:30.

6       Just a reminder to the jury, please do not speak with

7    anyone at all about this case.  Do not read or listen or do any

8    kind of research about this case.  And do not form any opinions

9    until this case is submitted to you for deliberation.

10      Until then, have a great weekend.

11         **THE MARSHAL:**  Hang on, one second.  We've got to let

12   the witness --

13         **THE COURT:**  All right, we'll let the witness leave

14   first, and then everyone else will exit afterwards.

15      Go ahead, Mr. Musk.

16         **THE WITNESS:**  Thank you.

17   (Witness excused)

18         **THE COURT:**  Okay.  Now we can excuse the jurors.

19         **THE COURTROOM DEPUTY:**  All rise for the jury.

20   (Jury excused)

21         **THE COURT:**  All right.  One thing I did want to raise,

22   we still have this outstanding matter of Exhibit 80, the PIF

23   notes.

24         **MR. PORRITT:**  Yes, Your Honor.

25         **THE COURT:**  And since that is likely to come up, you

CERTIFICATE OF REPORTERS

We, BELLE BALL and DEBRA PAS, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

_____

Belle Ball, CSR 8785, CRR, RDR

Saturday, January 21, 2023