David C. Marcus (SBN 158704)
david.marcus@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Tel: (213) 443-5312

Alan Schoenfeld (*pro hac vice*)
alan.schoenfeld@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Tel: (212) 937-7294

Allison Bingxue Que (SBN 324044)
allison.que@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Tel: (650) 858-6000

*Attorneys for Defendants Tesla, Inc., Tesla Lease Trust, Tesla Finance LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

|  |  |
|---|---|
| IN RE TESLA ADVANCED DRIVER ASSISTANCE SYSTEMS LITIGATION | CASE NO.: 4:22-cv-5240-HSG<br><br>**DEFENDANTS TESLA, INC., TESLA LEASE TRUST, AND TESLA FINANCE LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>*[Filed concurrently with Declaration of Alan Schoenfeld, Declaration of Raymond Kim, and Request for Judicial Notice]*<br><br>Hon. Haywood S. Gilliam, Jr.<br>Date: June 29, 2023<br>Time: 2:00 p.m.<br>Courtroom 2 – 4th floor |

# TABLE OF CONTENTS

**Page**

INTRODUCTION..................................................................................................1

STATEMENT OF FACTS.....................................................................................3

      A.     Tesla's Continuously Developing Driver Assistance Technology.............3

      B.     "Full Self-Driving Capability" Features Today ..........................................5

      C.     Tesla's Safety Record.................................................................................6

      D.     Tesla Makes Clear That Its Cars Are Not Fully Autonomous And That
They Require Active Driver Attention And Supervision............................6

      E.     Plaintiffs File This Lawsuit, Baselessly Claiming Tesla Promised Fully
Autonomous Vehicles Now Or Within A Certain Time ...........................10

      F.     Plaintiffs Move For Preliminary Injunction Nearly Six Months Later .....12

LEGAL STANDARD ...........................................................................................13

ARGUMENT ........................................................................................................13

     I.      PLAINTIFFS IGNORE THEIR COMPLAINT'S THRESHOLD FLAWS.........13

     II.     PLAINTIFFS HAVE NOT ESTABLISHED THAT THEIR
FALSE ADVERTISING CLAIMS WOULD LIKELY SUCCEED ...................15

     III.    PLAINTIFFS FAIL TO SHOW IRREPARABLE HARM .................................17

     IV.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST
DISFAVOR A PRELIMINARY INJUNCTION .................................................21

      A.     The Injunction Would Gravely And Unconstitutionally Burden Tesla ....21

      B.     Plaintiffs Will Suffer No Harm If The Motion Is Denied........................22

      C.     The Proposed Injunction Would Not Benefit The Public .........................23

     V.     PLAINTIFFS DO NOT JUSTIFY PROVISIONAL CLASS
CERTIFICATION.............................................................................................24

CONCLUSION ....................................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*44 Liquormart, Inc. v. Rhode Island,*

5

    517 U.S. 484 (1996) .................................................................................................. 22

6

*AdTrader, Inc. v. Google LLC,*

7

    2020 WL 1922579 (N.D. Cal. Mar. 24, 2020) ....................................................... 24

8

*Alliance for the Wild Rockies v. Cottrell,*

9

    632 F.3d 1127 (9th Cir. 2011).................................................................................. 21

10

*Avila v. Countrywide Home Loans,*

11

    2010 WL 5071714 (N.D. Cal. Dec. 7, 2010) .......................................................... 14

12

*Bobo v. Optimum Nutrition, Inc.,*

13

    2015 WL 13102417 (S.D. Cal. Sept. 11, 2015) ...................................................... 16

14

*Brown v. Entertainment Merchants Ass'n,*

15

    564 U.S. 786 (2011) ........................................................................................... 13, 22

16

*Caribbean Marine Services Co. v. Baldrige,*

17

    844 F.2d 668 (9th Cir. 1988)........................................................................ 14, 18, 20

18

*Community House, Inc. v. City of Boise,*

19

    490 F.3d 1041 (9th Cir. 2007)................................................................................. 22

20

*Consumer Advocates v. Echostar Satellite Corp.,*

21

    113 Cal. App. 4th 1351 (2003)................................................................................ 15

22

*D.B. v. Brooks-Lasure,*

23

    2022 WL 16840325 (N.D. Cal. Nov. 9, 2022)........................................................ 25

24

*Doe v. BHC Fairfax Hospital, Inc.,*

25

    2020 WL 4584228 (W.D. Wash. Aug. 10, 2020) .................................................. 24

26

*Doe v. Snyder,*

27

    28 F.4th 103 (9th Cir. 2022).................................................................................... 13

28

*Ellis v. Costco Wholesale Corp.*,
 657 F.3d 970 (9th Cir. 2011)............................................................................................... 24

*EnVerve, Inc. v. Unger Meat Co.*,
 779 F. Supp. 2d 840 (N.D. Ill. 2011) ................................................................................. 14

*In re Excel Innovations, Inc.*,
 502 F.3d 1086 (9th Cir. 2007).............................................................................................. 20

*Exeltis USA Inc. v. First Databank, Inc.*,
 2017 WL 6539909 (N.D. Cal. Dec. 21, 2017) ............................................................ 20, 22, 23

*Farris v. Seabrook*,
 677 F.3d 858 (9th Cir. 2012)................................................................................................. 13

*First Franklin Financial Corp. v. Franklin First Financial, Ltd.*,
 356 F. Supp. 2d 1048 (N.D. Cal. 2005) ............................................................................... 20

*Freeman v. Time, Inc.*,
 68 F.3d 285 (9th Cir. 1995).................................................................................................... 16

*Garcia v. Google, Inc.*,
 786 F.3d 733 (9th Cir. 2015) (en banc) ............................................................................ 3, 13

*United States v. Gear Box Z Inc.*,
 526 F. Supp. 3d 522 (D. Ariz. 2021).................................................................................... 19

*Hernandez v. Sessions*,
 872 F.3d 976 (9th Cir. 2017)................................................................................................. 23

*Hicks v. Neal*,
 2012 WL 3791399 (N.D. Cal. Aug. 31, 2012)..................................................................... 15

*Knowles v. ARRIS International PLC*,
 847 F. App'x 512 (9th Cir. 2021).......................................................................................... 17

*Lavie v. Procter & Gamble Co.*,
 105 Cal. App. 4th 496 (2003)................................................................................................ 15

*Murray v. Sears, Roebuck & Co.*,
 2014 WL 563264 (N.D. Cal. Feb. 12, 2014)........................................................................ 25

*National Institute of Family & Life Advocates v. Becerra*,

    138 S. Ct. 2361 (2018) .................................................................................... 22

*Oakland Tribune, Inc. v. Chronicle Publishing Co.*,

    762 F.2d 1374 (9th Cir. 1985) ......................................................................... 20

*Organization for a Better Austin v. Keefe*,

    402 U.S. 415 (1971) ......................................................................................... 22

*Overton v. Uber Technologies, Inc.*,

    2018 WL 1900157 (N.D. Cal. Apr. 20, 2018) ................................................ 15

*Playskool, Inc. v. Product Development Group, Inc.*,

    699 F. Supp. 1056 (E.D.N.Y. 1988) ............................................................... 19

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,

    944 F.2d 597 (9th Cir. 1991) ........................................................................... 21

*Rogers v. Lyft, Inc.*,

    452 F. Supp. 3d 904 (N.D. Cal. 2020) ............................................................ 14

*Stormans, Inc. v. Selecky*,

    586 F.3d 1109 (9th Cir. 2009) ......................................................................... 23

*Stuhlbarg International Sales Co. v. John D. Brush & Co.*,

    240 F.3d 832 (9th Cir. 2001) ........................................................................... 22

*Sultanis v. Champion Petfoods USA Inc.*,

    2021 WL 3373934 (N.D. Cal. Aug. 3, 2021) .................................................. 17

*Timbisha Shoshone Tribe v. Kennedy*,

    687 F. Supp. 2d 1171 (E.D. Cal. 2009) ........................................................... 13

*Toyo Tire Holdings of Americas Inc. v. Continental Tire North America, Inc.*,

    609 F.3d 975 (9th Cir. 2010) ........................................................................... 14

*Traeger Pellet Grills LLC v. Dansons US LLC*,

    2019 WL 6492446 (D. Ariz. Dec. 3, 2019) .................................................... 23

*Vegan Outreach, Inc. v. Chapa*,

    454 F. App'x 598 (9th Cir. 2011) .................................................................... 15

*Wal-Mart Stores, Inc. v. Dukes*,

    564 U.S. 338 (2011) ................................................................................................ 25

*Winter v. NRDC*,

    555 U.S. 7 (2008) .................................................................................................... 13

*Young v. Tesla, Inc.*,

    2022 WL 3355832 (D.N.M. Aug. 15, 2022) .......................................................... 15

**Statutes, Rules and Regulations**

Fed. R. Civ. P. 23(a) ...................................................................................................... 24

Fed. R. Civ. P. 23(b) ................................................................................................. 24, 25

Fed. R. Civ. P. 65(c) ...................................................................................................... 21

# INTRODUCTION

Tesla does not mislead its consumers into falsely believing that its cars are currently autonomous.  Rather, it embraces the future, and has been clear that the road to autonomy is challenging; but, along the way, it has released ground-breaking self-driving capabilities to customers, as they become available and are validated for safety.  Today, Tesla vehicles with Full Self-Driving Capability (FSDC), though never described as fully autonomous, can in fact drive themselves under the active and attentive supervision of a driver.  As represented, Tesla vehicles with FSDC can steer, accelerate, turn, brake, merge onto highways and offramps, adjust speed, stop at stop lights, slow down for yellow lights, stop at stop signs, activate and deactivate turn signals, adjust for traffic conditions, recognize obstacles and pedestrians, and more.  But as Tesla has always made clear—from before a customer purchases a vehicle through the moment she engages the FSDC features and continuing while she uses them each and every time—the driver must actively and attentively supervise all of this because the vehicles are not autonomous.

Five plaintiffs filed this lawsuit contending that Tesla's accurate statements about the capabilities of its vehicles constitute false advertising and fraud.  Tesla moved to dismiss these retread claims, already rejected in one federal court.  Months later, and with no explanation for their delay, Plaintiffs now move for a preliminary injunction to dismantle Tesla's self-driving program and impose their will on every Tesla driver who relies on these safe and convenient features.  This antic should be rejected.  Plaintiffs' motion meets none of the requirements for a mandatory preliminary injunction—a "highly disfavored" remedy—and only underscores the substantive weaknesses in their underlying complaint.

*First*, Plaintiffs do not show that the law and facts clearly favor them on merits.  For starters, their motion ignores critical threshold deficiencies with their lawsuit that Tesla raised in its motion to dismiss: four plaintiffs are bound to arbitration, and the fifth asserts claims that are time barred and lacks standing to pursue injunctive relief.  Even if Plaintiffs could overcome those procedural deficiencies—they cannot—Plaintiffs have not adequately pled a false advertising claim.  Tesla has never claimed that its FSDC features make the vehicles fully autonomous.  Plaintiffs' assertion that reasonable consumers are deceived by Tesla's advertising is nonsense because, at every turn—in its

announcements, in its vehicles, on its website, in its owner's manual—Tesla has ensured that consumers are apprised of both the capabilities and limitations of FSDC technology.  In fact, Plaintiffs fail to cite a single false representation to support this claim in their pleadings, and they offer no evidence to support it now.

*Second*, Plaintiffs cannot show that they would suffer irreparable harm without a preliminary injunction.  Their distasteful approach is to misleadingly invoke a handful of individual accidents and recent, limited over-the-air software updates Tesla made to FSDC in response to discussions with the National Highway Traffic Safety Administration (NHTSA).  While accidents are always unfortunate, Tesla has designed arguably the safest cars on the road and revolutionary self-driving capabilities to *reduce* accidents, injuries, and deaths.  And it is working.  Tesla vehicles have achieved top safety ratings across the world.  Just last year, for instance, EuroNCAP, an organization modeled after NHTSA and composed of car safety organizations in 14 EU nations, awarded Tesla's Model Y the highest overall score among any vehicle assessed under EuroNCAP's newest and most stringent protocol.  Indeed, Tesla cars using FSDC are statistically many times *less* likely to be in accidents—as much as five times less likely.  That Plaintiffs point to five accidents in seven years is indicative of nothing; no vehicle could be on the road if that were sufficient to demonstrate a problem.  Nor is Tesla's voluntary recall somehow proof of irreparable harm; the recall was in response to "potential" concerns and related only to a small subset of characteristics that were remedied through an over-the-air software update.  Moreover, Plaintiffs' motion comes half a year after their complaint, proving there is no exigent harm warranting extraordinary mandatory preliminary injunctive relief.  And the harm they manufacture is a speculative risk of harm not to Plaintiffs themselves, but to unknown third parties, an insufficient basis for a preliminary injunction.

*Third*, the balance of the equities and the public interest do not support Plaintiffs' motion.  The injunction would impose an enormous—and unconstitutional—burden on Tesla, both forbidding and compelling speech and requiring it to make major modifications to its products and labeling (including product changes that would make Tesla vehicles *less* safe).  By contrast, the injunction would not benefit—or even affect—Plaintiffs.  At most, it might have only a speculative and tangential effect on an unknown consumer—and only one who ignores or disregards Tesla's

clear descriptions on its website, warnings in the owner's manual, instructional videos, warnings and advisories for use that person actually must agree to before using Tesla's advanced driver assistance system, pop-up warnings that appear *every time* the system is engaged, and that person's own experience using the feature. The proposed injunction would *harm* Tesla drivers who use, benefit from, and enjoy the FSDC features Plaintiffs ask the Court to disable. Finally, the proposed injunction would harm the public interest, by banning FSDC—popular safety features that help *prevent* accidents that may cause death and serious injury.

In short, Plaintiffs' motion for a preliminary injunction is nothing more than a gimmick that baselessly maligns Tesla's safety-enhancing technology while distracting from the complaint's numerous and insurmountable failings. Because Plaintiffs fail to establish that "the facts and law clearly favor the moving party" and meet their "doubly demanding" burden for a mandatory injunction, the Court should deny their motion, including the motion's request to provisionally certify a class in order to grant this relief that much of the proposed provisional class would surely oppose. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

## STATEMENT OF FACTS

### A.   Tesla's Continuously Developing Driver Assistance Technology

Tesla is a pioneer in the electric vehicle revolution and a leader in the global auto industry due to its innovative technology, manufacturing approaches, and consistent top safety ratings. Today, a suite of advanced driver assistance (ADAS) features comes standard with all Tesla vehicles. Tesla's ADAS comprises hardware and software that are capable of over-the-air updates that allow Tesla to constantly improve upon its driver assistance offerings. Historically, Tesla has offered three different ADAS packages: (1) Autopilot; (2) Enhanced Autopilot; and (3) FSDC.

The earliest ADAS offering was Tesla's first-generation Autopilot, which offered the Traffic-Aware Cruise Control and Autosteer features. Schoenfeld Decl. Ex. A. These features help drivers match their speed to surrounding traffic and maintain direction within clearly marked lanes, reducing human error. *See id.* Tesla began developing this technology nearly a decade ago, equipping vehicles with the required hardware in 2014 and introducing the necessary software in October 2015. Compl. ¶¶ 40, 44. When Autopilot went live, Tesla explained that "Tesla Autopilot

functions like the systems that airplane pilots use when conditions are clear."  Schoenfeld Decl. Ex. B.[1]  Like with airplanes' autopilot, "[t]he driver is still responsible for, and ultimately in control of, the car."  *Id.*  Tesla made clear from the beginning that Autopilot "does not turn a Tesla into an autonomous vehicle and does not allow the driver to abdicate responsibility."  Dkt. 43-66.  Autopilot received high praise from the driving public.  *See* Schoenfeld Decl. Ex. D ("Every now and then a company introduces a technology that is truly a 'game changer' in how drastically different your daily life is impacted once you are introduced to it.").

In October 2016, Tesla announced that all new Tesla vehicles would be equipped with advanced hardware that would enable certain features included in the optional second-generation Autopilot/Enhanced Autopilot (EAP) and FSDC packages.  *See* Dkt. 43-25.  Tesla's announcement was explicit about the need to "further calibrate the system using millions of miles of real-world driving to ensure significant improvements to safety and convenience" before the features could be enabled.  Schoenfeld Decl. Ex. E.  On the website containing a promotional video for Autopilot, bold text explained: "Please note that self-driving functionality is dependent upon extensive software validation and regulatory approval, which may vary widely by jurisdiction.  It is not possible to know exactly when each element of the functionality described above will be available, as this is highly dependent on local regulatory approval."  Dkt. 43-25.  Over the next three years, as Tesla advanced its self-driving capabilities from highway to non-highway roadways, Tesla upgraded its ADAS hardware and deployed over-the-air software updates to remain cutting edge.  *See* Schoenfeld Decl. Ex. F.

In 2020, as part of an "extremely slow and cautious" rollout, Tesla released its FSD Beta program to a "small number" of "careful drivers" who had purchased the FSDC package. Schoenfeld Decl. Ex. G.  FSD Beta enables the vehicles to steer, brake, accelerate, stop at stop signs and stop lights on non-highway roads, and more.  Tesla later invited other candidates to participate in FSD Beta based on a safety score that identified the most responsible drivers.  *See* Schoenfeld

---

[1] While developing these self-driving features, Tesla also developed and implemented many active safety features, including collision warning, automatic emergency breaking, and blind spot warning.  *See* Schoenfeld Decl. Ex. C.  As with its self-driving features, Tesla continuously upgrades the active safety features via over-the-air updates.

1    Decl. Ex. H.   Tesla monitored the FSD Beta rollout and made regular adjustments—including

2    removing drivers who disregarded safety precautions.  *See* Schoenfeld Decl. Ex. I.  In 2022, Tesla

3    continued to refine the FSD Beta program software, and on November 24, 2022, Tesla released it

4    to all eligible customers who purchased FSDC.  *See* Schoenfeld Decl. Ex. J.

5          **B.     "Full Self-Driving Capability" Features Today**

6          Tesla's FSDC package builds on its Autopilot and Enhanced Autopilot offerings.  Customers

7    who purchase FSDC receive a suite of continuously updated features.   FSDC includes standard

8    Autopilot and Enhanced Autopilot features—like traffic-aware cruise control, Autosteer, smart

9    summon, and autopark—as well as traffic light and stop sign control, which "identifies stop signs

10   and traffic lights and automatically slows your car to a stop on approach, with your active

11   supervision."   Schoenfeld Decl. Ex. A.   And FSD Beta (also called Autosteer on City Streets)

12   automatically navigates and steers on city roads and now highways, with driver supervision.  *See id.*

13         While vehicles with FSDC require active and constant driver supervision, they are self-

14   driving, performing all the functions associated with operating a vehicle—steering, traffic

15   awareness, navigating, turning, lane changing (including signaling), accelerating and braking, and

16   traffic light- and sign-reading.  *See* Schoenfeld Decl. Ex. K at 81-110.  As a result, the self-driving

17   features require only an attentive human in the driver's seat.  As Tesla makes clear at every stage of

18   a driver's engagement, if a driver's feet are off the pedals and she is not steering, she must constantly

19   supervise the behavior of the vehicle to support these features, including steering, braking, or

20   accelerating as needed to maintain safety (SAE Level 2).[2]  That level of functionality is not the same

21   as fully autonomous driving (SAE Levels 4 and 5), which refers to automated driving features in

22   which the human is not driving when the features are engaged and the features will not require the

23   human to take over while driving.  *See* Dkt. 43-11.[3]

24

25

---

26          [2] SAE refers to Levels of Driving Automation published by SAE International, a standards-
     development organization formerly known as the Society of Automotive Engineers.  SAE levels
27   range from 0 to 5, with each level indicating a greater level of autonomy.  *See* Compl. ¶¶ 29-30.

28          [3] Nor is it the same as SAE Level 3, which requires a driver's attention only upon request;
     as Tesla always makes clear, at this time, FSDC requires that the driver always be alert and ready
     to take over *on her own initiative* to ensure safe operation of the vehicle.

1

2       **C.      Tesla's Safety Record**

3       Tesla's compilation of safety features, including FSDC, have propelled Tesla to the forefront

4  of automobile safety.  In 2018, Tesla's Model 3, Model S, and Model X earned the top three spots

5  for the lowest probability of injury in NHTSA's vehicle testing exam, including the best score of

6  any vehicle since 2011.  *See* Schoenfeld Decl. Ex. L; Schoenfeld Decl. Ex. M ("Model 3 earned the

7  highest score that Euro NCAP has awarded to date under their 2018/2019 testing protocols.").  In

8  2022, Tesla's Model Y received a five-star safety rating from EuroNCAP.  Schoenfeld Decl. Ex. N.

9  Between 2017 and 2023, the Insurance Institute for Highway Safety awarded the Model 3 and Model

10 Y top or nearly-top marks in every safety category, and in 2022 gave both their "Top Safety Pick+"

11 titles.  *See, e.g.*, Schoenfeld Decl. Ex. O.[4]  In 2022, cars using FSD Beta experienced airbag-

12 deploying crashes five times less frequently than the average U.S. car.  *See* Schoenfeld Decl. Ex. Q.

13      **D.      Tesla Makes Clear That Its Cars Are Not Fully Autonomous And That They**
         **Require Active Driver Attention And Supervision**

14      Tesla instructs drivers repeatedly that their cars are not fully autonomous and still require

15 their active and attentive supervision.  This begins with Tesla's statements on its website, carries

16 through the vehicle purchasing process, is reinforced in the vehicle manuals and in-vehicle prompts

17 that a driver must go through when requesting and before engaging the FSDC features, and is

18 enforced in FSD Beta by discontinuing use of the features when a driver uses it improperly.  Tesla's

19 website contains numerous posts, press statements, and information pages emphasizing the need for

20 active and continuous driver supervision.  Currently, every major section of Tesla's webpage that

21 details ADAS options contains an explicit and unmissable directive that active driver supervision is

22 required when ADAS features are activated.  *See* Schoenfeld Decl. Ex. R ("Autopilot advanced

23 safety and convenience features are designed *to assist you* with the most burdensome parts of

24 driving. …  Current Autopilot features *require active supervision and do not make the vehicle*

25 *autonomous.*" (emphases added)); *id.* ("The *future* use of these features *without supervision* is

26 dependent on achieving reliability far in excess of human drivers as demonstrated by billions of

27

28
_____
         [4] *See also* Schoenfeld Decl. Ex. P (critiquing reports discussing Tesla's overall crash numbers without providing context as to Tesla's market size or safety statistics).

miles of experiences, as well as regulatory approval, which may take longer in some jurisdictions." (emphases added)).  Tesla owner's manuals contain warnings and reminders similar in content to those found on Tesla's website and emphasizes them using gray bubbles with a red warning label. *See, e.g.*, Schoenfeld Decl. Ex. K.  Under the "About Autopilot" section of the manual, a general warning label like the example below appears describing the feature's "Limitations," and more detailed warnings under each suite feature (*e.g.*, Autosteer, Navigate on Autopilot, etc.) discuss the exact conditions in which ADAS features might falter.  *See generally id.* at 81-110.

> ⚠ **Warning**
> The list above does not represent an exhaustive list of situations that may interfere with proper operation of Autopilot components. Never depend on these components to keep you safe. It is the driver's responsibility to stay alert, drive safely, and be in control of the vehicle at all times.

In addition to these up-front warnings, Tesla also reminds drivers of safety precautions when these features are in use.  Many Autopilot features, including FSD Beta, "are disabled by default" and a driver must affirmatively "enable them" by going "to the Autopilot Controls menu within the Settings tab and turn[ing] them on."  Schoenfeld Decl. Ex. A.  "Before enabling Autopilot," Tesla vehicles prompt drivers "to agree to 'keep your hands on the steering wheel at all times' and to always 'maintain control and responsibility for your vehicle.'"  *Id.*  Every time the driver engages Autopilot afterward, they see a visual reminder to "keep your hands on the wheel."  *Id.*  If drivers remove their hands, Tesla vehicles correct them through audible and visual warnings.  The vehicles can detect the torque applied by the drivers while their hands are kept on the steering wheel, and newer models use a cabin-facing camera to monitor driver attention to ensure drivers are complying with the mandatory safety instructions.  *See* Schoenfeld Decl. Ex. S.

The warnings for FSD Beta are particularly robust.  Before FSD Beta was released to the general public, Tesla e-mailed an announcement to a select group of drivers who were eligible for early access to FSD Beta and notified them of the upcoming software update.  That e-mail warned that "Full Self-Driving is in early limited access Beta and must be used with additional caution.  It may do the wrong thing at the worst time, so you must always keep your hands on the wheel and pay extra attention to the road."  Kim Decl. Ex. 1.  Once the software was ready, before the select group of drivers were given access, they had to affirmatively request the feature through the

"Autopilot" tab on either their car touchscreen or through the Tesla app. *See* Kim Decl. Ex. 2. Also before actually accessing the software, drivers had to agree to terms and conditions, specifically by clicking a button saying "I understand that when using FSD Beta I am responsible for remaining alert with my hands on the wheel, and must be prepared to take action at any time. FSD Beta does not make my car autonomous." Kim Decl. Ex. 3. And once they had access to the software, before they actually used it, drivers had to agree to further terms, which warned drivers not to become complacent and required that they agree to use FSD Beta only if they "will pay constant attention to the road" and are "prepared to act immediately." Kim Decl. Ex. 4.

Today, Tesla provides FSD Beta purchasers with "Release Notes," which summarize the upgrades implemented with each software update. *See* Kim Decl. Ex. 5. The Release Notes appear on the vehicle's screen and must be manually closed by the user. The Release Notes may include disclaimers and safety reminders. For instance, in March 2022, Tesla sent an over-the-air FSD Beta update; the Release Notes reminded customers that they must "[u]se Full Self-Driving in limited Beta only if [they] will pay constant attention to the road[] and be prepared to act immediately." *Id*. To receive access to the current version of FSD Beta, users must navigate to the Autopilot menu and enable the Autosteer feature. *See* Kim Decl. Ex. 6. Once the user toggles on the feature, a warning appears reminding the driver that Autosteer "does not make your vehicle autonomous" and that the driver must "keep [their] hands on the steering wheel, and be prepared to take over at any time." *Id.* The warning also "encourage[s] a higher level of vigilance" and highlights conditions that may negatively affect Autosteer's performance. *Id.*

To this day, when drivers enable FSD Beta they must expressly agree that they "will pay constant attention to the road" and are "prepared to act immediately." Kim Decl. Ex. 7. Once FSD Beta is engaged, an audible chime sounds and a pop-up reminds drivers to "Please keep your hands on the wheel" and "Be prepared to take over at any moment." Kim Decl. Ex. 8. If the system detects that a user is improperly using FSD Beta or other ADAS features—including if the car detects that the driver is not actively supervising any of the ADAS features—the driver is reminded to comply via escalating audible chimes and on-screen notifications. Kim Decl. Exs. 8, 9. Failure to properly use those features results in a "forced autopilot disengagement," which disengages the feature for

the remainder of the trip.  *See* Kim Decl. Ex. 10.  After completing a drive in which FSD Beta was deactivated due to continued noncompliance with Tesla's active supervision requirements, drivers receive additional warnings that flag the user's improper use of the feature and must be manually acknowledged by clicking "OK."   Kim Decl. Ex. 11.   Drivers are notified that multiple disengagements will result in an extended suspension of the feature.  *See* Kim Decl. Ex. 12.

Tesla has continuously improved FSDC, fulfilling its promise to customers that their vehicles will be continually upgraded through over-the-air updates.  Since FSD Beta's release in October 2020, Tesla has shipped over 50 software updates, and will continue releasing them.  In March 2023, Tesla began deploying an over-the-air update (with no required service center visit) that included among other things changes addressing a recall Tesla filed with NHTSA on February 15, 2023.  Schoenfeld Decl. Ex. T.  As that report details, on January 25, 2023, "as part of regular ongoing communications between Tesla and NHTSA regarding Autopilot and FSD Beta, NHTSA advised Tesla that it had identified potential concerns related to certain operational characteristics of FSD Beta in four specific roadway environments."  *Id.* at 4.  The report concerns "certain rare circumstances" when "the feature could potentially infringe upon local traffic laws or customers … before some drivers may intervene," which "could increase the risk of a collision if the driver does not intervene."  *Id.*[5]  NHTSA's report confirms that Tesla is forthright with its customers about the expectation that drivers actively supervise their vehicles when FSD Beta is enabled.

The report makes clear that "[w]ith FSD Beta," "the driver is responsible for operation of the vehicle whenever the feature is engaged and must constantly supervise the feature and intervene (e.g., steer, brake or accelerate) as needed to maintain safe operation of the vehicle."  Schoenfeld Decl. Ex. T at 4.  It also recognizes that "[a]s part of FSD Beta's general design, the feature provides visual and audible warnings in circumstances to alert the driver to their constant supervisory responsibility, which customers acknowledge and agree to prior to first using FSD Beta."  *Id.*  When

---

[5] The four specific roadway circumstances are (1) traveling or turning through intersections "during a stale yellow traffic light"; (2) the "perceived duration of the vehicle's position at certain intersections with a stop sign, particularly when the intersection is clear of any other road users"; (3) adjusting vehicle speed while traveling through certain variable speed zones, based on detected speed limit signage and/or the vehicle's speed offset setting that is adjusted by the driver" and (4) "negotiating a lane change out of certain turn-only lanes to continue traveling straight."  *Id.*

NHTSA raised potential concerns, "NHTSA and Tesla met numerous times to discuss" them and, "while not concurring with the agency's analysis, Tesla decided to administer a voluntary recall out of an abundance of caution." *Id.*  As the report explains, "Tesla is not aware of any injuries or deaths that may be related to such conditions." *Id.*  The report then describes the "Remedy Program": "Tesla will deploy an over-the-air ('OTA') software update at no cost to the customer," which "will improve how FSD Beta negotiates certain driving maneuvers during the conditions described above." *Id.*  Tesla began deploying those over-the-air software improvements by March 6, 2023.

**E.      Plaintiffs File This Lawsuit, Baselessly Claiming Tesla Promised Fully Autonomous Vehicles Now Or Within A Certain Time**

After filing separate suits in September 2022, Plaintiffs filed their consolidated amended complaint on October 11, 2022.  Dkt. 17.  Their central contention is that they "paid Tesla thousands of additional dollars above the vehicle base price" expecting their vehicles to already or soon be fully autonomous.  Compl. ¶ 11.  Notably absent from the complaint are any statements by Tesla misrepresenting that Tesla vehicles either were fully autonomous or would become fully autonomous within a definite period of time, any statement misrepresenting or concealing facts about their safety features, or any facts showing reliance by Plaintiffs on such statements.   On November 28, 2022, Tesla moved to compel arbitration and to dismiss on these and other grounds.

Also notably absent from the complaint are any acknowledgments of the many ways Tesla has informed consumers that its vehicles are not fully autonomous.  In 2014, for instance, as Tesla was first introducing its Autopilot technology, its CEO Elon Musk explained that autopilot "does not represent self-driving any more than … autopilot[] make[s] an aircraft self-flying."  Dkt. 30-20 at 7:12.  Two years later, Musk continued relaying the same cautious message, warning in a blog post of the "importan[ce]" of "emphasiz[ing] that refinement and validation of the [autopilot] software will take much longer than" it did to "put[] in place" Tesla's hardware.  Dkt. 30-17 at 3. As the technology progressed, Tesla continued to clearly communicate about the technology's capabilities and limitations.  For example, during a 2016 conference call the day Tesla announced its "Enhanced Autopilot" features and FSDC package, Musk stated that "it'll take us some time … to complete validation of the [FSDC] software and to get through required regulatory approval" and

that the regulatory "approval process … [was] not something within [Tesla's] control."  Dkt. 30-20 at 00:35-00:48, 12:45-13:56.  And in 2020, when releasing FSD Beta to a subset of those who had purchased the FSDC package, Tesla cautioned that participants—a selected group of Tesla owners chosen in part based on their safe driving record—would need to "pay constant attention to the road and to be prepared to act immediately, especially around blind corners, crossing intersections, and in narrow driving situations."  Dkt. 30-22 at 2.  In fact, on FSD Beta's release in 2020, Tesla provided a direct and blunt in-car notice warning drivers that the system "may do the wrong thing at the worst time."  Schoenfeld Decl. Ex. U.

Today, a visitor to Tesla's website, and specifically the page concerning "Autopilot and Full Self-Driving Capability," sees a number of similar messages, including the following:

> Autopilot, Enhanced Autopilot and Full Self-Driving Capability are intended for use with a fully attentive driver, who has their hands on the wheel and is prepared to take over at any moment.  While these features are designed to become more capable over time, the currently enabled features do not make the vehicle autonomous. …

> The currently enabled Autopilot, Enhanced Autopilot and Full Self-Driving features require active driver supervision and do not make the vehicle autonomous.  Full autonomy will be dependent on achieving reliability far in excess of human drivers as demonstrated by billions of miles of experience, as well as regulatory approval, which may take longer in some jurisdictions. …

> While using Autopilot, it is your responsibility to stay alert, keep your hands on the steering wheel at all times and maintain control of your car.

Schoenfeld Decl. Ex. A.

Tesla's website also contains training videos depicting proper FSDC driving techniques, which tell viewers:  "We're excited about the future.  But today, you must be fully attentive and have your hands on the wheel at all times while driving regardless of what features are active."  Schoenfeld Decl. Ex. V.  The videos continue:  "Think of these [autopilot features] like advanced versions of cruise control.  Like with traditional cruise control, you are always in charge of what your car is doing, and you need to be ready to act at any moment."  *Id.*

Tesla also provides its customers (and the public at large) with extensive owner's manuals that, like Tesla's other materials, lay out FSD Beta and Autopilot's "Limitations."  Kim Decl. Ex. 13; Schoenfeld Decl. Ex. K.  The owner's manuals describe the "[m]any factors," such as weather conditions, unorthodox traffic signals, narrowing roads, and equipment interference, that

"can impact the performance of Autopilot components, causing them to be unable to function as intended." *Id.* at 82-83.  It contains many highlighted "Warning" labels, which reiterate:

> ⚠️ **Warning**
> Navigate on Autopilot does not make driving autonomous. You must pay attention to the road, keep your hands on the steering wheel at all times, and remain aware of your navigation route.

*Id.* at 93.  As to the FSDC-specific Traffic Light and Stop Sign Control feature, the manual warns:

> ⚠️ **Warning**
> **NEVER** make assumptions and predict when and where Traffic Light and Stop Sign Control will stop or continue through an intersection or road marking. From a driver's perspective, the behavior of Traffic Light and Stop Sign Control may appear inconsistent. Always pay attention to the roadway and be prepared to take immediate action. It is the driver's responsibility to determine whether to stop or continue through an intersection. Never depend on Traffic Light and Stop Sign Control to determine when it is safe and/or appropriate to stop or continue through an intersection.

*Id.* at 96.  Plaintiffs' complaint omits all of these sources, which inform any reasonable consumer that they are not purchasing a fully autonomous vehicle.

### F.    Plaintiffs Move For Preliminary Injunction Nearly Six Months Later

On March 22, 2023, six months after first filing suit, Plaintiffs filed this motion seeking a preliminary injunction based on their claims under the False Advertising Law, Consumer Legal Remedies Act, and Unfair Competition Law.  Plaintiffs' preliminary injunction motion bears little relation to their complaint.  Their complaint, at bottom, asserts that Plaintiffs overpaid for a premium feature they did not receive.  It contains general statements about enjoining Tesla from continuing false advertising, *see, e.g.*, Compl. ¶ 12 (seeking to enjoin "false, deceptive, or misleading statements to the public regarding the abilities, limitations, flaws, and value of Tesla's ADAS packages and technology"), but despite containing many gratuitous and irrelevant details on crashes involving Tesla vehicles, it nowhere seeks or asserts claims that would entitle Plaintiffs to enjoin Tesla's actual operations of its FSDC technology.  Their preliminary injunction motion, by contrast, now improperly seeks a sweeping mandatory injunction that would effectively shut down Tesla's FSD advancements altogether (including its safety advancements), ordering Tesla to immediately (1) stop using the terms "self-driving" and "autonomous" anywhere, (2) deactivate drivers' FSD Beta software and stop offering it to other drivers, and (3) "provide conspicuous written notice" by email and in-car pop-up that this Court has held Tesla's use of those terms was deceptive.  Mot. 1-

3.  This relief is not sought in the complaint and, indeed, could not be obtained by Plaintiffs even if they were to ultimately succeed on their claims.

### LEGAL STANDARD

Preliminary injunctions are an "extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must show that: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public interest." *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (citing *Winter*, 555 U.S. at 20).

A party seeking a mandatory injunction—*i.e.*, "one that goes beyond simply maintaining the status quo and orders the responsible party to take action"—faces a still higher burden.  *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022).  The Ninth Circuit has "cautioned" that such relief is "'particularly disfavored.'"  *Garcia*, 786 F.3d at 740.  "In general, mandatory injunctions … are not issued in doubtful cases."  *Snyder*, 28 F.4th at 111.  The "sliding scale" standard permitting preliminary injunctive relief with only a "substantial case for relief on the merits" (Mot. 13) does not apply to mandatory injunctions.  *See Snyder*, 28 F.4th at 111 n.4.  Instead, the "court should deny such relief unless the facts and law clearly favor the moving party."  *Garcia*, 786 F.3d at 740.  Finally, a mandatory injunction restraining or compelling speech must additionally survive strict scrutiny by being narrowly tailored and "actually necessary" to address a compelling interest. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011).

### ARGUMENT

### I.    PLAINTIFFS IGNORE THEIR COMPLAINT'S THRESHOLD FLAWS

Plaintiffs cannot prove that the "facts and law clearly favor" them when they ignore basic deficiencies with their pleadings—that (1) Broussard, Battiato, Mallow, and Imaguchi have binding arbitration agreements; (2) LoSavio's claims are time-barred; and (3) LoSavio lacks Article III standing to seek injunctive relief.  Although Tesla's pending motion to dismiss explains these flaws in detail (*see* ECF No. 30 ("MTC/D") 8-10, 11-18, 23-24), Plaintiffs ignore them entirely.  Their motion thus fails to show a clear likelihood of success on the merits and should be denied on that basis alone.  *See Timbisha Shoshone Tribe v. Kennedy*, 687 F. Supp. 2d 1171, 1187 n.5 (E.D. Cal.

2009) ("failure to address" threshold "challenges requires this Court to find that Plaintiffs are unlikely to succeed on the merits"); *EnVerve, Inc. v. Unger Meat Co.*, 779 F. Supp. 2d 840, 843 (N.D. Ill. 2011) ("failure to address the potentially dispositive argument raised by [defendant] leads this Court to conclude that [plaintiff] has not established likelihood of success on the merits").

**Arbitration.**  Four of the five plaintiffs (Broussard, Battiato, Mallow, and Imaguchi) agreed to arbitrate all claims relating to their Tesla purchases.  *See* MTC/D 8-10; ECF No. 38 1-4.  They cannot "sidestep the motion to compel" to "proceed directly to their motion for a preliminary injunction," which "would reclaim for the judiciary a matter assigned by the parties to arbitration." *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 912 (N.D. Cal. 2020), *aff'd*, 2022 WL 474166 (9th Cir. Feb. 16, 2022).  Indeed, "a district court may issue interim injunctive relief on arbitrable claims" only "if interim relief is necessary to preserve the status quo and the meaningfulness of the arbitration process."  *Toyo Tire Holdings of Ams. Inc. v. Continental Tire N. Am., Inc.*, 609 F.3d 975, 981 (9th Cir. 2010).  Here, Plaintiffs do not seek to maintain the status quo, but overhaul it completely by asking the Court to require Tesla to change core aspects of its business model and vehicle operations.  *See Rogers*, 452 F. Supp. 3d at 912.[6]

**Time Bar.**  LoSavio purchased his Tesla Model S with the FSDC package in January 2017, Compl. ¶ 16, more than five years before his complaint and well past the statutes of limitations for the FAL (3 years), CLRA (3 years), and UCL (4 years).  *See* MTC/D 11-14.  Claims that are likely (here, definitely) time-barred are not likely to succeed on the merits.  *See, e.g.*, *Avila v. Countrywide Home Loans*, 2010 WL 5071714, at *3 (N.D. Cal. Dec. 7, 2010) (finding "little likelihood of success on the merits" because "the[] claims may well be time-barred").

**Standing.**  LoSavio (like all Plaintiffs) lacks Article III standing to pursue prospective injunctive relief, *see* MTC/D 24, and certainly the preliminary injunctive relief sought now.  "[T]o establish standing" to seek a preliminary injunction, "a plaintiff must demonstrate immediate threatened injury," which is "a prerequisite to preliminary injunctive relief."  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  A plaintiff is also "[r]equired to show

---

[6] Tesla explains throughout this brief why Broussard, Battiato, Mallow, and Imaguchi cannot obtain the preliminary injunction they seek for many other reasons, but it does so reserving all rights to arbitrate their claims including for preliminary injunctive relief.

specifically that the preliminary injunction [he] seeks … is likely to redress [his] injuries." *Vegan Outreach, Inc. v. Chapa*, 454 F. App'x 598, 600 (9th Cir. 2011).  LoSavio fails to identify any imminent threat of injury from allegedly overpaying for FSDC over six years ago.  Compl. ¶¶ 16, 167, 183, 198.  He is not planning another purchase, and his alleged overpayment would, even if successful, be fully recovered through pre-judgment interest.  It would not be remedied by the mandatory injunction he seeks.  The mismatch between any alleged injury and the proposed remedy "poses a fatal [Article III] problem because granting preliminary relief would not redress the harm" LoSavio alleges.  *Overton v. Uber Techs., Inc.*, 2018 WL 1900157, at *2 (N.D. Cal. Apr. 20, 2018).

## II.   PLAINTIFFS HAVE NOT ESTABLISHED THAT THEIR FALSE ADVERTISING CLAIMS WOULD LIKELY SUCCEED

Even if they scaled the threshold barriers just discussed, Plaintiffs are unlikely to succeed on the merits of their false advertising claims.  Tesla's pending motion details why these claims do not meet even the pleading standard—namely, that Plaintiffs identify no statement misrepresenting that Tesla vehicles either were fully autonomous or would become fully autonomous within a definite period of time, no statement misrepresenting or concealing facts about their safety features, and no reliance by Plaintiffs on such statements.  *See* MTC/D 14-18; *see Young v. Tesla, Inc.*, 2022 WL 3355832, at *10 (D.N.M. Aug. 15, 2022) (Tesla's similar statements "indicat[e] that [Tesla] was not making the absolute representation Plaintiff asserts he was").  But even adequate pleadings would not suffice at this stage.  A "movant has to demonstrate, not merely allege, his entitlement to a preliminary injunction." *Hicks v. Neal*, 2012 WL 3791399, at *3 (N.D. Cal. Aug. 31, 2012).

To prove their false advertising claims, Plaintiffs must show that a consumer acting reasonably under the circumstances would have shared their alleged misunderstanding about FSDC's capabilities and its timing for advancement.  The "mere possibility that the advertisement might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner" does not suffice. *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003).  Plaintiffs must show "that it is probable that a significant portion of the general consuming public or of targeted customers, acting reasonably in the circumstances, could be misled." *Id.*; *see also Consumer Advocs. v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1360 (2003).  Any allegedly

1   false advertising must be analyzed in the context in which it appears, not in isolation.  *Freeman v.*

2   *Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995).  On this point, the case law is clear:  "A plaintiff cannot

3   pursue a claim based on a statement that can only be misleading when the information surrounding

4   it is ignored."  *Bobo v. Optimum Nutrition, Inc.*, 2015 WL 13102417 at *4 (S.D. Cal. Sept. 11, 2015).

5        Tesla offers ground-breaking self-driving capabilities to customers, but has never suggested,

6   promised, or assured consumers that its cars are fully autonomous.  Rather, Tesla has been clear at

7   every stage that active, constant, and attentive driver supervision is required even when FSDC is

8   engaged.  With Tesla's self-driving technology, its cars can steer, accelerate and decelerate, turn,

9   signal, brake, merge onto highways and offramps, adjust speed, stop at stop lights, slow down for

10  yellow lights, stop at stop signs, adjust for traffic conditions, and recognize obstacles and

11  pedestrians.  This makes the vehicles self-driving, but not autonomous.  Tesla has said that it intends

12  to keep innovating and improving on self-driving technology towards full autonomy—and there is

13  nothing misleading about explaining its plans and aspirations to its consumers.

14       Throughout, Tesla has been clear that achieving full autonomy must await both further

15  technological developments and the unpredictable approval of vehicle regulators around the world.

16  Tesla has made this point clear in announcements about self-driving technology advancements from

17  2014 to 2023.  Tesla's disclosures on its website are, and have always been, equally robust.  Indeed,

18  before a customer can purchase a Tesla via the company's website, he must visit a page explaining

19  in no uncertain terms that "the currently enabled features require active driver supervision and do

20  not make the vehicle autonomous," and that "the activation and use of these features are dependent

21  on achieving reliability far in excess of human drivers as demonstrated by billions of miles of

22  experience, as well as regulatory approval, which may take longer in some jurisdictions."

23  Schoenfeld Decl. Ex. W.  The website's FSD training videos similarly advise that "today, you must

24  be fully attentive and have your hands on the wheel at all times while driving regardless of what

25  features are active."  Schoenfeld Decl. Ex. V.  And in-vehicle warnings, which a potential purchaser

26  would see during any pre-purchase "demo" drive of a Tesla with FSDC and before driving her own,

27  specifically prompt drivers "to agree to 'keep your hands on the steering wheel at all times' and to

28  always 'maintain control and responsibility for your vehicle.'"  Schoenfeld Decl. Ex. A.

In this context, no reasonable consumer could misunderstand the current or near-term capabilities of the FSDC features.  *See, e.g.*, *Sultanis v. Champion Petfoods USA Inc.*, 2021 WL 3373934, at *14 (N.D. Cal. Aug. 3, 2021) (dismissing false advertising claims because they "ma[de] no mention of the disclaimers" that "contextualiz[ed]" the purported misrepresentations); *see also Knowles v. ARRIS Int'l PLC*, 847 F. App'x 512, 513 (9th Cir. 2021) (affirming summary judgment on false advertising claims where allegedly misleading statements "were not demonstrably false" and "the disclaimer on [the product's] packaging further tempered consumer's expectations").

No consumer acting reasonably under these circumstances could understand the words "self-driving" or "autonomous" to mean that FSDC features make their cars fully autonomous.  Doing so would require a consumer to ignore the multiple and repeated disclaimers regarding FSDC's limitations and warnings that the vehicles are not fully autonomous.  And Tesla does not hide these disclosures:  They are made manifest on every major part of Tesla's website, including the pages one must necessarily visit in order to purchase her car online.  Any reasonable consumer would thus understand what FSDC features do, and do not, offer.  In particular, any reasonable consumer who, like LoSavio, "spent considerable time exploring the Tesla website and articles about Tesla and FSD on the web" "[b]efore making [a] purchase" would understand that FSDC features did not yet offer fully autonomous driving.  LoSavio Decl. ¶ 6 (Dkt. 42-11).  This publicly available evidence shows a reasonable consumer would not misinterpret Tesla's statements about FSDC features to mean that its cars are already fully autonomous or will be in the immediate future.  At minimum, the facts do not show a clear likelihood of success in proving false advertising, as they must to grant Plaintiffs' desired mandatory preliminary injunction, including restraining and compelling Tesla's speech.

## III.   PLAINTIFFS FAIL TO SHOW IRREPARABLE HARM

Plaintiffs' motion should also be independently denied for its failure to show any risk of irreparable harm.  In this false advertising case about whether they overpaid for their vehicles, Plaintiffs claim that "deaths and serious injuries" are "virtually certain" without a preliminary injunction.  But despite this hyperbole, Plaintiffs waited months to seek this preliminary injunction, they identify only speculative risk, and the speculative risk they do cite is to third parties, not themselves.  Each of these reasons suffices to deny a preliminary injunction.  At bottom, Plaintiffs

fail to show their fundamental premise that Tesla vehicles are unsafe—quite the opposite, Tesla vehicles including their FSDC features, have been safe, are safe today, and are only getting safer. Plaintiffs' desired injunction would result in less safety, not more.

Start there:  Tesla vehicles are safe.  To obtain preliminary injunctive relief, "a plaintiff must *demonstrate* immediate threatened injury."  *Caribbean*, 844 F.2d at 674.  Plaintiffs contend that "deaths and serious injuries" are "virtually certain" to occur unless the Court orders Tesla to deactivate and stop selling FSDC software and to stop using the terms "self-driving" and autonomous."  This contention has no basis in reality and is in fact undermined by study after study demonstrating the exact opposite—that compared to all cars, Tesla vehicles are exceptionally safe. *See supra* at 6 (collecting relevant studies and awards).

Plaintiffs offer no evidence to rebut this sterling safety resume, let alone any evidence demonstrating that Tesla vehicles' FSDC features present an immediate threat of injury.  They rely primarily on two things—individual accidents over the years with no demonstrated connection to the use of FSDC and the February 2023 "recall" report.  Every car accident is unfortunate, and every car accident causing death or serious injury is a tragedy—a tragedy not to be cheaply deployed for litigation advantage.  But individual accidents involving Tesla vehicles do not prove they are unsafe, or even less safe than average—and the aggregate statistics prove otherwise.  If citing five accidents over seven years were enough to get a preliminary injunction ordering features disabled and marketing changes, every vehicle in America would be susceptible.  *See* Dkt. 43-4 (2016), 43-5 (2018), 43-6 (2019), 43-84 (2019), 43-106 (2023).  As for the February 2023 recall report, it concerned a set of very narrow issues that NHTSA was potentially concerned might arise in "specific and rare circumstances," and, in an abundance of caution, Tesla deployed an over-the-air fix soon afterward.  Although FSD Beta has been available for years now and to hundreds of thousands of customers, the recall report identified only eighteen warranty claims that may be related to the specific conditions at issue and did not identify any injuries related to these conditions. Plaintiffs' repeated assertion that NHTSA issued "a nationwide recall of all 362,758 vehicles with FSD" (Mot. 12) is misleading at best.  Yet based on this mischaracterization, Plaintiffs ask this Court

to deactivate FSDC on all those vehicles—something Tesla's regulator has not done.  Their claim that FSDC presents an imminent risk is not only inadequately supported—it is wrong altogether.

Plaintiffs point to no case where an injunction issued under remotely similar circumstances. They cite a single thirty-five-year-old Lanham Act case preliminarily enjoining allegedly misleading advertising, *Playskool, Inc. v. Prod. Dev. Grp., Inc.*, 699 F. Supp. 1056 (E.D.N.Y. 1988). But that case involved a preliminary injunction sought by Playskool, "a manufacturer of toys for preschool children," against a competing product manufacturer whose advertisements expressly and falsely stated that its toy "[a]ttaches to Playskool['s Toy]."  *Id.* at 1059.  In granting a preliminary injunction, the court focused on the fact that defendant's advertisement consisted of a plain and straightforward misrepresentation that directly encouraged children to take actions that "would clearly be unsafe."  *Id.* at 1060.  That is a far cry from this case—where Tesla repeatedly discloses the facts that Plaintiffs claim are omitted and where none of the representations is misleading.  Just as importantly, unlike in that case, Plaintiffs have come nowhere close to showing a direct risk of harm.  They also cite *United States v. Gear Box Z Inc.*, 526 F. Supp. 3d 522 (D. Ariz. 2021), which is even less on point.  There, the court enjoined the sale of a product on motion by the EPA, which had concluded an investigation demonstrating that the product violated the Clean Air Act, but the defendants nevertheless refused to stop selling it.  Nothing comparable has occurred here, in this lawsuit by private plaintiffs now weakly attempting to piggyback off an NHTSA recall report that, unlike the injunction Plaintiffs seek, did not require Tesla to deactivate FSD Beta.

Plaintiffs' attempt to show irreparable harm also fails for several other reasons.

*First*, Plaintiffs' long delay in seeking preliminary injunctive relief refutes their claim of any immediate threatened injury.  Plaintiffs filed suit years after they purchased their Tesla vehicles, attempting to recover additional money they allegedly spent on supposedly fully-autonomous-driving capabilities.  Now, *six months later*, faced with a motion to dismiss that reveals their claims' many legal insufficiencies, Plaintiffs move for a preliminary injunction with no circumstances justifying that extreme step, no explanation for why they did not file this motion at the outset, and nothing new justifying it now.  Years-old individual accidents and the narrowly tailored February recall that was remedied in March with an over-the-air update certainly do not show an imminent

1   risk.  This "long delay before seeking a preliminary injunction implies a lack of urgency and

2   irreparable harm."  *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir.

3   1985); *see also, e.g.*, *First Franklin Fin. Corp. v. Franklin First Fin., Ltd.*, 356 F. Supp. 2d 1048,

4   1055 (N.D. Cal. 2005) (three-month delay "undercut … claims of urgency and irreparable harm").

5          *Second*, "[r]ather than focus on [their] own injury," Plaintiffs try "to redirect the focus of the

6   irreparable harm injury to third parties."  *Exeltis USA Inc. v. First Databank, Inc.*, 2017 WL

7   6539909, at *9 (N.D. Cal. Dec. 21, 2017).  They speculate about a risk of harm to "the world,"

8   Mot. 1, "the public," *id.*, "many consumers," *id.*, "a significant number of Tesla owners," *id.*,

9   "customers," *id.* at 20, or "many FSD vehicle owners," *id.*  Nowhere do they show a risk of

10  immediate harm to themselves.  "This is not permissible."  *Exeltis*, 2017 WL 6539909, at *9.

11         *Third*, the supposed risk Plaintiffs cite is speculative.  Plaintiffs hypothesize that someone

12  might purchase a Tesla with FSDC based on the terms "self-driving" and "autonomous"; that that

13  person might misunderstand the labeling to suggest that his car is fully autonomous; that he might

14  hold on to that mistaken view despite the overwhelming amount of clear and publicly available

15  information to the contrary; that he might then misuse the technology due to his misunderstanding;

16  that this misuse might occur despite the many in-car warnings and prompts telling him to stay alert

17  and keep his hands on the wheel; that his misuse of that specific technology will cause an accident;

18  and that the accident will injure him or someone else.  With its many "contingencies" that "must

19  occur before" any risk of harm (let alone actual harm) arises, this theory is far "too attenuated and

20  conjectural" and thereby "too speculative to constitute an irreparable harm justifying injunctive

21  relief."  *Caribbean*, 844 F.2d at 675.  Courts rightly reject preliminary injunctions premised on such

22  speculation.  *See In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) ("Speculative

23  injury cannot be the basis for a finding of irreparable harm.").  And unlike the speculative harm that

24  Plaintiffs conjecture that their preliminary injunction might prevent, the harm that it would do—to

25  safety features, to Tesla, and to what customers understood they were buying—is a certainty.

26

27

28

## IV.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST DISFAVOR A PRELIMINARY INJUNCTION

Plaintiffs also fail to show that the "balance of hardships between the parties" and the "competing public interests" strongly favor their motion.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137-38 (9th Cir. 2011).   The proposed injunction would impose devastating and unconstitutional costs on Tesla, while not benefitting Plaintiffs personally or the public at all.

### A.   The Injunction Would Gravely And Unconstitutionally Burden Tesla

The proposed injunction would cost Tesla tremendously.  The injunction would require that Tesla change the name of the products it offers, cease marketing of one of its most popular features, and compel Tesla to issue a written notice and a one-time pop-up to all Tesla owners stating—before any definitive ruling on the merits—that this Court found its marketing inaccurate or misleading. On its face, complying with the injunction Plaintiffs seek would be burdensome and expensive.[7] And it would impose permanent, irremediable harm to Tesla's goodwill with existing and prospective customers.  Existing customers—including the many customers who enjoy access to FSD Beta, who know what their cars can and cannot do, and who do not share Plaintiffs' opinion about the product—may resent Tesla for deactivating the FSD features they paid extra for. Prospective customers may opt for a competitor's product while the injunction is ongoing, or their opinion of Tesla may be tainted by the first-of-its-kind injunction that Plaintiffs propose.  And the proposed compelled notice would mislead consumers by indicating—wrongly—that a ruling on the merits of Tesla's advertisements has been reached; if Tesla prevails at trial, it would not easily be able to recoup its reputation or undo the damage to its goodwill, as it would have no easy way to change customers' perception.  In short, Plaintiffs' proposed injunction would impose unreasonably high monetary costs and irreparable reputational costs on Tesla.  *See Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (damage to goodwill is a

---

[7] A preliminary injunction may issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  Plaintiffs must show they can satisfy this obligation, or good cause to be relieved of it.  They do neither.  The Court should not entertain issuing any injunction before determining that Plaintiffs are able to post adequate security.

serious and cognizable harm); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (threatened loss of customers is a serious injury).

The proposed injunction would also impose an unconstitutional burden on Tesla's First Amendment rights by both restraining and compelling Tesla's speech. First, it would impose a prior restraint on essentially all marketing of Tesla's ADAS and FSD systems. Prior restraints on speech are always constitutionally suspect. *See Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). Those constitutional concerns are amplified at the preliminary injunction stage, "before there has been any trial or adjudication of the merits." *Exeltis*, 2017 WL 6539909, at *5. A prior restraint at this stage must satisfy the strictest constitutional scrutiny and must be narrowly tailored and "actually necessary" to address a compelling interest. *Brown*, 564 U.S. at 799. So too with the proposed injunction's compelled speech—forcing Tesla to tell customers that it misled them, before any determination that it did so—since compelled speech is also "presumptively unconstitutional." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

Plaintiffs fail so show the injunction is "actually necessary" to vindicate *any* meaningful interest, *Brown*, 564 U.S. at 799, let alone a compelling one, *see Exeltis*, 2017 WL 6539909, at *5. At the same time, the proposed injunction would chill unchallenged and "truthful, nonmisleading commercial speech," presenting "special dangers" under the First Amendment. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 502 (1996). Because these speech restrictions and compulsions "raise[] serious First Amendment questions," "the balance of hardships tips sharply in [Tesla's] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007); *see Exeltis*, 2017 WL 6539909, at *11 (denying preliminary injunction due to concerns about restricting speech).

**B.      Plaintiffs Will Suffer No Harm If The Motion Is Denied**

While granting the proposed injunction would impose significant and immediate harm on Tesla, denying it would not harm—or even affect—Plaintiffs' interests. Plaintiffs do not even try to argue that they would be personally harmed without an injunction. *See* Mot. 21. They would not benefit from the Court ordering Tesla not to say "self-driving" or "autonomous"; they have no immediate plans to buy another Tesla vehicle with FSDC features and they are not imminently at risk of being misled. They face no harm from Tesla's offering FSDC features on new purchases,

since they are not making new purchases.  And they gain no benefit from deactivating existing FSD Beta software since they do not use it—indeed they and any Tesla drivers can disable the FSD Beta software on their own if they dislike it.  Simply put, the injunction would leave Plaintiffs in the same place they are today, and the absence of an injunction would impose no hardship on them.  The only hardship that Plaintiffs even hypothesize is the attenuated risk to other drivers from yet others' speculative misuse of FSD features.  They fail to prove that speculative harm—and, in any event, the balance of hardships would still tilt sharply in Tesla's favor because Plaintiffs' "asserted harm is far more attenuated than" Tesla's.  *Exeltis*, 2017 WL 6539909, at *10.

### C.   The Proposed Injunction Would Not Benefit The Public

Nor have Plaintiffs shown that the proposed injunction would benefit the public.  Plaintiffs must show that the public interest favors the injunction "in light of [its] *likely* consequences," *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017), which "must not be too remote, insubstantial, or speculative and must be supported by evidence," *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009).  Plaintiffs provide no evidence that the public uniformly received and misinterpreted Tesla's statements, especially in light of the vast evidence of Tesla informing consumers exactly what their cars can and cannot do.  And Plaintiffs fail to show that the public would benefit from deactivating FSD Beta, which is one of Tesla's most popular products that customers—including some Plaintiffs—consistently want, *see, e.g.*, LoSavio Decl. ¶ 3 (Dkt. 42-11) (LoSavio has "asked to be included in the Tesla FSD Beta Program").  Plaintiffs equally fail to show that the proposed injunction would benefit consumer or highway safety.  Again, the evidence proves otherwise: FSDC is arguably safer than manual driving.  *See, e.g.*, *supra* at 6.  Plaintiffs therefore fail to show that the public would benefit from being deprived of this technology altogether—or from being deprived of the opportunity to decide for themselves.  *See, e.g.*, *Traeger Pellet Grills LLC v. Dansons US LLC*, 2019 WL 6492446, at *4 (D. Ariz. Dec. 3, 2019) (denying preliminary injunction that "would force [the defendant] to eliminate one of its sub-brands, thereby restricting consumer choice," as not supporting "the public's interest").

## V.   PLAINTIFFS DO NOT JUSTIFY PROVISIONAL CLASS CERTIFICATION

Plaintiffs also fail to show that they represent the interests of *everyone* who bought a Tesla vehicle with FSDC capabilities since January 2016.  Plaintiffs therefore cannot demonstrate that their proposed provisional class satisfies the requirements of Rule 23(a) or Rule 23(b)(2).

Under Rule 23(a), "[a]dequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).  Plaintiffs try to meet this requirement with a passing conclusory statement that they lack conflicts of interest.  *See* Mot. 24.  But more is required.  Plaintiffs want the Court to order Tesla to deactivate the FSD Beta features of, by their count, over 360,000 vehicles.  Those features are highly popular— even some of the Plaintiffs still seek access to them.  LoSavio Decl. ¶ 3 (Dkt. 42-11).  Drivers paid extra for them.  Mot. 6.  Drivers use them daily, and these features offer safety enhancements.  Yet Plaintiffs make no effort whatsoever to show that their desire to force Tesla to deactivate, stop offering, and stop advertising these features is not antagonistic to the hundreds of thousands of drivers that the injunction would affect.  Nor do they show that prospective purchasers would want to give up the option that Plaintiffs had—to buy these features or not, then to activate them or not— by Court order.  Drivers who do agree with Plaintiffs, of course, can simply choose not to buy, activate, or use FSDC features.  Plaintiffs' proposed injunction hardly advances their interests, but will directly contradict the desires of the many drivers who use and like the FSDC features that they invested in—and in that way, Plaintiffs fail to satisfy Rule 23(a).  *See AdTrader, Inc. v. Google LLC*, 2020 WL 1922579, at *6 (N.D. Cal. Mar. 24, 2020) (for purposes of adequacy, "[a] conflict is fundamental if it goes to the specific issues in controversy or where some party members claim to have been harmed by the same conduct that benefitted other members of the class"); *Doe v. BHC Fairfax Hosp., Inc.*, 2020 WL 4584228, at *6 (W.D. Wash. Aug. 10, 2020) (declining to certify 23(b)(2) class because "Putative Class Representatives assert interests that might be antagonistic to those of putative class members … [and so] have not met the standard for adequate representation").

Plaintiffs also fail to satisfy Rule 23(b)(2), which authorizes class certification when a defendant acted "on grounds that apply generally to the class, so that injunctive relief is appropriate

respecting the class as a whole."  Plaintiffs do not demonstrate that Tesla acted on grounds that apply generally to everyone who bought a Tesla vehicle since January 1, 2016 who bought or could add FSDC features.  *See* Mot. 22.  They do not show that all those people misunderstood FSDC's capabilities or timing.  For one thing, they have identified no misstatement or misrepresentation Tesla made promising existing full autonomy or a setting a definite timeframe for it.  *See* MTC/D 14-18.  For another, the uses of the terms "self-driving" and "autonomous" that Plaintiffs do identify appear in contexts that make clear that FSDC features do *not* currently and will not in the near future offer fully autonomous driving.  Plaintiffs' own declarations make clear that Tesla vehicle purchasers saw and relied on different things (though none promising full autonomy).  Plaintiffs thus have not shown that the requested injunctive relief would be appropriate for all class members or would "redress [Plaintiffs'] alleged injuries or those of the class [they] seek[] to represent." *Murray v. Sears, Roebuck & Co.*, 2014 WL 563264, at *10 (N.D. Cal. Feb. 12, 2014).  To the contrary, Plaintiffs' theory presupposes differently situated class members with different injuries (of varying degrees and kinds) who would need different kinds of relief—placing their case far outside Rule 23(b)(2).  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (Rule 23(b)(2) "applies only when a single injunction or declaratory judgment would provide relief to each member of the class"); *see also D.B. v. Brooks-Lasure*, 2022 WL 16840325, at *12 (N.D. Cal. Nov. 9, 2022) ("Within the class, some of the 600-plus patients can be expected to prefer transfer to a safe facility rather than to remain at Laguna Honda, given its health and safety violations.  All our named plaintiffs would like to remain, but that does not dictate a similar attitude for the proposed class members.  Accordingly, the proposed class could not be certified.").  Plaintiffs therefore fail to show that Tesla acted on grounds that apply generally to the class.

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction and provisional class certification.

Respectfully submitted,

Dated: April 5, 2023

WILMER CUTLER PICKERING
   HALE AND DORR LLP

By:   */s/ Alan Schoenfeld*
       Alan Schoenfeld

*Attorneys for Defendants Tesla, Inc., Tesla Lease Trust, Tesla Finance LLC*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 5, 2023, I electronically filed the above document and supporting documents with the Clerk of the Court using CM/ECF, which will send electronic notification of such filing to all registered counsel.

Dated: April 5, 2023                            By:   */s/ Alan Schoenfeld*
                                                              Alan Schoenfeld