UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA ADVANCED DRIVER ASSISTANCE SYSTEMS LITIGATION | Case No. 22-cv-05240-HSG<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION, GRANTING MOTION TO DISMISS, AND DENYING MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: Dkt. Nos. 30, 42 |

Pending before the Court is Defendants' motion to compel arbitration and motion to dismiss, and Plaintiffs' motion for preliminary injunction. Dkt. Nos. 30, 42. The Court finds these matters appropriate for disposition without oral argument and the matters are deemed submitted. *See* Civil L.R. 7-1(b). For the reasons detailed below, the Court **GRANTS** the motion to compel arbitration; **GRANTS** the motion to dismiss; and **DENIES** the motion for preliminary injunction.

**I.    BACKGROUND**

Plaintiffs Brenda T. Broussard, Dominick Battiato, Christopher Mallow, Jazmin Imaguchi, and Thomas LoSavio initially filed this putative class action against Defendants Tesla, Inc., Tesla Lease Trust, and Tesla Finance LLC (collectively, "Tesla") in September 2022. *See* Dkt. No. 1. Plaintiffs have since filed a consolidated amended complaint, alleging that Tesla has made misleading and deceptive statements about its advanced driver assistance systems ("ADAS") technology. *See generally* Dkt. No. 23 ("CAC"). Specifically, Plaintiffs contend that Tesla has repeatedly made false statements indicating that its ADAS technology was on the precipice of delivering fully self-driving cars, but Tesla has yet to deliver on such promises. *See id.* at ¶¶ 1, 5–8, 11, 34–36, 43–48, 50, 52, 55–58, 60, 68. Plaintiffs further allege that the ADAS system is

1    unsafe and has led to accidents, injuries, and deaths. *See id.* at ¶ 4, 9, 49, 53, 61–62, 64, 67, 71,
2    73. Plaintiffs allege that they each bought one or more Tesla vehicles, and that all but one of them
3    bought the optional ADAS technology package, at different times between January 2017 and May
4    2022. *See id.* at ¶¶ 16–20.

5    Based on these allegations, Plaintiffs bring multiple causes of action against Defendants
6    for violations of the Magnuson Moss Warranty Act; California's False Advertising Law ("FAL"),
7    Consumer Legal Remedies Act ("CLRA"), and Unfair Competition Law ("UCL"); as well as
8    causes of action for breach of express and implied warranties, fraud, negligent misrepresentation,
9    negligence, and unjust enrichment. *See id.* at ¶¶ 122–225.

10   Defendants seek to compel arbitration as to Plaintiffs Broussard, Battiato, Mallow, and
11   Imaguchi, and to dismiss the CAC as to Plaintiff LoSavio. Dkt. No. 30. Plaintiffs, in turn, have
12   moved for a preliminary injunction. Dkt. No. 42.

13   **II.    MOTION TO COMPEL ARBITRATION**

14   Defendants contend that four of the five Plaintiffs entered into valid arbitration agreements
15   when they purchased their vehicles, and all of their claims should therefore be compelled to
16   arbitration.[1] *See* Dkt. No. 30.

17   Defendants contend that when Plaintiffs completed their vehicle purchases online, each of
18   them entered into an arbitration agreement in substantially the same way. *See id.* at 7–8.
19   Customers can buy or lease vehicles through either the desktop or mobile versions of Tesla's
20   website. *See* Dkt. No. 30-7 ("Ahluwalia Decl.") at ¶ 5. A Tesla account is automatically created
21   for customers through either process, and the checkout flow is substantially the same for the
22   website and mobile phone application. *Id.* at ¶ 6; Dkt. No. 30-1 ("Barclay Decl.") at ¶ 6.
23   Customers will reach an "order payment" screen to complete their order. *See* Barclay Decl. at ¶ 2.
24   After the customer selects the vehicle and vehicle configuration of their choice and enters the
25   required payment information, they must click a "Place Order" button on this screen. *See id.* at
26   ¶ 3; Ahluwalia Decl. at ¶ 7. Defendants explain that the phrase "By placing this order, I agree to

---

[1] For ease of reference, when the Court refers to "Plaintiffs" in this section, it means all Plaintiffs except for Plaintiff LoSavio.

2

the Model [3 or Y] Order Agreement" appears above the "Place Order" button, and is hyperlinked and in blue font, as reproduced below.  *See* Barclay Decl. at ¶ 3.



*See* Dkt. No. 30-2, Ex. A.  Below is a larger screenshot of that same page:



*Id.*

Although the desktop and mobile screens changed slightly over time, Defendants reviewed their records and provided samples of the order payment screens in place when each Plaintiff purchased their cars.[2]  *See* Dkt. Nos. 30-2, Ex. A; 30-3, Ex. B; 30-4, Ex. C; 30-5, Ex. D; 30-6, Ex.

---

[2] Rather than producing an actual screenshot of Plaintiff Imaguchi's order payment screen, Defendants produced the programming file that was used at the time she made her purchase, and explained that the HTML code would similarly create text like the others.  *See* Barclay Decl. at ¶ 11, & Ex. E.

3

1   E. As noted, they look substantially the same as the one above. *Id.*

2   Similarly, the type of vehicle Plaintiffs purchased differed, but Defendants confirmed that

3   their internal records indicate that the order agreements for all Plaintiffs contained an agreement to

4   arbitrate. *See* Barclay Decl. at ¶¶ 5; Ahluwalia Decl. at ¶¶ 10–19, & Exs. A–E. The arbitration

5   provisions are set off in a separate text box, and provide:

> **Agreement to Arbitrate.** Please carefully read this provision, which applies to any dispute between you and Tesla, Inc. and its affiliates, (together "Tesla").
>
> If you have a concern or dispute, please send a written notice describing it and your desired resolution to resolutions@tesla.com.
>
> *If not resolved within 60 days, you agree that any dispute arising out of or relating to any aspect of the relationship between you and Tesla will not be decided by a judge or jury but instead by a single arbitrator in an arbitration administered by the American Arbitration Association (AAA) under its Consumer Arbitration Rules. This includes claims arising before this Agreement, such as claims related to statements about our products.*
>
> We will pay all AAA fees for any arbitration, which will be held in the city or county of your residence. To learn more about the Rules and how to begin an arbitration, you may call any AAA office or go to www.adr.org.
>
> The arbitrator may only resolve disputes between you and Tesla, and may not consolidate claims without the consent of all parties. The arbitrator cannot hear clear or representative claims or request for relief on behalf of others purchasing or leasing Tesla vehicles. In other words, you and Tesla may bring claims against the other only in your or its individual capacity and not as a plaintiff or class member in any class or representative action. If a court or arbitrator decides that any part of this agreement to arbitrate cannot be enforced as to a particular claim or relief or remedy, then that claim or remedy (and only that claim or remedy) must be brought in court and any other claims must be arbitrated.
>
> If you prefer, you may instead take an individual dispute to small claims court.
>
> You may opt out of arbitration within 30 days after signing this Agreement by sending a letter to [Tesla's designated address] . . . .

28   *See, e.g.*, Dkt. No. 30-8, Ex. A (emphasis added). Defendants' records indicate that only Plaintiff

4

LoSavio opted out of the arbitration agreement. *See* Dkt. No. 30 at 2; *see also* Ahluwalia Decl. at ¶¶ 10–19.

### A. Legal Standard

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, sets forth a policy favoring arbitration agreements and establishes that a written arbitration agreement is "valid, irrevocable, and enforceable." 9 U.S.C. § 2; *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (noting federal policy favoring arbitration); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (same). The FAA allows that a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that . . . arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. This federal policy is "simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476 (1989). Courts must resolve any "ambiguities as to the scope of the arbitration clause itself . . . in favor of arbitration." *Id.*

When a party moves to compel arbitration, the court must determine (1) "whether a valid arbitration agreement exists" and (2) "whether the agreement encompasses the dispute at issue." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). The agreement may also delegate gateway issues to an arbitrator, in which case the court's role is limited to determining whether there is clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). In either instance, "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (citing 9 U.S.C. § 2).

### B. Discussion

Plaintiffs does not appear directly to contest Defendants' representations about the design and content of the order payment screens or the order agreements. *See* Dkt. No. 37 at 5–7. Instead, they respond (1) that Defendants' evidence is insufficient to establish what Plaintiffs saw when they ordered their cars; and that even if there was a valid agreement, (2) the arbitration

5

agreement is unconscionable; and (3) the arbitration agreement is unenforceable as to their California statutory claims for public injunctive relief. *Id.*

### i. Formation of Agreement to Arbitrate

Plaintiffs argue that Defendants have not proffered sufficient evidence that they received adequate notice of the arbitration agreement, and therefore they cannot be bound by it. Dkt. No. 37 at 6–7.

As an initial matter, Plaintiffs suggest that the example screenshots that Defendants proffered from the relevant time periods in which Plaintiffs purchased their vehicles are insufficient for the Court to evaluate what Plaintiffs saw when they purchased their cars. *Id.* at 6. But Defendants have explained that they keep historical website information, including screenshots and linked documents associated with the order payment screen, and they reviewed them as part of this case. *See* Barclay Decl. at ¶¶ 4–6. The examples that they provided are the versions in use at the time Plaintiffs each placed their order. *Id.* at ¶ 6. Plaintiffs do not explain what more Defendants should have provided, nor do they suggest that any Plaintiff disputes seeing the payment order screen as discussed above. Instead, Plaintiffs cite a single out-of-circuit case, *Nager v. Tesla Motors, Inc.*, No. 19-2382-JAR, 2019 WL 4168808, at *1 (D. Kan. Sept. 3, 2019).

This case is inapposite. In *Nager*, the plaintiffs argued that they had never signed an agreement to arbitrate and had purchased their vehicles over the phone. *See id.* The only time they used the Tesla website was to upload photographs of their drivers' licenses and insurance cards, and therefore they never saw any terms and conditions or arbitration agreement. *Id.* at *1, 4. The only document that Tesla produced was an undated and unsigned motor vehicle order agreement. *Id.* at *2. Tesla acknowledged that customers could place orders telephonically, and did not produce any evidence that the plaintiffs actually had to agree to an arbitration agreement when they uploaded their drivers' license and insurance card through the website. *Id.* at *2–4. The court concluded that Tesla had produced "just some random document with no connection to plaintiffs or the transaction at issue in this case." *See id.* at *3. The court concluded that there was a factual dispute, and directed the parties to engage in discovery related to whether the plaintiffs had agreed to arbitrate. *Id.* at *4.

6

In contrast, Defendants here have provided specific information related to Plaintiffs' purchases, and there does not appear to be any factual dispute.

Still, Plaintiffs urge that even if the Court were to consider the screenshots that Defendants provide, they do not establish that Plaintiffs entered into a binding arbitration agreement with Defendants. Dkt. No. 37 at 7. The Court again disagrees.

"In determining the validity of an agreement to arbitrate, federal courts 'should apply ordinary state-law principles that govern the formation of contracts.'" *See Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 782 (9th Cir. 2002) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).[3] "An essential element of any contract is the consent of the parties or mutual assent." *See Donovan v. RRL Corp.*, 26 Cal. 4th 261, 270 (Cal. 2001); *see also* Cal. Civ. Code §§ 1550, 1565. Mutual assent "is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Deleon v. Verizon Wireless, LLC*, 207 Cal. App. 4th 800, 813 (Cal. Ct. App. 2012) (quotation omitted); *see also* Cal. Civ. Code § 1639 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . ."). "[A] party's subjective intent, or subjective consent, therefore is irrelevant" to the question of mutual consent. *See Stewart v. Preston Pipeline Inc.*, 134 Cal. App. 4th 1565, 1587 (Cal. Ct. App. 2005) (quotation omitted).

As the Ninth Circuit has explained, when determining whether there is a binding agreement formed through websites, courts generally evaluate contracts as falling into one of two categories: (1) "browsewrap" agreements, where the website's terms and conditions are provided to users via a hyperlink at the bottom of a webpage and a user's assent to the terms is assumed by her continued use of the website; and (2) "clickwrap" agreements, where a user is presented with the terms and conditions and must click on a button or box to indicate that she agrees before she may continue. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–77 (9th Cir. 2014).

---

[3] Here, Defendants suggest that either California or Florida law may apply. *See* Dkt. No. 30. But the analysis under each state's law appears to be the same, and Plaintiffs do not specify what law they think should guide the Court's analysis regarding contract formation. *See generally* Dkt. No. 37.

1    Websites may also present some hybrid of the two, such as putting a link to the terms and
2    conditions on the web page near a button that the user must click to continue.  Regardless, "the
3    onus [is] on website owners to put users on notice of the terms to which they wish to bind
4    consumers."  *Id.* at 1178–79.
5           Here, the Tesla website appears to offer a type of hybrid browsewrap agreement where the
6    terms of the agreement are hyperlinked above the "Place Order" button.  A browsewrap agreement
7    is valid if "the user has actual or constructive knowledge of a website's terms and conditions."
8    *Nguyen*, 763 F.3d at 1176 (quotation omitted).  Plaintiffs argue that they could not have been on
9    constructive notice of the arbitration agreement based on the place order screen because it was
10   inconspicuous:  the font was small and not underlined.  *See* Dkt. No. 37 at 6–7.
11          As explained above, the text reads:  "By placing this order, I agree to the Model [3 or Y]
12   Order Agreement," and the agreement is hyperlinked.  *See* Barclay Decl. at ¶ 3.  Despite
13   Plaintiffs' urging, the text of this sentence was the same size as the "Place Order" button text
14   below it, and was the same size as other text on the webpage.  The hyperlinked agreement was
15   highlighted in blue, which courts have routinely found indicates to a user that there is a hyperlink.
16   *See, e.g.*, *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 516 (9th Cir. 2023) (collecting cases).
17   And this blue text is some of the only colored text on the screen.  There are no other distracting
18   details on the webpage, and the relevant language about the order agreement is therefore
19   conspicuous.  It also clearly indicates that clicking the "Place Order" button will manifest the
20   customer's consent to the agreement.
21          *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 853–57 (9th Cir. 2022), on which
22   Plaintiffs rely, provides a useful contrast.  In *Berman*, the webpage "included brightly colored
23   graphics," including a large text box with the plaintiff's zip code, and "a large green button
24   inviting [the plaintiff] to confirm the accuracy of the zip code so that she could proceed to the next
25   page in the website flow."  *Id.* at 853.  Inside the green button were "easy-to-read white letters"
26   stating "This is correct, Continue!"  *Id.*  The Ninth Circuit explained that the relevant language
27   regarding the terms and conditions were inconspicuous by comparison:
28

8

> Between the comparatively large box displaying the zip code and the large green "continue" button were two lines of text in a tiny gray font, which stated: "I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy." The underlined phrases "Terms & Conditions" and "Privacy Policy" were hyperlinks, but they appeared in the same gray font as the rest of the sentence, rather than in blue, the color typically used to signify the presence of a hyperlink.

*Id.* at 854. The Court later explained that the gray font was "barely legible to the naked eye" compared to the rest of the webpage, and the "other visual elements draw the user's attention away from [this] barely readable critical text." *Id.* at 856–57. The Ninth Circuit concluded that the webpages did not provide reasonably conspicuous notice of the terms and conditions because they were in fact designed to "draw the user's attention away from the most important part of the page." *Id.* at 856–57.

That is simply not the case here. The Court finds that Defendants' order payment screens provided conspicuous notice of the order agreements, the order agreements themselves are just a few pages long, and the arbitration provisions within them are offset from the rest of the agreement with a large text box. In short, Defendants have established that Plaintiffs were on constructive notice of the order agreement and manifested their assent by clicking the "Place Order" button.

### ii. Enforceability

Plaintiffs argue in the alternative that even if they entered into arbitration agreements with Defendants, the agreements are unconscionable and otherwise unenforceable. *See* Dkt. No. 37 at 7–8. As a threshold matter, the parties appear to dispute whether the arbitrator or the Court should decide such issues. *Compare* Dkt. No. 37 at 9–10, *with* Dkt. No. 38 at 1–2.

### a. Delegation of Arbitrability

Defendants argue that any questions about the enforcement of the arbitration agreement should be decided by the arbitrator. *See* Dkt. No. 30 at 9; Dkt. No. 38 at 1–2. Defendants state that the parties' agreements expressly incorporate the AAA's Consumer Arbitration Rules, which provide that the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or *validity* of the arbitration agreement or to

the arbitrability of any claim or counterclaim." *See* AAA Consumer Arbitration Rules at R-14(a) (emphasis added). In *Brennan v. Opus Bank*, the Ninth Circuit held that incorporation of the AAA rules can constitute clear and unmistakable delegation of the arbitrability question. *Brennan*, 796 F.3d at 1130 (noting that "[v]irtually ever circuit to have considered the issue" has agreed). The Court did not, however, directly address whether its holding was limited to sophisticated parties and commercial contracts. *See id.* at 1130–31. Instead, the Court explained that its holding did not "foreclose the possibility that this rule could also apply to unsophisticated parties or to consumer contracts." *Id.* at 1130. The Court did note that "the vast majority of the circuits that hold that incorporation of the AAA rules constitutes clear and unmistakable evidence of the parties' intent do so without explicitly limiting that holding to sophisticated parties or to commercial contracts." *Id.* at 1130–31.

Plaintiffs suggest that incorporation of the AAA rules should only constitute clear and unmistakable evidence of the parties' intent to delegate arbitrability issues for sophisticated parties and not for consumer agreements like the ones at issue here. *See* Dkt. No. 37 at 9–10, & n.7 (citing cases). Since *Brennan*, there has been a split among the district courts in this Circuit as to whether sophistication of the parties is a relevant consideration. *See, e.g.*, *Gerlach v. Tickmark Inc.*, No. 4:21-CV-02768-YGR, 2021 WL 3191692, at *4 (N.D. Cal. July 28, 2021) (collecting cases). But putting this split aside, Plaintiffs also note that there is an inherent tension in the arbitration agreements at issue here. *Id.* Plaintiffs point out that the arbitration agreements, in addition to incorporating the AAA rules, state:

> If *a court or arbitrator decides that any part of this agreement to arbitrate cannot be enforced* as to a particular claim or relief or remedy, then that claim or remedy (and only that claim or remedy) must be brought in court and any other claims must be arbitrated.

Dkt. No. 30-8, Ex. A (emphasis added). This language, they urge, at least suggests that a court may decide issues related to the arbitrability of an agreement.

The Court agrees. Although incorporation of the AAA rules may on its own constitute "clear and unmistakable evidence" of the parties' intent to delegate arbitrability issues, the

1  arbitration agreement here leaves open the possibility that a court could decide such issues too.
2  The Court is not persuaded by Defendants' suggestions that these provisions should be read in
3  isolation, and they provide no rationale for how to harmonize them. *See* Dkt. No. 38 at 2. The
4  Court therefore considers Plaintiffs' arguments that the agreement is unconscionable and cannot
5  be enforced as to their claims for public injunctive relief.

### b. Unconscionability

Plaintiffs argue that the arbitration agreement is unconscionable, and therefore unenforceable. *See* Dkt. No. 37 at 7–8.

Under California law, an agreement is enforceable unless it is both procedurally and substantively unconscionable.[4] *See Armendariz v. Foundation Health Psychcare Svcs. Inc.*, 24 Cal. 4th 83, 114 (Cal. 2000). Procedural and substantive unconscionability need not be present in equal amounts. *Id.* Rather, the two are evaluated on a "sliding scale," such that the more evidence of procedural unconscionability there is, the less evidence of substantive unconscionability is needed to render the agreement unenforceable, and vice versa. *Id.* However, both forms of unconscionability must be present in some amount "for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability." *Stirlen v. Supercuts, Inc.*, 51 Cal. App. 4th 1519, 1521 (Cal. Ct. App. 1997), *as modified* (Feb. 10, 1997).

Procedural unconscionability "focus[es] on 'oppression' or 'surprise' due to unequal bargaining power . . . ." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114, (Cal. 2000). Substantive unconscionability, on the other hand, "examines the fairness of a contract's terms." *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1001 (9th Cir. 2021) (citing *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 129 (Cal. 2019)). The doctrine "is concerned with terms that are unreasonably favorable to the more powerful party, not just a simple old-fashioned bad bargain." *Id.* at 1001–02 (quotations omitted).

Here, Plaintiffs raise cursory arguments that (1) the arbitration clause is procedurally unconscionable because it is "buried in small font" in the order agreement; and (2) the arbitration

---

[4] Plaintiffs appear to acknowledge that California law applies to this question. *See* Dkt. No. 37 at 7 (citing California court cases).

11

1  clause is substantively unconscionable because Defendants did not provide the applicable
2  arbitration rules to Plaintiffs before they signed.  *See* Dkt. No. 37 at 7–8.  The Court is not
3  persuaded.
4        As discussed in Section II.B.i above, the arbitration provisions are set off in a textbox from
5  the rest of the order agreement.  They are in the same size font as the rest of the agreement, and
6  the entire order agreement is only a few pages long.  The arbitration provision not only explains
7  that unresolved disputes will be resolved through arbitration, but explains what arbitration means:
8  "[Y]ou agree that any dispute arising out of or relating to any aspect of the relationship between
9  you and Tesla *will not be decided by a judge or jury but instead by a single arbitrator in an*
10 *arbitration* administered by the American Arbitration Association (AAA) under its Consumer
11 Arbitration Rules."  *See* Dkt. No. 30-8, Ex. A.  The agreement also permits consumers to opt out
12 of the agreement within 30 days by sending a letter to Tesla.  *See California Crane Sch., Inc. v.*
13 *Google LLC*, 621 F. Supp. 3d 1024, 1030 (N.D. Cal. 2022) (finding no procedural
14 unconscionability based on opt-out process).
15       And although Defendants may not have sent Plaintiffs a copy of the AAA Consumer
16 Arbitration Rules themselves, the arbitration provision explicitly states that consumers can "learn
17 more about the Rules and how to begin an arbitration" by either "call[ing] any AAA office or
18 go[ing] to www.adr.org."  *Id.*  Plaintiffs offer no support for their suggestion that the agreement at
19 issue here rises to the level of one-sidedness or unfairness that renders it substantively
20 unconscionable.

      **c.** ***McGill v. Citibank***

22       Lastly, Plaintiffs urge that their claims for public injunctive relief under the UCL, FAL,
23 and CLRA are exempt from arbitration under the California Supreme Court's opinion in *McGill v.*
24 *Citibank N.A.*, 2 Cal. 5th 945 (Cal. 2017).  *See* Dkt. No. 37 at 8.  Plaintiffs do not argue that the
25 arbitration agreement here prevents them from pursuing public injunctive relief in arbitration.  *Id.*
26 Rather, they urge that "[a]greements to arbitrate claims for public injunctive relief under the
27 CLRA, the UCL, or the [FAL] are not enforceable in California."  *Id.* (alterations in original).
28       Plaintiffs overstate the California Supreme Court's actual ruling in *McGill*.  In *McGill*, the

California Supreme Court held only that arbitration provisions are invalid and unenforceable if they purport to waive a plaintiff's statutory right to seek public injunctive relief in all forums. *See* 2 Cal. 5th at 954–67. In *McGill*, the plaintiff brought claims under the CLRA, UCL, and FAL, and sought an injunction prohibiting the defendant from continuing to engage in its allegedly illegal and deceptive practices. *Id.* at 952. The defendant sought to compel arbitration, and the Court held that the arbitration provision was unenforceable because it waived the plaintiff's right to seek public injunctive relief under these statutes regardless of the forum. *Id.* at 954. The Ninth Circuit has since interpreted California case law to establish that if a contract allows plaintiffs to seek public injunctive relief through arbitration, it does not violate the *McGill* rule and is enforceable. *See DiCarlo v. MoneyLion, Inc.*, 988 F.3d 1148, 1158 (9th Cir. 2021) (enforcing an arbitration agreement where public injunctive relief was sought for UCL, FAL, and CLRA claims).

Plaintiffs do not explain how the arbitration agreement at issue here waives their right to pursue public injunctive relief through arbitration and the Court sees no indication that it does. The Court therefore finds that the arbitration agreements are enforceable.

\*   \*   \*

The Court **GRANTS** the motion to compel arbitration as to Plaintiffs Broussard, Battiato, Mallow, and Imaguchi. The Court **STAYS** the case as to these four Plaintiffs. The parties are **DIRECTED** to provide status reports every 120 days regarding the status of the arbitration as to their claims.

### III. MOTION TO DISMISS

Defendants next argue that the claims of the remaining Plaintiff, Thomas LoSavio, should be dismissed in their entirety. *See* Dkt. No. 30 at 10–25.

#### A. Legal Standard

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the

13

complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nevertheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

"A claim may be dismissed under Rule 12(b)(6) on the ground that it is barred by the applicable statute of limitations only when the running of the statute is apparent on the face of the complaint." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (quotation omitted). "[A] complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Id.* (quotation omitted).

**B. Discussion**

    **i. Statute of Limitations**

Defendants first argue that Plaintiff LoSavio's claims are time-barred because he purchased his Tesla Model S in January 2017 and did not file suit until over five years later, in September 2022. *See* Dkt. No. 30 at 11–14; *see also* CAC at ¶ 16. The parties do not appear to dispute the relevant statutes of limitations.[5] Instead, Plaintiff argues that the statutes of limitations are tolled by several different doctrines. *See* Dkt. No. 37 at 10–14; *see also* CAC at ¶ 121

---

[5] Plaintiff appears to acknowledge that the relevant statutes of limitations for his claims range from two to four years. *See* Dkt. No. 37 at 10, & n.9. Therefore, without some kind of tolling, all his claims would be time barred.

14

1  (generically alleging that "[t]o the extent that there are any statutes of limitations applicable to
2  Plaintiffs' and Class members' claims, the running of the limitations periods have been tolled by
3  various doctrines and rules, including but not limited to equitable tolling, the discovery rule, the
4  fraudulent concealment rule, equitable estoppel, the repair rule, and class action tolling.").

### a. Continuing Violation

Plaintiff primarily argues that the continuing violation doctrine applies to toll his claims. *See id.* at 11–13. Plaintiff argues that "Tesla was engaged in a pattern of misrepresenting its ADAS technology," and he believed their "representations that its ADAS technology made its vehicles capable of being fully self-driving at the time of [ ] purchase, or that it would do so within a reasonably short period thereafter." *See id.* at 12 (citing CAC at ¶¶ 16–20). Even after Plaintiff purchased his vehicle, he asserts that "Tesla continued its misrepresentations that it was perpetually on the cusp" of such capabilities. *Id.* He therefore suggests that his "claims have still not yet accrued." *Id.*

Under the continuing violation doctrine, "the statute of limitations does not begin to run until the date of the last injury or when the tortuous [*sic*] acts cease." *Pugliese v. Superior Court*, 146 Cal. App. 4th 1444, 1452 (Cal. Ct. App. 2007) (applying doctrine in context of ongoing domestic violence); *see also Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1192 (Cal. 2013) ("The continuing violation doctrine aggregates a series of wrongs or injuries for purposes of the statute of limitations . . . ."). Underlying this doctrine is a concern that those injured incrementally "should not be handicapped by the inability to identify with certainty when harm has occurred or has risen to a level sufficient to warrant action." *Id.* at 1197–98. As a result, "[a]llegations of a pattern of reasonably frequent and similar acts may, in a given case, justify treating the acts as an indivisible course of conduct actionable in its entirety, notwithstanding that the conduct occurred partially outside and partially inside the limitations period." *Id.*

This doctrine is most commonly applied in the context of employment discrimination cases, in which employers engage in ongoing conduct that gives rise to the plaintiff's claim. *See, e.g.*, *Bird v. Dep't of Hum. Servs.*, 935 F.3d 738, 746 (9th Cir. 2019). Since then, the doctrine has been applied in other discrete contexts, such as in civil rights actions. *See Wen v. Greenpoint*

15

1 *Mortg. Funding, Inc.*, No. 21-CV-07142-EMC, 2021 WL 5449048, at *3–4 (N.D. Cal. Nov. 22,
2 2021) (describing scope of cases in which doctrine has been applied). Plaintiff does not cite any
3 cases like this one in which the doctrine has been applied, but just baldly asserts that "Tesla's
4 alleged conduct neatly fits into the continual violation doctrine . . . ." *See* Dkt. No. 37 at 12.

It is not clear that the doctrine has any applicability here. Still, in the handful of district court cases that have discussed the doctrine in the context of false advertising claims, such courts have required allegations that the plaintiffs made repeat purchases. In *Hunter v. Nature's Way Prods.*, LLC, 2016 WL 4262188 (S.D. Cal. Aug. 12, 2016), for example, the court found that the doctrine was applicable in the context of a putative class action about misstatements regarding the health benefits of coconut oil. *Id.* at *1–2. The plaintiff alleged that she had purchased the product approximately once a month over a five-year period, relying on the misstatements on the labels each time. *See id.* at *12; *see also Johnson v. Glock, Inc.*, No. 3:20-CV-08807-WHO, 2021 WL 1966692, at *5 (N.D. Cal. May 17, 2021) (denying application of doctrine to single gun purchase); *Clark v. Hershey Co.*, No. C 18-06113 WHA, 2019 WL 913603, at *7 (N.D. Cal. Feb. 25, 2019) (finding doctrine did not apply where plaintiffs did not allege "particularized purchases").

Here, Plaintiff's injury appears to have occurred and was apparent in January 2017 when he first purchased the car, paying $8,000 above the base price for the "Full Self-Driving ADAS package" that did not work as he thought. *See* CAC at ¶ 16. Plaintiffs allege that Defendants made ongoing statements about the viability of their ADAS technology after 2017. *See, e.g.*, CAC at ¶¶ 7–8, 63, 66, 81, 88, 99–100, 102, 106. But critically, Plaintiff does not explain in his opposition brief—let alone allege in the complaint—how such misrepresentations continued to injure him. Plaintiff does not suggest that he made any ongoing or new purchases from Tesla based on their subsequent representations about their technology. He does not allege that he even saw, let alone relied on, these subsequent statements. Instead, Plaintiff simply explains:

> [He] decided to purchase [his Tesla Model S] vehicle and ADAS package after researching, reviewing, and relying on Tesla's online and other public statements, including those made by Musk, which were disseminated to LoSavio and other consumers throughout the

16

> State of California, the United States, and the world, and which represented that Tesla's ADAS technology made its vehicles capable of being fully self-driving at the time of LoSavio's purchase, or that it would do so within a reasonably short period thereafter.

*Id.* at ¶ 16; *see also id.* at ¶ 130 ("Plaintiffs [ ] were lured into purchasing or leasing Class Vehicles with ADAS packages and technology by Tesla's misrepresentations that it already had developed, or would soon complete its development of, ADAS packages and technology capable of making the Class Vehicles fully self-driving."). But presumably, he could ascertain the limitations of his ADAS system each time he drove his car.

Even liberally construing the complaint, Plaintiff's injury appears to remain the same: the ADAS system still does not work as originally promised. *See, e.g.*, *id.* at ¶ 132 ("Plaintiffs [ ] were damaged as a result of Defendants' breaches of their warranties because they received Class Vehicles and ADAS packages incapable of performing as Defendants represented . . . ."); *id.* at ¶ 177 ("Defendants committed [ ] unfair or deceptive acts or practices when they sold or leased Class Vehicles and ADAS packages to Plaintiffs and Class members that did not have represented characteristics, uses, and benefits . . . ."); *see id.* at ¶ 196 ("Plaintiffs [ ] have each suffered monetary injury because they each paid Defendants money for a good or service (e.g., a vehicle with full self-driving capability) that Defendants have never provided, and because Defendants have wrongfully retained those monies."). But the "mere continuing *impact* from past violations is not actionable" under the continuing violation doctrine. *See Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir. 2001) (quotations omitted) (emphasis in original).

In short, Plaintiff has not established that the continuing violation doctrine applies to his claims.

### b. Fraudulent Concealment and Equitable Estoppel

Plaintiff also suggests in conclusory fashion that other tolling doctrines such as fraudulent concealment or equitable estoppel may apply to his claims. *See* Dkt. No. 37 at 13–14.

Plaintiff contends that he "may be able to prove a set of facts that would show the fraudulent concealment rule applies to toll [his] claims and render them timely. *Id.* at 13. He points out that as alleged, "Tesla was continually making new misrepresentations every few

1  months reassuring Plaintiffs and the public" about the "imminent" status of their self-driving
2  technology. *Id.*

3  The doctrine of fraudulent concealment requires pleading with particularity (1) the
4  substantive elements of the fraud, and (2) an excuse for late discovery of the facts. *See Yetter v.*
5  *Ford Motor Co.*, 428 F. Supp. 3d 210, 223 (N.D. Cal. 2019). The second element requires the
6  plaintiff to allege "(1) when the fraud was discovered; (2) the circumstances under which it was
7  discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or
8  presumptive knowledge of facts sufficient to put him on inquiry." *In re Ford Tailgate Litig.*, No.
9  11-CV-2953-RS, 2014 WL 1007066, at *8 (N.D. Cal. Mar. 12, 2014). As this Court has
10 previously noted, this generally requires allegations of "active conduct by a defendant, above and
11 beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from
12 suing in time." *Felix v. Anderson*, No. 14-CV-03809-HSG, 2016 WL 3540980, *4 (N.D. Cal.
13 June 29, 2016). Here, Plaintiff makes no attempt in the CAC or in his opposition to identify any
14 such allegations. Although he suggests in his opposition that Defendants' ongoing statements
15 about their ADAS technology may have concealed the true nature and timeline of their
16 technology, he provides no specificity or actual allegations to support this contention.

17 As for equitable estoppel, Plaintiff similarly states that given Tesla's ongoing
18 misstatements, he "should not be penalized for believing Tesla or giving it the benefit of the
19 doubt" about the status of the technology. *See* Dkt. No. 37 at 14. But as already explained, the
20 complaint does not state that Plaintiff was even aware of Defendants' subsequent misstatements,
21 let alone that they somehow lulled him into waiting five years to file a case against them.
22 Plaintiff's bare suggestion that he *may* be able to establish that a tolling doctrine applies to his
23 claims is simply insufficient.

24                    *       *       *

25 The Court finds that Plaintiff's claims are barred by the applicable statutes of limitations
26 on the face of the complaint, and **GRANTS** the motion to dismiss. Dkt. No. 30. It is not clear at
27 this time that Plaintiff can amend his complaint to address these deficiencies, but out of an
28 abundance of caution the Court will provide Plaintiff with an opportunity to do so.

## IV. MOTION FOR PRELIMINARY INJUNCTION

### A. Legal Standard

A plaintiff seeking preliminary relief must establish: (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Preliminary relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. A court must find that "a certain threshold showing" is made on each of the four required elements. *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011). Under the Ninth Circuit's sliding scale approach, a preliminary injunction may issue if there are "serious questions going to the merits" if "a hardship balance [also] tips sharply towards the [movant]," and "so long as the [movant] also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

### B. Discussion

Plaintiffs sought a preliminary injunction requiring Defendants to take several steps regarding their ADAS technology, including (1) no longer marketing their ADAS technology as providing "Full Self Driving Capability"; (2) no longer selling and instead de-activating their beta software; and (3) alerting all customers that Tesla's use of terms like "Full Self Driving Capability," "self-driving," and "autonomous" to describe the ADAS technology was inaccurate. *See generally* Dkt. No. 42. The Court has compelled the claims of four of the five Plaintiffs to arbitration, and dismissed the remaining Plaintiff's claims as barred by the statutes of limitations. Given this current posture, Plaintiffs cannot establish that the "extraordinary remedy" of a preliminary injunction is warranted. The Court therefore **DENIES** the motion.

## V. CONCLUSION

Accordingly, the Court **GRANTS** the motion to compel arbitration as to Plaintiffs Broussard, Battiato, Mallow, and Imaguchi and **GRANTS** the motion to dismiss Plaintiff LoSavio's claims. Dkt. No. 30. The Court **DENIES** the motion for preliminary injunction. Dkt. No. 42. Plaintiff LoSavio may amend the complaint within 21 days of the date of this order if he

can do so consistent with counsel's Rule 11 obligations.

The Court further **SETS** a case management conference on November 21, 2023, at 2:00 p.m. All counsel shall use the following dial-in information to access the call:

Dial-In: 888-808-6929;

Passcode: 6064255

All attorneys and pro se litigants appearing for a telephonic case management conference are required to dial in at least 15 minutes before the hearing to check in with the courtroom deputy. For call clarity, parties shall NOT use speaker phone or earpieces for these calls, and where at all possible, parties shall use landlines.

The Court further **DIRECTS** the parties to meet and confer and submit a joint case management statement by November 14, 2023.

**IT IS SO ORDERED.**

Dated: September 30, 2023

HAYWOOD S. GILLIAM, JR.
United States District Judge