1  FRANK M. PITRE (SBN 100077)
fpitre@cpmlegal.com
2  JULIE L. FIEBER (SBN 202857)
jfieber@cpmlegal.com
3  NABILAH A. HOSSAIN (SBN 329689)
nhossain@cpmlegal.com
4  ANDREW F. KIRTLEY (SBN 328023)
akirtley@cpmlegal.com
5  **COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
6  840 Malcolm Road
Burlingame, CA 94010
7  Telephone: (650) 697-6000
Fax: (650) 697-0577
8
9
10  FRANCIS A. BOTTINI, JR. (SBN 175783)
fbottini@bottinilaw.com
11  NICHOLAUS H. WOLTERING (SBN 337193)
nwoltering@bottinilaw.com
12  **BOTTINI & BOTTINI, INC.**
7817 Ivanhoe Avenue, Suite 102
13  La Jolla, CA 92037
Telephone: (858) 914-2001
14  Fax: (858) 914-2002
15
16  *Attorneys for Plaintiff and the Proposed Class*

DAVID S. CASEY, JR. (SBN 060768)
dcasey@cglaw.com
GAYLE M. BLATT (SBN 122048)
gmb@cglaw.com
JEREMY ROBINSON (SBN 188325)
jrobinson@cglaw.com
P. CAMILLE GUERRA (SBN 326546)
camille@cglaw.com
MICHAEL J. MORPHEW (SBN 304463)
mmorphew@cglaw.com
**CASEY GERRY SCHENK FRANCAVILLA**
**BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811

17  **UNITED STATES DISTRICT COURT**

18  **NORTHEN DISTRICT OF CALIFORNIA**

19

20  **In re Tesla Advanced Driver Assistance Systems Litigation**
21
22
23  This Case Relates To All Actions
24

Case No. 4:22-cv-05240-HSG

**CLASS ACTION**

**CONSOLIDATED SECOND AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

25
26
27
28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ......................................................................... 7

III.    PARTIES ............................................................................................................ 9

     A.   Plaintiff ................................................................................................... 9

     B.   Defendants ............................................................................................ 10

IV.     AGENCY, JOINT VENTURE, AIDING AND ABETTING, AND CONSPIRACY ........ 12

V.      FACTUAL ALLEGATIONS .......................................................................... 13

     A.   The Technology of Autonomous Vehicles ......................................... 13

     B.   Tesla's First-Generation "Autopilot" Technology .......................... 17

     C.   Tesla's Release of "Enhanced Autopilot" and "Full-Self-Driving Capability" ............. 22

     D.   Year After Year, Tesla Fails to Deliver on Its Promise of a Fully Self-Driving Car, Instead Providing Experimental Software that Kills and Maims Drivers ...................... 26

     E.   Federal and State Authorities Launch Numerous Investigations and Actions Regarding Tesla's Autopilot and FSD Technology ........................................ 47

          1.   The NHTSA significantly expands its investigations into Autopilot and FSD ...... 47

          2.   The FTC says Tesla's Autopilot and FSD is "on its radar" ................ 48

          3.   The California DMV charges Tesla with untrue and deceptive marketing of its Autopilot and FSD technology ...................... 49

          4.   The U.S. Department of Justice launches a criminal investigation ........................ 49

VI.     CLASS ACTION ALLEGATIONS.................................................................. 50

VII.    TOLLING OF THE STATUTES OF LIMITATIONS .................................. 54

VIII.   CLAIMS FOR RELIEF ................................................................................... 64

     FIRST CLAIM FOR RELIEF .............................................................................. 64
     Breach of Express Warranty
     Cal. Civ. Code §§ 1791.2(a), 1794

     SECOND CLAIM FOR RELIEF .......................................................................... 65
     Breach of Implied Warranties
     Cal. Civ. Code §§ 1791.1, 1792, 1794

THIRD CLAIM FOR RELIEF ............................................................................68
Violation of the California False Advertising Law
Cal. Bus. & Prof. Code § 17500, *et seq.*

FOURTH CLAIM FOR RELIEF .........................................................................70
Violation of the California Consumer Legal Remedies Act
Cal. Civ. Code § 1750, *et seq.*

FIFTH CLAIM FOR RELIEF ..............................................................................72
Violation of the California Unfair Competition Law
Cal. Bus. & Prof. Code § 17200, *et seq.*

SIXTH CLAIM FOR RELIEF ..............................................................................76
Fraud and Deceit

SEVENTH CLAIM FOR RELIEF ........................................................................77
Negligent Misrepresentation

EIGHTH CLAIM FOR RELIEF ...........................................................................78
Negligence

NINTH CLAIM FOR RELIEF ..............................................................................79
Unjust Enrichment

IX.    **PRAYER FOR RELIEF** .....................................................................................**80**

X.    **DEMAND FOR JURY TRIAL** ..........................................................................**81**

1    Plaintiff Thomas LoSavio, on behalf of himself and the plaintiff Class described herein, brings

2  this Consolidated Second Amended Complaint against Defendants Tesla, Inc., dba Tesla Motors, Inc.,

3  Tesla Lease Trust, and Tesla Finance LLC (collectively, "Defendants" or "Tesla"), and alleges as

4  follows:

5  **I.    INTRODUCTION**

6    1.    Plaintiff brings this consumer class action lawsuit to hold Tesla and its representatives,

7  including CEO Elon Musk, accountable for years of making misleading and deceptive statements

8  regarding the company's advanced driver assistance systems ("ADAS") technology. For years, Tesla

9  has deceptively and misleadingly marketed its ADAS technology as autonomous driving technology

10  under various names, including "Autopilot," "Enhanced Autopilot," and "Full Self-Driving

11  Capability" ("FSD"), the latter two of which Tesla charges consumers thousands of additional dollars

12  to add to their new vehicle. Tesla has deceived and misled consumers regarding the current abilities of

13  its ADAS technology and by representing that it was perpetually on the cusp of perfecting that

14  technology and finally fulfilling its promise of producing a fully self-driving car. Although these

15  promises have proven false time and time again, Tesla and Musk have continued making them to

16  generate media attention, to deceive consumers into believing it has unrivaled cutting-edge

17  technology, and to establish itself as a leading player in the fast-growing electric vehicle market.

18    2.    Despite portraying itself as a leader in autonomous vehicle technology, Tesla's ADAS

19  features have been surpassed by numerous automaker competitors that have developed autonomous

20  driving technology far more advanced than Tesla's, and now available in some consumer markets. At

21  the same time, former Tesla employees and investigations have revealed damning information that

22  now makes clear that, contrary to Tesla's repeated promises that it would have a fully self-driving car

23  within months or a year, Tesla has never been remotely close to achieving that goal.

24    3.    For example, to accompany the 2016 launch of Tesla's "Enhanced Autopilot" and

25  "Full Self-Driving" versions of its ADAS technology, much of the Tesla Autopilot engineering team

26  dropped everything to produce a video that purports to show a Tesla car driving itself. The video

27  begins with the following message: "The person in the driver's seat is only there for legal reasons. He

28  is not driving anything. The car is driving itself." In reality, Tesla employees who made the video

would later reveal that the car in the video had significant assistance from commercial mapping software not available to Tesla customers, and that the car still performed poorly and even ran into a fence during filming. Despite this assistance, the car had to run the same route over and over again before Tesla got acceptable video that appeared to show a car capable of driving itself. Even though the video was debunked as deceptive and misleading years ago, Tesla continues to prominently feature it on its website.





*Source: www.tesla.com/autopilot*

4.      Six years later in 2022, Tesla has yet to produce anything even remotely approaching a fully self-driving car. Instead, Tesla pushes out "updates" to its experimental FSD Beta software to a small minority of Tesla owners, who effectively act as untrained test engineers testing experimental

software on public roadways. Drivers have consistently found that Tesla's FSD Beta software has myriad problems, such as cars failing to make routine turns, running red lights, and steering directly into large objects and oncoming traffic.[1] There have also been numerous collisions involving Tesla's purportedly cutting-edge ADAS software, including Tesla vehicles plowing at high speeds into large stationary objects such as emergency vehicles and an overturned box truck. Dozens of people have suffered fatal and other serious injuries as a result of these ADAS-related collisions, triggering a host of investigations by state and federal regulators.



*Fatal 2018 crash involving Autopilot, in which Tesla's software suddenly steered the Tesla to the left, directly into a concrete barrier on a highway in Mountain View, California. Photograph by NTSB.*



*2018 crash in which Tesla's software crashed the vehicle into the back of a firetruck stopped at a red light in Utah. Photograph by South Jordan Police Department.*

---

[1] *See, e.g.*, The Dawn Project, "Unsafe at Any Speed," https://dawnproject.com/dan-odowds-ads-for-his-campaign/ (collecting video clips showing such problems).

**Consolidated Second Amended Complaint**
Case No. 4:22-cv-05240-HSG

3

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

1
2
3
4
5
6
7
8
9
10
11



*2020 crash involving Autopilot, in which the Tesla drove into an overturned box truck on a highway in Taiwan.*[2]

12      5.      As information has trickled out of the secretive company via former employees and

13  investigations, it has become increasingly clear that Tesla knew for years its statements regarding its

14  ADAS technology were deceptive and misleading, but the company made them anyway. Tesla did so

15  to generate excitement about the company's vehicles and thereby improve its financial condition by,

16  among other things, attracting investment, increasing sales, avoiding bankruptcy, driving up Tesla's

17  stock price, and helping to establish Tesla as a dominant player in the electric vehicle market.

18      6.      For example, in 2016, Musk tweeted a bold prediction—that a Tesla vehicle would

19  complete a fully self-driving trip *across the United States* by "next year." Later in 2016, Tesla

20  announced on its official blog that "All Tesla Cars Being Produced Now Have Full Self-Driving

21  Hardware." The blog post included the misleading October 2016 video of a Tesla car purportedly

22  driving itself without incident, and suggested that Tesla was on the cusp of bringing to market "[s]elf-

23  driving vehicles" that have "[f]ull autonomy."[3] When Tesla and Musk made these statements, they

24  knew there was no reasonable chance of Tesla being able to meet these forecasts.

25

26  [2] *See* Brad Templeton, "Tesla In Taiwan Crashes Directly Into Overturned Truck, Ignores Pedestrian, With
    Autopilot On," *Forbes* (June 2, 2020), *available at* https://www.forbes.com/sites/bradtempleton/2020/06/02
27  /tesla-in-taiwan-crashes-directly-into-overturned-truck-ignores-pedestrian-with-autopilot-on/ (includes
    surveillance video showing the collision).
28  [3] *See* The Tesla Team, "All Tesla Cars Being Produced Now Have Full Self-Driving Hardware," https://
    www.tesla.com/blog/all-tesla-cars-being-produced-now-have-full-self-driving-hardware (Oct. 19, 2016).

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**Consolidated Second Amended Complaint**
Case No. 4:22-cv-05240-HSG

4

1
2
3
4
5
6
7
8
9
10
11



*Musk making bold promises in 2016. Photograph by Justin Sullivan/Getty Images.[4]*

12      7.      From approximately 2017 to 2019, the page on Tesla's website explaining its "Full

13  Self-Driving Capability" technology similarly promised that consumers who purchased or leased cars

14  with the FSD version of its ADAS technology would receive cars capable of "full self-driving in

15  almost all circumstances," including being able to "conduct short and long distance trips with no

16  action required by the person in the driver's seat" and with a "probability of safety at least twice as

17  good as the average human driver." On the same webpage, Tesla went on to state:

18              **All you will need to do is get in and tell your car where to go.** If you
19              don't say anything, the car will look at your calendar and take you there
                as the assumed destination or just home if nothing is on the calendar. **Your**
20              **Tesla will figure out the optimal route, navigate urban streets (even**
                **without lane markings), manage complex intersections with traffic**
21              **lights, stop signs and roundabouts, and handle densely pack freeways**
                **with cars moving at high speed.**
22

23      8.      Indeed, in every year since 2016, Tesla and Musk have repeatedly made deceptive and

24  misleading statements to consumers indicating that a fully self-driving, fully autonomous Tesla

25  vehicle was just around the corner, often expressly stating that would occur by the end of that

26

27  _____

28  [4] *See* Maya Kosoff, "Elon Musk: Self-Driving Car Doubters Are Literally 'Killing People,'" *Vanity Fair* (Oct.
    20, 2016), *available at* https://www.vanityfair.com/news/2016/10/elon-musk-self-driving-car-doubters-are-
    literally-killing-people.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

calendar year or within the "next year."[5] For example, in May 2019, after years of failing to deliver on prior promises, Musk again promised consumers that a fully self-driving Tesla car would be available by the end of that year, tweeting that "everyone with Tesla Full Self-Driving will be able" to take a fully automated trip in their Tesla from Los Angeles to New York.[6] While tens of thousands of U.S. and California consumers have purchased or leased new Tesla vehicles with ADAS technology in 2019 and every year since, Tesla has yet to deliver on its repeated promises of a fully self-driving car at *any* distance—much less a fully automated three-thousand-mile journey across the country.

        9.     The reality of Tesla's ADAS technology is far different from what Tesla and Musk have spent years telling consumers. Instead of providing its customers the "Full Self-Driving Capability" they paid for, Tesla uses them as untrained test engineers to test drive its experimental FSD Beta software on public roadways, which generates data that Tesla can use to improve its software. Along the way, scores of Tesla owners who believed Tesla's and Musk's deceptive and misleading statements about the capabilities of Tesla's ADAS technology have been killed and seriously injured when that technology failed, often in the face of routine roadway scenarios.

        10.    Even Tesla itself has admitted that "Full Self-Driving" is an inaccurate name. In response to California regulators' concerns about Musk's public announcements in late 2020 indicating that a new FSD Beta update would make Tesla vehicles autonomous, Tesla attorneys sent private emails to those regulators (later disclosed in response to Public Records Act requests) walking those statements back and making clear they were false. Tesla attorneys told the regulators that Tesla vehicles equipped with so-called "Full Self-Driving Capability" were not fully self-driving at all, but still required the driver to steer, brake, and accelerate as needed. In the meantime, Tesla and Musk continued their deceptive marketing to consumers.

        11.    Plaintiff is a California resident who purchased a new Tesla vehicle in 2017 and paid Tesla thousands of additional dollars above the vehicle base price for the Enhanced Autopilot and Full Self-Driving Capability versions of Tesla's ADAS technology. Tesla had represented its ADAS

---

[5] *See, e.g.*, The Dawn Project, "Elon Musk's broken promises," https://dawnproject.com/wp-content/uploads/2022/06/The-Dawn-Project-Musk-promises-1min-NA.mp4?_=2 (collecting video clips of Musk making such promises from 2014 to 2021).
[6] Elon Musk, https://twitter.com/elonmusk/status/1126611407984779264 (May 9, 2019, 3:14 PM).

**Consolidated Second Amended Complaint**
Case No. 4:22-cv-05240-HSG

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

1   technology would make its vehicles fully self-driving in some situations and would soon make them

2   fully self-driving in all situations. It is now years later, and Tesla has never provided Plaintiff anything

3   remotely approaching the fully self-driving car it promised.

4        12.    Plaintiff brings this class action lawsuit on behalf of himself and fellow consumers who

5   purchased or leased a new Tesla vehicle with Tesla's ADAS technology but never received the self-

6   driving car that Tesla promised them. Plaintiff brings claims against Tesla for violations of

7   California's False Advertising Law, Consumer Legal Remedies Act, and Unfair Competition Law, as

8   well as common law claims for fraud and deceit, negligent misrepresentation, negligence, and unjust

9   enrichment. Plaintiff seeks various relief on behalf of himself and the proposed Class, including

10  injunctive relief prohibiting Tesla from continuing its deceptive and misleading marketing of its

11  ADAS technology, restitution of the money Plaintiff and Class members paid for technology that

12  Tesla promised but never delivered, and all available damages including punitive damages to punish

13  Tesla for years of using deceptive and misleading marketing to eventually establish itself as a

14  dominant player in the electric vehicle market.

15  **II.**    **<u>JURISDICTION AND VENUE</u>**

16       13.    This Court has subject matter jurisdiction over this action under the Class Action

17  Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), as Plaintiff seeks damages and other relief on a

18  behalf of a class consisting of hundreds of thousands of individuals. This action meets CAFA's

19  jurisdictional requirements because the sum or value of the relief sought exceeds $5,000,000

20  exclusive of interest and costs, and because at least one Class member is a citizen of a state different

21  from Defendants under § 1332(d)(2)(A) and/or a citizen of a foreign state under § 1332(d)(2)(B).

22       14.    This Court has personal jurisdiction over Defendants because they have conducted and

23  continue to conduct substantial business in California, and have sufficient minimum contacts with

24  California in that (1) from the beginning of the Class Period (as defined herein) until December 2021,

25  Defendant Tesla, Inc. was headquartered in Palo Alto, California, and thus designed, developed,

26  manufactured, tested, and marketed its vehicles and ADAS technology at issue in this action in

27  California throughout that period; (2) throughout the Class Period, Tesla, Inc. tested and manufactured

28  a substantial percentage of the Class Vehicles (as defined herein) at its factory in Fremont, California;

(3) throughout the Class Period, Tesla, Inc. has been the direct or indirect owner and operator of dozens of retail Tesla stores in California (accounting for more than a quarter of Tesla stores nationwide) that market and sell or lease new Tesla vehicles, including a substantial percentage of Class Vehicles; (4) throughout the Class Period, California has been by far the largest U.S. market for sales and leases of new electric vehicles, including sales and leases of new Tesla vehicles and Class Vehicles; (5) throughout the Class Period, Defendants developed the marketing scheme at issue in this action in California and targeted California consumers with that marketing scheme, including deceptive and misleading statements about Tesla's vehicles and ADAS technology on Tesla's website and Musk's Twitter feed (the latter of which has been an official source of Tesla corporate information since at least 2013); (6) Tesla, Inc. is registered with the California Secretary of State to do business in the State of California, and is licensed by the California Department of Motor Vehicles as a vehicle dealer and a vehicle manufacturer; and (7) Defendants Tesla Finance LLC and Tesla Lease Trust have their principal places of business in California.



*Tesla's 5.3 million square foot factory in Fremont, California.*

15.     Venue is proper in the United States District Court for the Northern District of California under 28 U.S.C. § 1391(b)(1) because Defendants are subject to the Court's personal jurisdiction with respect to this action and therefore reside in this District for purposes of venue, under § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims

occurred in this District (including both Defendants' wrongful conduct and the resulting harm to Plaintiff and Class members residing in this District), and under § 1391(b)(2) because a substantial part of the property that is the subject of this action is situated in this District.

## III.   PARTIES

### A.   Plaintiff

16.     Plaintiff Thomas J. LoSavio is a resident of Hillsborough, California. He is a retired attorney with over 34 years of experience in business litigation. In or about January 2017, LoSavio purchased a new 2017 Tesla Model S in the State of California from Defendant Tesla, Inc. He paid Tesla $5,000 above the vehicle's base price for Tesla's "Enhanced Autopilot" ADAS package, and an additional $3,000 on top of that for the "Full Self-Driving Capability" ADAS package. LoSavio decided to purchase this vehicle with these ADAS packages after researching, reviewing, and relying on Tesla's online and other public statements, including those made by Musk, which were disseminated to LoSavio and other consumers throughout the State of California, the United States, and the world.

17.     LoSavio paid more than $100,000 for his vehicle and ADAS packages, which he considered to be a major purchase. It was certainly more than he had ever previously paid for a car. Accordingly, he did many hours of research over many weeks before making the purchase decision. LoSavio's decision to purchase his car notwithstanding the high cost was motivated in significant part by his concern that, as an older driver, driving might become more difficult for him with age, particularly night driving, and so he was very interested in a car that would soon be able to drive itself, using technology Tesla would continually improve over time with over-the-air software updates delivered to his vehicle. LoSavio's purchase was motivated by Tesla's representations that its ADAS technology was already as safe as, or safer than, a human driver, and that it would only continue to get safer over time. This addressed LoSavio's concern that his driving abilities and reflexes might deteriorate a little as he aged, which might make driving less safe for him and others, in which case it would be great to have a safer self-driving car.

18.     LoSavio understood at the time of his purchase, based on statements from Tesla and Musk that he had seen before the purchase, that Tesla's self-driving software was still being refined

and validated and was not quite yet ready for widespread consumer use, but that it would ready for

Tesla owners to use within a year or two after his purchase, at which point his Tesla would be capable

of driving itself in at least some circumstances, and that Tesla's self-driving technology would only

continue to expand and improve over the life of his car, with Tesla regularly delivering improvements

and expanded self-driving abilities to his vehicle via over-the-air software updates. Considering

Tesla's and Musk's representations that he had seen before his purchase, in context with his intention

to own his Tesla for at least 10 years, LoSavio purchased his Tesla and the full suite of ADAS

packages because, although he knew that his vehicle would not be self-driving at the time of purchase,

he believed that it would be self-driving within a year or two, or some other reasonably short time,

after his purchase, such that he would be able to enjoy a continually improving self-driving car for the

majority of the years that he expected to own the car.

19.     Based on his reasonable reliance on Tesla's and Musk's representations that Tesla

would have self-driving technology for Tesla owners to use within a year or two, or some other

reasonably short period, after his purchase, LoSavio purchased his Tesla vehicle and paid Tesla an

additional $8,000 for the right to receive perpetual future updates for all of Tesla's available ADAS

technology packages, including its flagship Full Self-Driving, in January 2017. By buying FSD for

$8,000 a little before it would be available for Tesla owners' use, LoSavio believed he was saving

himself money in the long run based on statements from Tesla and Musk that he had seen indicating

that company would increase the price of FSD as the software improved and cars became fully self-

driving in next year or two. By purchasing FSD just a year or two before Tesla and Musk were saying

it would begin to make cars self-driving, LoSavio thought he was saving himself money in the long

run and that he would soon have a self-driving car.

**B.      Defendants**

20.     Defendant Tesla, Inc., dba Tesla Motors, Inc., is a Delaware corporation that had its

principal place of business in Palo Alto, California, from approximately 2003 until December 1, 2021,

at which point it moved its principal place of business to Austin, Texas. Defendant designs, develops,

manufactures, tests, markets, distributes, sells, and leases electric vehicles under the brand name

1    "Tesla." Defendant also offers services related to those vehicles, including designing, developing, and

2    periodically sending over-the-air updates for the ADAS software in Tesla vehicles.

3        21.    Tesla, Inc. has a vertically integrated business model. For example, instead of using

4    traditional dealerships, Tesla has vertically integrated "Stores" and "Galleries" where customers can

5    see vehicles before ordering them through the Tesla website. More specifically: (a) Tesla designs,

6    develops, manufactures, and tests its electric vehicles and the ADAS software on those vehicles. This

7    includes all versions of Tesla's ADAS technology (e.g., Autopilot, Enhanced Autopilot, FSD), which

8    were and are designed, developed, manufactured, and tested by Tesla in the State of California at its

9    Palo Alto offices, Fremont factory, and other California offices and facilities. On information and

10   belief, all or a substantial majority of the Class Vehicles (as defined herein) were manufactured and

11   tested in California. (b) Tesla markets its vehicles on its website, in marketing materials, in its brick-

12   and-mortar galleries and showrooms, and through the tweets, media interviews, new conferences,

13   earnings calls, conferences, forums, and other public events and statements by its representatives and

14   agents, including Elon Musk, all of which are intended and designed to generate media coverage, and

15   have been historically successful at doing so. (c) Tesla sells and leases its electric vehicles directly to

16   consumers, including through its website and retail stores, which Tesla owns and operates.

17       22.    Tesla, Inc. does not use conventional advertising. Instead, the company's marketing

18   strategy relies on Musk's high public profile and Musk's Twitter account to generate buzz for its

19   products. Musk's Twitter account has been an official source of Tesla corporate information since at

20   least 2013 and has long had tens of millions of followers, reaching 100 million followers as of June

21   2022 and 160 million followers today. Musk is a widely known public persona whose public

22   statements, including those alleged herein, routinely are the subject of significant media coverage by a

23   great variety of online, television, radio, and print media, resulting in Musk's statements reaching an

24   enormous audience on a virtually daily basis.

25       23.    Defendant Tesla Lease Trust is a Delaware statutory trust, and its initial beneficiary is

26   Tesla Finance LLC. Tesla Lease Trust is the title holder to the Tesla vehicles that are leased under a

27   leasing program managed by Tesla Finance LLC. Tesla Lease Trust has its principal place of business

28   in Palo Alto, California.

24.     Defendant Tesla Finance LLC is a wholly owned subsidiary of Tesla, Inc., and is the beneficial owner of the leasing assets held in Trust by Tesla Lease Trust and, as an agent of the Tesla Lease Trust, originates, services, administers, and collects leases for Tesla Lease Trust. Tesla Finance LLC is incorporated in Delaware and has its principal place of business in Palo Alto, California.

## IV.     AGENCY, JOINT VENTURE, AIDING AND ABETTING, AND CONSPIRACY

25.     On information and belief, Plaintiff alleges that at all relevant times herein, Defendants conspired with currently unidentified co-conspirators in carrying out the wrongful conduct alleged herein, and that all such unidentified co-conspirators were Defendants' agents, employees, and/or joint venturers, and were at all times acting within the course and scope of said agency, employment, and/or joint venture.

26.     Each Defendant and unidentified co-conspirators took actions that aided and abetted, encouraged, and rendered substantial assistance in accomplishing the wrongful conduct, wrongful goals, and other wrongdoing alleged herein. In taking these actions, each Defendant and unidentified co-conspirator acted with an awareness of his/her primary wrongdoing and realized his/her conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and other wrongdoing. In addition, each act and omission comprising the aforementioned wrongful conduct, wrongful goals, and other wrongdoing was made known to, and ratified by, each of the Defendants.

27.     Each Defendant and unidentified co-conspirator conspired with each other and with others to perpetrate the unlawful scheme on Plaintiff and Class members, as alleged herein. In doing so, each Defendant and unidentified co-conspirator have committed acts and omissions, including but not limited to making materially false, misleading, and deceptive statements and omissions, while acting within the scope and in furtherance of the conspiracy alleged herein, and with full knowledge of the goals of that conspiracy.

28.     Plaintiff reserves the right to amend this Complaint when he learns the identities of currently unidentified co-conspirators, and Plaintiff intends to sue each Defendant and co-conspirator as participants, alter egos, agents, and conspirators with one another in the wrongful acts, omissions, plans, schemes, and transactions alleged herein.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1

## V.      FACTUAL ALLEGATIONS

2

### A.      The Technology of Autonomous Vehicles

3

29.      SAE International, formerly the Society of Automotive Engineers, is a U.S.-based

4  professional association and standards development organization founded in the early 20th century.

5  In 2014, SAE International took a leading role in the development of autonomous vehicle technology

6  standards by publishing the initial version of *SAE J3016 Recommended Practice: Taxonomy and*

7  *Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles*,

8  commonly referred to as the SAE Levels of Driving Automation ("SAE Levels"). Following this,

9  SAE International published revised versions of the SAE Levels in 2016, 2018, and 2021.[7]

10

30.      The SAE Levels provide a taxonomy of vehicle driving automation systems with

11  detailed definitions for six levels for driving automation, ranging from no driving automation (SAE

12  Level 0) to full driving automation (SAE Level 5). The SAE Levels can be summarized as follows:

13  **Level 0: No Driving Automation.** The human driver performs all driving tasks (steering,

14  acceleration, braking, etc.), although vehicles may have safety features like automatic emergency

15  braking and forward collision warning. **Level 1: Driver Assistance.** The vehicle has features that

16  provide a small degree of automation over the vehicle's acceleration, braking, or steering (e.g.,

17  adaptive cruise control, lane-keeping assistance). **Level 2: Partial Driving Automation.** The vehicle

18  can perform multiple driving tasks (e.g., acceleration, steering) but remains under the human driver's

19  constant supervision, responsibility, and control. **Level 3: Conditional Driving Automation.** The

20  vehicle can take full control of certain driving tasks such that the human driver need not remain

21  constantly alert but must be ready to intervene upon request from the vehicle. **Level 4: High Driving**

22  **Automation.** The vehicle can perform all driving tasks in specific locations or environments, but

23  human override is still an option. **Level 5: Full Driving Automation.** The vehicle can perform all

24  driving tasks under all conditions, with zero human attention or interaction required. The SAE Levels

25  are summarized in the following graphic from *The Wall Street Journal*.

26

27

28

---

[7] *See* SAE International, *Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles* (revised Apr. 30, 2021), https://www.sae.org/standards/content/j3016_202104.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP



31.     The SAE Levels are a widely accepted international standard and have been adopted by regulatory agencies such as the National Transportation Safety Board ("NTSB"), National Highway Traffic Safety Administration ("NHTSA"), and U.S. Department of Transportation.

32.     SAE International refers to SAE Level 1 and 2 technologies as systems or features that provide "driver support" (see below in blue), whereas it refers to SAE Level 3, 4, and 5 technologies as systems or features that provide "automated driving" (see below in green). When SAE International published the current version of the SAE Levels in 2021, it summarized the revised SAE Levels in the following graphic, which emphasizes that for SAE Level 2 driver-support features, "You <u>are</u> driving whenever these driver support features are engaged" and "You must constantly supervise these support features."[8]

---

[8] SAE International, "SAE Levels of Driving Automation Refined for Clarity and International Audience" (May 3, 2021), https://www.sae.org/blog/sae-j3016-update.

33.      In May 2022, NHTSA published the following graphic summarizing the SAE Levels, which drives home many of the same points as the 2021 SAE International graphic—i.e., that at SAE Levels 0 to 2, the driver is fully responsible for the driving the car ("You drive, you monitor"), whereas autonomous technology does not begin until SAE Level 3 ("System drives, you must be able to take over upon request"), and fully self-driving technology does not occur until SAE Levels 4 and 5 ("system drives, you ride").[9]

---

[9] NHTSA, "Levels of Automation" (May 2022), *available at* https://www.nhtsa.gov/sites/nhtsa.gov/files/2022-05/Level-of-Automation-052522-tag.pdf.

34.     While Tesla and Musk have routinely promised Tesla's SAE Level 2 ADAS technology (including Autopilot and FSD) would rapidly advance to SAE Level 5 abilities within a year or other short period of time, Tesla's technology has never advanced beyond SAE Level 2.

35.     While Tesla has spent year after year stuck at SAE Level 2, other vehicle manufacturers have successfully designed and developed SAE Level 3 features, including Audi in

2017, Honda in 2021, and Mercedes-Benz in 2021. When the Consolidated Amended Class Action Complaint was filed in this matter in October 2022, Honda and Mercedes-Benz both offered automobiles with Level 3 features for sale or lease to the public in their respective home markets of Japan and Europe, Waymo was operating a limited SAE Level 4 taxi service on public roadways in some areas of Phoenix (since 2018) and San Francisco (since 2021), and Cruise was operating a fully driverless robotaxi service in San Francisco (since 2022). Between then and the filing of this Complaint in October 2023, those companies have continued to expand their technologies and receive increased regulatory approval to operate SAE Level 3 and higher technologies on public roadways, including expanded driverless commercial taxi services. All the while, Tesla's technology has remained stuck at SAE Level 2.

36.     Driving automation technologies at all SAE Levels require the use of vehicle-mounted sensors to gather data about the surrounding environment, including sensors such as cameras, radar, and lidar (light detecting and ranging). Tesla's Level 2 technology relies heavily on cameras (with limited assistance from a single forward-facing radar unit). To date, all Level 3 or higher technologies have used a combination of cameras, radar, and lidar. There has long been an expert consensus that truly autonomous, self-driving cars cannot be achieved without some reliance on expensive lidar technology, but Tesla has always refused to use lidar.

**B.     Tesla's First-Generation "Autopilot" Technology**

37.     In 2003, Tesla was founded by Martin Eberhard and Marc Tarpenning. The following year, PayPal co-founder Elon Musk made a substantial investment in Tesla and became chairman of the company's board. Tesla will later refer to Musk as a "co-founder" of the company.

38.     In 2008, Musk became Tesla's Chief Executive Officer ("CEO"), and Tesla released the Roadster, which was the first mainstream electric vehicle powered by lithium-ion batteries.

39.     In 2012, Tesla released its Model S sedan.

40.     In 2014, Tesla began equipping its Model S sedan with hardware that (although the necessary software was not yet active) was intended to allow vehicles to automate some steering, braking, and acceleration functions. Consistent with widely used industry terminology, Tesla originally called this feature "advanced driver assistance" before Tesla executives led by Musk

1    decided to change the name to "Autopilot." Tesla engineers expressed concerns that the name was

2    misleading and suggested less misleading options such as "Copilot," which Tesla rejected.[10]

3          41.    Tesla's "Autopilot" technology is based on two driver assistance technologies

4    developed by other automakers in the 1990s. The first is adaptive cruise control ("ACC") technology,

5    versions of which were debuted by Toyota and Mercedes-Benz in the 1990s. ACC uses radar to warn

6    the driver if a vehicle ahead is slowing down and automatically brakes if the driver fails to take

7    sufficient responsive action. Contemporary ACC technology also has the ability to follow a forward

8    vehicle at a pre-selected time gap, up to a driver-selected speed. ACC is an SAE Level 1 feature.[11]

9          42.    The second driver-assistance technology on which Autopilot is based is lane keeping

10   assistance ("LKA"). LKA evolved from lane departure warning ("LDW") technology, which was

11   developed in the 1990s and first appeared on commercial vehicles in Europe in 2000. LDW warns the

12   driver if the vehicle crosses a painted line on the roadway, whereas LKA controls steering inputs to

13   keep a vehicle in its lane. LKA is an SAE Level 1 feature.

14         43.    On October 2, 2014, CNN Business published video of portions of an interview with

15   Musk, in which Musk represented that "[a] Tesla car next year will probably be 90 percent capable of

16   Autopilot. Like, so 90 percent of your miles can be on auto. For sure highway travel."[12]

17         44.    In October 2015, Tesla released its Autopilot version 7.0 software, which enabled

18   Autopilot on Model S vehicles. In public comments surrounding the release, Musk stated: "We're

19   being especially cautious at this stage, so we're advising drivers to keep their hands on the wheel just

20   in case."[13] Shortly before the release of Autopilot v7.0, the head of the Autopilot project, Robert

21   Rose, resigned. Another Tesla Autopilot engineer who had worked on safety features, Evan Nakano,

22   objected internally that Autopilot was not ready for release and also resigned in protest when Tesla

23   ignored his concerns. In a resignation letter circulated widely among Tesla employees, Nakano

24

25   [10] Cade Metz & Neal E. Boudette, "Inside Tesla as Elon Musk Pushed an Unflinching Vision for Self-Driving
     Cars," *The New York Times* (Dec. 6, 2021), *available at* https://www.nytimes.com/2021/12/06/technology/tesla-
26   autopilot-elon-musk.html; Tesla, "Tesla Self-Driving Demonstration" (Nov. 18, 2016), https://www.tesla.com
     /videos/autopilot-self-driving-hardware-neighborhood-long.
27   [11] *See* NHTSA, "Automated Vehicles for Safety: The Road to Full Automation," https://www.nhtsa.gov
     /technology-innovation/automated-vehicles-safety#the-topic-road-to-full-automation.
28   [12] CNN Business, https://twitter.com/CNNBusiness/status/517738916892270592 (Oct. 2, 2014, 11:12 AM).
     [13] Alexandria Sage & David Ingram, "Tesla mixes warnings and bravado about hands-free driving," *Reuters*
     (July 1, 2016), https://www.reuters.com/article/tesla-autopilot-drivers-idCNL1N19N1U5.

charged that Autopilot's development and release had been based on "reckless decision making that has potentially put customer lives at risk."[14]

45.     By December 2015, Musk was publicly stating that Tesla vehicles would drive themselves within about two years. He told *Fortune* magazine, "I think we have all the pieces, and it's just about refining those pieces, putting them in place, and making sure they work across a huge number of environments—and then we're done. It's a much easier problem than people think it is."[15]

46.     In January 2016, Musk announced on a conference call with reporters that Autopilot was "probably better" than a human driver. He stated that Tesla vehicles would be able to drive significantly better than humans within two to three years, and that within approximately two years drivers would be able to use Tesla's "Summon" feature, which allows drivers to remotely instruct their vehicle to drive to a specified location, to summon a vehicle from the other side of the country.[16]



47.     Ten days later, on January 20, 2016, 23-year-old Gao Yaning, who had a history of relying on Autopilot to drive, was killed in China on the way home from a family wedding when his Tesla Model S crashed at full speed on a highway into the back of a large street sweeper. The facts of the accident strongly indicate that Autopilot was engaged at the time of the crash.[17]

---

[14] Ianthe Jeanne Dugan & Mike Spector, "Tesla's Push to Build a Self-Driving Car Sparked Dissent Among Its Engineers," *The Wall Street Journal* (Aug. 24, 2017), *available at* https://www.wsj.com/articles/teslas-push-to-build-a-self-driving-car-sparks-dissent-among-its-engineers-1503593742.

[15] Kristen Korosec, "Elon Musk Says Tesla Vehicles Will Drive Themselves in Two Years," *Fortune* (Dec. 21, 2015), *available at* https://fortune.com/2015/12/21/elon-musk-interview/.

[16] Elon Musk, https://twitter.com/elonmusk/status/686279251293777920 (Jan. 10, 2016, 12:11 PM).

[17] Neal Boudette, "Autopilot cited in Death of Chinese Tesla Driver," *The New York Times* (Sept. 14, 2016), *available at* https://www.nytimes.com/2016/09/15/business/fatal-tesla-crash-in-china-involved-autopilot-government-tv-says.html.

48.    In February 2016, Consumer Reports tested Tesla's new Summon feature, which Tesla claimed makes the car able to drive itself for short distances without anyone in the car, such as to enter or leave a parking space or garage. Although Consumer Reports had previously given Tesla vehicles rave reviews (scoring Tesla's Model S a 99 out of 100 and calling it "the best car we have ever tested" in 2013, and scoring a another version of the Model S even higher in 2015), this time Consumer Reports' testing revealed that the Summon feature failed to detect "several large objects that a homeowner might leave in a driveway or on the floor of a garage—such as a duffel bag and bicycle—and the car failed to stop before hitting them." Consumer Reports' testers also encountered other problems related to difficulties they had remotely stopping the car, which resulted in damage to one of the car's wheels and raised significant safety concerns.[18]

49.    In July 2016, Musk announced that Autopilot's performance was now "almost twice as good as a person."[19]

50.    On May 7, 2016, Tesla driver Joshua Brown was killed in Florida when the Autopilot on his Tesla Model S failed to recognize a tractor-trailer crossing in front his car, which resulted in Brown's car striking and passing under the trailer at 74 mph.[20] The top third of Brown's car was sheared off (pictured below). Brown was a Tesla enthusiast who had previously made videos of himself using Autopilot, one of which was retweeted by Elon Musk just a few weeks earlier.[21] Tesla later publicly stated that the Autopilot software on Brown's car failed to detect the white tractor-trailer because it could not distinguish it from the bright sky. Several months later, in September 2016, Tesla would announce it was confident it had fixed the issue in version 8 of its Autopilot software by

---

[18] Jake Fisher, "Tesla to Fix Self-Parking Feature After Consumer Reports Raises Safety Concern," *Consumer Reports* (Feb. 10, 2016), *available at* https://www.consumerreports.org/car-safety/tesla-fixes-self-parking-feature-after-consumer-reports-raises-safety-concern/.

[19] Sage & Ingram, *supra* note 13.

[20] NTSB, Investigation No. HWY16FH018, Dkt. No. 2, "Crash Summary Report" (June 19, 2017), *available at* https://data.ntsb.gov/Docket/Document/docBLOB?ID=40453253&FileExtension=.PDF&FileName=Crash%20Summary-Master.PDF.

[21] Rachel Abrams & Annalyn Kurtz, "Joshua Brown, Who Died in Self-Driving Accident, Tested Limits of His Tesla," *The New York Times* (July 1, 2016), *available at* https://www.nytimes.com/2016/07/02/business/joshua-brown-technology-enthusiast-tested-the-limits-of-his-tesla.html.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1  increasing the system's reliance on radar so that it "would see a large metal object across the road."[22]



*Joshua Brown's Tesla Model S following the fatal crash. Photograph by NTSB/Florida Highway Patrol.*

51.    Less than a month later, on June 2, 2016, Musk confidently announced that "autonomous driving" was "basically a solved problem," and reiterating that Tesla's Autopilot software was already safer than a human driver on highways. "I think we're basically less than two years away from complete autonomy—*complete*," Musk said.[23]

52.    On July 14, 2016, Consumer Reports took the unusual step of publicly calling on Tesla to take certain actions. It urged Tesla to "change the name of the Autopilot feature because it promotes a potentially dangerous assumption that the Model S is capable of driving on its own." Instead of using the "misleading" name Autopilot, Consumer Reports urged Tesla to "name automated features with descriptive, not exaggerated, titles."[24]

53.    On July 20, 2016, Tesla's official blog published a post by Musk, in which he misleadingly suggests that lack of regulatory approval was a major challenge Tesla was facing in bringing to market fully self-driving vehicles: "When true self-driving is approved by regulators, it

---

[22] Neal Boudette, "Elon Musk Says Pending Tesla Updates Could Have Prevented Fatal Crash," *The New York Times* (Sept. 11, 2016), *available at* https://www.nytimes.com/2016/09/12/business/elon-musk-says-pending-tesla-updates-could-have-prevented-fatal-crash.html.

[23] Recode, "Elon Mush | Full Interview | Code Conference 2016," https://www.youtube.com/watch?v=wsixsRI-Sz4&t=4675s at 1:17:55–1:21:20 (June 2, 2016).

[24] Consumer Reports, "Consumer Reports Calls on Tesla to Disable and Update Auto Steering Function, Remove 'Autopilot' Name" (July 14, 2016), *available at* https://www.consumerreports.org/media-room/press-releases/2016/07/consumer-reports-calls-on-tesla-to-disable-and-update-auto-steering-function-remove-autopilot-name/.

will mean that you will be able to summon your Tesla from pretty much anywhere. Once it picks you up, you will be able to sleep, read or do anything else enroute to your destination. You will also be able to add your car to the Tesla shared fleet just by tapping a button on the Tesla phone app and have it generate income for you while you're at work or on vacation."[25]

54.     In August 2016, after a Tesla driver with Autopilot engaged crashed into a parked vehicle on a Beijing highway and later stated publicly that Tesla had misrepresented Autopilot's capabilities and misled buyers, Tesla removed from its China website a term that translates as "self-driving" and replaced it with a term that translates as "self-assisted driving."[26] Tesla did not make any similar changes to its U.S. website.

55.     In September 2016, Tesla's key vehicle sensor supplier Mobileye stopped supplying sensors to Tesla due to stated "reputation" concerns that Mobileye had due to "be[ing] associated with [Tesla] pushing the envelope in terms of safety."[27]

56.     On or about October 16, 2016, German regulators sent Tesla a formal letter reading, "In order to prevent misunderstanding and incorrect customers' expectations, we demand that the misleading term Autopilot is no longer used in advertising the system." The German government also reminded Tesla vehicle owners that Tesla's ADAS technology required, and could only be safely operated with, constant driver attention and supervision.[28]

**C.     Tesla's Release of "Enhanced Autopilot" and "Full-Self-Driving Capability"**

57.     On October 19, 2016, Tesla released its Autopilot 2.0 software and announced that all new Tesla cars would come with a new suite of hardware (called Autopilot Hardware 2.0) comprising eight cameras, twelve ultrasonic sensors, and a forward-facing radar unit, which Tesla claimed would allow the cars to soon become capable of SAE Level 5 autonomy.[29] To access the hardware, owners

---

[25] Elon Musk, "Master Plan, Part Deux," https://www.tesla.com/blog/master-plan-part-deux (July 20, 2016).
[26] Jake Spring & Alexandria Sage, "Tesla removes 'self-driving' from China website after Beijing crash," *Reuters* (Aug. 15, 2016), https://www.reuters.com/article/us-tesla-china-crash-idUSKCN10Q0L4.
[27] Eric Auchard & Tova Cohen, "Mobileye says Tesla was 'pushing the envelope in terms of safety,'" *Reuters* (Sept. 14, 2016), https://www.reuters.com/article/us-mobileye-tesla-idUSKCN11K2T8.
[28] Reuters Staff, "Germany says Tesla should not use 'Autopilot' in advertising," *Reuters* (Oct. 16, 2016), *available at* https://www.reuters.com/article/idUSKBN12G0KS.
[29] *See* Alex Nishimoto, "All New Tesla Models Will Feature Level 5-Capable Autopilot Hardware," *Motor Trend* (Oct. 20, 2016), *available at* https://www.motortrend.com/news/new-tesla-models-will-feature-level-5-capable-autopilot-hardware/.

would have to pay $5,000 for an "Enhanced Autopilot" feature and another $3,000 for the right to activate Tesla's promised "Full Self-Driving Capability." The Enhanced Autopilot package provided drivers most or all of the features in the FSD package, except for the right to unlimited access to Tesla's soon-to-arrive full self-driving technology, and potential early access to FSD Beta updates Tesla might release on its way perfecting that technology.

58.     As part of the announcement, Tesla published on its official blog a post titled "All Tesla Cars Being Produced Now Have Full Self-Driving Hardware." The post includes numerous carefully worded statements that, even if technically true, could easily mislead reasonable consumers about the abilities of Tesla's technology, including each of the following: (a) "Full autonomy will enable a Tesla to be substantially safer than a human driver." (b) "[A]s of today, all Tesla vehicles … will have the hardware needed for full self-driving capability at a safety level substantially greater than that of a human driver." (c) "[T]his system provides a view of the world that a driver alone cannot access, seeing in every direction simultaneously and on wavelengths that go far beyond the human senses."[30]

59.     The blog post included a video, made in the weeks before the release, by Tesla's "Autopilot" team. (Tesla and Musk often use "Autopilot" as an umbrella term to refer to all of Tesla's ADAS technologies and systems, including Autopilot, Enhanced Autopilot, and FSD, and Tesla's Autopilot team has historically developed all of Tesla's ADAS technologies and systems.) The video purports to show a Tesla driving itself without any human intervention from the person in the driver's seat, whose hands remain off the steering wheel throughout the video. The video begins with a note saying, **"The person in the driver's seat is only there for legal reasons. He is not doing anything. The car is driving itself."**[31] Musk shared the video on Twitter, stating: "Tesla drives itself (no human input at all) thru urban streets to highway to streets, then finds a parking spot."[32]

a.     However, the video was debunked by a 2021 *New York Times* investigation based on interviews with 19 former Autopilot employees. The investigation showed that Tesla had

---

[30] The Tesla Team, "All Tesla Cars Being Produced Now Have Full Self-Driving Hardware," https://www.tesla.com/blog/all-tesla-cars-being-produced-now-have-full-self-driving-hardware (Oct. 19, 2016).
[31] Tesla, https://www.tesla.com/autopilot.
[32] Elon Musk, https://twitter.com/elonmusk/status/789019145853513729 (Oct. 20, 2016, 1:23 AM).

1   concealed key facts about the video, including that the car: was assisted by a pre-loaded 3D digital

2   map of the route (a technology Tesla's ADAS systems do not use), had to repeatedly drive the pre-

3   loaded route to get usable video because the ADAS software kept executing driving tasks poorly, and

4   crashed into a fence during filming.[33] In January 2023, this reporting was broadly confirmed by

5   deposition testimony of longtime Autopilot engineer Ashok Elluswamy (transcript obtained by

6   Reuters) in which Elluswamy admitted that the route was "3-D mapped beforehand," that the car

7   drove into a fence, and that the video shows the car having abilities not then possessed by Tesla's

8   ADAS technology.[34] The reporting was further confirmed by contemporaneous internal Tesla emails

9   surrounding the making of the video (obtained by Bloomberg News), which include an email from

10  Musk in which he rejected a fourth draft of the video because there were still too many jump cuts, and

11  instructed Tesla staff that the video "needs to feel like one continuous take," and which reportedly

12  establish that Musk personally dictated the text at the beginning of the videos.[35] None of these facts

13  were referenced in the video or otherwise disclosed by Tesla. Even though Tesla has never denied the

14  facts underlying any of the above-referenced reporting, Tesla continues to feature the video on the

15  main "Autopilot" webpage on the company's website.[36]

16          b.      Tesla made similar videos during the same period, which suffer from the same

17  flaws and all of which begin with that same deceptive and misleading text: "The person in the driver's

18  seat is only there for legal reasons. He is not doing anything. The car is driving itself." Despite the

19  equally deceptive and misleading nature of those videos, Tesla also continues to make those videos

20  available to the public on its website.[37]

21

22  [33] *See* Metz & Boudette, *supra* note 10.

    [34] *See* Ashok Elluswamy Depo. Tr. at 71, 80, 82-84, 88-89, in *Huang v. Tesla Inc.*, No. 19-cv-346663 (Cal.
23  Super. Santa Clara County June 30, 2022), *available at* https://s3.documentcloud.org/documents/23574198
    /elluswamy-deposition-transcript.pdf.

24  [35] Dana Hull & Sean O'Kane, "Musk Oversaw Video That Exaggerated Tesla's Self-Driving Capabilities,"
    *Bloomberg News* (Jan. 19, 2023) https://www.bloomberg.com/news/articles/2023-01-19/elon-musk-directed-
25  tesla-autopilot-video-saying-car-drove-itself-tsla?leadSource=uverify%20wall.

    [36] *See id.*; Tesla, https://www.tesla.com/autopilot; Tesla, "Tesla Self-Driving Demonstration" (Nov. 18, 2016),
26  https://www.tesla.com/videos/autopilot-self-driving-hardware-neighborhood-long.

    [37] Tesla, "Full Self-Driving Hardware on All Teslas" (Oct. 20, 2016), https://www.tesla.com/videos/full-self-
27  driving-hardware-all-tesla-cars; Tesla, "Full Self-Driving Hardware on All Teslas" (Oct. 20, 2016), https://
    vimeo.com/188105076; Tesla, "Tesla Self-Driving Demonstration" (Nov. 18, 2016), https://www.tesla.com
28  /videos/autopilot-self-driving-hardware-neighborhood-long; Tesla, "Autopilot Full Self-Driving Hardware
    (Neighborhood Short)" (Nov. 18, 2016), https://vimeo.com/192179726.

60.     On October 19, 2016, Tesla also held a conference call with reporters, during which Musk stated that all new Tesla cars would now include all the cameras, computing power, and other hardware necessary for "full self-driving"—not a technical term but one that suggests truly autonomous operation. Musk further stated that Tesla would "be able to demonstrate a demonstration drive of our full autonomy all the way from LA to New York. So basically from home in LA to let's say dropping you off in Times Square, NY and then having the car parking itself by the end of next year without the need for a single touch."[38] Musk repeatedly represented that autonomous vehicles were safer than human-driven ones, and even warned journalists that they would be "killing people" if they wrote negative articles about self-driving technology that dissuaded people from using it.[39]

61.     According to reporting by multiple outlets, including *The Wall Street Journal* and *The New York Times*, Tesla's decision to promise the technology would be able to provide "Full Self-Driving" and Musk's statements at the news conference "took the Tesla engineering team by surprise, and some felt that Musk was promising something that was not possible." Sterling Anderson, who was the head of Tesla's Autopilot program at the time, "told Tesla's sales and marketing teams that they should not refer to the company's technology as 'autonomous' or 'self-driving' because this would mislead the public."[40] In a meeting after the October announcement, someone asked Anderson how Tesla could defend branding the product "Full Self-Driving." Anderson reportedly declined to defend the branding, responding instead, "This was Elon's decision." Two months later, in December 2016, Mr. Anderson resigned.[41]

---

[38] Xautoworld, "Transcript: Elon Musk's Autopilot 2.0 Conference Call," https://www.xautoworld.com/tesla/transcript-elon-musk-autopilot-2-conference-call/ (Oct. 19, 2016).
[39] Kosoff, *supra* note 4; Andrew Batiuk, "Tesla October 19th 2016 Autopilot 2.0 Conference Call With Visuals Added," https://www.youtube.com/watch?v=-vjGEEF_p5E (Oct. 20, 2016).
[40] Metz & Boudette, *supra* note 10.
[41] Dugan & Spector, *supra* note 14.

62.     On October 20, 2016, the day after the release of Enhanced Autopilot and FSD, Musk tweeted that Tesla's "Summon" feature was capable of autonomously driving itself to pick up its owner "even if you are on the other side of the country."[42]



D.     **Year After Year, Tesla Fails to Deliver on Its Promise of a Fully Self-Driving Car, Instead Providing Experimental Software that Kills and Maims Drivers**

63.     Since 2017, the "Autopilot" page on Tesla's website has stated that FSD is capable of "full self-driving in almost all circumstances," including being able to "conduct short and long distance trips with no action required by the person in the driver's seat" and with a "probability of safety at least twice as good as the average human driver." According to Tesla, "All you will need to do is get in and tell your car where to go. … Your Tesla will figure out the optimal route, navigate urban streets (even without lane markings), manage complex intersections with traffic lights, stop signs and roundabouts, and handle densely packed freeways with cars moving at high speed."[43]

64.     In April 2017, in a TED interview, Musk stated that Tesla would achieve a "fully autonomous" cross-country trip " by the end of 2017," and that Tesla owners would be able to sleep while their cars drove them around in "about two years."[44]

65.     In May 2017, a Twitter user tweeted if there was any update on the coast-to-coast Autopilot demo, and Musk responded, "Still on for end of year. Just software limited. Any Tesla car with HW2 (all cars built since Oct last year) will be able to do this."[45]

---

[42] Elon Musk, https://twitter.com/elonmusk/status/789022017311735808 (Oct. 20, 2016, 1:34 AM).
[43] *See, e.g.*, Internet Archive Wayback Machine, https://web.archive.org/web/20170104193524/tesla.com/autopilot (captured Jan. 4, 2017); *id.*, https://web.archive.org/web/20180101212757/tesla.com/autopilot (captured Jan. 1, 2018); Tesla, https://www.tesla.com/autopilot.
[44] Elon Musk Interview Tr. at 15:00-15:40, 16:42-17:02, 2017 TED conference (Apr. 2017), *available at* https://www.ted.com/talks/elon_musk_the_future_we_re_building_and_boring/transcript?language=en.
[45] Elon Musk, https://twitter.com/elonmusk/status/866482406160609280 (May 21, 2017, 7:34 PM).

66.     In March 2018, in an interview at the South by Southwest (SXSW) festival in Texas, Musk stated that Tesla vehicles would be driving themselves "by the end of next year."[46]

67.     In March 2018, Apple engineer Walter Huang was killed when the Autopilot on his Tesla Model X became confused at a fork in the highway and caused the car to veer sharply to the left and crash into a concrete barrier in Mountain View, California (pictured below).



68.     In the aftermath of that fatal crash, Tesla publicly released crash data and sought to blame Huang for the accident, including that Huang's hands were not detected on the steering wheel during the six seconds before the collision. This release of information violated Tesla's agreement with NTSB not to comment on crashes during the course of an investigation and caused NTSB to remove Tesla as a party to its investigation.

69.     In April 2018, in the wake of the Huang crash, Musk appeared on the national morning news show *CBS This Morning* to discuss Autopilot with co-host Gayle King and take her on a ride in a Tesla vehicle to demonstrate how it worked. During the demonstration, Musk was driving and King was in the passenger seat. Musk repeatedly took his hands off the steering wheel and kept his hands

---

[46] SXSW 2018, "Elon Musk Answers Your Questions!" at 36:05-36:30 (Mar. 11, 2018), https://www.youtube.com/watch?v=kzlUyrccbos&t=8s.

off the wheel while the car was moving with Tesla's ADAS technology engaged, falsely suggesting to the nation that a Tesla vehicle was fully capable of driving itself.[47]

70.     Less than a month later, a Tesla vehicle with Autopilot engaged struck and killed a pedestrian in Japan.

71.     In September 2018, Musk sent a series of tweets regarding Tesla's stock price and his purported plans to take the company private that the Securities and Exchange Commission ("SEC") labeled "misleading." The SEC filed a lawsuit against Tesla and Musk, who settled two days later. Under the settlement, Tesla and Musk agreed to pay $40 million in penalties, Tesla agreed to oversee Musk's communications, and Musk was forced to step down as Tesla's chairman (though he would remain as CEO). Musk would later send at least two tweets that violated the terms of the settlement.

72.     An October 2018 study by Thatcham Research showed that 71% of drivers globally at the time mistakenly believed that they could purchase a self-driving car, and 11% said they would be tempted to have a brief nap while using ADAS technology. The study concluded that a significant percentage of consumers incorrectly believe that ADAS makes cars "autonomous," and that Tesla was the company that survey respondents most cited (incorrectly) as a seller of self-driving cars.[48]

73.     In November 2018, a Twitter user posted a tweet asking, "When will they [Tesla cars] just self drive to the customer's door?" Musk tweeted in response, "Probably technically able to do so in about a year. Then up to regulators."[49]

74.     In December 2018, Musk appeared on the CBS show *60 Minutes* in a segment with co-host Leslie Stahl. As part of the segment, Musk took Stahl on a ride in a Tesla vehicle to demonstrate the Tesla's ADAS technology, with Musk driving and Stahl in the passenger seat. Just as he had earlier in the year on *CBS This Morning*, Musk repeatedly took his hands off the steering wheel and

---

[47] Gayle King, "Elon Musk says Tesla's autopilot system will 'never be perfect,'" *CBS This Morning* (Apr. 13, 2018), https://www.youtube.com/watch?v=AO33rOofFpg.

[48] "Automated Driving hype is dangerously confusing drivers, study reveals" *Thatcham Research* (Oct. 18, 2018), *available at* https://news.thatcham.org/pressreleases/autonomous-driving-hype-is-dangerously-confusing-drivers-study-reveals-2767283.

[49] Elon Musk, https://twitter.com/elonmusk/status/1063123659290595328 (Nov. 15, 2018, 9:36 AM).



kept them off the wheel while the car was moving with Tesla's ADAS technology engaged, falsely suggesting to the nation that a Tesla vehicle was fully capable of driving itself.[50]

75.     In January 2019, in a Tesla quarterly earnings call, Musk stated, in response to a question seeking "an update on full-self driving and Tesla network development," and specifically asking "[w]hen will customers start seeing full self-driving features," Musk responded: "…when will we think it's safe for full self-driving? It's probably toward the end of this year, and then it's up to regulators to decide when they want to approve that."[51]

76.     In March 2019, Jeremy Banner was killed when his 2018 Tesla Model 3 with Autopilot engaged drove under a tractor-trailer in Florida. The Banner accident was eerily similar to the 2016 accident that killed Joshua Brown when his car drove under a tractor-trailer, and that led Tesla to announce in September 2016 that the company was confident it had fixed the issue by increasing its ADAS software's reliance on radar. The Banner accident indicated that Tesla had not fixed this significant flaw in its ADAS technology in September 2016, and still had not done so two-and-a-half years later.

77.     In April 2019, in a popular podcast, Musk stated that Tesla so close to FSD that anyone who " buys a Tesla today … [is] buying an appreciating asset, not a depreciating asset."[52]

78.     In April 2019, at an event in Palo Alto, California, that Tesla dubbed "Autonomy Day," Musk took to the stage and made widely reported-on announcements that Tesla vehicles would be capable of full self-driving and autonomously navigating dense urban areas like San Francisco and New York by the end of 2019, that Tesla vehicles would provide hands-free driving by the "second quarter of next year," and that the company would be making cars without steering wheels or pedals in two years.[53] Musk also stated, "If you fast forward a year, maybe a year and three months, but next

---

[50] Leslie Stahl, "Tesla CEO Elon Musk: The 60 Minutes Interview," *60 Minutes* (Dec. 9, 2018), https://www.cbsnews.com/news/tesla-ceo-elon-musk-the-2018-60-minutes-interview/; *see also* Jack Stewart, "Even Elon Musk Abuses Tesla's Autopilot," *Wired* (Dec. 10, 2018), *available at* https://www.wired.com/story/elon-musk-tesla-autopilot-60-minutes-interview/.
[51] Tesla (TSLA) Q4 2018 Earnings Conference Call Transcript (Jan. 30, 2019), *available at* https://www.fool.com/earnings/call-transcripts/2019/01/31/tesla-tsla-q4-2018-earnings-conference-call-transc.aspx.
[52] Lex Fridman, "Elon Musk: Tesla Autopilot," *Lex Fridman Podcast No. 18* at 15:15-15:35 (Apr. 12, 2019), *available at* https://www.youtube.com/watch?v=dEv99vxKjVI.
[53] Video of Tesla Autonomy Day at 1:55:48-1:56:01 (Apr. 22, 2019), *available at* https://vimeo.com/331892012; R. Baldwin, "Tesla promises 'one million robo-taxis' in 2020," *Engadget* (Apr. 22, 2019), https://www.engadget.com/2019-04-22-tesla-elon-musk-self-driving-robo-taxi.html.

**Consolidated Second Amended Complaint**
Case No. 4:22-cv-05240-HSG

year for sure, we will have over a million robo-taxis on the road," which Musk stated would be operating at "[SAE] Level 5 without a geofence." Musk continued: "I feel very confident predicting autonomous robo-taxis for Tesla next year. … I'm confident we'll have at least regulatory approval somewhere, literally next year." Musk further stated that the robo-taxis would be a way for Tesla owners to make money when they aren't using their vehicles, with Tesla taking 25 or 30 percent of the revenue and allowing the company to compete with popular ride-hailing services like Uber and Lyft.[54] Shortly thereafter, some investment analysts discovered that Musk had made the robotaxi announcement without Tesla appearing to have any "answers to or [] even considered pretty basic questions on the pricing, insurance liability, or regulatory and legal requirements."[55] But, as routinely occurs, the cautionary reporting received only miniscule press attention relative to Musk's headline-grabbing, widely published claims of Tesla putting a million robotaxis on the road by the following year. A few months later, Musk doubled-down on the robo-taxi prediction, tweeting that Tesla would "have a million robotaxis by end of 2020."[56] To date, Tesla has never developed a robotaxi and is nowhere near doing so.

79.    In May 2019, Musk tweeted that a Tesla vehicle would complete a fully autonomous cross-country trip "this year."[57]

80.    In May 2019, Tesla released an update to its ADAS "Navigate" feature, which is designed to automate some lane-change functions. When Consumer Reports tested the feature, it found that it cut off other cars without leaving enough space, failed to pass in the correct lane, and sometimes struggled to merge into traffic.[58]

---

[54] Video of Tesla Autonomy Day at 1:55:48-1:56:01 (Apr. 22, 2019), *available at* https://vimeo.com/331892012; *Tech Insider*, "Watch Elon Musk Unveil Plans For A Tesla Ride-Hailing App," https://www.youtube.com /watch?v=YiWbdZ8ItRs (Apr. 22, 2019); Matt McFarland, "Elon Musk says Tesla will have robo-taxis operating next year," *CNN Business*, https://www.cnn.com/2019/04/22/tech/tesla-robotaxis (Apr. 22, 2019).
[55] Lora Kolodny, "Elon Musk sent a two-line email telling employees how great Tesla's autonomy day was, but the plan has lots of holes," *CNBC* (Apr. 23, 2019), https://www.cnbc.com/2019/04/23/elon-musk-celebrates-flawed-tesla-autonomy-day-with-employee-email.html.
[56] Elon Musk, https://twitter.com/elonmusk/status/1148070210412265473 (July 7, 2019, 8:24 PM).
[57] Elon Musk, https://twitter.com/elonmusk/status/1126611407984779264 (May 9, 2019, 3:14 PM).
[58] *See* Keith Barry, "Tesla's Updated Navigate on Autopilot Requires Significant Driver Intervention," *Consumer Reports* (May 22, 2019), *available at* https://www.consumerreports.org/autonomous-driving/tesla-navigate-on-autopilot-automatic-lane-change-requires-significant-driver-intervention/.

81.    In October 2019, Consumer Reports tested Tesla's "Smart Summon" feature, which Tesla claimed would allow owners to use a smartphone app to "summon" their Tesla vehicle to drive itself across a parking lot without any occupants inside the vehicle. Consumer Reports' testing revealed that the feature had difficulty negotiating a parking lot, with the summoned car crossing lane lines and wandering erratically "like a drunken or distracted driver."[59] This was nearly four years after Musk's January 2016 tweet that Tesla was two years away from its customers being able to use Summon to have their car come to them even if it was thousands of miles away.[60]

82.    In December 2019, Jenna Monet was killed when the Model 3 she was in crashed into the back of a parked fire truck in Indiana while Autopilot was engaged.

83.    In February 2020, the NTSB called on NHTSA to set stricter standards on Autopilot, citing the high number of Autopilot-related collisions and deaths.

84.    In April 2020, Musk tweeted that Tesla would complete and be ready to roll out robotaxi technology "this year" with "[r]egulatory approval [being] the big unknown."[61] That same month, Musk made public comments that he expected Telsa robotaxis to receive regulatory approval to be operating on public roadways "next year."[62]

85.    In July 2020, in a major interview on stage at the World Artificial Intelligence Conference, Musk stated, in his capacity as Tesla CEO, "we are very close" and "will have the basic functionality for Level 5 autonomy complete this year."[63]

86.    In August 2020, a couple was killed in Saratoga, California, after their Tesla veered off a highway while Autopilot was active.

87.    In September 2020, Consumer Reports published the first in a series of evaluations of Tesla's "Full Self-Driving Capability" technology, finding that the technology caused vehicles to engage in unusual and unsafe behavior, such as stopping at green lights, driving through stop signs,

---

[59] Jeff Plungis, "Tesla's Smart Summon Performance Doesn't Match Marketing Hype," *Consumer Reports* (Oct. 8, 2019), *available at* https://www.consumerreports.org/automotive-technology/teslas-smart-summon-performance-doesnt-match-marketing-hype/.
[60] Musk, *supra* notes 16, 42.
[61] Elon Musk, https://twitter.com/elonmusk/status/1249210220200550405 (Apr. 11, 2020, 10:38 PM).
[62] Joey Klender, "Tesla CEO Elon Musk opens up about Robotaxi rollout for next year" *Teslarati* (Apr. 30, 2020), https://www.teslarati.com/elon-musk-talks-tesla-robotaxi-plans-2021/.
[63] Elon Musk Speech at 00:20-00:36, *available at* "Elon Musk delivers virtual speech for WAIC," *Shanghai Daily* (July 9, 2020), https://www.youtube.com/watch?v=MdpZUp4I-H8.

1   slamming on the brakes for yield signs when the merge was clear, and stopping at every exit while

2   going around a traffic circle.[64]

3       88.   In October 2020, Tesla increased the price of an FSD package from $8,000 to $10,000,

4   and informed some owners who had previously purchased an FSD package that their vehicles would

5   require a $1,000 hardware upgrade to be compatible with Tesla's FSD technology going forward.

6       89.   On November 20, 2020, Tesla attorneys sent the California Department of Motor

7   Vehicles ("DMV") a letter (later released via Public Records Act request) in response to the DMV's

8   questions about the FSD "City Streets" feature that was about to be released to some Tesla owners in

9   a software update. Tesla's legal counsel wrote, "For context, as we've previously discussed, City

10  Streets continues to firmly root the vehicle in SAE Level 2 capability." The letter goes on to explain

11  in detail FSD's limitations and to admit that the system is nowhere near being fully autonomous or

12  fully self-driving:

13              City Streets' capabilities with respect to the object and event detection
                and response (OEDR) sub-task are limited, as there are circumstances and
14              events to which the system is not capable of recognizing or responding.
                These include static objects and road debris, emergency vehicles,
15              construction zones, large uncontrolled intersections with multiple
                incoming ways, occlusions, adverse weather, complicated or adversarial
16              vehicles in the driving path, unmapped roads. As a result, the driver
                maintains responsibility for this part of the dynamic driving task (DDT).
17              In addition, the driver must supervise the system, monitoring both the
                driving environment and the functioning of City Streets, and he is
18              responsible for responding to inappropriate actions taken by the system.
                The feature is not designed such that a driver can rely on an alert to draw
19              his attention to a situation requiring response. There are scenarios or
                situations where an intervention from the driver is required but the system
20              will not alert the driver. In the case of City Streets (and all other existing
                FSD features), because the vehicle is not capable of performing the entire
21              DDT, a human driver must participate ....[65]

22

23

24

25

---

26  [64] See Mike Monticello & Keith Barry, "Tesla's 'Full Self-Driving Capability' Falls Short of Its Name: The
    pricey option doesn't make the car self-driving, and now Tesla's promises are under scrutiny by state regulators
27  in California," *Consumer Reports* (Sept. 4, 2020) (last updated May 19, 2021), *available at* https://
    www.consumerreports.org/autonomous-driving/tesla-full-self-driving-capability-review-falls-short-of-its-name-
    a1224795690/.
28  [65] Letter from Eric Williams (Tesla) to Miguel Acosta (DMV) Re: City Streets – Pilot Release at 1 (Nov. 20,
    2020), *available at* https://www.plainsite.com/documents/242a2g/california-dmv-tesla-robotaxi-ADAS-emails/.

90.     On December 14, 2020, in another letter to the California DMV (released via Public Records Act request), Tesla's legal counsel reiterated that any final release of the FSD City Streets feature to the Tesla customer fleet "will continue to be an SAE Level 2, advanced driver-assistance feature" that, like all other FSD features, "do[es] not make the vehicle autonomous" and is "intended for use only with a fully attentive drier who has his or her hands on the wheel and is prepared to take over at any moment." Tesla's counsel continued, "Please note that Tesla's development of true autonomous features (SAE Levels 3+) … will not be released to the general public until we have fully validated them and received any required regulatory permits or approvals."[66]

91.     On December 28, 2020, in another letter to the California DMV (released via Public Records Act request), Tesla's legal counsel again reiterated the SAE Level 2 nature and limitations of Tesla's FSD technology:

> Full Self-Driving (FSD) Capability is an additional optional suite of features that builds from Autopilot and is also representative of SAE L2. Features that comprise FSD Capability are Navigate on Autopilot, Auto Lane Change, Autopark, Summon, Smart Summon, Traffic and Stop Sign Control, and, upcoming, Autosteer on City Streets (City Streets). While we designed these features to become more capable over time through over-the-air software updates, currently neither Autopilot nor FSD Capability is an autonomous system, and currently no comprising feature, whether singularly or collectively, is autonomous or makes our vehicles autonomous. This includes the limited pilot release of City Streets.[67]

92.     During the same month that Tesla's legal team was assuring California regulators that the most advanced version of its ADAS technology was still at SAE Level 2 and suggesting it was likely to remain at Level 2 for the foreseeable future, Elon Musk gave an interview to Business Insider in which he promised that Tesla would achieve Level 5 before the end of the following year,

---

[66] Letter from Eric Williams (Tesla) to Miguel Acosta (DMV) Re: City Streets – Pilot Release at 2-3 (Dec. 14, 2020), *available at* https://www.plainsite.org/documents/242a2g/california-dmv-tesla-robotaxi-ADAS-emails/.
[67] Letter from Eric Williams (Tesla) to Miguel Acosta (DMV) Re: Autonomous Mode Disengagements for Reporting Year 2020 at 1-2 (Dec. 14, 2020), *available at* https://www.plainsite.org/documents/242a2g /california-dmv-tesla-robotaxi-ADAS-emails/; *see also* David Silver, "Tesla Emails To The California DMV Emphasize Continued Reliance On Maps," *Forbes* (Mar. 9, 2021), *available at* https://www.forbes.com/sites /davidsilver/2021/03/09/tesla-emails-to-the-california-dmv-emphasize-continued-reliance-on-maps/?sh =2c0884c957e6.

stating "I'm extremely confident that Tesla will have level five next year, extremely confident, 100%."[68]

93.   On January 6, 2021, Waymo announced that it would no longer use the term "self-driving" to refer to its fleet of vehicles, noting that "some automakers [i.e., referring to Tesla] use the term 'self-driving' in an inaccurate way, giving consumers and the general public a false impression of the capabilities of driver assist (not fully autonomous) technology." Central to this decision was Waymo's determination that the use of "self-driving" as a descriptor of driver assist technology was not just misleading, but that its use also causes drivers to unknowingly over-rely on the technology to operate the vehicle and thus take risks that "jeopardize not only their own safety but the safety of people around them."[69]

94.   In January 2021, Tesla released its earnings, reporting $721 million in profit in 2020, its first profitable year. This was a dramatic turnaround in the company's financial condition from prior years. According to Musk, Tesla had been, as recently as 2018, "bleeding money like crazy" and on the brink of collapse, at one point being "about a month" away from having to declare bankruptcy.[70] In early 2019, Musk coupled a $2 billion capital campaign with new projections about Tesla' s imminent advances in " self-driving" technology.[71] This included the headline-grabbing claim that a million Tesla cars would be able to act as Level 5 "robotaxis" by 2020.

95.   On the Tesla January 2021 earnings call, Musk stated that the company had made "massive progress on Full Self-Driving," and that it "will become obvious later this year" that "Tesla

---

[68] Mathias Döpfner, "Elon Musk reveals Tesla's plan to be at the forefront of a self-driving-car revolution," *Business Insider*, https://www.businessinsider.com/elon-musk-interview-axel-springer-tesla-accelerate-advent-of-sustainable-energy (Dec. 5, 2020).

[69] The Waymo Team, "Why you'll hear us saying fully autonomous driving tech from now on," https://waymo.com/blog/2021/01/why-youll-hear-us-say-autonomous-driving.html (Jan. 6, 2021).

[70] *See* Chris Isidore, "Tesla just proved all its haters wrong. Here's how," *CNN Business*, https://www.cnn.com/2020/01/31/investing/tesla-cash-crunch/index.html (Jan. 31, 2020); Chris Isidore, "Elon Musk: Tesla was month away from bankruptcy," *CNN Business*, https://www.cnn.com/2020/11/04/tech/elon-musk-tesla-once-got-near-bankruptcy/index.html (Nov. 4, 2020); Steve Kovach, "Elon Musk: Tesla had 'single-digit weeks' as it teetered on brink of collapse" *CNBC* (Nov. 25, 2018), https://www.cnbc.com/2018/11/25/elon-musk-tesla-had-single-digit-weeks-before-it-would-die.html; Lora Kolodny, "Elon Musk says Tesla was 'about a month' from bankruptcy during Model 3 ramp," *CNBC* (Nov. 3, 2020), https://www.cnbc.com/2020/11/03/musk-tesla-was-about-a-month-from-bankruptcy-during-model-3-ramp.html.

[71] Lora Kolodny, "Elon Musk sent a two-line email telling employees how great Tesla's autonomy day was, but the plan has lots of holes," *CNBC* (Apr. 23, 2019), https://www.cnbc.com/2019/04/23/elon-musk-celebrates-flawed-tesla-autonomy-day-with-employee-email.html.

Autopilot is capable of full self-driving." Musk also stated, "I'm highly confident the car will drive itself for the reliability in excess of a human this year. This is a very big deal." When a financial analyst asked Musk why he was confident Tesla would achieve SAE Level 5 autonomy in 2021, Musk responded, "I'm confident based on my understanding of the technical roadmap and the progress that we're making between each beta iteration."[72]

96.     On an investor call a few days later, Musk talked up Tesla's self-driving strategy right off the bat, calling it "the fundamental driver of value for Tesla," and projecting it would soon make Tesla vehicles "worth $150,000 to $250,000."[73] Musk has continued making the claims up to the present day, while also repeatedly stating that Tesla's brand and value depends on FSD being successful, calling it " the difference between Tesla being worth a lot of money and being worth basically zero."[74]

97.     Six weeks later, on a March 9, 2021 phone call with California DMV regulators, Tesla's director of Autopilot software, CJ Moore, contradicted Musk. According to an internal DMV memo memorializing the call (released via Public Records Act request), "DMV asked CJ to address, from an engineering perspective, Elon's messaging about L5 [Level 5] capability by the end of the year. Elon's tweet does not match engineering reality per CJ." (It appears that the DMV tried but failed to redact that last sentence.) In response to a question from DMV regulators about "how Tesla evaluates the potential advancement of levels of autonomy," Tesla representatives "indicated they are still firmly in L2 [Level 2]." Tesla further told DMV that "[t]he ratio of driver interaction would need to be in the magnitude of 1 or 2 million miles per driver interaction to move into higher levels of automation [i.e., Level 3 and higher]."[75] In other words, drivers would need to intervene only once per 1 to 2 million miles before Tesla would proceed to Level 3 software. Tesla's ADAS software, which routinely makes mistakes, is not even remotely close to this level of reliability.

---

[72] Tesla (TSLA) Q4 2020 Earnings Call Transcript (Jan. 27, 2021), *available at* https://www.fool.com/earnings /call-transcripts/2021/01/27/tesla-tsla-q4-2020-earnings-call-transcript/.

[73] Lora Kolodny, "Elon Musk to investors: Self-driving will make Tesla a $500 billion company," *CNBC* (May 2, 2019), https://www.cnbc.com/2019/05/02/elon-musk-on-investor-call-autonomy-will-make-tesla-a-500b-company.html.

[74] Faiz Siddiqui, "How Elon Musk knocked Tesla's 'Full Self-Driving' off course" *The Washington Post* (Mar. 19, 2023), https://www.washingtonpost.com/technology/2023/03/19/elon-musk-tesla-driving/.

[75] Memorandum to File by Miguel Acosta (DMV) Re: Tesla AP City Streets Update (Mar. 9, 2021), *available at* https://www.plainsite.org/documents/28jcs0/california-dmv-tesla-robotaxi-ADAS-notes/.

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**Consolidated Second Amended Complaint**
Case No. 4:22-cv-05240-HSG

35

98.     Following up on the March 9, 2021 phone call, the California DMV wrote to Tesla: "Notwithstanding other public messaging from Tesla about developing vehicles capable of full driving automation, Tesla reiterated that the City Streets feature is currently a Society of Automotive Engineers (SAE) level two (2) Advanced Driver-Assistance feature and that Tesla will continue to monitor how participants interact with the feature and make improvements. As mentioned in your [prior] correspondence and per California regulations, should Tesla develop technology features characterized as SAE level 3 or higher, Tesla will seek the appropriate regulatory permitting from the DMV before autonomous vehicles are operated on public roads."[76]

99.     In May 2021, Tesla began building new Tesla vehicles bound for the North America market without radar, as part of the company's move toward achieving a fully self-driving car using only cameras (and neural network machine learning). No longer including radar in new Tesla vehicles has reduced Tesla's manufacturing costs, but it is contrary to the industry-standard view that a combination of sensors—i.e., at minimum, cameras, radar, and lidar—is necessary to achieve technology capable of SAE Level 3, 4, or 5 functionality. Tesla's decision to change the hardware mix by excluding radar and relying heavily or solely on cameras also means that Tesla's ADAS technology cannot now and likely will never be able to function safely in weather conditions with reduced visibility, such as heavy rain and fog.[77]

100.    Also in May 2021, under pressure from the Transportation Committee of the California Senate, the California Department of Motor Vehicles launched an investigation into whether Tesla is deceptively marketing its ADAS technology as making its cars capable of autonomous driving.[78]

---

[76] Letter from Miguel Acosta (DMV) to Eric Williams (Tesla) (Apr. 21, 2021), *available at* https://www.plainsite.org/documents/28jcs0/california-dmv-tesla-robotaxi-ADAS-notes/.
[77] *See* Kirsten Korosec, "Tesla is no longer using radar sensors in Model 3 and Model Y vehicles built in North America," *TechCrunch* (Mar. 25, 2021), https://techcrunch.com/2021/05/25/tesla-is-no-longer-using-radar-sensors-in-model-3-and-model-y-vehicles-built-in-north-america/; Hyunjoo Jin, "Explainer: Tesla drops radar; is Autopilot system safe?," *Reuters* (June 2, 2021), https://www.reuters.com/business/autos-transportation/tesla-drops-radar-is-autopilot-system-safe-2021-06-02/.
[78] *See* Russ Mitchell, "DMV probing whether Tesla violates state regulations with self-driving claims," *Los Angeles Times* (May 17, 2021), *available at* https://www.latimes.com/business/story/2021-05-17/dmv-tesla-california-fsd-autopilot-safety.

101.     In June 2021, in what was widely seen as a response to motor vehicle collisions involving Tesla's ADAS technology, NHTSA issued an unprecedented order requiring automobile manufacturers to report any crash involving an injury, fatality, or property damage that happens while or immediately after a vehicle is automating some driving tasks.

102.     In early July 2021, Tesla released the FSD Beta 9 version of its FSD software to certain Tesla vehicle owners. Following the release, Tesla owners took videos of the software in action that show vehicles missing turns, scraping against bushes, and veering toward parked cars.

103.     On July 26, 2021, on a quarterly earnings call, Musk told investors and reporters that he was confident FSD-equipped Tesla vehicles would soon "be able to drive themselves with the safety levels substantially greater than that of the average person."

104.     On August 13, 2021, NHTSA's Office of Defects Investigation opened a "Preliminary Evaluation" investigation to assess the performance of Tesla's Autopilot system, which was prompted by at least 11 incidents in which Tesla vehicles using Autopilot crashed into parked emergency vehicles that had their lights on and flashing, killing one person and injuring 17.[79] The investigation was reported to be "the broadest look yet at Autopilot and at potential flaws that could make it and the Teslas that operate on it dangerous."[80] As alleged below, NHTSA significantly expanded this investigation in June 2022.

105.     Later in August 2021, two U.S. Senators called for the Federal Trade Commission to investigate what they referred to as Tesla's potentially deceptive marketing practices surrounding its FSD technology, including Tesla's use of the phrase "full self-driving" to describe and market a set of features that does not make the vehicle fully self-driving.

106.     On August 31, 2021, NHTSA ordered Tesla to produce documents and information regarding the design of its FSD technology, crashes involving that technology, and marketing materials that make representations about that technology. On the date that was the deadline for

---

[79] NHTSA, Investigation PE 21-020, ODI Resume (Aug. 13, 2021), *available at* https://static.nhtsa.gov/odi/inv /2021/INOA-PE21020-1893.PDF.
[80] Neal Boudette & Niraj Chokshi, "U.S. Will Investigate Tesla's Autopilot System Over Crashes With Emergency Vehicles," *The New York Times* (Aug. 16, 2021), *available at* https://www.nytimes.com/2021/08 /16/business/tesla-autopilot-nhtsa.html.

1    compliance, Tesla submitted only a partial response to NHTSA, claiming that the documents and

2    information it had requested was confidential business information.

3         107.    In September 2021, Tesla announced it was aiming for a wider release of FSD Beta by

4    the end of that month. In response, NTSB Chair Jennifer Homendy made public comments stating

5    that Tesla should address "basic safety issues" before expanding the availability of FSD. Regarding

6    Tesla's of the term "full self-driving," Homendy called it "misleading and irresponsible," and further

7    stated that Tesla "has clearly misled numerous people to misuse and abuse the technology."

8         108.    On October 12, 2021, NHTSA asked Tesla about its practice of asking FSD Beta users

9    to sign nondisclosure agreements prohibiting users from sharing negative information about their

10   experiences using the FSD Beta software.

11        109.    On October 24, 2021, Tesla pulled back the release of version 10.3 of its ADAS

12   software, which the company had already made available for drivers to use on public roads, because

13   of problems the software was having making left turns at traffic lights.

14        110.    On October 25, 2021, NTSB Chair Homendy sent Musk a letter expressing concern

15   that Tesla was rolling out FSD software updates without having implemented recommendations about

16   improving the safety of Tesla's ADAS technology that NTSB had made years earlier following fatal

17   crashes involving Tesla's ADAS technology. The following day, Homendy appeared on the CNBC

18   show *Squawk Box* to share her concerns about Tesla's anticipated rollout of FSD beta to a larger

19   group of Tesla vehicle owners.

20             My biggest concern is that Tesla is rolling out Full Self-Driving
21             technology in beta on city streets with untrained drivers, and they
               [Tesla] have not addressed our [NTSB's] recommendations that we've
22             issued as a result of numerous investigations of Tesla crashes.

23             … The NTSB, and I specifically, meet people on the worst day of their
24             lives after a crash, after they've lost a loved one. That is part of our job
               at the NTSB. And our job is to determine what happened, why it
               happened, and prevent a crash from happening again. We conduct a
25             thorough investigation, and at the end of that investigation, we issue
26             findings of probable cause and safety recommendations, and then we
               work extensively with the recipients of those recommendations to
27             ensure they're implemented because it's not until they're implemented
               that safety is truly improved. And in this case, we haven't received a
28

response from Tesla in four years, yet we've reiterated those recommendations numerous times.

The show's host then asked Chair Homendy about Tesla's statements that Tesla drivers "need to be engaged when [they're] behind the wheel—that's not enough [to ensure safety]?" Chair Homendy unequivocally responded that it was not, in part because Tesla's marketing of its ADAS technology as "Full Self-Driving" is inherently misleading:

> No, that's not enough. It's clear that if you're marketing something as Full Self-Driving, and it is not full self-driving, and people are misusing the vehicles and the technology, that you have a design flaw, and you have to prevent that misuse. And part of that is how you talk about your technology. It is not full self-driving. … It isn't full self-driving technology. It's misleading.[81]

111.    In October 2021, after an update to the FSD Beta software, there was a major increase in "phantom braking" incidents, in which the software identifies a non-existent threat that triggers the vehicle's emergency braking system. The result is that Tesla vehicles, traveling at various speeds, were suddenly slamming on the brakes for no apparent reason. Tesla initially claimed it had identified the source of the problem and fixed it with a software update released on October 25, 2021, but subsequently issued a formal recall over the issue for the more than 11,0000 vehicles using the FSD Beta software in a reported effort to head off adverse action by U.S. regulators.[82] Tesla's claims of having fixed the problem, however, turned out to be false, as driver complaints about "phantom braking" issues soared to 107 NHTSA complaints in the three-month period of November 2021 through January 2022 (compared with only 34 such complaints in the preceding 22 months). Owner complaints to NHTSA included everything from phantom braking incidents that were "happening with NOTHING present in front of my vehicle, and sometimes with nothing around me at all," to an incident where Tesla software slammed on the brakes in response to a plastic bag.[83] Many industry

---

[81] Michael Wayland, "NTSB head criticizes Tesla's self-driving features, calls them 'misleading,'" *CNBC* (Oct. 26, 2021), https://www.cnbc.com/2021/10/26/ntsb-head-criticizes-teslas-self-driving-features-calls-them-misleading.html.

[82] Tom Krisher, "Tesla software recall may head off fight with US regulators," *Associated Press* (Nov. 2, 2021), *available at* https://apnews.com/article/technology-business-software-d3e2107435f432fd9b36ba14898166a0.

[83] Faiz Siddiqui & Jeremy B. Merrill, "Tesla drivers report a surge in 'phantom braking,'" *The Washington Post* (Feb. 2, 2022), *available at* https://www.washingtonpost.com/technology/2022/02/02/tesla-phantom-braking/.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

experts have opined that the increase in "phantom braking" incidents is a predictable result of removing radar from new Tesla vehicles in favor of relying more heavily or entirely on cameras.[84]

112. On November 18, 2021, CNN Business reported that it spent a morning testing Tesla's FSD technology on the streets of New York City and "watched the software nearly crash into a construction site, try to turn into a stopped truck and attempt to drive down the wrong side of the road." The FSD software reportedly "needed plenty of human interventions to protect us and everyone else on the road," including a driver intervention "every couple of blocks or so" and multiple instances in which the driver "quickly jerked the wheel to avoid a crash."[85]

113. On December 6, 2021, *The New York Times* published an article about its investigation into the failures of Tesla's ADAS technology based on interviews with 19 Tesla employees who had worked on design, developing, and testing that technology at Tesla over the prior decade. The article reported that interviews with the employees indicated that Musk "repeatedly misled buyers" about the abilities of Tesla's ADAS technology.[86]

114. Later in December 202l, Musk appeared on a popular podcast and predicted that Tesla's ADAS technology would reach SAE Level 4 in 2022. The podcast host asked Musk, "When you do you think Tesla will solve level four FSD?" Musk responded, "I mean, it's looking quite likely that it'll be next year."[87]

115. In January 2022, Musk stated on an earnings call, "My personal guess is that we'll achieve Full Self-Driving this year. I would be shocked if we do not achieve Full Self-Driving safer than a human this year. I would be shocked."

---

[84] *See, e.g.*, Jonathan M. Gitlin, "Tesla's radar-less cars investigated by NHTSA after complaints spike: Tesla's safety camera system has a real problem with false positives," *ArsTechnica* (Feb. 18, 2022), https://arstechnica.com/cars/2022/02/teslas-radar-less-cars-investigated-by-nhtsa-after-complaints-spike/.

[85] Matt McFarland, "We tried Tesla's 'full self-driving.' Here's what happened," *CNN Business*, https://www.cnn.com/2021/11/18/cars/tesla-full-self-driving-brooklyn/index.html (Nov. 18, 2021); *CNN*, "CNN tests a 'full self-driving' Tesla," https://www.youtube.com/watch?v=2PMu7MD9GvI (Nov. 18, 2021).

[86] Metz & Boudette, *supra* note 10; Tesla, "Tesla Self-Driving Demonstration" (Nov. 18, 2016), https://www.tesla.com/videos/autopilot-self-driving-hardware-neighborhood-long.

[87] Lex Fridman, Podcast #252 at 1:26:56 (Dec. 28, 2021), https://youtu.be/DxREm3s1scA?t=5215.

116.     In February 2022, the company Cruise received regulatory approval to begin offering a fully driverless robotaxi service with no backup driver behind the wheel, and received regulatory approval to begin charging customers.[88]

117.     In May 2022, Musk told reporters in Brazil that Tesla will have self-driving cars without the need for people behind the wheel in about a year. The comments received media coverage in the United States.

118.     On July 13, 2022, the Dawn Project, an organization dedicated to increasing software safety, published a white paper regarding its testing of a Tesla Model 3 equipped with FSD Beta 10.12.2 (released on June 1, 2022). The purpose of the testing was to determine the FSD software's safety in terms of its ability to detect and avoid hitting small children. The testing was performed on a closed racetrack with the Tesla driving itself between a long row of cones with a child-sized mannequin placed in plain view at the end of the row—i.e., conditions significantly less complex and more favorable to the FSD software than those that would be encountered in the real world. Nevertheless, the testing found that Tesla's FSD software consistently failed to detect the stationary child-size mannequins and "d[id] not avoid the child or even slow down," but instead "repeatedly struck the child mannequin in a manner that would be fatal to an actual child."[89]

119.     On July 14, 2022, the editor-in-chief of Electrek, a website that covers electric vehicles, published a review of Tesla's FSD Beta software based on his experience of using it over the course of two months. His ultimate conclusion was that, despite years of development and updates by Tesla, FSD Beta's "decision-making is still the equivalent of a 14-year-old who has been learning to drive for the last week and sometimes appears to consume hard drugs."[90]

120.     In August 2022, Tesla announced that the price of FSD on new Tesla cars would increase from $12,000 to $15,000, effective September 5, 2022.

---

[88] *See* Andres Picon, "Cruise gets state permit to offer paid driverless taxi rides in San Francisco," *San Francisco Chronicle* (June 2, 2022), *available at* https://www.sfchronicle.com/bayarea/article/Cruise-gets-state-permit-to-offer-paid-driverless-17216515.php.

[89] The Dawn Project, *In Scientific Test, Tesla "Full Self-Driving" Technology Consistently Strikes Child-Sized Mannequins* (July 13, 2022), *available at* https://dawnproject.com/wp-content/uploads/2022/08/The_Dawn _Project___Tesla_FSD_Test__8_.pdf.

[90] Fred Lambert, "Elon Musk does the impossible and manages expectations on Tesla's next Full Self-Driving update," *Electrek* (July 14, 2022), https://electrek.co/2022/07/14/elon-musk-manages-expectations-tesla-next-big-full-self-driving-update/.

121.    On October 19, 2022, in a quarterly earnings call, Musk said he expects Tesla to release upgraded FSD software that "will be able to take you from your home to your work, your friend's house, to the grocery store without you touching the wheel. So, it's looking very good."

122.    On the same call, Musk made comments stating Tesla was unlikely to get regulatory approval for its full self-driving technology in 2022—a misleading rhetorical tactic that Musk has used throughout the Class Period (as defined below) to generate media coverage that is likely to leave many readers and viewers with the false impression that Tesla's Autopilot and FSD technology is, for all intents and purposes, already capable of making the car fully autonomous (i.e., SAE Level 4 or 5), and it is only that "regulators" are refusing to recognize this and/or preventing Tesla from making it's most advanced self-driving technology available to the public. This is misleading, in part, because it implies that Tesla's Autopilot and FSD technology is ready or almost ready for regulatory approval as an SAE Level 3, 4, or 5 technology, when that is not the case, when Musk and Tesla know that is not the case, and when no objectively reasonable view of the relevant facts known to Musk and Tesla could lead them to believe that that is the case. To the contrary, Musk and Tesla know, and any objectively reasonable view of the facts known to Musk and Tesla would lead a reasonable person to conclude, that Tesla's Autopilot and FSD technology is an SAE Level 2 ADAS technology and nowhere near an SAE Level 3, 4, or 5 technology, or ready to seek regulatory approval as an SAE Level 3, 4, or 5 technology.

123.    Just as such comments regularly have in the past, Musk's October 20, 2022 comments regarding the anticipated lack of "regulatory approval" in the two remaining months of 2022 generated misleading news coverage. A Reuters article about Musk's comments is typical of kind of misleading news coverage that such comments often generate, and that Musk and Tesla know such comments have often generated in the past and are likely to generate whenever such comments are made. Ignoring that Tesla's Autopilot and FSD technology is an SAE Level 2 ADAS technology, the Reuters article reports that Musk's comments "signal[] that the company is not yet able to satisfy authorities that its cars can be driven without someone behind the wheel" (i.e., SAE Level 4 or 5). The article goes on to report on Musk's comments as follows:

> On a call on Wednesday to discuss quarterly results, Musk said he expects to release an upgraded FSD software at the end of the year, adding that while its cars are not ready to have no one behind the wheel, drivers would rarely have to touch the controls. [¶] "The car will be able to take you from your home to your work, your friend's house, the grocery store without you touching the wheel," he said. [¶] "It's a separate matter as to will it have regulatory approval. It won't have regulatory approval at that time," he added.[91]

124.    In late 2022, a survey of 2,000 U.S. drivers found that 72% of respondents answered "Yes, definitely" or "Yes, possibly" to the question: "Do you think it is possible to purchase a car today than can drive itself?" On information and belief, Tesla is aware of such grossly inaccurate perceptions in the marketplace, and indeed is perhaps the biggest reason for those misperceptions, and capitalizes on them in misleadingly marketing its ADAS software as making cars self-driving, or being on the cusp of making its cars self-driving.

125.    On a January 26, 2023 earnings call, Musk falsely touted Tesla's FSD as the most advanced autonomous driving technology in the industry:

> Who do we think is close to Tesla with -- a general solution for self-driving? And we still don't even know really who would even be a distant second. So yes, it really seems like we're -- I mean, right now, I don't think you could see a second place with a telescope, at least we can't."[92]

126.    On April 19, 2023, during Tesla's next quarterly earnings call, Musk used the terms "full self-driving" and "full autonomy" as fully synonymous, indicating he views that the two terms as having the same meaning. Musk also reported that "it looks like" Tesla would achieve full self-driving and full autonomy during the year 2023—i.e., within the following 7.5 months. Specifically,

---

[91] Hyunjoo Jin & Akrash Sriram, "Tesla cars will not be approved as fully self driving this year, Musk says," *Reuters* (Oct. 20, 2022), *available at* https://www.reuters.com/business/autos-transportation/tesla-flags-its-cars-not-ready-be-approved-fully-self-driving-this-year-2022-10-20/.

[92] Tesla (TSLA) Q4 2022 Earnings Call Transcript (Jan. 26, 2023), *available at* https://www.fool.com/earnings/call-transcripts/2023/01/26/tesla-tsla-q4-2022-earnings-call-transcript/.

Musk stated that "the trend is very clearly towards full self-driving, towards full autonomy. And I hesitate to say this, but I think we'll do it this year. So that's what it looks like. Yes."[93]

127.    On June 8, 2023, the California DMV approved a deployment permit to Mercedes-Benz permitting use of its SAE Level 3 "Drive Pilot" system on certain highways and under certain conditions.[94] Mercedes Benz therefore became the first company approved by the California DMV to sell SAE Level 3 technology to the public, and joined Waymo, Cruise, and Nuro as the fourth company to acquire a California DMV permit for deployment of vehicles with SAE Level 3 or higher technology on public roads in California.[95]

128.    In June 2023, *The Washington Post* published an in-depth analysis of national crash data, revealing that Tesla's Autopilot mode was involved in 736 crashes in the United States since 2019, "far more than previously reported." The article noted that the "uptick in crashes coincides with Tesla's aggressive rollout of Full Self-Driving," and reported a former NHTSA official's view that the data showed Tesla vehicles were having "more severe—and fatal—crashes than people in a normal data set."[96]

129.    On July 5, 2023, a Tesla vehicle that appeared to have its ADAS features activated at the time of the crash caused a head-on collision in South Lake Tahoe, California, killing the driver of the other vehicle and a three-month-old passenger in the Tesla.[97]

---

[93] Tesla (TSLA) Q1 2023 Earnings Call Transcript (Apr. 19, 2023), *available at* https://seekingalpha.com/article/4595114-tesla-inc-tsla-q1-2023-earnings-call-transcript.
[94] California DMV, "California DMV Approves Mercedes-Benz Automated Driving System for Certain Highways and Conditions" (June 8, 2023), *available at* https://www.dmv.ca.gov/portal/news-and-media /california-dmv-approves-mercedes-benz-automated-driving-system-for-certain-highways-and-conditions/.
[95] California DMV, "Autonomous Vehicle Testing Permit Holders," *available at* https://www.dmv.ca.gov /portal/vehicle-industry-services/autonomous-vehicles/autonomous-vehicle-testing-permit-holders/.
[96] Faiz Siddiqui & Jeremy B. Merrill, "17 fatalities, 736 crashes: The shocking toll of Tesla's Autopilot," *The Washington Post* (June 10, 2023), *available at* https://www.washingtonpost.com/technology/2023/06/10/tesla-autopilot-crashes-elon-musk/.
[97] David Shepardson, "US opens special probe into fatal Tesla crash," *Reuters* (July 18, 2023), *available at* https://www.reuters.com/business/autos-transportation/us-opens-new-special-probe-into-fatal-tesla-crash-2023-07-18/.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**Consolidated Second Amended Complaint**
Case No. 4:22-cv-05240-HSG

130.    On July 19, 2023, in a Tesla quarterly earnings call, Musk stated that Tesla's FSD technology would be "better than human by the end of this year."[98]

131.    That same day, July 19, 2023, a Tesla vehicle drove under a tractor-trailer in Warrenton Virginia, killing the driver of the Tesla.[99] This was yet another fatal incident caused by a Tesla car driving under a tractor-trailer, following the similar crash that killed Joshua Brown in 2016 and the similar crash that killed Jeremy Banner in 2019.

132.    On August 10, 2023, the California Public Utilities Commission ("CPUC") approved permits for additional operating authority to both Cruise and Waymo "to conduct commercial passenger service using driverless vehicles in San Francisco." The permits allowed the companies to charge fares to riders at any time of day.[100] Neither the California DMV nor the CPUC have issued Tesla any approval to deploy, sell, or lease vehicles with technology at SAE Level 3 or higher, or to use vehicles with such technology for driverless commercial passenger service.

133.    Even in vehicles and software not yet released to the public, Tesla still has not achieved a fully self-driving car. On August 25, 2023, Musk livestreamed a demonstration of the upcoming Tesla FSD v12 software it has stated it plans to release in the near future.[101] During the video, the Tesla vehicle accelerated at a red light in an unsafe manner and in violation of traffic safety laws, requiring driver intervention to stop it.[102]

---

[98] Tesla (TSLA) Q2 2023 Earnings Call Transcript (July 19, 2023), *available at* https://www.fool.com/earnings/call-transcripts/2023/07/19/tesla-tsla-q2-2023-earnings-call-transcript/.
[99] David Shepardson, "US opens investigation into fatal Tesla crash in Virginia," *Reuters* (Aug. 10, 2023), *available at* https://www.reuters.com/technology/us-opens-new-investigation-into-fatal-tesla-crash-virginia-2023-08-10/.
[100] California Public Utilities Commission, "CPUC Approves Permits for Cruise and Waymo to Charge Fares for Passenger Service in San Francisco" (Aug. 10, 2023), *available at* https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M516/K992/516992488.PDF.
[101] Elon Musk, https://twitter.com/elonmusk/status/1695247110030119054 (Aug. Livestream Demonstrating FSD v12 (Aug. 25, 2023).
[102] Beatrice Nolan, "Elon Musk's Tesla almost ran a red light during a FSD demo, video shows," *Business Insider* (Aug. 29, 2023), *available at* https://www.businessinsider.com/elon-musk-tesla-fsd-almost-ran-red-light-2023-8.

134.    In October 2023, J.D. Power and the Massachusetts Institute of Technology released a joint study regarding consumer knowledge of ADAS technology, finding that consumers were not able to differentiate between lower levels of automation, namely SAE Level 2 and Level 3.[103] For example, the study found that there was "no distinction in the activities that consumers are willing to do in a vehicle (e.g., talking, texting, online searching) as the level of automation increases from SAE Level 2 to SAE Level 3."[104] The study also indicates much of the confusion may be caused by consumers' inaccurate perception of Tesla's ADAS technology, reporting that nearly of quarter (22%) of the 3,000 surveyed respondents indicated they believed, inaccurately, that "Tesla" or "Autopilot" are examples of "fully automated" driving technologies.[105]

135.    On October 18, 2023, in a Tesla quarterly earnings call, Musk stated that "all of the cars we're making and have made for a while, we believe, are capable of full autonomy."[106] Like Musk's many prior representations about the current and near-term future abilities of FSD, this representation was false and misleading.

136.    Instead of providing its customers fully self-driving cars, Tesla has used them, and continues to use them, to test drive its FSD system on public roadways and thereby generate the "trial and error" data that Tesla needs to improve FSD. Musk has publicly touted Tesla has a competitive advantage in having a "massive inflow of data" from all the Tesla cars on the road, and that Tesla is able to use that data to test and improve its ADAS software.

---

[103] Lisa Boor, et al., *J.D. Power 2023 U.S. Mobility Confidence Index (MCI) Study* 6 (2023), *available at* https://discover.jdpa.com/hubfs/2023%20Mobility%20Confidence%20Index%20Study%20Whitepaper.pdf.
[104] J.D. Power, "Stakes are High and Consumer Confidence is Fragile for Automated Vehicles, J.D. Power Finds" (Oct. 4, 2023), *available at* https://www.jdpower.com/business/press-releases/2023-us-mobility-confidence-index-mci-study.
[105] Boor, *supra* note 103, at 7-8.
[106] Tesla (TSLA) Q3 2023 Earnings Call Transcript (Oct. 19, 2023), *available at* https://www.fool.com/earnings/call-transcripts/2023/10/18/tesla-tsla-q3-2023-earnings-call-transcript/.

E.     **Federal and State Authorities Launch Numerous Investigations and Actions Regarding Tesla's Autopilot and FSD Technology**

*1.   NHTSA significantly expands its investigations into Autopilot and FSD*

137.     In April 2022, NHTSA opened two defect investigations into Autopilot. In reporting on this development, *Bloomberg News* spoke on the record with several current and former top federal officials responsible for roadway safety under various administrations, all of whom singled out Tesla and its Autopilot and FSD software as cause for concern. According to the article, NTSB Chair Jennifer Homendy "describe[d] Tesla's deployment of features marketed as Autopilot and Full Self-Driving as artificial-intelligence experiments using untrained operators of 5,000-pound vehicles," and said "It is a disaster waiting to happen." David Friedman, a former deputy and acting administrator of NHTSA from 2013 to 2015, told reporters that Tesla's approach to automated-driving features "sticks out like a sore thumb" in the industry and "has for years." Heidi King, a deputy and acting administrator of NHTSA during the Trump administration, similarly stated for the article: "I really dislike a lot of what Tesla has done, and at the top of the list in bright, bold letters, is Elon Musk's habit of making false public claims, and using his podium in a way that creates safety risks." King continued: "We all admire his [Musk's] visionary attributes. But visionary exaggerations about a consumer product can be very, very dangerous."[107]

138.     In June 2022, NHTSA announced it was upgrading its August 2021 "Preliminary Evaluation" into Tesla's Autopilot system into an "Engineering Analysis"—a significant expansion of the investigation.[108] The announcement was welcomed by many roadway safety organizations, including the Governors Highway Safety Association, whose executive director told the *The New York Times* that his organization had been "asking for closer scrutiny of Autopilot for some time," and that the product names Autopilot and Full Self-Driving "confuse people into thinking they can do more than they are actually capable," and that "[a]t a minimum they should be renamed."[109]

---

[107] Craig Trudell & Keith Laing, "Tesla Autopilot Stirs U.S. Alarm as 'Disaster Waiting to Happen,'" *Bloomberg News* (Apr. 18, 2022), https://www.bloomberg.com/news/articles/2022-04-18/tesla-autopilot-stirs-u-s-alarm-as-disaster-waiting-to-happen.

[108] NHTSA, Investigation EA 22-002, ODI Resume (June 8, 2022), *available at* https://static.nhtsa.gov/odi/inv/2022/INOA-EA22002-3184.PDF.

[109] Neal E. Boudette, "Federal safety agency expands its investigation of Tesla's Autopilot system," *The New*

139.    In February 2023, NHTSA issued a nationwide recall of all 362,758 Tesla vehicles with FSD.[110] The recall identified four new FSD safety defects not identified by NHTSA's other ongoing FSD investigations: (1) traveling or turning through intersections during a stale yellow light, (2) not stopping at stop signs, (3) not reducing vehicle speed in response changes in posted speed limits, and (4) changing lanes out of a turn-only lane to continue traveling straight.[111] To remedy the problems identified by the recall Tesla offered to "deploy an over-the-air ("OTA") firmware update to affected vehicles that will improve how FSD Beta negotiates certain driving maneuvers in specific conditions."[112] Tesla has self-reported that 334,747 of the total vehicles have been "remedied," but has provided little or no information about the efficacy of the remedy.[113]

140.    On July 26, 2023, NHTSA issued a Special Order to Tesla requesting information about its driver monitoring systems after it "became aware that Tesla has introduced an Autopilot configuration that, when enabled, allows drivers using Autopilot to operate their vehicles for extended periods without Autopilot prompting the driver to apply torque to the steering wheel."[114] Tesla provided responses to the Special Order confidentially, and has declined to make any public comment on the investigation.[115]

### 2.   The FTC says Tesla's Autopilot and FSD is "on its radar"

141.    On June 7, 2022, Lina Khan, the Chair of the Federal Trade Commission ("FTC"), which is charged with protecting the consuming public from unfair and deceptive corporate practices, made public comments indicating that concerns about Tesla's Autopilot and FSD technology were on the FTC's radar. Though Chair Khan declined to say whether the FTC had opened an investigation

---

*York Times* (June 9, 2022), *available at* https://www.nytimes.com/2022/06/09/business/tesla-autopilot-nhtsa-investigation.html.
[110] NHTSA, "Part 573 Safety Recall Report 23V-085" (Feb. 15, 2023), *available at* https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V085-3451.PDF.
[111] *Id.*
[112] Tesla, Recall Notice to Tesla Owners (2023), *available at* https://static.nhtsa.gov/odi/rcl/2023/RCONL-23V085-7530.pdf.
[113] NHTSA, "Recall Quarterly Report 23V-085" (Aug. 1, 2023), *available at* https://static.nhtsa.gov/odi/rcl/2023/RCLQRT-23V085-2089.PDF.
[114] Letter from John Donaldson (NHTSA Acting Chief Counsel) to Dinna Eskin (Sr. Director, Legal, Tesla Inc.) (July 26, 2023), *available at* https://static.nhtsa.gov/odi/inv/2022/INLM-EA22002-91174P.pdf.
[115] Keith Laing, "Tesla Ordered to Address New Concern About Autopilot Setting" *Bloomberg* (Aug. 29, 2023), *available at* https://www.bloomberg.com/news/articles/2023-08-29/tesla-ordered-by-regulators-to-address-new-issue-over-autopilot.

1  into Tesla, she referred to concern about the marketing of Autopilot and FSD as an "issue on which
2  many members of Congress have focused and written to us about, so it's certainly something that's on
3  our radar."[116]

4      ### 3.  The California DMV charges Tesla with untrue and deceptive marketing
5          of its Autopilot and FSD technology

6      142.    On July 28, 2022, following a year-long investigation, the California DMV, which
7  licenses motor vehicle manufacturers and dealerships in California (including Tesla's Fremont factory
8  and dozens of Tesla retail stores), brought two related administrative enforcement actions against
9  Tesla for "untrue," "misleading," and "deceptive" marketing of its Autopilot and FSD technology. The
10  DMV specifically alleged that Tesla's use of the product labels "Autopilot" and "Full Self-Driving
11  Capability," as well as statements about those technologies that have appeared on Tesla's website in
12  2022, "represent that vehicles equipped with those ADAS features will operate as an autonomous
13  vehicle, but vehicles equipped with those ADAS features could not at the time of those
14  advertisements, and cannot now, operate as autonomous vehicles." For relief, the DMV seeks
15  restitution and the revocation or suspension of Tesla's California vehicle manufacturer license and
16  vehicle dealer license. *See In the Matter of the Accusation Against Tesla Inc. dba Tesla Motors, Inc., a*
17  *Vehicle Manufacturer*, Case No. 21-02188, Accusation (July 28, 2022) (attached here as **Exhibit A**);
18  *In the Matter of the Accusation Against Tesla Inc. dba Tesla Motors, Inc., a Vehicle Dealer*, Case No.
19  21-02189, Accusation (July 28, 2022) (attached here as **Exhibit B**). On information and belief, those
20  California DMV enforcement actions are ongoing.

21      ### 4.  The U.S. Department of Justice launches a criminal investigation

22      143.    On October 25, 2022, Reuters reported that the U.S. Department of Justice had
23  launched a criminal investigation against Tesla, Inc. regarding the company's claims that its vehicles
24  could drive themselves. As part of the investigation, "Justice Department prosecutors in Washington
25  and San Francisco are examining whether Tesla misled consumers, investors and regulators by
26  making unsupported claims about its driver assistance technology's capabilities." One of the article's

27  _____
28  [116] Diane Bartz & David Shepardson, "Tesla Autopilot concerns are on U.S. agency's 'radar,' chair says,"
   *Reuters* (June 9, 2022), https://www.reuters.com/business/autos-transportation/tesla-autopilot-concerns-are-us-
   agencys-radar-chair-says-2022-06-09/.

1  sources provided information indicating that the criminal probe "is competing with two other DOJ

2  investigations involving Tesla" but did not elaborate on the subject matter of those other ongoing

3  investigations.[117] On information and belief, those USDOJ investigations are ongoing.

4  **VI.    CLASS ACTION ALLEGATIONS**

5      144.    Plaintiff brings this lawsuit individually and as a class action under Federal Rule of

6  Civil Procedure ("Rule") 23, seeking declaratory relief, injunctive relief, restitution, damages, and

7  other relief specified herein, on behalf of a proposed nationwide class and, in the alternative, a

8  proposed California class (collectively, the "Class"), defined as follows:

9          **Nationwide Class:** All persons who purchased or leased from Tesla, Inc.
           (or any entity it directly or indirectly owns or controls, including but not
10         limited to Tesla Lease Trust and Tesla Finance LLC) a new Tesla vehicle
           with "Autopilot," "Enhanced Autopilot," or "Full Self-Driving
11         Capability" (collectively, "Class Vehicles") at any time from January 1,
           2016, to the present ("Class Period").
12

13         **California Class:** All persons who purchased or leased from Tesla, Inc.
           (or any entity it directly or indirectly owns or controls, including but not
14         limited to Tesla Lease Trust and Tesla Finance LLC) a new Tesla vehicle
           with "Autopilot," "Enhanced Autopilot," or "Full Self-Driving
15         Capability" (collectively, "Class Vehicles") at any time from January 1,
           2016, to the present ("Class Period"), and who either purchased or leased
16         that vehicle in California or who currently reside in California.

17

18      145.    The following persons are excluded from the proposed Class: Defendants; any entity

19  that Defendants directly or indirectly own or control; Defendants' officers, directors, employees,

20  agents, legal representatives, and attorneys; and the Court and its employees.

21      146.    Plaintiff reserves the right under Rule 23 to amend or modify the proposed Class

22  definitions and to add one or more subclasses based on information obtained during this litigation.

23      147.    This action is brought and may be properly maintained as a class action against

24  Defendants under the following provisions of Rule 23:

25          a.    **Numerosity (Rule 23(a)(1)):** The members of the Class are so numerous that

26  their individual joinder is impracticable. Defendants sold or leased tens of thousands of Class

27

28  ---
[117] Mike Spector & Dan Levine, "Exclusive: Tesla faces U.S. criminal probe over self-driving claims," *Reuters*
(Oct. 26, 2022), https://www.reuters.com/legal/exclusive-tesla-faces-us-criminal-probe-over-self-driving-
claims-sources-2022-10-26/.

**Consolidated Second Amended Complaint**
Case No. 4:22-cv-05240-HSG

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

Vehicles during the Class Period. The identities of Class members may be identified through business records regularly maintained by Defendants and their employees, agents, and subsidiaries, and through the media. If necessary, Class members can be notified of this action by e-mail, mail, and supplemental published notice.

        b.    **Commonality and Predominance (Rules 23(a)(2) and 23(b)(3)):** Many questions of law and fact are common to the Class. These common questions predominate over any questions affecting only individual Class members. These common questions include, but are not limited to:

    i.   Whether Defendants and their agents (collectively, "Defendants") engaged in the conduct alleged herein;

    ii.   Whether Defendants' use of the terms "Autopilot," "Enhanced Autopilot," "Full Self-Driving," and "Full Self-Driving Capability" to describe their ADAS technology was false, deceptive, or misleading;

    iii.   Whether Defendants knew or should have known that their public statements and omissions regarding the time period in which Tesla vehicles would be, or would likely be, fully self-driving were false, deceptive, or misleading;

    iv.   Whether Defendants knew or should have known that their prior public statements regarding the time period in which Tesla vehicles would be, or would likely be, fully self-driving were false, deceptive, or misleading, but failed to take steps adequate to correct those prior statements;

    v.   Whether Defendants knowingly concealed from consumers information that would cause a reasonable consumer to develop material doubts or conclude that Defendants' public statements and omissions regarding the time period in which Tesla vehicles would be, or would likely be, fully self-driving were false, deceptive, or misleading;

    vi.   Whether Defendants' conduct alleged herein violates consumer protection laws;

    vii.   Whether Defendants' conduct alleged herein violates warranty laws;

viii.  Whether Defendants' conduct alleged herein violates any other laws set forth below in the Claims for Relief;

ix.  Whether Defendants' conduct alleged herein actually and proximately caused Plaintiff and Class members to suffer legally cognizable harm; and

x.  Whether Plaintiff and Class members are entitled to declaratory relief, injunctive relief, restitution, damages, or any other relief requested herein.

c.  **Typicality (Rule 23(a)(3)):** Plaintiff's claims are typical of the other Class members' claims because: Defendants' wrongful acts and omissions alleged herein were substantially the same with respect to Plaintiff and all other Class members, Defendants' wrongful acts and omissions alleged herein caused Plaintiff and all other Class members comparable injury, Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class members, and there are no defenses that are unique to Plaintiff.

d.  **Adequacy of Representation (Rule 23(a)(4)):** Plaintiff can fairly and adequately represent and protect the interests of all other Class members. There are no material conflicts between the interests of Plaintiff and the other Class members that would make certification of the Class inappropriate. Plaintiff has retained competent and qualified counsel who have extensive experience in complex litigation and class action litigation, and who will vigorously prosecute the claims of Plaintiff and all other Class members.

148.  This action is properly maintained as a class action under Rule 23(b) for the following reasons:

a.  **Class Action Status (Rule 23(b)(1)):** Class action status is appropriate under Rule 23(b)(1)(A) because prosecution of separate actions by each of the tens of thousands of Class members would create a risk of establishing incompatible standards of conduct for Defendants and inconsistent results for Class members. Class action status is also appropriate under Rule 23(b)(1)(B) because prosecution of separate actions by Class members would create a risk of adjudication with respect to individual Class members that, as a practical matter, would be dispositive of other Class members' interests or would substantially impair or impede their ability to protect their interests.

b. **Declaratory and Injunctive Relief (Rule 23(b)(2)):** Certification under Rule 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds that apply generally to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

c. **Predominance and Superiority (Rule 23(b)(3)):** Certification under Rule 23(b)(3) is appropriate because questions of law and fact common to the Class predominate over the questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this controversy, including consideration of the following: (i) the relatively limited interests of Class members in individually controlling the prosecution of separate actions; (ii) the limited extent and nature of any litigation concerning this controversy already begun by Class members; (iii) the desirability of concentrating the litigation of the claims in this forum; and (iv) the relatively minor difficulties likely to arise in managing the proposed class action. Class action treatment is superior here because the monetary harms suffered by individual Class members are small compared to the burden and expense of bringing and prosecuting individual actions against Defendants to address their complex misconduct against the consuming public. A class action allows for the adjudication of a significant number of claims that would otherwise go unaddressed because of the significant practical difficulties and relative expense of bringing and maintaining an individual action, and also provides economies of scale and other significant potential benefits that can be realized only by resolving this controversy in a single adjudication with comprehensive supervision by a single court. By contrast, individualized litigation also presents a potential for inconsistent or contradictory judgments, would increase the delay and expense to all parties and the court system due to the complex legal and factual issues involved in this controversy, and would make it virtually impossible for individual Class members to redress effectively the harm done to them by Defendants.

149. **Issue Certification (Rule 23(c)(4)):** Certification of particular issues in this action, including issues of liability and relief sought, is appropriate under Rule 23(c)(4) because these issues are common to all Class members, and because resolution of these common issues on a classwide basis will materially advance the disposition of the litigation as a whole.

150.    The Class is ascertainable from Defendants' own records, and there is a well-defined community of interest in the questions of law and fact alleged herein since the rights of each Class member were infringed or violated by Defendants in the same or similar fashion.

## VII.    TOLLING OF THE STATUTES OF LIMITATIONS

151.    To the extent that there are any statutes of limitations applicable to Plaintiff's and Class members' claims, the running of the limitations periods have been tolled by various doctrines and rules, including but not limited to equitable tolling, the discovery rule, the fraudulent concealment rule, equitable estoppel, the repair rule, and class action tolling. With respect to Plaintiff LoSavio, tolling is supported by the following facts.

152.    In late 2016 and January 2017, before purchasing his Tesla vehicle in January 2017, LoSavio spent considerable time exploring the Tesla website and online media to learn about the Enhanced Autopilot and FSD packages. During that time, LoSavio read statements on Tesla's website and press coverage of statements from Tesla and Musk stating that new Tesla vehicles were being manufactured with all the hardware necessary to become fully self-driving vehicles through future software updates, and that such updates would makes Tesla vehicles self-driving cars in about a year, or two years at most. For example, LoSavio saw press coverage of a statement by Musk that a Tesla would soon drive itself coast-to-coast across the country.[118]

153.    Before purchasing his Tesla, LoSavio reviewed the Tesla website and read Tesla's descriptions of Enhanced Autopilot and Full Self-Driving, and its representations that Tesla cars would soon be self-driving. The following descriptions and representations from the "Autopilot" page of Tesla's website captured by the Internet Archive Wayback Machine on January 26, 2017, are consistent with LoSavio's recollection of what he read before purchasing his vehicle:

> Enhanced Autopilot adds these new capabilities to the Tesla Autopilot driving experience. Your Tesla will match speed to traffic conditions, keep within a lane, automatically change lanes without requiring driver input, transition from one freeway to another, exit the freeway when your destination is near, self-park when near a parking spot and be summoned to and from your garage.

---

[118] *See, e.g.*, Paul A. Eisenstein, "A Driverless Tesla Will Travel from L.A. to NYC by 2017, Says Musk," *NBC News* (Oct. 20, 2016), https://www.nbcnews.com/business/autos/driverless-tesla-will-travel-l-nyc-2017-says-musk-n670206.

**Tesla's Enhanced Autopilot software has begun rolling out and features will continue to be introduced as validation is completed, subject to regulatory approval.**

On-ramp to Off-ramp
Once on the freeway, your Tesla will determine which lane you need to be in and when. In addition to ensuring you reach your intended exit, Autopilot will watch for opportunities to move to a faster lane when you're caught behind slower traffic. When you reach your exit, your Tesla will depart the freeway, slow down and transition control back to you.

Autosteer+
With the new Tesla Vision cameras, sensors and computing power, your Tesla will navigate tighter, more complex roads.

Smart Summon
With Smart Summon, your car will navigate more complex environments and parking spaces, maneuvering around objects as necessary to come find you.

Full Self-Driving Capability
Build upon Enhanced Autopilot and order Full Self-Driving Capability on your Tesla. This doubles the number of active cameras from four to eight, enabling full self-driving in almost all circumstances, at what we believe will be a probability of safety at least twice as good as the average human driver. The system is designed to be able to conduct short and long distance trips with no action required by the person in the driver's seat. For Superchargers that have automatic charge connection enabled, you will not even need to plug in your vehicle.

All you will need to do is get in and tell your car where to go. If you don't say anything, the car will look at your calendar and take you there as the assumed destination or just home if nothing is on the calendar. Your Tesla will figure out the optimal route, navigate urban streets (even without lane markings), manage complex intersections with traffic lights, stop signs and roundabouts, and handle densely packed freeways with cars moving at high speed. When you arrive at your destination, simply step out at the entrance and your car will enter park seek mode, automatically search for a spot and park itself. A tap on your phone summons it back to you.

**Please note that Self-Driving functionality is dependent upon extensive software validation and regulatory approval, which may vary widely by jurisdiction. It is not possible to know exactly when each element of the functionality described above will be available, as this is highly dependent on local regulatory approval.** Please note also that using a self-driving Tesla for car sharing and ride hailing for friends and family is fine, but doing so for revenue purposes will only be permissible on the Tesla Network, details of which will be released next year.

From Home
All you will need to do is get in and tell your car where to go. If you don't say anything, your car will look at your calendar and take you there as

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

the assumed destination. Your Tesla will figure out the optimal route, navigating urban streets, complex intersections and freeways.

To your Destination
When you arrive at your destination, simply step out at the entrance and your car will enter park seek mode, automatically search for a spot and park itself. A tap on your phone summons it back to you.

Standard Safety Features
These active safety technologies, including collision avoidance and automatic emergency braking, have begun rolling out through over-the-air updates

Automatic Emergency Braking
Designed to detect objects that the car may impact and applies the brakes accordingly

Side Collision Warning
Warns the driver of potential collisions with obstacles alongside the car

Front Collision Warning
Helps warn of impending collisions with slower moving or stationary cars

Auto High Beams
Adjusts high/low beams as required

Internet Archive Wayback Machine, https://web.archive.org/web/20170126073829/tesla.com/autopilot (capturing "Autopilot" page on Tesla website as of January 26, 2017) (attached here as **Exhibit C**) (emphasis added).

154.    At or around the time of his purchase in January 2017, LoSavio also saw multiple quotes from Tesla and Musk concerning what the then-existing Enhanced Autopilot and FSD features could do, such as autosteering and navigating on autopilot, and that those features were being rapidly improved to result in software updates for fully self-driving cars soon being available. For example, LoSavio received and read a newsletter that Tesla emailed to him on November 12, 2016 (attached here as **Exhibit D**), in which Tesla made the following representations that influenced LoSavio's purchase his Tesla Model S:

All Tesla vehicles produced in our factory now have full self-driving hardware, enabling **a rapidly expanding set of new Autopilot features to be introduced over time.** While active safety features continue to come standard in all Tesla vehicles, customers can now choose from two new Autopilot packages: Enhanced Autopilot, which is an advanced suite of driver-assistance features, and Full Self-Driving Capability which will

ultimately take you from home to work and find a parking space for you on its own.

Self-driving vehicles will play a crucial role in improving transportation safety and accelerating the world's transition to a sustainable future. **Once the software is extensively validated and there is regulatory approval, full autonomy will enable a Tesla to be substantially safer than a human driver.** It will also lower the financial cost of transportation for those who own a car, while providing low-cost on-demand mobility for those who do not.

Ex. D (emphasis added).

155.     In reliance on these and other similar representations from Tesla and Musk that LoSavio saw on Tesla's website and in press accounts of Musk's public statements in the months leading up to his January 2017 purchase, LoSavio understood some of Tesla's representations about self-driving features would not be fully operational on the vehicle he was buying. Rather, he understood they were being developed and refined and would be introduced in the next year or two, or some similar reasonable time after his purchase, as the software was refined and validated. Consistent with Tesla's and Musk's representations, LoSavio reasonably expected that he would be able to enjoy those features during most of the years he expected to own his Model S. Based on this, he decided to pay the additional $8,000 for all of Tesla's ADAS features and the right to receive future updates of its promised fully self-driving technology. He understood from Tesla's and Musk's representations, and was motivated by his understanding, that the price would be cheaper in January 2017 if he purchased the options then, rather than waiting another year or two, until those features had been refined, validated, and were being rolled out to the public.

156.     At all relevant times (from the months leading up to his purchase to the present), LoSavio has received and typically read three newspapers daily: *The Wall Street Journal*, *The New York Times*, and *The San Francisco Chronicle*. After his purchase, he continued his usual habit of reading these papers, and paid particular interest and attention to any articles regarding Tesla, Musk, and especially Tesla's purposed self-driving technologies. At regular intervals following the purchase, LoSavio recalls seeing news reports that Tesla and particularly Musk were continuing to make statements indicating that the release of self-driving features for consumer use was coming reasonably soon, often in a year or so. Sometimes when LoSavio saw such articles or other press related to Tesla

ADAS and purported self-driving technology (at least 1-2 times per year), he would go to Tesla's website seeking updating information on the timing for Tesla providing software updates for making cars self-driving. Additionally, when LoSavio encountered such representations by Tesla and Musk, he believed that Tesla and Musk were making them in objective and subjective good faith, and he certainly did not believe they were false or misleading. When he noticed that Tesla and Musk made statements that seemed to push back their projections slightly for when self-driving software would be available, he thought that complex projects do not always go perfectly to plan, gave Tesla the benefit the doubt, and believed Tesla and Musk's representations that it would just take them a little longer to deliver the promised self-driving software.

157.    For example, during each of the first three years after his purchase (i.e., in 2017, 2018, and 2019), LoSavio recalling see press coverage discussing and quoting Musk's tweets and public comments stating that Tesla cars would be self-driving in about a year.[119] LoSavio assumed that Musk was making these statements in good faith, and that if Musk he saying these things and making these projections in such a public way, he must have both a subjectively and objectively reasonable basis for doing so. In each of the years following his purchase, LoSavio periodically went to the Tesla website seeking updates on the rollout of these features and when they would be operational in his vehicle. He recalls consistently seeing on Tesla's website, and believing, representations that the Model S would be able to be updated with full self-driving capabilities in the future.[120]

158.    Similarly, in each of the years following his purchase, LoSavio recalls visiting the Tesla website and reading and believing representations such as this statement appearing on Tesla's website in April 2020 regarding the FSD features: "All Tesla vehicles have the hardware needed in the future for full self-driving in almost all circumstances, at a safety level we believe will be at least twice as good as the average human driver."[121] Consistent wth these representations, he continued to

---

[119] *See, e.g.*, *supra* ¶ 72 & note 49 (discussing Musk's November 15, 2018 tweet that Tesla vehicles would be able to drive themselves from the factory to customers' doors "probably technically … in about a year").
[120] *See, e.g.*, Internet Archive Wayback Machine, https://web.archive.org/web/20190414140516 /tesla.com/models (captured Apr. 14, 2019) (Full Self-Driving Hardware [¶] Every new Model S comes standard with advanced hardware capable of providing Autopilot features today, and full self-driving capabilities in the future—through software updates designed to improve functionality over time.").
[121] *Id.*, https://web.archive.org/web/20200418045832/tesla.com/models (captured Apr. 18, 2020).

**Consolidated Second Amended Complaint**
Case No. 4:22-cv-05240-HSG

58

1   believe, as he did at the time of purchase, that his vehicle had had all the hardware needed for the his

2   car to become self-driving through software updates soon to be provided by Tesla.

3        159.    Throughout his ownership, LoSavio's car has received periodic over-the-air software

4   updates, some of which had titles and were accompanied by release notes indicating they were

5   software related to eventually making his car self-driving. All these software updates were initiated

6   by a message on the vehicle touchscreen indicating the update was available. LoSavio would typically

7   push a button on the touchscreen to request that the update be installed as soon as it became available.

8   Once installed, it was at all relevant times Losavio's habit, who was curious about the software and

9   particularly whether it related to self-driving, to click through a few screens on the touchscreen to

10  access the "release notes" for the software update, which described the update, and to read those

11  release notes. In every year from 2017 to the present, LoSavio recalls regular software updates to his

12  vehicle that were accompanied by release notes that described updates related to self-driving features,

13  which he took to be evidence of Tesla continually working and making progress toward the goal of

14  making their cars self-driving.

15       160.    While LoSavio has been unable to locate documentation concerning the updates on his

16  Model S during 2017 and 2018, he has located and reviewed such documentation for the years 2019

17  to present. The documented updates from 2019 to present are broadly consistent with the number and

18  kinds of updates that LoSavio recalls his vehicle receiving in 2017 and 2018.

19       161.    For example, for the years 2019, 2020, and 2021, Losavio found documentation

20  indicating that his vehicle received the following updates from Tesla, which are broadly consistent

21  with his recollection of  the updates his vehicles received during those years, based on the information

22  including release notes that he read about the updates on his vehicle touchscreen:

23       a.    2019:  (a) Adjacent Lane Speeds, Autosteer Stop Sign Warning, Driving

24  Visualization Improvements (Release 2019.40.2); (b) Automatic Lane Change Improvements and

25  Autosteer (Beta) (Release 2019.40.1.1); (c) Smart Summon (Beta), Navigate on Autopilot (Beta)

26  (Release 2019.40.50.1); and (d) Adjacent Lane Speeds and Autosteer Stop Sign Warning (Release

27  2019.40.2).

28

1
           b.     2020: (a) Navigating on Autopilot (Beta), Adjacent Lane Speeds (Release

2
2020.4); (b) Navigating on Autopilot (Beta), Traffic Light and Stop Sign Control (Beta), Driving

3
Visualization Improvements (Release 2020.16); (c) Traffic Light and Stop Sign Control (Beta)

4
(Release 2020.20.13); (d) Traffic Light and Stop Sign Control (Beta), Driving Visualization

5
Improvements (Release 2020.24.6); (e) Traffic Light and Stop Sign Control (Beta) (Release

6
2020.28.1); (f) Traffic Light and Stop Sign Control (Beta), Navigating on Autopilot (Beta) – Exit

7
Passing Lane (Release 2020.36.10); (g) Driving Visualization Improvements, Autosteer Stop Sign

8
and Stop Light Warning, Speed Assist Improvements, Pedestrian Warning (Release 2020.36); (h) Full

9
Self-Driving (Beta) (Release 2020.40.8.10); (i) Driving Visualization Improvements, Full Self-

10
Driving (Beta), Speed Assist Improvements, Traffic Light and Stop Sign Control (Beta) (Release

11
2020.44.15.3); (j) Autopilot Set Speed (Release 2020.44); (k) Driving Visualization Improvements

12
and Scheduled Departure Improvements (Release 2020.48.25); and (l) Navigation Improvements,

13
Autosteer Stop Sign and Stop Light Warning (Release 2020.48.5).

14
           c.     2021: (a) Full Self-Driving (Beta) and Driving Visualization Improvements

15
(Release 2021.4.18.12); (b) Emergency Lane Departure Avoidance and Smart Summon (Release

16
2021.4.18.10); (c) Improved Navigation and Navigation Improvements (Release 2021.4.16); (d) Full

17
Self-Driving (Beta) and Driving Visualization Improvements (Release 2021.12.25.15); (e) Detect

18
Emergency Vehicles (Release 2021.24.12); (f) Full Self-Driving (Beta) and Driving Visualization

19
Improvements (Release 2021.24.15); (g) Auto Park, Navigation Voice Guidance, Navigation Route,

20
Navigation Lane Guidance (Release 2021.24); (h) Full Self-Driving (Beta) and Driving Visualization

21
Improvements (Release 2021.32.25); (i) Request Full Self-Driving (Beta) (Release 2021.32.22); (j)

22
Autopark (Release 2021.32.5); (k) FSD v10.6 Release Notes (Release 2021.36.8.9); (l) Full Self-

23
Driving (Beta) Terms, Full Self-Driving (Beta) Suspension, FSD v10.5 Release Notes (Release

24
2021.36.8.7); (m) FSD v10.4 Release Notes (Release 2021.36.8.5); (n) FSD v10.3.1 Release Notes

25
(Release 2021.36.5.3); (o) Autopark (Release 2021.40.6); (p) FSD Beta v10.3.2 Release Notes

26
(Release 2021.44.30.21); (q) FSD Beta v10.3.1 Release Notes (Release 2021.44.30.20); (r) FSD Beta

27
v10.3.2 Release Notes (Release 2021.44.30.21); (s) FSD Beta v10.10 Release Notes (Release

28
2021.44.30.15); (t) FSD v10.8.1 Release Notes (Release 2021.44.30.5); (u) FSD v10.8 Release Notes

(Release 2021.44.25.5); (v) FSD v10.7 Release Notes, Full Self-Driving (Beta) and Driving Visualization Improvements (Release 2021.44.6); and (w) Autopark (Release 2021.44).

162.     At the time, LoSavio reasonably believed that many of these updates were being installed but were not yet active on his vehicle. For example, many of the updates concerned FSD Beta at a time FSD Beta was available to only a limited number of Tesla owners, and LoSavio was not one of those owners. LoSavio believed that the updates were part of the roll out prefatory to Tesla continuing to validate and eventually activate those features for his and other Tesla owners' use. LoSavio was encouraged by the fact of the updates because he believed they were evidence of Tesla making concrete progress toward the promised full roll-out and activation of software that would make his car self-driving. Based on these continual updates, LoSavio believed that Tesla was somewhat behind schedule relative some of its early predictions but that it was otherwise making concrete progress and on track to providing a self-driving software, and that it was just a matter of waiting a little longer for Tesla to refine that software and activate it on his vehicle.

163.     In addition to reading the news and keeping up with software updates to his vehicle, LoSavio also regularly stayed in contact with and sought out information from Tesla employees and representatives about the state of development and timeline for Tesla bringing its promised self-driving software to market. For example, 6 to 9 months after his purchase, LoSavio began inquiring through local Tesla service centers about when his vehicle would have the features that he had paid for to make his car self-driving. He visited Tesla service centers periodically to have his car serviced, and when he did, he commonly asked service center workers if they knew anything about when Tesla's full self-driving software could be activated on his car. The same was true of the few visits he made to the Tesla showroom in Burlingame, California after his purchase. The responses he received from Tesla employees on those occasions were consistent with and confirmed his original understanding that the software would be activated within a year or two, or some other reasonably short time, after his purchase. On one visit to the Tesla showroom in Burlingame, California within a year or two after purchase, LoSavio asked about when self-driving features on his car might be activated, and the Tesla representative told him that those features could not be updated through the showroom. Rather, LoSavio was told he would need to make a Tesla service appointment.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

164.    Following these instructions, LoSavio made service appointments with Tesla service centers in 2018, 2019, and 2020, so that Tesla could perform whatever service was necessary for self-driving features to be activated on his vehicle. However, most every time he made a service appointment, Tesla would cancel the appointment as the date approached. For example, on August 7, 2020, LoSavio brought his car into the Tesla Service Center for a service that Tesla documentation describes as an "FSD Computer Retrofit." Tesla has represented that an FSD Computer Retrofit was performed on his vehicle during that appointment. However, following the appointment, the FSD software on his car was still not activated.

165.    Before Losavio's purchase and in the years following his purchase, the Tesla website and Tesla employees consistently represented to LoSavio that his Model S had all the hardware needed for full self-driving, and that all his car needed to become fully self-driving was software updates that could be delivered to his car in over-the-air updates. However, in November 2021, Tesla told LoSavio that his vehicle would now need hardware upgrades to activate FSD on his vehicle. That month, LoSavio had once again scheduled an appointment to get FSD working on his vehicle, but Tesla Service canceled the appointment by text on November 13, 2021. The text informed LoSavio that "there was just announced about a camera upgrade that needs to be performed on your vehicle. The cameras are not available at this time. You will receive a notice from Tesla when the parts become available for your vehicle. That is when you can make an appointment – We will go ahead and close out this appointment."

166.    LoSavio then scheduled a camera upgrade appointment with Tesla Service. On December 24, 2021, Tesla responded: "The camera upgrade for Full Self-Driving is not yet available. Qualifying customers will be notified and asked to schedule service one [sic] the upgrade is available. We will be closing this appointment now, but please let us know if you have any questions." On December 25, 2021, LoSavio texted back asking for the expected date of the upgrade, but the only response was to be again told that the service appointment has been closed, and that for additional service needs he must schedule an appointment via the Tesla app.

167.    In December 2021, NHTSA issued a recall related to the secondary trunk latch on Tesla Model S vehicles, which impacted LoSavio's vehicle. On or around March 20, 2022, LoSavio

contacted Tesla Service through its app to obtain the repair for the trunk defect and also to obtain any necessary FSD upgrades. On March 20, 2022, Tesla Service responded that there was an FSD hardware upgrade to his vehicle on August 8, 2020, but "[t]here is one more equipment upgrade that will need to be performed on your vehicle. Tesla has determined that the cameras that are installed on your vehicle will need to be upgraded to work with the latest hardware. You will receive a notice with the cameras will become available. Then you can make an appointment to have the updated." On March 25, 2022, in response to LoSavio's request for clarification, Tesla Service responded, "I am sorry for the miscommunication – for your vehicle the FSD has been updated – however there is still a camera upgrade that needs to be performed – at this time, the parts are not available. Once they are, you will be notified by Tesla."

168.     On April 22, 2022, Tesla Service left him a voicemail and also sent him a message through the Tesla app: "Looks like we did the FSD retrofit 2 years ago. Your service appointment is confirmed." LoSavio responded to explain that he was told the driver facing cameras were necessary for FSD, and that was what he was trying to schedule. Tesla Service responded, "I checked with my technicians and that is not a service that we perform or have heard of." LoSavio responded by sending copies of the earlier Tesla messages he had received regarding the so-called camera upgrade, and Tesla Service responded by asking if he had received notice that the camera was available. On April 23, 2022, Tesla Service responded to LoSavio, "No you are correct I was just confused because you only mentioned the forward facing cameras. Unfortunately we do have to wait until you get the notice. Our parts team physically can not order parts that are not configured to your vehicles vin. Without the notice they will not be able to order the cameras."

169.     Following this, LoSavio considered Tesla's numerous delays and changing explanations for the delayed activation of FSD on his vehicle, and the fact that it had now been over five years since he purchased his car. He realized for the first time that the most likely explanation for why FSD was not activated on his vehicle was that Tesla and Musk had misled him about the current state of its self-driving technology, had misled him about the likely timeline for Tesla being able to make his car self-driving, and had been stringing him along, and that he was likely never going to get the self-driving car for which he had paid. As a result, he joined this litigation as a named plaintiff.

VIII.   <u>CLAIMS FOR RELIEF</u>

<u>FIRST CLAIM FOR RELIEF</u>

**Breach of Express Warranty**

**Cal. Civ. Code §§ 1791.2(a), 1794**

170.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

171.    Defendants expressly warranted to Plaintiff and Class members through written statements within the meaning of Cal. Civ. Code § 1791.2(a)(1) (including but not limited to statements that Defendants made or caused to be made on Tesla's website, in Tesla marketing materials, on Musk's Twitter account, in various print media, and other written forums) that the Class Vehicles were fully self-driving, or that they would be fully self-driving within a reasonable time after Plaintiff and Class members purchased or leased their respective Class Vehicles and ADAS packages.

172.    Defendants also expressly warranted to Plaintiff and Class members through use the of samples and models within the meaning of Cal. Civ. Code § 1791.2(a)(2) (including but not limited to videos Defendants produced purporting to show Tesla vehicles driving themselves) that the Class Vehicles were fully self-driving, or that they would be fully self-driving within a reasonable time after Plaintiff and Class members purchased or leased their respective Class Vehicles and ADAS packages.

173.    The Class Vehicles and ADAS packages that Plaintiff and Class members purchased or leased: were not as warranted when they left Tesla's factories, reached Plaintiff and Class members without substantial change in the condition in which they were sold or leased, and did not perform as warranted.

174.    Defendants breached their warranties by knowingly selling or leasing Class Vehicles equipped with ADAS packages and technology that had abilities, limitations, flaws, and value that were different from what Defendants had represented and warranted. Defendants' breaches were "willful" within the meaning of Cal. Civ. Code § 1794(c).

175.    As a direct and proximate result of Defendants' breaches, Plaintiff and Class members have suffered various injuries and economic losses, including but not limited to (1) purchasing or leasing Class Vehicles and ADAS packages they would not otherwise have purchased or leased;

1 | (2) purchasing or leasing an inferior product whose nature and characteristics render it of lesser value

2 | than represented; (3) incurring monetary harm from the diminution in the Class Vehicles' and ADAS

3 | packages' value and resale value; and (4) purchasing or leasing Class Vehicles and ADAS packages

4 | that pose a danger to the health and safety of Plaintiff, Class members, and the public.

5 |       176.    The failure of the Class Vehicles and ADAS packages to be as warranted was a

6 | substantial factor in causing Plaintiff's and Class members' harm, which includes the difference

7 | between the prices they paid for their respective Class Vehicles and ADAS packages as warranted

8 | and the actual value of their Class Vehicles and ADAS packages as delivered.

9 |       177.    Unless Defendants are enjoined from engaging in conduct alleged herein that violates

10 | their express warranties, members of the consuming public will be further harmed by that conduct.

11 |       178.    For relief, Plaintiff and the Class are entitled to and seek (a) an injunction prohibiting

12 | Defendants from sending or transmitting false, deceptive, or misleading statements to the public

13 | regarding the abilities, limitations, flaws, and value of Tesla's ADAS packages and technology;

14 | (b) damages caused by Defendants' breaches of the warranties, including economic damages (based

15 | on the return of the price that Plaintiff and Class members paid for their respective Class Vehicles and

16 | ADAS packages and/or the difference between the price paid for the Class Vehicles and ADAS

17 | packages as warranted and their actual value as delivered); (c) consequential and incidental damages;

18 | (d) a civil penalty of two times the amount of damages under Cal. Civ. Code § 1794; (d) reasonable

19 | attorneys' fees and costs under Cal. Civ. Code § 1794 and any other applicable law; and (e) all other

20 | available relief prayed for below.

21 |       WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

22 | **SECOND CLAIM FOR RELIEF**

23 | **Breach of Implied Warranties**

24 | **Cal. Civ. Code §§ 1791.1, 1792, 1794**

25 |       179.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth

26 | above, as though fully set forth in this Claim for Relief.

27 |       180.    Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, *et seq.*,

28 | every sale or lease of consumer goods to a retail buyer is accompanied by an implied warranty of

merchantability from both the manufacturer and the retail seller or lessor, and some such sales and leases may also be accompanied by an implied warranty of fitness from both the manufacturer and the retail seller or lessor. *Id.* § 1792-1792.2.

181.    The durations of these implied warranties are coextensive with the duration of the Defendants' express warranty, provided the duration of the express warranty is reasonable, except that the duration of the implied warranties cannot have a duration of less than 60 days or more than one year. *Id.* § 1791.1(c).

182.    Defendants' sale or lease of Class Vehicles and ADAS packages to Plaintiff and Class members was accompanied by Defendants' implied warranty of merchantability, both in their capacities as manufacturer and as retail seller or lessor of Class Vehicles and ADAS packages. *Id.* § 1792.

183.    Defendants' implied warranties of merchantability include warranties that the Class Vehicles and ADAS packages (1) will pass without objection in the trade under the contract description, (2) are fit for the ordinary purposes for which such goods are used, (3) are adequately contained, packaged, and labelled, and (4) will conform to the promises or affirmations of fact made on the container or label. *Id.* § 1791.1(a).

184.    At the time of purchase or lease, or within one year thereafter, the Class Vehicles and ADAS packages and technology failed to conform with Defendants' implied warranty of merchantability because they (1) did not pass without objection in the trade under the contract description, (2) were not fit for the ordinary purposes for which such goods are used, (3) were not adequately contained, packaged, and labelled, and (4) did not conform to the promises or affirmations of fact made on the container or label. Among other things, the Class Vehicles and ADAS packages did not conform to the promises contained in the labels "Autopilot," "Enhanced Autopilot," and "Full Self-Driving Capability."

185.    Defendants' sale or lease of Class Vehicles and ADAS packages to Plaintiff and Class members was also accompanied by Defendants' implied warranty of fitness, both in their capacities as manufacturer and as retail seller or lessor of Class Vehicles and ADAS packages. *Id.* § 1792.

186.    At the time that Plaintiff and Class members purchased or leased their Class Vehicles and ADAS packages from Defendants, Defendants were in the business of designing, developing, testing, manufacturing, selling, and leasing electric vehicles and ADAS technology in general, and the Class Vehicles and Tesla's ADAS packages and technologies in particular.

187.    Defendants held themselves out as having special knowledge or skill regarding the designing, developing, testing, and manufacturing of electric vehicles and ADAS technology in general, and the Class Vehicles and Tesla's ADAS packages and technologies in particular. Further, Defendants knew or had reason to know that Plaintiff and Class members required the Class Vehicles and ADAS packages for a particular purpose, and that Plaintiff and Class members were relying on Defendants' skill and judgment to furnish goods suitable for that purpose.

188.    Defendants breached the implied warranty of fitness because they failed to deliver Class Vehicles and ADAS packages that were suited to Plaintiff's and Class members' purpose of purchasing or leasing a car that was fully self-driving car at the time of transaction, or that would be fully self-driving within a reasonably short period thereafter.

189.    Defendants breached their warranties by knowingly selling or leasing Class Vehicles equipped with ADAS packages and technology that had abilities, limitations, flaws, and value that were different from what Defendants had represented and warranted. Defendants' breaches were "willful" within the meaning of Cal. Civ. Code § 1794(c).

190.    As a direct and proximate result of these breaches, Plaintiff and Class members have suffered various injuries and economic losses, including but not limited to (1) purchasing or leasing Class Vehicles and ADAS packages they would not otherwise have purchased or leased; (2) purchasing or leasing inferior products whose nature and characteristics render them of lesser value than warranted; (3) incurring monetary harm from the diminution in the Class Vehicles' and ADAS packages' value and resale value; and (4) purchasing or leasing Class Vehicles and ADAS packages that pose a danger to the health and safety of Plaintiff, Class members, and the public.

191.    The failure of the Class Vehicles and ADAS packages to be as warranted was a substantial factor in causing Plaintiff's and Class members' harm, which includes the difference

1  between the prices they paid for their respective Class Vehicles and ADAS packages as warranted

2  and the actual value of their Class Vehicles and ADAS packages as delivered.

3       192.    Unless Defendants are enjoined from engaging in conduct alleged herein that violates

4  their implied warranties, members of the consuming public will be further harmed by that conduct.

5       193.    For relief, Plaintiff and the Class are entitled to and seek (a) an injunction prohibiting

6  Defendants from sending or transmitting false, deceptive, or misleading statements to the public

7  regarding the abilities, limitations, flaws, and value of Tesla's ADAS packages and technology;

8  (b) damages caused by Defendants' breaches of their warranties, including economic damages (based

9  on the return of the price that Plaintiff and Class members paid for their respective Class Vehicles and

10  ADAS packages and/or the difference between the price paid for the Class Vehicles and ADAS

11  packages as warranted and their actual value as delivered); (c) consequential and incidental damages;

12  (d) a civil penalty of two times the amount of damages under Cal. Civ. Code § 1794; (e) reasonable

13  attorneys' fees and costs under Cal. Civ. Code § 1794 and any other applicable law; and (f) all other

14  available relief prayed for below.

15       WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

16  **THIRD CLAIM FOR RELIEF**

17  **Violation of the California False Advertising Law**

18  **Cal. Bus. & Prof. Code § 17500, *et seq.***

19       194.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth

20  above, as though fully set forth in this Claim for Relief.

21       195.    Defendants' conduct alleged herein violates California's False Advertising Law

22  ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*, which makes it unlawful for a business to make,

23  disseminate, or cause to be made or disseminated to the public "any statement, concerning … personal

24  property … which is untrue or misleading, and which is known, or which by the exercise of

25  reasonable care should be known, to be untrue or misleading." *Id.* § 17500.

26       196.    The Class Vehicles and ADAS packages (including all ADAS hardware, software, and

27  rights to receive updates and use the same) are "personal property" within the meaning of the FAL.

28

197.    Any express or implied representation, material omission of information, or failure to correct a past material misrepresentation or omission regarding the abilities, limitations, flaws, or value of the Class Vehicles and ADAS packages and technology is a "statement[] concerning personal property" within the meaning of the FAL.

198.    Defendants violated the FAL by making, disseminating, and causing to be made or disseminated to the public statements about the abilities, limitations, flaws, and value of Tesla's ADAS packages and technology that were "untrue or misleading" within the meaning of the FAL, and by failing to correct what was untrue or misleading about those statements after they had been made.

199.    Defendants made, disseminated, caused to be made or disseminated, and failed to correct such public statements in numerous forums, including but not limited to Tesla's blog and website, Musk's Twitter account, earnings calls and other public statements to investors, conferences and other public events, television, radio, podcasts, and other publicly available media (whether print, video, audio, or some other format) that republished such representations and omissions.

200.    Defendants knew or, by the exercise of reasonable care, should have known about each of those statements at or near the time they were made or disseminated, and at all times thereafter.

201.    Defendants knew or, by the exercise of reasonable care, should have known that each of those statements was untrue, misleading, and likely to deceive the public at or near the time it was made or disseminated, and at all times thereafter.

202.    Unless Defendants are enjoined from engaging in the conduct alleged herein that violates the FAL, members of the consuming public will be further harmed by that conduct.

203.    As a result of Defendants' FAL violations and the harm caused thereby, Plaintiff and Class members are entitled to and seek (a) injunctive relief to protect the consuming public by prohibiting Tesla from engaging in its past and ongoing acts, omissions, and conduct that violate the FAL; (b) restitution of the full value of all monies and other consideration that Plaintiff and Class members paid Defendants for the purchase or lease of Class Vehicles and ADAS packages, which Defendant continues to wrongfully retain, including any diminished value of Plaintiff's and Class members' Class Vehicles and ADAS packages and disgorgement of the profits Defendants derived

1  from their wrongful conduct; (c) an award of reasonable attorneys' fees under Cal. Code Civ. Proc.

2  § 1021.5 and any other applicable law; and (d) all other available relief prayed for below.

3      WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

4  **FOURTH CLAIM FOR RELIEF**

5  **Violation of the California Consumer Legal Remedies Act**

6  **Cal. Civ. Code § 1750, *et seq.***

7      204.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth

8  above, as though fully set forth in this Claim for Relief.

9      205.    The California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et*

10  *seq.*, makes unlawful certain "unfair methods of competition and unfair or deceptive acts or practices

11  … undertaken by any person in a transaction intended to result or that results in the sale or lease of

12  goods or service to any consumer." *Id.* § 1770(a).

13      206.    Each Defendant is a "person" under the CLRA, *id.* § 1761(c).

14      207.    Plaintiff and all Class members are "consumers" under the CLRA because they are all

15  individuals who acquired, by purchase or lease, Class Vehicles and ADAS packages for personal,

16  family, or household purposes. *See id.* § 1761(d).

17      208.    The purchase or lease of a Class Vehicle and/or ADAS package is a "transaction"

18  under the CLRA, *id.* § 1761(e).

19      209.    Class Vehicles and ADAS packages are "goods" under the CLRA, *id.* § 1761(a).

20      210.    In selling or leasing Class Vehicles and ADAS packages to Plaintiff and Class

21  members, Defendants made an express or implied promise to provide future ADAS software

22  development, future ADAS software updates, and other work or labor that constitutes "services"

23  under the CLRA, *id.* § 1761(b).

24      211.    Defendants' wrongful acts, practices, and conduct alleged herein—including but not

25  limited to their false, misleading, and deceptive marketing, representations, and omissions regarding

26  the present and likely future abilities, limitations, flaws, and value of Class Vehicles and ADAS

27  packages and technology, and the time periods in which Tesla's ADAS packages and technology

28

1 would result in a fully self-driving vehicle—are "unfair or deceptive acts or practices" in violation of

2 the CLRA, *id.* § 1770(a).

3     212.   "Unfair or deceptive acts or practices" in violation of the CLRA include but are not

4 limited to: (a) representing that goods or services have characteristics, ingredients, uses, or benefits

5 that they do not have, *id.* § 1770(a)(5); (b) representing that goods or services are of a particular

6 standard or quality, or that goods are of a particular style or model, if they are of another, *id.*

7 § 1770(a)(7); (c) advertising goods or services with intent not to sell or lease them as advertised, *id.*

8 § 1770(a)(9); and (d) representing that the subject of a transaction has been supplied in accordance

9 with a previous representation when it has not, *id.* § 1770(a)(16).

10     213.   Defendants committed these unfair or deceptive acts or practices when they sold or

11 leased Class Vehicles and ADAS packages to Plaintiff and Class members that did not have

12 represented characteristics, uses, and benefits; were not of the represented quality; were not sold or

13 leased as advertised; did not perform as advertised; and were materially worse, less capable, less safe,

14 and less valuable than Defendants had represented, and continued to represent them, to be.

15     214.   Defendants knowingly and intentionally committed these unfair or deceptive acts or

16 practices.

17     215.   A reasonable consumer would consider knowing the reasons why Defendants'

18 representations were unfair or deceptive to be material and important in deciding whether to purchase

19 or lease a Class Vehicle, and whether to pay additional money above the vehicle's base price for an

20 ADAS package.

21     216.   Defendants' unfair or deceptive acts or practices materially affected Plaintiff's and

22 Class members' purchasing and leasing decisions. Defendants' false, misleading, and deceptive

23 marketing, representations, and omissions regarding Class Vehicles and ADAS packages and

24 technology were a substantial factor in Plaintiff's and Class members' decisions to purchase or lease

25 Class Vehicles, and their decisions to pay thousands of dollars above the vehicle's base price for an

26 ADAS package.

27     217.   Plaintiff's CLRA venue affidavits is attached here as **<u>Exhibit E</u>**, in accordance with

28 Cal. Civ. Code § 1780(d).

218.   Unless Defendants are enjoined from engaging in conduct alleged herein that violates the CLRA, members of the consuming public will be further harmed by that conduct.

219.   As a result of Defendants' CLRA violations and the harm caused thereby, Plaintiff and Class members are entitled to and seek (a) injunctive relief to protect the consuming public by prohibiting Defendants from engaging in its past and ongoing acts, omissions, and conduct that violate the CLRA; (b) an award of reasonable attorneys' fees under Cal. Civ. Code § 1780(e), Cal. Code Civ. Proc. § 1021.5, and any other applicable law; and (c) all other available relief prayed for below.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## FIFTH CLAIM FOR RELIEF

### Violation of the California Unfair Competition Law

### Cal. Bus. & Prof. Code § 17200, *et seq.*

220.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

221.   California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, prohibits any unlawful, unfair, or fraudulent business act or practice, including but not limited any act or practice that constitutes deception, fraud, misrepresentation, or the concealment, suppression, or omission of a material fact in a consumer transaction, or that is likely to deceive the consuming public.

222.   Defendants' wrongful acts and omissions alleged herein were and are unlawful, unfair, and fraudulent business acts and practices in violation of the UCL. Defendants' wrongful acts and omissions alleged herein were and are likely to deceive the consuming public in California and throughout the United States regarding the abilities, limitations, flaws, and value of the Class Vehicles and Tesla's ADAS packages and technology. Defendants' wrongful acts and omissions alleged herein also constitute deception, fraud, and misrepresentation, and concealment, suppression, and omission of material facts in the context of consumer transactions with Plaintiff and Class members.

223.   Defendants knew or should have known that their wrongful acts and omissions alleged herein were are likely to deceive the consuming public in California and the rest of the United States,

1 and Defendants committed those acts and omissions anyway for their own financial gain, including

2 for the purpose of shoring up and otherwise improve their financial condition, avoiding bankruptcy,

3 increasing the likelihood of receiving new capital from investors, increasing their revenue and profits,

4 and increasing the value of Tesla (including by increasing its share price).

5     224.    Defendants' "unfair" business acts and practices under the UCL include, among other

6 things, Defendants' acts, omissions, and conduct in: (a) marketing and referring to Tesla's ADAS

7 packages and technology as "Autopilot," "Full Self-Driving," and "Full Self-Driving Capability";

8 (b) representing the capabilities, limitations, flaws, and value of Tesla's ADAS packages and

9 technology to the public in a way that is materially different from how Defendants

10 contemporaneously represented those same subjects to regulators, especially when those

11 representations were communicated to regulators in a non-public forum or in a way not

12 contemporaneously available to the public (e.g., when a FOIA or PRA request is required to obtain

13 the communication); (c) describing and marketing Tesla's ADAS packages and technology in a way

14 that largely or entirely focuses on its actual or purported positive attributes and abilities in forums

15 likely to generate significant public attention or reach large numbers of consumers (e.g., Musk's

16 Twitter feed, interviews with high-distribution or otherwise influential media outlets, news

17 conferences and other public events likely to generate media coverage, pages on the Tesla website

18 that potential Tesla customers are more likely to visit than other pages on the website), while

19 relegating information about the ADAS packages' and technology's limitations and flaws to forums

20 likely to generate little public attention or otherwise reach a relatively small number of relevant

21 consumers (e.g., pages on the Tesla website that potential Tesla customers are less likely to visit than

22 other pages on the website, vehicle user manuals, regulatory filings); (d) misrepresenting or otherwise

23 providing information likely to deceive the public regarding the then-existing abilities, limitations,

24 flaws, and value of Tesla's ADAS packages and technology, including versions of that technology

25 then available to some or all eligible Tesla owners, and versions Defendants represented to be in their

26 possession but not yet available to some or all eligible Tesla owners; (e) misrepresenting or otherwise

27 providing information likely to deceive the public regarding the likely future abilities, limitations,

28 flaws, and value of Tesla's ADAS packages and technology, and the time periods in which those

1   future abilities would likely be achieved and the future limitations and flaws likely reduced or

2   eliminated; and (f) otherwise disseminating or causing to be disseminated to the consuming public

3   information likely to deceive the consuming public in California and the rest of the United States.

4        225.    Defendants' acts, omissions, and conduct alleged herein were and are "unfair" under

5   the UCL because they are offensive to public policy and constitute immoral, unethical, oppressive,

6   and unscrupulous activities that caused and continue to cause substantial injury to the consuming

7   public, including Plaintiff and Class members. The harm caused by Defendants' conduct greatly

8   outweighs any countervailing benefits to consumers or competition.

9        226.    Defendants have engaged in "unlawful" business acts and practices by, as set forth in

10  this Complaint, violating the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, *et seq.*;

11  violating the California False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*; violating the

12  California Consumer Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*; and violating their common

13  law obligations.

14       227.    Defendants have further engaged in "unlawful" business acts and practices by

15  (a) committing "unfair or deceptive acts or practices in or affecting commerce" in violation of 15

16  U.S.C. § 45; (b) "mak[ing] or disseminat[ing], or caus[ing] to be made or disseminated, before the

17  public in this state … a statement that is untrue or misleading and that is known, or that by the

18  exercise of reasonable care should be known, to be untrue or misleading," in violation of Cal. Vehicle

19  Code § 11713(a); (c) "mak[ing] or disseminat[ing], or caus[ing] to be so disseminated, a statement as

20  part of a plan or scheme with the intent not to sell a vehicle or service … as so advertised," in

21  violation of Cal. Vehicle Code § 11713(a); (d) making "advertised statements, representations, or

22  offers [] in connection with the sale or attempted sale of any vehicle(s)" that is not "clearly set forth,"

23  "based on facts," or otherwise violates the Vehicle Code or Title 13, Division 1, Chapter 1 of the

24  California Code of Regulations, in violation of 13 Cal. Code Regs. § 260.00; (e) violating other

25  "provision[s] of Article 1 (commencing with Section 11700) of, or Article 1.1 (commencing with

26  Section 11750) of, Chapter 4 of Division 5 or any rule or regulation adopted pursuant thereto," as

27  referenced in Cal. Vehicle Code § 11705(a)(10); and (f) causing Plaintiff and all other Class members

28

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1   to suffer "loss or damage by reason of any fraud or deceit practiced on that person or fraudulent

2   representations made to that person" within the meaning of Cal. Vehicle Code § 11705(a)(14).

3          228.    Defendants have engaged in "fraudulent" business acts and practices by making

4   representations (including by failing to disclose and concealing information) about the abilities,

5   limitations, flaws, and value of the Class Vehicles and Tesla's ADAS packages and technology that

6   were likely to deceive the public. Among other representations likely to deceive the public,

7   Defendants represented the Class Vehicles and Tesla's ADAS packages and technology as being

8   capable of full self-driving at the time of purchase or lease, or within a reasonably short period

9   thereafter. Plaintiff and Class members reasonably relied on Defendants' representations,

10  nondisclosure, and concealment, and suffered economic injury as a result, including by not receiving

11  the full benefit of the bargain from their purchase or lease of their new Tesla vehicle and ADAS

12  package.

13         229.    Defendants' wrongful conduct and the harm it has caused, and continues to cause, was

14  and is not reasonably avoidable by Plaintiff, Class members, or the consuming public. At all relevant

15  times, Defendants knew or should have known that Plaintiff and Class members would not have

16  reasonably known or discovered that so many of Defendants' representations regarding the present

17  and likely future abilities, limitations, flaws, and value of Tesla's ADAS packages and technology,

18  and time periods in which those future abilities would likely be achieved and the future limitations

19  and flaws likely reduced or eliminated, were false, deceptive, or misleading.

20         230.    Defendants' false, deceptive, or misleading representations regarding the capabilities,

21  limitations, flaws, and value of Tesla's ADAS packages and technology were material, and Plaintiff's

22  and Class members' reasonable reliance on the truth and accuracy of those material

23  misrepresentations was a substantial factor in influencing Plaintiff and Class members to purchase or

24  lease Class Vehicles and ADAS packages from Defendants.

25         231.    As a direct and proximate result of their wrongful conduct, Defendants (a) have

26  received wrongful obtained money from Plaintiff and Class members that rightfully belongs to

27  Plaintiff and Class members, but that Defendants continue to wrongfully retain; (b) will continue to

28  receive revenue, profits, and other benefits that they would not have received if they had not engaged

in conduct violating the UCL as alleged herein, and (c) have obtained, and will continue to obtain, an unfair advantage over similar businesses that represent their goods and services in a manner that either does not violate the UCL, or that violates the UCL to a lesser extent than Defendants.

232.    As a direct and proximate cause of Defendants' UCL violations, Plaintiff and Class members have each suffered monetary injury because they each paid Defendants money for a good or service (e.g., a vehicle with full self-driving capability) that Defendants have never provided, and because Defendants have wrongfully retained those monies.

233.    Unless Defendants are enjoined from engaging in conduct alleged herein that violates the UCL, members of the consuming public will be further harmed by that conduct.

234.    As a result of Defendants' UCL violations and the harm caused thereby, Plaintiff and Class members seek and are entitled to (a) injunctive relief to protect the consuming public by prohibiting Defendants from engaging in their past and ongoing acts, omissions, and conduct that violate the UCL; (b) restitution of the full value of all monies and other consideration that Plaintiff and Class members paid Defendants for Class Vehicles and for ADAS packages, including any diminished value of Plaintiff's and Class members' Class Vehicles and ADAS packages and disgorgement of the profits Defendants derived from their wrongful conduct; (c) an award of reasonable attorneys' fees under Cal. Code Civ. Proc. § 1021.5 and any other applicable law; and (d) all other available relief prayed for below.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## SIXTH CLAIM FOR RELIEF

### Fraud and Deceit

### Cal. Civ. Code §§ 1572, 1573, 1710

235.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

236.    Based on Defendants' conduct alleged in this Complaint, Defendants have engaged in fraud and deceit as set forth in Cal. Civ. Code §§ 1572, 1573, and 1710.

237.    Defendants misrepresented to Plaintiff and Class members the abilities, limitations, flaws, and value of Class Vehicles and Tesla's ADAS packages by marketing them in a manner that

Defendants knew was materially false and deceptive, including by knowingly engaging in misrepresentation, nondisclosure, and concealment of material facts. Among other wrongful conduct, Defendants knowingly misrepresented the Class Vehicles and Tesla's ADAS packages and technology as being capable of full self-driving at the time of purchase or lease, or within a reasonably short period thereafter.

238.    Plaintiff and Class members reasonably relied on Defendants' misrepresentations, nondisclosure, and concealment, and were induced by Defendants' wrongful conduct to purchase or lease Class Vehicles and ADAS packages that they would not otherwise have purchased or leased in the absence of Defendants' fraud and deceit.

239.    As a direct and proximate result of Defendants' fraud and deceit, Plaintiff and Class members have suffered damages and other harms. Plaintiff's and Class members' reliance was a substantial factor in causing their harm because they purchased or leased Class Vehicles and ADAS packages that they would not otherwise have purchased or leased, and/or because they paid materially more for Class Vehicles and ADAS packages than they otherwise would have paid, in the absence of Defendants' fraud and deceit.

240.    Defendants' misrepresentations, deceit, and concealment were intentionally false or deceptive, and Defendants engaged in that conduct with the intent to mislead and deceive Plaintiff and Class members in order to obtain their business and otherwise benefit financially. As a result, Plaintiff and Class members are entitled punitive or exemplary damages under Cal. Civ. Code § 3294.

241.    As a result of Defendants' fraud and deceit and the harm caused thereby, Plaintiff and Class members seek and are entitled to (a) damages in an amount to be determined at trial, (b) punitive or exemplary damages under Cal. Civ. Code § 3294 and any other applicable law, and (c) all other available relief prayed for below.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## SEVENTH CLAIM FOR RELIEF

### Negligent Misrepresentation

242.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

243.    Defendants misrepresented the abilities, limitations, flaws, and value of Class Vehicles and ADAS packages by marketing the Class Vehicles and ADAS packages as being capable of full self-driving at the time of purchase or lease, or within a reasonable short period thereafter.

244.    Defendants' representations were not true because the Class Vehicles and ADAS packages were not capable of full self-driving at the time of purchase or lease, or within a reasonable short period thereafter. On information and belief, Defendants are still nowhere near being able to deliver fully self-driving vehicles to Plaintiff, Class members, and the consuming public.

245.    Defendants had no reasonable grounds for believing their representations were true and not misleading or deceptive when they made them.

246.    Defendants' misrepresentations, nondisclosure, and/or concealment of material facts to Plaintiff and Class members, as set forth above, were intended by Defendants to mislead and deceive Plaintiff and Class members.

247.    Plaintiff and Class members reasonably relied on Defendants' misrepresentations, nondisclosure, and/or concealment, and were actually misled and deceived thereby, and were induced by Defendants' wrongful conduct to purchase or lease Class Vehicles and ADAS packages that they would not otherwise have purchased or leased in the absence of Defendants' wrongful conduct.

248.    Plaintiff and Class members were damaged by Defendants' misrepresentations, and Plaintiff's and Class members' reliance was a substantial factor in causing their harm.

249.    As a result of Defendants' negligent misrepresentation and the harm caused thereby, Plaintiff and Class members seek and are entitled to (a) damages in an amount to be determined at trial and (b) all other available relief prayed for below.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## EIGHTH CLAIM FOR RELIEF

### Negligence

250.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

251.    Defendants have a duty to their customers, potential customers, and consumers to exercise a degree of care that a reasonable person in a similar position would exercise, including a

duty to follow industry custom and standards to accurately represent the abilities, limitations, flaws, and value of Class Vehicles and Tesla's ADAS packages and technology.

252.   Defendants breached their duties to Plaintiff and Class members by negligently misrepresenting that the Class Vehicles and ADAS packages had greater abilities and value than they actually had, and fewer limitations and flaws than they actually had, and by further repeatedly representing that they were on the cusp of advancing their ADAS technology to the point of being able to deliver fully self-driving vehicles within a reasonable time in near future, when Defendants had no reasonable basis to believe that those representations were true, accurate, and non-misleading.

253.   As a direct and legal result of Defendants' wrongful acts and omissions, Plaintiff and Class members have suffered damages and other harms.

254.   Defendants' negligence was a substantial factor in causing Plaintiff's and Class members' damages and other harms.

255.   As a result of Defendants' negligent misrepresentation and the harm caused thereby, Plaintiff and Class members seek and are entitled to (a) damages in an amount to be determined at trial and (b) all other available relief prayed for below.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## NINTH CLAIM FOR RELIEF

### Unjust Enrichment

256.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

257.   Plaintiff and Class members paid Defendants the value of Class Vehicles with ADAS packages that would make their vehicles fully self-driving at the time of purchase or lease, or within a reasonably short period thereafter.

258.   In exchange, Defendants provided Plaintiff and Class members with Class Vehicles and ADAS packages that could not meet Plaintiff's and Class members' reasonable expectations created by Defendants' marketing, labelling, and other representations, concealment, and nondisclosure.

259.     Defendants knew or should have known that the Class Vehicles and ADAS packages could not meet Plaintiff's and Class members' reasonable expectations created by Defendants' marketing, labelling, and other representations, concealment, and nondisclosure.

260.     As such, Plaintiff and Class members conferred value upon Defendants which would be unjust for Defendants to retain.

261.     As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and Class members have suffered and continue to suffer economic and other harms.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## IX.     PRAYER FOR RELIEF

262.     WHEREFORE, Plaintiff, on behalf of himself and all other Class members, pray for judgment against Defendants and the following relief:

A.     An order certifying this matter as a class action, appointing Plaintiff and his counsel of record to represent the Class, and requiring Defendants to pay the costs of all Class notice and administration of Class relief;

B.     Declaratory and preliminary and permanent injunctive relief prohibiting Defendants from continuing to engage in acts, omissions, and conduct alleged herein that violate any law set forth in the Claims for Relief for which injunctive relief is available, including but limited to the California FAL, CLRA, and UCL;

C.     An award of all recoverable actual, general, special, incidental, compensatory, consequential, statutory, and punitive damages, as well as civil penalties, in an amount to be determined at trial;

D.     An order awarding Plaintiff and the Class restitution and disgorgement in an amount to be determined at trial;

E.     An award of reasonable attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5, Cal. Civ. Code § 1780(e), Cal. Civ. Code § 1794, and any other applicable law;

F.     Pre- and post-judgment interest at the maximum rate provided by law; and

G.     Such other and further relief as the Court may deem proper.

1

**X.       DEMAND FOR JURY TRIAL**

2

Plaintiff hereby demands trial by jury on all issues so triable.

3

4

Dated:  October 30, 2023                    **COTCHETT, PITRE & McCARTHY, LLP**

5

By:      */s/ Frank M. Pitre*

6                                                            FRANK M. PITRE
                                                             JULIE L. FIEBER

7                                                            NABILAH A. HOSSAIN
                                                             ANDREW F. KIRTLEY

8
                                                             *Attorneys for Plaintiff Thomas LoSavio and the*

9                                                            *Proposed Class*

10

Dated:  October 30, 2023                    **BOTTINI & BOTTINI, INC.**

11

By:      */s/ Francis A. Bottini, Jr.*

12                                                           FRANCIS A. BOTTINI, JR.
                                                             NICHOLAUS H. WOLTERING

13
                                                             *Attorneys for the Proposed Class*

14

Dated:  October 30, 2023                    **CASEY GERRY SCHENK FRANCAVILLA**

15                                                           **BLATT & PENFIELD, LLP**

16

By:      */s/ David S. Casey, Jr.*

17                                                           DAVID S. CASEY, JR.
                                                             GAYLE M. BLATT

18                                                           JEREMY ROBINSON
                                                             P. CAMILLE GUERRA

19                                                           MICHAEL J. MORPHEW

20
                                                             *Attorneys for the Proposed Class*

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**Consolidated Second Amended Complaint**            81
Case No. 4:22-cv-05240-HSG

1

## **ATTORNEY ATTESTATION**

2          I, Frank M. Pitre, am the ECF User whose ID and password are being used to file this

3    Consolidated Second Amended Complaint. In compliance with Civil Local Rule 5-l(i)(3), I hereby

4    attest that concurrence in the filing of this document has been obtained from each signatory.

5

6     Dated:  October 30, 2023                          By:    */s/ Frank M. Pitre*
                                                                Frank M. Pitre

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit A

1   JENNIFER BERRY
    Assistant Chief Counsel
2   DANIAN HOPP, Attorney IV, SBN 204066
    DEPARTMENT OF MOTOR VEHICLES
3   Legal Affairs Division, Los Angeles Office
    Administrative Law Section
4   320 West Fourth Street, Suite 410
    Los Angeles, CA 90013-2318
5   Telephone: (213) 576-6237
    *Attorneys for Complainant*
6

FILED
DEPT. OF MOTOR VEHICLES
JUL 2 8 2022
By _____

7

8                    DEPARTMENT OF MOTOR VEHICLES

9                         STATE OF CALIFORNIA

10

11  In the Matter of the Accusation Against:          CASE NO. 21-02188

12  TESLA INC. dba TESLA MOTORS INC.,                 LICENSE NO. 63277
    a Vehicle Manufacturer,
13                                                    AIMS NO. 21V1L12011

14                                                    **ACCUSATION**

15                      Respondent.

16

17  COMPLAINANT ALLEGES AS FOLLOWS:

18                            **PARTIES**

19        1. AILENE SHORT (Complainant) brings this Accusation solely in her official

20  capacity as Branch Chief, Industry Services Branch, Occupational Licensing Operations,

21  Operations Division, Department of Motor Vehicles.

22        2. During the times set forth in the Cause for Discipline, TESLA INC. was doing

23  business as TESLA MOTORS INC. (Respondent), a corporation, operating in the State of

24  California, under vehicle manufacturer license number 63277 issued by the Department of Motor

25  Vehicles (Department). Said license is in full force and effect and is scheduled to expire on

26  October 31, 2022.

27  ///

28  ///

_____
                                      1
Accusation                    In re Tesla Inc. dba Tesla Motors Inc. (Manufacturer) Case No. 21-02188

1

**JURISDICTION**

2     3. This Accusation is brought before the Office of Administrative Hearings and is

3   conducted pursuant to Vehicle Code § 11705(c).

4     4. The Department has continuing jurisdiction to file this Accusation pursuant to

5   Vehicle Code § 11721(c).

6

**CAUSE FOR DISCIPLINE**

7     5. Respondent made or disseminated statements that are untrue or misleading, and not

8   based on facts, in advertising vehicles as equipped, or potentially equipped, with advanced

9   driver assistance system (ADAS) features.  On at least five dates between May 28, 2021, and

10  July 12, 2022, specifically May 28, 2021, June 3, 2022, June 14, 2022, June 28, 2022, and

11  July 12, 2022, Tesla advertised ADAS features in written marketing materials primarily on

12  Tesla's internet website using the product label and descriptions:

13     A. "Autopilot"

14     B. "Full Self-Driving Capability"

15     C. The phrase:  "The system is designed to be able to conduct short and long-distance

16        trips with no action required by the person in the driver's seat."

17     D. The claims:  "From Home - All you will need to do is get in and tell your car where

18        to go.  If you don't say anything, your car will look at your calendar and take you

19        there as the assumed destination. Your Tesla will figure out the optimal route,

20        navigating urban streets, complex intersections and freeways.  To your Destination

21        – When you arrive at your destination, simply step out at the entrance and your car

22        will enter park seek mode, automatically search for a spot and park itself.  A tap on

23        your phone summons it back to you."

24  Instead of simply identifying product or brand names, these "Autopilot" and "Full Self-Driving

25  Capability" labels and descriptions represent that vehicles equipped with the ADAS features

26  will operate as an autonomous vehicle, but vehicles equipped with those ADAS features could

27  not at the time of those advertisements, and cannot now, operate as autonomous vehicles.

28  These advertisements are a deceptive practice under Civil Code § 1770(a)(5).  Tesla has

2

1    published disclaimers including one observed June 28, 2022, stating in part: "The currently

2    enabled features require active driver supervision and do not make the vehicle autonomous."

3    However, the disclaimer contradicts the original untrue or misleading labels and claims, which

4    is misleading, and does not cure the violation.  Respondent advertised statements not based on

5    facts in violation of Cal. Code Regs. Title 13, § 260.00.  Respondent made untrue or

6    misleading statements in advertisements in violation of Vehicle Code § 11713(a).

7    Respondent's acts, omissions, or conduct constitutes cause to discipline a manufacturer license

8    pursuant to Vehicle Code § 11705(a)(10).

9                                      **PRAYER**

10       6. By reason of the facts alleged in paragraph 5 in this Accusation, Respondent's acts

11   or omissions are cause for suspension or revocation of Respondent's manufacturer license and

12   special plates under Vehicle Code § 11705.

13       WHEREFORE, the undersigned prays that the Department of Motor Vehicles take such

14   action against the license of the Respondent as is warranted by the facts of this case, to wit:

15       a.  To suspend or revoke Respondent's manufacturer license and special plates number

16            63277;

17       b.  For an order pursuant to Government Code § 11519.1(a), if applicable, that

18            Respondent pay restitution to the persons or institutions who have suffered financial

19            loss or damage, according to proof; and

20       c.  To order any other and further action as it may deem just and proper under the

21            circumstances.

22   DATED:  7/28/2022

23

24

25   AILENE SHORT
     Branch Chief, Industry Services Branch
26   Occupational Licensing Operations
     Operations Division
27   Department of Motor Vehicles

28

                                      3

Accusation                    In re Tesla Inc. dba Tesla Motors Inc. (Manufacturer) Case No. 21-02188

**DEPARTMENT OF MOTOR VEHICLES
STATEMENT TO RESPONDENT**

FILED
DEPT. OF MOTOR VEHICLES
JUL 2 8 2022
By *Immulcahy*

## ACCUSATION

An Accusation filed by the Chief, Occupational Licensing Branch ("Complainant"), Department of Motor Vehicles ("Department"), in which you are named as Respondent, is hereby served on you along with the enclosed Notice of Defense. *THE CHARGES IN THE ACCUSATION, IF PROVED, COULD HAVE SERIOUS CONSEQUENCES ON ANY OCCUPATIONAL LICENSE ISSUED TO YOU BY THE DEPARTMENT. PLEASE READ THE FOLLOWING INFORMATION CAREFULLY:*

**Defending the Accusation:** If you want to defend the allegations in the Accusation, you must submit a written request for a hearing (Notice of Defense) to the Department, signed by you or by an individual acting on your behalf. The request for hearing may be made by delivering or mailing the Notice of Defense as provided by Section 11506 of the Government Code, to the address checked below. If the Notice of Defense is not **delivered or mailed to the Department within 15 days** after the Accusation was personally served on you or mailed to you, the Department may proceed on the Accusation without a hearing. **Failure to file the Notice of Defense shall constitute a waiver of your right to a hearing** and the Department may take action against your license or license rights as provided by law.

**Representation by Counsel and Discovery:** You may, but need not, be represented by counsel **at your own expense** at all stages of these proceedings. If you desire the names and addresses of witnesses or an opportunity to inspect and copy the items mentioned in Section 11507.6 of the Government Code in the possession, custody or control of the Department, you may contact the Department at the address checked below. Copies of Sections 11507.5, 11507.6 and 11507.7 of the Government Code are attached.

**Postponements:** The hearing may be postponed only for good cause. If you desire a postponement and have good cause, you **must** notify the Department AND the Office of Administrative Hearings within 10 working days after you discover the good cause. Failure to give notice within 10 working days will deprive you of a postponement.

**Interpreters: The hearing shall be conducted in English. If you or your witnesses do not speak or understand English, you may request an interpreter BEFORE the commencement of the hearing, and the Department will provide one.**

**Waiver of Certain Objections:** If you sign and timely file the Notice of Defense, all parts of the Accusation which you do not expressly admit will be deemed denied. However, if you do not separately object to the Accusation on the ground that it is so indefinite or uncertain that you cannot identify the transaction or prepare a defense, all such objections to the form of the Accusation shall be deemed waived.

**Burden of Proof and Governing Procedures:** The Complainant has the burden of proving the charges in the Accusation before an Administrative Law Judge in an adjudicative proceeding held in accordance with the provisions of Chapters 4.5 and 5 of Title 2, Division 3, Part 1 of the Government Code (Section 11400 et seq.). In reaching a decision, the Administrative Law Judge may rely on certain guidelines applicable to your case. These guidelines are contained in 13 California Code of Regulations, section 440.04. You may obtain a copy of these Occupational Licensing and Disciplinary Guidelines by contacting the *Department of Motor Vehicles, Occupational Licensing Branch, Services and Support Unit, P. O. Box 932342, MS-L224, Sacramento, CA 94232-3420, telephone number (916) 229-3153.*

**If you desire further information, you may contact the Department's Legal Office:**

320 West Fourth Street, Suite 410, Los Angeles, California 90013-2318
Phone Number: (213) 576-6237



STATE OF CALIFORNIA
**DMV**
DEPARTMENT OF MOTOR VEHICLES
*A Public Service Agency*

## COPY OF GOVERNMENT CODE SECTION
## 11507.5, 11507.6 AND 11507.7
## PURSUANT TO GOVERNMENT CODE SECTIONS
## 11504 AND 11505.

### *11507.5.*

The provisions of Section 11507.6 provide the exclusive right to and method of discovery as to any proceeding governed by this chapter.

### *11507.6*

After initiation of a proceeding in which a respondent or other party is entitled to a hearing on the merits, a party, upon written request made to another party, prior to the hearing and within 30 days after service by the agency of the initial pleading or within 15 days after the service of an additional pleading, is entitled to (1) obtain the names and addresses of witnesses to the extent known to the other party, including, but not limited to, those intended to be called to testify at the hearing, and (2) inspect and make a copy of any of the following in the possession or custody or under the control of the other party:

(a)  A statement of a person, other than the respondent, named in the initial administrative pleading, or in any additional pleading, when it is claimed that the act or omission of the respondent as to this person is the basis for the administrative proceeding;

(b)  A statement pertaining to the subject matter of the proceeding made by any party to another party or person;

(c)  Statements of witnesses then proposed to be called by the party and of other persons having personal knowledge of the acts, omissions or events which are the basis for the proceeding, not included in (a) or (b) above;

(d)  All writings, including, but not limited to, reports of mental, physical and blood examinations and things which the party then proposes to offer in evidence;

(e)  Any other writing or thing which is relevant and which would be admissible in evidence;

(f)  Investigative reports made by or on behalf of the agency or other party pertaining to the subject matter of the proceeding, to the extent that these reports (1) contain the names and addresses of witnesses or of persons having personal knowledge of the acts, omissions or events which are the basis for the proceeding, or (2) reflect matters perceived by the investigator in the course of his or her investigation, or (3) contain or include by attachment any statement or writing described in (a) to (e), inclusive, or summary thereof.

For the purpose of this section, "statements" include written statements by the person signed or otherwise authenticated by him or her, stenographic, mechanical, electrical or other recordings, or transcripts thereof, of oral statements by the person, and written reports or summaries of these oral statements.

Nothing in this section shall authorize the inspection or copying of any writing or thing which is privileged from disclosure by law or otherwise made confidential or protected as the attorney's work product.

*11507.7.*

(a)  Any party claiming the party's request for discovery pursuant to Section 11507.6 has not been complied with may serve and file with the administrative law judge a motion to compel discovery, naming as respondent the party refusing or failing to comply with Section 11507.6. The motion shall state facts showing the respondent party failed or refused to comply with Section 11507.6, a description of the matters sought to be discovered, the reason or reasons why the matter is discoverable under that section, that a reasonable and good faith attempt to contact the respondent for an informal resolution of the issue has been made, and the ground or grounds of respondent's refusal so far as known to the moving party.

(b)  The motion shall be served upon respondent party and filed within 15 days after the respondent party first evidenced failure or refusal to comply with Section 11507.6 or within 30 days after request was made and the party has failed to reply to the request, or within another time provided by stipulation, whichever period is longer.

(c)  The hearing on the motion to compel discovery shall be held within 15 days after the motion is made, or a later time that the administrative law judge may on the judge's own motion for good cause determine. The respondent party shall have the right to serve and file a written answer or other response to the motion before or at the time of the hearing.

(d)  Where the matter sought to be discovered is under the custody or control of the respondent party and the respondent party asserts that the matter is not a discoverable matter under the provisions of Section 11507.6, or is privileged against disclosure under those provisions, the administrative law judge may order lodged with it matters provided in subdivision (b) of Section 915 of the Evidence Code and examine the matters in accordance with its provisions.

(e)  The administrative law judge shall decide the case on the matters examined in camera, the papers filed by the parties, and such oral argument and additional evidence as the administrative law judge may allow.

(f)  Unless otherwise stipulated by the parties, the administrative law judge shall no later than 15 days after the hearing make its order denying or granting the motion. The order shall be in writing setting forth the matters the party is entitled to discover under Section 11507.6. A copy of the order shall forthwith be served by mail by the administrative law judge upon the parties. Where the order grants the motion in whole or in part, the order shall not become effective until 10 days after the date the order is served. Where the order denies relief to the moving party, the order shall be effective on the date it is served.

# DEPARTMENT OF MOTOR VEHICLES

## STATE OF CALIFORNIA

In the Matter of the Accusation Against:

CASE NO. 21-02188

TESLA INC., dba TESLA MOTORS INC.,
a Vehicle Manufacturer,

NOTICE OF DEFENSE

Respondent.

I, the Respondent, in the above-entitled proceeding, acknowledge receipt of a copy of the Accusation, Statement to Respondent, and a copy of the Notice of Defense.

I hereby request a hearing to permit me to present my defense to the charges contained in said Accusation.

All correspondence concerning this proceeding should be sent to the following address:

(If you are represented by an attorney, all correspondence concerning this matter will be sent to the attorney.)

_____
Address                                                              Telephone Number

_____
City                                    State                        Zip Code

_____
Signature                               Date                         Email **(Required)**

**I will need an interpreter at my hearing: Yes _____ No _____**

**Language? _____**

**I consent to the proceedings at my hearing being recorded/reported electronically:    Yes _____    No _____**

ADM 1146 (REV 8/2008)
**DEPARTMENT OF MOTOR VEHICLES**
LEGAL OFFICE   C128
P.O. BOX 932382
SACRAMENTO, CA 94232-3820

NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES



# BUSINESS REPLY MAIL
FIRST CLASS     PERMIT NO. 1415     SACRAMENTO, CA

POSTAGE WILL BE PAID BY ADDRESSEE

STATE OF CALIFORNIA
DEPARTMENT OF MOTOR VEHICLES
LEGAL OFFICE   C128
P.O. BOX 932382
SACRAMENTO, CA 94299-9992

1
2
3                    DEPARTMENT OF MOTOR VEHICLES
4                        STATE OF CALIFORNIA
5

6   | In the Matter of the Accusation Against: | CASE NO. 21-02188 |

7   TESLA INC. dba TESLA MOTORS INC.,            LICENSE NO.  63277
    a Vehicle Manufacturer,
8                                                AIMS NO.  21V1L12011

9                    Respondent.               **REQUEST FOR DISCOVERY**

10

11  TO:  TESLA INC. dba TESLA MOTORS INC.

12          Pursuant to Government Code section 11507.6, Complainant requests the following:

13          1. The names and addresses of all witnesses to the extent known by you, including, but

14  not limited to, those intended to be called to testify at the hearing.

15          2. An opportunity to inspect and copy each and all the matters set forth in Government

16  Code section 11507.6, subdivisions (a) through (f) inclusive, which are under your possession,

17  custody, or control.

18          Please be advised that this request for discovery is continuing in nature.

19  Dated:  **JUL 2 8** 2022

20

21

22

23                                              DANIAN HOPP
                                                Attorney IV
24

25

26

27

28

                                                1

## DECLARATION OF SERVICE

Case Name   :     TESLA, INC., dba TESLA MOTORS, INC.

Case No.    :     21-02188

Court       :     OFFICE OF ADMINISTRATIVE HEARINGS

I declare:

I am employed in the County of Sacramento. My business address is 2415 First Avenue, Sacramento, CA 95818. I am over the age of 18 years and not a party to the within entitled case.

On **July 28, 2022**, I served the following:

### *ACCUSATION; STATEMENT TO RESPONDENT; COPY OF GOVERNMENT CODE SECTION 11507.5, 11507.6, AND 11507.7 PURSUANT TO GOVERNMENT CODE SECTIONS 11504 AND 11505; NOTICE OF DEFENSE; REQUEST FOR DISCOVERY*

Addressed as follows:

Tesla Inc., dba Tesla Motors Inc.
45500 Fremont Blvd.
Fremont, CA 94538

By the following method:

☒ **US MAIL:** By placing the true copies thereof enclosed in a sealed envelope marked certified mail with return receipt requested. I am familiar with the business practice at the Department of Motor Vehicles for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Department of Motor Vehicles is deposited with the United States Postal Service that same day in the ordinary course of business.

☐ **E-MAIL:** By causing a true copy of the above described document in pdf form to be e-mailed to the e-mail address/es listed above. **Opposing party has agreed to be served by email.**

☐ **OTHER SERVICE:** I caused such envelope(s) to be delivered to the office of the addressee(s) listed above by:
☐ Golden State Overnight

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed at Sacramento, California on **July 28, 2022**.

MAUREEN MULCAHY
Legal Secretary

CERTIFIED MAIL® ARTICLE NUMBER

9414 7266 9904 2972 0384 51

| US Postal Service® | | |
|---|---|---|
| **Certified Mail® Receipt** | Postage | $ |
| | Certified Mail Fee | $ |
| | Return Receipt Fee (Endorsement Required) | $ |
| | Restricted Delivery Fee (Endorsement Required) | $ |
| *Domestic Mail Only No Insurance Coverage Provided* | Total Postage & Fees | $ |

Postmark Here

Sent To:

21-02188   (ACC)   SMD

TESLA INC dba TESLA MOTORS INC
45500 FREMONT BOULEVARD
FREMONT, CA  94538

PS Form 3800, April 2015                    **SEE REVERSE FOR INSTRUCTIONS**

Exhibit B

1   JENNIFER BERRY
    Assistant Chief Counsel
2   DANIAN HOPP, Attorney IV, SBN 204066
    DEPARTMENT OF MOTOR VEHICLES
3   Legal Affairs Division, Los Angeles Office
    Administrative Law Section
4   320 West Fourth Street, Suite 410
    Los Angeles, CA 90013-2318
5   Telephone: (213) 576-6237
    *Attorneys for Complainant*
6

FILED
DEPT. OF MOTOR VEHICLES
JUL 2 8 2022
By MMulcahy

7

8                  DEPARTMENT OF MOTOR VEHICLES

9                        STATE OF CALIFORNIA

10

| 11   In the Matter of the Accusation Against: | CASE NO. 21-02189 |
|---|---|
| 12   TESLA INC. dba TESLA MOTORS INC., a Vehicle Dealer, | LICENSE NO. 68106 |
| 13   | AIMS NO. 21V1L12011 |
| 14   | **ACCUSATION** |
| 15                        Respondent. | |

16

17   COMPLAINANT ALLEGES AS FOLLOWS:

18                              **PARTIES**

19       1. AILENE SHORT (Complainant) brings this Accusation solely in her official

20   capacity as Branch Chief, Industry Services Branch, Occupational Licensing Operations,

21   Operations Division, Department of Motor Vehicles.

22       2. During the times set forth in the Cause for Discipline, TESLA INC. was doing

23   business as TESLA MOTORS INC. (Respondent), a corporation, operating in the State of

24   California, under vehicle dealer license number 68106 issued by the Department of Motor

25   Vehicles (Department). Said license is in full force and effect and is scheduled to expire on

26   October 31, 2022.

27   ///

28   ///

_____

                                        1

Accusation                    In re Tesla Inc. dba Tesla Motors Inc. (Dealer) Case No. 21-02189

1

**JURISDICTION**

2      3. This Accusation is brought before the Office of Administrative Hearings and is

3  conducted pursuant to Vehicle Code § 11705(c).

4      4. The Department has continuing jurisdiction to file this Accusation pursuant to

5  Vehicle Code § 11721(c).

6

**CAUSE FOR DISCIPLINE**

7      5. Respondent made or disseminated statements that are untrue or misleading, and not

8  based on facts, in advertising vehicles as equipped, or potentially equipped, with advanced

9  driver assistance system (ADAS) features. On at least five dates between May 28, 2021, and

10  July 12, 2022, specifically May 28, 2021, June 3, 2022, June 14, 2022, June 28, 2022, and

11  July 12, 2022, Tesla advertised ADAS features in written marketing materials primarily on

12  Tesla's internet website using the product labels and descriptions:

13      A. "Autopilot"

14      B. "Full Self-Driving Capability"

15      C. The phrase: "The system is designed to be able to conduct short and long-distance

16      trips with no action required by the person in the driver's seat."

17      D. The claims: "From Home - All you will need to do is get in and tell your car where

18      to go. If you don't say anything, your car will look at your calendar and take you

19      there as the assumed destination. Your Tesla will figure out the optimal route,

20      navigating urban streets, complex intersections and freeways. To your Destination

21      – When you arrive at your destination, simply step out at the entrance and your car

22      will enter park seek mode, automatically search for a spot and park itself. A tap on

23      your phone summons it back to you."

24  Instead of simply identifying product or brand names, these "Autopilot" and "Full Self-Driving

25  Capability" labels and descriptions represent that vehicles equipped with the ADAS features

26  will operate as an autonomous vehicle, but vehicles equipped with those ADAS features could

27  not at the time of those advertisements, and cannot now, operate as autonomous vehicles.

28  These advertisements are a deceptive practice under Civil Code § 1770(a)(5). Tesla has

2

1   published disclaimers including one observed June 28, 2022, stating in part: "The currently
2   enabled features require active driver supervision and do not make the vehicle autonomous."
3   However, the disclaimer contradicts the original untrue or misleading labels and claims, which
4   is misleading, and does not cure the violation.  Respondent advertised statements not based on
5   facts in violation of Cal. Code Regs. Title 13, § 260.00.  Respondent made untrue or
6   misleading statements in advertisements in violation of Vehicle Code § 11713(a).
7   Respondent's acts, omissions, or conduct constitutes cause to discipline a dealer license
8   pursuant to Vehicle Code § 11705(a)(10).

9                                                    **PRAYER**

10       6. By reason of the facts alleged in paragraph 5 in this Accusation, Respondent's acts
11   or omissions are cause for suspension or revocation of Respondent's dealer license and special
12   plates under Vehicle Code § 11705.

13       WHEREFORE, the undersigned prays that the Department of Motor Vehicles take such
14   action against the license of the Respondent as is warranted by the facts of this case, to wit:

15       a.  To suspend or revoke Respondent's dealer license and special plates number 68106;
16       b.  For an order pursuant to Government Code § 11519.1(a), if applicable, that
17           Respondent pay restitution to the persons or institutions who have suffered financial
18           loss or damage, according to proof; and
19       c.  To order any other and further action as it may deem just and proper under the
20           circumstances.

21   DATED:   7/28/2022

22
23
24                                          AILENE SHORT
                                            Branch Chief, Industry Services Branch
25                                          Occupational Licensing Operations
                                            Operations Division
26                                          Department of Motor Vehicles
27
28

                                                    3
     Accusation                          In re Tesla Inc. dba Tesla Motors Inc. (Dealer) Case No. 21-02189

**FILED**
DEPT. OF MOTOR VEHICLES

JUL 2 8 2022

By _[signature]_

## DEPARTMENT OF MOTOR VEHICLES
## STATEMENT TO RESPONDENT

### ACCUSATION

An Accusation filed by the Chief, Occupational Licensing Branch ("Complainant"), Department of Motor Vehicles ("Department"), in which you are named as Respondent, is hereby served on you along with the enclosed Notice of Defense. *THE CHARGES IN THE ACCUSATION, IF PROVED, COULD HAVE SERIOUS CONSEQUENCES ON ANY OCCUPATIONAL LICENSE ISSUED TO YOU BY THE DEPARTMENT. PLEASE READ THE FOLLOWING INFORMATION CAREFULLY:*

**Defending the Accusation:** If you want to defend the allegations in the Accusation, you must submit a written request for a hearing (Notice of Defense) to the Department, signed by you or by an individual acting on your behalf. The request for hearing may be made by delivering or mailing the Notice of Defense as provided by Section 11506 of the Government Code, to the address checked below. If the Notice of Defense is not **delivered or mailed to the Department within 15 days** after the Accusation was personally served on you or mailed to you, the Department may proceed on the Accusation without a hearing. **Failure to file the Notice of Defense shall constitute a waiver of your right to a hearing** and the Department may take action against your license or license rights as provided by law.

**Representation by Counsel and Discovery:** You may, but need not, be represented by counsel **at your own expense** at all stages of these proceedings. If you desire the names and addresses of witnesses or an opportunity to inspect and copy the items mentioned in Section 11507.6 of the Government Code in the possession, custody or control of the Department, you may contact the Department at the address checked below. Copies of Sections 11507.5, 11507.6 and 11507.7 of the Government Code are attached.

**Postponements:** The hearing may be postponed only for good cause. If you desire a postponement and have good cause, you **must** notify the Department AND the Office of Administrative Hearings within 10 working days after you discover the good cause. Failure to give notice within 10 working days will deprive you of a postponement.

**Interpreters: The hearing shall be conducted in English. If you or your witnesses do not speak or understand English, you may request an interpreter BEFORE the commencement of the hearing, and the Department will provide one.**

**Waiver of Certain Objections:** If you sign and timely file the Notice of Defense, all parts of the Accusation which you do not expressly admit will be deemed denied. However, if you do not separately object to the Accusation on the ground that it is so indefinite or uncertain that you cannot identify the transaction or prepare a defense, all such objections to the form of the Accusation shall be deemed waived.

**Burden of Proof and Governing Procedures:** The Complainant has the burden of proving the charges in the Accusation before an Administrative Law Judge in an adjudicative proceeding held in accordance with the provisions of Chapters 4.5 and 5 of Title 2, Division 3, Part 1 of the Government Code (Section 11400 et seq.). In reaching a decision, the Administrative Law Judge may rely on certain guidelines applicable to your case. These guidelines are contained in 13 California Code of Regulations, section 440.04. You may obtain a copy of these Occupational Licensing and Disciplinary Guidelines by contacting the *Department of Motor Vehicles, Occupational Licensing Branch, Services and Support Unit, P. O. Box 932342, MS-L224, Sacramento, CA 94232-3420, telephone number (916) 229-3153.*

**If you desire further information, you may contact the Department's Legal Office:**

320 West Fourth Street, Suite 410, Los Angeles, California 90013-2318
Phone Number: (213) 576-6237


A Public Service Agency

# COPY OF GOVERNMENT CODE SECTION 11507.5, 11507.6 AND 11507.7 PURSUANT TO GOVERNMENT CODE SECTIONS 11504 AND 11505.

## *11507.5.*

The provisions of Section 11507.6 provide the exclusive right to and method of discovery as to any proceeding governed by this chapter.

## *11507.6*

After initiation of a proceeding in which a respondent or other party is entitled to a hearing on the merits, a party, upon written request made to another party, prior to the hearing and within 30 days after service by the agency of the initial pleading or within 15 days after the service of an additional pleading, is entitled to (1) obtain the names and addresses of witnesses to the extent known to the other party, including, but not limited to, those intended to be called to testify at the hearing, and (2) inspect and make a copy of any of the following in the possession or custody or under the control of the other party:

(a) A statement of a person, other than the respondent, named in the initial administrative pleading, or in any additional pleading, when it is claimed that the act or omission of the respondent as to this person is the basis for the administrative proceeding;

(b) A statement pertaining to the subject matter of the proceeding made by any party to another party or person;

(c) Statements of witnesses then proposed to be called by the party and of other persons having personal knowledge of the acts, omissions or events which are the basis for the proceeding, not included in (a) or (b) above;

(d) All writings, including, but not limited to, reports of mental, physical and blood examinations and things which the party then proposes to offer in evidence;

(e) Any other writing or thing which is relevant and which would be admissible in evidence;

(f) Investigative reports made by or on behalf of the agency or other party pertaining to the subject matter of the proceeding, to the extent that these reports (1) contain the names and addresses of witnesses or of persons having personal knowledge of the acts, omissions or events which are the basis for the proceeding, or (2) reflect matters perceived by the investigator in the course of his or her investigation, or (3) contain or include by attachment any statement or writing described in (a) to (e), inclusive, or summary thereof.

For the purpose of this section, "statements" include written statements by the person signed or otherwise authenticated by him or her, stenographic, mechanical, electrical or other recordings, or transcripts thereof, of oral statements by the person, and written reports or summaries of these oral statements.

Nothing in this section shall authorize the inspection or copying of any writing or thing which is privileged from disclosure by law or otherwise made confidential or protected as the attorney's work product.

*11507.7.*

(a)  Any party claiming the party's request for discovery pursuant to Section 11507.6 has not been complied with may serve and file with the administrative law judge a motion to compel discovery, naming as respondent the party refusing or failing to comply with Section 11507.6. The motion shall state facts showing the respondent party failed or refused to comply with Section 11507.6, a description of the matters sought to be discovered, the reason or reasons why the matter is discoverable under that section, that a reasonable and good faith attempt to contact the respondent for an informal resolution of the issue has been made, and the ground or grounds of respondent's refusal so far as known to the moving party.

(b)  The motion shall be served upon respondent party and filed within 15 days after the respondent party first evidenced failure or refusal to comply with Section 11507.6 or within 30 days after request was made and the party has failed to reply to the request, or within another time provided by stipulation, whichever period is longer.

(c)  The hearing on the motion to compel discovery shall be held within 15 days after the motion is made, or a later time that the administrative law judge may on the judge's own motion for good cause determine. The respondent party shall have the right to serve and file a written answer or other response to the motion before or at the time of the hearing.

(d)  Where the matter sought to be discovered is under the custody or control of the respondent party and the respondent party asserts that the matter is not a discoverable matter under the provisions of Section 11507.6, or is privileged against disclosure under those provisions, the administrative law judge may order lodged with it matters provided in subdivision (b) of Section 915 of the Evidence Code and examine the matters in accordance with its provisions.

(e)  The administrative law judge shall decide the case on the matters examined in camera, the papers filed by the parties, and such oral argument and additional evidence as the administrative law judge may allow.

(f)  Unless otherwise stipulated by the parties, the administrative law judge shall no later than 15 days after the hearing make its order denying or granting the motion. The order shall be in writing setting forth the matters the party is entitled to discover under Section 11507.6. A copy of the order shall forthwith be served by mail by the administrative law judge upon the parties. Where the order grants the motion in whole or in part, the order shall not become effective until 10 days after the date the order is served. Where the order denies relief to the moving party, the order shall be effective on the date it is served.

**DEPARTMENT OF MOTOR VEHICLES**

**STATE OF CALIFORNIA**

In the Matter of the Accusation Against:

TESLA INC. dba TESLA MOTORS INC.,
a Vehicle Dealer,

Respondent.

CASE NO.  21-02189

NOTICE OF DEFENSE

I, the Respondent, in the above-entitled proceeding, acknowledge receipt of a copy of the Accusation, Statement to Respondent, and a copy of the Notice of Defense.

I hereby request a hearing to permit me to present my defense to the charges contained in said Accusation.

All correspondence concerning this proceeding should be sent to the following address:

(If you are represented by an attorney, all correspondence concerning this matter will be sent to the attorney.)

_____
Address                                               Telephone Number

_____
City                              State                  Zip Code

_____
Signature                         Date                   Email **(Required)**

**I will need an interpreter at my hearing: Yes _____ No _____**

**Language? _____**

**I consent to the proceedings at my hearing being recorded/reported electronically:     Yes _____     No _____**



NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES



# BUSINESS REPLY MAIL
FIRST CLASS   PERMIT NO. 1415   SACRAMENTO, CA

POSTAGE WILL BE PAID BY ADDRESSEE

STATE OF CALIFORNIA
DEPARTMENT OF MOTOR VEHICLES
LEGAL OFFICE   C128
P.O. BOX 932382
SACRAMENTO, CA 94299-9992

ADM 1146 (REV. 8/2008)
**DEPARTMENT OF MOTOR VEHICLES**
LEGAL OFFICE   C128
P.O. BOX 932382
SACRAMENTO, CA 94232-3820

1
2
3                           DEPARTMENT OF MOTOR VEHICLES
4                                STATE OF CALIFORNIA
5

6   In the Matter of the Accusation Against:        CASE NO.  21-02189

7   TESLA INC. dba TESLA MOTORS INC.,                 LICENSE NO.  68106
    a Vehicle Dealer,
8                                                   AIMS NO.  21V1L12011

9                         Respondent.              **REQUEST FOR DISCOVERY**

10

11  TO:  TESLA INC. dba TESLA MOTORS INC.

12          Pursuant to Government Code section 11507.6, Complainant requests the following:

13          1.  The names and addresses of all witnesses to the extent known by you, including, but

14  not limited to, those intended to be called to testify at the hearing.

15          2.  An opportunity to inspect and copy each and all the matters set forth in Government

16  Code section 11507.6, subdivisions (a) through (f) inclusive, which are under your possession,

17  custody, or control.

18          Please be advised that this request for discovery is continuing in nature.

19  Dated:    **JUL 2 8 2022**

20

21

22

23                                              DANIAN HOPP
                                                Attorney IV
24

25

26

27

28

                                                1
    Discovery Request                          Tesla Inc. dba Tesla Motors Inc., Case No. 21-02189

## DECLARATION OF SERVICE

Case Name   :    TESLA INC., dba TESLA MOTORS INC.
Case No.     :    21-02189
Court         :    OFFICE OF ADMINISTRATIVE HEARINGS

I declare:

I am employed in the County of Sacramento. My business address is 2415 First Avenue, Sacramento, California 95818. I am over the age of 18 years and not a party to the within entitled case.

On July 28, 2022, I served the following:

### *ACCUSATION; STATEMENT TO RESPONDENT; GOVERNMENT CODE SECTION 11507.5, 11507.6, AND 11507.7 PURSUANT TO GOVERNMENT CODE SECTIONS 11504 AND 11505; NOTICE OF DEFENSE; REQUEST FOR DISCOVERY*

Addressed as follows:

Tesla Inc., dba Tesla Motors Inc.
45500 Fremont Blvd.
Fremont, CA  94538

By the following method:

☒ **US MAIL:**   By placing the true copies thereof enclosed in a sealed envelope marked certified mail with return receipt requested. I am familiar with the business practice at the Department of Motor Vehicles for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Department of Motor Vehicles is deposited with the United States Postal Service that same day in the ordinary course of business.

☐ **FACSIMILE TRANSMISSION:**   On the date below from facsimile machine number (213) 576-6245, I personally transmitted to the above-named person(s) to the facsimile number(s) shown above, pursuant to California Rules of Court 2003-2008. True copies of the above-described document(s) were transmitted by facsimile transmission and the transmission was reported as complete and without error. A copy of the transmission report issued by the transmitting machine is attached to this proof of service.

☐ **OTHER SERVICE**   I caused such envelope(s) to be delivered to the office of the addressee(s) listed above by:
☐      Express Mail
☐      Golden State Overnight
☐      Messenger

☐ **PERSONAL SERVICE**   By causing a true copy of the above-described documents to be hand delivered to the office(s) of the addressee(s).

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on July 28, 2022, at Sacramento, California.

MAUREEN MULCAHY
Legal Secretary

US Postal Service®

**Certified**
**Mail®**
**Receipt**

*Domestic Mail Only*
*No Insurance*
*Coverage Provided*

CERTIFIED MAIL® ARTICLE NUMBER

9414 7266 9904 2172 0384 68

| | |
|---|---|
| Postage | $ |
| Certified Mail Fee | $ |
| Return Receipt Fee (Endorsement Required) | $ |
| Restricted Delivery Fee (Endorsement Required) | $ |
| Total Postage & Fees | $ |

Postmark
Here

Sent To:

21-02189  (ACC)  SMD

TESLA INC dba TESLA MOTORS INC
45500 FREMONT BOULEVARD
FREMONT, CA  94538

PS Form 3800, April 2015                    SEE REVERSE FOR INSTRUCTIONS

Exhibit C



## Advanced Sensor Coverage

Eight surround cameras provide 360 degrees of visibility around the car at up to 250 meters of range. Twelve updated ultrasonic sensors complement this vision, allowing for detection of both hard and soft objects at nearly twice the distance of the prior system. A forward-facing radar with enhanced processing provides additional data about the world on a redundant wavelength that is able to see through heavy rain, fog, dust and even the car ahead.



**Rearward Looking Side Cameras**
Max distance 100m

**Wide Forward Camera**
Max distance 60m

**Main Forward Camera**
Max distance 150m

**Narrow Forward Camera**
Max distance 250m

**Rear View Camera**
Max distance 50m

**Ultrasonics**
Max distance 8m

**Forward Looking Side Cameras**
Max distance 80m

**Radar**
Max distance 160m

Learn more about Camera Views, Radar and Ultrasonics  ⊕

## Processing Power Increased 40x

To make sense of all of this data, a new onboard computer with over 40 times the computing power of the previous generation runs the new Tesla-developed neural net for vision, sonar and radar processing software. Together, this system provides a view of the world that a driver alone cannot access, seeing in every direction simultaneously, and on wavelengths that go far beyond the human senses.



### Tesla Vision

To make use of a camera suite this powerful, the new hardware introduces an entirely new and powerful set of vision processing tools developed by Tesla. Built on a deep neural network, Tesla Vision deconstructs the car's environment at greater levels of reliability than those achievable with classical vision processing techniques.

Autopilot

ORDER

# Enhanced Autopilot

Enhanced Autopilot adds these new capabilities to the Tesla Autopilot driving experience. Your Tesla will match speed to traffic conditions, keep within a lane, automatically change lanes without requiring driver input, transition from one freeway to another, exit the freeway when your destination is near, self-park when near a parking spot and be summoned to and from your garage.

Tesla's Enhanced Autopilot software has begun rolling out and features will continue to be introduced as validation is completed, subject to regulatory approval.



## On-ramp to Off-ramp

Once on the freeway, your Tesla will determine which lane you need to be in and when. In addition to ensuring you reach your intended exit, Autopilot will watch for opportunities to move to a faster lane when you're caught behind slower traffic. When you reach your exit, your Tesla will depart the freeway, slow down and transition control back to you.



## Autosteer+

With the new Tesla Vision cameras, sensors and computing power, your Tesla will navigate tighter, more complex roads.

---

Autopilot                                                                                     ORDER

## Smart Summon

With Smart Summon, your car will navigate more complex environments and parking spaces, maneuvering around objects as necessary to come find you.



## Full Self-Driving Capability

Build upon Enhanced Autopilot and order Full Self-Driving Capability on your Tesla. This doubles the number of active cameras from four to eight, enabling full self-driving in almost all circumstances, at what we believe will be a probability of safety at least twice as good as the average human driver. The system is designed to be able to conduct short and long distance trips with no action required by the person in the driver's seat. For Superchargers that have automatic charge connection enabled, you will not even need to plug in your vehicle.

All you will need to do is get in and tell your car where to go. If you don't say anything, the car will look at your calendar and take you there as the assumed destination or just home if nothing is on the calendar. Your Tesla will figure out the optimal route, navigate urban streets (even without lane markings), manage complex intersections with traffic lights, stop signs and roundabouts, and handle densely packed freeways with cars moving at high speed. When you arrive at your destination, simply step out at the entrance and your car will enter park seek mode, automatically search for a spot and park itself. A tap on your phone summons it back to you.

**Please note that Self-Driving functionality is dependent upon extensive software validation and regulatory approval, which may vary widely by jurisdiction.** It is not possible to know exactly when each element of the functionality described above will be available, as this is highly dependent on local regulatory approval. Please note also that using a self-driving Tesla for car sharing and ride hailing for friends and family is fine, but doing so for revenue purposes will only be permissible on the Tesla Network, details of which will be released next year.

## From Home

All you will need to do is get in and tell your car where to go. If you don't say anything, your car will look at your calendar and take you there as the assumed destination. Your Tesla will figure out the optimal route, navigating urban streets, complex intersections and freeways.



Autopilot

<span style="color:red">**ORDER**</span>



## To your Destination

When you arrive at your destination, simply step out at the entrance and your car will enter park seek mode, automatically search for a spot and park itself. A tap on your phone summons it back to you.

### Standard Safety Features

These active safety technologies, including collision avoidance and automatic emergency braking, have begun rolling out through over-the-air updates

**Automatic Emergency Braking**

Designed to detect objects that the car may impact and applies the brakes accordingly

**Side Collision Warning**

Warns the driver of potential collisions with obstacles alongside the car

**Front Collision Warning**

Helps warn of impending collisions with slower moving or stationary cars

**Auto High Beams**

Adjusts high/low beams as required



ORDER MODEL S     ORDER MODEL X

Tesla Motors © 2017 | Privacy & Legal | Contact | Careers | Forums | Locations | 🇺🇸 United States

Autopilot

**ORDER**

Exhibit D

**Tesla <newsletter@tesla.com>**                    11/12/2016 2:58 AM

Tesla Update - November 2016

To tlosavio@comcast.net



### An Update to our Supercharger Program

Four years ago, Tesla introduced the Supercharger Network – the world's
fastest charging solution – to enable convenient long distance travel. Today,
more than 4,600 Superchargers allow over 160,000 Tesla owners to drive all
over the world.

We recently announced a change to the economics of Supercharging – one that allows us to reinvest in the network, accelerate its growth and bring all owners, current and future, the best Supercharging experience.

Any Tesla ordered by December 31, 2016 will continue to benefit from free unlimited Supercharging. For Model S and Model X vehicles ordered after January 1, 2017, 400 kWh of free Supercharging credits (roughly 1,000 miles) will be included annually so that owners can continue to enjoy free Supercharging during travel. Read the blog.

ORDER NOW

SUPERCHARGING



All Tesla Cars Now With Full Self-Driving Hardware

All Tesla vehicles produced in our factory now have full self-driving hardware, enabling a rapidly expanding set of new Autopilot features to be introduced over time. While active safety features continue to come standard in all Tesla vehicles, customers can now choose from two new Autopilot packages: Enhanced Autopilot, which is an advanced suite of driver-assistance features, and Full Self-Driving Capability which will ultimately take you from home to work and find a parking space for you on its own.

Self-driving vehicles will play a crucial role in improving transportation safety and accelerating the world's transition to a sustainable future. Once the software is extensively validated and there is regulatory approval, full autonomy will enable a Tesla to be substantially safer than a human driver. It will also lower the financial cost of transportation for those who own a car, while providing low-cost on-demand mobility for those who do not.

Read the blog.

ORDER NOW

VALUE MY TRADE

LEARN MORE



## Price Increase for Model S 60

On November 22, 2016 the base price of Model S 60 will be increasing by $2,000. Now is the time to get behind the wheel of a Tesla for as low as $737/month (details here). The Model S 60 can drive up to 218 miles on a single charge and accelerates from zero to 60 mph in just 5.5 seconds.

ORDER NOW

TEST DRIVE

Tesla | 3500 Deer Creek Road | Palo Alto, CA 94304
Privacy Policy | Unsubscribe

    

Exhibit E

JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
FRANK M. PITRE (SBN 100077)
fpitre@cpmlegal.com
NABILAH A. HOSSAIN (SBN 329689)
nhossain@cpmlegal.com
ANDREW F. KIRTLEY (SBN 328023)
akirtley@cpmlegal.com
**COTCHETT, PITRE & McCARTHY LLP**
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax: (650) 697-0577

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHEN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BRIGGS A. MATSKO**, **THOMAS J. LOSAVIO**, and **BRENDA T. BROUSSARD**, on behalf of themselves and all others similarly situated, | Case No. 3:22-cv-05240 |
| Plaintiffs, | **PLAINTIFF THOMAS J. LOSAVIO'S CLRA VENUE AFFIDAVIT** |
| v. | [Cal. Civ. Code § 1780(d)] |
| **TESLA, INC., dba TESLA MOTORS, INC.**; **TESLA LEASE TRUST**; and **TESLA FINANCE LLC**, | |
| Defendants. | |

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

1    I, THOMAS J. LOSAVIO, hereby declare:

2        1.      I have personal knowledge of the facts stated herein and, if called upon to do so, could

3 competently testify thereto.

4        2.      I am a Plaintiff in the above-captioned action.

5        3.      I am a resident of Hillsborough, California.

6        4.      I submit this declaration in support of the Amended Complaint ("Complaint"), which

7 is based in part on violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*,

8 in connection with my purchase of a new 2017 Tesla Model S with Full Self-Driving Capability

9 ("FSD") from Defendant Tesla, Inc.

10        5.      The Complaint has been filed in the proper venue under Cal. Civ. Code § 1780(d)

11 because a substantial portion of these transactions occurred in the Northern District of California.

12 Specifically, I purchased the above vehicle while residing in Hillsborough, California (San Mateo

13 County) from Tesla, Inc., which had its principal place of business in Palo Alto, California (Santa

14 Clara County), which manufactured the vehicle at its factory in Fremont, California (Alameda

15 County), and which designed, developed, tested, marketed the vast majority of its FSD technology in

16 Palo Alto, California (Santa Clara County) and elsewhere in this District. All of these locations and

17 counties are in the Northern District of California.

18        6.      The Complaint has also been filed in the proper venue under Cal. Civ. Code § 1780(d)

19 for the separate and independent reasons that Defendants do substantial business in most if not all of

20 the California counties comprising the Northern District of California; because all Defendants

21 principal places of business were in Palo Alto, California (Santa Clara County) at the time of the

22 transaction; and because Defendants Tesla Lease Trust's and Tesla Finance LLC's principal places of

23 business are still in Palo Alto, California (Santa Clara County), according to information available on

24 the California Secretary of State's website on the date indicated below.

25       I declare under penalty of perjury, pursuant to the laws of the State of California, that the

26 foregoing is true and correct. Executed this 23rd day of September 2022 at Hillsborough, California.

27

28                                 THOMAS J. LOSAVIO

**Plaintiff Thomas J. LoSavio's CLRA Venue Affidavit**
Case No. 3:22-cv-05240