# EXHIBIT A

Benjimin M. Brees, Esq. (CSB #148020)
Law Offices of Benjimin Michael Brees
3033 5th Avenue, Suite 201
San Diego, CA 92103
Tel: (619) 236-8355 | Fax: (619) 374-7056
Email:  info@BenBreeslaw.com

Attorney for Plaintiff
JOEL RICHARDSON

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego
**10/02/2023** at 11:06:48 AM
Clerk of the Superior Court
By Christopher Metoyer,Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| JOEL RICHARDSON,<br><br>          Plaintiff,<br><br>     vs.<br><br>TESLA, INC., dba TESLA MOTORS, INC.;<br>TESLA LEASE TRUST; TESLA FINANCE<br>LLC; and DOES 1-100, inclusive,<br><br>          Defendants. | Case No.   37-2023-00042794-CU-BC-CTL<br><br>**CLASS ACTION COMPLAINT**<br>**1. VIOLATION OF THE MAGNUSON-**<br>**MOSS WARRANTY ACT**<br>**2. BREACH OF EXPRESS WRITTEN**<br>**WARRANTY**<br>**3. BREACH OF IMPLIED WARRANTY**<br>**OF MERCHANTABILITY**<br>**4. VIOLATION OF THE CALIFORNIA**<br>**FALSE ADVERTISING LAW**<br>**5. VIOLATION OF THE CALIFORNIA**<br>**CONSUMER LEGAL REMEDIES ACT**<br>**6. VIOLATION OF THE CALIFORNIA**<br>**UNFAIR COMPETITION LAW**<br>**7. FRAUD AND DECEIT**<br>**8. NEGLIGENT MISREPRESENTATION**<br>**9. UNJUST ENRICHMENT**<br>**10. NEGLIGENCE**<br><br>**DEMAND FOR JURY TRIAL** |

1

2

# TABLE OF CONTENTS

I. INTRODUCTION.................................................................................... 1

II. JURISDICTION AND VENUE…………………………............................... 7

III. PARTIES………......................................................................................... 9

A. Plaintiff………......................................................................................... 9

B. Defendants ………..................................................................................... 9

IV. AGENCY, JOINT VENTURE, AIDING AND ABETTING, AND
CONSPIRACY .............................................................................................. 10

V. FACTUAL ALLEGATIONS...................................................................... 11

A. The Technology of Autonomous Vehicles…………….............................. 11

B. Tesla's First-Generation "Autopilot" Technology.................................... 15

C. Tesla's Release of "Enhanced Autopilot" and "Full-Self-Driving Capability" …20

D. Year After Year, Tesla Fails to Deliver on Its Promise of a Fully Self-Driving
Car, Instead Providing Experimental Software that Kills and Maims Drivers .................. 22

E. The California DMV Charges Tesla with Untrue, Misleading, and Deceptive
Marketing of its "Autopilot" and "Full Self-Driving" Technology……………….. 31

VI. CLASS ACTION ALLEGATIONS............................................................ 32

VII. TOLLING OF THE STATUTES OF LIMITATIONS................................... 36

VIII. CLAIMS FOR RELIEF........................................................................... 36

FIRST CLAIM FOR RELIEF…………….................................................... 36

Violation of the Magnuson-Moss Warranty Act
15 U.S.C. § 2301, et seq.

SECOND CLAIM FOR RELIEF ................................................................ 38

Breach of Express Warranty
Cal. Civ. Code §§ 1791.2(a), 1794

THIRD CLAIM FOR RELIEF...................................................................... 40

Breach of Implied Warranties
Cal. Civ. Code §§ 1791.1, 1792, 1794

FOURTH CLAIM FOR RELIEF.................................................................. 42

Violation of the California False Advertising Law
Cal. Bus. & Prof. Code § 17500, et seq.

FIFTH CLAIM FOR RELIEF…................................................................... 44

Violation of the California Consumer Legal Remedies Act
Cal. Civ. Code § 1750, et seq.

SIXTH CLAIM FOR RELIEF…................................................................... 46

Violation of the California Unfair Competition Law
Cal. Bus. & Prof. Code § 17200, et seq.

SEVENTH CLAIM FOR RELIEF ............................................................... 50

Fraud and Deceit

i

EIGHTH CLAIM FOR RELIEF .......................................................................... 51

Negligent Misrepresentation

NINTH CLAIM FOR RELIEF………….................................................... 52

Negligence

TENTH CLAIM FOR RELIEF………….................................................. 53

Unjust Enrichment

IX. PRAYER FOR RELIEF ............................................................................. 54

X. DEMAND FOR JURY TRIAL ............................................................................ 54

TABLE OF CONTENTS

Plaintiff JOEL RICHARDSON, on behalf of himself and the Plaintiff Class described herein, brings this class action Complaint against Defendants Tesla, Inc., dba Tesla Motors, Inc., Tesla Lease Trust, and Tesla Finance LLC (collectively, "Defendants" or "Tesla"), and alleges as follows:

**I. INTRODUCTION**

1. Plaintiff brings this consumer class action lawsuit to hold Tesla and its representatives, including CEO Elon Musk, accountable for years of making misleading and deceptive statements regarding the company's advanced driver assistance systems ("ADAS") technology. For years, Tesla has deceptively and misleadingly marketed its ADAS technology as autonomous driving technology under various names, including "Autopilot," "Enhanced Autopilot," and "Full Self-Driving Capability" ("FSD"), the latter two of which Tesla charges consumers thousands of additional dollars to add to their new vehicle. Tesla has deceived and misled consumers regarding the current abilities of its ADAS technology and by representing that it was perpetually on the cusp of perfecting that technology and finally fulfilling its promise of producing a fully self-driving car. Although these promises have proven false time and time again, Tesla and Musk have continued making them to generate media attention, to deceive consumers into believing it has unrivaled cutting-edge technology, and to establish itself as a leading player in the fast-growing electric vehicle market.

2. Despite portraying itself as a leader in autonomous vehicle technology, Tesla's ADAS features have been surpassed by numerous automaker competitors that have developed autonomous driving technology far more advanced than Tesla's, and now available in some consumer markets. At the same time, former Tesla employees and investigations have revealed damning information that now makes clear that, contrary to Tesla's repeated promises that it would have a fully self-driving car within months or a year, Tesla has never been remotely close to achieving that goal.

3. For example, to accompany the 2016 launch of Tesla's "Enhanced Autopilot" and "Full Self-Driving" versions of its ADAS technology, much of the Tesla Autopilot engineering tea dropped everything to produce a video that purports to show a Tesla car driving itself. The video begins with the following message: "The person in the driver's seat is only there for legal reasons. He is not driving anything. The car is driving itself." In reality, Tesla employees made the video would later

reveal that the car in the video had significant assistance from commercial mapping software not available to Tesla customers, and that the car still performed poorly and even ran into a fence during filming. With the assistance of a large team of Tesla engineers, the car had to run the same route over and over again before Tesla got acceptable video that appeared to show a car capable of driving itself.  Even though the video was debunked as deceptive and misleading years ago, Tesla continues to prominently feature it on its website.

4. Six years later in 2022, Tesla has yet to produce anything even remotely approaching a fully self-driving car. Instead, Tesla pushes out "updates" to its experimental FSD Beta software to a small minority of Tesla owners, who effectively act as untrained test engineers testing experimental software on public roadways. Drivers have consistently found that Tesla's FSD Beta software has myriad problems, such as cars failing to make routine turns, running red lights, and steering directly into large objects and oncoming traffic.1 There have also been numerous collisions involving Tesla's purportedly cutting-edge ADAS software, including Tesla vehicles plowing at high speeds into large stationary objects such as emergency vehicles and an overturned box truck. Dozens of people have suffered fatal and other serious injuries as a result of these ADAS-related collisions, triggering a host of investigations by state and federal regulators.

5. As information has trickled out of the secretive company via former employees and investigations, it has become increasingly clear that Tesla knew for years its statements regarding its ADAS technology were deceptive and misleading, but the company made them anyway. Tesla did so to generate excitement about the company's vehicles and thereby improve its financial condition by, among other things, attracting investment, increasing sales, avoiding bankruptcy, driving up Tesla's stock price, and helping to establish Tesla as a dominant player in the electric vehicle market.

6. For example, in 2016, Musk tweeted a bold prediction—that a Tesla vehicle would complete a fully self-driving trip across the United States by "next year." Later in 2016, Tesla announced on its official blog that "All Tesla Cars Being Produced Now Have Full Self-Driving Hardware." The blog post included the misleading October 2016 video of a Tesla car purportedly driving itself without incident, and suggested that Tesla was on the cusp of bringing to market cars that would be fully

"self-driving" and have "full autonomy."3 When Tesla and Musk made these statements, they knew there was no reasonable chance of Tesla being able to meet these forecasts.

7. From approximately 2017 to 2019, the page on Tesla's website explaining its "Full Self-Driving Capability" technology similarly promised that consumers who purchased or leased cars with the FSD version of its ADAS technology would receive cars capable of "full self-driving in almost all circumstances," including being able to "conduct short and long distance trips with no action required by the person in the driver's seat" and with a "probability of safety at least twice as good as the average human driver." On the same webpage, Tesla went on to state:

> All you will need to do is get in and tell your car where to go. If you don't say anything, the car will look at your calendar and take you there as the assumed destination or just home if nothing is on the calendar. Your Tesla will figure out the optimal route, navigate urban streets (even without lane markings), manage complex intersections with traffic lights, stop signs and roundabouts, and handle densely pack freeways with cars moving at high speed.

8. Indeed, in every year since 2016, Tesla and Musk have repeatedly made deceptive and misleading statements to consumers indicating that a fully self-driving, fully autonomous Tesla vehicle was just around the corner, often expressly stating that would occur by the end of that calendar year or within the "next year."5 For example, in May 2019, after years of failing to deliver on prior promises, Musk again promised consumers that a fully self-driving Tesla car would be available by the end of that year, tweeting that "everyone with Tesla Full Self-Driving will be able" to take a fully automated trip in their Tesla from Los Angeles to New York.6 While tens of thousands of U.S. and California consumers have purchased or leased new Tesla vehicles with ADAS technology in 2019 and every year since, Tesla has yet to deliver on its repeated promises of a fully self-driving car at any distance—much less a fully automated three-thousand-mile journey across the country.

9. The reality of Tesla's ADAS technology is far different from what Tesla and Musk have spent years telling consumers. Instead of providing its customers the "Full Self-Driving Capability" they paid for, Tesla uses them as untrained test engineers to test drive its experimental FSD Beta software

on public roadways, which generates data that Tesla can use to improve its software. Along the way, scores of Tesla owners who believed Tesla's and Musk's deceptive and misleading statements about the capabilities of Tesla's ADAS technology have been killed and seriously injured when that technology failed, often in the face of routine roadway scenarios.

10. Even Tesla itself has admitted that "Full Self-Driving" is an inaccurate name. In response to California regulators' concerns about Musk's public announcements in late 2020 indicating that a new FSD Beta update would make Tesla vehicles autonomous, Tesla attorneys sent private emails to those regulators (later disclosed in response to Public Records Act requests) walking those statements back and making clear they were false. Tesla attorneys told the regulators that Tesla vehicles equipped with so-called "Full Self-Driving Capability" were not fully self-driving at all, but still required the driver to steer, brake, and accelerate as needed. In the meantime, Tesla and Musk continued their deceptive marketing to consumers.

11. Plaintiff JOEL RICHARDSON is California resident who purchased a new 2020 Tesla Model 3 with the Enhanced Autopilot version of Tesla's ADAS technology. Tesla had represented its ADAS technology would make the vehicle fully self-driving in some situations and would soon make it fully self-driving in all situations. It is now three years later, and Tesla has never provided Plaintiff anything remotely approaching the fully self-driving car it promised to provide.

12. Plaintiff brings this class action lawsuit on behalf of himself and fellow consumers who purchased or leased a new Tesla vehicle with Tesla's ADAS technology but never received the self-driving car that Tesla promised them. Plaintiff brings claims against Tesla for violations of the federal Magnuson-Moss Warranty Act and California's False Advertising Law, Consumer Legal Remedies Act, and Unfair Competition Law, as well as common law claims for fraud and deceit, negligent misrepresentation, negligence, and unjust enrichment. Plaintiff seeks various relief on behalf of himself and the proposed Class, including injunctive relief prohibiting Tesla from continuing its deceptive and misleading marketing of its ADAS technology, restitution of the money Plaintiff and Class members paid for technology that Tesla promised but never delivered, and all available damages including punitive damages to punish Tesla for years of using deceptive and

COMPLAINT FOR DAMAGES

misleading marketing to eventually establish itself as a dominant player in the electric vehicle market.

## II. JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), as Plaintiff seeks damages and other relief on a behalf of a class consisting of hundreds of thousands of individuals. This action meets CAFA's jurisdictional requirements because the sum or value of the relief sought exceeds $5,000,000 exclusive of interest and costs, and because at least one Class member is a citizen of a state different from Defendants under § 1332(d)(2)(A) and/or a citizen of a foreign state under § 1332(d)(2)(B). The Court also has federal question jurisdiction over Plaintiff's Magnuson-Moss Warranty Act claim under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claims under § 1367.

14. This Court has personal jurisdiction over Defendants because they have conducted and continue to conduct substantial business in California, and have sufficient minimum contacts with California in that (1) from the beginning of the Class Period (as defined herein) until December 2021, Defendant Tesla, Inc. was headquartered in Palo Alto, California, and thus designed, developed, manufactured, tested, and marketed its vehicles and ADAS technology at issue in this action in California throughout that period; (2) throughout the Class Period, Tesla, Inc. tested and manufactured a substantial percentage of the Class Vehicles (as defined herein) at its factory in Fremont, California; (3) throughout the Class Period, Tesla, Inc. has been the direct or indirect owner and operator of dozens of retail Tesla stores in California (accounting for more than a quarter of Tesla stores nationwide) that market and sell or lease new Tesla vehicles, including a substantial percentage of Class Vehicles; (4) throughout the Class Period, California has been by far the largest U.S. market for sales and leases of new electric vehicles, including sales and leases of new Tesla vehicles and Class Vehicles; (5) throughout the Class Period, Defendants developed the marketing scheme at issue in this action in California and targeted California consumers with that marketing scheme, including deceptive and misleading statements about Tesla's vehicles and ADAS technology on Tesla's website and Musk's Twitter feed; (6) Tesla, Inc. is registered with the California Secretary of State to do business in the State of California, and is licensed by the

California Department of Motor Vehicles as a vehicle dealer and a vehicle manufacturer; and (7) Defendant Tesla Finance LLC has its principal place of business in California.

15. Venue is proper pursuant to California Code of Civil Procedure § 395.

**III. PARTIES**

**A. Plaintiff**

16. Plaintiff JOEL RICHARDSON is, and was at all relevant times, a resident of the County of San Diego.  Plaintiff purchased a 2020 Tesla Model 3 from Defendant Tesla, Inc.  Plaintiff decided to purchase this vehicle and the ADAS package after researching, reviewing, and relying on Tesla's online and other public statements, including those made by Musk, which were disseminated to Plaintiff and other consumers throughout the State of California, the United States, and the world.

**B. Defendants**

17. Defendant Tesla, Inc., dba Tesla Motors, Inc., is a Delaware corporation that had its principal place of business in Palo Alto, California, from approximately 2003 until December 1, 2021, at which point it moved its principal place of business to Austin, Texas. Defendant designs, develops, manufactures, tests, markets, distributes, sells, and leases electric vehicles under the brand name "Tesla." Defendant also offers services related to those vehicles, including designing, developing, and periodically sending over-the-air updates for the ADAS software in Tesla vehicles.

18. Tesla, Inc. has a vertically integrated business model. (a) Tesla designs, develops, manufacturers, and tests its electric vehicles and the ADAS software on those vehicles. This includes all versions of Tesla's ADAS technology (e.g., Autopilot, Enhanced Autopilot, FSD), which were and are designed, developed, manufactured, and tested by Tesla in the State of California at its Palo Alto offices, Fremont factory, and other California offices and facilities. On information and belief, all or a substantial majority of the Class Vehicles (as defined herein) were manufactured and tested in California. (b) Tesla markets its vehicles on its website, in marketing materials, in its brick-and-mortar galleries and showrooms, and through the tweets, media interviews, new conferences, earnings calls, conferences, forums, and other public events and statements by its representatives and agents, including Elon Musk, all of which are intended and designed to generate media coverage, and have been historically successful at doing so. (c) Tesla sells and leases its electric vehicles

directly to consumers, including through its website and retail stores, which Tesla owns and operates.

19. Defendant Tesla Lease Trust is a Delaware statutory trust, and its initial beneficiary is Tesla Finance LLC. Tesla Lease Trust is the title holder to the Tesla vehicles that are leased under a leasing program managed by Tesla Finance LLC.

20. Defendant Tesla Finance LLC is a wholly owned subsidiary of Tesla, Inc., and is the beneficial owner of the leasing assets held in Trust by Tesla Lease Trust and, as an agent of the Tesla Lease Trust, originates, services, administers, and collects leases for Tesla Lease Trust. Tesla Finance LLC is incorporated in Delaware and has its principal place of business in California.

**IV. AGENCY, JOINT VENTURE, AIDING AND ABETTING, AND CONSPIRACY**

21. On information and belief, Plaintiff alleges that at all relevant times herein, Defendants conspired with currently unidentified co-conspirators in carrying out the wrongful conduct alleged herein, and that all such unidentified co-conspirators were Defendants' agents, employees, and/or joint venturers, and were at all times acting within the course and scope of said agency, employment, and/or joint venture.

22. Each Defendant and unidentified co-conspirators took actions that aided and abetted, encouraged, and rendered substantial assistance in accomplishing the wrongful conduct, wrongful goals, and other wrongdoing alleged herein. In taking these actions, each Defendant and unidentified co-conspirator acted with an awareness of his/her primary wrongdoing and realized his/her conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and other wrongdoing. In addition, each act and omission comprising the aforementioned wrongful conduct, wrongful goals, and other wrongdoing was made known to, and ratified by, each of the Defendants.

23. Each Defendant and unidentified co-conspirator conspired with each other and with others to perpetrate the unlawful scheme on Plaintiff and Class members, as alleged herein. In doing so, each Defendant and unidentified co-conspirator have committed acts and omissions, including but not limited to making materially false, misleading, and deceptive statements and omissions, while acting within the scope and in furtherance of the conspiracy alleged herein, and with full knowledge of the goals of that conspiracy.

24. Plaintiff reserves the right to amend this Complaint when he learns the identities of currently unidentified co-conspirators, and he intends to sue each Defendant and co-conspirator as participants, alter egos, agents, and conspirators with one another in the wrongful acts, omissions, plans, schemes, and transactions alleged herein.

## V. FACTUAL ALLEGATIONS

### A. The Technology of Autonomous Vehicles

25. SAE International, formerly the Society of Automotive Engineers, is a U.S.-based professional association and standards development organization founded in the early 20th century. In 2014, SAE International took a leading role in the development of autonomous vehicle technology standards by publishing the initial version of SAE J3016 Recommended Practice: Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles, commonly referred to as the SAE Levels of Driving Automation ("SAE Levels"). Following this, SAE International published revised versions of the SAE Levels in 2016, 2018, and 2021.[7]

26. The SAE Levels provide a taxonomy of vehicle driving automation systems with detailed definitions for six levels for driving automation, ranging from no driving automation (SAE Level 0) to full driving automation (SAE Level 5). The SAE Levels can be summarized as follows: Level 0: No Driving Automation. The human driver performs all driving tasks (steering, acceleration, braking, etc.), although vehicles may have safety features like automatic emergency braking and forward collision warning. Level 1: Driver Assistance. The vehicle has features that provide a small degree of automation over the vehicle's acceleration, braking, or steering (e.g., adaptive cruise control, lane-keeping assistance). Level 2: Partial Driving Automation. The vehicle can perform multiple driving tasks (e.g., acceleration, steering) but remains under the human driver's constant supervision, responsibility, and control. Level 3: Conditional Driving Automation. The vehicle can take full control of certain driving tasks such that the human driver need not remain constantly alert but must be ready to intervene upon request from the vehicle. Level 4: High Driving Automation. The vehicle can perform all driving tasks in specific locations or environments, but human override is still an option. Level 5: Full Driving Automation. The vehicle can perform all driving tasks under

all conditions, with zero human attention or interaction required. The SAE Levels are summarized in the following graphic from the Wall Street Journal.

27. The SAE Levels are a widely accepted international standard and have been adopted by regulatory agencies such as the National Transportation Safety Board ("NTSB"), National Highway Traffic Safety Administration ("NHTSA"), and U.S. Department of Transportation.

28. SAE International refers to SAE Level 1 and 2 technologies as systems or features that provide "driver support" (see below in blue), whereas it refers to SAE Level 3, 4, and 5 technologies as systems or features that provide "automated driving" (see below in green). When SAE International published the current version of the SAE Levels in 2021, it summarized the revised SAE Levels in the following graphic, which emphasizes that for SAE Level 2 driver-support features, "You are driving whenever these driver support features are engaged" and "You must constantly supervise these support features."

29. In May 2022, the NHTSA published the following graphic summarizing the SAE Levels, which drives home many of the same points as the 2021 SAE International graphic—i.e., that at SAE Levels 0 to 2, the driver is fully responsible for the driving the car ("You drive, you monitor"), whereas autonomous technology does not begin until SAE Level 3 ("System drives, you must be able to take over upon request"), and fully self-driving technology does not occur until SAE Levels 4 and 5 ("system drives, you ride").

30. While Tesla and Musk have routinely promised Tesla's SAE Level 2 ADAS technology (including Autopilot and FSD) would rapidly advance to SAE Level 5 abilities within a year or other short period of time, Tesla's technology has never advanced beyond SAE Level 2.

31. While Tesla has spent year after year stuck at SAE Level 2, other vehicle manufacturers have successfully designed and developed SAE Level 3 features, including Audi in 2017, Honda in 2021, and Mercedes-Benz in 2021. Honda and Mercedes-Benz both currently offer automobiles with Level 3 features for sale or lease to the public in their respective home markets of Japan and Europe. Meanwhile, Waymo has been operating limited SAE Level 4 taxi service on public roadways in some areas of Phoenix (since 2018) and San Francisco (since 2021).

32. Whereas Tesla's Level 2 technology relies heavily on cameras (with limited assistance from a single forward-facing radar unit), the successful design and development of safer and more advanced Level 3 and 4 systems to date has universally relied on a more robust and expensive combination of cameras, multiple radar units, and one or more lidar units. The general consensus among autonomous vehicle experts is that truly autonomous, self-driving cars cannot be achieved without some reliance on lidar technology, which Tesla has always refused to use because of considerations related to expense and aesthetics.

**B. Tesla's First-Generation "Autopilot" Technology**

33. In 2003, Tesla was founded by Martin Eberhard and Marc Tarpenning. The following year, PayPal co-founder Elon Musk made a substantial investment in Tesla and became chairman of the company's board. Tesla will later refer to Musk as a "co-founder" of the company.

34. In 2008, Musk became Tesla's Chief Executive Officer ("CEO"), and Tesla released the Roadster, which was the first mainstream electric vehicle powered by lithium-ion batteries.

35. In 2012, Tesla released its Model S sedan.

36. In 2014, Tesla began equipping its Model S sedan with hardware that (although the necessary software was not yet active) was intended to allow vehicles to automate some steering, braking, and acceleration functions. Consistent with widely used industry terminology, Tesla originally called this feature "advanced driver assistance" before Tesla executives led by Musk decided to change the name to "Autopilot." Tesla engineers expressed concerns that the name was misleading and suggested less misleading options such as "Copilot," which Tesla rejected.

37. Tesla's "Autopilot" technology is based on two driver assistance technologies developed by other automakers in the 1990s. The first is adaptive cruise control ("ACC") technology, versions of which were debuted by Toyota and Mercedes-Benz in the 1990s. ACC uses radar to warn the driver if a vehicle ahead is slowing down and automatically brakes if the driver fails to take sufficient responsive action. Contemporary ACC technology also has the ability to follow a forward vehicle at a pre-selected time gap, up to a driver-selected speed. ACC is an SAE Level 1 feature.

38. The second driver-assistance technology on which Autopilot is based is lane keeping assistance ("LKA"). LKA evolved from lane departure warning ("LDW") technology, which was developed in

the 1990s and first appeared on commercial vehicles in Europe in 2000. LDW warns the driver if the vehicle crosses a painted line on the roadway, whereas LKA controls steering inputs to keep a vehicle in its lane. LKA is an SAE Level 1 feature.

39. In October 2015, Tesla released its version 7.0 software, which enabled Autopilot on Model S vehicles. Robert Rose, the head of the Autopilot project, left Tesla shortly before the release. Evan Nakano, a Tesla Autopilot engineer who had worked on safety features, objected that Autopilot was not ready for release When Tesla ignored his concerns, Nakano resigned in protest and wrote a resignation letter, circulated widely among Tesla employees, that called Autopilot's development based on "reckless decision making that has potentially put customer lives at risk."

40. By December 2015, Musk was publicly stating that Tesla vehicles would drive themselves within about two years. He told Fortune magazine, "I think we have all the pieces, and it's just about refining those pieces, putting them in place, and making sure they work across a huge number of environments—and then we're done. It's a much easier problem than people think it is."

41. In January 2016, Musk announced on a conference call with reporters that Autopilot was "probably better" than a human driver. He stated that Tesla vehicles would be able to drive significantly better than humans within two to three years, and that within approximately two years drivers would be able to use Tesla's "Summon" feature, which allows drivers to remotely instruct their vehicle to drive to a specified location, to summon a vehicle from the other side of the country.

42. Ten days later, on January 20, 2016, 23-year-old Gao Yaning, who had a history of relying on Autopilot to drive, was killed in China on the way home from a family wedding when his Tesla Model S crashed at full speed on a highway into the back of a large street sweeper. The facts of accident strongly indicate that Autopilot was engaged at the time of the crash.

43. In February 2016, Consumer Reports tested Tesla's new Summon feature, which Tesla claimed makes the car able to drive itself for short distances without anyone in the car, such as to enter or leave a parking space or garage. Although Consumer Reports had previously given Tesla vehicles rave reviews (scoring Tesla's Model S a 99 out of 100 and calling it "the best car we have every tested" in 2013, and scoring a another version of the Model S even higher in 2015), this time Consumer Reports' testing revealed that the Summon feature failed to detect "several large objects

that a homeowner might leave in a driveway or on the floor of a garage—such as a duffel bag and bicycle—and the car failed to stop before hitting them." Consumer Reports' testers also encountered other problems related to difficulties they had remotely stopping the car, which resulted in damage to one of the car's wheels and raised significant safety concerns.

44. On May 7, 2016, Tesla driver Joshua Brown was killed in Florida when the Autopilot on his Tesla Model S failed to recognize a tractor-trailer crossing in front his car, which resulted in Brown's car striking and passing under the trailer at 74 mph.17 The top third of Brown's car was sheared off. Brown was a Tesla enthusiast who had previously made videos of himself using Autopilot, one of which was retweeted by Elon Musk just a few weeks earlier. Tesla later publicly stated that the Autopilot software on Brown's car failed to detect the white tractor-trailer because it could not distinguish it from the bright sky. Several months later, in September 2016, Tesla would announce it was confident it had fixed the issue in version 8 of its Autopilot software by increasing the system's reliance on radar so that it "would see a large metal object across the road."

45. Less than a month later, on June 2, 2016, Musk confidently announced that "autonomous driving" was "basically a solved problem," and that Tesla's Autopilot software was already safer than a human driver on highways. "I think we're basically less than two years away from complete autonomy—complete," Musk said.

46. On July 14, 2016, Consumer Reports took the unusual step of publicly calling on Tesla to take certain actions. It urged Tesla to "change the name of the Autopilot feature because it promotes a potentially dangerous assumption that the Model S is capable of driving on its own." Instead of using the "misleading" name Autopilot, Consumer Reports urged Tesla to "name automated features with descriptive, not exaggerated, titles."

47. On July 20, 2016, Tesla's official blog published a post by Musk, in which he misleadingly suggests that lack of regulatory approval was a major challenge Tesla was facing in bringing to market fully self-driving vehicles: "When true self-driving is approved by regulators, it will mean that you will be able to summon your Tesla from pretty much anywhere. Once it picks you up, you will be able to sleep, read or do anything else enroute to your destination. You will also be able to

add your car to the Tesla shared fleet just by tapping a button on the Tesla phone app and have it generate income for you while you're at work or on vacation."

48. In August 2016, after a Tesla driver with Autopilot engaged crashed into a parked vehicle on a Beijing highway and later stated publicly that the Tesla had misrepresented Autopilot's capabilities and misled buyers, Tesla removed from its China website a term that translates as "self-driving" and replaced it with a term that translates as "self-assisted driving."23 Tesla did not make any similar changes to its U.S. website.

49. On or about October 16, 2016, German regulators sent Tesla a formal letter reading, "In order to prevent misunderstanding and incorrect customers' expectations, we demand that the misleading term Autopilot is no longer used in advertising the system." The German government also reminded Tesla vehicle owners that Tesla's ADAS technology required, and could only be safely operated with, constant driver attention and supervision.

**C. Tesla's Release of "Enhanced Autopilot" and "Full-Self-Driving Capability"**

50. On October 19, 2016, Tesla released its Autopilot 2.0 software and announced that all new Tesla cars would come with a new suite of hardware (called Autopilot Hardware 2) comprising eight cameras, twelve ultrasonic sensors, and a forward-facing radar unit, which Tesla claimed would allow the cars to soon become capable of SAE Level 5 autonomy.  To access the hardware, owners would have to pay $5,000 for an "Enhanced Autopilot" feature and another $3,000 for the right to activate Tesla's promised "Full Self-Driving Capability." The Enhanced Autopilot package provided drivers most or all of the features in the FSD package, except for the right to unlimited access to Tesla's soon-to-arrive full self-driving technology, and potential early access to FSD Beta updates Tesla might release on its way perfecting that technology.

51. As part of the announcement, Tesla published on its official blog a post titled "All Tesla Cars Being Produced Now Have Full Self-Driving Hardware," stating "[w]e are excited to announce that, as of today, all Tesla vehicles produced in our factory – including Model 3 – will have the hardware needed for full self-driving capability at a safety level substantially greater than that of a human driver." In the same post, Tesla stated that "[s]elf-driving vehicles will play a crucial role in

improving transportation safety and accelerating the world's transition to a sustainable future," and that "[f]ull autonomy will enable a Tesla to be substantially safer than a human driver."

52. The blog post included a video made by Tesla's Autopilot team in the weeks before the release, which purported to show a Tesla driving itself without any human intervention from the person in the driver's seat, whose hands remain off the steering wheel throughout the video. The video begins with a note saying, "The person in the driver's seat is only there for legal reasons. He is not doing anything. The car is driving itself." However, multiple Tesla Autopilot employees who worked on the video would later report that the route taken by the car had been charted ahead of time by software that created a three-dimensional digital map (a feature unavailable to drivers using the commercial version of Autopilot), and that the video did not accurately show how the car operated during filming. For example, the car kept executing driving tasks poorly and engineers had to run the pre-programmed route over and over again to get video that would make it appear the car capable of driving itself. At one point during filming, the car crashed into a fence while on Autopilot and had to be repaired.27 None of these facts were referenced in the video or otherwise disclosed by Tesla. The deceptive and misleading video was later used to promote Autopilot's purported abilities, and indeed is still featured on the company's website despite having been debunked for years.

53. Also on October 19, 2016, the company held a conference call with reporters, during which Musk stated that all new Tesla cars would now include all the cameras, computing power, and other hardware necessary for "full self driving"—not a technical term but one that suggests truly autonomous operation. Musk further stated that Tesla would "be able to demonstrate a demonstration drive of our full autonomy all the way from LA to New York. So basically from home in LA to let's say dropping you off in Times Square, NY and then having the car parking itself by the end of next year without the need for a single touch."29 Musk repeatedly represented that autonomous vehicles were safer than human-driven ones, and even warned journalists that they would be "killing people" if they wrote negative articles about self-driving technology that dissuaded people from using it.

54. According to reporting by multiple outlets, including the Wall Street Journal and The New York Times, Tesla's decision to promise the technology would be able to provide "Full Self-Driving" and

Musk's statements at the news conference "took the Tesla engineering team by surprise, and some felt that Musk was promising something that was not possible." Sterling Anderson, who was the head of Tesla's Autopilot program at the time, "told Tesla's sales and marketing teams that they should not refer to the company's technology as 'autonomous' or 'self-driving' because this would mislead the public." In a meeting after the October announcement, someone asked Mr. Anderson how Tesla could brand the product "Full Self-Driving," to which he responded, "This was Elon's decision." Two months later, in December 2016, Mr. Anderson resigned.

55. On October 20, 2016, the day after the release of Enhanced Autopilot and FSD, Musk tweeted that Tesla's "Summon" feature was capable of autonomously driving itself to pick up its owner "even if you are on the other side of the country."

**D. Year After Year, Tesla Fails to Deliver on Its Promise of a Fully Self-Driving Car, Instead Providing Experimental Software that Kills and Maims Drivers**

56. In March 2018, Apple engineer Walter Huang was killed when the Autopilot on his Tesla Model X became confused at a fork in the highway and caused the car to veer sharply to the left and crash into a concrete barrier in Mountain View, California.

57. In the aftermath of that fatal crash, Tesla publicly released crash data and sought to blame Huang for the accident, violating its agreement with NTSB not to comment on crashes during the course of an investigation, and causing NTSB to remove Tesla as a party to its investigation.

58. In April 2018, a Tesla with Autopilot engaged struck and killed a pedestrian in Japan.

59. In September 2018, Musk sent a series of tweets regarding Tesla's stock price and his purported plans to take the company private that the Securities and Exchange Commission ("SEC") labeled "misleading." The SEC filed a lawsuit against Tesla and Musk, who settled two days later. Under the settlement, Tesla and Musk agreed to pay $40 million in penalties, Tesla agreed to oversee Musk's communications, and Musk was forced to step down as Tesla's chairman (though he would remain as CEO). Musk would later send at least two tweets that violated the terms of the settlement.

60. In March 2019, Jeremy Banner was killed when his 2018 Tesla Model 3 with Autopilot engaged drove under a tractor-trailer in Florida. The Banner accident were eerily similar to the 2016 accident that killed Joshua Brown when his car drove under a tractor-trailer, and that led Tesla to announce in

September 2016 that the company was confident it had fixed the issue by increasing the software's reliance on radar. The Banner accident indicated that Tesla had not fixed this significant flaw in its ADAS technology in September 2016, and still had not done so two-and-a-half years later.

61. In April 2019, at an event in Palo Alto, California, that Tesla dubbed "Autonomy Day," Musk took to the stage and announced that Tesla vehicles would be capable of full self-driving and autonomously navigating dense urban areas like San Francisco and New York by the end of 2019, and that in two years the company would be making cars without steering wheels or pedals. Musk also stated, "If you fast forward a year, maybe a year and three months, but next year for sure, we will have over a million robo-taxis on the road," and "I feel very confident predicting autonomous robo-taxis for Tesla next year. … I'm confident we'll have at least regulatory approval somewhere, literally next year." Musk stated the robo-taxis would be a way for Tesla owners to make money when they aren't using their vehicles, with Tesla taking 25 or 30 percent of the revenue and allowing the company to compete with popular ride-hailing services like Uber and Lyft.35 A few months later, Musk doubled-down on the robo-taxi prediction, tweeting that Tesla would "have a million robotaxis by end of 2020." Tesla has never developed a robo-taxi and is nowhere near doing so.

62. In May 2019, Tesla released an update to its ADAS "Navigate" feature, which is designed to automate some lane-change functions. When Consumer Reports tested the feature, it found that it cut off other cars without leaving enough space, failed to pass in the correct lane, and sometimes struggled to merge into traffic.

63. In October 2019, Consumer Reports tested Tesla's "Smart Summon" feature, which Tesla claimed would allow owners to use a smartphone app to "summon" their Tesla vehicle to drive itself across a parking lot without any occupants inside the vehicle. Consumer Reports' testing revealed that the feature had difficulty negotiating a parking lot, with the summoned car crossing lane lines and wandering erratically "like a drunken or distracted driver." This was nearly four years after Musk's January 2016 tweet that Tesla was two years away from its customers being able to use Summon to have their car come to them even if it was thousands of miles away.

64. In December 2019, Jenna Monet was killed when the Model 3 she was in crashed into the back of a parked fire truck in Indiana while Autopilot was engaged.

65. In February 2020, the NTSB called on NHTSA to set stricter standards on Autopilot, citing the high number of Autopilot-related collisions and deaths.

66. In August 2020, a couple was killed in Saratoga, California, after their Tesla veered off a highway while Autopilot was active.

67. In September 2020, Consumer Reports published the first in a series of evaluations of Tesla's "Full Self-Driving Capability" technology, finding that the technology caused vehicles to engage in unusual and unsafe behavior, such as stopping at green lights, driving through stop signs, slamming on the brakes for yield signs when the merge was clear, and stopping at every exit while going around a traffic circle.40

68. In October 2020, Tesla increased the price of an FSD package from $8,000 to $10,000, and informed some owners who had previously purchased an FSD package that their vehicles would require a $1,000 hardware upgrade to be compatible with Tesla's FSD technology going forward.

69. On November 20, 2020, Tesla attorneys sent the California Department of Motor Vehicles ("DMV") a letter (later released via Public Records Act request) in response to the DMV's questions about the FSD "City Streets" feature that was about to be released to some Tesla owners in a software update. Tesla's legal counsel wrote, "For context, as we've previously discussed, City Streets continues to firmly root the vehicle in SAE Level 2 capability." The letter goes on to explain in detail FSD's limitations and to admit that the system is nowhere near being fully autonomous or fully self-driving:

> City Streets' capabilities with respect to the object and event detection and response (OEDR) sub-task are limited, as there are circumstances and events to which the system is not capable of recognizing or responding. These include static objects and road debris, emergency vehicles, construction zones, large uncontrolled intersections with multiple incoming ways, occlusions, adverse weather, complicated or adversarial vehicles in the driving path, unmapped roads. As a result, the driver maintains responsibility for this part of the dynamic driving task (DDT). In addition, the driver must supervise the system, monitoring both the

> driving environment and the functioning of City Streets, and he is responsible for responding to inappropriate actions taken by the system. The feature is not designed such that a driver can rely on an alert to draw his attention to a situation requiring response. There are scenarios or situations where an intervention from the driver is required but the system will not alert the driver. In the case of City Streets (and all other existing FSD features), because the vehicle is not capable of performing the entire DDT, a human driver must participate …

70. On December 14, 2020, in another letter to the California DMV (released via Public Records Act request), Tesla's legal counsel reiterated that any final release of the FSD City Streets feature to the Tesla customer fleet "will continue to be an SAE Level 2, advanced driver-assistance feature" that, like all other FSD features, "do[es] not make the vehicle autonomous" and is "intended for use only with a fully attentive drier who has his or her hands on the wheel and is prepared to take over at any moment." Tesla's counsel continued, "Please note that Tesla's development of true autonomous features (SAE Levels 3+) … will not be released to the general public until we have fully validated them and received any required regulatory permits or approvals."

71. On December 28, 2020, in another letter to the California DMV (released via Public Records Act request), Tesla's legal counsel again reiterated the SAE Level 2 nature and limitations of Tesla's FSD technology:

> Full Self-Driving (FSD) Capability is an additional optional suite of features that builds from Autopilot and is also representative of SAE L2. Features that comprise FSD Capability are Navigate on Autopilot, Auto Lane Change, Autopark, Summon, Smart Summon, Traffic and Stop Sign Control, and, upcoming, Autosteer on City Streets (City Streets). While we designed these features to become more capable over time through over-the-air software updates, currently neither Autopilot nor FSD Capability is an autonomous system, and currently no comprising feature, whether singularly or collectively, is autonomous or makes our

vehicles autonomous. This includes the limited pilot release of City
Streets.

72. During the same month that Tesla's legal team was assuring California regulators that the most advanced version of its ADAS technology was still at SAE Level 2 and suggesting it was likely to remain at Level 2 for the foreseeable future, Elon Musk gave an interview to Business Insider in which he promised that Tesla would achieve Level 5 before the end of the following year, stating "I'm extremely confident that Tesla will have level five next year, extremely confident, 100%."

73. In January 2021, Tesla reported $721 million in profit in 2020, its first profitable year. This was a dramatic turnaround in the company's financial condition from prior recent years. Tesla had been burning through cash, was in danger of running out of money, and at one point was approximately only one month away from having to declare bankruptcy.

74. In a January 2021 earnings call, Musk stated that the company had made "massive progress on Full Self-Driving," and that it "will become obvious later this year" that "Tesla Autopilot is capable of full self-driving." Musk also stated, "I'm highly confident the car will drive itself for the reliability in excess of a human this year. This is a very big deal." When a financial analyst asked Musk why he was confident Tesla would achieve SAE Level 5 autonomy in 2021, Musk responded, "I'm confident based on my understanding of the technical roadmap and the progress that we're making between each beta iteration."

75. Six weeks later on a March 9, 2021 phone call with California DMV regulators, Tesla's director of Autopilot software, CJ Moore, contradicted Musk. According to an internal DMV memo memorializing the call (released via a Public Records Act request), "DMV asked CJ to address, from an engineering perspective, Elon's messaging about L5 [Level 5] capability by the end of the year. Elon's tweet does not match engineering reality per CJ." (It appears that the DMV tried but failed to redact that last sentence.) In response to a question from DMV regulators about "how Tesla evaluates the potential advancement of levels of autonomy," Tesla representatives "indicated they are still firmly in L2 [Level 2]." Tesla further told DMV that "[t]he ratio of driver interaction would need to be in the magnitude of 1 or 2 million miles per driver interaction to move into higher levels of automation [i.e., Level 3 and higher]."[47] In other words, drivers would need to intervene only

once per 1 to 2 million miles before Tesla would proceed to Level 3 software. Tesla's ADAS software, which routinely makes mistakes, is not even remotely close to this level of reliability.

76. Following up on the March 9, 2021 phone call, the California DMV wrote to Tesla: "Notwithstanding other public messaging from Tesla about developing vehicles capable of full driving automation, Tesla reiterated that the City Streets feature is currently a Society of Automotive Engineers (SAE) level two (2) Advanced Driver-Assistance feature and that Tesla will continue to monitor how participants interact with the feature and make improvements. As mentioned in your [prior] correspondence and per California regulations, should Tesla develop technology features characterized as SAE level 3 or higher, Tesla will seek the appropriate regulatory permitting from the DMV before autonomous vehicles are operated on public roads."

77. In May 2021, under pressure from the Transportation Committee of the California Senate, the California Department of Motor Vehicles launched an investigation into whether Tesla is deceptively marketing its ADAS technology as making its cars capable of autonomous driving.

78. In June 2021, in what was widely seen as a response to motor vehicle collisions involving Tesla's ADAS technology, NHTSA issued an unprecedented order requiring automobile manufacturers to report any crash involving an injury, fatality, or property damage that happens while or immediately after a vehicle is automating some driving tasks.

79. In early July 2021, Tesla released the FSD Beta 9 version of its FSD software to certain Tesla vehicle owners. Following the release, Tesla owners took videos of the software in action that show vehicles missing turns, scraping against bushes, and veering toward parked cars.

80. On July 26, 2021, on a quarterly earnings call, Musk told investors and reporters that he was confident FSD-equipped Tesla vehicles would soon "be able to drive themselves with the safety levels substantially greater than that of the average person."

81. In August 2021, NHTSA opened a preliminary safety defect investigation into Autopilot, and two U.S. Senators called for the Federal Trade Commission to investigate what they referred to as Tesla's potentially deceptive marketing practices surrounding its FSD technology, including Tesla's use of the phrase "full self-driving" to describe and market a feature that does not make the vehicle fully self-driving.

82. On August 31, 2021, NHTSA ordered Tesla to produce documents and information regarding the design of its FSD technology, crashes involving that technology, and marketing materials that make representations about that technology. On the date that was the deadline for compliance, Tesla submitted only a partial response to NHTSA, claiming that the documents and information it had requested was confidential business information.

83. On October 12, 2021, NHTSA asked Tesla about its practice of asking FSD Beta users to sign nondisclosure agreements prohibiting users from sharing negative information about their experiences using the FSD Beta software.

84. On October 24, 2021, Tesla pulled back the release of version 10.3 of its ADAS software, which the company had already made available for drivers to use on public roads, because of problems the software was having making left turns at traffic lights.

85. In October 2021, an update to the FSD Beta software caused a major increase in "phantom braking" incidents, in which the software identifies a non-existent threat that triggers the vehicle's emergency braking system. The result is that Tesla vehicles, traveling at various speeds, were suddenly slamming on the brakes for no apparent reason. Tesla initially claimed it had identified the source of the problem and fixed it with a software update released on October 25, 2021, but subsequently issued a formal recall over the issue for the more than 11,0000 vehicles using the FSD Beta software in a reported effort to head off adverse action by U.S. regulators. Tesla's claims of having fixed the problem, however, turned out to be false, as driver complaints about "phantom braking" issues soared to 107 NHTSA complaints in the three-month period of November 2021 through January 2022 (compared with only 34 such complaints in the preceding 22 months). Owner complaints to NHTSA included everything from phantom braking incidents that were "happening with NOTHING present in front of my vehicle, and sometimes with nothing around me at all," to an incident where Tesla software slammed on the brakes in response to a plastic bag.

86. On November 18, 2021, CNN Business reported that it spent a morning testing Tesla's FSD technology on the streets of New York City and "watched the software nearly crash into a construction site, try to turn into a stopped truck and attempt to drive down the wrong side of the road." The FSD software reportedly "needed plenty of human interventions to protect us and

everyone else on the road," including a driver intervention "every couple of blocks or so" and multiple instances in which the driver "quickly jerked the wheel to avoid a crash."

87. On December 6, 2021, The New York Times published an article about its investigation into the failures of Tesla's ADAS technology based on interviews with 19 Tesla employees who had worked on design, developing, and testing that technology at Tesla over the prior decade. The article reported that interviews with the employees indicated that Musk "repeatedly misled buyers" about the abilities of Tesla's ADAS technology.

88. In January 2022, Musk stated on an earnings call, "My personal guess is that we'll achieve Full Self-Driving this year. I would be shocked if we do not achieve Full Self-Driving safer than a human this year. I would be shocked."

89. In February 2022, the company Cruise received regulatory approval to begin offering a fully driverless robotaxi service with no backup driver behind the wheel, and received regulatory approval to begin charging customers.

90. On July 13, 2022, the Dawn Project, an organization dedicated to increasing the software safety, published a paper regarding its testing of a Tesla Model 3 equipped with FSD Beta 10.12.2 (released on June 1, 2022) on a closed racetrack. The purpose of the testing was to determine the FSD software's safety in terms of its ability to detect and avoid hitting small children. The testing was performed on a closed racetrack with the Tesla driving itself between a long row of cones with a child-sized mannequin placed in plain view at the end of the row—i.e., conditions significantly less complex and more favorable to the FSD software than those that would be encountered in the real world. Nevertheless, the testing found that Tesla's FSD software consistently failed to detect the stationary child-size mannequins and "d[id] not avoid the child or even slow down," but instead "repeatedly struck the child mannequin in a manner that would be fatal to an actual child."

91. On July 14, 2022, the editor-in-chief of Electrek, a website that covers electric vehicles, published an article reviewing his experience of using Tesla's FSD Beta software over the course of two months. His ultimate conclusion was that, despite years of development and updates by Tesla, FSD Beta's "decision-making is still the equivalent of a 14-year-old who has been learning to drive for the last week and sometimes appears to consume hard drugs."

COMPLAINT FOR DAMAGES

92. In August 2022, Tesla announced that the price of FSD on new Tesla cars would increase from $12,000 to $15,000, effective September 5, 2022.

**E. The California DMV Charges Tesla with Untrue, Misleading, and Deceptive Marketing of its "Autopilot" and "Full Self-Driving" Technology**

93. On July 28, 2022, following a year-long investigation, the California DMV, which licenses motor vehicle manufacturers and dealerships in California (including Tesla's Fremont factory and dozens of Tesla retail stores), brought two related administrative enforcement actions against Tesla for "untrue," "misleading," and "deceptive" marketing of its Autopilot and FSD technology. The DMV specifically alleged that Tesla's use of the product labels "Autopilot" and "Full Self-Driving Capability," as well as statements about those technologies that have appeared on Tesla's website in 2022, "represent that vehicles equipped with those ADAS [advanced driver assistance system] features will operate as an autonomous vehicle, but vehicles equipped with those ADAS features could not at the time of those advertisements, and cannot now, operate as autonomous vehicles." For relief, the DMV seeks restitution and the revocation or suspension of Tesla's California vehicle manufacturer license and vehicle dealer license. See In the Matter of the Accusation Against Tesla Inc. dba Tesla Motors, Inc., a Vehicle Manufacturer, Case No. 21-02188, Accusation (July 28, 2022) (attached here as Exhibit A); In the Matter of the Accusation Against Tesla Inc. dba Tesla Motors, Inc., a Vehicle Dealer, Case No. 21-02189, Accusation (July 28, 2022) (attached here as Exhibit B).

**VI. CLASS ACTION ALLEGATIONS**

94. Plaintiff brings this lawsuit individually and as a class action under Federal Rule of Civil Procedure ("Rule") 23, seeking declaratory relief, injunctive relief, restitution, damages, and other relief specified herein, on behalf of a proposed nationwide class and, in proposed California class (collectively, the "Class"), defined as follows:

> Nationwide Class: All persons who purchased or leased from Tesla, Inc. (or any entity it directly or indirectly owns or controls, including but not limited to Tesla Lease Trust and Tesla Finance LLC) a new Tesla vehicle with "Autopilot," "Enhanced Autopilot," or "Full Self-Driving Capability" (collectively, "Class Vehicles") at any time from January 1,

2016, to the present ("Class Period").

California Class: All persons who purchased or leased from Tesla, Inc. (or any entity it directly or indirectly owns or controls, including but not limited to Tesla Lease Trust and Tesla Finance LLC) a new Tesla vehicle with "Autopilot," "Enhanced Autopilot," or "Full Self-Driving Capability" (collectively, "Class Vehicles") at any time from January 1, 2016, to the present ("Class Period"), and who either purchased or leased that vehicle in California or who currently reside in California.

95. The following persons are excluded from the proposed Class: Defendants; any entity that Defendants directly or indirectly own or control; Defendants' officers, directors, employees, agents, legal representatives, and attorneys; and the Court and its employees.

96. Plaintiff reserves the right under Rule 23 to amend or modify the proposed Class definitions and to add one or more subclasses based on information obtained during this litigation.

97. This action is brought and may be properly maintained as a class action against Defendants under the following provisions of Rule 23:

a. Numerosity (Rule 23(a)(1)): The members of the Class are so numerous that their individual joinder is impracticable. Defendants sold or leased tens of thousands of Class Vehicles during the Class Period. The identities of Class members may be identified through business records regularly maintained by Defendants and their employees, agents, and subsidiaries, and through the media. If necessary, Class members can be notified of this action by e-mail, mail, and supplemental published notice.

b. Commonality and Predominance (Rules 23(a)(2) and 23(b)(3)): Many questions of law and fact are common to the Class. These common questions predominate over any questions affecting only individual Class members. These common questions include, but are not limited to:

i. Whether Defendants and their agents (collectively, "Defendants") engaged in the conduct alleged herein;

ii. Whether Defendants' use of the terms "Autopilot," "Enhanced Autopilot," "Full Self-Driving," and "Full Self-Driving Capability" to describe their ADAS technology was false, deceptive, or misleading;

iii. Whether Defendants knew or should have known that their public statements and omissions regarding the time period in which Tesla vehicles would be, or would likely be, fully self-driving were false, deceptive, or misleading;

iv. Whether Defendants knew or should have known that their prior public statements regarding the time period in which Tesla vehicles would be, or would likely be, fully self-driving were false, deceptive, or misleading, but failed to take steps adequate to correct those prior statements;

v. Whether Defendants knowingly concealed from consumers information that would cause a reasonable consumer to conclude or develop material doubts that Defendants' public statements and omissions regarding the time period in which Tesla vehicles would be, or would likely be, fully self-driving were false, deceptive, or misleading;

vi. Whether Defendants' conduct alleged herein violates consumer protection laws;

vii. Whether Defendants' conduct alleged herein violates warranty laws;

viii. Whether Defendants' conduct alleged herein violates any other laws set forth below in the Claims for Relief;

ix. Whether Defendants' conduct alleged herein actually and proximately caused Plaintiff and Class members to suffer legally cognizable harm; and

x. Whether Plaintiff and Class members are entitled to declaratory relief, injunctive relief, restitution, damages, or any other relief requested herein

c. Typicality (Rule 23(a)(3)): Plaintiff's claims are typical of the other Class members' claims because Defendants' wrongful acts and omissions alleged herein were substantially the same with respect to Plaintiff and all other Class members, Defendants' wrongful acts and omissions alleged herein caused Plaintiff and all other Class members comparable injury, Plaintiff is advancing

the same claims and legal theories on behalf of himself and all other Class members, and there are no defenses that are unique to Plaintiff.

d. Adequacy of Representation (Rule 23(a)(4)): Plaintiff can fairly and adequately represent and protect the interests of all other Class members. There are no material conflicts between the interests of Plaintiff and the other Class members that would make certification of the Class inappropriate. Plaintiff has retained competent and qualified counsel that has extensive experience in complex litigation and class action litigation, and that will vigorously prosecute the claims of Plaintiff and all other Class members.

98. This action is properly maintained as a class action under Rule 23(b) for the following reasons:

a. Class Action Status (Rule 23(b)(1)): Class action status is appropriate under Rule 23(b)(1)(A) because prosecution of separate actions by each of the thousands of Class members would create a risk of establishing incompatible standards of conduct for Defendants and inconsistent results for Class members. Class action status is also appropriate under Rule 23(b)(1)(B) because prosecution of separate actions by Class members would create a risk of adjudication with respect to individual Class members that, as a practical matter, would be dispositive of other Class members' interests or would substantially impair or impede their ability to protect their interests.

b. Declaratory and Injunctive Relief (Rule 23(b)(2)): Certification under Rule 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds that apply generally to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

c. Predominance and Superiority (Rule 23(b)(3)): Certification under Rule 23(b)(3) is appropriate because questions of law and fact common to the Class predominate over the questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this controversy, including consideration of (i) the relatively limited interests of Class members in individually controlling the prosecution of separate actions; (ii) the limited extent and nature of any litigation concerning this controversy already begun by Class members; (iii) the desirability of concentrating the litigation of the claims in this forum; and (iv) the relatively minor difficulties likely to arise in managing the proposed class action. Class

COMPLAINT FOR DAMAGES

action treatment is superior here because the monetary harms suffered by individual Class members are small compared to the burden and expense of bringing and prosecuting individual actions against Defendants to address their complex misconduct against the consuming public. Individualized litigation also presents a potential for inconsistent or contradictory judgments, would increase the delay and expense to all parties and the court system due to the complex legal and factual issues involved in this controversy, and would make it virtually impossible for individual Class members to redress effectively the harm done to them by Defendants. By contrast, a class action allows for the adjudication of a significant number of claims that would otherwise go unaddressed  because of the significant practical difficulties and relative expense of bringing and maintaining an individual action. A class action also provides economies of scale and other significant potential benefits that can be realized only by resolving this controversy in a single adjudication with comprehensive supervision by a single court.

99. Issue Certification (Rule 23(c)(4)): Certification of particular issues in this action, including issues of liability and relief sought, is appropriate under Rule 23(c)(4) because these issues are common to all Class members, and because resolution of these common issues on a classwide basis will materially advance the disposition of the litigation as a whole.

100. The Class is ascertainable from Defendants' own records, and there is a well-defined community of interest in the questions of law and fact alleged herein since the rights of each Class member were infringed or violated by Defendants in the same or similar fashion.

## VII. TOLLING OF THE STATUTES OF LIMITATIONS

101. To the extent that there are any statutes of limitations applicable to Plaintiff's and Class members' claims, the running of the limitations periods have been tolled by various doctrines and rules, including but not limited to equitable tolling, the discovery rule, the fraudulent concealment rule, equitable estoppel, the repair rule, and class action tolling.

## VIII. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

Violation of the Magnuson-Moss Warranty Act

15 U.S.C. § 2301, et seq.

102. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

103. The Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq., provides a cause of action for any consumer damaged by the failures of a warrantor to comply with a written or implied warranty. See 15 U.S.C. § 2310(d)(1).

104. The Class Vehicles and the ADAS packages on those vehicles are "consume products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

105. Plaintiff and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

106. Defendants are each a "supplier" and a "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

107. Under 15 U.S.C. § 2310(e), Plaintiff and the Class are not required to provide Defendants notice of this class action and an opportunity to cure until the time the Court determines the representative capacity of Plaintiff under Rule 23.

108. Defendants' representations (including those made by Defendants' representatives and agents) on Tesla's website, on Twitter, in Tesla marketing materials, and in various other media that the Class Vehicles already were or would soon become fully self-driving cars are each written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

109. Through written and implied warranties, Defendants warranted that the Class Vehicles and the ADAS packages and technology on those vehicles (both as sold or leased, and as periodically updated thereafter) are free from defects, of merchantable quality, and fit for their ordinary and represented use.

110. Defendants breached their written and implied warranties as described herein. Plaintiff and Class members were lured into purchasing or leasing Class Vehicles with ADAS packages and technology by Tesla's misrepresentations that it already had developed, or would soon complete its development of, ADAS packages and technology capable of making the Class Vehicles fully selfdriving. Instead, the Class Vehicles and ADAS packages and technology purchased or leased by

Plaintiff and Class members do not perform as promised, are not free of defects, are not of merchantability quality, and are unfit for their ordinary and represented use.

111. Defendants knew or should have known that they were making express and implied warranties that they would not be able to keep regarding the current and future near-term abilities, limitations, and value of Tesla's ADAS packages and technology, and knew or should have known that Tesla's ADAS packages and technology would not perform as promised, were not free of defects, were not of merchantability quality, and were unfit for their ordinary and represented use. Nevertheless, Defendants repeatedly promised in highly public and sensational ways intended to attract media attention and consumer interest in Tesla's vehicles and ADAS packages and technology that its vehicles already were or would very shortly be fully self-driving.

112. Plaintiff and Class members were damaged as a result of Defendants' breaches of their warranties because they received Class Vehicles and ADAS packages incapable of performing as Defendants represented, rendering the Class Vehicles and ADAS packages significantly less valuable than represented.

113. For relief, Plaintiff and the Class are entitled to and seek (a) damages caused by Defendants' breaches of the warranties, including economic damages (based on the return of the price that Plaintiff and Class members paid Defendants for ADAS packages and/or the difference between the price paid for the Class Vehicles as warranted and the actual value of the Class Vehicles as delivered) and all other available damages; (b) reasonable attorneys' fees and costs, and (c) all other available relief sought herein.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

**SECOND CLAIM FOR RELIEF**

Breach of Express Warranty

Cal. Civ. Code §§ 1791.2(a), 1794

114. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

115. Defendants expressly warranted to Plaintiff and Class members through written statements within the meaning of Cal. Civ. Code § 1791.2(a)(1) (including but not limited to statements that

29

Defendants made or caused to be made on Tesla's website, in Tesla marketing materials, on Musk's Twitter account, in various print media, and other written forums) that the Class Vehicles were fully self-driving, or that they would be fully self-driving within a reasonable time after Plaintiff and Class members purchased or leased their respective Class Vehicles and ADAS packages.

116. Defendants also expressly warranted to Plaintiff and Class members through use the of samples and models within the meaning of Cal. Civ. Code § 1791.2(a)(2) (including but not limited to videos Defendants produced purporting to show Tesla vehicles driving themselves) that the Class Vehicles were fully self-driving, or that they would be fully self-driving within a reasonable time after Plaintiff and Class members purchased or leased their respective Class Vehicles and ADAS packages.

117. The Class Vehicles and ADAS packages that Plaintiff and Class members purchased or leased: were not as warranted when they left Tesla's factories, reached Plaintiff and Class members without substantial change in the condition in which they were sold or leased, and did not perform as warranted.

118. Defendants breached their warranties by knowingly selling or leasing Class Vehicles equipped with ADAS packages and technology that had abilities, limitations, flaws, and value that were different from what Defendants had represented and warranted. Defendants' breaches were "willful" within the meaning of Cal. Civ. Code § 1794(c).

119. As a direct and proximate result of these breaches, Plaintiff and Class members have suffered various injuries and economic losses, including but not limited to (1) purchasing or leasing Class Vehicles and ADAS packages they would not otherwise have purchased or leased; (2) purchasing or leasing an inferior product whose nature and characteristics render it of lesser value than represented; (3) incurring monetary harm from the diminution in the Class Vehicles' and ADAS packages' value and resale value; and (4) purchasing or leasing Class Vehicles and ADAS packages that pose a danger to the health and safety of Plaintiff, Class members, and the public.

120. The failure of the Class Vehicles and ADAS packages to be as warranted was a substantial factor in causing Plaintiff's and Class members' harm, which includes the difference between the

prices they paid for their respective Class Vehicles and ADAS packages as warranted and the actual value of their Class Vehicles and ADAS packages as delivered.

121. Unless Defendants are enjoined from engaging in conduct alleged herein that violates their express warranties, members of the consuming public will be further harmed by that conduct.

122. For relief, Plaintiff and the Class are entitled to and seek (a) an injunction prohibiting Defendants from sending or transmitting false, deceptive, or misleading statements to the public regarding the abilities, limitations, flaws, and value of Tesla's ADAS packages and technology; (b) damages caused by Defendants' breaches of the warranties, including economic damages (based on the return of the price that Plaintiff and Class members paid for their respective Class Vehicles and ADAS packages and/or the difference between the price paid for the Class Vehicles and ADAS packages as warranted and their actual value as delivered); (c) consequential and incidental damages;

(d) a civil penalty of two times the amount of damages under Cal. Civ. Code § 1794; (d) reasonable attorneys' fees and costs under Cal. Civ. Code § 1794 and any other applicable law; and (e) all other available relief sought herein.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

### THIRD CLAIM FOR RELIEF

Breach of Implied Warranties

Cal. Civ. Code §§ 1791.1, 1792, 1794

123. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

124. Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, et seq., every sale or lease of consumer goods to a retail buyer is accompanied by an implied warranty of merchantability from both the manufacturer and the retail seller or lessor, and some such sales and leases may be also be accompanied by an implied warranty of fitness from both the manufacturer and the retail seller or lessor. Id. § 1792-1792.2.

125. The durations of these implied warranties are coextensive with the duration of the Defendants' express warranty, provided the duration of the express warranty is reasonable, except that the

31

duration of the implied warranties cannot have a duration of less than 60 days or more than one year. Id. § 1791.1(c).

126. Defendants' sale or lease of Class Vehicles and ADAS packages to Plaintiff and Class members was accompanied by Defendants' implied warranty of merchantability, both in their capacities as manufacturer and as retail seller or lessor. Id. § 1792.

127. Defendants' implied warranties of merchantability include warranties that the Class Vehicles and ADAS packages (1) will pass without objection in the trade under the contract description, (2) are fit for the ordinary purposes for which such goods are used; (3) are adequately contained, packaged, and labelled, and (4) will conform to the promises or affirmations of fact made on the container or label. Id. § 1791.1(a).

128. At the time of purchase or lease, or within one year thereafter, the Class Vehicles and ADAS packages and technology failed to conform with Defendants' implied warranty of merchantability because they (1) did not pass without objection in the trade under the contract description, (2) were not fit for the ordinary purposes for which such goods are used, (3) were not adequately contained, packaged, and labelled, and (4) did not conform to the promises or affirmations of fact made on the container or label. Among other things, the Class Vehicles and ADAS packages did not conform to the promises contained in the labels "Autopilot," "Enhanced Autopilot," and "Full Self-Driving Capability."

129. Defendants' sale or lease of Class Vehicles and ADAS packages to Plaintiff and Class members was also accompanied by Defendants' implied warranty of fitness, both in their capacities as manufacturer and as retail seller or lessor. Id. § 1792.

130. At the time that Plaintiff and Class members purchased or leased their Class Vehicles and ADAS packages from Defendants, Defendants were in the business of designing, developing, testing, manufacturing, selling, and leasing electric vehicles and ADAS technology in general, and the Class Vehicles and Tesla's ADAS packages and technologies in particular.

131. Defendants held themselves out as having special knowledge or skill regarding all these general and particular subject matters. Further, Defendants knew or had reason to know that Plaintiffs and Class members required the Class Vehicles and ADAS packages for a particular purpose, and that

Plaintiff and Class members were relying on Defendants' skill and judgment to furnish goods suitable for that purpose.

132. Defendants breached the implied warranty of fitness because they failed to deliver Class Vehicles and ADAS packages that were suited to Plaintiff's and Class members' purpose of purchasing or leasing a fully self-driving car.

133. Defendants breached their warranties by knowingly selling or leasing Class Vehicles equipped with ADAS packages and technology that had abilities, limitations, flaws, and value that were different from what Defendants had represented and warranted. Defendants' breaches were "willful" within the meaning of Cal. Civ. Code § 1794(c).

134. As a direct and proximate result of these breaches, Plaintiff and Class members have suffered various injuries and economic losses, including but not limited to (1) purchasing or leasing Class Vehicles and ADAS packages they would not otherwise have purchased or leased; (2) purchasing or leasing an inferior product whose nature and characteristics render it of lesser value than warranted; (3) incurring monetary harm from the diminution in the Class Vehicles' and ADAS packages' value and resale value; and (4) purchasing or leasing Class Vehicles and ADAS packages that pose a danger to the health and safety of Plaintiff, Class members, and the public.

135. The failure of the Class Vehicles and ADAS packages to be as warranted was a substantial factor in causing Plaintiff's and Class members' harm, which includes the difference between the prices they paid for their respective Class Vehicles and ADAS packages as warranted and the actual value of their Class Vehicles and ADAS packages as delivered.

136. Unless Defendants are enjoined from engaging in conduct alleged herein that violates their implied warranties, members of the consuming public will be further harmed by that conduct.

137. For relief, Plaintiff and the Class are entitled to and seek (a) an injunction prohibiting Defendants from sending or transmitting false, deceptive, or misleading statements to the public regarding the abilities, limitations, flaws, and value of Tesla's ADAS packages and technology; (b) damages caused by Defendants' breaches of the warranties, including economic damages (based on the return of the price that Plaintiff and Class members paid for their respective Class Vehicles and ADAS packages and/or the difference between the price paid for the Class Vehicles and ADAS

packages as warranted and their actual value as delivered); (c) consequential and incidental damages; (d) a civil penalty of two times the amount of damages under Cal. Civ. Code § 1794; (e) reasonable attorneys' fees and costs under Cal. Civ. Code § 1794 and any other applicable law; and (f) all other available relief sought herein.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

### FOURTH CLAIM FOR RELIEF

Violation of the California False Advertising Law

Cal. Bus. & Prof. Code § 17500, et seq.

138. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

139. Defendants' conduct alleged herein violates California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, et seq., which makes it unlawful for a business to make, disseminate, or cause to be made or disseminated to the public "any statement, concerning … personal property … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Id. § 17500.

140. The Class Vehicles and ADAS packages (including all ADAS hardware, software, and rights to receive updates and use the same) are "personal property" within the meaning of the FAL.

141. Any express or implied representation, material omission of information, or failure to correct a past material misrepresentation or omission regarding the abilities, limitations, or value of the Class Vehicles and ADAS packages and technology is a "statement[] concerning personal property" within the meaning of the FAL.

142. Defendants violated the FAL by making, disseminating, and causing to be made or disseminated to the public statements about the abilities, limitations, flaws, and value of Tesla's ADAS packages and technology that were "untrue or misleading" within the meaning of the FAL.

143. Defendants made, disseminated, or caused to be made or disseminated such public statements in numerous forums, including but not limited to Tesla's blog and website, Musk's Twitter account, earnings calls and other public statements to investors, conferences and other public events,

television, radio, podcasts, and other publicly available media (whether print, video, audio, or other format) that republished such representations and omissions.

144. Defendants knew or, by the exercise of reasonable care, should have known about each of those statements at or near the time they were made or disseminated, and at all times thereafter.

145. Defendants knew or, by the exercise of reasonable care, should have known that each of those statements was untrue, misleading, and likely to deceive the public at or near the time it was made or disseminated, and at all times thereafter.

146. Unless Defendants are enjoined from engaging in the conduct alleged herein that violates the FAL, members of the consuming public will be further harmed by that conduct.

147. As a result of Defendants' FAL violations and the harm caused thereby, Plaintiff and Class members are entitled to and seek (a) injunctive relief to protect the consuming public by prohibiting Tesla from engaging in its past and ongoing acts, omissions, and conduct that violate the FAL; (b) restitution of the full value of all monies and other consideration that Plaintiff and Class members paid Defendants for the purchase or lease of Class Vehicles and ADAS packages, which Defendant continues to wrongfully retain, including any diminished value of Plaintiff's and Class members' Class Vehicles and ADAS packages and disgorgement of the profits Defendants derived from their wrongful conduct; (c) an award of reasonable attorneys fees under Cal. Code Civ. Proc. § 1021.5 and any other applicable law; and (d) all other available relief prayed for below.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## FIFTH CLAIM FOR RELIEF

Violation of the California Consumer Legal Remedies Act

Cal. Civ. Code § 1750, et seq.

148. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

149. The California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq., makes unlawful certain "unfair methods of competition and unfair or deceptive acts or practices … undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or service to any consumer." Id. § 1770(a).

150. Each Defendant is a "person" under the CLRA. See id. § 1761(c).

151. Plaintiff and all Class members are "consumers" under the CLRA because they are all individuals who acquired, by purchase or lease, Class Vehicles and ADAS packages for personal, family, or household purposes. See id. § 1761(d).

152. The purchase or lease of a Class Vehicle and/or ADAS package is a "transaction" under the CLRA. See id. § 1761(e).

153. Class Vehicles and ADAS packages are "goods" under the CLRA. See id. § 1761(a).

154. In selling or leasing Class Vehicles and ADAS packages to Plaintiff and Class members, Defendants made an express or implied promise to provide future ADAS software development, future ADAS software updates, and other work or labor that constitutes "services" under CLRA. See id. § 1761(b).

155. Defendants' wrongful acts, practices, and conduct alleged herein—including but not limited to their false, misleading, and deceptive marketing, representations, and omissions regarding the present and likely future abilities, limitations, flaws, and value of Class Vehicles and ADAS packages and technology, and the time periods in which Tesla's ADAS packages and technology would result in a fully self-driving vehicle—are "unfair or deceptive acts or practices" in violation of the CLRA. Id. § 1770(a).

156. "Unfair or deceptive acts or practices" in violation of the CLRA include but are not limited to: (a) representing that goods or services have characteristics, ingredients, uses, or benefits that they do not have, id. § 1770(a)(5); (b) representing that goods or services are of a particular standard or quality, or that goods are of a particular style or model, if they are of another, id. § 1770(a)(7); (c) advertising goods or services with intent not to sell or lease them as advertised, id. § 1770(a)(9); and (d) representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not, id. § 1770(a)(16).

157. Defendants committed these unfair or deceptive acts or practices when they sold or lease Class Vehicles and ADAS packages to Plaintiff and Class members that did not have represented characteristics, uses, and benefits; were not of the represented quality; were not sold or leased as

advertised; did not perform as advertised; and were materially worse, less capable, less safe, and less valuable than Defendants had represented, and continued to represent them, to be.

158. Defendants knowingly and intentionally committed these unfair or deceptive acts or practices.

159. A reasonable consumer would consider knowing the reasons why Defendants' representations were unfair or deceptive to be material and important in deciding whether to purchase or lease a Class Vehicle, and whether to pay or additional money above the vehicle's base price for an ADAS package.

160. Defendants' unfair or deceptive acts or practices materially affected Plaintiff's and Class members' purchasing or leasing decisions. Defendants' false, misleading, and deceptive marketing, representations, and omissions regarding Class Vehicles and ADAS packages and technology were a substantial factor in Plaintiff's and Class members' decisions to purchase or lease Class Vehicles, and their decisions to pay thousands of dollars above the vehicle's base price for an ADAS package.

161. Plaintiff's CLRA venue affidavit is attached as Exhibit C to this Complaint, in accordance with Cal. Civ. Code § 1780(d).

162. Unless Defendants are enjoined from engaging in conduct alleged herein that violates the CLRA, members of the consuming public will be further harmed by that conduct.

163. As a result of Defendants' CLRA violations and the harm caused thereby, Plaintiff and Class members are entitled to and seek (a) injunctive relief to protect the consuming public by prohibiting Defendants from engaging in its past and ongoing acts, omissions, and conduct that violate the CLRA; (b) an award of reasonable attorneys fees under Cal. Civ. Code § 1780(e), Cal. Code Civ. Proc. § 1021.5, and any other applicable law; and (c) all other available relief prayed for below.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

### SIXTH CLAIM FOR RELIEF

Violation of the California Unfair Competition Law

Cal. Bus. & Prof. Code § 17200, et seq.

164. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

COMPLAINT FOR DAMAGES

165. California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., prohibits any unlawful, unfair, or fraudulent business act or practice, including but not limited any act or practice that constitutes deception, fraud, misrepresentation, or the concealment, suppression, or omission of a material fact in a consumer transaction, or that is likely to deceive the consuming public.

166. Defendants' wrongful acts and omissions alleged herein were and are unlawful, unfair, and fraudulent business acts and practices in violation of the UCL. Defendants' wrongful acts and omissions alleged herein were and are likely to deceive the consuming public in California and throughout the United States regarding the abilities, limitations, and value of the Class Vehicles and Tesla's ADAS packages and technology. Defendants' wrongful acts and omissions alleged herein also constitute deception, fraud, and misrepresentation, and concealment, suppression, and omission of material facts in the context of consumer transactions with Plaintiff and Class members.

167. Defendants knew or should have known that their wrongful acts and omissions alleged herein were are likely to deceive the consuming public in California and the rest of the United States, and Defendants committed those acts and omissions anyway for their own financial gain, including by shoring up and otherwise improve their financial condition, avoiding bankruptcy, increasing the likelihood of receiving new capital from investors, increasing their revenue and profits, and increasing the value of Tesla (including by increasing its share price).

168. Defendants' "unfair" business acts and practices under the UCL include, among other things, Defendants' acts, omissions, and conduct in: (a) marketing and referring to Tesla's ADAS packages and technology as "Autopilot," "Full Self-Driving," and "Full Self-Driving Capability"; (b) representing the capabilities, limitations, and value of Tesla's ADAS packages and technology to the public in a way that is materially different from how Defendants contemporaneously represented those same subjects to regulators, especially when Defendants' representations to regulators were communicated in a non-public forum or in a way not contemporaneously available to the public (e.g., a FOIA or PRA request is required to obtain the communication); (c) describing and marketing Tesla's ADAS packages and technology in a way that largely or entirely focuses on its actual or purported positive attributes and abilities in forums likely to generate significant public attention or

reach large numbers of consumers (e.g., Musk's Twitter feed, interviews with high-distribution or otherwise influential media, news conferences and other public events likely to generate media coverage, pages on the Tesla website that potential Tesla customers are more likely to visit than other pages on the website), while relegating information about the ADAS packages' and technology's flaws and limitations to forums likely to generate little public attention or otherwise reach a relatively small number of relevant consumers (e.g., pages on the Tesla website that potential Tesla customers are unlikely to visit relative to other pages on the website, vehicle user manuals, regulatory filings); (d) misrepresenting or otherwise providing information likely to deceive the public regarding the then-existing abilities and limitations of Tesla's ADAS packages and technology, including versions of that technology then available to some or all eligible Tesla owners, as well as versions of that technology represented as being in the possession of Defendants but not yet available to some or all eligible Tesla owners; (e) misrepresenting or otherwise providing information likely to deceive the public regarding the likely future abilities and limitations of Tesla's ADAS packages and technology, and the time periods in which those future abilities would likely be achieved and the future limitations likely reduced or eliminated; and (f) otherwise disseminating or causing to be disseminated to the consuming public information likely to deceive the consuming public in California and the rest of the United States.

169. Defendants' acts, omissions, and conduct alleged herein were and are "unfair" under the UCL because they are offensive to public policy and constitute immoral, unethical, oppressive, and unscrupulous activities that caused and continue to cause substantial injury to the consuming public, including Plaintiff and Class members. The harm caused by Defendants' conduct greatly outweighs any countervailing benefits to consumers or competition.

170. Defendants have engaged in "unlawful" business acts and practices by, as set forth in this Complaint, violating the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq.; violating the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, et seq., violating the California False Advertising Law, Cal. Bus. & Prof. Code § 17500, et seq.; violating the California Consumer Legal Remedies Act, Cal. Civ. Code §1750, et seq.; and violating their common law obligations.

171. Defendants have further engaged in "unlawful" business acts and practices by (a) committing "unfair or deceptive acts or practices in or affecting commerce" in violation of 15 U.S.C. § 45; (b) "mak[ing] or disseminat[ing], or caus[ing] to be made or disseminated, before the public in this state … a statement that is untrue or misleading and that is known, or that by the exercise of reasonable care should be known, to be untrue or misleading," in violation of Cal. Vehicle Code § 11713(a); (c) "mak[ing] or disseminat[ing], or caus[ing] to be so disseminated, a statement as part of a plan or scheme with the intent not to sell a vehicle or service … as so advertised," in violation of Cal. Vehicle Code § 11713(a); (d) making "advertised statements, representations, or offers [] in connection with the sale or attempted sale of any vehicle(s)" that is not "clearly set forth," "based on facts," or otherwise violates the Vehicle Code or Title 13, Division 1, Chapter 1 of the California Code of Regulations, in violation of 13 Cal. Code Regs. § 260.00; (e) violating other "provision[s] of Article 1 (commencing with Section 11700) of, or Article 1.1 (commencing with Section 11750) of, Chapter 4 of Division 5 or any rule or regulation adopted pursuant thereto," as referenced in Cal. Vehicle Code § 11705(a)(10); and (f) causing Plaintiff and all other Class members to suffer "loss or damage by reason of any fraud or deceit practiced on that person or fraudulent representations made to that person" within the meaning of Cal. Vehicle Code § 11705(a)(14).

172. Defendants have engaged in "fraudulent" business acts and practices by making representations (including by failing to disclose and concealing information) about the abilities, limitations, and value of the Class Vehicles and Tesla's ADAS packages that were likely to deceive the public. Among other representations likely to deceive the public, Defendants represented the Class Vehicles and Tesla's ADAS packages and technology as being capable of full self-driving at the time of purchase or lease, or within a reasonably short period thereafter. Plaintiff and Class members reasonably relied on Defendants' representations, nondisclosure, and concealment, and suffered economic injury as a result, including by not receiving the full benefit of the bargain from their purchase or lease of their new Tesla vehicle and ADAS package.

173. Defendants' wrongful conduct and the harm it has caused, and continues to cause, was and is not reasonably avoidable by Plaintiff, Class members, or the consuming public. At all relevant times, Defendants knew or should have known that Plaintiff and Class members would not have reasonably

known or discovered that so many of Defendants' representations regarding the present and likely future abilities, limitations, and value of Tesla's ADAS packages and technology, and time periods in which those future abilities would likely be achieved and the future limitations likely reduced or eliminated, were false, deceptive, or misleading.

174. Defendants' false, deceptive, or misleading representations regarding the capabilities, limitations, and value of Tesla's ADAS packages and technology were material, and Plaintiff's and Class members' reasonable reliance on the truth and accuracy of those material misrepresentations was a substantial factor in influencing Plaintiff and Class members to purchase or lease Class Vehicles and ADAS packages from Defendants.

175. As a direct and proximate result of their wrongful conduct, Defendants (a) have received wrongful obtained money from Plaintiff and Class members that rightfully belongs to Plaintiff and Class members, but that Defendants continue to wrongfully retain; (b) will continue to receive revenue, profits, and other benefits that it would not have received if it had not engaged in conduct violating the UCL as alleged herein, and (c) have obtained, and will continue to obtain, an unfair advantage over similar businesses that represent their goods and services in a manner that either does not violate the UCL, or that violates the UCL to a lesser extent than Defendants.

176. As a direct and proximate cause of Defendants' UCL violations, Plaintiff and Class members have each suffered monetary injury because they each paid Tesla money for a good or service (e.g., a vehicle with full self-driving capability) that Tesla has never provided, Defendants have and continue to wrongfully retain those monies paid by Plaintiff and Class members.

177. Unless Defendants are enjoined from engaging in conduct alleged herein that violates the UCL, members of the consuming public will be further harmed by that conduct.

178. As a result of Defendants' UCL violations and the harm caused thereby, Plaintiff and Class members seek and are entitled to (a) injunctive relief to protect the consuming public by prohibiting Defendants from engaging in their past and ongoing acts, omissions, and conduct that violate the UCL; (b) restitution of the full value of all monies and other consideration that Plaintiff and Class members paid Defendants for Class Vehicles and for ADAS packages, including any diminished value of Plaintiff's and Class members' Class Vehicles and ADAS packages and disgorgement of

the profits Defendants derived from their wrongful conduct; (c) an award of reasonable attorneys fees under Cal. Code Civ. Proc. § 1021.5 and any other applicable law; and (d) all other available relief prayed for below.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## SEVENTH CLAIM FOR RELIEF

### Fraud and Deceit

### Cal. Civ. Code §§ 1572, 1573, 1710

179. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

180. Based on Defendants' conduct alleged in this Complaint, Defendants have engaged in fraud and deceit as set forth in Cal. Civ. Code §§ 1572, 1573, and 1710.

181. Defendants misrepresented to Plaintiffs and Class members the abilities, limitations, and value of Class Vehicles and Tesla's ADAS packages by marketing them in a manner that Defendants knew was materially false and deceptive, including by engaging in misrepresentation, nondisclosure, and concealment of material facts. Among other misrepresentations, Defendants misrepresented the Class Vehicles and Tesla's ADAS packages and technology as being capable of full self-driving at the time of purchase or lease, or within a reasonably short period thereafter.

182. Plaintiff and Class members reasonably relied on Defendants' misrepresentations, nondisclosure, and concealment, and were induced by Defendants' wrongful conduct to purchase or lease Class Vehicles and ADAS packages, which they would not otherwise have purchased or leased.

183. As a direct and proximate result of Defendants' fraud and deceit, Plaintiff and Class members have suffered damages and other harms. Plaintiff and Class members' reliance was a substantial factor in causing their harm because they purchased or leased Class Vehicles and ADAS packages that they would not otherwise have purchased or leased, and/or because they paid materially more for Class Vehicles and ADAS packages than they otherwise would have paid.

184. Defendants' misrepresentations, deceit, and concealment were intentionally false or deceptive, and Defendants engaged in that conduct with the intent to mislead and deceive Plaintiff and Class

42

members in order to obtain their business and otherwise benefit financially. As a result, Plaintiffs are entitled punitive or exemplary damages under Cal. Civ. Code § 3294.

185. As a result of Defendants' fraud and deceit and the harm caused thereby, Plaintiff and Class members seek and are entitled to (a) damages in an amount to be determined at trial, (b) punitive or exemplary damages under Cal. Civ. Code § 3294, and (c) all other available relief prayed for below. WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

### EIGHTH CLAIM FOR RELIEF

Negligent Misrepresentation

186. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

187. Defendants misrepresented the abilities, limitations, and value of Class Vehicles and ADAS packages by marketing the Class Vehicles and ADAS packages as being capable of full self-driving at the time of purchase or lease, or within a reasonable short period thereafter.

188. Defendants' representations were not true because the Class Vehicles were not capable of full self-driving at the time of purchase or lease, or within a reasonable short period thereafter. On information and belief, Defendants are nowhere near being able to deliver fully self-driving vehicles.

189. Defendants had no reasonable grounds for believing their representations were true when they made them.

190. Defendants' misrepresentations, nondisclosure, and/or concealment of material facts to Plaintiff and Class members, as set forth above, were intended by Defendants to mislead and deceive Plaintiff and Class members.

191. Plaintiff and Class members reasonably relied on Defendants' misrepresentations, but were actually misled and deceived, and were induced by Defendants to purchase or lease Class Vehicles and ADAS packages that they would not otherwise have purchased or leased.

192. Plaintiff and Class members were damaged by Defendants' misrepresentations, and Plaintiff's and Class members' reliance was a substantial factor in causing their harm.

193. As a result of Defendants' negligent misrepresentation and the harm caused thereby, Plaintiff and Class members seek and are entitled to (a) damages in an amount to be determined at trial and (b) all other available relief prayed for below.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

### NINTH CLAIM FOR RELIEF

Negligence

194. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

195. Defendants had a duty to their consumers to exercise a degree of care that a reasonable person in the like position would exercise. Defendants failed to do so. Among other things Defendants had a duty to follow industry custom and standards to accurately represent the abilities, limitations, and value of Class Vehicles and Tesla's ADAS packages and technology.

196. Defendants breached their duty to Plaintiff and Class members by negligently misrepresenting that the Class Vehicles and ADAS packages had greater abilities and value than they actually had, and fewer limitations and flaws than they actually had, and by further repeatedly representing that Tesla was on the cusp of advancing its ADAS technology to the point of being able to deliver fully self-driving vehicles in near future, when Defendants had no reasonable basis to believe that those representations were true, accurate, and non-misleading.

197. As a direct and legal result of Defendants' wrongful acts and omissions, Plaintiff and Class members were harmed.

198. Defendants' negligence was a substantial factor in causing Plaintiff's and Class members' damages and other harm.

199. As a result of Defendants' negligent misrepresentation and the harm caused thereby, Plaintiff and Class members seek and are entitled to (a) damages in an amount to be determined at trial and (b) all other available relief prayed for below.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

### TENTH CLAIM FOR RELIEF

Unjust Enrichment

200. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

201. Plaintiff and Class members paid Defendants the value of Class Vehicles and ADAS packages that would make their vehicles fully self-driving at the time of purchase or lease, or within a reasonably short period thereafter.

202. In exchange, Defendants provided Plaintiff and Class members with Class Vehicle and ADAS packages that could not meet Plaintiff's and Class members' reasonable expectations created by Defendants' marketing, labelling, and other representations.

203. Defendants knew or should have known that the Class Vehicles and ADAS packages could not meet Plaintiff's and Class members' reasonable expectations created by Defendants' marketing, labelling, and other representations.

204. As such, Plaintiff and Class members conferred value upon Defendants which would be unjust for Defendants to retain.

205. As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and Class members have suffered and continue to suffer economic and other harms.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all other Class members, prays for judgment against Defendants and the following relief:

A. An order certifying this matter as a class action, appointing Plaintiff and his counsel of record to represent the Class, and requiring Defendants to pay the costs of all Class notice and administration of Class relief;

B. Declaratory and preliminary and permanent injunctive relief prohibiting Defendants from continuing to engage in acts, omissions, and conduct alleged herein that violate any law set forth in the Claims for Relief for which injunctive relief is available, including but limited to the California FAL, CLRA, and UCL;

COMPLAINT FOR DAMAGES

C. An award of all recoverable actual, general, special, incidental, compensatory, consequential, statutory, and punitive damages, as well as civil penalties, in an amount to be determined at trial;

D. An order awarding Plaintiff and the Class restitution and disgorgement in an amount to be determined at trial;

E. An award of reasonable attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5, Cal. Civ. Code § 1780(e), Cal. Civ. Code § 1794, and any other applicable law;

F. Pre- and post-judgment interest at the maximum rate provided by law; and

G. Such other and further relief as the Court may deem proper.

## X. DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues so triable.

Dated: October 2, 2023

Benjimin M. Brees
Attorney for Plaintiff
JOEL RICHARDSON

COMPLAINT FOR DAMAGES