Pages 1 - 35

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Rita F. Lin, Judge Presiding

```
BRIGGS A. MATSKO on behalf of  )
himself and all others         )
similarly situated; et al.,    )
                               )
           Plaintiffs,         )
                               )
  VS.                          )    NO. 3:22-cv-05240-RFL
                               )
TESLA, INC., doing business as )
TESLA MOTORS, INC.; et al.,    )
                               )
           Defendants.         )
_____)
```

San Francisco, California
Tuesday, April 30, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
        COTCHETT, PITRE & McCARTHY LLP
        San Francisco Airport Office Center
        840 Malcolm Road
        Burlingame, California  94010
    **BY:  ANDREW F. KIRTLEY, ATTORNEY AT LAW**

For Defendants:
        WILMER, CUTLER, PICKERING, HALE
        & DORR LLP
        7 World Trade Center
        New York, New York 10007
    **BY:  ALAN E. SCHOENFELD, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

STENOGRAPHICALLY REPORTED BY:
Kelly Shainline, CSR No. 13476, RPR, CRR
Official Reporter

```
 1   **APPEARANCES**:   (CONTINUED)

 2   For Defendants:
                                WILMER, CUTLER, PICKERING, HALE
 3                                 & DORR LLP
                                2600 El Camino Real, Suite 400
 4                              Palo Alto, California  94306
                          BY:   **ALLISON BINGXUE QUE, ATTORNEY AT LAW**
 5
                                WILMER CUTLER PICKERING HALE
 6                                 & DORR LLP
                                350 South Grand Avenue, Suite 2400
 7                              Los Angeles, California 90071
                          BY:   **DAVID MARCUS, ATTORNEY AT LAW**
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>**Tuesday - April 30, 2024**</u>                    <u>**10:04 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

---oOo---

**THE CLERK:**  Calling Civil Case 22-5240, Matsko vs. Tesla, Inc., et al.

Counsel, please state your appearances for the record beginning with the plaintiffs.

**MR. KIRTLEY:**  Yes.  Good morning, Your Honor.  Andrew Kirtley representing the plaintiff.

**MR. SCHOENFELD:**  Good morning, Your Honor.  Alan Schoenfeld representing Tesla.

**THE COURT:**  Good morning to both of you.

I put out a notice of questions for the hearing last week. I just wanted to make sure everybody got it.  I see everybody nodding.  Great.

So let's just march through the questions in the order that I've set them out, and at the end I'll make sure you both have time to let me know anything else you think is important I know about the case.

So let's just start with Question 1.  I'm going to read it so we are all on the same page.

Plaintiff states he reviewed website statements prior to his purchase in which Tesla represented that the car had the, quote, "hardware needed for full self-driving capability," end quote, but that this was false because the car lacked lidar.

1      Tesla contends that plaintiff was insufficiently diligent

2   in discovering the lack of lidar on his car and the necessity

3   of lidar for fully autonomous self-driving.

4      What does Tesla contend would have put plaintiff on

5   inquiry notice that even when the software for autonomous

6   driving became available, the car might still lack the

7   necessary hardware components?

8           **MR. SCHOENFELD:**  Yes, ma'am.

9           **THE COURT:**  This is a question for Tesla.  So I'll ask

10   counsel for Tesla to start.

11           **MR. SCHOENFELD:**  Thanks very much, Your Honor.

12      As your question notes, the only hardware Mr. Losavio

13   alleges he lacked is lidars.  Tesla's view, of course, as the

14   plaintiff alleges in paragraph 35 of the complaint, takes the

15   view that lidars are not required to achieve full driving

16   autonomy.

17      But to the extent plaintiff alleges that lidars are

18   required making Tesla's statements false, the sources informing

19   him of other views on lidars put him on notice to inquire into

20   whether his vehicle had lidars.

21      So when he learned about what he calls a longstanding

22   expert consensus that lidar are required to achieve full

23   autonomy cited in paragraph 35 of the complaint, he was on

24   notice to inquire.  When he learned that Audi reached Level 3

25   autonomy with lidars in 2017, as he discusses in paragraph 35

1   and 36 noting that the only vehicles to achieve full autonomy

2   had lidars, he was on notice.

3      And when he encountered the April 29th -- April 2019

4   article, he cites in Footnote 53 of his complaint which make

5   the industry and Tesla views express, it says "Tesla has no

6   intention of using lidar and other vehicles making

7   autonomous" -- "other companies making autonomous vehicles were

8   using lidar," he had notice to inquire.

9      There's also plenty of press from 2016 addressing this

10   issue about some -- the views held by some in the industry that

11   lidar are required and the views held by Tesla that they're not

12   required.  Any of these would have put a diligent suiter on

13   notice to inquire as to whether his vehicle has lidars.

14      He doesn't allege he thought Tesla had lidars and it's not

15   concealed from him.  It's an external feature.  It's a hardware

16   feature of the car.  It either appears as sort of a revolving

17   cone on the top of the car, or on the Volvo vehicles it's this

18   really kind of bulbous protrusion on the windshield.  It's not

19   a secret.

20      So all of those allegations in his complaint make clear

21   that he was on notice that if he took the view that lidars

22   were, in fact, required, consistent with what he describes as a

23   longstanding industry consensus, he had all the information he

24   would need to inquire as to whether Tesla had lidars.

25      And he acknowledges that he went into dealerships six to

1    nine months after he purchased the vehicle.  It would have been

2    an easy question to pose to the extent he was mistaken about

3    whether the vehicle had lidars or not.

4         **THE COURT:**  I understand what you're saying from the

5    perspective of him not -- had he started to look into the issue

6    of what hardware does a car need to have in order to be fully

7    autonomously self-driving.  Once he went down that road, I

8    could see that a reasonably diligent person would then look in

9    the many news sources that are cited in the complaint and say

10   to themselves, "Well, gee, it looks like lidar is one of the

11   main things you need, and my car doesn't seem to have that very

12   obvious component that would show that there's lidar, so maybe

13   I need to find out whether there's some more subtle form of

14   lidar that Tesla's come up with to put in this car if they're

15   telling me it's fully autonomous -- it's fully ready for

16   autonomous self-driving in terms of hardware."

17        But I think the stumbling block for me is understanding

18   what put the plaintiff, in Tesla's view, on inquiry notice to

19   investigate in the first place whether there were potentially

20   missing hardware components.  Why would he even bother to start

21   looking into that issue in the first place?

22        **MR. SCHOENFELD:**  Well, I think it's the sources that I

23   cited.  But, again, what plaintiff alleges here is that Tesla

24   misrepresented that the vehicle would be able to become fully

25   autonomous at the time he purchased it in January 2017.  And

according to him, lidar were required as a hardware feature on
the vehicle in order to achieve that promise of full-driving
autonomy.

All of the sources that I referenced cited in the
complaint are very early discussions about the view of some in
the industry.  I mean, if he formed a view that lidar were
required, he didn't form that view on his own.  He formed it
based on reading industry press or discussions about this.

All of those sources are longstanding sources that would
have put him on inquiry notice to say, "All right.  I'm hearing
from this longstanding expert consensus, from the fact that
Audi went to full autonomy or Level 3 autonomy in 2017," and
this article that is cited in his own complaint in April of
2019 reflecting a discrepancy in views between Tesla and other
vehicle manufacturers about the necessity of lidars being
present on the vehicle.

Any or all of those things would have put someone who was
so focused on this issue on notice to scratch their head and
say, "All right.  There's a consensus that lidar are required,
and I know from these very sources and I know from looking at
my own vehicle that lidar are not present on my vehicle.  So
what's the deal?  How is it possible that they are making this
promise of full-driving autonomy but I don't have what I
understand, based on these sources, to be the one kind of
needed requirement or one needed hardware requirement to make

 1   full autonomy possible?"

 2       So all of those things, again alleged in his complaint, I

 3   think fairly read on the face of the complaint to be things

 4   that he read prepurchase or shortly after his purchase would

 5   have put him on notice about this.

 6       And, again, it's not -- it's not a subtle point; right?

 7   It's hardware.  You know it's there or not; and according to

 8   the complaint, this is something that everyone in the industry

 9   knows and has known for a long time that lidar are required.

10       Does that answer your question?

11           **THE COURT:**  I understand what your answer is to the

12   question.  I'll give plaintiff an opportunity to respond.

13           **MR. KIRTLEY:**  Thank you, Your Honor.

14       Mr. Losavio was not on inquiry notice.  Tesla, you know,

15   told him that the cars had all the hardware needed for full

16   self-driving capability.  This is coming from a company that is

17   widely perceived as one of the foremost experts in an emerging

18   technology.  It's coming from -- it's coming from Elon Musk,

19   who's widely perceived, you know, as a foremost expert on this

20   technology.

21       Mr. Losavio, who was a retired attorney, is just trying to

22   purchase a car.  He's not an expert in this emerging technology

23   of, you know, autonomous driving.  He's just a regular

24   consumer, and it's not the standard that a consumer in making a

25   purchase is supposed to become an expert in what they're

purchasing.

You know, Your Honor can imagine the sort of paradigmatic or typical false advertising case where there is a product on a shelf at a retail store, and let's take, for example, a food product that is making some sort of a health claim -- right? -- such as "This product is good for your heart" or "This product improves bone health."

A typical complaint in that kind of case would allege this is false, this product does not actually improve bone health, this product is not actually good for your heart.  And we know that because cardiologists or the American Heart Association or whatever heart experts, they know that, or whatever sort of bone experts know that, but it's not an expectation of a consumer walking through a grocery store or a nutritional supplement store that they have the same expertise as a cardiologist or whatever.  It's a representation that's coming from a manufacturer; and the case law says that, as a general rule, consumers are entitled to rely on representations from manufacturers.

And, you know, in this area where you're dealing with an emerging technology, a new technology, it's being developed, a lot of these representations are based on nonpublic information that only the company has.  They have, you know, exclusive access to the information about whether the software that they're supposedly developing is going to be able to make a car

1  with a particular hardware suite self-driving.

2      So in addition to just the general rule that consumers

3  aren't required to have expertise, we also have a number of

4  heightened factors here where, you know, we allege an expert

5  consensus that lidar is required.  But Tesla is simultaneously

6  taking the opposite view and saying, "No, but wait.  With our

7  software, our software is going to make these cars with -- you

8  know, this car with this hardware suite self-driving and just

9  wait and you will see."

10          **THE COURT:**  Let me move to Question 2.

11          **MR. SCHOENFELD:**  Your Honor, I apologize.  May I just

12  very briefly respond?

13          **THE COURT:**  Brief response.

14          **MR. SCHOENFELD:**  Very briefly.

15      So just two points.  The first one is, I think

16  Mr. Kirtley's response conflates the merits question with the

17  statute of limitations questions.  The question for statute of

18  limitations purposes is:  When is this person on inquiry

19  notice?  I'm not asking for expertise.  I'm not asking for, you

20  know, weighing and balancing the expert testimony.

21      He alleges that he read this article in April of 2019.

22  That's enough to put him on inquiry notice to say "I understand

23  there to be a view in the not specialized press, not concealed

24  information."  It's in the MSNBC article he cites in FM53.

25      The other point to make is, there's still not sufficient

1   allegation of knowing falsity as required under 9(b) with

2   respect to the statement; right?  This is Tesla's view.  He

3   alleges an expert consensus on the other side.  There's no

4   allegation that this is, in fact, required or that Tesla knew

5   it to be false when made.

6       And I'll just stop there because I know you want to move

7   on.

8          **THE COURT:**  Okay.  I understand the point.

9       Question --

10         **MR. KIRTLEY:**  I'm sorry, Your Honor.  If I could just

11  correct one thing.

12         **THE COURT:**  Okay.  Last word on Question 1.

13         **MR. KIRTLEY:**  So there's no allegation that

14  Mr. Losavio read the articles being referenced.  There's no

15  allegation that Mr. Losavio read every single article and

16  source in the complaint; right?

17      I mean, Tesla can't have it both ways in terms of saying,

18  "You know, he needs to allege which articles that he read," you

19  know, when it's convenient to their argument; and then when

20  it's inconvenient to their argument assume that he's read

21  everything in the complaint and he read it all

22  contemporaneously.  I mean, it's not -- it's not what the

23  complaint alleges.

24         **THE COURT:**  Thank you.

25      Let's move to Question Number 2.  Plaintiff says that he

 1  reviewed statements made by Musk in 2016 that Tesla would be

 2  able to drive itself from Los Angeles to New York without the

 3  need for a single touch by the end of the year.  He reviewed

 4  these statements in deciding to purchase the FSD software

 5  package.  He contends that after his purchase Musk lulled him

 6  into not bringing suit by promising every year that such

 7  technology would be implemented in the next year in statements

 8  reported in media that he read.

 9          Tesla argues that plaintiff cannot rely on equitable

10  estoppel because the statements at issue cannot be the same as

11  the ones that formed the basis for his underlying claim.

12  However, the statements forming the basis for his underlying

13  claims were allegedly made presale; whereas, the statements

14  supporting his equitable estoppel were allegedly made postsale.

15          So on what basis does Tesla contend that those statements

16  are the -- quote, "are the same"?  And is it sufficient for

17  this inquiry that the statements relate to the same topic?

18          **MR. SCHOENFELD:**  To answer your question directly,

19  yes.  Alleged misconduct is the, quote, "same" for these

20  purposes if it, quote, "relates to the underlying wrongdoing,"

21  as the court put it in *Rushing*, 2022 WL 2833980, or is, quote,

22  "part and parcel," end quote, of plaintiff's underlying claim,

23  as the court put it in *Spears*, 2013 WL 1748284.  And that makes

24  sense in light of the rationale for this rule.

25          In *Lukovsky*, the leading Ninth Circuit case on this,

535 F.3d 1044, the court explained that a plaintiff -- if a plaintiff seeks to estop a defendant from asserting a statute of limitations defense, he, quote, "must point to some fraudulent concealment, some active conduct by the defendant above and beyond the wrongdoing upon which the plaintiff's claim is filed to prevent the plaintiff from suing in time," end quote.

And that's because, as the Ninth Circuit explained, if the same misconduct underlies both the claim and the invocation of equitable estoppel or fraudulent concealment, quote, "the tolling doctrine would merge with the substantive wrong and would virtually eliminate the statute of limitations unless the defendant informs the plaintiff of the wrong at the time it occurs."  And that's the Ninth Circuit's decision in *Easter*, 381 F.3d 948.

So the paradigm cases that both the Ninth Circuit and the California Supreme Court identify as conduct going above and beyond the underlying claim is when a defendant essentially lies about the statute of limitations.

In *Lukovsky*, which I cited earlier, the Ninth Circuit says that equitable estoppel would be appropriate, quote, "if defendant had told plaintiff that it would not plead the statute of limitations as a defense."

And the California Supreme Court in *Lantzy*, 31 Cal.4th 363, says, quote (as read):

1          "The defendant's statement or conduct must amount to

2     a misrepresentation bearing on the necessity of bringing a

3     timely suit.  The defendant's mere denial of legal

4     liability does not set up an estoppel," end quote.

5          So getting back to this case, it means that a continuous

6     course of alleged misconduct, like we have here, is inadequate

7     as a matter of law to trigger equitable estoppel.  A defendant

8     subject to equitable estoppel must deceive someone about the

9     timeliness of their claims.  You can't just say that a company

10    falsely advertised a product and then continued to falsely

11    advertise it after you purchased it.

12         And so because the question is whether the wrongdoing, the

13    part and parcel of the underlying claims, that supposedly

14    estops the defendant from invoking a statute of limitations is

15    the same wrongdoing as the one that motivated the complaint to

16    begin with.  The question here is:  What's the wrongdoing upon

17    which Losavio's claim is filed?  It's that Tesla misrepresented

18    its capabilities as to full autonomy.  The pre and postsale

19    statements Losavio alleges, and which Your Honor's question

20    cites, are all part of a same wrongdoing.

21         A good example to show this principle in action is

22    Judge Orrick's decision in *Rushing*, which I cited before, 2022

23    WL 283980.  Rushing sued William Sonoma for allegedly

24    advertising -- or misleadingly advertising the thread count of

25    certain bed linens.  She didn't sue until years later and

invoked William Sonoma equitable estoppel on the ground that

William Sonoma, quote, "actively misled her by," end quote,

continues to falsely advertise and sell the linens with the

thread count.

And the Court rejected the argument and said (as read):

"Far from being above and beyond the wrongdoing at

issue, these theories of harm go to the heart of her case.

Because these allegations are related to the underlying

wrongdoing rather than an effort to prevent plaintiff from

being able to sue, these allegations cannot constitute the

affirmative conduct needed for fraudulent concealment."

So I think *Rushing* and *Spears*, and I'll also cite

Your Honor to another case that I think is useful on this

point, which is *Kirsopp vs. Yamaha Motor Company*, 2015 WL

11197829 -- and we'll, of course, provide the Court with the

citations -- all of those cases involve continued courses of

conduct where the same allegation that gave rise to the claim,

the prepurchase claim, are the same allegations that are

invoked.  Sometimes it's the same misrepresentations.  It's an

ongoing course of conduct.  That's exactly what the courts say

is not the above and beyond.  It does not go to the necessity

of filing a claim, simply the gravamen of the plaintiff's

complaint against the defendant in a false advertising case.

**THE COURT:**  The question I have about that reasoning

is that I think of kind of the paradigmatic case of lulling as

a situation of, say, where somebody defrauds another person of
their money and then every month that person says "Don't worry.
I have your money.  I'm about to get it to you.  I'll have it
to you next month."  And then the next month rolls around and
they say "I have it.  It's just stuck in this other investment
vehicle.  It's a little hard to liquidate right now.  I'll get
it to you next month."

     And that even though those statements relate to the same
topic, we think of that as sort of a classic lulling-type
situation, which in some ways reminds me of what plaintiffs are
alleging here.  Because plaintiffs are saying there was an
initial misrepresentation in the purchase of the car about the
timeline at which self-driving would become available and then
there's this ongoing narrative:  It will be here next year.  I
know we had expected it earlier, but end of next year for sure.
Until one day plaintiff gives up and says "This is clearly not
happening" and brings suit.

     So what do you think it is that distinguishes this case
from that sort of paradigmatic lulling case that I mentioned?
Or do you think that type of paradigmatic case is not, in fact,
paradigmatic and is -- it is outside the scope of equitable
estoppel?

          **MR. SCHOENFELD:**  So I'm not aware of -- I don't think
plaintiff cites a case and I can't cite a case to you that's
sort of like the Ponzi scheme type lulling scenario.

1    One answer is:  Equitable estoppel only awards a diligent

2    suiter.  And so Losavio's claim in this case is "I was told

3    before I purchased my car that it would become fully autonomous

4    within a year or two."  So as of January 2019, he knew that he

5    had not gotten, according to him, what he purchased, and no

6    promise that Tesla made after that point would give him back

7    the damages he seeks for having purchased a vehicle in

8    January 2017 that wasn't available as of January 2019.  That's

9    particularly the case for Mr. Losavio who said he wanted this

10   car because he was an older driver with deteriorating faculties

11   and he wanted it to be fully autonomous for the majority of the

12   10 years that he would own it.

13       By January of 2019, someone as attentive as Mr. Losavio

14   would have known that he was not getting what he paid for; and

15   so the additional, you know, alleged misrepresentations would

16   not have lulled this particular diligent suiter into sitting on

17   his rights the way that he did.

18       I still think that there's a commonness to the allegations

19   that, in the Ninth Circuit's view, runs the risk of conflating

20   the underlying cause of action and the statute of limitations.

21   And I think the *Kirsopp* case that I cited to you is in some

22   ways the most analogous I could find because one of the

23   representations in that case was that the motor would be good

24   for at least a thousand miles, and that was the prepurchase

25   representation and the postpurchase representation.

1    So the fact that there was something built into it about

2    how much you would get out of the car versus -- or in that case

3    I think it might have been a boat, a motor, but how much you

4    would get out of it versus how much you were actually getting

5    out of it, that was a commonality between the pre and

6    postpurchase misrepresentations alleged in that case.  And the

7    court said that's not enough; it's the entire premise of your

8    claim.

9    So the risk the Court needs to be alert to, according to

10   the Ninth Circuit in *Lukovsky* and *Easter*, is:  Are you running

11   the risk -- and statutes of limitations are always claim

12   specific -- are you running the risk of obviating the statute

13   of limitations and really on the facts alleged in the

14   underlying claim making it so that the only way the claim ever

15   triggers is if Tesla were to acknowledge, you know, "We're not

16   telling you the truth."  Again, we dispute all of that, but

17   that's -- that's the risk you're running as a matter of law

18   when you talk about *Easter* and *Lukovsky*.

19   So that's the first answer to the legal question; but,

20   again, I think the case law is legion that this principle only

21   rewards a diligent suiter and only applies for the period of

22   time before a diligent suiter is on inquiry notice.

23   So if we're talking about when he became alert to the fact

24   that he did not get what he thought he purchased in January of

25   2017, he's not asking for specific performance for Tesla to

deliver a fully autonomous car.  He's asking for damages.  He was damaged, according to him, in those two years and he could never get that back except through a claim for damages, which is what he brings here.

So he was aware no later than January of 2019 that he had not gotten what he was promised and none of the postpurchase misrepresentations he alleges would have cured that fact.

**THE COURT:**  Brief response from plaintiff.  I'm not sure I have a lot of questions for plaintiff on this issue, but you can respond briefly if you'd like.

**MR. KIRTLEY:**  Thank you.

So the point that he should have -- that Mr. Losavio should have known as of January 2019 that he had not received the software that he purchased for future delivery is, of course, true, but it's totally unresponsive to Your Honor's observation that it seems like a typical lulling case where he's being told "It's coming.  It's coming."

But I would also argue that it's not just a regular lulling case.  It's -- I would guess it's a lulling case with numerous aggravating factors.  And what I mean by that is, you know, in our opposition brief Footnote 3, we gather up a lot of these statements and point to where they're cited in the complaint.  But Mr. Musk after January 2017 isn't just pushing back the date; he's also making all kinds of statements to where he is doubling down on the fact that this is coming.

You know, he's getting more specific.  There's all kind of statements about when Level 5 is going to come.  There are promises about robo taxis.  There are promises about the, you know, dates that he's very confident about when there's going to be regulatory approval somewhere.

There are, you know, comments that -- you know, paragraphs 94 and 95 are a great example -- in 2021 on an investor call -- or, rather, on an earnings call where he -- you know, he is saying "Full self-driving is coming.  I'm 100 percent confident."  And he's asked, you know, "Why are you confident?"  And he's saying, "Well, it's based on basically nonpublic information that I, as the CEO, know about what's coming down -- what's coming down the pike."  And then at the same time he's tying the value of the company to Tesla's ability to deliver full self-driving.

I mean, he's -- really he's -- all of these statements where he's continually doubling down and sort of providing extra reasons to where a reasonable person would believe it must really be coming because he keeps getting more specific and he's saying -- you know, he's not just moving out the date. He's getting more specific.  He is -- you know, he's doubling down on how important it is to the value of the company, and he's telling financial analysts across the country "This is critical to our company and I'm confident it's coming."

It's a wide variety of evolving and different statements

 1   that would lead a reasonable person to think it must really be

 2   coming because why else would -- why else would Elon Musk go

 3   farther out on the limb?  He keeps going farther out on the

 4   limb.

 5           **THE COURT:**  Let me -- I know Tesla may have responses

 6   to that.  Let's just hold those till the end.  If you have more

 7   you want me to know on anything we've covered, you can let me

 8   know that at the end.

 9       But I want to move to Question 3, which is really for the

10   plaintiff, about the implied and express warranty claims.  So

11   plaintiff concedes he knew his car was not self-driving on the

12   day that he bought it.  So does that mean that plaintiff agrees

13   that his warranty claims are not based on any kind of warranty

14   that the car was already self-driving on the day he bought it?

15           **MR. KIRTLEY:**  So the short answer is, yes, with a

16   caveat.  So, of course, we do allege that Mr. Losavio knew that

17   his car -- in the doc specs his car would be self-driving at

18   the time that he purchased it.  So we do concede those warranty

19   claims are not based on a warranty made to Thomas Losavio that

20   the car would be self-driving at the time of purchase.

21           **THE COURT:**  Right now on the motion to dismiss we're

22   just talking about Thomas Losavio; right?

23           **MR. KIRTLEY:**  Correct.  I just want to make that point

24   because I want to be clear that the plaintiff is not waiving

25   and intends to pursue, you know, merits arguments of full

 1    self-driving and autopilot are actually misleading and are

 2    likely to mislead a reasonable consumer -- I'm referencing what

 3    the standards are under the UCL and the false advertising

 4    law -- and that many consumers have been and continue to be

 5    misled by these names, and we have allegations to that effect

 6    in the complaint.

 7        I mean, one way that it does tie back to Mr. Losavio --

 8    and we make this point in our opposition brief -- is that the

 9    use of the name is an -- you know, is one reason that

10    Mr. Losavio believed the promises about future delivery and why

11    was it coming.  And what I mean by that is, a reasonable

12    consumer would assume that if a company represents "We don't

13    quite have the software yet, but we are so close and the

14    software is called full self-driving," it makes that -- it

15    makes that representation.  I mean, it makes things fit

16    together because why else would a responsible company call a

17    product full self-driving if it's not going to make cars fully

18    self-driving?  It indicates that the company is close.

19        **THE COURT:**  Well, let me move to Question 4 because I

20    think that that really goes to that issue.

21        So for the implied and express warranty claims, there's an

22    allegation that there's a warranty that the car would become

23    full self-driving within a reasonable amount of time, but what

24    I don't understand is how that is a promise to, quote,

25    "preserve or maintain a feature" of the car under the

1  California Civil Code provision for warranty claims.  It has to

2  be preserving or maintaining a feature, and the point is that

3  this is a future feature that isn't yet in the car.  So tell me

4  how your claim fits within the statute.

5       **MR. KIRTLEY:**  Right.  So I would distinguish between

6  two products here.  One is the car and one is the software;

7  and, of course, they work together because the point of the

8  software is to make a particular car with a particular hardware

9  suite self-driving.

10      So one of the representations that was made and that

11 Mr. Losavio believed and was part of the reason that he

12 purchased the car is -- which we already discussed today, is

13 that the car had all of the hardware needed for full

14 self-driving capability, and that obviously runs more towards

15 the car.  It's really the only claim that we have that runs --

16 that involves the car per se as distinguished from the

17 software.

18      **THE COURT:**  So the warranty would be to Mr. Losavio on

19 the day he bought it, "We promise you this car has all the

20 hardware it needs for full self-driving," and because that

21 hardware was not present on the day that he bought the car,

22 that's the basis of the breach of warranty claim?

23      **MR. KIRTLEY:**  It is a basis of that claim.  I mean,

24 and the complaint also alleges -- so it's a promise that it

25 already has the hardware needed for full self-driving, but

implicit in that is if that were to change, you know, the

hardware needed for full self-driving will be preserved and

maintained.

     And the complaint goes through two allegations where

Mr. Losavio's car through various service appointments actually

received what Tesla described as an FSD computer retrofit, and

then there was also an issue about installing an additional

camera; and the purpose of those additional hardware

installations was to, you know, allegedly be compatible with

the software that is coming that is perpetually on the horizon.

     **THE COURT:**  But is the fact that something's missing a

component, is that a basis for a warranty claim?  I thought a

warranty claim had to be based on the idea that the component

is -- you know, didn't continue to stand the test of time, but

are there warranty claims that can be based on missing

components?

     **MR. KIRTLEY:**  Well, the -- I don't know that the

warranty here is based on missing components because the

representation is that the car has all the hardware needed for

full self-driving.

     My only point is that if that were to change, it would

make sense that as part of that warranty, then the car -- you

know, there's a warranty to modify it so that that warranty

continues to be true, you know.  It's a feature of the car that

it has all the hardware needed for full self-driving.

1          **THE COURT:**  As the technology evolves for what is

2    required for full self-driving?  I'm not sure I quite follow

3    that.  What do you mean "continues to be true"?

4          **MR. KIRTLEY:**  Well, if it -- I'm just saying if Tesla

5    determines that for unforeseen reasons it needs to modify what

6    the hardware mix is in order to be compatible with its, you

7    know, nonpublic proprietary developing software that, you know,

8    it's been representing is, you know, perpetually 6 to 12 or

9    15 months away.

10         You know, the car is one is having a particular hardware

11   mix that's going to work in tandem with the particular

12   software.  So if the software needs change, then it would make

13   sense that the hardware mix needs to change too.  I mean, it --

14   you know, also it feels a little bit like we're in a sort of a

15   theoretical land in the sense -- I mean, really the heartland

16   of our complaint are, you know, the false advertising claims,

17   the UCL claim, the CLRA claim that there was no reasonable

18   basis for making any of these promises because the software

19   development was -- you know, it was just years and years and

20   years away; and that, you know, there's no reasonable basis to

21   be making representations about what hardware mix is required

22   or about when the delivery date for the software is going to be

23   and, you know, the last seven, eight, nine years have borne

24   that out.

25         **THE COURT:**  Thank you.

1    I don't have a lot of questions for the defendant on the
2    implied warranty claim --

3        **MR. SCHOENFELD:**  Sure.

4        **THE COURT:**  -- but you may have a brief opportunity to
5    respond.

6        **MR. SCHOENFELD:**  I'll be very brief.

7    I think this is sort of like a square-peg-round-hole-type
8    issue.  These are sort of relics of a prior iteration of a
9    complaint where he alleged that he wasn't delivered at the time
10   a vehicle that had full self-driving capability.

11   Warranty claims are really specific.  They require, you
12   know, a specific and unequivocal promise to preserve and
13   maintain.  There are statutory definitions of "model" and
14   "sample," none of which are addressed in their opposition
15   brief.  There's also the issue of the presuit notice, so I'll
16   rest on our papers as to why these claims fail.

17       **THE COURT:**  I promised I'd give each of you one last
18   opportunity to tell me anything else you thought I ought to
19   know from the motion.  Since it's defendants' motion, I'll let
20   you go first, and then I can hear from plaintiff, and you can
21   have the last word at the end.

22       **MR. SCHOENFELD:**  Sure.  Thanks, Your Honor.

23   I think Your Honor is obviously focused on the statute of
24   limitations piece, at least as to the majority of the claims.
25   So I just want to bring this back, and I think Mr. Kirtley teed

1  this up nicely, which is this is a false advertising case;

2  right?

3      At the end of the day, he needs to allege some prepurchase

4  statements consistent with 9(b).  He's now been given four

5  opportunities to do that.  He's got three complaints and 70

6  pages of charts, and there is not a single statement in his 11

7  prepurchase statements that is pled adequately under Rule 9(b).

8      You can really group these into three buckets:  Statements

9  supposedly implying a timeline, statements that Tesla had all

10  the hardware necessary to enable full autonomy, and statements

11  regarding safety.

12      You know, as to the first bucket, which is statements

13  supposedly implying a timeline, which has been the gravamen of

14  his complaint all along, only one statement, Statement 11, says

15  anything about when Tesla vehicles might become autonomous.

16  And he doesn't say where or when he read it.  He says "I read

17  three newspapers," and then he lists them, and he doesn't say

18  where he read that in a newspaper.  And that's not just a

19  trifling 9(b) argument.

20      Here's why it matters.  In his complaint, he cites a

21  different source for that particular statement at Footnote 118.

22  And in that article from MSNBC -- from -- sorry -- NBC News

23  from October 2016, it specifically says after citing that

24  language (as read):

25          "Tesla cautioned that not all the new features will

1          be activated immediately upon the launch of Model 3, which

2          is expected to occur sometime in late 2017.  It first

3          needs to clock millions of miles of real-world driving to

4          ensure everything works properly."

5          And it has other statements in there where it cites Tesla

6     making precisely the same caveats that we cite in our brief.

7          So, you know, this is a 9(b) argument in the sense that

8     Tesla is entitled to know at this point in this litigation

9     exactly what it's contending with, and we have none of that

10    here, notwithstanding four opportunities.

11         **THE COURT:**  Can you tell me what the footnote is that

12    you mentioned again?

13         **MR. SCHOENFELD:**  Yeah.  It's Footnote 118 in the

14    complaint, and this is what he cites for the quotation that a

15    driverless Tesla will travel from LA to NYC in 2017.

16         So that article has all of that cautionary language,

17    which, again, is consistent with the 2016 blog post that we

18    address in our brief.  He doesn't even cite that article in his

19    chart for Statement 11.  What he cites for Statement 11 is he

20    says "I read three newspapers a day," and he lists the *New York*

21    *Times*, the *Wall Street Journal*, and the *San Francisco*

22    *Chronicle*.  We have no idea which of those it appears in, and

23    that's important because the context matters.  We have no idea

24    what other -- whether it was in there or what the statements

25    are.  That's all he says he reads.

1    And then he -- well, so I'll leave that there.

2    As to the second bucket, you know, about Tesla vehicles

3    having the hardware necessary to enable full autonomy, I think

4    we've addressed that, and I don't want to rehearse it.

5    And then as to the safety claims, all of the claims that

6    he points to in his chart are about how safely FSD would

7    perform in the future.  And other than listing a handful of

8    accidents, which, of course, are tragic, but a handful of

9    accidents involving Tesla vehicles over many years, he doesn't

10   actually say anything about Tesla vehicles being less safe than

11   they are represented to be, which is what would be necessary to

12   satisfy Rule 9(b).

13   So all of the arguments that we went over for however

14   long, you know, are really critical to the case, but I think

15   it's worth kind of stepping back to say:  Has he adequately

16   pleaded, consistent with Rule 9(b), any actionable

17   misrepresentation?  And, you know, in Tesla's view, the answer

18   is no.  The charts are not any more illuminating than the

19   briefs and the three iterations of the complaint as to what, in

20   fact, Mr. Losavio saw before he purchased the vehicle that gave

21   him any sorts of expectations that might have been frustrated

22   and that would be actionable in this case.

23   **MR. KIRTLEY:**  Thank you.

24   I would -- again, I'd reference again the Footnote 3 in

25   our opposition brief, which tries to -- which does effectively

gather together all of these statements made over the years

year by year with citations to the complaint of concrete,

specific, varied statements that Elon Musk is making about when

full self-driving is coming, when Level 4 is coming, when

Level 5 is coming, how he is 100 percent confident.  And, you

know, these are statements from a person who, out of anyone in

the whole world, is in the best position to know about when it

is actually likely to be coming.

And I think, you know, a liberal reading of the complaint

and one of -- you know, is reading those in conjunction with

paragraphs 21b and 22, which makes the point that in some ways

this is a unique case.  Because we're not talking about, you

know, about the statements of a -- of the CEO of a cereal

manufacturer; right?  This is -- this is someone who is in the

newspaper virtually every single day.  You know, he is

incredibly widely reported on.  This is alleged in the

complaint again at 21b and 22.  I think we all also know it

from living in the world.

His statements are incredibly widely reported on online,

in print media every single day, and you have all of these

statements that are constantly coming that are flooding the

zone.

And, you know, with regard to Mr. Losavio in particular,

you know, as alleged at paragraphs 156 to 168, this is not

just, you know, what I would argue as an ordinarily diligent

consumer.  This is a particularly diligent consumer.  This is a
retired attorney who reads three newspapers, you know, every
day and he's reading them, as alleged in the complaint, with a
particular eye for articles about Tesla, articles about Musk
and full self-driving because, for understandable reasons, that
is a topic in which he is interested.

There's allegations about how he, you know, has regularly
gone to Tesla's website.  He's reading the actual -- he alleges
reading the actual release notes of the updates that are coming
to his car for software that has not yet been activated on his
car but that he keeps being told it's coming as alleged in the
complaint.

He's reasonably understanding those updates and the
descriptions, which repeatedly use, you know, the term "full
self-driving," that this is evidence of Tesla making progress
that corroborates Mr. Musk's statements about how they're
making huge progress and how full self-driving is coming but
it -- you know, it just never comes.

But I just want to respond to one thing about the
allegations of safety because I think this has gotten lost a
little bit, which is a fairly simple point.

The purpose of the safety allegations, they're part of a
constellation of allegations, which is to say, software that
has really basic problems is not, you know, on the cusp of
being perfected allowing cars to drive themselves in a very

1    complex environment.  So, you know, when cars are driving into

2    walls, driving into overturned trucks, driving into

3    perpendicular enormous tractor-trailers across many years, you

4    know, with fatalities in 2017 and as recently as 2023, that

5    indicates or suggests, you know, the software still appears to

6    have a long way to go.

7         But it's not just safety.  There's all kinds of

8    allegations about how the software also can't, you know, do

9    things like consistently make a turn or consistently stop at a

10   stop sign or running through red lights.  I mean, you know, the

11   list goes on and on about basic driving maneuvers that cannot

12   consistently be performed.

13        And the point is simply to say that it -- you know, it's

14   consistent with what we allege is a whole pattern of

15   misrepresentation that Mr. Losavio, you know, despite his

16   diligence and all the things that he did -- I didn't mention,

17   you know, the allegations about speaking to Tesla employees who

18   told him he needed service appointments and consistently

19   scheduling those service appointments and being told, oh, he

20   needs new parts but now he has to wait because the part isn't

21   in stock and he's waiting for months and months and he needs

22   this part is like the last step before he can finally get the

23   software.

24        There's a whole constellation of factors about why it was

25   reasonable for him to basically -- with the camera, for

1    example, you know, he's like exhausting remedies in a way

2    because the company is telling him, "Well, you're not even

3    eligible until you get the camera."  And so that's a whole

4    period of time where he's waiting for the camera; right?

5        The point is just he was particularly diligent in doing

6    all the things that was alleged in the complaint.  And, you

7    know, it wasn't until April 2022, as alleged in the complaint,

8    when he first began to suspect that maybe the software was

9    never coming.

10       The last thing I'll say, all the things that we're talking

11   about here are, you know, questions of fact.  I know obviously

12   that Your Honor knows that we're still at the pleading stage --

13   right? -- but I think it's just worth emphasizing we are at the

14   pleading stage.

15       The allegations in the complaint are detailed.  They show

16   someone behaving reasonably even above and beyond what a normal

17   consumer would do.  They also show someone who is, arguably,

18   more sophisticated or at least has more formal education than a

19   normal consumer would have and yet, you know, Mr. Losavio was

20   deceived by this ongoing years' long campaign.

21           **THE COURT:**  Last word for Tesla.

22           **MR. SCHOENFELD:**  Sure.  I'll make three very, very

23   quick points.

24       The first one is with respect to the hardware.  I think

25   Your Honor alluded to this before.  A software improves.  It's

1  not out of the ordinary for hardware to need to keep pace.  He

2  doesn't allege he paid anything more for the camera that was

3  installed, and so I don't think there's anything notable about

4  that and it certainly doesn't make the 2016 statements untrue,

5  knowingly untrue, at the time they were made.

6      Second, I think Mr. Kirtley said before that I was

7  conflating sort of general allegations in the complaint versus

8  Mr. Losavio's specific ones.  I think one of the points he made

9  here is to talk about all of the statements in the complaint,

10  which he then says "We don't know whether Mr. Losavio read or

11  he did read."

12      We know from his chart, because Your Honor put the

13  question directly to him, those are the 11 statements that he

14  could testify under oath that he read prepurchase, and none of

15  them satisfies Rule 9(b) for the reasons I previously gave.

16      The last point, and this is a really minor one, but I just

17  can't help point out why this is not a class case in any

18  respect.  I think Mr. Kirtley has underscored in numerous

19  respects how idiosyncratic the plaintiff is.  And recall that

20  this is a case about someone who opted out of an enforceable

21  arbitration agreement.  So we're talking about a pretty small

22  universe of people here rather than the majority who were

23  subject to these binding arbitration provisions.

24      But we've heard a number of different times in a number of

25  different ways how his response to the warranty is atypical.  I

think Mr. Kirtley called him uniquely, you know, attentive to

these issues, which are going to be critical in the case.  So

if the case does proceed, which, of course, we don't believe it

should, I think that that view of Mr. Losavio's claims here as

being so atypical should inform the way that this case is

litigated going forward.

        **THE COURT:**  I will take the motion under submission

and issue a written order.

    Thank you both for the argument.

        **MR. SCHOENFELD:**  Thanks very much, Your Honor.

        **MR. KIRTLEY:**  Thank you, Your Honor.

        (Proceedings adjourned at 10:54 a.m.)

            ---oOo---

1

2

3                    <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Wednesday, May 1, 2024

8

9

10

11    _____

12          Kelly Shainline, CSR No. 13476, RPR, CRR
                      U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25