FIEBER DEC EX. 2

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

| In Re: Tesla Advanced Driver Assistance Systems Litigation | Case No. 3:22-cv-05240RFL |
| --- | --- |

## EXPERT DECLARATION OF DR. GERALD GOLDHABER

## Table of Contents

Page No.

CERTIFICATION OPINIONS .................................................................................. 4

BACKGROUND AND RELEVANT EXPERIENCE.................................................. 4

    a.    Educational and Academic Background ................................................. 4

    b.    Consulting Background ........................................................................... 4

    c.    Writing and Commentator Background ................................................. 5

RETENTION IN THIS CURRENT MATTER ............................................................ 5

    a.    **California Opt-Out Class:** All persons who purchased or leased from Tesla, Inc. (or any entity it directly or indirectly owns or controls, including but not limited to Tesla Lease Trust and Tesla Finance LLC) a Tesla vehicle and paid a separate amount, either through purchase or subscription, for Enhanced Autopilot and/or Full Self-Driving technology packages (collectively, "Class Vehicles") at any time from January 1, 2016, to the present ("Opt-Out Period"), and who either purchased or leased that vehicle in California or who currently reside in California, who opted out of Tesla's arbitration agreement. ................................. 5

    b.    **California Pre-Arbitration Class:** All persons who purchased or leased from Tesla, Inc. (or any entity it directly or indirectly owns or controls, including but not limited to Tesla Lease Trust and Tesla Finance LLC) a Tesla vehicle and paid a separate amount, either through purchase or subscription, for Enhanced Autopilot and/or Full Self-Driving technology packages (collectively, "Class Vehicles") at any time from January 1, 2016, through May 19, 2017 ("Pre-Arbitration Period"), and who either purchased or leased that vehicle in California or who currently reside in California. ................................. 5

MATERIALS REVIEWED ........................................................................................ 6

REPRESENTATIONS AT ISSUE IN THIS CASE ................................................... 6

    a.    Tesla vehicles have all the hardware for full self-driving capability ..................... 6

    b.    A Tesla vehicle will be able to drive autonomously from L.A. to NY within a year or so .................................................................................. 6

    c.    A self-driving Tesla (according to two videos posted on Tesla's website since 2016) is capable of making turns, stopping at traffic lights and stop signs and even parking itself without a driver in the car. ............................ 6

d.      Tesla repeated these representations over time. For example, the statement regarding hardware was on Tesla's website until August 2024, and at least one of the videos is still on Tesla's website today. This report will document how Tesla's statements were apparently false and misleading to the reasonable consumer, who in all likelihood, were deceived by Tesla's representations. ................................... 6

HOW TESLA MARKETS ITS VEHICLES .......................................................................... 7

WHAT WOULD A REASONABLE CONSUMER UNDERSTAND TESLA'S REPRESENTATIONS TO MEAN? ............................................................................ 8

TESLA APPEARS TO HAVE ENGAGED IN A DELIBERATE CAMPAIGN CONSISTING OF FALSE AND MISLEADING MARKETING REPRESENTATIONS WHICH PRELIMINARY EVIDENCE SUGGESTS WERE UNTRUE AND, IN ALL LIKELIHOOD, MISLED AND DECEIVED THE ORDINARY CONSUMER ............................ 9

THE STATEMENTS AND REPRESENTATIONS MADE BY TESLA WERE MATERIAL/IMPORTANT TO A REASONABLE CONSUMER DECIDING WHETHER OR NOT TO PURCHASE EITHER ENHANCED AUTOPILOT OR FSD TECHNOLOGIES. ................................................................................... 13

BASED UPON THE EVIDENCE CITED ABOVE, IT APPEARS THAT TESLA AND ELON MUSK HAVE ENGAGED IN A YEARS-LONG CAMPAIGN OF FALSE AND MISLEADING MARKETING REPRESENTATIONS ........................................... 14

a.      Tesla vehicles had all the hardware needed for full self-driving capability. ........ 14

b.      A Tesla vehicle will be able to drive autonomously from LA to   NY within a year or so. ................................................................................. 14

c.      A self-driving Tesla will have the ability to make turns, stop at traffic lights and stop signs and even park itself without a driver in the car. .................. 14

d.      Full Self-Driving Capabilities would arrive within a year or so. ........................... 14

OVERALL CONCLUSION ............................................................................. 15

## CERTIFICATION OPINIONS

Certification Opinion 1. Analysis of Tesla's "information environment," as more fully described within, suggests that Tesla deceived and misled the average consumer who purchased Tesla's Enhanced Autopilot and/or Full Self-Driving technology packages into believing that they "had all the hardware they needed for full self-driving capability" and "that a Tesla vehicle will be able to drive autonomously from LA to NY within a year or so."

Certification Opinion 2. Tesla's representations appear to have been material or important to the reasonable, ordinary consumer making the decision whether to purchase Tesla's Enhanced Autopilot and/or Full Self-Driving technology packages.

Certification Opinion 3. If the classes are certified, I plan to conduct a series of surveys and focus groups, as described within, that will, within a reasonable degree of certainty, tell us on a class-wide basis what the reasonable consumer understands when they are exposed to the cited statements and representations that were made by Tesla and the materiality or importance of those statements to decisions to purchase Tesla's Enhanced Autopilot and/or Full Self-Driving technology packages.

## BACKGROUND AND RELEVANT EXPERIENCE

     a.    Educational and Academic Background

1.    For the past 47 years, I have been working in the area of marketing and safety communications and warnings as a professor, researcher, author, consultant and product warning evaluator and designer. I received a B.A. in Speech Communication from the University of Massachusetts in 1965, an M.A. in Communication Theory and Measurement/Statistics from the University of Maryland in 1967 and a Ph.D. in Organizational Communication and Industrial Psychology/Human Factors/Statistics from Purdue University in 1970. I have been an Assistant Professor of Communication at the University of New Mexico (1970-74) and an Associate Professor of Communication (1974-2004) and Department Chair (1979-88) at SUNY-Buffalo, where I regularly taught courses in organizational and safety communications as well as advertising and market research.

     b.    Consulting Background

2.    As President of Goldhaber Research Associates, LLC (1978-present), a market and safety research company, my clients have included many of the top companies in the United States including: Exxon Mobil, McKesson, General Motors, Ford, Chrysler, General Electric, Home Depot, Johnson & Johnson, Proctor & Gamble, Dow Dupont, Eli Lilly, McDonalds, Goodyear, Firestone, Philip Morris, Raytheon, Motorola, Xerox, Bayer, etc. and several others for whom I have designed and/or evaluated warnings including: Rheem Water Heaters, Otis Elevators, Playtex Tampons, Nissin Foods, SC Johnson's Raid and Off, Dr. Pepper/7Up/Cadbury Beverages, Owens Corning Fiberglas Wool Insulation, the Swimming Pool Industry, etc. I have

also been a consultant for the FDA, the USDA, the DOD, the CPSC, the IRS, the U.S. Army and other government agencies.

        c.      <u>Writing and Commentator Background</u>

3.      I am the author of 12 books, including two of the all-time best sellers in the field of communication (**Organizational Communication**, the first and leading college textbook in the field, now in its 8th edition and translated into Spanish, Finnish and Chinese and **Communication Probes**, which sold over a quarter million books), several hundred scientific papers and consumer/industry speeches as well as the subject of dozens of interviews by leading television networks and newspapers/magazines (Forbes, Fortune, Time, CBS, NBC, ABC, CNN, New York Times, Boston Globe, Wall Street Journal, etc.) on marketing and safety communications and warnings issues. I was also CNN's and CNN.Com's chief commentator/analyst for issues dealing with warnings and/or safety communications. I am also the publisher of the monthly **Goldhaber Warnings Report**, now in its 14th year reaching thousands of lawyers nationally and the instructor of the official digital course on warnings and safety communications for the National Association of Continuing Legal Education (NACLE), the nations leading provider of continuing education for the legal profession. My 12th book, **MURDER INCORPORATED: HOW UNREGULATED INDUSTRY KILLS OR INJURES THOUSANDS OF AMERICANS EVERY YEAR…AND WHAT YOU CAN DO ABOUT IT** was an Amazon Best Seller and named by Kirkus Reviews as one of the top one hundred non-fiction books of 2020.

**RETENTION IN THIS CURRENT MATTER**

4.      In this case, I was retained to review Tesla advertising and sales materials related to its sale of enhanced autopilot and Full Self-Driving technology packages, to reach conclusions as to whether these materials (along with news stories and tweets featuring comments by Tesla CEO, Elon Musk) would be deceptive for the reasonable consumer considering purchases of either package and whether this information would be material or important to the purchase decision. In the next phase of my work, I will implement the methodology outlined in this report confirming that the opinions I have reached apply to the proposed classes:

        a.    **California Opt-Out Class:** All persons who purchased or leased from Tesla, Inc. (or any entity it directly or indirectly owns or controls, including but not limited to Tesla Lease Trust and Tesla Finance LLC) a Tesla vehicle and paid a separate amount, either through purchase or subscription, for Enhanced Autopilot and/or Full Self-Driving technology packages (collectively, "Class Vehicles") at any time from January 1, 2016, to the present ("Opt-Out Period"), and who either purchased or leased that vehicle in California or who currently reside in California, who opted out of Tesla's arbitration agreement.

        b.    **California Pre-Arbitration Class:** All persons who purchased or leased from Tesla, Inc. (or any entity it directly or indirectly owns or controls, including but not limited to Tesla Lease Trust and Tesla Finance LLC) a Tesla vehicle and paid a separate amount, either through purchase or subscription, for Enhanced

Autopilot and/or Full Self-Driving technology packages (collectively, "Class Vehicles") at any time from January 1, 2016, through May 19, 2017 ("Pre-Arbitration Period"), and who either purchased or leased that vehicle in California or who currently reside in California.

## MATERIALS REVIEWED

5.    With regards to this case, I have reviewed materials including the Third Amended Complaint, Tesla website and newsletter content and videos and interviews, news stories and tweets featuring comments by Tesla CEO, Elon Musk. (See Exhibit 4 for a list of all materials reviewed)

6.    Based upon my review of these materials, plus my education, training, knowledge, publications and research in the field of organizational, marketing and safety communications and warnings (see Exhibits 1 through 3, providing my current CV, rate sheet and recent testimony list), I have arrived at the following opinions, all of which I hold to a reasonable degree of professional certainty and all of which are derived from ensuring analytical adherence to the scientific method, a method based upon observation of facts and applying those facts to scientific theories to draw conclusions.  It is my intent to further test these opinions with a rigorous testing program consisting of surveys and focus groups, should the case be certified, along with examining a sampling of Tesla's sales materials and scripts to review statements made to customers about the availability and timeline for Tesla's promised Enhanced Autopilot and Full Self-Driving capabilities.

## REPRESENTATIONS AT ISSUE IN THIS CASE

7.    Beginning in October 2016, Tesla represented on its website and in the public press that:

    a.    Tesla vehicles have all the hardware for full self-driving capability

    b.    A Tesla vehicle will be able to drive autonomously from L.A. to NY within a year or so.

    c.    A self-driving Tesla (according to two videos posted on Tesla's website since 2016) is capable of making turns, stopping at traffic lights and stop signs and even parking itself without a driver in the car.

    d.    Tesla repeated these representations over time. For example, the statement regarding hardware was on Tesla's website until August 2024, and at least one of the videos is still on Tesla's website today. This report will document how Tesla's statements were apparently false and misleading to the reasonable consumer, who in all likelihood, were deceived by Tesla's representations.

8.    The Federal Trade Commission (FTC) regulates most product advertisements under the FTC Act, Section 5, which calls for ads that are not deceptive, that are truthful and are evidence-based. According to the FTC, a deceptive ad is one that misleads consumers or omits material

(important) information needed by consumers to help them decide whether to buy or use a product. (FTC Act, Section 5). From a communication perspective, the FTC is asking product manufacturers to engage in what I call in my book "principled disclosure" (i.e., tell the truth and don't leave out any important information that implies something that isn't true, e.g., leaving out information that Tesla consumers did not have "all the hardware they needed for full self-driving capability") so that consumers can make informed choices about whether or not to buy a product and/or how to use it safely. (G. Goldhaber, **Murder, Inc.: How Unregulated Industry Kills or Injures Thousands of Americans Every Year…And What You Can Do About It.** (Hartford, CT., Publish Your Purpose Press, 2020)

## HOW TESLA MARKETS ITS VEHICLES

9.      From its onset, Tesla is unique among car manufacturers in that it does not rely upon independent auto dealers. Instead, it sells directly to consumers through the phones, its website and Tesla owned and operated sales centers. As such, its representations regarding its products are tightly controlled and uniform and, like its sales, go directly to the consumer.



10.     Tesla also reaches out directly to its customers through its website, YouTube (where it maintains a page with videos at https://www.youtube.com/@tesla), Instagram (@Teslamotors), press conferences and other sales events, *e.g.*, "Autonomy Day," typically featuring its CEO Mr. Musk, similar press coverage of Mr. Musk's own newsfeed on twitter.com (aka x.com), and marketing newsletters sent to customers and potential customers, including one received by Plaintiff in November 2016.

11.     It is my understanding that Tesla has represented in this litigation that it does not advertise or market its products. This means that consumers, in all likelihood, will rely upon Tesla statements, on its website, on Elon Musk's comments and pronouncements as reported in the press as well as his tweets in order to understand what it is selling, especially for such esoteric products like "full self-driving" or "enhanced autopilot" technologies. These are not every day consumer products, thus, consumers must rely upon Tesla to explain what they do.

12.     The bases for my opinion are derived from my examination of the "information environment" available to Tesla consumers. The "information environment", a term I developed in my first book (G. Goldhaber, **Organizational Communication**, 8th Edition, Buffalo, NY: SUNY Press, 2003), consists of all sources, messages and channels of information available to a receiver at the time of a decision. In this situation, Tesla's "information environment" included the following sources, messages and channels of communication made available to consumers:

Tesla's website's verbal and video content, Tesla social media, press coverage including statements by Tesla CEO, Elon Musk during interviews as well as on Twitter and statements made to consumers in Tesla's sales materials. As I referenced above, Tesla has a history of direct communication with its customers and consumer base, and although it claims it does no mass advertising (e.g., placing Tesla ads in newspapers or magazines or on TV, etc.), it certainly has used and continues to use the above-mentioned channels of communication (e.g., website, social media, press, tweets, etc.) present in its "information environment" to market and make representations directly to its customers and consumer base, many of which, in my preliminary opinion, appear to be false and misleading.

13.     Tesla's representations, referenced above, about the hardware and timeline for Full Self-Driving capability were communicated consistently, uniformly and widespread using all of the available channels of communication in Tesla's "information environment" from October 2016 continuing through the present, given that Tesla still has at least one of its apparently false and misleading videos still on its website. Tesla repeated these comments and representations over several years from 2016 until the present. For example, only in August 2024 did Tesla remove its October 2016 blog post from its website that first stated that all vehicles had the software for full self-driving.

14.     Tesla's customers, therefore, had virtually no choice but to rely upon Tesla for information related to any purchase decision related to Tesla and its products. Tesla's strategy to primarily rely upon direct-to-consumer (DTC) marketing tactics has been shown to be a very effective tool to reach the ordinary consumer. (See, e.g., Syed Akhter et al, "Consumers' attitudes toward direct marketing and purchase intentions: An empirical investigation," Journal of Direct Marketing, Volume 5, Issue 3, 1991, pp.48-56). Further, Tesla's specific DTC marketing strategy has been evaluated by studies that have documented its effectiveness in reaching consumers. (See, e.g., Yizhen Li, "Analysis of Tesla's marketing strategy model," Advances in Economics Management and Political Sciences 54 (1): 33-39). Finally, as shown next in this report, the credibility of the source of a communication is the most important characteristic in determining the effectiveness of any communication. And, as we will see, the credibility of Elon Musk, as early as 2016, was extremely positive, thus making his and Tesla's messaging highly likely to be effective.

## WHAT WOULD A REASONABLE CONSUMER UNDERSTAND TESLA'S REPRESENTATIONS TO MEAN?

15.     In the field of communication, the standard model used to describe the communication process consists of the source, message, channel, receiver and feedback (G. Goldhaber, **Organizational Communication**, 8th Edition, Buffalo, NY: SUNY Press, 2003; this will be my source for these opinions). We rely upon characteristics associated with the source, message and channel in the communication process to determine if we are likely to be effective in communicating with our intended receiver(s), that is, to determine if the receiver understood our message(s).

16.     The **source** is the originator of the message. In this case, the source is Tesla and/or Elon Musk. The most important characteristic for a source to be effective in communicating is its

credibility.  In 2016, Elon Musk was a very credible source who, as an entrepreneur, entered the public eye as the genius behind both PayPal and Space X.  He arguably became a household name after his involvement as a founder and now CEO of Tesla. As proof of his positive credibility among the public, First Round Capital, in its annual survey of 700 entrepreneurs in 2016 found that Elon Musk was the most admired founder and entrepreneur, ranking significantly ahead of Jeff Bezos, Mark Zuckerberg and Steve Jobs.

17.     The **message** is the information being communicated.  The most effective messages are clear, succinct, repeated and consistent.  Tesla's representations referenced above, as I will document, definitely met those criteria.

18.     The **channel** is the means by which the message is communicated from the source to the receiver.  Multiple channels conveying a consistent message are the most effective in the communication process.  As I will document, Tesla used multiple channels (e.g., social and mass media, website content and videos) to communicate its representations about the hardware and timeline for Full Self-Driving capability.

19.     **Feedback** is the means by which the source confirms that its message(s) were effectively communicated, i.e., that the message(s) reached the receiver through the designated channels and was understood by the receiver.  Given that Tesla's "information environment" consisted of widespread and repeated messaging through direct-to-consumer channels, messaging that could only have come from Tesla itself, the most credible source about the hardware in its vehicles and its capabilities, the best way to confirm that the information was received by the class of consumers (i.e., feedback) was that they had to pay for the product (enhanced autopilot and full self-driving packages) over and above the price of the vehicle.  Without information from Tesla about the vehicle's capability re. FSD, there was no basis for the consumer to purchase the additional feature.  As we will see, Musk and Tesla represented that FSD was already here (through its posted videos) or would soon be here (as Musk said in an interview boasting that a Tesla would drive itself from L.A. to NY by 2017), claims that appear to be false and misleading to consumers.

### TESLA APPEARS TO HAVE ENGAGED IN A DELIBERATE CAMPAIGN CONSISTING OF FALSE AND MISLEADING MARKETING REPRESENTATIONS WHICH PRELIMINARY EVIDENCE SUGGESTS WERE UNTRUE AND, IN ALL LIKELIHOOD, MISLED AND DECEIVED THE ORDINARY CONSUMER

20.     Tesla's Website has consistently used bold headlines such as "Full Self-Driving Capability" or "Enhanced Autopilot" to mislead consumers into believing that their Tesla could drive itself. Research in the field of communication has concluded that a headline can shape memory and interpretation of information, even when the body of the information contradicts the headline. (See e.g., Ecker, U.K.H., Hogan, J.L. & Lewandowsky, S. (2017), Reminders and Repetition of Misinformation: Helping or Hindering Its Retraction? Journal of Applied Research in Memory and Cognition 6 (2) 185-192).

21. ████████████████████████████████████████████
████████████

22.     According to an article in Aviation Titans, "Autopilot allows pilots to operate the aircraft in nearly full automation throughout the flight.  Autopilot systems can now control the aircraft during almost every phase of flight, including takeoff, climb, cruise, descent, and landing…" (M. Aston, "The Role of Autopilot: How Much Control Does a Pilot Have?" Aviation Titans, January 18, 2025, pp.1-15).  Given the airline industry's common use and meaning of "autopilot", it is easy to see that the average consumer would be deceived into thinking that a Tesla with the same name, Autopilot, could drive itself. Even Tesla's software engineer for Autopilot, Dhaval Shroff, testified in his deposition of 2/27/25 (p.121) that a fully autonomous car is a "car that can go by itself from Place A to Place B."

23.     In this case, a reasonable consumer would be expected to pay attention to the headlines used by Tesla that say, e.g., "Full Self-Driving Capability" and would, in all likelihood, interpret that headline to mean the Tesla could drive itself, especially when this headline is reinforced, as shown below, by Tesla's statements and videos in its website and the quotes and Tweets by Tesla's CEO, Elon Musk.

24.     **Tesla's Website** has consistently stated (since 2016) with a bold headline that "All Tesla vehicles produced in our factory…have the full-self driving capability at a safety level substantially greater than that of a human driver."  See, for example, this quote from the 2019 website: "All Tesla vehicles have the hardware needed in the future for full self-driving in almost all circumstances, at a safety level we believe will be at least twice as good as the average human driver."

25.     This statement appears to be false and misleading, as will be examined by Plaintiff's expert, Vincent Socci, whose opinions I will rely upon to document this assertion.

26.     Further, an article published April 14, 2025 by electric vehicle expert and Editor-in-Chief of Electrek, Fred Lambert, concluded that Tesla's 2016 claim "that all of its vehicles in production going forward have all the hardware necessary for full self-driving capability…has yet to happen and won't happen soon in most of the cars Tesla has delivered over the last decade."  Lambert concluded that Tesla's claim "quickly proved untrue."  "Tesla (TSLA) has to replace the 'self-driving' computer inside about 4 million vehicles" which appears to prove that Tesla's earlier representation that "Tesla vehicles have all the hardware for full self-driving capability" is false. This claim will also be examined by Vincent Socci, upon whose opinions I will rely.

27.     Tesla's Website since 2016 has consistently included two **videos** that supposedly show a Tesla driving itself and even parking itself.  These videos are preceded by a message stating "The person in the driver's seat is only there for legal reasons.  He is not driving anything.  The car is driving itself."  According to an article in Business Insider, "Tesla faked a 2016 video promoting its self-driving technology." (L. Varanasi, "Tesla Faked a 2016 video promoting its

self-driving technology, according to a senior company engineer's deposition testimony," Business Insider, January 17, 2023).

28.    This video appears to be misleading to consumers because the car was driven, according to the article and discovery in this case, with the aid of commercial mapping software not available to consumers; ████████████████████ ████████████████ and several dry runs of the supposed "self-driving car" were taken by Tesla before it got the desired result. In footage that did not make it into the final video, "the test car crashed into a fence in Tesla's parking lot" (according to Reuters who quoted from a deposition given by Tesla VP of Engineering, Ashok Elluswamy).

29.    This is a classic example of what the FTC meant when they stated: "An act or practice is deceptive where a representation, omission, or practice misleads or is likely to mislead the consumer." (FTC Act, Section 5). Clearly, Tesla did not disclose to consumers that the cars in their website videos were driven with the aid of software not available to them and that Tesla took several takes before they could produce the videos posted in their website. To the contrary, Tesla's videos explicitly told consumers that the man behind the wheel was "not driving anything" and showed him doing absolutely nothing to drive or park the Tesla, clearly giving the reasonable consumer the impression that the Tesla was driving itself throughout the entire videos.

30.    The October 2016, 3 minute and 46 second video. (Bates #303) featured the Rolling Stones singing "Paint it Black" while the Tesla maneuvered through city roads, highways and parking lots while making 6 turns, stopping at 2 stop signs and 1 traffic signal and even parking itself without a driver in the car, none of which could be done by a 2017 Tesla in the hands of an ordinary consumer ████████████████████████████████

31.    The November 2016, 2 minute and 7 second video (Bates #318) showed a Tesla making 11 turns, stopping at 9 stop signs and 1 traffic signal as well as parking itself without a driver in the car, again, none of which could be done by the ordinary consumer driving a production 2017 Tesla.

32.



33.



34. 

35.    **YouTube Video**: https://www.youtube.com/watch?v=TUDiG7PcLBs
Tesla has continued to make similar representations over time, such as its September 10, 2024, YouTube Video showing a driver not touching the wheel while the Tesla vehicle appears to drive itself through challenging situations such as curvy roads, narrow streets, unexpected situations and traffic controls.

36.    **News stories** such as NBC's 10/20/2016 story by Paul Eisenstein, with the headline "A Driverless Tesla Will Travel from LA to NYC by 2017, Says Musk," reported, "By 2017, Tesla cars could be driving all the way across the country without any hands on the wheel, according to CEO Elon Musk and his vision for driverless technology."  Musk said, "By the end of next year, Tesla would demonstrate a fully autonomous drive from, say, a home in LA, to Times Square...without the need for a single touch, including the charging."  This was further evidence of apparently false and misleading information coming from Tesla and its CEO.

37.    

38.    Although Teslas still could not drive by themselves, Musk, repeated this apparently false claim on a podcast reported by CNBC's Robert Ferris on February 19, 2019, with the headline, "Tesla CEO Elon Musk: Cars will have full self-driving features by the end of the year." Musk actually said, "I think we will be feature complete---full self-driving—this year. Meaning the car will be able to find you in a parking lot, pick you up and take you all the way to your destination without an intervention, this year.  I would say I am certain of that. That is not a question mark." Musk did concede that it did not work with 100% certainty NOW, but he said it would by the end of the year.

39.    **Tweets** by Tesla CEO, Elon Musk, continued this campaign of apparently false and misleading information about Tesla's capability and timeline to develop its Full Self-Driving Capability.  For example, on January 10, 2016, Musk (who claims 219.8M Twitter followers) tweeted: "in 2 years, summon should work anywhere connected by land & not blocked by borders, eg you're in LA and the car is in NY." On May 21, 2017, Musk tweeted "Excited about the Tesla Autopilot software release rolling out next month. New control algorithm feels as smooth as silk."  Later that day, he answered a tweeted question about "Update on the coast-to-coast autopilot demo?"  "Still on for end of year.  Just software limited.  Any Tesla car with HW2 (all cars built since Oct. last year) will be able to do this."  On May 19, 2019, more than 2 ½ years after he told NBC Tesla could drive hands-free from LA to NYC, it still had not happened, and Musk answered a Tweet asking him, "Are there still plans to drive from NYC to

LA on full autopilot?" with the following tweets: "That journey will have a diff age rating." And, "We could have gamed an LA/NY Autopilot journey last year, but when we do it this year, everyone with Tesla Full Self-Driving will be able to do it too." Six years after these Tweets by Musk, Tesla still is unable to complete the journey that Musk appears to have deceptively misled consumers about it since 2016.

40.     Tesla claims that they placed a **disclaimer** on their website stating that their release of FSD capabilities was "pending validation and regulatory approval" (See, e.g., Bates #1418-19). However, this disclaimer, typically issued in a small font buried towards the end of any discussions about the FSD technologies, is contrasted by the use of bold headlines such as "Full Self-Driving Capability" or "Enhanced Autopilot" (See above). This disclaimer is further nullified by the apparently false representations listed above in Tesla's website, videos, press releases, interviews and Tweets.

41.     Finally, although Tesla claims to be waiting for regulatory approval and validation of the efficacy of FSD, to this date Tesla has not applied for regulatory approval (See Tesla's Responses to LoSovio's Interrogatories of 11/14/2024, #2 which states, "To date, it has not sought regulatory approval from CADMV to operate SAE Level 3 or higher technologies without a safety driver.") Tesla has also indicated in discovery (See Tesla's Response to Request for Production 3/3/25, RFP 46-50) that it doesn't know what validation actually means, thus calling into question the sincerity of these representations and rendering their disclaimer all but meaningless. Nevertheless, if the classes are certified, I intend to use my research methodology described below to test the efficacy of Tesla's disclaimers.

## THE STATEMENTS AND REPRESENTATIONS MADE BY TESLA WERE MATERIAL/IMPORTANT TO A REASONABLE CONSUMER DECIDING WHETHER OR NOT TO PURCHASE EITHER ENHANCED AUTOPILOT OR FSD TECHNOLOGIES.

42.     As I stated above, a consumer (the receiver in the communication model) would evaluate the credibility of the source, the clarity, consistency, succinctness and repetitiveness of the message, and the use of multiple communication channels to show that they received and understood the message.

43.     The "feedback" indicating they understood the message was evidenced by spending thousands of dollars to purchase Tesla's FSD packages, an expenditure they, in all likelihood, would not have made if they knew that the vehicle could drive into a fence or require repeated intervention from a Tesla engineer operating a laptop computer in the back seat in order to prevent accidents, which, as the testimony cited above indicates, was the reality behind the videos posted on Tesla's website.

44.     I will implement the methodology outlined in this report confirming this opinion and others stated herein across the proposed classes through conducting the rigorous surveys and focus groups described below, should the classes be certified.

**BASED UPON THE EVIDENCE CITED ABOVE, IT APPEARS THAT TESLA AND ELON MUSK HAVE ENGAGED IN A YEARS-LONG CAMPAIGN OF FALSE AND MISLEADING MARKETING REPRESENTATIONS**

45.     Tesla repeatedly told consumers who purchased its FSD technology packages that:

    a.     Tesla vehicles had all the hardware needed for full self-driving capability.

    b.     A Tesla vehicle will be able to drive autonomously from LA to   NY within a year or so.

    c.     A self-driving Tesla will have the ability to make turns, stop at traffic lights and stop signs and even park itself without a driver in the car.

    d.     Full Self-Driving Capabilities would arrive within a year or so.

46.     While the reasonable consumer, in my opinion, was deceived and misled by Tesla's apparently false representations for the reasons stated above, the following plan, which I have implemented in prior consultancies and other litigation matters, will provide additional and conclusive evidence on a class-wide basis that would document how the reasonable consumer would actually perceive these statements and representations made by Tesla.

47.     The standard method in the market research and advertising industry to test consumer understanding of ads is to conduct surveys and/or use focus groups. (See e.g., Threlfall, K.D. (1999), "Using focus groups as a consumer research tool," Journal of Marketing Practice: Applied Marketing Science, 5 (4), 102-105; and Burns, A.C., & Bush, R.F. (2020), Marketing Research (9th Ed.) Boston, MA:  Pearson; and Belch, G.E., & Belch, M.A. (2021), Advertising and Promotion: An Integrated Marketing Communications Perspective (12 ed.) New York: McGraw-Hill Education).

48.     Therefore, the best way to measure a reasonable consumer's (from  the affected classes) perception of words, phrases, concepts used by Tesla in its marketing representations is to conduct a survey of a representative sample of the California consumers who purchased or leased a Tesla from January 1, 2016 through May 19, 2017 and an additional survey of a representative sample of the California consumers who purchased or leased a Tesla from January 1, 2016 to the present.  Both samples would include only those consumers who purchased Tesla's FSD technology packages.

49.     These surveys would be followed by a series of focus groups, comprised of small groups (8-10/group) representing each of the above two surveyed groups.  The focus groups would be shown the statements and representations made by Tesla, including the videos from Tesla's website and social media, and asked what they understood the statements to mean, as well as their overall perception of the main message conveyed by Tesla.

50.     The results of these surveys and focus groups will tell us definitively, on a class wide basis, what the reasonable consumer understands from the statements, representations and videos

provided by Tesla. This methodology is the typical method used by most advertising and market research companies, including my own, to test the meaning and efficacy of advertisements. I used this methodology for twenty years testing consumer perceptions of Chrysler, Jeep, Pontiac and other clients' print and broadcast advertisements. I used this methodology to test hundreds of political ads from the 1970's through the 1990's, including in the Presidential campaigns of Ronald Reagan. I also used this methodology when I was retained as the lead communication expert by the plaintiffs in the "vanishing premium" MDL litigation against most of the insurance industry and in other litigation matters.

51.     In sum, this methodology will, within a reasonable degree of certainty, tell us what the reasonable consumer understands when they are exposed to the statements and representations made by Tesla about "having all the hardware they needed for full self-driving capability" and that "A Tesla vehicle will be able to drive autonomously from LA to NY within a year or so", including the ability to make turns, stop at traffic lights and stop signs and even park itself without a driver in the car, and, in other words, that "full-self-driving capabilities would arrive within a year," along with other statements such as "Enhanced Autopilot", "Full Self-Driving Capability", etc.

## OVERALL CONCLUSION

52.     It is my overall conclusion, within a reasonable degree of professional certainty, that an analysis of Tesla's "information environment" consisting of its website headlines, statements and videos, along with statements, news stories and Tweets by Tesla's CEO, Elon Musk, has provided convincing evidence that Tesla appears to have deceived and misled the average Tesla consumer who purchased Tesla's Enhanced Autopilot and/or Full Self-Driving technology packages into believing that they "had all the hardware they needed for full self-driving capability", "that a Tesla vehicle will be able to drive autonomously from LA to NY within a year or so", including the ability to make turns, stop at traffic lights and stop signs and even park itself without a driver in the car and, in other words, "full-self-driving capabilities would arrive within a year or so," and that these representations were material or important to the decision to purchase those technology packages. Further, if the class is certified, I plan to conduct a series of surveys and focus groups, as described above, that will, within a reasonable degree of certainty, tell us, on a class-wide basis, what the reasonable consumer understands when they are exposed to the statements and representations cited above that were made by Tesla.

53.     I reserve the right to amend this report should my review of additional discovery materials so warrant.

54.     This report is intended for use only in this matter and is not to be used in any other proceedings.

Dated: May 6, 2025

*Gerald Goldhaber*

**Dr. Gerald Goldhaber**
President and CEO
Goldhaber Research Associates, LLC
885 6th Avenue, Suite 36G

New York, NY 10001
(212) 379-6661 (Office)
(917( 279-2303 (Cell)
geraldgoldhaber@yahoo.com
www.goldhaber.com
@warningsexpert
@CNNTonight

EXHIBIT 1

GERALD MARTIN GOLDHABER, Ph.D.

| | | |
|---|---|---|
| OFFICES: | Goldhaber Research Associates, LLC | Goldhaber Research Associates, LLC |
| | 1525 Amherst Manor Drive, #907 | 885 6th Avenue, Suite 36G |
| | Williamsville, NY 14221 | New York, NY 10001 |
| | (716) 689-3311 | (212) 379-6661 |
| | (716) 689-3342 fax | (917) 279-2303 |
| | e-mail:      geraldgoldhaber@yahoo.com | |
| | website:    www.goldhaber.com | |
| | Twitter:     @WarningsExpert | |

EDUCATION:

Ph.D. (1970)
Purdue University
Major:         Organizational/Interpersonal Communication
Minors:       Industrial Psychology
                   Statistics/Measurement
Dissertation: Experimental Study of the Effect of Ego-Involvement
                   (directed by W. Charles Redding)

M.A. (1967)
University of Maryland
Major:         Communication Theory
Minor:         Statistics/Measurement
Thesis:        Listener Comprehension of Compressed Speech
                   (directed by Carl H. Weaver)

B.A. (1965)
University of Massachusetts
Major:         Speech
Minor:         Political Science

EMPLOYMENT
HISTORY:

Director, Graduate Studies, Department of Communication
State University of New York at Buffalo (1999 – 2004)

Chairman, Department of Communication
State University of New York at Buffalo (1979 – 1988)

Associate Professor (1974 – 2004) and Associate Chairman
Department of Communication, State University of New York at Buffalo (1974 – 1975)

Assistant Professor Department of Speech Communication
University of New Mexico (1970 – 1974)

President, Goldhaber Research Associates, LLC (GRA)
A company that provides expert witness testimony in products liability and personal injury
litigation related to failure to warn claims and designs/evaluates warnings for
clients in business, industry and government.   (1978 - present).

| | |
|---|---|
| SELECTED HONORS AND AWARDS: | Visiting lecturer, University of Montreal (April, 1978)<br>Visiting lecturer, Communication Institute, Hebrew University, Jerusalem (1984)<br>Visiting lecturer, National Chengchi University, Taiwan (1988)<br>Visiting lecturer, Tamkung University, Taiwan (1988)<br>Visiting lecturer, People's University of China, Beijing (October, 1998)<br>Visiting lecturer, Macquarie University, Sidney, Australia (November, 1998)<br>Visiting lecturer, Chinese University of Hong Kong (November, 1998)<br>Visiting lecturer, University of Barcelona (June, 1999)<br>Visiting lecturer, Universitat Pompeu Fabra, Barcelona, Spain (June, 1999)<br><br>New York Speech Communication Association, Scholar of the Year Award (1986)<br><br>Temple Beth El of Greater Buffalo, 1995 Volunteer Services Award (January, 1996)<br><br>Eastern Communication Association, Spotlight Award (April, 1996)<br><br>Mortar Board Society, State University of New York at Buffalo, Honorary Member (May, 1996)<br><br>National Society of Fund Raising Executives, Philanthropy Award (November, 1999) |
| MAJOR PROFESSIONAL MEMBERSHIPS: | Human Factors and Ergonomics Society<br>Gotham City Networking, Inc., Chairman, Expert Witness Group (2008-2013t)<br>New York Regional Expert Witness Association, Chairman (2013-present)<br>International Communication Association (Vice President 1974-1976) |
| MAJOR UNIVERSITY AND COMMUNITY SERVICE: | Temple Beth El of Greater Buffalo<br>Vice President (1990-1992); President (1992-1994); Chairman of the Board (1994-1997)<br>Shea's Center for the Performing Arts, Buffalo, NY<br>Member, Board of Directors (1991-2002); Executive Committee Member (1994-2002); First Vice Chairman and CEO (1995-1997); Chairman of the Board of Directors (1997-2000)<br><br>WBEN-AM, Buffalo, NY – Political Analyst and Commentator (1980-2004)<br><br>WXXI-AM, Rochester, NY – Political Analyst and Commentator (1990-Present)<br><br>State University of New York at Buffalo – Human Subjects Review Committee (1996)<br><br>State University of New York at Fredonia – Member, Fredonia College Foundation Board of Directors (1997-2004); Vice Chairman of the Board (2001-2002); Chairman Elect (2003-2004)<br><br>State University of New York at Buffalo, School of Informatics – Divisional Committee Chairman (2002-2004);  Personnel Committee (2002-2004) |

2

State University of New York at Buffalo – Academic Adjudication Committee (2002-2004)

PRIMARY
EDITORIAL
ASSIGNMENTS:

Human Communication Research – Review Editor (1979)
Communication Yearbook – Contributing Editor (1979)
Organizational Communication Abstracts – Editorial Board (1974-1994)
Journal of Communication – Advertising Manger (1970-1973); Contributing Editor (1976-1978)

COMMUNICATION
CURRICULUM
CONSULTANT FOR:

University of Wisconsin - River Falls (1974)
University of South Florida (1975)
University of Texas - San Antonio (1976)

PUBLICATIONS:

BOOKS

Garrido, F.,Goldhaber,G., and Putnam,L., Fundamentals of Organizational Communication (Mexico and Spain: World Spanish Network of Organizational Communication 2020).

Goldhaber, G.M., MURDER, INCORPORATED:  How Unregulated Industry Kills or Injures Thousands of Americans Every Year… And What You Can Do About It (Hartford, CT: Publish Your Purpose Press 2020).

Goldhaber, G.M., Organizational Communication (Dubuque, Iowa: W.C. Brown, 1974, 2nd Ed., 1979, 3rd Ed., 1983, 4th Ed, 1987, 5th Ed., 1990, 6th Ed., 1993, McGraw-Hill, New York, NY; 7th Ed., 2002, SUNY Press, Buffalo, NY; 8th Ed., 2003, Buffalo, NY).
Translated by O. Wiio into Finnish, Organisatio Viestinta (Helsinki: Weilin and Goos, 1981).  Translated by Jose Balaguer into Spanish, Communicacion Organizacional (Mexico City: Editorial Diana, 1984).

Burns, P., Shaner, S., Gartenberg, H., Mitchell, J., Eckert, M. and Goldhaber, G.M., Instructor's Manual for Organizational Communication (5th Ed.), (Dubuque, Iowa: W.C. Brown 1990).

Peterson, B., Goldhaber, G.M., and Pace, R.W. Editors), Communication Probes (Chicago:  SRA, 1974, 2nd Ed., 1977, 3rd Ed., 1982).

Rosenfeld, L., Goldhaber, G.M., and Smith, V., Experiments in Human Communication, (New York: Holt, Rinehart, Winston, 1975).

Goldhaber, G.M. and Goldhaber, M.B. (Editors), Transactional Analysis, (Boston: Allyn and Bacon, 1976).

3

Zannes, E. and Goldhaber, G.M., <u>Stand Up and Speak Out</u> (Reading, MA: Addison Wesley, 1978, 2nd Ed.,1983).

Goldhaber, G.M. (Editor) <u>Improving Institutional Communication</u> (San Francisco: Jossey-Bass, 1978).

Goldhaber, G.M.,  Dennis, H., Richetto, G., and Wiio, O., <u>Information Strategies: New Pathways</u>    to <u>Corporate Power</u> (Englewood Cliffs, NJ: Prentice Hall, 1979, 2nd Ed., 1984, Norwood, N.J.: Ablex   Publishing Co.).

Goldhaber, G.M. and Rogers, D., <u>Auditing Organizational Communication Systems: The ICA Audit</u> (Dubuque, Iowa: Kendall-Hunt, 1979).

Goldhaber, G.M. and Barnett, G., (Editors) <u>Handbook of Organizational Communication</u> (Norwood, NJ: Ablex Publishing Co. 1988).

## CHAPTERS IN BOOKS

Goldhaber, G.M. and Goldhaber, M.B., "Is Your Organization OK?" in <u>Everybody Wins: Transactional Analysis Applied to Organizations</u> by Dorothy Jongeward (Editor) (Reading, MA: Addison-Wesley Co., 1973) pp. 266-271.

Goldhaber, G.M.,  " Effects  of  Speech  Compression Training on Comprehension of Native Speakers of English, Spanish, and Navajo," in <u>Time-Compressed Speech</u> by Sam Duker (Ed.),(Metuchen, NJ: Scarecrow Press, 1974), pp. 730-35.

Goldhaber, G.M., E. Baker and G. Richetto, "T.A. and O.D.: Research Needs," in <u>Transactional Analysis</u> by G.M. and M.B. Goldhaber (Eds.) (Boston: Allyn and Bacon, 1976) pp. 346-351.

Goldhaber, G.M., "Communication Variables in Organizations," in <u>Reader in Library Communication</u> by  M. B. Cassata and R. C. Palmer (Eds.) (Englewood, CO: Information Handling Services, Library and Education Division, 1976) pp. 146-163.

Goldhaber, G.M., and Goldhaber, M.B., "A Model For Assessing the Effectiveness of T.A. Training for Airlines Personnel", in <u>Transactional Analysis</u> by G.M. and M.B. Goldhaber (Editors) (Boston: Allyn & Bacon, 1976) pp. 351-357.

Goldhaber, G.M., "Games Organizations Play", in <u>Transactional Analysis</u> by G.M. and M.B. Goldhaber (Eds.) (Boston: Allyn and Bacon, 1976), pp. 164-178.

Goldhaber, G.M., "Gay Talk", in <u>Urban Communication</u>, W. Arnold and J. Buley (Eds.) Winthrop Publishing Co., 1977, 82-115.

4

Goldhaber, G.M., "Evaluating Internal Communication: The ICA Communication Audit," in Improving Institutional Communication, G.M. Goldhaber (Ed.) (San Francisco: Jossey-Bass, 1978), pp. 37-54.

Rogers, D. and G.M. Goldhaber, "Conducting One's Own Communication Audit",in Improving Institutional Communication, G.M. Goldhaber (Ed.) (San Francisco: Jossey-Bass, 1978) pp. 55-70.

Goldhaber, G.M. and D. Rogers, "Reporting Results of Communication Audits", in Improving Institutional Communication, G.M. Goldhaber (Ed.) (San Francisco: Jossey-Bass, 1978) pp. 71-92.

Goldhaber, G.M. and W. Knoer, "Warm Flesh, Not Cold Plastic", in Communication Probes, B. Peterson, G. Goldhaber, R. Pace (Eds.)(Chicago: SRA, 1982, 3rd Ed.), pp. 97-103.

Goldhaber, G.M. and M.B. Goldhaber, "Transactional Analysis", in Communication Probes, B. Peterson,G. Goldhaber, R. Pace (Eds) (Chicago:SRA, 1982, 3rd Ed.), pp. 141-144.

Goldhaber, G.M., "Charisma," in Communication Probes  by B. Peterson, G. Goldhaber, R. Pace (Eds.) (Chicago: SRA, 1982, 3rd Ed.), pp. 237-243.

Goldhaber, G.M. and D. Rogers, "Data Based Communication Consulting" in The Standard Handbook of Business Communication, D. Gootnick and M. Gootnick (Eds.) (New York: The Free Press 1984), pp. 321-349.

Goldhaber, G.M. and V. di Salvo, "The Communication Revolution" in Communicating Employee Responsibilities and Rights, C. Osigweh (Ed.) (New York: Quorum Books, 1987) pp. 119-132.

Goldhaber, G.M., "The Jury's Perspective in Products Liability Litigation: The Role of Communication Theory" in  Products Liability in New York: Strategy and Practice, N. Goldberg (Ed.) (Albany, NY: New York State Bar Association, 1997) pp.  773-821.

Goldhaber, G.M., "Communication Variables in Organizations", in Readings in Communication, T. Jacobson and C. O'Donnell (Eds.) (Buffalo, NY: SUNY at Buffalo, 1997) pp. 55-73.

Goldhaber, G.M., "Organizational Communication in 1976: Present Domain and Future Directions", in Organizational Communication and Change, P. Salem (Ed.) (Cresskill, NJ: Hampton Press Inc., 1998).

5

Goldhaber, G.M.,  "The Jury's Perspective in Products Liability Litigation: The Role of
Communication Theory" in  <u>Products Liability in New York:
Strategy and Practice</u>: N. Goldberg (Ed.) (Albany, NY: New York State Bar
Association, Supplement 2002) pp. 299-301.

Goldhaber, G. M.,  "The Effectiveness of Warnings in Preventing Pool Diving Accidents"
in <u>Aquatic Safety Compendium</u>: Egstrom, Glen H. (Ed.) (Colorado Springs,
CO: National Swimming Pool Foundation, 2006) pp. 247-280.

Goldhaber, G.M., "The Jury's Perspective in Products Liability Litigation: The Role of
Communication Theory" in <u>Products Liability in New York: Strategy and Practice:</u>
N. Goldberg (Ed.) (Albany, NY: New York State Bar Association, Supplement
2008.  (In Press)

<u>ARTICLES</u>

Goldhaber, G.M. and C.H. Weaver, "Listener Comprehension of Compressed Speech
When the Rate of Presentation, Difficulty of the Content and Sex of the Listener
are Varied," <u>Speech Monographs</u>, 35: 20-25, March 1968.

Goldhaber, G.M., "Listener Comprehension of Compressed Speech as a Function of
Academic Level of Subject," <u>Journal of Communication</u>, 20: 167-73, June, 1970.

Goldhaber, G.M., "A Content Analysis of Two Employment Manuals with Implications
for Theory X-Y Management Assumptions," <u>EPS</u> 11: 426-31, April, 1971.

Goldhaber, G.M. and J. Kline, "Effects of Videotape on Attendance and Attitude in the
Fundamentals of Speech Communication Course", <u>Speech Teacher</u>, 21: 93-98,
March, 1972.

Goldhaber, G.M., D. Fossum, and S. Black, "College Student and State Police Attitudes
and Attitude Perceptions of Each Other," <u>Law and Order</u>, 20: 101-6, April, 1972.

Goldhaber G.M., "Communication at the University," <u>Western Speech</u>, 36: 169-80,
Summer, 1972.

Goldhaber, G.M., "PAUSAL: A Computer Program to Identify and Measure Pauses,"
<u>Western Speech</u>, 7: 23-6, Winter, 1973.

Goldhaber, G.M., "Communication is More Than Just Talking," <u>College and University
Business</u>, January 1973, 36-41.

Goldhaber, G.M., "Communication at the University - Part II," <u>Western Speech</u>, 38: 157
61, Summer, 1974.

Goldhaber, G.M., "The Status of Organizational Communication Research," Journal of Applied Communication Research, 3: 114-116, November, 1975.

Goldhaber, G.M., "Managing The Impossible: So You Want to be a Department Chairperson?" Association for Communication Administration Bulletin, 15: 28-30, January 1976.

Goldhaber, G.M., "Organizational Communication-State of the Art," Vital Speeches of the Day, 42:268-73, February 15, 1976.

Goldhaber, G.M., "Data Gathering and Theory Building," Association for Communication Administration Bulletin, 18: 27-30, October 1976.

Goldhaber, G.M., and P. Krivonos, "The ICA Communication Audit:  Process, Status, Critique," The Journal of Business Communication, 15: 41-56, Fall, 1977.

Goldhaber, G.M., H. Jain, I. Meadows, N. Agarwal, "Process Training," The Canadian Personnel and Industrial Relations Journal, 25: 18-29, March 1978.

Goldhaber, G.M., M. Yates, D. Porter, and R. Lesniak,"Organizational Communication Research– State of the Art: 1978", Human Communication Research, 5: 76-96, 1978.

Lesniak, R., M. Yates, G.M. Goldhaber, W. Richards, "NEGOPY and NETPLOT," Connections:  Bulletin of the International Network for Social Network Analysis, 1: 26-29, Winter, 1978.

Dennis,H., G.M. Goldhaber, M. Yates, "Organizational Communication Theory and Research: An Overview of Research Methods," Communication Yearbook, 2: 243-269, 1978.

Goldhaber, G.M., "Warm Flesh Beats Cold Plastic," Vital Speeches of the Day, 45: 683-688, September 1, 1979.

Jain, H., R. Kanungo,  and G.M. Goldhaber, "Attitudes Towards A Communication System: A Comparison of Anglophone and Francophone Hospital Employees,"Human Communication Research, 6: 178-84, Winter, 1980.

Wiio, O., G.M. Goldhaber, M. Yates, "Organizational Communication Research:  Time for Reflection?", Communication Yearbook 4:  83-97, 1980.

Goldhaber, G.M., "The Charisma Factor--Using it To Win Elections," Campaigns and Elections Journal, 2: 4-17, Spring, 1981.

Goldhaber, G.M., "A Pollster's Sampler:  An Analysis of Presidential Polling Techniques," Public Opinion, 7: 47-50, 53, June-July 1984.

Goldhaber, G.M. and M.A. deTurck, "Effects of Consumers' Familiarity with a Product on Attention to and Compliance with Warnings," Journal of Products Liability, 11:1, 29-37, March 1988.

Goldhaber, G.M. and M.A. deTurck, "A Dimensional Analysis of Signal Words," Forensic Reports, 1: 193-206, 1988.

Goldhaber, G.M. and M.A. deTurck, "Effectiveness of Warning Signs: Gender and Familiarity Effects," Journal of Products Liability, 11:  271-284, 1988.

Goldhaber, G.M., and M.A. deTurck, "Effectiveness of Warning Signs: "Familiarity Effects". Forensic Reports, 1:281-301, 1988.

deTurck, M.A. and G.M. Goldhaber, "Perjury and Deceptive Judgments: How Timing and Modality of Witness Deception Affect Jurors' Deceptive Judgments". Communication Quarterly, 36: 4, 276-289, Fall 1988.

Goldhaber, G.M. and M. A. deTurck, "Effects of Product Warnings on Adolescents in an Educational Setting," Product Safety and Liability Reporter, 11: 949-955, September 1988.

deTurck, M.A. and G.M. Goldhaber, "Effectiveness of Product Warning Labels: Effects of Consumers' Information Processing Objectives". Journal of Consumer Affairs, 23: 1, 111-126, Summer 1989.

deTurck, M.A., G.M. Goldhaber, G.M. Richetto, "Effectiveness of Product Warnings: Effects of Language Valence, Redundancy and Color" Journal of Products Liability. 12: 93-102, 1989.

deTurck, M.A. and G.M. Goldhaber, "Effectiveness of Signal Words in Product Warnings: Effects of Familiarity and Gender," Journal of Products Liability. 12: 103-113, 1989.

deTurck, M.A. and G. M. Goldhaber, "A Developmental Analysis of Warning Signs: The Case of Familiarity and Gender," Journal of Products Liability. 13:1, 65-78, March, 1991.

deTurck, M.A. and G.M. Goldhaber, "Reward, Affect, and Attitude Change," Speech Communication Annual,5, 23-35. Geneseo, NY: The New York State Speech Communication Association, 1991.

8

deTurck, M.A., G. M. Goldhaber, and G. M. Richetto, "Uncertainty Reduction in Product Warnings: Effects of Fear and Color," <u>Journal of Products Liability.</u> 13: 339-346, 1991.

deTurck, M.A., G. M. Goldhaber, and G. M. Richetto, "Uncertainty Reduction in Product Warnings: Effects of Fear in Signal Word and Hazard Statement," <u>Journal of Products Liability.</u> 13: 329-338, 1991.

deTurck, M.A., G. M. Goldhaber, G. M. Richetto, M.J.Young, "Effects of Fear-Arousing Warning Messages," <u>Journal of Products Liability.</u> 14: 3/4, 217-223, 1992.

deTurck, M.A., G. M. Goldhaber, G. M. Richetto, "Effectiveness of Warnings on Alcoholic Beverages: Consumers' Information Processing Objectives and Level of Fear," <u>Journal of Products Liability.</u> 14: 3/4, 329-339, 1992.

deTurck, M.A., G. M. Goldhaber, G. M. Richetto, "Familiarity and Awareness: Effects of Conscious Versus Nonconscious Safety Information," <u>Journal of Products Liability.</u> 14: 3/4, 341-350, 1992.

deTurck, M.A. and G. M. Goldhaber, "Effects of Information Processing Objectives on Persuasion," <u>Speech Communication Annual</u>, 6, 79-106. Geneseo, NY: The New York State Speech Communication Association, 1992.

Goldhaber, G. M., "A National Survey About Parent Awareness of the Risk of Severe Brain Injury From Playing Football." <u>Journal of Athletic Training</u>, 28:4, 306-311, Winter, 1993.

deTurck, M.A. and G. M. Goldhaber, "A Developmental Analysis of Warning Signs:  The Case of Familiarity and Gender," in <u>Human Factors Perspectives on Warnings: Selections from Human Factors and Ergonomics Society Annual Meeting Proceedings, 1980-1993</u>.  Santa Monica, CA: Human Factors and Ergonomics Society, 72-76, 1994.

deTurck, M.A., G. M. Goldhaber, and G. M. Richetto, "Effectiveness of Alcohol Beverage Warning Labels:  Effects of Consumer Information Processing Objectives and Color of Signal Word," <u>Journal of Products and Toxics Liability.</u> 17:3,187-195, 1995.

Goldhaber, G. M., "E-mail: Tool or Torment?", <u>Communication World</u>, 24-26, August-September, 2001.

Goldhaber, G.M., "Communication Audits in the Age of the Internet." <u>Management Communication Quarterly</u>, 15:3, 447-453, February, 2002.

9

Vishwanath, A. and G. M. Goldhaber,"An examination of the factors contributing to adoption decisions among late diffused technology products", <u>New Media & Society</u>, 5 (4), 547-572, 2003.

Goldhaber, G. M., <u>Goldhaber Warnings Report</u>, newsletter published monthly, (March 2009-Present).

<u>CONFERENCE PROCEEDINGS & BIBLIOGRAPHIES</u>

Goldhaber, G.M. and V.R. Smith, "Time-Compressed  Speech: An Annotated Bibliography: <u>ERIC, Speech Communication Module</u>, July, 1973.

deTurck, M.A. and G.M. Goldhaber, "Consumers' Information Processing Objectives and Effects of Product Warnings," <u>Proceedings of the Human Factors Society,</u> 32: 445-449, October, 1988.

Goldhaber, G.M. and M.A. deTurck, "A Developmental Analysis of Product Warning Effects: The Case of Gender and Familiarity", <u>Proceedings of the Human Factors Society. 33: 1019-1023, October, 1989.</u>

Goldhaber, G.M., "The Design and Evaluation of An On-Product Warning: Applying a Theoretical Model", <u>Proceedings of the  International Ergonomics Association, Triennial Congress, August, 2003.</u> (Peer Reviewed)

<u>CONGRESSIONAL TESTIMONY</u>

Statement of G. M. Goldhaber before the Subcommittee on Transportation, Tourism and Hazardous Materials of the Committee on Energy and Commerce, U.S. House of Representatives on <u>H. R. 4543, The Cigarette Testing and Liability Act of 1988.</u>" June 8, 1988.

Statement of G. M. Goldhaber before the Committee on Labor and Human Resources, U.S. Senate on <u>S1883, The Tobacco Product Education and Health Protection Act of 1990."</u> February 20, 1990.

Statement of G. M. Goldhaber before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce, U.S. House of Representatives on <u>H. R. 5041, The Tobacco Control and Health Protection Act."</u> July 12, 1990.

Statement of G. M. Goldhaber before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce, U.S. House of Representatives on <u>H. R. 2147, The Fairness in Tobacco and Nicotine Regulation Act of 1993</u>."  March 25, 1994.

<u>INTERVIEWS</u>

Goldhaber, G.M., "In Industry, Failure to Communicate," <u>Newsday</u>, 29: October 20, 1975.

Goldhaber, G.M., "Public Opinion Polling," <u>PR Reporter</u>, 20:3, May 23 1977; 20: 3, May 30, 1977; 20: 3, June 6, 1977; 20: 4, June 13, 1977, (A 4-part series of interviews on public opinion polling).

Goldhaber, G.M., "Image Making is Part of Scientific Approach in Campaigning," <u>Campaign Insights</u>, 8: 1-4, October 1977.

Goldhaber, G.M., "McLuhan's Disputed Effect on Advertising," <u>Ad Week</u>, 22: 20-22, February 23, 1981.

Goldhaber, G.M., "Charisma Factor: Secret to Rating Rubes on the Tube," <u>Washington Star</u>, C-2, July 10, 1981.

Goldhaber, G.M., "Information is Lost in Electronic Meetings," <u>Meeting News</u>, 6:1 1,18, February 1982.

Goldhaber, G.M., "What Managers Can Learn from Manager Reagan," <u>Fortune</u> (Cover Story), September 15, 1986.

Goldhaber, G.M., "How Gus Blythe Smelled Opportunity," <u>Forbes</u>, October 3, 1988.

Goldhaber, G.M., "Silly Warnings", <u>CBS Morning News</u>, February 20, 1991.

Goldhaber, G.M., "Human Factors Design: In Search of Effective Warnings," <u>Medical Device & Diagnostic Industry</u>, 60-66, November 1991.

Goldhaber, G.M., "Product Paranoia," <u>U.S. News and World Report</u>, February 24, 1992.

Goldhaber, G.M., "Buffalo: Operation Fizzle,", <u>Time</u>, 33, May 4, 1992.

Goldhaber, G.M., "Does "No Fear" Really Promote No Restraint," <u>San Jose Mercury News</u>, 11C, November 6, 1993.

Goldhaber, G.M., "The Science of Crying Wolf," <u>Boston Globe</u>, April 21, 1996.

Goldhaber, G.M., "To Warn or Not to Warn, That is the Safety Question," <u>Business First</u>, April 22, 1996.

Goldhaber, G.M., "Danger: Warning Labels May Backfire", <u>Wall Street Journal</u>, April 28, 1997.

Goldhaber, G.M., "Weird Warnings", <u>Buffalo News</u>, January 28, 2000.

Goldhaber, G.M., "Let's Hear It From The Expert", Suffolk Lawyer, June 2013.

Goldhaber, G.M., CNN Analyst/Commentator on Consumer Safety and Warnings issues, 2015-present.

<u>NATIONAL AND INTERNATIONAL LECTURES AND PAPERS</u>

Monterrey, Mexico: International Symposium on Communication, October 1975. Delivered keynote address on organizational communication and conducted a workshop on communication audits.

Kobe, Japan:  Communication Association of the Pacific, Distinguished Scholars Program, June, 1976.  Delivered paper on communication audits.

Manila, Philippines:  Philippine-American Communication Conference, July 1976. Presented paper on communication audits.

London, England:  Communication Studies Group, May 1977.  Presented paper on communication audits.

Berlin, Germany:  International Communication Association, June 1977. Presented three papers and conducted a workshop on communication audits.

Brussels, Belgium:  European Institute for Advanced Studies in Management, March, 1979.  Presented paper on communication audits to Symposium on Organizational Communication.

Jerusalem, Israel:  Visiting Lecturer, Hebrew University Communication Institute, March 1984.

Tokyo, Japan:  World Media Conference, November, 1984.  Presented paper on media and election projections.

Madrid, Spain:  Symposium on the Informatic Revolution in the Mass Media, Association of European Journalists, October, 1985. Presented paper on communication technologies.

Mexico City, Mexico:  Congress of the Mexican Association of Business Communicators, September 1987.  Presented paper on communication technologies.

Taipei, Taiwan:  Meeting of the Asia and World Institute, October 1988.  Presented paper on 1988 Presidential Election.

Taipei, Taiwan:  Congress of the Chinese Institute of Public Opinion, November 1988. Presented paper on effects of public opinion polling.

Taipei, Taiwan:  Visiting lecturer, National Chengchi University, 1988.

Taipei, Taiwan:  Visiting lecturer, Tamkung University, 1988.

Taipei, Taiwan:  Member International Observation/Inspection Team to oversee National Taiwanese elections, December 1989.

Orlando, Florida: Trial Strategies Program sponsored by The Travelers, December 1989. Featured speaker on "The Problem of the Human Factors Engineer."

Orlando, Florida: Human Factors Society, 34th Annual Meeting, October 1990. Conducted workshop on "The Design and Development of Product Warning Systems."

Atlanta, Georgia: Human Factors Society, 36th Annual Meeting, October 1992. Conducted workshop on "The Design and Development of Product Warning Systems."

Chicago, Illinois: Defense Research Institute, Mid-Year Meeting, September 1993. Featured speaker on "Product Design and Warnings, The Impact of ANSI Z535."

Washington, DC:  U.S. Consumer Product Safety Commission, February 1997. Participant in Chairman Ann Brown's Roundtable on "How to Motivate Young Teens to Use Safety Gear."

Beijing, China: Visiting lecturer, People's University of China, International Political Science and Journalism Departments, October 1998.

Sidney, Australia: Visiting lecturer, Macquarie University, Department of Media and Communication Studies, November 1998.

Hong Kong, China: Visiting lecturer, Chinese University of Hong Kong, Department of Journalism and Communication, November 1998.

Barcelona, Spain: Visiting lecturer, University of Barcelona, Institute of Social Sciences, June 1999.

Barcelona, Spain: Visiting lecturer, Universitat Pompeu Fabra, Political Science and Communication Studies Departments, June 1999.

Atlanta, Georgia: American Law Firm Association, Product Liability Practice Group Seminar, May 2000.  Featured speaker on "The Design and Development of Product Warning Systems."

Atlanta, Georgia:  National Communication Association, Annual Convention, November 2001.  Featured speaker on "Communication Audits in the Age of the Internet."

Chicago, Illinois:  International Association of Business Communicators, International Conference, June 2002.  Featured speaker on: "E-mail vs. Face-to-Face Communication."

Providence, Rhode Island: International Microwave Power Institute, 47th Annual Conference, June 2013.  Featured speaker on: "When Are Warnings Appropriate for Selected Foods."

Washington D.C.: United States Department of Agriculture, June 2014.  Featured speaker On: FDA's Proposed Rules on the Nutrition and Supplement Facts and Serving Size Labels."

New York, New York: National Academy of Continuing Legal Education, June 2014.  Online course: "Litigating a Failure to Warn Claim in a Products Liability or Personal Injury Case."

New York, New York: National Academy of Continuing Legal Education, September 2014.  Online 3-part course: " I. Theory, History, Codes and Standards, Research Findings; II. The Design and Evaluation of Product Warnings;  III. Plaintiff and Defense Courtroom Strategies."

New York, New York: The Expert Institute, November 2014.  Webinar: "Litigating a Failure to Warn Claim in Personal Injury or Products Liability Lawsuits."

Blue Bell, Pennsylvania: TASA Group, March 2018.  Webinar:" Litigating A Failure to Warn Claim in Products Liability/Personal Injury Cases."

Washington, D.C.: American Bar Association, November 2021.  Webinar: "Strategies and Tips: Securing and Preparing Your Expert Witness."

Washington, D.C.: Bureau of Labor Statistics, May 2024. Guest speaker: "Occupational Safety and Health Statistics (OSHS) Data Users Panel.

Further, I have received several academic honors and awards, research grants and completed many university and community service assignments as well as published several monographs and additional articles in non-refereed journals and delivered papers and speeches or conducted workshops at over 200 meetings of professional and local organizations.

May  2024

14

EXHIBIT 2

**LEGAL CONSULTING
FEE SCHEDULE**

**GERALD M. GOLDHABER, PH.D.**

1. $10,000 retainer fee prior to start of case work

2. $625/hour for review of depositions, materials, phone calls, travel and meeting time, etc.

3. $6,000/day for deposition (plus expenses: travel and travel time, hotel, meals, etc.)

4. $6,500/day for trial testimony (plus expenses: travel and travel time, hotel, meals, etc.)

5. Any direct costs related to the pending case.

**DIRECTOR OF LIBRARY RESEARCH
PAUL C. LEINER, MLS**

$295/hour for research and reference services

**NOTE:    DR. GOLDHABER REQUIRES THAT ALL OUTSTANDING INVOICES BE PAID AND THE ACCOUNT CURRENT PRIOR TO ANY EXPERT REPORT BEING RELEASED OR HIS APPEARANCE FOR DEPOSITION OR TRIAL TESTIMONY.**

**3/1/24**

EXHIBIT 3

RECENT TRIAL & DEPOSITION TESTIMONY
GERALD M. GOLDHABER, Ph.D.


TRIAL TESTIMONY
Kempney v. Wallcur (2020 NY)
Rigo v. Home Depot (2022 OH)
Rodriguez v. Toyota (2023 FL)
Santiago v. Terex (2025 PA)


DEPOSITIONS
Penn v. Nap Nanny (2020 NJ)
Biloxi Crash/Voight v. Garmin (2020 TX)
Cola v. Dow Chemical (2020 TX)
DeGroff v. Ford Motor (2020 PA)
Ermi & Felton v. City of Milwaukee (2021 WI)
Aranzamendi v. Atmos Energy (2021 TX)
Rodriguez v. Toyota (2022 FL)
Bayer-Culverson v. GlaxoSmithKline (2022 TX)
Bauman v. Houston House Apartments (2022 TX)
Gregory v. Fisher-Price (2023 NC)
VanZyck v. Coca Cola (2023 FL)
Canyes v. Carnival Cruise Lines (2023 FL)
Bradford v. Modula (2023 IL)
Carroll v. Affordable Boating (2024 FL)
Allied World v. Nisus (2024 LA)
Rebmann v. Astec (2025 NY)
Ochoa v. Brunswick (2025 IL)


January 30, 2025

SUPPLEMENTAL
EXHIBIT 4

# SUPPLEMENTAL EXHIBIT 4

**IN RE TESLA ADVANCED DRIVER ASSISTANCE SYTEM LITIGATION**
**Case No.: 3:22-cv-05240-RFL**

**Materials Considered by Gerald Goldhaber**

| Sent Date | Document Title | Description |
|---|---|---|
| 01-14-2025 | 2024-06-05 [102] TAC | Consolidated Third Amended Complaint |
| 02-26-2025 | 2025-02-26 Materials for Goldhaber | Excel spreadsheet with Musk tweets, news articles, Tesla website, letter, and videos |
| 02-26-2025 | 2016-01-10 Musk Tweets | Elon Musk Tweet dated 2016-01-10 |
| 02-26-2025 | 2017-01-23 Musk Tweets | Elon Musk Tweet dated 2017-01-23 |
| 02-26-2025 | 2017-05-21 Musk Tweets | Elon Musk Tweet dated 2017-05-21 |
| 02-26-2025 | 2019-05-09 Musk Tweets | Elon Musk Tweet dated 2019-05-09 |
| 02-26-2025 | 2016-10-20 [NBC News] A Driverless Tesla Will Travel From L.A. to NYC by 2017, Says Musk | NBC News article |
| 02-26-2025 | 2016-11-30 Transcript - Elon Musk's Autopilot 2.0 Conference Call | Elon Musk press conference transcript |
| 02-26-2025 | Tesla Website | Links to web.archive.org of Tesla's website from various dates<br>• 2016-10-20<br>• 2016-10-25<br>• 2016-10-26<br>• 2017-01-26<br>• 2017-06-26<br>• 2018-11-28<br>• 2019-12-01<br>• 2020-12-04<br>• 2021-12-01<br>• 2022-11-29 |

| Sent Date | Document Title | Description |
|---|---|---|
|  |  | • 2023-11-02<br>• 2024-07-03 |
| 02-26-2025 | 2016-11-12 Letter (Ex D) | Exhibit D of Consolidated Second Amended Complaint |
| 02-26-2025 | LOSAVIO_000303 (Tesla Oct 2016 video) | Plaintiff's document production |
| 02-26-2025 | LOSAVIO_000318 (Tesla Nov 2016 video) | Plaintiff's document production |
| 03-32-2025 | TSLA_LOSAVIO_00044176_00044228 | Tesla's assorted document production |
| 04-03-2025 | Exhibit 24 | Schroff Exhibit 24: A Driverless Tesla Will Travel From L.A. to NYC by 2017, Says Musk |
| 04-03-2025 | Exhibit 25 | Schroff Exhibit 25: 2017-05-21 Elon Musk Tweet |
| 04-03-2025 | Exhibit 26 | Schroff Exhibit 26: 2019-05-09 Elon Musk Tweet |
| 04-16-2025 | 2025-04-14 [Electrek] Tesla (TSLA) has to replace computer in ~4 million cars or compensate their owners | Electrek article |
| 04-21-2025 | TSLA_LOSAVIO_00044176_44390 | Tesla's assorted document production |
| 04-21-2025 | 2023-01-17 [Business Insider] Tesla Faked a Video in 2016 Promoting Self-Driving Technology_ Report | Business Insider article |
| 04-21-2025 | 2025-02-27 - PDF - FULL SIZE - DHAVAL SHROFF - LINKED EXHIBITS CONFIDENTIAL - ATTORNEYS' EYES ONLY |  |
| 04-21-2025 | 2025-03-19 - PDF - FULL SIZE - AKSHAY PHATAK - LINKED EXHIBITS  Highly Confidential - Attorney's Eyes Only |  |

| Sent Date | Document Title | Description |
|---|---|---|
| 04-21-2025 | TSLA_LOSAVIO_00044176-00044390 | Tesla's assorted document production:<br>• TSLA_LOSAVIO_00001418<br>• TSLA_LOSAVIO_00001419<br>• TSLA_LOSAVIO_00001420-TSLA_LOSAVIO_00001423<br>• TSLA_LOSAVIO_00001424-TSLA_LOSAVIO_00001425<br>• TSLA_LOSAVIO_00001426-TSLA_LOSAVIO_00001428<br>• TSLA_LOSAVIO_00001429-TSLA_LOSAVIO_00001430<br>• TSLA_LOSAVIO_00001431-TSLA_LOSAVIO_00001432<br>• TSLA_LOSAVIO_00001433<br>• TSLA_LOSAVIO_00001434-TSLA_LOSAVIO_00001435<br>• TSLA_LOSAVIO_00001436<br>• TSLA_LOSAVIO_00001437<br>• TSLA_LOSAVIO_00001438<br>• TSLA_LOSAVIO_00001439<br>• TSLA_LOSAVIO_00001440<br>• TSLA_LOSAVIO_00001441-TSLA_LOSAVIO_00001442<br>• TSLA_LOSAVIO_00001443-TSLA_LOSAVIO_00001444<br>• TSLA_LOSAVIO_00001445-TSLA_LOSAVIO_00001446<br>• TSLA_LOSAVIO_00001447<br>• TSLA_LOSAVIO_00001448-TSLA_LOSAVIO_00001450<br>• TSLA_LOSAVIO_00001451-TSLA_LOSAVIO_00001452<br>• TSLA_LOSAVIO_00001453-TSLA_LOSAVIO_00001455<br>• TSLA_LOSAVIO_00001456<br>• TSLA_LOSAVIO_00001457-TSLA_LOSAVIO_00001460<br>• TSLA_LOSAVIO_00001461-TSLA_LOSAVIO_00001462<br>• TSLA_LOSAVIO_00001463 |

| Sent Date | Document Title | Description |
|---|---|---|
| 04-23-2025 | 2024-11-14 Tesla's Resps & Objs to LoSavio's RFAs, Set 1 | Defendants Tesla, Inc., Tesla Lease Trust, and Tesla Finance LLC's Responses and Objections to Plaintiff Thomas LoSavio's First Set of Request For Admission |
| 04-23-2025 | 2024-11-14 Tesla's Am Resps & Objs to LoSavio's Rogs, Set 1 | Defendants Tesla, Inc., Tesla Lease Trust, and Tesla Finance LLC's Amended and Supplemental Responses and Objections to Plaintiff Thomas LoSavio's Interrogatories (Set One) |
| 04-28-2025 | 2024-09-10 Full Self-Driving (Supervised) | Tesla | YouTube video |
| 04-28-2025 | 2023-09-27 Automated driving revolution: Mercedes-Benz announces U.S. availability of DRIVE PILOT – the world's first certified SAE Level 3 system for the U.S. market | Mercedes-Benz (USA) announcement |
| 04-28-2025 | Li, Y. (2023). Analysis of Tesla's Marketing Strategy Model. *Advances in Economics, Management and Political Sciences*, *54*, 33-39. | Research article |
| 04-28-2025 | Akhter, S. H., & Durvasula, S. (1991). Consumers' attitudes toward direct marketing and purchase intentions: An empirical investigation. *Journal of Direct Marketing*, *5*(3), 48-56. | Research article |
| 05-01-2025 | Screen Shot 2025-05-01 at 09.01.23.500 AM | Screenshot of @teslamotors Instagram account |
| 05-01-2025 | 2019-04-03 [Tesla] Tesla To Host Autonomy Investor Day - Tesla Investor Relations | Tesla Investor Relations announcement |
| 05-01-2025 | Tesla Autonomy Day | Tesla | YouTube video |