Pages 1 - 41

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Rita F. Lin, Judge

```
BRIGGS A. MATSKO, on behalf of )
himself and all others         )
similarly situated, et al.     )
                               )
          Plaintiffs,          )
                               )
  VS.                          )   NO. 3:22-cv-05240-RFL
                               )
TESLA, INC., doing business as )
Tesla Motors, Inc., et al.,    )
                               )
          Defendants.          )
_____ )
```

San Francisco, California
Tuesday, August 12, 2025

__TRANSCRIPT OF PROCEEDINGS__

__APPEARANCES__:

For Plaintiffs:
                    COTCHETT, PITRE & MCCARTHY LLP
                    840 Malcolm Road
                    Burlingame, California 94010
                BY: **JULIE LYNN FIEBER, ATTORNEY AT LAW**
                    **MAKENA KERSHAW, ATTORNEY AT LAW**

For Defendants:
                    WILMER, CUTLER, PICKERING, HALE
                      & DORR LLP
                    7 World Trade Center
                    250 Greenwich Street
                    New York, New York 10007
                BY: **ALAN E. SCHOENFELD, ATTORNEY AT LAW**

Also present:  Tom LoSavio


Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

|    |    |
|----|----|
| 1  | **Tuesday - August 12, 2025**                                **11:22 a.m.** |
| 2  | P R O C E E D I N G S |
| 3  | ---o0o--- |
| 4  | **THE COURTROOM DEPUTY:**  Please come to order.  Please |
| 5  | be seated. |
| 6  | Calling Civil Action 22-5240, Matsko versus Tesla Inc., et |
| 7  | al. |
| 8  | Counsel, please, approach -- please state your appearances |
| 9  | for the record, beginning with counsel for plaintiff. |
| 10 | **MS. FIEBER:**  Good morning, Your Honor.  Julie Fieber |
| 11 | on behalf of plaintiffs and the putative class.  I also have |
| 12 | Makena Kershaw, and in the gallery we have our named plaintiff, |
| 13 | Tom LoSavio. |
| 14 | **MR. SCHOENFELD:**  Good morning, Your Honor.  Alan |
| 15 | Schoenfeld for Tesla. |
| 16 | **THE COURT:**  Good morning to all of you. |
| 17 | Let's just walk through my notice of questions and I have |
| 18 | some additional questions too; and then I'll give you each an |
| 19 | opportunity to tell me anything else you think I ought to know. |
| 20 | So the first question I had is really for plaintiffs. |
| 21 | Plaintiffs contend that due to Tesla's lack of traditional |
| 22 | advertising, it's reasonable to infer that consumers who are |
| 23 | considering buying enhanced autopilot or full self-driving |
| 24 | packages would visit Tesla's autopilot website, and therefore |
| 25 | be exposed to the hardware statement. |

1    What evidence shows how consumers interested in buying

2    those products would find that page when visiting the Tesla

3    website or searching for information about those products?

4         **MS. FIEBER:**  So, Your Honor, I want to answer that

5    question factually, but I also want to orient the Court towards

6    the legal test that is going to apply to this question.

7         Now, on the facts, the hardware statement has consistently

8    been on the web page through August 2024.  Consumers choosing

9    to buy this add-on product had to go to the website to find out

10   what it does, how to get it, and what it costs.  Tesla's

11   website is, in effect, the packaging for full self-driving.

12        And in the course of making that purchase, consumers

13   necessarily encountered this representation.  How else would

14   they even know if the full self-driving package would work on

15   their car?

16        Further -- and Dr. Goldhaber elaborates on this in his

17   report -- the hardware statements are part of Tesla's sales

18   pitch.  They were picked up and published by the press, and

19   they became part of the Tesla information environment so much

20   so that it would actually be unreasonable to infer that a

21   consumer would affirmatively choose to purchase a full

22   self-driving packet without having understanding and having

23   been exposed to the representation that all Tesla vehicles have

24   the hardware that was needed to operate that technology.

25        **THE COURT:**  I have a more basic question which is:

How do they end up on the part of the website that has the
hardware statement, where it's been on there a lot?

I understand the argument about the information ecosystem,
but I really think plaintiffs' strongest argument is that if
you want to buy this product, there's not a lot of other places
where you could get information about it since Tesla doesn't do
traditional advertising, so you're going to end up on the
website.

Is there some flow that tells me how people get from the
main Tesla website to the -- to the web page, the autopilot web
page?  Is that the only page that has the information about the
full self-driving and enhanced autopilot products?

Help me understand why it's natural that someone would end
up on this web page, and it's not some obscure corner of the
website that people are unlikely to find.

MS. FIEBER:  The original October 2016 statement
showed up in the Tesla blog.  But it also shows up to -- by
inference, if you're going to buy -- for example, I went
through this yesterday.

If you want to buy a Tesla full self-driving -- if you
want to buy a Tesla vehicle, you go to the Tesla website.  You
go to the "Buy My Model Y Vehicle."  You start clicking off
options that you want.  If you click that you want full
self-driving, it has a page that opens up.  There's a video
there that shows you what full self-driving does.  It shows a

1   person not touching the wheel and the car is driving itself.

2       And it's offering you that full self-driving package for

3   your car which, by inference, right there, says that you're

4   able -- it's going to work on your car.  There's certainly no

5   disclaimers saying your car doesn't have the hardware needed to

6   use this -- this technology.

7       So it comes about that way.  It comes about for the

8   longest time throughout -- through October -- August 2024.  If

9   you wanted to research "autopilot," you would just go in and

10  there's an "autopilot" link and that takes you into more

11  information on what the autopilot and full self-driving options

12  do.

13      **THE COURT:**  And if I wanted to see this in the record,

14  is the place that I go to that -- the Wayback Machine link that

15  was provided in the submissions?

16      **MS. FIEBER:**  Yeah.  You can go through the Wayback

17  Machine, also the exhibits to the third amended complaint are

18  showing you.

19      **THE COURT:**  I know you said you had more about the

20  legal backdrop, but I want to focus just on the facts in this

21  question first, and then, at the end, if you have anything else

22  you think is important that I know, I'm open to hearing it.

23  But let me hear from Tesla about this question.

24      **MR. SCHOENFELD:**  Certainly.  Thanks, Your Honor.

25      I think the best evidence in the record about whether

1    customers were consulting this statement on the website is

2    attached to the Lee declaration.  And the website traffic data

3    shows that the locations where the hardware statement was on

4    the website got a tiny fraction of web traffic flow from the

5    broader website.  It's less than a percent, I think, every

6    single month, and some months it's less than a tenth of a

7    percent.

8        So the idea that customers could only consult the portion

9    of the website where the hardware statement existed, is just

10   refuted by the only showing in the record as to the actual

11   traffic on that portion of the website.

12       **THE COURT:**  I have a question about that, though,

13   because if it's a small percentage of the total traffic to the

14   Tesla website, that doesn't really tell me a lot because I

15   really need to understand what percentage of people who are

16   buying full self-driving are looking at this, which is

17   different from the people who visit the Tesla website which can

18   be for a million different reason, like you want to buy the

19   stock, you were curious about this thing your friend is talking

20   about, you have no interest in buying a Tesla.

21       So I need to hone in on a very narrow population of

22   people, and I'm not sure what the Lee declaration tells me

23   about that population.  What's your response to that?

24       **MR. SCHOENFELD:**  Certainly.  And I don't want to get

25   into the law because Your Honor has been clear on that.  But I

1    do just want to reiterate, it's plaintiffs' burden to make the

2    showing that the class that they -- or the classes that they

3    have proposed include people who are exposed to this statement.

4        So one would expect, in this record, to find an

5    affirmative showing by plaintiffs, either on the facts or

6    through expert testimony -- am I okay? -- but that the members

7    of the class that they have proposed, in fact, consulted this.

8    There's no evidence in that respect.

9        I think Dr. Goldhaber's testimony is actually useful on

10   this point because what it says is that because of the nature

11   of the information environment, you can actually figure out

12   what any given class member relied on.  He describes this sort

13   of two-stage information flow.  It's not tethered to either of

14   the two statements at issue in this litigation.  He doesn't

15   chart the flow of those particular statements through the

16   information environment.

17       Essentially there's no evidence in the record that anyone

18   interested in purchasing this product would necessarily have

19   consulted the website.  Customers purchased the product through

20   the app.  The hardware statement wasn't on the app.  Customers

21   purchased the statement by visiting a Tesla showroom, speaking

22   with Tesla representatives, as Mr. LoSavio did, and purchasing

23   a vehicle on a kiosk in a showroom.  It wasn't on the kiosk in

24   the showroom.  In other words, there's no factual evidence that

25   either, you know, customers necessarily were pushed through a

1   user flow that showed this hardware statement.

2        This isn't like a case where -- like in your Epic Games

3   case, where someone trying to open an account necessarily had

4   to encounter a particular statement and check a box

5   acknowledging it.  This was not part of a sales flow.  It was a

6   freestanding web page.  The web page didn't even have a link to

7   the purchase flow; in other words, it was an independent

8   website that didn't direct it.

9        So there's no basis for the Court to draw the inference.

10  This isn't a product label.  It's not eye-level on a yogurt

11  container.  It's not necessarily part of the information flow.

12       It's not even like the *Trump* case, where the Court could

13  infer from the circumstances, that customers had to have been

14  exposed to that information.  In that case, you've got three

15  sort of tiers of different seminars.  And the only information

16  about Tiers 2 and 3 were provided during the Tier 1 seminars.

17  And so the court drew the inference that the only place a

18  customer could learn about that product was by sitting through

19  that seminar, which was tightly scripted.

20       Here you have Dr. Goldhaber saying information about Tesla

21  is everywhere and you should assume, based on the pervasive

22  information environment, that customers who were willing to pay

23  this necessarily encountered the hardware statement.  That

24  doesn't follow.  There's no effort to tie the hardware

25  statement and the minimal exposure that customers had to it on

 1    the website to the information environment that they rely on.

 2          **THE COURT:**  What about the argument that if you want

 3    to understand what full self-driving is and that that's part of

 4    your purchase process for full self-driving, the only place to

 5    really get that information, Tesla's account of what you're

 6    going to get with full self-driving, is the website?

 7          So if you're at the showroom, it's not like they have

 8    brochures or other materials.  They have a kiosk, but there's

 9    no -- I didn't see anything in the record indicating or

10    contradicting plaintiffs' point that in order to find out what

11    is full self-driving, you've got to go to Tesla's website.

12    There's really only one principal sort of information from the

13    horse's mouth on this issue.

14          **MR. SCHOENFELD:**  Absolutely.  I think it's directly

15    contrary to what's in the record both from plaintiff and

16    Dr. Goldhaber's testimony which says:  This information was

17    everywhere.  Descriptions of full self-driving -- how it

18    operated, how safe it was, how futuristic it was -- were coming

19    from Mr. Musk's Tweets.  They were coming from press coverage

20    that plaintiff says is attributable to Tesla.  They were coming

21    from the three newspapers that Mr. LoSavio says he read on a

22    regular basis reporting statements from Tesla representatives.

23    You can't infer from that very broad, very diffuse information

24    environment that plaintiff saw this particular information.

25          I also think --

 1          **THE COURT:**  How is that different from a situation

 2    where a company has brochures that go with their microwave, and

 3    they have a description of what the microwave does.  But, of

 4    course, there is -- you know, there are consumer forums, there

 5    are consumer reports about -- there's Yelp, and there's all

 6    these other avenues of information.  But the courts presume

 7    that customers care about what comes from the company's mouth

 8    about -- on their packaging about their product.

 9          **MR. SCHOENFELD:**  Absolutely.  I think it would be a

10    very different case if there were a statement in a pamphlet or

11    a user's manual that came with every single Tesla.

12          In the case with the microwave that comes with the

13    brochure there's presumably evidence in the record that it was

14    part of the packaging; that, in fact, when you open up the box,

15    it's on top and it says "read me."  Those are circumstances

16    that might give rise to an inference that every customer has

17    seen that particular representation.

18          The cases where courts are willing to infer this generally

19    involve some evidence that the plaintiff has put in -- okay? --

20    some evidence that the plaintiff has put into the record

21    showing that the Court can draw the inference that a customer

22    would have seen it.

23          The packaging cases, I think, are the easiest.  If you buy

24    a yogurt that says "100 percent vanilla," the Court will infer

25    that you saw "100 percent vanilla" as you were choosing vanilla

from the shelf.  If you buy a microwave, a court will infer

that if that was included with the microwave, you read it.

    *Gutierrez versus Wells Fargo*, which plaintiffs cites, the

Ninth Circuit decision talks about high-to-low posting order

for overdraft fees.  And what the court recites is that

statements about the high-to-low posting order, or how

overdraft fees would be calculated were in single

account-opening document during the class period.  I'm sure not

every class member read that representation, but it was part of

the account-opening process that every class member opening a

debit card account had to go through.  There's nothing like

that here.

    And if you look at the reasons that Mr. LoSavio gave for

purchasing his vehicle, and that other customers give for

purchasing their vehicle, it doesn't necessarily tie back to

the hardware statement.  It's recommendations about safety.

There's the availability of certain features, certain

autonomous driving features, over time, including at the point

of purchase, that would justify or that would make someone

purchase the product.

    In other words, there's ample evidence in the record that

would refute any tendency to draw an inference that a customer

who purchased this product necessarily saw the hardware

statement.  Just to reiterate this point, the only evidence in

the record about who or how many people saw the hardware

1    statement tends to show that this class of however many

2    thousands of people, not everyone read it, not everyone visited

3    the website, not everyone navigated to that subsite to visit

4    that page where this information resided.

5          **THE COURT:**  I did give Tesla an opportunity to talk

6    about the law, so I'll let plaintiff respond on that point.

7          **MS. FIEBER:**  Thank you, Your Honor.

8        Well, a couple of things.  Obviously, the legal test is we

9    don't have to show that everyone saw it.  Under *Carmignac*, the

10   focus is on the consistency of the message and whether it's

11   material.  And you can make the inference here because the only

12   reason you would spend $3,000 to $15,000 buying this add-on

13   software package is if you knew it worked on your car.

14       I wouldn't go buy FSD.  I drive a Subaru.  I know it's not

15   going to work on my car.

16       People have to have some understanding from somewhere --

17   and we're saying it's coming from Tesla -- that their

18   vehicles -- all Tesla vehicles, in fact, as Mr. Musk announced

19   in October 2016, and is subsequently carried in the press and

20   picked up in other announcements, all Tesla vehicles have all

21   the hardware needed to be fully self-driving.  So you can, with

22   confidence, go buy a full self-driving software package from us

23   on our Tesla website because your vehicle has it.  If that

24   wasn't the case, they would have to have disclaimers saying

25   "Your vehicle is not going to work with this."

1    But they said "It's going to work and it's going to work

2    with versions of full self-driving coming out.  It's going to

3    be able to do it."

4    So that's where the inference comes from.  It's supported

5    under the structure of the law because we're looking at

6    consistency and materiality.  We have put on evidence on those

7    points through Dr. Goldhaber's opinions.  Tesla hasn't put on

8    contrary evidence.

9    And so we do believe that this case fits in with the cases

10   like *Makaeff* and *Opperman*, which looked at the buzz around

11   Apple's marking campaign.  The *Children's -- Committee on*

12   *Children's Television* case.  *Morgan* and *Tate* cases cited in our

13   opening brief, where you do have a very consistent marketing

14   campaign and you have a representation that's going to be

15   material to a consumer purchase.  Here, that representation for

16   the hardware statement goes to:  Will this work on this

17   specific Tesla vehicle I've purchased?

18   **THE COURT:**  Let's go to Question 2.  I know there

19   might be more on this, but you can let me know more at the end.

20   Question 2 is:  Plaintiffs point to Elon Musk's 2016 news

21   conference statement, two subsequent Tweets in 2017 and 2019,

22   and accompanying press coverage as the information environment

23   that allegedly exposed class members to the "cross-country

24   statement."  Is that sufficient to support an inference that

25   class members were exposed to that representation without

1    information about the actual number of views or impressions of

2    those particular Tweets and their resulting news coverage?

3           **MS. FIEBER:**  It's a similar situation here.  Again,

4    we're looking for consistency of message and materiality.

5           Here, the statement goes to:  Well, what does it mean to

6    be a full self-driving car?

7           Musk expressed it as:  Yeah.  Your car is going to be able

8    to drive itself, within a year or so, cross-country, hands-off

9    for the entire journey, including vehicle charging.

10          Now, again, our main evidence on this is coming from

11   Dr. Goldhaber whose, you know, experience and credentials in

12   this area of marketing are unquestioned by Defense.  And he's

13   looking at not just the original Musk Tweets, but he's also

14   looking at the information Tesla has accompanying those; in

15   particular, the videos that it has on its YouTube site, on its

16   website, even on its website currently.

17          And they show:  What does it mean to say the car can drive

18   autonomously?

19          It means it's hands-off.  And literally, in the, you know,

20   check I did on the website yesterday, there's a video -- if you

21   want to buy full self-driving, there's a video of a person

22   driving in a variety of situations with their hands off the

23   wheel.

24          So this is the information environment.  You look at the

25   original Tweets, that original promise of an autonomous

1  cross-country trip; but you also look at how Tesla has

2  continued consistently to make the same representations over

3  time.

4      And you look at the materiality.  Here, it's material:

5  What does it mean to say cars can autonomously drive across

6  country?

7      It means you can sit there with your hands off the wheel

8  while the car takes you wherever you need it to take you.

9      That's the information environment these are uniform very

10  targeted representations that it is very reasonable to assume

11  that anyone interested in spending thousands of dollars for a

12  standalone product, you don't need to buy this product via

13  Tesla, but if you want to buy this standalone product, you want

14  to try and go and look at the Tesla website, and look at the

15  information about what full self-driving does, and you're going

16  to do that before you make that click to buy that extra

17  product.

18      **THE COURT:**  I'll give Tesla an opportunity to respond,

19  although I don't have a lot of questions about this one.

20      **MR. SCHOENFELD:**  Sure.  So Dr. Goldhaber's testimony

21  is that the relevant statements were made consistently,

22  uniformly, and through all channels.

23      With respect to this statement in particular, all three of

24  those things are untrue.  They weren't made consistently; they

25  were made in one statement in October 2016, and Tweets in 2017

and 2019.

They weren't made uniformly; they were different variants in 2017, 2017, and 2019.

And they weren't made through all channels; they were only made by Tesla through the October 2016 press conference statement and two Tweets.

Dr. Goldhaber, for his information environment theory, relies on Tesla's YouTube account, its website, statements people make in showrooms, Instagram. The statement wasn't made in any of those places.

There's been no effort. Even sort of -- there's been no effort to tie this to any particular population, certainly not the class population here.

The last thing I'll say on Dr. Goldhaber's testimony: He hasn't done anything. His deposition, I asked him repeatedly "Have you done anything to test who actually saw the statement or how widespread it is?"

He said "No, I can't do that until the Court defines the class for me."

That's not how this works. Plaintiffs' have a burden of proof to demonstrate at the starting gate that all class members were exposed to the relevant representations. And that's particularly important in this case because there's only two representations at issue. And in order to have an actionable UCL or CLRA claims here, there's got to be some

1    connection between those two statements and the supposed injury

2    that the class members suffered.

3         And the showing starts with exposure.  The showing starts

4    that class members uniformly saw this statement or were exposed

5    to it.  And there's nothing in the record to show that, and

6    there's insufficient evidence in the record to draw that

7    inference.

8         **THE COURT:**  Let's go on to Question 3, which is that

9    plaintiffs contend that the question of whether Tesla vehicles

10   were equipped with hardware sufficient for full self-driving

11   capabilities is subject to common proof.  For example, there

12   was testimony that the ability for the sensors to perform in

13   bad weather is a limitation that would be common across the

14   class.

15        My question for plaintiffs is:  Will the proof of the

16   inadequacy of sensor types and configurations vary depending on

17   the hardware package; that is Hardware 3 versus Hardware 4

18   versus Hardware 5; and is that an issue that could or should be

19   addressed through subclasses?

20        **MS. FIEBER:**  So, Your Honor, the key fact on this is

21   that none of the Tesla vehicles are full self-driving.

22        None of them have sensors that are going to work in all

23   situations 100 percent of the time.

24        None of them have hardware that are going to allow them to

25   be fully self-driving.  That's Hardware Version 3, 4, or even

1   this future, rumored Version 5.

2         Simple fact is:  Tesla vehicles can't drive themselves.

3         That's the common proof and that holds true for every

4   Tesla vehicle that's on the road today, regardless of vehicle's

5   hardware configuration.

6         Now, because of that, while there may be differences

7   between hardware for model year or model combinations that's

8   simply irrelevant.  Even the latest and best version of Tesla's

9   hardware, which is what it's using in its so-called robo-taxi,

10  it still can't fully drive itself.  If you have to have a

11  person with a kill switch in the car to keep it from crashing

12  into something, that's not a fully self-driving car.

13        It doesn't matter how close Tesla gets.  It doesn't have

14  what it was selling people.

15        It's like -- it's like if you take your kid to Disneyland

16  and they want to ride a roller coaster, and there's a minimum

17  height of 4-foot 10 inches, and your kid is 4-foot 9 inches.

18  They're not going to make the test.  They're not going to get

19  to go on that ride.

20        That's the problem with Tesla's so-called full

21  self-driving cars.  They don't drive themselves.  They can't

22  and it doesn't matter what hardware they have right now.

23            **THE COURT:**  The issue for class certification, though,

24  isn't just whether the answer will be the same for Hardware 3,

25  4, and 5, but whether the way you prove the failure is the same

1    for 3, 4, and 5.

2         In other words, help me understand what this is going to

3    look like at a trial.  Are you saying that at a trial there's

4    going to be an expert who is going to get on the stand and say

5    "All of these hardwares have the same problem, which is that

6    they don't perform well in bad weather, and you could see that

7    because they all lack the same thing, which is a certain type

8    of sensor."

9         I can't tell if that's the case from the evidence.  Help

10   me understand how the evidence shows that you're going to put

11   on classwide evidence on the failure.

12        **MS. FIEBER:**  Yes, Your Honor.

13        I think it would look like that.  The reality is, none of

14   the sensors on the vehicles at this point in time work in all

15   situations, and full self-driving has to work in all

16   situations.  The hardware for all the versions that are on the

17   road right now is not adequate for this neural network AI

18   system that the software is currently moving towards.  So they

19   simply -- the vehicles on the road now can't fully drive

20   themselves.  And that's going to be the common proof that's

21   going to go for everyone.

22        **THE COURT:**  Let me give Tesla an opportunity to

23   respond.

24        **MR. SCHOENFELD:**  I think Your Honor has it exactly

25   right, that plaintiffs' theory here is that they're going to

 1    win at trial and they'll win on common evidence as to the sort

 2    of maximal reach of their theory.  Their burden at class

 3    certification, however, is to demonstrate that common proof

 4    will prove their claims; and they haven't done that.

 5         They rely on one paragraph in Socci's declaration, and

 6    that paragraph has no support showing that there's common

 7    classwide proof.

 8         Look, for example, at his evidence of sensor performance

 9    deficiencies, which I think is 137-21 -- or 138-22; it's a

10    Tesla document from August of 2019.  That's the only document

11    he cites to say that there were sensor deficiencies or anything

12    else that would prevent full self-driving capability.  That's

13    from 2019.  That was last updated in August of 2019.  And it

14    only refers to Hardware Systems 2.5 and Hardware 3.0.  That

15    doesn't take the Court or the jury through the class period.

16         There's also testimony in the record that even at the

17    beginning, when Mr. LoSavio purchased his vehicle, the vehicles

18    were -- did have full self-driving capability, and were capable

19    of coast-to-coast driving.  Plaintiff has offered no evidence

20    that there's classwide proof to refute those statements.  In

21    other words, there's no commonality of evidence across the

22    class period, across the class, across hardware versions to

23    prove any of plaintiffs' claims.

24         Your Honor asked about subclassing.  I don't think that's

25    a remedy here for a couple of reasons.  The first one is you

1   need a subclass representative for each subclass, and there is

2   no such person.  You also need independents showing that each

3   subclass meets the other requirements of Rule 23 with respect

4   to these claims.

5       And whether statements like "hardware capable of full

6   self-driving," would be material to the entire class, let alone

7   subclasses who are hearing that statement with respect to

8   progressively more advanced hardware systems, I think, are

9   materially different questions.

10      So subclassing, I don't think works as a remedy.  And I

11  think that there are obviously a number of issues that go to

12  the uncertifiability of any subclasses.  But specifically with

13  respect to this showing, I think, those are two other problems.

14          **THE COURT:**  Why can't I find that common issues

15  predominate as to the ability of the sensors to perform in bad

16  weather?  Sure, there may be variations between Hardware 3, 4,

17  and 5, and there may need to be some extra testimony explaining

18  that the -- that defectiveness of the sensors is

19  across-the-board for all of the different hardware packages.

20  But it seems to me that that's still an issue where common

21  proof is mostly predominating.

22          **MR. SCHOENFELD:**  I disagree that any such showing has

23  been made.  There's one document that plaintiff and Socci cite

24  about sensor performance being an issue with the performance of

25  the full self-driving capability of the vehicle.  It's from

1    August 2019.

2    The Court has no way to decide past August of 2019,

3    whether that remained an issue.  That's not an inquiry that

4    Socci has undertaken.  He hasn't reached any conclusions about

5    whether it remained an issue.  He hasn't reached any

6    conclusions about whether it remained an issue with respect to

7    all Teslas, with respect to certain hardware versions, with

8    respect to certain combinations of hardware versions and

9    software, since the two interact.  There's none of that in the

10   record.  One would expect -- oh, go ahead.

11        **THE COURT:**  Why isn't it enough that -- I have his

12   deposition testimony where he is saying:  I -- I'm saying there

13   are limitations to the performance of FSD that are common

14   across the class.

15        He was asked what are those limitations.

16        And he's saying that that's the ability for the sensors to

17   perform in bad weather is a classwide problem.

18        Now, I understand that you're saying he doesn't provide

19   enough backup and -- but the question of whether that's true or

20   not seems also to be a common question across the class.  So at

21   a trial if you can show that Socci is wrong, and that this

22   isn't something that's true across the board, that the sensors

23   are defective in bad weather, then Tesla has an opportunity to

24   prove that on a common basis across the class.

25        **MR. SCHOENFELD:**  I don't think that statement, which

1    was just a kind of reflexive answer of common proof is enough

2    for the Court to go on to believe that, if you were to try this

3    case for a nine-year class period, Mr. Socci could come up with

4    evidence that is common to the class.

5        Plaintiffs need to show that the proof that he's going put

6    into the record in front of the jury to prove their claim --

7    because that is their entire -- the entire basis for the

8    falsity or truthfulness of those claims -- there's no evidence

9    other than his say-so at his deposition that he would show the

10   same issues persisted from the time Mr. LoSavio purchased his

11   Tesla in 2017, through 2025, or that there's common evidence,

12   or that it affected the vehicles in a common way.

13       There's got to be some showing at this point.  I mean, the

14   Supreme Court has said repeatedly this is a question of proof

15   and not of pleading at the Rule 23 stage.

16       And I don't think Mr. Socci's *ipse dixit* is sufficient.  I

17   mean, if you read his report, which is the source of his

18   opinions here, it's one paragraph of analysis.  The only thing

19   he points to for commonality of proof with respect to this

20   issue -- which plaintiffs hang their hat on; even in their

21   reply, they say that this sensor performance issue is one of

22   the pieces of common evidence -- there's zero evidence in the

23   record that that is a common issue of fact.

24           **THE COURT:**  Is there a rebuttal to his -- his opinion

25   on this topic?

1          **MR. SCHOENFELD:**  There's no rebuttal expert testimony,

2     no.

3          **THE COURT:**  Let me move to Question 4, which is about

4     the damages model.

5          Plaintiffs propose reasonable methods exist to apportion

6     value of specific features, like autopark, that Tesla may prove

7     that people got through full self-driving, and subtract that

8     value from the amount of the full refund.

9          So Stockton's report describes this method for

10    apportioning value for viable self-driving features that may

11    become available over the course of the litigation.  Obviously

12    that's a different issue.  But is there any reason that

13    Stockton's methodology could not be equally applied to other

14    valuable features including -- included in the EAP or FSD

15    package provided at the time of purchase like autopark?

16         That's really a question for Tesla.

17         And the followup is:  If so, does Stockton's report

18    provide sufficient evidence of a common method to calculate

19    class damages?

20         **MR. SCHOENFELD:**  So I think, the answer to both

21    questions is no.

22         I'm not actually sure what Stockton is proposing to do in

23    those two paragraphs of his report.  And part of the confusion

24    arises from the fact that he says there are no valuable

25    features to FSD, and there are no valuable features

1   forthcoming.

2       So one way to read his testimony is that if Tesla makes

3   available fully self-driving vehicles on plaintiffs' definition

4   of what that term means, during the litigation, he can compare

5   the MSRP at that point in time to the MSRP, discount some

6   depreciation, and get the value of that.

7       He doesn't provide a methodology, however.  I know

8   plaintiffs say this in their reply, but I don't actually read

9   his report to propose a methodology for calculating the value

10  of discrete autonomous driving functionality over time.

11      However, you read his report, however, I think the answer

12  remains that it's not a viable methodology to do what

13  Your Honor's question presupposes.  Because if you think

14  retrospectively, certain FSD features were available when

15  people bought their vehicles, including Mr. LoSavio.

16      He offers no methodology to disaggregate the value of

17  those valuable FSD features, as of January of 2017, from the

18  rest of the vehicle.  He doesn't say that there's data that

19  shows which vehicles were purchased with FSD capability and

20  which were not, so there's a data problem to figure out what

21  the actual delta in value was for the delivery of those

22  features.

23      Those features were delivered at different points in time

24  to different individual people.  There are individualized

25  questions about when people purchased their vehicles.  When --

1    sorry.

2            (Reporter interruption for clarity of the record.)

3            **THE COURT:**  You need -- she has to write every word

4    you say.

5            **MR. SCHOENFELD:**  I understand.  I apologize.  I really

6    am trying.  So I apologize.

7        -- when people purchased their vehicles when their

8    hardware was upgraded, as Mr. LoSavio's was, when they got

9    access to particular software that improved certain

10   functionality.  So there are individualized questions.  There

11   are also methodological questions as to how to use whatever

12   Mr. Stockton says in those paragraphs to calculate that value.

13       Let me just make two --

14           **THE COURT:**  Let me ask a different question then.

15       I was looking over Mr. Stockton's report, more, over the

16   last couple of days, and it does seem to me, on some level,

17   what he's really saying is that these other features have zero

18   value, and I will prove that through consumer surveys, that

19   these other features have zero value, no one would buy full

20   self-driving for these other features.  The only value of full

21   self-driving is really the promise that you can drive with

22   hands off and it will work in all conditions, you can rely on

23   it.

24       And I am sure Tesla disagrees with that, but that seems to

25   me something that is a theory that is common across the class,

 1    could be -- could rise and fall on common proof.  What's your

 2    response to that?

 3            MR. SCHOENFELD:  Respectfully, I don't think he says

 4    that; and there wouldn't any basis for him to say that because

 5    he hasn't done anything.  He's just proposed a methodology

 6    which could yield all sorts of discrepant results that differ

 7    individual by individual.  He's done nothing to test the

 8    economic value of any particular feature.  And he says, both in

 9    his report and in his deposition, that that was at the

10    direction of counsel which instructed him not to treat any

11    particular element of full self-driving capability as having

12    any value.

13        They went all-in on a full-refund theory.  We don't think

14    that's legally available to them.  I think there's at least

15    some credit for offsets for these valuable dimensions of full

16    self-driving.  And I think there's evidence in the record to

17    support that there's value that customers took from it,

18    including repeat subscribers who could cancel their FSD

19    subscription at any time.

20        Mr. LoSavio said that he used particular functionality

21    associated with his FSD package.  There are increased safety

22    benefits from using this.  All of that needs to be assessed.

23    And at the class certification stage, I think that's

24    plaintiffs' obligation to figure out whether they have a

25    methodology for accounting for that.

 1          The last thing I'll say is the *Makaeff versus Trump* case

 2    that plaintiffs rely on, in fact, decertified the damages case

 3    on precisely this question.  The 2015 decision that plaintiffs

 4    rely on from Judge Curiel goes through the entire analysis, and

 5    with respect to a full-refund theory, bottoms out on the

 6    proposition that because there has to be some offset for the

 7    value that customers got from participating in these

 8    seminars, even if the whole thing was a fraud and even if

 9    Trump University wasn't a university, they still need to be

10    given -- they still have the due process right to be present

11    those defenses, and the only way to accommodate that is to not

12    certify for damages purposes.

13          **THE COURT:**  Let me give plaintiffs an opportunity to

14    respond.

15          **MS. FIEBER:**  Thank you, Your Honor.

16          The full-refund model for damages does make sense here.

17    What they were selling was full self-driving.  They haven't

18    delivered it.  And for that reason -- it's not just the *Makaeff*

19    case.  There's the *Figgie* case, there's the *Allen* case, which

20    is about homeopathic medicines; the *U.S. v. Kennedy* case, where

21    people bought nice-looking counterfeit art.  There may have

22    been some value -- in fact, in the 2015 *Makaeff*, you know,

23    people thought they were getting some value.

24          But the reality is people were putting out money, making

25    purchases that they wouldn't have otherwise made because they

thought they were going to get something that was going to give
them what Tesla was advertising, which was a car that could
drive itself across country, to the office -- like it shows in
its videos; that's what people thought they were getting.

Now, if we go to trial and we get to the merits phase of
this case -- and we're not at the merits right now.  I mean,
with all due respect to counsel, he talks about valuable
features such as autopark, but really what value is a feature
that doesn't work reliably and could, in fact, be dangerous?

What value is Smart Summon, or the predecessor to that
which was kind of Dumb Summon -- I forget what they called it.
What value is in these features that aren't reliable?

But if we get to trial and the jury does determine
something got delivered either, you know, full self-driving or
some feature, Mr. Stockton's report sets out a method and he
can come up with some value, some way of assigning value to
that feature; but we're not at that point yet.

The bottom line is our theory of the case and the
liability theory and the damages theory are premised on:  They
did not deliver what they promised people, which is a full
self-driving car.

THE COURT:  Let me come back to Tesla about that
issue.

Essentially, I read Stockton's report as saying, I'll use
a consumer survey to be able to value different components of

1  this.

2      And it seems like common sense that a consumer survey

3  would be a basic way of providing common proof as to whether

4  certain features are or are not valuable to people.  Why is

5  that -- why is it more complicated than that?

6      **MR. SCHOENFELD:**  I think you're giving a lot of

7  benefit of the doubt to Mr. Stockton.  What you're describing

8  may be a conjoint.  He hasn't proposed doing a conjoint.  He

9  doesn't say he's an expert on conjoint.

10      Part of his job would be to identify the economic impact

11  of the two statements at issue.  He doesn't say he can do that.

12  He doesn't say he ever has done that.  He doesn't say that a

13  conjoint could do that.  He doesn't say any of this in his

14  report.

15      I mean, these are -- I agree with you.  These are

16  commonplace ways of proving harm in consumer protection cases

17  and false advertising cases.  The problem here is that

18  plaintiff and their expert haven't done any of it.  There's no

19  effort to show that any of this would be proven by common

20  evidence.

21      And I know plaintiffs, in their brief, sort of fault us

22  for saying that a survey is required or something else is

23  required.  I'm not saying anything in particular is required.

24  There's a million different ways for plaintiff to carry their

25  burden at class certification.  The problem here is that they

1   haven't even tried any of them.

2       **THE COURT:**  On the legal issue for plaintiffs of

3   whether the Court should follow a full brief on theory rather

4   than giving some offset for the value, I'll just tell you my

5   hesitation so you can give me a response.

6       I do see that the majority of district courts provide some

7   offset for value.  And to me it seems like, if you took this

8   full-refund theory to the extreme, you could have situations

9   where people are buying something that is very expensive --

10  like a Tesla, for example -- and there is one component of it,

11  the light above the rearview mirror doesn't work properly, that

12  is, you know, a minor thing, that they were represented that

13  all the lights in the car work properly, but that one thing

14  didn't work; and now we're saying that they should get the full

15  value of the car because they wouldn't have bought a Tesla if

16  they knew that it had defective lights in it.  That seems to be

17  really extreme in a situation where people are definitely

18  deriving a lot of value from the car, and it's a relatively

19  minor component that is missing.

20      So that's my hesitation about that line of cases.  I'm

21  open to hearing if there's something else I should be thinking

22  about with that.

23      **MS. FIEBER:**  Well, I mean, the cases such as -- the

24  other cases where they have done a full refund, the *Kennedy* and

25  the *Allen* case, and the *Figgie* case, and even the steroid case,

they are instructive because those were situations where there

was some value, but they still required a full refund because

for example in the steroid hormone product case what they sold

was illegal; you can't be selling steroids.

     And that's kind of, actually, what's going on here because

Tesla isn't certified even to be selling, at this point, a

self-driving car.  So bottom line, this is what they were

advertising, you know, Teslas that can drive themselves.  And

that's what was influencing the consumer purchase and was

causing people to lay out the $3,000 to $15,000 to buy this

standalone product.

     **THE COURT:**  Let me move to Question 5, which is about

the injunctive relief claim.

     As defined, the proposed class encompasses those who have

no intention of ever purchasing enhanced autopilot or full

self-driving in the future, either by purchasing another Tesla

or an ongoing subscription.  How would those class members have

standing to seek injunctive relief concerning accurate

representations from Tesla about EAP and FSD in the future, and

could this problem be cured through modification of the class

definition that limited the (b)(2) class to those interested in

purchasing those products in the future?

     **MS. FIEBER:**  Thanks, Your Honor.

     First off, you could limit the (b)(2) class in that way.

There would be no problem with that.

1      But stepping back from that, also there's no problem in

2  fact if there is some over-inclusiveness in the (b)(2) class

3  because, as the *Walters versus Reno* case in our opening briefs

4  notes, it's okay if not all class members were injured, you can

5  have an overbroad injunctive class.

6      And more instructive on this point, it's a case that we

7  didn't cite in our briefs, but came up in looking at your

8  questions, the *In Re: Yahoo! Mail* litigation case, and that's

9  at 308 FRD 577.

10     That's a case where the plaintiff only sought a 23(b)(2)

11  class, so only wanted injunctive relief.  It was about a

12  class -- the class set was persons who were not Yahoo! Mail

13  subscribers, but who had sent or received e-mails with Yahoo!

14  Mail subscribers.  And there, on the standing issue, the Court

15  observed that with -- standing would be satisfied if at least

16  one of the named plaintiffs had standing.

17     Well, here Mr. LoSavio does have standing.  You've seen

18  our preliminary injunction declaration where he evinced his

19  interest in a future purchase.  So we complete that test for

20  standing for 23(b)(2) class based on Mr. LoSavio.

21     And another way of looking at this is:  Is a class

22  ascertainable?

23     And in the Yahoo! Mail case, it added discussion of that

24  question "Do you need to be able to find all your class members

25  for 23(b)(2) class?"  And it basically came out with --

concluding that the ascertainability requirement didn't even apply, because if you're not looking for damages or if you're not looking to force a repair, like in the *Victorino* case that Tesla cites, it doesn't matter that there may be people in the class who no longer own their vehicle so they can't get it repaired or have already made the repair.

So I think under the law, it's fine to narrow it as Your Honor suggests or it's fine to keep it somewhat overbroad.

**THE COURT:** Tesla's response.

**MR. SCHOENFELD:** Sure. If I may, just one preliminary point.

The plaintiffs concede that these statements are not being made and have not been made; the hardware statement since August of 2024, and the latest iteration of their cross-country statement they cite is from 2019. So we're not talking about anything that's even subject to injunctive relief, which I think then feeds into the question of an individualized inquiry.

I think the question of whether every member of a class needs to have standing is obviously a really challenging one. The Supreme Court keeps granting and then not answering it.

But under, I think, settled Ninth Circuit law at least some large majority of the class needs to be demonstrated to be eligible for the relief in order for there to be a certifiable class. So with respect to the 23(b)(2) class, there's no

 1   showing here that any of the class members besides Mr. LoSavio

 2   would want to purchase this in the future, or would benefit

 3   from some clarification with respect to these two statements

 4   which are the only ones.

 5       And as to Your Honor's proposed fix, you can't have a

 6   class that depends on the subjective self-identification of a

 7   class member.  The example that plaintiffs' counsel cites, the

 8   *Yahoo!* case, which I have not read, but even to hear the class

 9   definition, those are objective criteria; right?  Someone who

10   doesn't have a Yahoo! account, but either sent or received a

11   Yahoo! e-mail, or whatever else.

12       Those are objective criteria.  You can figure out who

13   those people are.  Relying on class members to profess that

14   they are interested in purchasing EAP or FSD in the future

15   isn't enough.  People can't just come forward and submit

16   affidavits about their subjective future intentions in order to

17   become members of the class.

18       **THE COURT:**  Let me also ask you all about the hardware

19   statement coming down in August 2024.  I was also working

20   through that issue.  And it -- I'm wondering from the

21   plaintiffs' perspective on what basis do you think that the

22   Court can infer that someone who purchased or subscribed to EAP

23   or FSD after the hardware statement was taken down from the

24   Tesla website would be exposed to that statement?

25       **MS. FIEBER:**  Inferentially, the fact is Tesla is still

1  selling people this FSD package.  So unless they're going to

2  put out a disclaimer saying this isn't working on your car --

3  because Tesla knows whether it will or will not work for that

4  model of car -- I think, it's fair for people to continue to

5  rely that Tesla is selling something that has a hardware to

6  actually make use of the full self-driving package.

7       THE COURT:  Because of the continued use of the term

8  "full self-driving"?

9       MS. FIEBER:  Right.  And the continued fact that Tesla

10 is selling it to all -- or it's offering it for sale to a

11 purchase of any -- purchaser of any model of Tesla vehicle from

12 August 2024 to the present.

13      THE COURT:  I understand the argument.

14   I don't have anymore questions for the parties, but you

15 may add whatever additional information you think I ought to

16 know before entering a ruling.

17   I'll give plaintiffs first opportunity to and Tesla can

18 have the last word.

19      MR. SCHOENFELD:  May I briefly respond to last point

20 just for a second?

21      THE COURT:  Why don't you just hold that and then you

22 can respond after plaintiffs let me know anything else you

23 would like me to know.

24      MS. FIEBER:  Well, one thing I did want to touch back

25 on, which was on the third product -- or the third question,

sorry -- where we were discussing whether common proof existed

showing that the hardware is not sufficient.  And I think there

is other common proof in the record such as, for example, the

fact that Tesla itself had stopped trying to do an autonomous

trip as of 2017, and we went through and we cited this in the

record.  They haven't continued to do it -- haven't tried to do

it since 2017.  So that's in the record.

      And there is also cited in the record Mr. Musk's public

statements that they were going to have to go back and retrofit

vehicles with the pre-Hardware 4 methodologies.  So that is

evidence -- and this most recent Hardware 5 update that's been

talked of, but that is going to be evidence that is also common

across all vehicle classes showing that the hardware that was

being sold at the time with the vehicles is, in fact, not

capable of working with Tesla's current full self-driving

package, or future full self-driving.

      **MR. SCHOENFELD:**  Sure.  I'll be very brief.

      But with respect to the last question Your Honor gave, I

think plaintiffs' answer is very telling.  In their view, it

doesn't matter whether the hardware statement is up on the

website or not up on the website.  You can infer, based on the

bare fact that customers purchased FSD that it was material to

them.  There's no way you can do that, and it just shows how

loose the plaintiffs' entire theory here is.  They rely on this

very broad information environment thing, and they think that

1   you can infer from the fact of purchase that plaintiffs relied

2   on these two representations.

3        In that connection, I think it's incredibly instructive

4   that paragraph 43 of Goldhaber's report, the only paragraph

5   where he actually addresses the sort of materiality question,

6   he doesn't even talk about either of these statements.  He says

7   the feedback, which is the customers' willingness to purchase

8   FSD, would not have been made if they knew that the vehicle

9   could drive into a fence or require repeated intervention.

10       This has nothing to do with the hardware statement.  That

11  has nothing to do with their cross-country statement.

12       Your Honor, was very clear in the motion to dismiss order,

13  there are two statements at issue in this case.  Plaintiffs

14  burden at class certification is to show that they can prevail

15  on their claims predicated on those two statements.  They

16  haven't done that.

17       If I can have 30 seconds just to summarize here.  I think,

18  Your Honor gets at the jugular issues in your questions.  This

19  is a false advertising case and plaintiffs have not -- and I'm

20  not imputing these conclusions to you, I'm just saying where

21  your questions lead me.

22       This is a false advertising case.  Plaintiffs haven't

23  satisfied their most elemental burden of showing common

24  classwide exposure.  There's no evidence that they can prove

25  the falsity of these two particular statements with evidence

1 | that's common across the class.  And there's no common
2 | classwide damages model.
3 |     I just want to highlight two other issues that I think are
4 | relevant here.  The first one is materiality which goes to the
5 | question of common classwide proof of deception or reliance.
6 |     Plaintiffs' burden at class certification is to show that
7 | the relevant statements are material to a reasonable consumer.
8 | That is how they get the benefit of a classwide inference of
9 | deception and reliance.  And the Ninth Circuit has been very
10 | clear on this as they sort of tightened the rigor around this
11 | inquiry in CLRA and UCL cases.  That means that at this stage,
12 | in order to dispense with their obligation to otherwise prove
13 | that there is classwide evidence, deception and reliance, they
14 | need to demonstrate that these two statements were material to
15 | a reasonable consumer.  They haven't done that.
16 |     The only evidence they put in the record is
17 | Dr. Goldhaber's report.  And he says he hasn't done anything to
18 | figure that out, and maybe he'll figure that out, and maybe the
19 | answer will be, yes, maybe the answer will be no, maybe the
20 | answer will be different from class member to class member.
21 | That's not enough at the class certification stage.
22 |     And finally, statute of limations.  I think plaintiffs'
23 | reply brief sort of misconstrues the issue.  It's not about
24 | whether there's a common statute of limitations argument
25 | applicable to the class.  It's about whether there's a common

tolling or discovery rule defense applicable to the class.

Plaintiffs' only answer to our showing in our opposition brief is that the limitation defense, like plaintiffs' other claims, will be judged by the reasonable consumer standard. They say that at Reply 12.  There's no authority for that proposition.

Whether tolling doctrines apply has nothing to do with the reasonable consumer standard.  And to the extent they would rely on proof of particular lulling statements they said at the motion to dismiss stage Tesla made, that just raises the question of exposure.  Was each class member exposed to that lulling statement?  Did it induce them to sit on their rights?  Did it induce them to avoid being diligent in pursuit of their claims?  Does it suffice to equitably estop Tesla with respect to that customer, to bring a statute of limitations defense.  There is no effort to shoulder that burden.

**THE COURT:**  Thank you.  I'll take the motion under submission and issue a written -- or did you have a final brief response?

**MS. FIEBER:**  If I may.

First, on inferring materiality, it is very reasonable to infer it based on the fact you wouldn't buy a software package if it didn't work on your specific vehicle.

As far as our evidence of materiality we are relying primarily on Dr. Goldhaber's report, and we've cited other

1    cases to the Court which similarly relied on an expert's

2    opinion.  Tesla has offered no contrary evidence.

3        Regarding the statute of limitations, we did cite

4    authority, the *Corcoran* case specifically, which does say it

5    would be a reasonable consumer standard in determining whether

6    that defense applies.  That defense is common to much of the

7    class.  And therefore, we believe we have met our burden.

8        Class -- I mean statute of limitations issues are

9    typically merits-based, fact-based decisions.  This is not the

10   proper venue for deciding it today, but we can show it.  And

11   Goldhaber talks about how that can be tested further with

12   consumer surveys and focus groups.

13       So in summary, from our perspective, Your Honor, this is a

14   quintessential case where all the evidence is based on what

15   Tesla said, what equipment its cars have, what it's done, what

16   capabilities its cars actually have.  This is a quintessential

17   case for class certification, and both the 23(b)(3) class and

18   23(b)(2) class are properly certified here.

19        **THE COURT:**  Thank you.  I'll take the matter under

20   submission and issue a written order.

21        **MR. SCHOENFELD:**  Thank you, Your Honor.

22        **MS. FIEBER:**  Thank you, Your Honor.

23           (Proceedings adjourned at 12:19 p.m.)

24                    ---o0o---

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Friday, August 15, 2025




_____
 Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
            Official Reporter, U.S. District Court