UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA ADVANCED DRIVER ASSISTANCE SYSTEMS LITIGATION | Case No.  22-cv-05240-RFL<br><br>**ORDER CERTIFYING CLASSES AND APPOINTING COUNSEL**<br>Re: Dkt. No. 138 |

This case involves putative class action claims regarding Defendant Tesla, Inc.'s ("Tesla") allegedly misleading statements about the full self-driving capability of its vehicles. Plaintiff Thomas LoSavio, individually and on behalf of those similarly situated, alleges that Tesla's conduct violates California's Unfair Competition Law ("UCL"), Consumer Legal Remedies Act ("CLRA"), and False Advertising Law ("FAL"), and further constitutes fraud, negligent misrepresentation, and negligence.  Plaintiff filed a motion for class certification on May 6, 2025.  (Dkt. No. 138.)   For the reasons stated below, the Court **GRANTS** Plaintiff's motion for class certification, subject to the modified class definitions set forth below.

## I.    BACKGROUND

### A.    Factual Background

Defendant Tesla, Inc. designs, develops, manufactures, tests, markets, distributes, sells, and leases electric vehicles under the brand name "Tesla."  Unlike other automakers, Tesla does not sell or lease its vehicles through third parties; the only way to buy a Tesla is through Tesla itself.  (Dkt. No. 138-4 ("Goldhaber Rep.") ¶ 8.)  Tesla does not engage in traditional marketing or advertising media (*i.e.*, TV ads or magazine features).  (Goldhaber Rep. ¶ 12.)  Instead, it

reaches consumers directly through its website, as reinforced by its own YouTube, Instagram, press conferences, sales events, marketing newsletters, and CEO Elon Musk's personal Twitter account.  (Goldhaber Rep. ¶ 10.)

Tesla has historically offered customers the ability to purchase or subscribe to optional technology packages—ranging from $3,000 to $15,000 in price—designed to enable autonomous vehicle operation.  (Dkt. No. 137-11 at 92-95.)[1]  The Enhanced Autopilot ("EAP") package includes features such as Autopark, Dumb Summon, Actually Smart Summon, and Navigate on Autopilot (highway).  (Dkt. No. 137-9 ("Socci Rep.") ¶ 29.)  The Full Self-Driving (FSD) package includes all Enhanced Autopilot features, with the addition of Stop Sign and Traffic Signal recognition and Autosteer on Streets.  (*Id.*)  Enhanced Autopilot was offered as a stand-alone package only until the first quarter of 2019, and again for a limited period from the second quarter of 2022 through the second quarter of 2024; at other times, these features were available only as part of the FSD package.  (*Id.*)

Plaintiff alleges that he relied on two types of misrepresentations Tesla made throughout the relevant class periods: (1) that Tesla vehicles are equipped with the hardware necessary for full self-driving capability ("Hardware Statement"), and (2) that a Tesla vehicle would be able to drive itself across the country within the following year ("Cross-Country Statement").

***Hardware Statement.***  At a press conference on October 19, 2016, Musk said of Tesla's second-generation autonomous driving hardware:

> Basic news is that all cars exiting the factory have hardware necessary for Level 5 Autonomy so that's in terms of Cameras, Compute Power, it's in every car we make on the order 2,000 cars a week are shipping now with Level 5 literally meaning hardware capable of full self-driving for driver-less capability.

(Dkt. No. 138-13 at 3.)  Statements to this effect were displayed on Tesla's website, including on the Autopilot, Model S, and Model X subpages.  (Dkt. No. 102 at 108-09) ("All Tesla vehicles produced in our factory, including Model 3, have the hardware needed for full self-

---

[1] Page numbers reflect the pagination applied by the court's electronic case filing system.

driving capability at a safety level substantially greater than that of a human driver."). The Complaint alleges that a substantially similar statement also appeared in a Tesla newsletter disseminated in November 2016 ("All Tesla vehicles produced in our factory now have full self-driving hardware, enabling a rapidly expanding set of new Autopilot features to be introduced over time") (Dkt. No. 102 at 116-17), a Tesla blog post published in October 2016 (Dkt. No. 138-7 at 2), and a Tesla quarterly earnings call in May 2017 (Dkt. No. 102 ¶ 65).

Tesla's hardware has been updated multiple times since the 2016 announcement. For example, in 2021, Tesla released Hardware Version 3.0 (HW3), which equipped vehicles with a more powerful computer and upgraded cameras. (Socci Rep. ¶¶ 32-33.) In 2023, Tesla began rolling out Hardware Version 4.0 (HW4), which further upgraded the computer and offered cameras wider fields of vision to partially remedy blind spot issues. (*Id.*) Musk later stated on a 2024 earnings call that a hardware upgrade may be necessary for customers who purchased FSD with prior hardware configurations:

> I mean, I think the honest answer is that we're going to have to upgrade people's hardware 3 computer for those that have bought full self driving. And that is the honest answer. And that's going to be painful and difficult, but we'll get it done. Now I'm kind of glad that not that many people bought the FSD package.

(Dkt. No. 138-12 at 6-7.)

***Cross-Country Statement.*** At a press conference in October 2016, Musk also stated:

> I feel pretty good about this goal is that we will be able to demonstrate a [demonstration] drive of our full autonomy all the way from LA to New York. So basically from home in LA to let's say dropping you off in Times Square, NY and then having the car parking itself by the end of next year without the need for a single touch including the charger.

(Dkt. No. 138-13 at 7.) Musk posted versions of this claim on his personal Twitter account three times. In January 2016, Musk tweeted that "in 2 years, summon should work anywhere connected by land & not blocked by borders, eg you're in LA and the car is in NY." (Goldhaber Rep. ¶ 39.) On May 21, 2017, in response to a question asking for an "[u]pdate on the coast to coast autopilot demo," Musk stated that the demo was "[s]till on for end of year. Just software

limited.  Any Tesla car with HW2 (all cars built since Oct last year) will be able to do this."
(Dkt. No. 138-25 at 2.)  When he was asked again in May 9, 2019 whether there were "still plans
to drive from NYC to LA on full autopilot," Musk posted that "[w]e could have gamed an
LA/NY Autopilot journey last year, but when we do it this year, everyone with Tesla Full Self-
Driving will be able to do it too[.]"  (Dkt. No. 138-26 at 2.)  While Musk's Twitter account has
over 200 million followers, the 2019 Tweet generated around 2,000 engagements, and the 2017
Tweet generated around 300 engagements.  Plaintiff does not identify any evidence about the
number of engagements applicable to the 2016 Tweet.

Around October 2016, Tesla began displaying a video that showed a Tesla driving
autonomously, which remains on the Tesla site today.  (Goldhaber Rep. ¶ 35; Dkt. No. 138-30.)
Tesla has also posted content on YouTube to the same effect, including a September 10, 2024
video that showed a Tesla vehicle driving itself through challenging conditions without the
driver having to touch the wheel.  *Id.*

Tesla does not dispute that it has not yet provided the cross-country capability that Musk
touted in his statements.  In its promotional materials, Tesla suggests FSD could not be obtained
until completion of validation and regulatory approval.  (Goldhaber Rep. ¶¶ 40-42.)  However,
Plaintiff presents evidence that Tesla has not applied for regulatory approval to deploy a Society
of Automotive Engineers ("SAE") Level 3 or higher vehicle in California, which is a necessary
step for approval of a full self-driving vehicle.  (Dkt. No. 137-13 at 4; *see also* Socci Rep ¶¶ 21-
28.)

### B.      The Proposed Class Representative

In early 2017, Plaintiff Thomas J. LoSavio paid Tesla $5,000 for EAP and $3,000 for the
FSD packages for his new Tesla Model S car.  (Dkt. No. 138-27 at 2.)  LoSavio alleges he
purchased these packages because he was misled by the Hardware Statement and Cross-Country
Statements.  (Dkt. No. 138-3 ¶¶ 1-7.)  Specifically, LoSavio alleges that he saw the Hardware
Statement on Tesla's website in October 2016 and in a Tesla newsletter sent in November 2016.
(Dkt. No. 102 ("TAC") ¶¶ 159-60.)  He also alleges that he read statements that a Tesla would

soon drive itself across the country, leading him to assume that the self-driving software would be available to him in the next year or two.  (TAC ¶ 18.)

LoSavio alleges that he discovered Tesla's alleged fraud in April 2022.  (TAC ¶¶ 174-75.)

### C.    Procedural Background

Briggs A. Matsko, Thomas J. Losavio, Brenda T. Broussard, Dominick Battiato, and Christopher Mallow brought separate lawsuits against Tesla in September 2022, alleging that Tesla violated the federal Magnuson-Moss Warranty Act, breached express and implied warranties, violated various California consumer protection statutes, and engaged in fraud, negligence, and negligent misrepresentation.  (Dkt. Nos. 1, 6, 22.)  The Court consolidated the cases and Plaintiffs filed a Consolidated Amended Complaint the following month.  (Dkt. Nos. 22, 23.)  On November 28, 2022, Tesla moved to dismiss the Consolidated Amended Complaint.  (Dkt. No. 30.)  The Court granted the motion with leave to amend and compelled arbitration as to one group of plaintiffs.  (Dkt. No. 57.)  Following the filing of the Second Amended Complaint, Tesla renewed its motion to dismiss.  (Dkt. No. 71.)  On May 15, 2024, the Court granted in part and denied in part the motion.  (Dkt. No. 96.)  The Court dismissed all warranty claims but permitted Plaintiff's fraud-based, negligence-based, and related statutory claims to proceed to the extent they are premised on the Hardware Statement or the Cross-Country Statement.  The Court also granted leave to amend to address Tesla's challenge to Plaintiff's standing to seek injunctive relief.  Plaintiff filed the operative Consolidated Third Amended Complaint ("TAC") on June 5, 2024. (Dkt. No. 102.)

## II.    LEGAL STANDARD

Class certification under Rule 23 is a two-step process.  First, Plaintiff must demonstrate that the four requirements of 23(a) are met: "numerosity," "commonality," "typicality," and "adequacy."  "One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or

defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. Pro. 23(a). Class certification is proper only if the trial court has concluded, after a "rigorous analysis," that Rule 23(a) has been satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).

Second, a plaintiff must also establish that one of the bases for certification in Rule 23(b) is met. Here, Plaintiff invokes both 23(b)(3) and 23(b)(2). Rule 23(b)(3) requires plaintiffs to prove the elements of predominance and superiority, such that "questions of law or fact common to class members predominate over any questions affecting only individual members, and [] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Pro. 23(b)(3). Rule 23(b)(2) requires the Court to find that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

The party seeking class certification bears the burden of demonstrating by a preponderance of the evidence that all four requirements of Rules 23(a) and at least one of the three requirements under Rule 23(b) are met. *See Dukes*, 564 U.S. at 350 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").

## III.  DISCUSSION

### A.  Rule 23(a) and 23(b)(3)

For the reasons discussed in the sections below, the Court certifies the following two 23(b)(3) classes:

> **California Arbitration Opt-Out Class:** All persons who purchased or leased from Tesla, Inc. (or any entity it directly or indirectly owns or controls, including but not limited to Tesla Lease Trust and Tesla Finance LLC) a Tesla vehicle and paid a separate amount, either through purchase or subscription, for the Full Self-

Driving technology package at any time from May 19, 2017, to July 31, 2024, and who either purchased or leased that vehicle in California or who currently reside in California, who opted out of Tesla's arbitration agreement.

**California Pre-Arbitration Class:** All persons who purchased or leased from Tesla, Inc. (or any entity it directly or indirectly owns or controls, including but not limited to Tesla Lease Trust and Tesla Finance LLC) a Tesla vehicle and paid a separate amount, either through purchase or subscription, for the Full Self-Driving technology package at any time from October 20, 2016, through May 19, 2017 ("Pre-Arbitration Period"), and who either purchased or leased that vehicle in California or who currently reside in California.

These classes differ from the classes proposed by Plaintiff in a few ways, for reasons further detailed below. Both classes do not include purchasers or subscribers of EAP. The California Arbitration Opt-Out class has been narrowed to end on July 31, 2024, instead of the present day, based on the removal of a key statement from the Tesla website in August 2024. The California Pre-Arbitration class has also been narrowed to start from October 20, 2016, which is the date on which the Autopilot page on Tesla's website was created according to the Wayback Machine link submitted in evidence, instead of January 1, 2016. (Dkt. No. 102 at 108-09.)

### 1. Numerosity

As a preliminary matter, Tesla does not contest that 23(a) numerosity is met. In the Ninth Circuit, courts routinely hold that numerosity is satisfied when the class contains 40 members. *See In re Cooper Cos. Sec. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009). Here, Tesla's data demonstrates that there are at least 3,595 people who purchased or subscribed to FSD packages from November 2016 to May 2017 who are not subject to arbitration and at least 212 FSD purchasers or subscribers from June 2017 to July 2024 who opted out of arbitration. (Dkt. No. 137-11 ("Stockton Rep") at 113-16.)

### 2. Predominance Under Rule 23(b) and Commonality Under Rule 23(a)

Plaintiff has met his burden of establishing both commonality and predominance. In seeking to certify a Rule 23(b)(3) class, plaintiffs must show that common questions

"predominate over any questions affecting only individual members." This requirement presupposes satisfaction of the commonality requirement of Rule 23(a)(2), which itself tests "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1052 (9th Cir. 2015) (citation omitted). But the predominance inquiry goes further and "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

In determining whether common issues predominate, a district court must identify the substantive issues related to the plaintiffs' claims—both the causes of action and affirmative defenses—and then consider the proof necessary to establish each element of the claim or defense. *See* Schwarzer et al., Cal. Prac. Guide Fed. Civ. Pro. Before Trial Ch. 10-C § 10:412. The court must also evaluate "the method or methods by which plaintiffs propose to use the [class-wide] evidence to prove the common question in one stroke." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666 (9th Cir. 2022) (internal quotation marks omitted).

For the purposes of class certification, Plaintiff's CLRA, UCL, and FAL claims are "materially indistinguishable" and thus can be analyzed together. *Forcellati v. Hyland's, Inc.*, No. CV 12-1983-GHK, 2014 WL 1410264, at *9 (C.D. Cal. Apr. 9, 2014). Claims under the CLRA, UCL and FAL are governed by an objective, "reasonable consumer" test. *See Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). "Each statute allows Plaintiffs to establish the required elements of reliance, causation, and damages by proving that Defendants made what a reasonable person would consider a material misrepresentation." *Broomfield v. Craft Brew All., Inc.*, No. 17-CV-01027-BLF, 2018 WL 4952519, at *10 (N.D. Cal. Sept. 25, 2018). The plaintiff must also prove that the "defendant engaged in uniform conduct likely to mislead the entire class." *Davis-Miller v. Automobile Club of Southern California*, 201 Cal. App. 4th 106, 122 (Ct. App. 2011).

Plaintiff's common law fraud, negligence, and negligent misrepresentations claims turn

on the falsity of Tesla's statements and Tesla's knowledge of falsity or assertion of a falsehood without reasonable grounds. *Small v. Fritz Cos., Inc.*, 30 Cal. 4th 167, 173-74 (2003). As with the statutory claims, reliance may be inferred for the California common law claims when the facts show that material misrepresentations were made to the entire class. *Vasquez v. Superior Court*, 4 Cal. 3d 800, 814 (1971) (common law fraud); *Collins v. Rocha*, 7 Cal. 3d 232, 237 (1972) (negligent misrepresentation). Each of these elements will be addressed in turn.

### a.    Class-Wide Exposure

Tesla contends that Plaintiff has failed his burden to show that the common issue of whether class members were exposed to the Hardware or Cross-Country Statements predominates over individualized questions. A showing of common exposure can be made, for instance, in labeling cases, where every purchaser is exposed to the product label. *See, e.g.*, *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1020 (9th Cir. 2024). It can also be made when there is a sufficiently "massive advertising campaign" that leaves "little doubt that almost every class member had been exposed to defendants' misleading statements." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012), *overruled on other grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (citing *In re Tobacco II Cases*, 46 Cal. 4th 298, 324-27 (2009)). Plaintiff has shown by a preponderance of the evidence that class members were exposed to the Hardware Statement from October 2016 to August 2024, but fails to do so as to the Cross-Country Statement.

The evidence shows that the Hardware Statement was (1) on the "Autopilot" subpage of Tesla's website from October 2016 until August 2024; (2) on various other subpages of Tesla's website, including the "Model X" and "Model S" pages, at certain points throughout that period; (3) disseminated by Musk at a high-profile conference in 2016; (4) stated in a Tesla blog post published in October 2016; (5) stated in a Tesla quarterly earnings call in May 2017; and (6) sent via newsletter to prospective and current Tesla vehicle owners in 2016. While these channels alone may not ordinarily be enough to establish class-wide exposure for a traditional car manufacturer, Tesla's distinctive advertising strategy warrants a departure from the typical

approach.

It is undisputed that Tesla does not engage in traditional mass advertising or employ independent dealerships to sell its vehicles; instead, it sells directly to consumers through its website (tesla.com) and Tesla-owned and operated sales centers. (Goldhaber Rep. ¶ 9.) Consumers are therefore highly likely to visit the website when considering the purchase of an expensive package such as EAP or FSD. (*See* Dkt. No. 138-3 ¶ 6 (LoSavio stating that he spent "considerable time exploring the Tesla website" before making the purchase).) Indeed, the undisputed evidence indicates that the Autopilot page is the principal source of detailed marketing information from Tesla, and typically the only written source of such information, describing the supported features and how they work. Additionally, consumers can order those packages directly through the site. Although there is no specific requirement forcing them through the Autopilot page to complete their purchase, that is where the key information about the FSD features is located. In that environment, it is reasonable to infer that almost all consumers spending thousands of dollars on the packages would review Tesla's description to make that decision.

Moreover, because Tesla itself serves as the primary source of product information, it is reasonable to infer that the few alternative sources available to consumers—*i.e.*, YouTube videos demonstrating self-driving capability, word-of-mouth, news articles—reinforce Tesla's core message that full-self driving capability is on the horizon, even if they do not specifically contain the Hardware Statement. *See In re Tobacco II Cases*, 46 Cal. 4th 298, 327-28 (2009) (plaintiffs need not plead reliance on particular advertisements and statements so long as they were exposed to the core allegedly fraudulent message). This is corroborated by Dr. Gerald Goldhaber, who opines that the Hardware Statement was "communicated consistently, uniformly and [in a] widespread [manner] using all of the available channels of communication in Tesla's 'information environment.'"[2] (Goldhaber Rep. ¶ 13.)

---

[2] However, where the Hardware Statement did not appear on the Tesla site, the remaining channels of communication are insufficient to support an inference of class-wide exposure for

The cases Tesla cites are distinguishable.  For example, in *In re MyFord Touch Consumer Litigation*, the plaintiffs did not allege how long the challenged representations appeared on Ford's website or show that website was a primary channel through which consumers sought product information, precluding a finding of class-wide exposure.  No. 13-cv-03072-EMC, 2016 WL 7734558, at *21 (N.D. Cal. Sept. 14, 2016).  Similarly, in *Mazza*, the Ninth Circuit explained that though the alleged misrepresentations about the vehicle's braking system appeared in brochures, months-long television commercials, and certain dealership or owner-facing materials, those efforts were of relatively short duration and failed to reach a substantial portion of the putative class.  666 F.3d at 586-87, 596 (9th Cir. 2012).  The representations at issue in this case are more akin to those in the product labeling cases.  In those cases, though some consumers may not read the packaging when opening an item, courts have inferred class-wide exposure based on the "inherently high likelihood" that consumers would have relied upon those representations when encountering them in the course of purchasing the product. *See Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 895 (N.D. Cal. 2015).  A similar analysis applies to Tesla's representations here.

Nor does the Lee declaration, which shows monthly Tesla website traffic data from January 2017 to March 2025 in a table, counsel a different result.  (Dkt. No. 146-13 at 1-4.)  As a preliminary matter, Plaintiff's motion to strike the Lee declaration is denied.  Lee has sufficiently authenticated and established personal knowledge of the data by testifying that she retrieved the data from Google Analytics and created the table.  (Dkt. No. 151-2 at 17-18.)  While it appears that the data in the table excludes incognito users and those using ad blockers, and is missing data for several months at a time, that is an issue that goes to the weight of the evidence, not admissibility.

Using the table, Tesla contends that traffic to the tesla.com/autopilot subpage and the October 2016 blog post was only a "sliver" of the Tesla website's total traffic, and therefore

---

the same reasons discussed below regarding the Cross-Country Statement.  Thus, the class has been limited to the duration for which the Hardware Statement was present on the website.

cannot support a conclusion of class-wide exposure to the Hardware Statement. For example, in December 2019, the table showed that while over 11 million people visited the Tesla site, only around 14,000 people visited tesla.com/autopilot and 1,000 visited the blog post. (Dkt. No. 146-14 at 2.) But this information has little bearing on the key issue of the proportion of FSD purchasers who viewed those pages, as it is reasonable to assume that many people visit the Tesla website for reasons other than to purchase FSD. Moreover, the table does not include the number of monthly visits to the Model X and Model S subpages, which also contained the Hardware Statement at certain points throughout the relevant time period, and is missing large portions of data (*i.e.*, from January to November 2017 for tesla.com/autopilot). Indeed, the view counts are consistent with a finding of class-wide exposure, as it appears thousands of people on average—which does not include those using ad blockers—viewed the Autopilot page and blog post each month throughout the class period. Tesla has therefore failed to rebut Plaintiff's showing of class-wide exposure as to the Hardware Statement.

However, Plaintiff has not sufficiently demonstrated class-wide exposure to the Cross-Country statement. The evidence shows that Musk only made this statement four times, the first at an October 2016 news conference. Musk also tweeted versions of the statement in 2016, and then in 2017 and 2019, both times in response to a user inquiring about progress on the cross-country demo Musk had promised. Despite Musk's 200-million-plus follower count on Twitter, the 2019 Tweet generated 2,300 engagements, and the 2017 Tweet only generated around 300 engagements. And while Dr. Goldhaber also opines that the Cross-Country Statement was widespread throughout Tesla's "information environment," he does so conclusorily without reference to the number of actual views or impressions of these tweets, resulting news coverage, or any other exposure consumers may have had to the statement. The sporadic publication of statements by a prominent individual through social media, without evidence of their actual reach, cannot by itself establish that Tesla's use of the Cross-Country statement was sufficiently "pervasive" that almost every class member can be reasonably inferred to have seen it. *See Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 729 (9th Cir. 2012).

Perhaps most critically, there is no evidence that the Cross-Country statement was located prominently on website throughout the class period such that a prospective customer would encounter it while researching or purchasing the FSD.  Indeed, there's no evidence the statement was on the website at all.  Plaintiff points to a video on Tesla's website purporting to show a Tesla vehicle driving autonomously, with a voice-over that states "[t]he person in the driver's seat is only there for legal reasons.  He is not driving anything.  The car is driving itself." (Goldhaber Rep. ¶ 2.)  But the representation in the video is not itself a version of the Cross-Country Statement, which requires a representation that a Tesla vehicle would be able to drive itself across the country within the following year, and does not provide a sufficient basis to infer that putative class members would have encountered the Cross-Country Statement in other contexts.[3]

### b.    Materiality

Plaintiff has sufficiently established that the Hardware Statement would be material to an FSD purchaser.  "Materiality is an objective standard," *Badella v. Deniro Mktg. LLC*, No. C 10–03908 CRB, 2011 WL 5358400, at *9 (N.D. Cal. Nov. 4, 2011), as a misrepresentation is "material" if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question[.]"  *Tobacco II*, 46 Cal. 4th at 327. Plaintiff's expert Dr. Goldhaber explained that Tesla's representations were "material or important to the reasonable, ordinary consumer making the decision whether to purchase" EAP or FSD due to the objective credibility of the speakers (*i.e.* Tesla itself and Musk, Tesla's CEO and an industry leader), existence of multiple channels conveying a consistent message, centrality of statement to the product's core qualities, and clear nature of the promise. (Goldhaber Rep. ¶¶ 15-19.)  Dr. Goldhaber also opined that a consumer would not have spent

---

[3] Nor can the video itself serve as a separate misrepresentation as to which a class could be certified.  Plaintiff's claim based on the video itself was previously dismissed.  (Dkt. No. 96 at 4.)  The description of the video itself was not alleged to be false (since the car was in fact driving itself, though its performance was allegedly poor) and the video did not promise fully autonomous self-driving on a particular timeline.  (*Id.*; *see also* TAC ¶ 3.)  Plaintiff has not moved for leave to amend those allegations after discovery.

thousands of dollars to purchase Tesla's FSD packages had they known that their vehicle was not capable of full self-driving, but instead "require[d] repeated intervention from a Tesla engineer [] in the back seat in order to prevent accidents." (Goldhaber Rep. ¶ 43.) While Dr. Goldhaber has not yet conducted a consumer survey to support his conclusion, an extensive consumer survey is "not required" at this stage of the case if the expert's "testimony is otherwise reliable." *Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 401 (N.D. Cal. 2021). Here, Dr. Goldhaber's forty-seven years of marketing experience, extensive scholarship in the field of organizational communications, and thorough review of the materials at issue provide a reliable and persuasive foundation for his opinions on materiality. (Goldhaber Rep. ¶¶ 1-3, 5, 6.)

Tesla contends that some class members were subject to "explicit signs or explicit verbal advice [that] would negate the claimed representation." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1070 (9th Cir. 2014), *abrogated in part on other grounds by Microsoft Corp. v. Baker*, 582 U.S. 23 (2017). Specifically, Tesla points to its disclosure on the Tesla website that FSD functionality was subject to "validation and regulatory approval," as well as other "manuals, contracts and [] documents [that] made it crystal clear that the technology was for 'driver assistance' and NOT to replace the driver." (Dkt. No. 102 at 112; Dkt. No. 146-8 at 2.) However, the first representation does not "negate" the Hardware Statement because a consumer can simultaneously believe that his car has the hardware necessary to enable full self-driving and that such functionality would only be released to him after regulatory approval. The "manuals, contracts and [] documents," moreover, refer to a Tesla vehicle's current capabilities, not the full self-driving capability touted by Tesla and Musk as being possible using the existing hardware. Therefore, these disclosures do not constitute "disparate" signals that would complicate the materiality analysis. *Mazza*, 666 F.3d at 596. Nor does the testimony of a handful of customers perceiving the Hardware Statement to be "mere puffery" undermine the common evidence demonstrating materiality, as the question is an objective one. (Dkt. No. 146 at 21.)

However, Dr. Goldhaber has not shown that class members who only bought or subscribed to EAP found the Hardware Statement to be material to that decision. Dr. Goldhaber

does not explain why purchasers of EAP, which is not marketed to provide full self-driving capability, would be swayed by the Hardware Statement. Instead, Dr. Goldhaber lumps consideration of materiality as to EAP together with materiality as to FSD. However, unlike with FSD, the representations in the Hardware Statement do not appear to be central to EAP's core product qualities, which encompass only discrete features like Autopark and Dumb Summon that do not require full self-driving functionality. Therefore, the certified class excludes individuals who only purchased or subscribed to EAP.

Because Plaintiff fails to show common exposure as to the Cross-Country statement, the Court does not reach the issue of materiality as to that statement.

### c.    Falsity

Plaintiffs have also adequately shown that the issue of whether Tesla vehicles were equipped with hardware sufficient for Full Self-Driving capability is subject to common proof. Tesla contends that class members have different vehicle hardware packages (*e.g.*, Hardware 3 versus Hardware 4), each of which contain different sensors and processing capabilities. This, Tesla argues, would necessitate individualized proof of the falsity as to the each of the configurations. But Plaintiff's expert Vince Socci identified several avenues of common proof. At his deposition—and after reviewing the sensor and compute configurations for Tesla vehicles throughout the class period—Socci testified that "[t]he [in]ability for the sensors to perform in bad weather" is a limitation that would be common across the different hardware versions. (Dkt. No. 148-8 at 11; *see also* Socci Rep. ¶ 3 ("Admitted limitations in Tesla's FSD technologies, *e.g.*, . . . sensor limits in harsh weather conditions . . . [and] limitations in FSD operation in challenging and unexpected driving environments are all common features and rest on the same proof across the population of Class vehicles.").) The common question of whether the cars lacked the combination of sensors, such as lidar and other non-vision based sensors, needed to achieve high level autonomy therefore predominates over any individualized issues. Moreover, that Tesla has been unable to demonstrate a long-distance autonomous drive with any of its vehicles or obtain the required certifications to do driverless testing in California further supports

the lack of full self-driving capability across the class.  (Socci Rep. ¶¶ 24, 27-28.)  Tesla has

neither contested the admissibility of Socci's commonality opinions nor submitted expert

rebuttal of those opinions.

### d.    Damages

To satisfy Rule 23(b)(3)'s predominance requirement, plaintiffs must also offer a "model

purporting to serve as evidence of damages" that "measure[s] only those damages attributable to

[their] theory" of liability.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).  A plaintiff must

present "a likely method for determining class damages, though it is not necessary to show that

his method will work with certainty at this time."  *Chavez v. Blue Sky Natural Beverage Co.*, 268

F.R.D. 365, 379 (N.D. Cal. 2010) (internal quotation marks omitted)  "[C]lass action plaintiffs

may rely on an unexecuted damages model to demonstrate that damages are susceptible to

common proof so long as the district court finds, by a preponderance of the evidence, that the

model will be able to reliably calculate damages in a manner common to the class at trial."

*Nutramax*, 99 F.4th at 570.

Plaintiff argues, and the Court agrees, that damages can be established through common

proof.  Under California law, the proper measure of restitution is "[t]he difference between what

the plaintiff paid and the value of what the plaintiff received."  *In re Vioxx Class Cases*, 180 Cal.

App. 4th 116 (2009).[4]  Here, Plaintiff's theory is that because Tesla has delivered no assisted or

self-driving features that could be "plausibly marketed as safe, reliable self-driving features," and

therefore delivered no value, the appropriate measure of damages would simply require

refunding class members the amounts paid for their purchases or subscriptions to FSD.

(Stockton Rep. ¶ 30.)  Though Tesla disputes that determination, that issue is subject to common

---

[4] Plaintiff also argues that a full refund is required if class members would not have spent any
money absent Tesla's misrepresentations.  While that is the rule in FTC Act cases, *see FTC v.
Figgie Int'l, Inc.*, 994 F.2d 595 (9th Cir.1993), and has been applied by a handful of district
courts under California consumer statutes, the majority opinion among the district courts favors
accounting for the value provided by what was received.  However, this order does not reach that
issue, as commonality and predominance are satisfied even without applying the full refund
theory.

proof. The question whether Tesla vehicles possessed the hardware necessary to deliver *any* safe and reliable self-driving features (*i.e.*, Autopark, Summon etc.) is subject to the common inquiry of whether the vehicle's sensors were adequate, as discussed above. (*See* Dkt. No. 148-8 at 11.)

   **e.**  **Statute of Limitations**

   Tesla contends that because thousands of putative class members' claims would be subject to the statute of limitations, it is necessary to conduct individualized inquiries to determine whether tolling is appropriate as to each class member. But "[t]he possibility of individual questions regarding statute of limitations is not fatal to class certification when there is a sufficient nucleus of common questions." *Pace v. Quintanilla*, 308 F.R.D. 644, 648 (C.D. Cal. 2015) (listing cases). "This is particularly so when the issues surrounding the statute of limitations defense are susceptible to common proof." *Id.* (citing *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002) (finding that common questions predominated over individualized questions where plaintiffs' theory of tolling was focused on defendants' concealment of information, not on the putative class members' actions)). Indeed, "[c]ourts have been nearly unanimous . . . in holding that possible differences in the application of a statute of limitations to individual class members, including the named plaintiffs, does not preclude certification of a class action so long as the necessary commonality and, in a 23(b)(3) class action, predominance, are otherwise present." *Schramm v. JPMorgan Chase Bank, N.A.*, No. LA CV09-09442 JAK, 2011 WL 5034663, at *10 (C.D. Cal. Oct. 19, 2011).

   Both theories of tolling that remain in the case—the delayed discovery rule and equitable estoppel—turn primarily on the objective inquiry of whether Tesla's misrepresentations to the class stopped a consumer from discovering the cause of action or pursuing a lawsuit. *See Huseman v. Icicle Seafoods, Inc.*, 471 F.3d 1116, 1121 (9th Cir. 2006) ("Equitable estoppel, sometimes called fraudulent concealment, 'focuses primarily on the actions taken by the defendant in preventing a plaintiff from filing suit . . . [including] the plaintiff's actual and reasonable reliance on the defendant's conduct or representations.'"); *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005) (explaining that under the delayed discovery rule,

accrual is delayed "until the plaintiff has, or should have, inquiry notice of the cause of action"). These questions, like the statutory and common-law claims analyzed above, are well-suited for resolution on a class-wide basis, particularly where Plaintiff can show that the alleged misrepresentations were made to the class as a whole. For example, throughout both class periods, the same Tesla Autopilot webpage that contained the Hardware Statement also contained some version of the statement that "Self-Driving functionality is dependent upon extensive software validation and regulatory approval, which may vary widely by jurisdiction." (Dkt. No. 12 at 112.) It is thus a matter of common proof whether that statement lulled consumers into believing that the delay in full self-driving was caused by regulatory rather than technical reasons, when in fact those features had never been submitted for regulatory approval. (Dkt. No. 137-13.)

Moreover, to the extent any individualized factual inquiries remain as to certain class members' statute of limitations defense, they may be handled in a manner similar to that used when individualized damages inquiries arise in class action proceedings. *See Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1168 (9th Cir. 2014) (affirming certification of a class where "the district court was careful to preserve [the defendant's] opportunity to raise any individualized defense it might have at the damages phase of the proceedings"); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002) (holding that individualized claims and defenses on statute of limitations issue can be adjudicated in a separate determinations of damages and affirming certification of 23(b)(3) class).

### 3.    Adequacy and Typicality

The only basis on which Tesla challenges LoSavio's Rule 23(a) typicality and adequacy is that he is subject to a statute of limitations defense. Typicality ensures that "the interest of the named representatives align with the interests of the class." *Wolin v. Jaguar Land Rover N. Am. LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of

conduct.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "The adequacy of representation requirement . . . requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000).

Here, most other class members will also be subject to the same statute of limitations issues LoSavio faces. *See Corcoran v. CVS Health*, No. 15-CV-03504-YGR, 2019 WL 6250972, at *5 (N.D. Cal. Nov. 22, 2019) (finding class typical where other class members are also "very likely to be subjected to the same statute of limitations defense"). Tesla further argues that LoSavio is atypical because his "idiosyncratic diligence" is what will uniquely enable him to potentially overcome the statute of limitations. But as discussed above, the primary question in the tolling inquiry here is the extent to which consumers reasonably relied on Tesla's misrepresentations that the technology was software-limited or that full self-driving features would be coming. (*See* Dkt. No. 96 at 5-6.) This question is subject to resolution on a class-wide basis.

LoSavio has further demonstrated both the adequacy of his status as Lead Plaintiff and the adequacy of Lead Counsel. LoSavio has attested that he will continue to actively oversee the litigation and collaborate with class counsel to protect the interests of absent class members. (Dkt. No. 138-3 ¶¶ 13-15.) Moreover, LoSavio has retained experienced class action attorneys from Cotchett, Pitre & McCarthy LLP, Casey Gerry Francavilla Blatt LLP, and Bottini & Bottini, Inc., who have litigated numerous complex class actions in California.

### 4. Superiority

Tesla does not dispute, and the Court finds, that superiority is established. "[C]ertification pursuant to Rule 23(b)(3) . . . is appropriate 'whenever the actual interests of the parties can be served best by settling their differences in a single action.'" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998). Here, no class member would have significant interest in pursuing individual litigation given the relatively low amount of individual losses and

high expected cost of litigation. Moreover, economies of scale make it desirable to concentrate these claims in one forum, and this case is manageable as a class action.

### B.    Rule 23(b)(2) Class

For the reasons discussed below, the Court certifies the following 23(b)(2) class:

> All members of the California Arbitration Opt-Out Class and California Pre-Arbitration Class, as defined above, who have stated that they would like to purchase or subscribe to FSD in the future but cannot rely on the product's future advertising or labelling.

This class definition is narrower than Plaintiff's proposed definition, which would include people who have no intention of purchasing or subscribing to FSD in the future.

An injunctive class can be certified under Rule 23(b)(2) where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Unlike Rule 23(b)(3), a plaintiff does not need to show predominance of common issues or superiority of class adjudication to certify a Rule 23(b)(2) class. Rather, Rule 23(b)(2) "[o]rdinarily will be satisfied when plaintiffs have described the general contours of an injunction that would provide relief to the whole class, that is more specific than a bare injunction to follow the law, and that can be given greater substance and specificity at an appropriate stage in the litigation through fact-finding, negotiations, and expert testimony." *Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014).

As a preliminary matter, Plaintiff has shown that he has standing to seek injunctive relief. "To have standing to obtain injunctive relief, a plaintiff must allege that a 'real or immediate threat' exists that he will be wronged again." *Rahman v. Mott's LLP*, No. CV 13–3482 SI, 2014 WL 325241 at *10 (N.D. Cal. Jan. 29, 2014) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). Specifically, a plaintiff may allege that he (1) cannot "rely on the product's advertising or labeling in the future, and so will not purchase the product although [he] would like to" or (2) might purchase the product again, "as [he] may reasonably, but incorrectly, assume the product was improved." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969-70

20

(9th Cir. 2018). Here, LoSavio pleads that he "feels he is unable to rely on Tesla's and Musk's statements about its vehicles and technology and, therefore, is unable to evaluate Tesla's cars and technology against competing manufacturers' products." (TAC ¶ 177.) But if he "could regain trust" in Tesla's statements, "he would of course be interested in purchasing that car and that technology[.]" (*Id.*)

Nonetheless, the injunction must be narrowed to those class members who, like LoSavio, would consider buying FSD again because the injunction would not otherwise provide relief "to the whole class." Members of the proposed class who have no intention of ever purchasing or subscribing to FSD in the future would obtain no benefit if Tesla were prevented from making the Hardware Statement, yet would be bound by a judgment on that claim. *See Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 559 (C.D. Cal. 2012) (denying certification where "the class includes former owners of class vehicles who will not benefit from declaratory or injunctive relief"); *see also Dukes*, 564 U.S. at 365 (reversing certification where about "half the members of the class approved by the Ninth Circuit ha[d] no claim for injunctive or declaratory relief at all"). Tesla objects to the narrowed class definition only on ascertainability grounds: that is, that class membership would depend on upon class members' "[subjective] state of mind" of whether they would consider purchasing or subscribing to FSD and whether they can rely on Tesla's representations about the product. *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 528-29 (N.D. Cal. 2012). The Court, however, finds persuasive the view adopted by the majority of district courts in the Ninth Circuit, and the appellate opinions in several other circuits, holding that ascertainability is not a requirement for certifying a Rule 23(b)(2) class. *See e.g.*, *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 597 (N.D. Cal. 2015); *Shelton v. Bledsoe*, 775 F.3d 554, 563 (3d Cir. 2015).

Tesla next argues that certification of a 23(b)(2) class is barred where, as here, Plaintiff primarily seeks monetary relief. *See Diacakis v. Comcast Corp.*, No. C 11–3002 SBA, 2013 WL 1878921, at *9 (N.D. Cal. May 3, 2013). But the fact that Plaintiff also seeks to certify a damages class does not preclude certification of an injunction class. *See In re ConAgra Foods,*

*Inc.*, 90 F. Supp. 3d 919, 977 (C.D. Cal. 2015) ("[T]he court can separately certify an injunctive relief class and, if appropriate, also certify a Rule 23(b)(3) damages class"). Moreover, in the consumer protection context, "injunctive relief against future harm is [no] less important than monetary relief for past harm," such that it cannot be said that Plaintiff's claim for injunctive relief is merely incidental. *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 698 (N.D. Cal. 2021); *see also Tobacco II*, 46 Cal. 4th at 319 ("[A] primary form of relief available under the UCL to protect consumers from unfair business practices is an injunction[.]").

Lastly, while Plaintiff does not specifically describe the injunctive relief sought in the Complaint, he has at least provided "the general contours of an injunction" that can be "given greater substance" at a later stage in the case. *Parsons*, 754 F.3d at 689 n.35. Namely, Plaintiff seeks to stop Tesla from continuing to state that its vehicles have the hardware capable of full self-driving until the vehicles are actually able to do so.[5] That is more than just a "bare injunction to follow the law." *Id.*

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion for Class Certification subject to the modified class definitions set forth above. The Court appoints Plaintiff Thomas LoSavio as the representative of the certified classes. The Court appoints Cotchett Pitre & McCarthy LLP, Casey Gerry Francavilla Blatt LLP, and Bottini & Bottini, Inc. as class counsel. Within 14 days of the date of this Order, Plaintiff shall file an amended complaint that amends the class definition to comport with the Court's certified class definitions. Plaintiff may not

---

[5] Tesla also mentions in passing that Plaintiff has not shown that Tesla continues to make the Hardware Statement today. But that does not render injunctive relief moot. For mootness to apply based on the voluntary cessation of the complained of unlawful behavior, the party must prove that subsequent events make it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000). "Such a burden will typically be met only by changes that are permanent in nature and that foreclose a reasonable chance of recurrence of the challenged conduct." *Tandy v. City of Wichita*, 380 F.3d 1277, 1291 (10th Cir. 2004); *see also Rosebrock v. Mathis*, 745 F.3d 963, 972 (9th Cir. 2014). Here, Tesla has not met its burden of showing that it has foreclosed the possibility that Tesla or Musk will make the Hardware Statement in the future.

make any other substantive changes to the complaint without court approval.  The case management conference is reset for **September 24, 2025, at 10:00 a.m.**  The parties shall file a joint case management statement by **September 17, 2025.**

      **IT IS SO ORDERED.**

Dated: August 18, 2025

RITA F. LIN
United States District Judge